Don Springmeyer (Nevada Bar No. 1021)
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Tel.: (702) 385-6000
Fax: (702) 385-6001
Email:  dspringmeyer@kempjones.com

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Kajan Johnson and Clarence Dollaway, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Zuffa, LLC (d/b/a Ultimate Fighting Championship and UFC) and Endeavor Group Holdings, Inc.,<br><br>Defendants. | Case No.:<br><br>**ANTITRUST CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

I.      NATURE OF ACTION AND SUMMARY ................................................................1

II.     JURISDICTION AND VENUE .............................................................................8

III.    DEFINITIONS.................................................................................................9

IV.     PARTIES .....................................................................................................10

V.      CLASS ACTION ALLEGATIONS .....................................................................12

VI.     THE UFC'S MONOPOLY AND MONOPSONY POWER....................................14

        A.      The UFC's Monopoly Power in the Relevant Output Market ...........................14

                1.      The Relevant Output Market................................................................14

                2.      The Relevant Geographic Market .......................................................16

                3.      The UFC's Monopoly Power with Respect to Promoting Live Professional
                        MMA Bouts. ..................................................................................17

        B.      The UFC has Monopsony Power in the Relevant Input Market .......................19

                1.      The Relevant Input Market................................................................19

                2.      The Relevant Geographic Market .......................................................21

                3.      The UFC has Monopsony Power with Respect to Professional MMA
                        Fighter Services. ...........................................................................22

        C.      Overview of the MMA Industry and the UFC's Dominance...............................24

        D.      The UFC's Complete Control of Its Sport Is Unique in the Context of Big-Time
                Professional Sports...............................................................................25

        E.      The Growth of MMA in the United States .................................................25

VII.    THE UFC'S ANTICOMPETITIVE SCHEME AND ITS RESULTING ANTITRUST
        INJURIES TO PLAINTIFFS AND MEMBERS OF THE CLASS ............................26

        A.      The UFC's Anticompetitive Scheme to Acquire, Maintain, and Enhance
                Monopsony Power .................................................................................26

                1.      The UFC Has Leveraged Its Monopoly and Monopsony Power to Deny
                        Necessary Inputs to Would-Be Rival MMA Promoters.........................26

                2.      After Impairing Actual or Potential Rival Promoters in the Relevant Output
                        Market Through the Scheme Alleged Herein, the UFC Acquired Those
                        Would-Be Rivals that It Did Not Put Out of Business or Relegate to the
                        "Minor Leagues."...........................................................................33

i

3. After Impairing Actual or Potential Rivals and Acquiring Virtually Every Would-Be Rival Promoter That It Did Not Put Out of Business, the UFC Relegated all Remaining MMA Promoters to "Minor League" Status..................36

B. The UFC's Exclusionary Scheme Substantially Foreclosed Competition in the Relevant Input and Output Markets...................................................................40

C. Plaintiffs and Members of the Class Suffered Antitrust Injury .........................41

VIII.  INTERSTATE COMMERCE .......................................................................................42

IX.  CLAIM FOR RELIEF FOR MONOPSONIZATION UNDER SECTION 2 OF THE SHERMAN ACT .........................................................................................................42

X.  DEMAND FOR JUDGMENT......................................................................................44

XI.  DEMAND FOR JURY TRIAL.....................................................................................44

Kajan Johnson and Clarence Dollaway ("Plaintiffs") file this action on behalf of themselves and as a class action on behalf of all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure, against Defendants Zuffa, LLC ("Zuffa"), operating under the trademark Ultimate Fighting Championship® or UFC® ("UFC"), and Endeavor Group Holdings, Inc. ("Endeavor") (collectively, "Defendants"). Plaintiffs seek treble damages and injunctive relief for Defendants' violations of Section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiffs complain and allege as follows based on: (a) their personal knowledge; (b) the investigation of Plaintiffs' counsel; and (c) information and belief:

# I.     NATURE OF ACTION AND SUMMARY

1.     This case is similar to the class action brought by Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury against the UFC currently pending in this Court. *See Cung Le, et al. v. Zuffa*, *LLC d/b/a Ultimate Fighting Championship and UFC*, No. 2:15-cv-01045-RFB-BNW (D. Nev.) ("*Le*"). Plaintiffs in *Le* brought suit on behalf of a class defined as follows in the *Le* Complaint: "All persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States during the Class Period [*i.e.*, the period from December 16, 2010 until the illicit scheme alleged herein ceases]." ECF No. 208 ¶¶39, 27(c). The *Le* plaintiffs ultimately sought certification of the following class: "All persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States from December 16, 2010, to June 30, 2017." *Le*, ECF No. 518 at i. Because the class period ultimately proposed by the plaintiffs in *Le* closed on June 30, 2017, Plaintiffs Johnson and Dollaway bring this case on behalf of those like themselves who fought a bout promoted by the UFC from July 1, 2017 to the present. Like *Le*, this is a civil antitrust action under Section 2 of the Sherman Act, 15 U.S.C. § 2, for treble damages and other relief arising out of Defendants' overarching anticompetitive scheme to maintain and enhance the UFC's (a) monopoly power in the market for promotion of live Professional Mixed Martial Arts ("MMA") Fighter bouts,[1] and (b) monopsony power in the market for Professional MMA Fighter services. The relevant geographic market for both the Relevant Input Market and Relevant Output Market

---

[1] A "bout," as used in this Complaint, is a professional live MMA contest between two Mixed Martial Artists promoted by an MMA Promoter.

is limited to the United States and, in the alternative, North America. Regardless of whether the relevant geographic market includes the U.S., North America, or indeed the entire world, the UFC has monopoly and monopsony power, which it gained, enhanced, and maintained through the anticompetitive scheme alleged herein. As alleged below, the UFC has engaged in an illegal scheme to eliminate competition from would-be rival MMA Promoters by systematically preventing them from gaining access to resources critical to successful MMA Promotions (namely, top-ranked MMA athletes), including by imposing extreme restrictions on UFC Fighters' ability to fight for would-be rivals during and after their tenure with the UFC. As a result of this scheme, UFC Fighters are paid a fraction of what they would earn in a competitive marketplace.

2.      Plaintiffs Kajan Johnson and Clarence Dollaway are both Professional MMA Fighters who fought in multiple bouts promoted by the UFC during the period running from July 1, 2017 to the present ("Class Period"). Plaintiffs bring this action on behalf of themselves and a proposed class of similarly situated current and former UFC Fighters (the "Class," defined in more detail below).

3.      Through a series of anticompetitive, illicit, and exclusionary acts, the UFC has illegally acquired, enhanced, and maintained dominant positions in the markets for (a) promoting live Professional MMA Fighter bouts (the "Relevant Output Market"), and (b) Professional MMA Fighter services (the "Relevant Input Market"). The Relevant Output Market and Relevant Input Market are referred to collectively herein as the "Relevant Markets."

4.      Defendants' conduct, as alleged herein, has substantially foreclosed competition and thereby enhanced and maintained the UFC's monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market. By dominating the market for promoting live Professional MMA bouts, Defendants make the UFC the "only game in town" for Professional MMA Fighters who want to earn a living in their chosen profession at the highest level of the sport of MMA. By dominating the market for Professional MMA Fighter services through the scheme alleged herein (including through long-term exclusive agreements with MMA Fighters and other exclusionary and anticompetitive acts), the UFC controls the talents of Professional MMA Fighters who are popular with national audiences. Because an MMA Promoter can attract a significant live or Pay-Per-View audience based on the public notoriety of the Professional MMA Fighters scheduled to appear, and because the

2

ANTITRUST CLASS ACTION COMPLAINT

UFC blocks its MMA Fighters from competing against Fighters from other promotions, would-be rival MMA Promoters require access to a critical mass of fighters with such notoriety in order to become significant players in the market for promoting live Professional MMA bouts.

5.     The UFC has used the ill-gotten monopoly and monopsony power it has obtained and maintained through the scheme alleged herein to artificially suppress compensation for UFC Fighters in the Class to below competitive levels.

6.     The UFC, which (through the conduct alleged herein) now controls approximately 90% of the revenues derived from live Professional MMA bouts (regardless of whether the geographic market is the U.S., North America, or the entire world), and has the vast majority of top-ranked Professional MMA Fighters signed to exclusive deals, promotes and distributes professional live MMA bouts through various venues, in the U.S. and internationally, including physical venues such as the SAP Center and the HP Arena in San Jose, California; the Sleep Train Arena in Sacramento, California; the Key Arena in Seattle, Washington; the Honda Center in Anaheim, California; the United Center in Chicago, Illinois; the Prudential Center in Newark, New Jersey; the Amway Center in Orlando, Florida; the Mandalay Bay Events Center in Las Vegas, Nevada; the Philips Arena in Atlanta, Georgia; the Wells Fargo Center in Philadelphia, Pennsylvania; the Target Center in Minneapolis, Minnesota; the Patriot Center in Fairfax, Virginia; the TD Garden in Boston, Massachusetts; and through network television venues and Pay-Per-View events broadcast in the U.S. and North America. As part of the anticompetitive scheme alleged herein, the UFC has acquired, driven out of business, foreclosed the entry of, and/or substantially impaired the competitiveness of multiple actual and potential MMA Promotion rivals. As a result, the only remaining promoters of MMA bouts are either fringe competitors—which, as a general matter, do not and cannot successfully compete directly with the UFC—or entities that have essentially been conscripted by the UFC, through the scheme alleged herein, into acting as the UFC's "minor leagues," developing talent for the UFC but not competing directly with it.

7.     In an April 2008, Forbes magazine article entitled "Ultimate Cash Machine," Lorenzo Fertitta was quoted as saying: "We are like football and the NFL. The sport of mixed martial arts is known by one name: UFC." By 2010, as a result of the anticompetitive conduct alleged herein, Defendant Zuffa's President, Dana White, boasted that it had essentially eliminated all of its competition.

White publicly proclaimed that, within the sport of MMA: "There is no competition. We're the NFL. You don't see people looking at the NFL and going, 'Yeah, but he's not the best player in the world because there's a guy playing for the Canadian Football League or the Arena League over here.' We're the NFL. ***There is no other guy***." However, unlike the NFL—which has multiple teams vying for player services— within the UFC, there is no competition for Professional MMA Fighter services. Due to the scheme alleged herein, for Professional MMA Fighters at the top of their sport, it's the UFC or nothing. To repeat Mr. White's boastful concession: "There is no other guy."

8.    As set forth in more detail below, the UFC acquired and maintained monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market through a series of exclusionary acts, including (a) direct acquisitions of actual or potential rivals (who were forced to sell to the UFC because they found it impossible to compete profitably due to the UFC's anticompetitive scheme), as well as (b) a multifaceted scheme to impair and foreclose competition by leveraging the UFC's market dominance—including its tight-fisted control over the supply of Professional MMA Fighters—to block actual or potential rivals from accessing inputs (such as, *e.g.*, Professional MMA Fighters) necessary to compete successfully in the market for promoting live Professional MMA bouts and the market for Professional MMA Fighter Services. The UFC has locked up the supply of Professional MMA Fighters through, first, a series of acquisitions designed to remove competing rivals and would-be rivals and thereby championship titles from the marketplace by acquiring the contracts of Professional MMA Fighters and shuttering the acquired promotions; and second, by, *inter alia*, forcing all UFC Fighters to enter into long-term exclusive contracts that bar them from working with would-be rival MMA Promotion companies all but indefinitely.

9.    Through the scheme alleged herein, the UFC locked up all or virtually all Professional MMA Fighters with substantial national or regional notoriety or rank to long-term exclusive deals. Without access to, or the ability to compete for access to, an available pool of top-flight or top-ranked Professional MMA Fighters, would-be UFC rivals cannot hope to attract enough viewers (either live or via Internet, television or Pay-Per-View broadcast) to make their promotions significantly profitable such that they could possibly challenge the UFC's dominance in the Relevant Markets.

10.   The UFC denied actual and potential rivals the necessary inputs to run effective

4

professional MMA Promotion companies, raising rivals' costs, and making it impossible for them to compete effectively. As a result of the UFC's exclusionary scheme, multiple actual or potential rivals were forced to sell to the UFC, exit the market entirely, or be relegated to "feeder league" status, effectively serving as a proving ground for potential future UFC fighters.

11.     The UFC has publicly touted its success in using the scheme alleged in this Complaint to squash its competition. For example, in November 2008, UFC President Dana White uploaded a pre-bout video blog to YouTube in which he held up the following mock tombstone prominently displaying the letters "RIP" as well as the logos and "dates of death" of would-be rival MMA Promoters— International Fight League ("IFL"), Elite Xtreme Combat ("EliteXC"), and Affliction Entertainment ("Affliction"). Each promotion had been or would soon be put out of business by the UFC's anticompetitive conduct.



12.     After reading off the names of the MMA Promotion companies that the UFC had eliminated through the conduct alleged herein, White took credit for their demise, proclaiming, "I'm the grim reaper, motherf***ers."

13.     Similarly, on October 14, 2012, White boastfully responded on Twitter to a fan of the acquired and shuttered Pride Fighting Championships promotion by stating:



14.     In a June 14, 2010 interview with a leading MMA website, MMA Junkie, White stated:

> There was a time when it [competition in the MMA industry] was neck-and-neck. That time is over. There were times when we were in dogfights, but everybody needs to just concede and realize we're the [expletive] NFL. Period. End of story.

15.     While the UFC dominates the sport of MMA much like the NFL dominates the sport of football, the UFC does not contain rival teams that vie to sign players based on their estimated value in a competitive market; nor is the UFC a "league" of any kind.

16.     The UFC is an individual sport that issues championship titles to athletes competing in, and winning, title bouts. The UFC follows no independent ranking criteria, nor does it establish any objective criteria for obtaining a title bout. By following no objective criteria, the UFC is able to exert enormous control over its exclusive roster of athletes, who are constantly at risk of losing the opportunity to be afforded "title bouts" or to earn a living as an MMA fighter. Further, the UFC shuts out rival promotion opportunities for promoters and fighters by refusing to co-promote events with would-be rival MMA Promoters and prohibiting its athletes from competing against any non-UFC MMA Fighters in live Professional MMA bouts. Such exclusivity, as part of the alleged scheme, bolsters the UFC's ability to maintain its iron-fisted control of Professional MMA Fighters and MMA more generally, including by controlling the only titles that matter in top-flight MMA. As a result of the UFC's scheme, in order to generate any significant public notoriety and earn a living in their chosen profession, Professional MMA Fighters are foreclosed from the opportunity to self-promote and must sign exclusively with the UFC and

6

compete only against other UFC athletes.

17.     Having thoroughly dominated the Relevant Markets, in November 2013, the UFC unveiled its plans for extending its dominance internationally from the U.S. and North American markets when it posted to Twitter the following image of White, flanked by former Zuffa co-owners Frank and Lorenzo Fertitta, at a sports conference, in front of a screen stating, "World F**king Domination Reshaping the Sports World:"[2]



18.     As a result of the anticompetitive scheme alleged herein, the UFC has foreclosed competition and gained, maintained, and enhanced its position as the dominant promoter of MMA and one of the most powerful organizations in professional sports. The UFC now generates approximately $900 million dollars in annual revenues and has profit margins higher than all or nearly all other major professional sports. This anticompetitive scheme, which has afforded the UFC dominance in the Relevant Markets, allows it to exploit the MMA Fighters on whose backs the business rests. All UFC Fighters are paid a mere fraction of what they would make in a competitive market. Rather than earning paydays comparable to boxers, a sport with many natural parallels, Professional MMA Fighters go substantially undercompensated despite the punishing—and popular—nature of their profession. In fact, UFC fighters

---

[2] The image has been edited to modify the offensive language appearing in the first line of the original text, as have various quotations from Dana White throughout this Complaint.

collectively earn less than 20% of the revenues generated by UFC events, whereas athletes in boxing, MLB, the NBA, the NFL, and the NHL all earn 50% or more—sometimes substantially more—of revenues generated by those sports.

19.    As described below, the UFC did not acquire and does not maintain its monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market lawfully. The UFC's anticompetitive and illegal scheme through which it obtained and maintains its unlawful monopoly/monopsony, as described herein, reaches virtually every aspect of the sport.

20.    As alleged below, by gaining, maintaining, and enhancing iron-fisted control over the Relevant Markets through the ongoing exclusionary scheme alleged herein, the UFC has foreclosed competition in the Relevant Markets; acquired, enhanced, and maintained (i) monopoly power in the Relevant Output Market and (ii) monopsony power in the Relevant Input Market; and used its dominant position to enter into and dominate other segments of the MMA Industry unrelated to the promotion of live Professional MMA events. This conduct, taken together, has had substantial anticompetitive effects in the Relevant Markets, and has harmed members of the Class defined herein in that compensation of members of the Class has been and continues to be substantially and artificially suppressed.

## II.    <u>JURISDICTION AND VENUE</u>

21.    This action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2.

22.    Plaintiffs have been injured, and are likely to continue to be injured, as a direct result of Defendants' unlawful conduct.

23.    The United States District Court for the District of Nevada has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and section 4 of the Clayton Act, 15 U.S.C. § 15(a)(2).

24.    Venue is proper in this District under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22. Zuffa is a resident of this District and has its principal place of business in this District. Zuffa has promoted professional live MMA events in this District, and sold or licensed promotional, merchandising, or ancillary materials throughout this District. Venue in this District is also proper pursuant to 28 U.S.C. § 1391.

25.    The UFC has acquired, enhanced, and is illegally maintaining monopsony power in the

Relevant Input Market and monopoly power in the Relevant Output Market through the anticompetitive scheme alleged herein.

III.   **DEFINITIONS**

26.   As used herein:

a.   "Bout Agreement" means a contract between a UFC Fighter and Zuffa, or its affiliates, which designates, among other things, the opponent, weight class, and date of a scheduled bout.

b.   "Card" means the identification of all of the bouts that occur during a single MMA event. The Card typically consists of the Main Card and the Undercard.

c.   "Class Period" means the period from July 1, 2017 until the ongoing illicit scheme alleged herein ceases.

d.   "Exclusive Promotional and Ancillary Rights Agreement" means a contract between a UFC Fighter and Zuffa, pursuant to which Zuffa is the exclusive promoter of a UFC Fighter's bouts for a period of time, and the UFC Fighter grants certain ancillary rights to Zuffa in perpetuity.

e.   "Mixed Martial Arts" or "MMA" means a competitive individual sport in which competitors use interdisciplinary forms of martial arts that include, *e.g.*, jiu-jitsu, judo, karate, boxing, kickboxing, taekwondo, and/or wrestling to their strategic and tactical advantage in a supervised match. Scoring in live professional MMA bouts is based on state athletic commission-approved definitions and rules for striking (blows with the hand, feet, knees or elbows) and grappling (submission holds, chokeholds, throws or takedowns).

f.   "MMA Industry" means the business of promoting live MMA bouts and may also include the promotion of Pay-Per-View MMA events to generate Pay-Per-View revenues and ticket sales as well as ancillary activities such as: the sale of live and taped television programming, video-on-demand, merchandise (videos, DVDs, video games, apparel, hats, sporting equipment, etc.), event and fighter sponsorships, and the collection of MMA-related copyright and trademark royalties.

g.   MMA Promoter" or "MMA Promotion" means a person or entity that arranges professional live MMA bouts for profit.

h.   "Pay-Per-View" or "PPV" means a type of pay television or broadcast service by which a subscriber of an Internet or television service provider can purchase events to view live via

9

private telecast or Internet broadcast. The events are typically purchased live but can also be purchased for several weeks after an event first airs. Events can be purchased using an on-screen guide, an automated telephone system, on the Internet or through a live customer service representative.

> i.      "Professional MMA Fighter" means a person who is compensated as a combatant in a Mixed Martial Arts bout.

> j.      "UFC Fighter" means a person who is paid by the UFC for participating in one or more professional MMA bouts promoted by the UFC.

## IV.   **PARTIES**

27.   Defendant Zuffa, LLC is a Nevada limited liability company founded in 2000 and headquartered in Las Vegas, Nevada.

28.   Zuffa is a privately-held entity that is owned by Endeavor. Zuffa is in the business of, among other things, promoting live Professional MMA bouts in the U.S. and elsewhere, under the trade names of the Ultimate Fighting Championship® or UFC®. Under the UFC trademark, which is wholly owned by Zuffa, Zuffa promotes professional MMA events for live audiences as well as live television, Internet and PPV broadcasts; and licenses, markets, sells and distributes UFC Licensed Merchandise and/or Promotional Materials including, but not limited to, tickets to bouts, live and taped television programming, broadcasts over an Internet subscription service, sponsorships and other merchandise including video games, action figures, gyms, fitness products, athletic equipment, apparel, footwear, hats, photographs, toys, collectibles, trading cards and digital media products.

29.   Defendant Endeavor Group Holdings, Inc. ("Endeavor") is a sports, events, media, and talent company. Endeavor owns and operates the UFC, produces and distributes UFC programming, manages UFC live events and experiences, and licenses UFC media and sponsorship rights. Endeavor produces more than 40 live UFC events annually which are broadcast in over 160 countries and territories to approximately 1 billion TV households as well as other editorial video content for the UFC.[3] Endeavor and its employees hold promoters and matchmakers licenses in various states to organize and

---

[3] *See* Endeavor Group Holdings, Inc., Amendment No. 1 to Form S-1 Registration Statement (Apr. 20, 2021), https://www.sec.gov/Archives/edgar/data/0001766363/000119312521122043/d67085ds1a.htm at 108.

hold UFC's live events.[4] In addition, Endeavor sells global media and sponsorship rights for the UFC and licenses the UFC's intellectual property.[5] Endeavor recently entered into a "record seven-year deal with ESPN/ESPN+ for UFC's linear and pay-per-view rights in the US."[6] Endeavor also owns and operates the UFC's FIGHT PASS streaming platform and the UFC Performance Institute, which offers specialized training to athletes.[7] In August 2016, Endeavor acquired Zuffa, together with affiliates of Silver Lake Partners ("Silver Lake") and Kohlberg Kravis Roberts & Co. L.P. ("KKR"), for approximately $4 billion. Following the transaction, Endeavor owned 50.1% of Zuffa. In February 2021, Endeavor entered into an agreement with Silver Lake and KKR to acquire the outstanding equity in Zuffa contingent upon Endeavor's initial public offering ("IPO"), among other conditions.[8] On March 31, 2021, Endeavor filed a Form S-1 Registration Statement with the United States Securities and Exchange Commission in connection with its planned IPO.[9] On April 28, 2021, Endeavor completed its IPO and acquired the remainder of Zuffa. Following the IPO, Endeavor now owns 100% of Zuffa.

30.     All of Defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful anticompetitive scheme and illegal restraints of trade alleged herein, and were authorized, ordered, and/or performed by Defendants' various owners, shareholders, officers, agents, employees, or other representatives, including but not limited to, Endeavor CEO Ari Emmanuel, former Zuffa owners Lorenzo Fertitta and Frank Fertitta, and UFC president Dana White, while actively engaged in the management of the UFC's affairs, within the course and scope of their roles or duties of employment, or with the actual, apparent, or ostensible authority of Endeavor, Zuffa, and the UFC.

31.     Defendants have illegally acquired and continue to maintain monopsony power in the Relevant Input Market, *i.e.*, the market for Professional MMA Fighter services, through various illicit market restraints and exclusionary conduct, including unlawful restraints and exclusionary conduct in the

---

[4] *Id.* at 159.

[5] *Id.* at 4-7, 109, 121, 148.

[6] *Id.* at 150.

[7] *Id.* at 5, 49, 108, 150-51.

[8] *See id.* at 11-12, 80-83, 213-15.

[9] Endeavor Group Holdings, Inc., Form S-1 Registration Statement (Mar. 31, 2021), https://www.sec.gov/Archives/edgar/data/1766363/000119312521102184/d67085ds1.htm#rom67085_1.

Relevant Output Market.

32.     Plaintiff Kajan Johnson, a resident of Port Moody, British Columbia, Canada, is a Professional MMA Fighter and a proposed representative of the Class. Plaintiff Johnson competed in seven UFC-promoted bouts that were each broadcast in the United States from 2014 through September 2018. Plaintiff Johnson's compensation for participation in those UFC bouts was artificially suppressed due to the anticompetitive scheme alleged herein. Plaintiff Johnson was injured as a result of the Defendants' unlawful conduct.

33.     Plaintiff Clarence Dollaway, a resident of Mesa, Arizona, is a Professional MMA Fighter and a proposed representative of the Class. Plaintiff Dollaway competed in 20 UFC-promoted bouts in the United States and elsewhere that were each broadcast in the United States from 2008 through 2018. Plaintiff Dollaway's compensation for participation in those UFC bouts was artificially suppressed due to the anticompetitive scheme alleged herein. Plaintiff Dollaway was injured as a result of the Defendants' unlawful conduct.

## V.     CLASS ACTION ALLEGATIONS

34.     Plaintiffs bring this action individually and as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class consisting of:

> All persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States during the period July 1, 2017 to the present ("Class Period"). The Class excludes all persons who are not residents or citizens of the United States unless the UFC paid such persons for competing in a bout fought or broadcast in the United States.

35.     There are multiple questions of law and fact common to the Class that predominate over any questions solely affecting individual members, including but not limited to:

a.     whether the relevant geographic market is the United States, or alternatively, North America;

b.     whether the market for Professional MMA Fighter services, *i.e.*, the Relevant Input Market, is an appropriate relevant market for analyzing the claims in this case;

c.     whether the UFC possesses monopsony power in the Relevant Input Market;

d.     whether, through the conduct alleged herein, the UFC willfully acquired,

maintained and enhanced monopsony power;

        e.    whether the UFC engaged in unlawful exclusionary conduct to impair the opportunities of actual or potential rivals in the Relevant Markets;

        f.    whether the UFC entered into exclusionary agreements with actual or potential rival MMA Promoters, MMA venues, or other entities, that foreclosed the UFC's actual or potential rivals from competing in the Relevant Markets;

        g.    whether the terms in the UFC's contracts requiring exclusivity are, when taken together, anticompetitive;

        h.    whether Defendants' exclusionary scheme had anticompetitive effects in the Relevant Markets;

        i.    whether Defendants' actions alleged herein caused injury to Plaintiffs and the members of the Class in the form of artificially suppressed compensation for participating in UFC-promoted MMA bouts taking place in or broadcast in the U.S.;

        j.    the appropriate measure of aggregate damages; and

        k.    the propriety of declaratory and injunctive relief.

36.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Although the precise number of such individuals is currently unknown, Plaintiffs believe that the number of members in the Class is, at minimum, in the hundreds, and that the members reside across the United States, including in this District.

37.    Plaintiffs' claims are typical of those of the Class they seek to represent. Plaintiffs, like all other members of the Class, were injured by the UFC's illegally obtained monopsony power that resulted in artificially suppressed compensation for competing in UFC bouts.

38.    Plaintiffs are more than adequate representatives of the Class and their chosen Class Counsel (the undersigned) are more than adequate attorneys. Plaintiffs have the incentive, and are committed to prosecuting this action, for the benefit of the Class. Plaintiffs have no interests that are antagonistic to those of the Class. Plaintiffs have retained counsel highly experienced in antitrust and class action litigation.

39.    This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because

Defendants have acted and refused to act on grounds that apply generally to the Class, and final injunctive and declaratory relief is appropriate, and necessary, with respect to the Class as a whole.

40. This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as that asserted in this Complaint. Plaintiffs are aware of no difficulties that would render this case unmanageable.

41. Plaintiffs and members of the Class have all suffered, and will continue to suffer, antitrust injury and damages as a result of the UFC's acquisition, enhancement, and/or maintenance of monopsony power in the Relevant Input Market.

## VI. THE UFC'S MONOPOLY AND MONOPSONY POWER

### A. The UFC's Monopoly Power in the Relevant Output Market

#### 1. The Relevant Output Market

42. The Relevant Output Market is the promotion of live Professional MMA bouts.

43. Promoters of live professional MMA bouts arrange contests between Professional MMA Fighters who compete in one-on-one fights known as bouts.

44. Live professional MMA bouts are held in venues for which admission tickets are sold. Revenues from the promotion of live professional MMA bouts may also include broadcast of the event on PPV, television, or over the Internet as well as through the sale of live and taped television programming, video-on-demand, merchandise (videos, DVDs, video games, apparel, hats, sporting equipment, etc.), event sponsorships, and the collection of MMA-related copyright and trademark royalties.

45. The successful promotion of a live Professional MMA event requires a critical mass of top

Professional MMA Fighters—*i.e.*, those Fighters who have reputations for winning professional bouts (often reflected in MMA fighter rankings published by MMA publications) or who have gained notoriety with the MMA fan base and thus who can attract a wide audience. Mixed Martial Artists are skilled athletes who typically train for years before competing professionally. A successful promotion of a live Professional MMA event also requires a suitable venue, access to PPV or television distribution outlets, sponsors, and endorsements.

46.     MMA is a unique blend of various martial arts disciplines, including, *e.g.*, boxing, Muay Thai (kickboxing), judo, wrestling, Brazilian jiu-jitsu, taekwondo and karate. The rules of MMA differentiate it from other combat sports (such as boxing, which does not allow kicks, takedowns, chokeholds, joint-locks, or any strikes below the waist). Similarly, wrestling does not allow striking of any kind (kicks, punches, etc.), and does not have an outlet for elite amateur wrestlers to continue their athletic careers as wrestlers professionally.

47.     MMA is distinct from "professional" wrestling as currently promoted under the umbrella of World Wrestling Entertainment ("WWE"). Professional wrestling is now acknowledged to be "staged"—that is, scripted entertainment involving acting with the outcome of individual matches predetermined. Combat sports such as boxing or those that are limited to a single martial art, such as judo, are not adequate substitutes for live Professional MMA. There is no meaningful market substitute amongst the television-viewing and ticket-paying audience for the sport of MMA. Single-discipline combat sports, such as boxing and kickboxing, do not qualify as economic substitutes because they do not enjoy reasonable interchangeability of use and cross-elasticity of demand amongst the consuming audience.

48.     Boxing does not combine different elements from a diverse set of martial arts, as it is limited to only strikes with the hands above the waist of an opponent, and hence does not provide a viewing experience akin to MMA. Indeed, while state athletic gaming commissions (or equivalents thereof) sanction both boxing and MMA events, such commissions impose strict requirements that define each sport separately. Such distinctions include the method of scoring, weight classes, the duration and number of rounds, and the methods of combat that may be employed. For example, scoring in live Professional MMA bouts is based on athletic commission-approved definitions and rules for striking

(blows with the hand, feet, knees or elbows) and grappling (submission, chokeholds, throws or takedowns), most forms of which are prohibited in boxing.

49.     Promotion of live Professional MMA events is not reasonably interchangeable with promoting any other sport or entertainment, including boxing and/or kickboxing. For instance, and on information and belief, raising the prices for live MMA events above competitive levels by a small but significant amount for a substantial period of time would not cause so many consumers to switch to other sporting events or entertainment options that such price inflation would be unprofitable.

## 2.     The Relevant Geographic Market

50.     The relevant geographic market for the Relevant Output Market is the United States, and, in the alternative, North America. In other words, the promotion of live MMA bouts in the United States—and in the alternative, North America—is the appropriate market for analyzing the claims in this case. For purposes of geographic boundaries of the Relevant Output Market, bouts that take place outside of the U.S. (or in the alternative, outside of North America), but which are typically broadcast live (or subject to a delay to account for differences among time zones) via television, Internet and/or PPV into the U.S. (or in the alternative, North America), are in the relevant geographic market. A bout which neither takes place in the U.S. nor is broadcast into the U.S. is not in the geographic market.

51.     MMA events involving Professional MMA Fighters are typically broadcast in the U.S. on national television and reported on by national broadcasters (ESPN, FOX Sports, etc.) in national media outlets. U.S. consumers do not view MMA events staged or broadcast outside of the U.S. as reasonable substitutes for events staged in the U.S. or broadcast into it. Barriers associated with language, travel, and other costs separate non-U.S.-promoted bouts from bouts promoted in the U.S. The PPV, broadcast, and other rights to MMA promotions are sold separately in each country and region. Consumers in the U.S. would not view events which are neither fought nor broadcast widely in the U.S., and would not see such non-U.S. events as reasonable substitutes for bouts fought or broadcast in the U.S. A small but significant increase in ticket prices for bouts fought or viewable in the U.S. would not cause so many consumers to switch to bouts not fought or broadcast in the U.S. to make such an increase unprofitable.

52.     The United States is the only geographic area in which MMA Promoters operating in the U.S. can practically turn for supplies and inputs necessary for promoting and broadcasting profitable live

MMA events to U.S. consumers. Staging a live event in the U.S. requires a venue in the U.S. Broadcasting an event on television or PPV in the U.S., even if it takes place outside of the U.S., requires contracting with U.S. television broadcasting and/or PPV companies with licenses to operate in the U.S. Bouts in the U.S. typically require mainly U.S.-based medical staff, judges, referees, and athletic commissions.

53.     In the alternative, if the geographic market extends beyond the U.S., it would include only the rest of North America, which has the same time zones as does the U.S., and includes countries that abut the U.S. geographically, cutting down on travel and other costs.

### 3.     The UFC's Monopoly Power with Respect to Promoting Live Professional MMA Bouts.

54.     At all relevant times, the UFC had monopoly power in the Relevant Output Market, *i.e.*, the market for promoting live Professional MMA bouts in the U.S. In the alternative, even if the Relevant Output Market included North America, or indeed, the entire world, the UFC would have monopoly power.

55.     The UFC obtained and maintains monopoly power in the Relevant Output Market, in large part, through the anticompetitive conduct alleged herein. The UFC possesses the ability to control, maintain, and increase prices associated with the promotion of professional live MMA bouts above competitive levels and to impair and exclude competitors from promoting professional live MMA bouts whether the Relevant Output Market is limited to the U.S. or, in the alternative, North America, or the entire world. The UFC has the ability to foreclose, and has in fact substantially foreclosed, would-be rivals from the market for promoting live Professional MMA bouts taking place or broadcast in the U.S., North America or the world.

56.     The UFC has, and has exercised, the power to impair and exclude competition in the Relevant Output Market no matter how it is geographically defined.

57.     The UFC is, by far, the dominant provider of live Professional MMA events in the Relevant Output Market, regardless of whether the geographic market includes the U.S. only, North America only, or the entire world. According to Zuffa's President, Dana White, by 2010, the UFC had essentially eliminated all of its competition. He announced that, within the sport of MMA: "There is no

competition. We're the NFL. You don't see people looking at the NFL and going, 'Yeah, but he's not the best player in the world because there's a guy playing for the Canadian Football League or the Arena League over here.' We're the NFL. ***There is no other guy***."

58.    The UFC possesses the ability to preclude or delay new entry into the Relevant Output Market, to raise would-be rivals' costs in that market, to impair the opportunities and efficiencies of would-be rivals, and to control prices and exclude competition.

59.    The UFC enjoys high profit margins on its sales in the Relevant Output Market in the U.S., North America, and around the world. The UFC's worldwide profit margins are among the highest, if not the highest, in professional sports.

60.    Because, as alleged below, the UFC possesses monopsony power in the Relevant Input Market, *i.e.*, the market for Professional MMA Fighter services, the UFC has been able to use that dominance as a means to restrict access and limit expansion of actual or potential rivals into the Relevant Output Market. Through, *e.g.*, exclusive contracts with MMA Fighters, the UFC has deprived potential and actual competitors of a critical input for a successful Professional MMA Promotion, namely the services of a critical mass of top-ranked Professional MMA Fighters.

61.    As a result of its anticompetitive conduct, as alleged herein, the UFC receives approximately 90% of all revenue generated by MMA events in the U.S. and North America, and upon information and belief, throughout the entire world.

62.    Barriers to entry in the Relevant Output Market are high for several reasons, including that, *inter alia*, establishing and maintaining a rival MMA promotion requires a substantial investment of capital to be able to promote professional MMA bouts involving Professional MMA Fighters successfully. Successful promotion requires the ability to secure appropriate venues, sponsorships, endorsements, and PPV, and/or television distribution rights. The UFC asserts that the "UFC brand is more recognizable than the sum of its individual fighters, as evidenced by its ability to nearly sell out venues even before announcing the main card to the public." According to Lorenzo Fertitta, "Zuffa has built the UFC into an international brand that, in many instances, has been synonymous with the rapidly growing sport of MMA." In terms of promotions, prospective market entrants cannot enter the Relevant Output Market unless they can attract and retain a critical mass of top-ranked Professional MMA

Fighters. Actual or potential rival promoters cannot attract and retain the necessary critical mass of top-ranked Professional MMA Fighters unless they can demonstrate that they can promote a series of profitable bouts that will result in potentially competitive compensation to the fighters. The UFC has also amassed an unparalleled content video library of bouts and continues to acquire rights to additional footage libraries which are an important component of marketing Professional MMA Fighters and bouts. The UFC's anticompetitive conduct—which deprives would-be rival promoters of MMA events of necessary inputs to pull off successful promotions, including through exclusionary contracts with the vast majority of top-ranked Professional MMA Fighters themselves—creates high barriers to entry for would-be rival promoters.

**B.     The UFC has Monopsony Power in the Relevant Input Market**

**1.     The Relevant Input Market**

63.     The Relevant Input Market is the market for Professional MMA Fighter services.

64.     Professional MMA Fighters are elite athletes who typically train for years before competing professionally. In live professional MMA bouts, Mixed Martial Artists compete by using multiple disciplines of martial arts, including wrestling, judo, jiu-jitsu, Muay Thai, karate, taekwondo and boxing. Such bouts are registered with, sanctioned by and conducted according to rules promulgated by the Athletic Commission (or equivalent thereof) for the jurisdiction in which the bout is held.

65.     Professional MMA Fighters are typically compensated for participating as a combatant in a live Professional MMA bout.

66.     Athletes who have trained for, and now engage in, sports other than MMA, including professional boxing, and those who engage in a single martial art, such as judo, are not substitutes for Professional MMA Fighters. For instance, boxers and those who engage in a single martial art are generally not trained in the additional forms of martial arts (which may include wrestling, judo, jiu-jitsu, taekwondo, Muay Thai and karate) necessary to become and successfully compete as a Professional MMA Fighter.

67.     Importantly, there are no reasonably interchangeable sports to which Professional MMA Fighters can turn when demand and compensation for Professional MMA Fighters is artificially suppressed below competitive levels. Other martial arts disciplines do not have the audiences necessary

for the fighters to earn competitive wages or even generally to be paid at all. For this and other reasons, no material number of Professional MMA Fighters could successfully transition to other sports sufficient to prevent a monopsonist in the market for Professional MMA Fighter services from artificially suppressing Professional MMA Fighter compensation by even a small but significant amount for a substantial period of time.

68.     For instance, with respect to judo, tournaments occur infrequently, and the major ones (World Championships, Olympics) are for "amateur" fighters, that is, unpaid athletes. Brazilian Jiu Jitsu ("BJJ") is a popular amateur sport, but there are very few tournaments that offer more than nominal prizes (as opposed to awarding salaries or prize money to competitors) and even those occur rarely. Karate and Muay Thai, much like BJJ and judo, are mainly amateur disciplines. Muay Thai and kick-boxing are striking disciplines that do not employ any of the grappling techniques in which MMA Fighters must be proficient in order to successfully compete. None of these sports would be plausible alternatives for Professional MMA Fighters who are facing artificial suppression of their compensation by a monopsonist in the market for Professional MMA Fighter services.

69.     Neither boxing nor "professional" WWE wrestling provides a reasonable alternative for Professional MMA Fighters. Professional boxing requires years of intensive, specialized and limited training in a striking art that MMA Fighters do not undergo. While Professional MMA Fighters do train in boxing, that is but one of many martial arts disciplines Professional MMA Fighters must practice, and it is not (and, indeed, cannot be) their sole focus. As a result, an insufficient number of Professional MMA Fighters could successfully transition to boxing to prevent a monopsonist in the market for Professional MMA Fighter services from artificially suppressing Professional MMA Fighter compensation below competitive levels by even a small but significant degree for a substantial period of time.

70.     Although professional wrestling does pay compensation to its "wrestlers," professional wrestling events are staged, and depend predominantly on acting ability. It is extremely unusual for an athlete to possess the right combination of skills to excel in both MMA and professional wrestling, and furthermore, professional wrestling is not a sport at all requiring competition between athletes. For this reason alone, professional wrestling is not a reasonable substitute for MMA. An insufficient number of

Professional MMA Fighters could successfully transition to professional wrestling to prevent a monopsonist in the market for Professional MMA Fighter services from artificially suppressing MMA Fighter compensation by even a significant degree for a substantial period of time.

71.     Because other sports are not plausible alternatives for Professional MMA Fighters, reducing the compensation of Professional MMA Fighters below competitive levels by even a small but significant degree for a substantial period of time will not cause sufficient numbers of Professional MMA Fighters to switch to other sports or professions to make the Professional MMA Fighter compensation suppression unprofitable. Quite simply, MMA is a highly specialized and unique sport engaged in by elite athletes with years of cross-disciplinary training.

### 2.     The Relevant Geographic Market

72.     The relevant geographic market for the Relevant Input Market is the United States, and in the alternative, North America.

73.     A monopsonist in the Relevant Input Market would need to control only Professional MMA Fighter Services in the United States, or in the alternative, in North America, to be able to suppress Professional MMA Fighter compensation substantially below competitive levels.

74.     Professional MMA Fighters in the United States, or in the alternative, North America, do not view participation in MMA bouts outside of the United States (or, in the alternative, North America) as a reasonable substitute for bouts in the United States (or, in the alternative, North America). Competing abroad imposes substantial costs on Professional MMA Fighters, including higher costs of training, travel, and lodging and reduced sponsorship income. Moreover, Professional U.S. MMA Fighters may have difficulty, or face significant costs associated with, obtaining necessary visas and approvals for themselves, family members, sparring partners, or trainers needed for fighting abroad. As a result, most U.S.-based MMA Fighters could not practically turn to a non-U.S.-based MMA Promotion company to earn a living or competitive compensation as a Professional MMA Fighter.

75.     Nearly all non-U.S.-based MMA promotion companies focus on regional or local fighters. Moreover, non-U.S.-based MMA Promoters frequently hold only a few events per year—very few of which are generally or widely open to non-locals. Further, non-U.S.-based MMA Promoters lack the prestige of the UFC and most MMA Fighters would not view non-U.S.-based promoters as

interchangeable with the UFC. In any case, the UFC deprives non-U.S.-based promoters of access to top-flight and top-ranked Professional MMA Fighters. Accordingly, no significant number of U.S. Fighters can earn competitive compensation for appearing in live Professional MMA events in foreign geographic markets.

76.     Successful foreign fighters have immigrated to the U.S. to participate in Professional MMA bouts. But, to the extent that a U.S. MMA Promoter such as the UFC is a net importer of foreign labor, this fact would serve to enhance its monopsony power and bargaining power vis-à-vis U.S. MMA Fighters and MMA Fighters as a whole.

### 3.     The UFC has Monopsony Power with Respect to Professional MMA Fighter Services.

77.     At all relevant times, the UFC had and continues to have monopsony power in the Relevant Input Market, *i.e.*, the market for Professional MMA Fighter services, whether that market includes only the United States, only North America, or, alternatively, the entire world.

78.     The UFC has the vast majority of top-ranked and well-known fighters across all major weight classes locked up under multi-bout exclusive agreements. As a result of the Scheme, the UFC offers the only titles in MMA that matter to Fighters and fans. Unlike other MMA Promoters, the UFC refuses to co-promote live Professional MMA Events in conjunction with another MMA Promoter. The only way for Professional MMA Fighters to compete against other top-ranked MMA Fighters is therefore to sign an exclusive agreement with the UFC.

79.     The UFC controls the vast majority of the market for Professional MMA Fighter services (measured either in the UFC's share of the total amount paid to Professional MMA Fighters as a group or the total number of top-ranked, marketable MMA Fighters) whether the geographic market includes only the United States, only North America, or the entire world. The UFC possesses the ability to reduce the demand and compensation for Professional MMA Fighter services without losing so much revenue as to make their conduct unprofitable. As a result of the UFC's monopsony power in the Relevant Input Market, Professional MMA Fighters do not have the ability to turn to alternative MMA Promoters to earn competitive compensation in response to the UFC's artificial suppression of demand and compensation for Professional MMA Fighter services below competitive levels.

80.     The UFC's control of the Relevant Input Market affords it the ability to, *inter alia*, (i) compensate Professional MMA Fighters below competitive levels profitably for a substantial period of time, (ii) artificially suppress demand for Professional MMA Fighter services below competitive levels, (iii) require UFC Fighters to enter into long-term exclusive contracts, and (iv) impair or preclude UFC Fighters from engaging in their profession or working with would-be rival promoters.

81.     Whether the relevant market is the U.S. only, North America only, or the entire world, the UFC is capable of artificially reducing compensation—and has in fact artificially reduced compensation—of Professional MMA Fighters without causing so many Professional MMA Fighters to switch to other MMA Promotions, or other sports or professions so as to make that compensation reduction unprofitable.

82.     Barriers to entry in the Relevant Input Market are high. To become a successful MMA Promotion, an entity would need a critical mass of top-ranked, well-known, Professional MMA Fighters. But through the scheme alleged herein, the UFC has locked up the vast majority of critical inputs to long-term exclusive contracts. To become a Professional MMA Fighter, one needs to be highly skilled and spend many years undergoing specialized training in multiple martial arts disciplines. Because MMA is a unique blend of various martial arts disciplines, including boxing, Muay Thai (kickboxing), judo, wrestling, BJJ, taekwondo and karate, a high level of proficiency in any one discipline alone is not sufficient to achieve elite-level status as a Professional MMA Fighter. For example, while a professional boxer may possess the mental and athletic skill to box and take blows in the form of punches, if he does not possess expert ability to grapple, wrestle or engage in other martial arts, he will not succeed as a Professional MMA Fighter. Professional MMA Fighters are rare multidisciplinary athletes who can perform at very high levels in more than one discipline. Also, training is costly and time consuming. To achieve top-level status, Professional MMA Fighters train daily, making alternative simultaneous full-time employment nearly impossible. Training also requires the services of professional trainers, sparring partners, and the relevant space and training equipment. To rise to the level of a fighter capable of being promoted by the UFC, a Professional MMA Fighter typically needs to work his or her way up the ranks in local and regional promotions, often earning very little money in the process. Further, because the only way to rise in the ranks is to fight against other top-ranked Fighters, and the UFC has locked up the vast

23

majority of such Fighters to long-term exclusive deals, non-UFC MMA Promotions cannot gain access to top-ranked Fighters sufficient to compete effectively in the market for MMA Fighter Services.

       **C.**     **Overview of the MMA Industry and the UFC's Dominance**

83.    The popularity of MMA as a combat sport began to take off during the 1990s. Professional MMA has since become one of the most popular and fastest growing spectator sports in the U.S. and North America.

84.    Professional MMA Fighters are among the most respected professional athletes in the world. Professional MMA Fighters include world-class and Olympic athletes utilizing all disciplines of martial arts, including wrestling, judo, jiu-jitsu, Muay Thai, taekwondo, karate and boxing, in one-on-one bouts.

85.    MMA Fighters typically achieve the status of UFC Fighters only after participating successfully in events organized by other local or regional MMA Promoters.

86.    MMA Promotions are not organized into leagues or teams as is common in many organized sports. Because the UFC refuses to engage in "co-promotion," Professional MMA Fighters tend only to compete against other Professional MMA Fighters who are under contract with the same promoter.

87.    MMA Promoters host events that ordinarily contain seven to twelve bouts on a Card, and bouts are organized by recognized weight classes. Together, all of the bouts for an event constitute the Card. The Card at a typical event includes an Undercard, or a set of preliminary bouts, that generally feature up-and-coming and/or local Professional MMA Fighters, and the Main Card, which typically features Professional MMA Fighters who are further along in their careers and/or possess higher levels of public notoriety.

88.    The strength of the Card draws ticket purchases for live events as well as viewers for broadcasts and purchases of PPV access (provided the promotion garners PPV coverage). During the Class Period, it has been and continues to be extremely rare for a bout that is not promoted by the UFC to garner PPV coverage.

89.    Professional MMA events are sanctioned in the U.S. by the same state athletic commissions as boxing. Nearly all athletic commissions in North America are members of the

Association of Boxing Commissions ("ABC"). All member commissions of the ABC have passed the Unified Rules of Mixed Martial Arts which govern professional MMA bouts and establish MMA weight classes, ring-fighting area requirements and equipment, length and number of rounds in a bout, the rest period between rounds, the nature of the protective gear worn by fighters, judging requirements, fouls, and other bout rules and regulations.

### D.   The UFC's Complete Control of Its Sport Is Unique in the Context of Big-Time Professional Sports

90.   As more fully set forth below, due to the anticompetitive scheme alleged herein, the UFC has been able to suppress Professional MMA Fighters' compensation to a very low percentage of the revenues generated from bouts. On information and belief, UFC Fighters are paid less than 20% of UFC revenues generated from bouts. As alleged further below, all UFC Fighters—from the highest paid to the lowest—have had their compensation artificially reduced due to the anticompetitive scheme challenged in this Complaint.

91.   Athletes in sports such as boxing and the "Big 4," *i.e.*, football, baseball, basketball, and hockey in the United States, generally earn approximately 50% of league revenue, a significantly higher percentage of revenues than those paid to UFC Fighters.

92.   Boxers Floyd Mayweather and Manny Pacquiao have previously taken the number one and two spots, respectively, on the "Forbes 100-highest paid athletes list," earning upwards of $40 million in guaranteed purse for a single bout, before inclusion of PPV profits. Mayweather's compensation has reportedly topped $90 million for a single bout for an event that draws comparable PPV purchase rates to high-profile UFC events. As a result of the scheme alleged herein, UFC Fighters get a fraction of that level of compensation. Famed boxing promoter Bob Arum, for example, pays his boxers approximately 80% of the proceeds generated by a Card. Comparing the fighter compensation between boxing and the UFC, Arum accurately described the disparity between the UFC and boxing as follows: "Because of the monopoly that the UFC has, they [the UFC] pay[s] their fighters maybe 20% of the proceeds that come in on a UFC fight."

### E.   The Growth of MMA in the United States

93.   MMA's initial growth in the 1990s was accompanied by the growth of competing MMA

25

Promoters. The UFC was founded in 1993. By 2001, MMA Promotions were competing vigorously in the U.S. Prior to 2011, the existence of such competition allowed UFC Fighters—such as Mark Kerr, BJ Penn, Mark Coleman, and Carlos Newton—to receive higher purses with UFC competitors. In 2001, Zuffa purchased the UFC from Semaphore Entertainment Group ("SEG") for $2 million and appointed White as its President.

94.     By the mid-2000s, professional MMA had gained even broader mainstream support in the United States. The UFC and its competitors actively promoted MMA events and began introducing the sport to the public through more extensive television programming and marketing activities. As an overall result of competition between rival promotions in the Relevant Input and Output Markets through the early 2000s, MMA's fan base grew dramatically; while fewer than 90,000 people purchased the UFC's first MMA PPV event, by 2006, the UFC's PPV events drew more than one million buyers.

## VII.   THE UFC's ANTICOMPETITIVE SCHEME AND ITS RESULTING ANTITRUST INJURIES TO PLAINTIFFS AND MEMBERS OF THE CLASS

### A.   The UFC's Anticompetitive Scheme to Acquire, Maintain, and Enhance Monopsony Power

#### 1.   The UFC Has Leveraged Its Monopoly and Monopsony Power to Deny Necessary Inputs to Would-Be Rival MMA Promoters.

95.     The UFC has illegally acquired, maintained, and exercised monopsony power in the market for Professional MMA Fighter services, *i.e.*, the Relevant Input Market, through an aggressive series of exclusionary and anticompetitive acts. The anticompetitive effects associated with this ill-gotten monopsony power manifest themselves as artificially suppressed compensation for Professional MMA Fighters in the Class and reduced output of Professional MMA bouts.

96.     Unless an MMA Promoter can attract and retain top-ranked Professional MMA Fighters, it cannot compete successfully in the Relevant Input or Output Markets. MMA Promoters cannot attract and retain Professional MMA Fighters unless they can demonstrate to such athletes that they can promote profitable bouts that will result in meaningful opportunities to rise in the rankings (because the promotion has a critical mass of top fighters and thus is capable of creating multiple match-ups of top Fighters) and gain increased notoriety such that Fighters have the ability to earn significant compensation over an extended period of time. To succeed in the MMA Industry, Professional MMA Fighters must have the

ability to compete against other top-ranked Fighters for championship belts that matter to fans and Fighters and register wins in widely viewed MMA events that build public notoriety, reputation, fan base, and earnings potential. Without big-ticket MMA Cards with top-ranked Professional MMA Fighters, or the ability to offer championship belts that matter in the industry, rival MMA Promoters are unable to generate either valuable match-ups to Fighters or public demand sufficient to generate enough revenues to be able to offer bout purses capable of attracting a deep pool of top-ranked Professional MMA Fighters. The UFC, knowing this, has engaged in a scheme to deny actual or potential rival MMA Promoters (and any potential future rivals) the access to inputs necessary to promote successful MMA events or attract the best Professional MMA Fighters who are top-ranked or have the potential to become top-ranked (*e.g.*, a critical mass of top-ranked Professional MMA Fighters).

**a.    The UFC Uses Exclusive Contracts with UFC Fighters as Part of its Anticompetitive Scheme.**

97.    The UFC has illegally obtained and maintained its monopoly position in the Relevant Output Market and its monopsony position in the Relevant Input Market through an anticompetitive scheme to exclude and impair actual and potential rival MMA Promoters by foreclosing access to a deep pool of top-ranked Professional MMA Fighters necessary to sustain and grow a profitable rival MMA promotion company. As a result, Professional MMA Fighters have no effective, reasonably substitutable, alternative promoter to the UFC with whom to contract for Professional MMA bouts.

98.    The UFC's illegal monopsony position is sustained, in substantial part, through the use of exclusive agreements with UFC Fighters that lock in Professional MMA Fighter services perpetually and exclusively for the UFC. The UFC's long-term exclusive contracts foreclose would-be rival promoters from vital inputs—namely a deep pool of top-ranked Professional MMA Fighters with the notoriety needed to sustain a successful live Professional MMA promotion. Discussing the UFC's exclusive contracts, White has conceded that, across the MMA Industry, "everybody knows how crazy we are about protecting our contracts."

99.    Through the anticompetitive scheme alleged herein, including by successfully eliminating and impairing actual or potential rivals in the Relevant Input and Output Markets, the UFC has garnered and maintained unrivaled bargaining power vis-à-vis Professional MMA Fighters. The UFC uses its

27

monopsony power to extract exclusionary and restrictive concessions from all of its MMA Fighters.

100.    The UFC classifies all of its Fighters as independent contractors, who are compensated based on the number of fights in which they participate. But the UFC uses standard-form agreements with all or nearly all of its UFC Fighters that require exclusivity during the term of the agreements and extending after the term technically expires, often long after it expires. Given that, through the alleged scheme, the UFC dominates the Relevant Markets, Professional MMA Fighters have little choice but to accept the UFC's exclusionary terms if they want to try to earn a living and rise in the ranks as Professional MMA Fighters.

101.    The UFC's standard agreements with Fighters have contained, during the 2000s and continuing into the Class Period, at least the following restrictive provisions:

a.    The "Exclusivity Clause," which binds UFC Fighters into a restricted relationship with the UFC and prohibits them from appearing in bouts televised or organized by actual or potential rival promotions unless approved by the UFC, thus preventing athletes from receiving competitive purses from co-promoted or competitor MMA events. This clause blocks actual or potential rival promotions from having access to Professional MMA Fighters under contract with the UFC for protracted periods of time. Regardless of the term of the agreement, the provision includes various termination and extension clauses that can be triggered at the UFC's sole discretion, thereby effectively extending the exclusivity provisions indefinitely.

b.    The "Champion's Clause," which allows the UFC, at its discretion alone, to extend a UFC Fighter's contract for one-year or three bouts for a Fighter who is a "champion" in his or her weight class, preventing the Fighter from financially benefiting from his or her "championship" status by soliciting competing bids from other MMA Promotions even after the end of his or her original UFC contract term. This clause specifically blocks actual or potential rival promotions from having access to successful Professional MMA Fighters, which are needed for a would-be rival event to be commercially successful. This clause (combined with other aspects of the UFC's Fighter contracts) denies UFC Fighters free agency—despite their being independent contractors—thereby retaining the Fighter's services for the UFC effectively indefinitely.

c.    The "Exclusive Negotiation Period" and "Right to Match" Clauses, which give the

28

UFC up to 90 days of exclusive negotiation rights after the term of the Fighter's contract has officially expired and then an additional year to match the financial terms and conditions of any offer made to a UFC Fighter from a rival promotion. Because the UFC Fighter would need to refrain from earning money in his or her chosen profession for nearly 15 months in order to fight for another promotion against the UFC's will, these clauses, in the context of the other portions of the UFC Fighter contracts, make it nearly impossible for a Fighter to leave the UFC if the UFC wants to keep that Fighter.

        d.     The "Promotion Clause," which requires UFC Fighters to attend, cooperate, and assist in the promotion of bouts in which they fight and, as required by the UFC, any other bouts, events, broadcasts, press conferences and sale of merchandise, for no additional compensation. By contrast, no affirmative obligation exists for the UFC to promote the UFC Fighter. In fact, the UFC regularly punishes athletes who do not bow to its whims. As just one example, UFC light-heavyweight champion Jon Jones refused to take a short-notice replacement of one of his opponents, as MMA Fighters typically train for bouts with a specific opponent. After his refusal, the UFC issued a press release stating, "Lorenzo Fertitta (UFC chairman and CEO) and I [Dana White] are disgusted with Jon Jones and Greg Jackson [Jones trainer]." White continued by stating, "UFC 151 will be remembered as the event Jon Jones and Greg Jackson murdered." By denigrating the UFC Fighter in public, the UFC reduces a Fighter's earnings ability as the consuming audience will support events featuring the UFC Fighter in lower numbers, leading to reduced payments for bouts and endorsements.

        e.     The "Retirement Clause," which gives the UFC the power "to retain the rights to a retired fighter in perpetuity," when a Fighter retires before competing in the specified number of bouts in his or her UFC contract.

        f.     Tolling provisions, which extend the term of the UFC Fighter's contract during periods when he or she is injured, retired, or otherwise declines to compete, thus virtually prohibiting even disgruntled athletes from sitting out the term and signing with a would-be rival promoter.

        g.     The "Sponsorship and Endorsement Clause," which grants the UFC sole discretion over all sponsorship and endorsement approvals. In effect, the Sponsorship and Endorsement Clause requires the approval of the UFC before an entity can contract with a UFC Fighter to sponsor or endorse the entity's product or service during any UFC events. This gives the UFC control over sponsors and

Fighters and allows the UFC to block opportunities for sponsors where: (i) the UFC has decided to boycott the sponsor in retaliation for the sponsor having endorsed non-UFC Fighters or otherwise worked with actual or potential rival MMA Promoters; (ii) the sponsors have refused to pay the UFC's "sponsorship tax," which is a fee paid to the UFC for the right to sponsor a UFC Fighter; or (iii) the sponsors are engaged in ancillary business endeavors that compete with the UFC in any segment of the MMA Industry that the UFC intends to dominate, such as, *e.g.*, MMA publications, MMA video games, gyms, online MMA stores, energy drinks, online gaming sites, fan festivals and apparel providers. This clause gives substantial power to the UFC to block sponsors from working with actual or potential rival promoters and to deprive them of key revenue opportunities for themselves and their fighters, making actual or potential rivals less profitable and a less attractive option for top-ranked Professional MMA Fighters.

102.    As the UFC gained and then maintained market and monopsony power through this anticompetitive scheme, including by eliminating actual or potential rivals, it added provisions—such as additional restrictions on sponsorship rights—that further enhanced the UFC's control over its Fighters.

103.    No Plaintiff in this matter is suing as part of this case, on behalf of himself or any proposed class member, to enforce any rights or provisions of his own particular UFC contract. Nor is any Plaintiff in this matter claiming, as part of this case, on behalf of himself or any proposed Class member, that his contract, standing alone, violates the antitrust laws. Rather, Plaintiffs allege here that all of the UFC's contracts with Fighters—and the exclusionary provisions therein—taken together form part of the UFC's anticompetitive scheme to impair actual or potential rivals and enhance its monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market. Cumulatively, the exclusionary contractual provisions deprive the UFC's would-be rivals of critical inputs necessary to compete with the UFC in the MMA Industry—that is, the services of a deep pool of top-ranked Professional MMA Fighters—and thereby have substantially foreclosed competition in the Relevant Markets and enhanced and maintained monopoly and monopsony power.

b.    **The UFC's Exclusionary Scheme Included the Use of Threats, Intimidation, and Retaliation Against MMA Fighters Who Work With or For Would-Be Rivals or Speak Out Against the UFC.**

104.    As part of its exclusionary scheme, the UFC has retaliated against: (i) UFC Fighters who work or threaten to work with would-be rival promoters, (ii) MMA Fighters working with would-be rival promoters who might someday wish to compete in the UFC, and (iii) would-be rival promoters who work with UFC Fighters. As a result, UFC Fighters have refused offers to fight for actual or potential rival promoters, even those that offer higher compensation, out of fear that the UFC would retaliate against both the promoter and the Fighter. Professional MMA Fighters are deterred by the UFC's threats because Professional MMA Fighters recognize that being banned from future opportunities to fight for the UFC will substantially diminish their ability to earn income as Professional MMA Fighters. Moreover, the UFC has control over key sponsors, sponsors the UFC threatens never to work with if they contract with a Professional MMA Fighter against the UFC's wishes.

105.    For example, the UFC negotiated a deal with THQ, Inc. for the development of a UFC video game. Zuffa required its athletes, for no compensation, to assign exclusively and in perpetuity their likeness rights for video game use. Fighters who resisted or wished to negotiate this request were terminated. White also publicly threatened all MMA Fighters, even those not under contract with Zuffa with a permanent ban from competing in the UFC if the Fighter chose to sign with EA Sports, a video game developer that was working on a video game with a rival MMA promoter.

106.    Additionally, following his victory over Matt Hughes in a welterweight title bout that had been promoted by the UFC, UFC Fighter B.J. Penn informed the UFC that he planned to sign with an actual or potential rival promotion company for a much higher payday than UFC was then offering. In response, the UFC's Dana White called Penn and threatened that the UFC would ban Penn from fighting for the UFC forever if Penn worked with another promoter. White told Penn that Penn was "f***ing done! You'll never fight in the UFC again! You're finished. You're scorched earth, motherf***er. Scorched earth. Don't call me crying saying you want to come back because your f***ing done!" White also threatened to remove or blur Penn's face from UFC videos and promotions and said he would remove his bout with Hughes from the UFC's DVD library so that Penn "would be forgotten." This behavior, as part of the anticompetitive scheme, had a chilling effect on the ability of UFC Fighters to

31

compete for potential rival promotions.

107.    The UFC punished and continues to punish Fighters that refuse, or consider refusing, the UFC's contractual terms, including by eliminating them from the UFC's Promotional Materials. Through the "Ancillary Rights Clause" of its Promotional Agreements with Fighters, the UFC retains rights to the names and likenesses of every UFC Fighter in perpetuity. Randy Couture, a well-known and historically accomplished UFC Fighter who won championship titles in multiple weight classes, refused to assign his Ancillary Rights and, instead, attempted to negotiate control over his Identity. According to Couture, he had "issues with Zuffa" after "g[e]t[ting] off on the wrong foot over the ancillary rights in my contract and signing away my name and image, which then led to the [UFC] . . . having m[e] pulled out of the video game, pulled out of the ad campaigns with Carmen Electra and all those things. Because I wasn't willing to just sign those things away like most fighters had done to date at that point, I think that immediately put me on the outs with the manager, with Dana [White] and the people that own the company." In fact, Couture lost the benefit of being promoted by the UFC despite competing in bouts, including by being airbrushed out of the following UFC ad campaign for refusing to assign his Identity to the UFC for no compensation:



(Below, Couture is airbrushed out of the ad campaign.)



**2.      After Impairing Actual or Potential Rival Promoters in the Relevant Output Market Through the Scheme Alleged Herein, the UFC Acquired Those Would-Be Rivals that It Did Not Put Out of Business or Relegate to the "Minor Leagues."**

108.    The UFC's scheme successfully blocked actual or potential rival promoters from accessing inputs necessary to put on successful MMA events and to operate, sustain, and grow successful MMA Promotions that could eventually compete directly with the UFC. This scheme put several actual or potential rival MMA Promoters out of business. Those companies that were not forced to exit the MMA Promotion business by the scheme were weakened to such a degree that selling out to the UFC or becoming a "feeder" or "developmental" promotion for the UFC became the only realistic options. As a result, and as part of the scheme, from December 2006 to March 2011, the UFC engaged in a series of strategic acquisitions of competing MMA Promoters, culminating with its acquisition of rival MMA promotion company, Strikeforce. The UFC's acquisitions, along with other aspects of the exclusionary scheme, resulted in the UFC becoming, by its own admission, the only meaningful Promoter of live Professional MMA in the U.S. and North America, enhancing the UFC's monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market.

109.    Beginning at least as early as December 2006, the UFC embarked on a campaign to monopolize and monopsonize the Relevant Markets. As part of a deliberate plan to consolidate the MMA

33

Industry and more broadly solidify its control over the Relevant Markets, the UFC began acquiring its competitors one by one. In December 2006, the UFC announced the acquisition of assets of actual or potential rival promoters World Extreme Cagefighting ("WEC") and World Fighting Alliance ("WFA"). Initially, the UFC operated WEC, based in California, as a separate MMA promotion company, broadcast on a separate cable network to block would-be rivals from being televised on the network. But in October 2010, the UFC announced that it was merging the WEC and all of its fighters with the UFC. The UFC's acquisition of WEC enabled the UFC to eliminate a would-be rival for Professional MMA Fighters in heavier weight classes, while also acquiring the major promotion entity for Fighters in lighter weight classes. The UFC also acquired "Pride" and several other would-be rival promoters in 2007.

110.    Between 2008 and 2011, and continuing into the present, the UFC accelerated its aggressive anticompetitive campaign. As part of the scheme alleged herein, the UFC's efforts to prevent any successful competitive activity by new entrants directly contributed to the impairment and ultimate failure of the following MMA Promoters, among others:

a.    Affliction Entertainment/Golden Boy Promotions. Golden Boy Promotions is the promotional arm of legendary boxer Oscar de la Hoya. Golden Boy partnered with Affliction Entertainment and entered the market for promotion of live Professional MMA events for less than one year before being forced to pull out in 2009 after just two events. As part of its scheme, the UFC forced Affliction, a niche apparel provider, to exit the MMA promotion business by raising its costs and blocking Affliction from continuing to sponsor any UFC Fighters.

b.    HDNet Fights. HDNet Fights was founded in 2007 by billionaire owner of the Dallas Mavericks and HDNet founder, Mark Cuban. HDNet Fights briefly promoted its own live Professional MMA bouts. By 2009, the UFC had forced Cuban to shut down and, instead, become a bondholder in Zuffa. The combination of the UFC's Exclusive Promotional Agreements, its persistent refusal to co-promote, and its blocking of the ability of Professional MMA Fighters to self-promote, even after the terms of their contracts had expired, prevented Cuban's promotion company from promoting potentially lucrative fights, including a proposed mega fight between Randy Couture and Russian superstar Fedor Emelianenko.

111.    By 2011, the only potentially robust competitor to the UFC was Strikeforce, an MMA

promotion company that had been threatening to become a major force in the MMA Industry. Strikeforce had a strong roster of top-ranked Professional Mixed Martial Artists, and at the time was the only major MMA outfit promoting women's MMA. It also had signed lucrative broadcast deals with Showtime and CBS. In addition, Strikeforce had succeeded in obtaining significant promotional sponsors and entered an agreement with EA Sports to develop an MMA video game to compete with the UFC's MMA video game, which had been developed by THQ of Agoura Hills, California. Strikeforce also publicly announced its desire to co-promote high-level MMA events with international promoters, and had a number of co-promotional arrangements, including co-promotional arrangements with Russian promoter M-1 and the Japanese promotion Dream. Co-promotional arrangements, common in boxing, mean athletes promoted by competing promoters fight against each other in co-promoted events with a split of profits generated.

112.    As part of the exclusionary scheme, in the years before 2011, the UFC had actively sought to use its market dominance to put Strikeforce out of business. For instance, as part of this scheme—even when it was not economically rational but for the potential for exclusion—the UFC regularly "counterprogrammed" against Strikeforce events, *i.e.*, purposely staged UFC events on the same nights as Strikeforce events to prevent Strikeforce from gaining adequate ticket sales, television viewers or public notoriety for its events. The UFC counter-programmed against Strikeforce not because it was profitable in the short-run, but rather because it was a means of using the UFC's dominance in the Relevant Markets to prevent Strikeforce from successfully promoting MMA events and thereby gaining adequate economies of scale or scope. Moreover, the UFC used its market power to pressure sponsors of Strikeforce's MMA fighters to withdraw their sponsorships by threatening to ban them from sponsoring UFC Fighters or otherwise appearing in UFC broadcasts.

113.    In March 2011, as part of the scheme alleged herein, after the UFC had made it difficult for Strikeforce to compete profitably, Strikeforce was forced to, and did, sell to Defendant Zuffa. Following the purchase, the UFC signed many of Strikeforce's top stars and champions, including Cung Le, Jason Miller, Nick Diaz, Dan Henderson, and Alistair Overeem. Under Zuffa's ownership, Strikeforce closed the promotion's men's weight classes below "lightweight." After an extension was reached to continue Strikeforce as a separate entity under the UFC's umbrella through 2012, the

promotion's heavyweight division was merged into the UFC, and the UFC ended the promotion's "Challengers" series. The final show under the Strikeforce brand was "Strikeforce: Marquardt vs. Saffiedine" on January 1, 2013, after which the UFC dissolved the promotion and all fighter contracts were either ended (where the UFC did not find them valuable) or absorbed into the UFC.

114.    After the UFC's acquisition of Strikeforce, the UFC controlled virtually all top-ranked Professional MMA Fighters in every weight class. The Strikeforce acquisition was part of a series of UFC acquisitions of actual or potential rival promotions that, together, enabled the UFC to consolidate and maintain its control over the revenue-generating core of the MMA Industry. While they proclaimed to promote the best in every weight class prior to the Strikeforce acquisition, following the Strikeforce purchase, the UFC could accurately state that it now controlled virtually all top-ranked Professional MMA Fighters in every weight class. Going forward, this insured that, to succeed in Professional MMA and achieve corresponding public notoriety, a Professional MMA Fighter must sign with the UFC and compete against UFC Fighters for UFC championship belts.

> **3.    After Impairing Actual or Potential Rivals and Acquiring Virtually Every Would-Be Rival Promoter That It Did Not Put Out of Business, the UFC Relegated all Remaining MMA Promoters to "Minor League" Status.**

115.    Beginning no later than March 2011, those few fringe MMA Promoters that the UFC had not yet acquired or put out of business, such as Bellator MMA ("Bellator"), effectively functioned and continue to function as "minor leagues" or feeder promotions for the UFC. These MMA Promotion outfits provide no real access to top media rankings, public notoriety, lucrative bout purses, endorsements, or sponsorships. Thus, through its anticompetitive scheme, the UFC has come to dominate, and maintain dominance in, the Relevant Input and Output Markets.

116.    Professional MMA Fighters generally view non-UFC Promotion companies that still exist as the "minor leagues," *i.e.*, as training grounds for future UFC Fighters.

117.    Ben Askren ("Askren"), a former Bellator welterweight champion, represented the U.S. Olympic wrestling team in freestyle wrestling, was a four-time NCAA All-American, two-time national champion, and NCAA wrestler of the year. Askren publicly stated that the only means of moving up the MMA ranks and obtaining notoriety as a Professional MMA Fighter was to join the UFC and defeat UFC Fighters.

118.     While skilled Professional MMA Fighters may emerge outside of the UFC or break off from the UFC, those Fighters cannot demonstrate their skill, garner attention, or otherwise maintain sustainable careers outside of the UFC. The measure of success of a Professional MMA Fighter is dependent upon the level of competition he or she faces and his or her success or failure when doing so. The success of a Professional Mixed Martial Artist requires that he or she register wins over Fighters seen by the viewing audience and media as top-ranked or otherwise well-known Professional MMA Fighters in widely viewed MMA events to build public notoriety, reputation, fan base, sponsor interest, and earnings potential. Professional MMA Fighters who compete at the highest level of the sport cannot "opt out" of the UFC because the UFC's anticompetitive conduct has made it impossible to maintain a successful MMA fighting career outside of the UFC.

119.     Likewise, because UFC Fighters are bound by non-compete agreements, and because the UFC will not co-promote, would-be rival MMA promotion companies cannot stage bouts between their own non-UFC fighters and UFC Fighters. Because UFC Fighters are considered to be MMA's top Professional MMA Fighters, would-be rival MMA promotion companies cannot compete effectively. Without big-ticket MMA Cards with top-ranked Professional MMA Fighters, would-be rival promotions are unable to secure sufficient public interest or sponsors and venues large enough or prestigious enough to generate revenues and bout purses that can sustain the demands of training costs, travel, health coverage, gym membership, sparring partners, and other expenses necessary for sustaining a career as a Professional MMA Fighter. As a result, would-be rival promoters do not and cannot promote MMA events that offer top-ranked or otherwise well-known Professional Mixed MMA Fighters substantial earnings potential on PPV broadcasts, major network, or subscription-based broadcast outlets.

120.     Accepting and publicly acknowledging their "minor league" status, rather than competing with the UFC, potential rival promotions in the MMA Promotion Industry seek instead to work as developmental leagues for the UFC and to obtain the UFC's approval. Thus, instead of seeking to invest in and develop Professional MMA Fighters to their full potential, the UFC's potential rival promoters acknowledge that they can afford only small purses. Thus, "rival" promoters survive and attract Professional MMA Fighters by serving as a "minor league" training ground for the UFC and guaranteeing their Fighters' release to the UFC—and only the UFC—should the Professional MMA

Fighter achieve enough success and earn enough notoriety to potentially obtain an offer from the UFC. Alternatively, non-UFC MMA promotions attract MMA Fighters on the downsides of their careers that the UFC no longer wishes to retain. Either way, potential rival promotions cannot put on events that compete with the UFC and cannot offer potential top-level MMA Fighters opportunities to advance their careers.

121.     Resurrection Fighting Alliance ("RFA"), formerly broadcast on AXS TV (formally HDNet), was one such UFC "minor league." The RFA was a regional-level promotion operated by Ed Soares, who stated that his "vision" for the RFA was "to build a developmental league for guys who want to move up into the UFC." According to Soares, the RFA was truly a "developmental" promotion for Professional MMA Fighters seeking to make it to the UFC, and for veteran Professional MMA Fighters released by the UFC to "test themselves against the guys who are coming up." Soares further stated that all RFA Professional MMA Fighters who receive offers from the UFC would be released from their RFA promotional agreement. RFA promotional agreements contain an express "release" provision in the event a Mixed Martial Artist obtains an offer from Zuffa. Because of the UFC's dominance of the Relevant Markets through the scheme alleged herein, absent such a provision, it is unlikely that promotions such as RFA and others would be able to attract any significant number of Professional MMA Fighters. Scott Cutbirth, the former matchmaker responsible for arranging RFA bouts, has acknowledged, "[a]ll of our contract [sic] are exclusive with a Zuffa[-]out clause. So yes, if they get offered a deal with Zuffa, we will honor that. No other organizations will be honored." Purses paid by the RFA are minimal compared to the UFC. Soares is also a prominent manager of many Professional MMA Fighters currently under contract with the UFC. The RFA subsequently merged with Legacy Fighting Alliance (discussed below).

122.     Titan Fighting Championship ("Titan FC") is another existing MMA "minor league" promotion outfit. Titan FC is a regional promotion originally formed in 2006, and currently promoted by serial entrepreneur and multi-millionaire Jeff Aronson. Aronson advised the press in January 2014 that all Mixed Martial Artists signed to Titan FC will have a "Zuffa-out" clause in their contracts, meaning they will be released if Zuffa offers the fighter a bout. Aronson has acknowledged that Titan FC "is not looking to compete with Zuffa." Aronson explained that Titan FC's role is "to take the best guys that are out there, who may be scared to get into long-term deals, and give them a forum to get back" into the

UFC. Titan FC is broadcast exclusively on the UFC's internet broadcast subscription service "Fight Pass."

123.   Legacy Fighting Alliance ("LFA") is still another "minor league" MMA Promoter (formed in 2009) that does not dare compete directly with the UFC. LFA has survived as an MMA Promoter, in part, by clearly establishing that it, too, does not and will not compete with the UFC. Rather, Mick Maynard, LFA's former President (and now matchmaker for the UFC), has publicly stated that LFA exists to supply the UFC with fighters rather than compete with the UFC. Currently, LFA is operated by Ed Soares, and is broadcast on the UFC's internet broadcast subscription service "Fight Pass."

124.   Invicta Fighting Championship ("Invicta"), broadcast on the UFC's Internet broadcast subscription service "Fight Pass," was formed in 2012, and solely promotes women's MMA events. Shannon Knapp, the founder and owner of Invicta, is a veteran of the MMA Industry. Knapp insists that Invicta does not aim to compete directly with the UFC. Knapp has acknowledged that Invicta functions as a platform from which female Professional MMA Fighters can "graduate" or "advance" to the UFC.

125.   Responding to questions regarding whether Invicta (and all other MMA Promoters) were being established as "feeder" promotions to the UFC, White stated: "As bad as people don't want to believe it, they don't want to hear it, meaning the other owners of the other mixed martial arts organizations—that's what they all are, they're all the Triple-A [*i.e.*, the minor leagues] to the UFC." White continued by boasting that all promotions that resist minor league status "end up $30 million in the hole. All the people that don't embrace it, embrace losing sh*t loads of money."

126.   Another potential competitor, Bellator, is viewed within the MMA Industry—and by the UFC itself—as a "minor league," a training ground for future UFC Fighters, or as a place for former UFC Fighters to compete after they have been released by the UFC.

127.   Bellator athletes lack significant public notoriety, in part because it is a "minor league," and in part because the UFC refuses to co-promote with any of Bellator's fighters regardless of talent or merit, leaving Bellator unable to promote MMA events of relative significance. Bellator's bout purses, gate revenues, attendance figures, merchandise sales, television licensing fees and ad rates are minimal compared to those obtained by the UFC.

128.   As White said on November 14, 2013 of Professional MMA Fighters under contract with

39

Bellator, "I feel sorry for the kids that fight there. I do. I truly feel sorry for the kids that have to be stuck in that s**thole."

129.    Even though the UFC has publicly stated that it views Bellator as a "minor league" that does not present a competitive threat to the UFC, as part of the exclusionary scheme alleged herein, the UFC has nevertheless engaged in aggressive conduct to inhibit Bellator's development into a viable rival promotion.

**B.    The UFC's Exclusionary Scheme Substantially Foreclosed Competition in the Relevant Input and Output Markets**

130.    The UFC's ongoing anticompetitive scheme has enhanced and maintained the UFC's monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market by substantially foreclosing competition in both Relevant Markets.

131.    The UFC has used its exclusive contracts and dominant market power to prevent Fighters from competing for other MMA Promoters, foreclosing other Promoters' access to a sufficient stable of top Fighters. By locking up the vast majority of top Fighters, including through provisions that gave the UFC the power to extend contracts perpetually, ensuring that contract end dates were staggered, and that the most valuable Fighters were locked up for the longest terms, the UFC's Scheme has blocked potential competitors from entering or expanding. Without access to the top Fighters the UFC locked up with its contracts, other MMA promoters have given up on competing with the UFC for talent, and have become "feeder" leagues to the UFC or "minor" leagues.

132.    As a result of the UFC's scheme, compensation associated with fighting in MMA bouts to members of the Class has been and continues to be artificially suppressed. In addition, the anticompetitive effects of the UFC's exclusionary scheme in the Relevant Markets include, *inter alia*:

    a.    reduced competitiveness of live Professional MMA events;

    b.    artificially suppressed output in the Relevant Output Market, including fewer live Professional MMA bouts than would exist in the absence of the challenged anticompetitive scheme; and,

    c.    artificially suppressed demand in the Relevant Input Market.

133.    There are no legitimate procompetitive justifications for the anticompetitive scheme alleged in this Complaint, or for any aspect of the anticompetitive conduct standing alone. Even if,

40

*arguendo*, such justifications existed, there are less restrictive means of achieving those purported procompetitive effects. To the extent the anticompetitive scheme or any aspect of the anticompetitive scheme has any cognizable procompetitive effects, they are substantially outweighed by the anticompetitive effects.

### C.     Plaintiffs and Members of the Class Suffered Antitrust Injury

134.     As a direct and proximate result of the Defendants' anticompetitive conduct, as alleged herein, Plaintiffs and all members of the Class suffered substantial losses to their business or property in that their compensation associated with fighting in one or more live Professional UFC-promoted MMA bouts was artificially suppressed during the Class Period. The full amount of such damages will be calculated after discovery and upon proof at trial.

135.     In return for signing a contract with the UFC, a UFC Fighter is scheduled, at the UFC's discretion, an average of fewer than two fights per year. The starting pay for a UFC Fighter, as of 2015, was $10,000 to "show," *i.e.*, compete in a bout, and $10,000 if the UFC Fighter is victorious in a bout as a "win" bonus.

136.     As part of its effort to foreclose potential rival MMA Promoters from accessing a critical mass of top-ranked Professional MMA Fighters, the UFC has contracted with more Fighters than it needs for bouts during any given year. The UFC has consistently been able to keep Fighters bound by the exclusionary provisions in its contracts—and thus unavailable to other MMA promoters—while simultaneously promoting an insufficient number of bouts given the number of Fighters on its roster. The UFC has been able to suppress the number of events in which Fighters would participate below what Fighters would otherwise prefer and maintain significantly more Fighters under contract than it could use in bouts. In April 2014, UFC President Dana White acknowledged that the UFC has contracts with more Professional MMA Fighters than necessary, stating: "We have 500 guys under contract, which is a lot more than we really need, and after each show, we really, really need to take a close look at what we do with guys." Because the UFC only pays Fighters when the compete in bouts, this conduct bolster's the UFC's scheme to enhance its monopoly and monopsony power in the Relevant Markets without offering any countervailing benefits to Fighters.

137.     Unlike boxing, where promoters frequently advance funds to cover the costs of medical

tests, training camps, coaches, food and nutrition, sparring partners, and living expenses, UFC Fighters bear their own costs. UFC Fighters typically pay out approximately 15 to 25% of their MMA earnings to cover the costs of gym memberships and management fees and must also pay the costs of any necessary sparring partners brought into the athlete's training camp in preparation for a bout.

138.    As a result of the anticompetitive scheme, the UFC is able to compensate UFC Fighters below competitive levels even though UFC events have among the highest average ticket prices in all of sports. UFC fighters collectively earn less than 20% of the revenues generated by UFC events, whereas athletes in boxing, MLB, the NBA, the NFL, and the NHL all earn 50% or more—sometimes substantially more—of revenues generated by those sports.

139.    Additionally, the UFC has been able to raise ticket and PPV prices significantly above competitive levels as the UFC consolidated its market dominance through the conduct alleged herein. Where the average live ticket price for a major UFC event was $178 in 2005, it is now approximately $300. Under Zuffa, the UFC has also increased its prices for PPV events from an average of $28.91 per event for its first broadcast in 2001 to the current price of $69.99 per event.

140. The conduct comprising the UFC's anticompetitive scheme is continuing and so are the damages suffered by the members of the Class.

## VIII.   INTERSTATE COMMERCE

141.    The UFC engages in interstate commerce and in activities substantially affecting interstate commerce including (1) promotion of MMA events in nearly all of the states comprising the United States, (2) PPV, television, and Internet subscription-based broadcasts which occur throughout the United States, (3) sale, distribution or licensing of merchandise throughout the United States, and (4) production of television and Internet subscription-based programming which occurs throughout the United States.

## IX.    CLAIM FOR RELIEF FOR MONOPSONIZATION UNDER SECTION 2 OF THE SHERMAN ACT

142.    Plaintiffs incorporates by reference all of the preceding and ensuing paragraphs as if fully alleged herein.

143.    The relevant geographic market is the United States, or in the alternative, North America.

144.    The Relevant Markets include the markets for (a) promoting Professional MMA bouts in

the United States (the "Relevant Output Market"), and (b) the market for Professional MMA Fighter services (the "Relevant Input Market").

145.   The UFC possesses monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market, whether the geographic market includes the U.S. only, North America only, or the entire world. The UFC has obtained, enhanced, and maintained dominance in both Relevant Markets through the exclusionary scheme alleged herein. The UFC has abused and continues to abuse that power to maintain and enhance its market dominance in the market for Professional MMA Fighter services through an exclusionary scheme to impair and substantially foreclose competition by depriving actual and potential competitors in the Relevant Markets of necessary inputs (including, *e.g.*, top-ranked Professional MMA Fighters) and pursuing an aggressive strategy of merging with or purchasing the would-be rivals that its scheme had first competitively impaired.

146.   The UFC's exclusionary scheme includes, but is not limited to, the following conduct: (a) causing or directly and intentionally contributing to the failure of competing MMA Promotions and acquiring actual or potential rival promotions to eliminate competing titles from the marketplace and to obtain the contracts of Professional MMA Fighters; and (b) leveraging its monopsony and monopoly power in the Relevant Markets through the use of long-term Exclusive Agreements with Professional MMA Fighters.

147.   By locking up the vast majority of top-ranked MMA Fighters across all major weight classes to multi-bout exclusive contracts that are effectively perpetual, the UFC's exclusionary scheme has substantially foreclosed competition in the Relevant Markets by ensuring that no rival MMA Promoter can obtain a critical mass of top Fighters, thereby impairing the ability of any MMA Promoters to compete with the UFC in either Relevant Market.

148.   As a direct and proximate result of this continuing violation of Section 2 of the Sherman Act, Plaintiffs and members of the Class have suffered injury and damages in the form of artificially suppressed bout compensation in amounts to be proven at trial.

149.   Plaintiffs, on behalf of themselves and other members of the Class, seek money damages from Defendants for these violations. These damages represent the additional compensation Plaintiffs and other members of the Class would have received for their Professional MMA Fighter services absent the

anticompetitive scheme alleged herein. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. §15. Plaintiffs' and Class members' injuries are of the type the antitrust laws were designed to prevent, and flow directly from the Defendants' unlawful conduct.

150.    Plaintiffs, on behalf of themselves and other members of the Class, seek injunctive relief barring Defendants from engaging in the anticompetitive scheme alleged herein. The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

## X.    DEMAND FOR JUDGMENT

151.    WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully ask the Court for a judgment that:

a.    Certifies the case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3), and appoints Plaintiffs and their attorneys as class representative and class counsel, respectively;

b.    Awards Plaintiffs and the Class treble the amount of damages actually sustained by reason of the antitrust violations alleged herein, plus the reasonable costs of this action including attorneys' fees;

d.    Orders such equitable relief as is necessary to correct for the anticompetitive market effects caused by the unlawful conduct of Defendants;

e.    Enters judgment against each Defendant, holding each Defendant jointly and severally liable for the antitrust violations alleged; and

f.    Directs such further relief as it may deem just and proper.

## XI.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as provided by Rule 38(b) of the Federal Rules of Civil Procedure.

Dated this 23rd day of June, 2021.

Respectfully Submitted,

KEMP JONES, LLP

By:   _/s/ Don Springmeyer_____
Don Springmeyer, Esq. (Nevada Bar No. 1021)
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169

44

Eric L. Cramer, Esq. *(Pro hac vice forthcoming)*
Michael Dell'Angelo, Esq. *(Pro hac vice forthcoming)*
Patrick Madden, Esq. *(Pro hac vice forthcoming)*
Mark R. Suter, Esq. *(Pro hac vice forthcoming)*
BERGER MONTAGUE PC
1818 Market St., Suite 3600
Philadelphia, PA 19103

Joseph R. Saveri, Esq. *(Pro hac vice forthcoming)*
Joshua P. Davis, Esq. *(Pro hac vice forthcoming)*
Kevin E. Rayhill, Esq. *(Pro hac vice forthcoming)*
JOSEPH SAVERI LAW FIRM, INC.
601 California St., Suite 1000
San Francisco, California 94108

Richard A. Koffman, Esq. *(Pro hac vice forthcoming)*
Benjamin D. Brown, Esq. *(Pro hac vice forthcoming)*
Daniel Silverman, Esq. *(Pro hac vice forthcoming)*
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave., N.W., Suite 500, East Tower
Washington, DC 20005

Robert C. Maysey, Esq. *(Pro hac vice forthcoming)*
Jerome K. Elwell, Esq. *(Pro hac vice forthcoming)*
WARNER ANGLE HALLAM JACKSON &
FORMANEK PLC
2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016

ANTITRUST CLASS ACTION COMPLAINT