Don Springmeyer (Nevada Bar No. 1021)
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Fl.
Las Vegas, Nevada 89169
Tel: (702) 385-6000
Fax: (702) 385-6001
Email: dspringmeyer@kempjones.com

*Counsel for Plaintiffs Kajan Johnson and*
*Clarence Dollaway and the Proposed Class*

[Additional counsel listed on signature page]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| Kajan Johnson and Clarence Dollaway, on behalf of themselves and all others similarly situated, | Case No.: 2:21-cv-01189-RFB-BNW |
| Plaintiffs, | **OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| vs. | |
| Zuffa, LLC (d/b/a Ultimate Fighting Championship and UFC) and Endeavor Group Holdings, Inc., | |
| Defendants. | |

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     LEGAL STANDARD ...........................................................................................3

III.    ARGUMENT ........................................................................................................4

    A.      Plaintiffs Allege Plausible Relevant Markets.................................................4

        1.      Plaintiffs' Allegations of Monopsony Power Defeat Defendants'
                Motion.......................................................................................................4

        2.      Plaintiffs Adequately Allege Monopoly Power................................8

    B.      Plaintiffs State a Claim for Monopsonization (and Properly Allege
                Monopolization)..............................................................................................10

        1.      Defendants Invent an Allegation that "the Market Is Frozen."......10

        2.      Defendants Premise Their Motion on Improper Factual
                Assertions..............................................................................................11

    C.      The *Johnson* Complaint Was Timely..............................................................13

        1.      The Court Can Consider All Conduct in Furtherance of
                Defendants' Scheme..............................................................................13

        2.      Defendants' Argument About *American Pipe* Tolling Is
                Irrelevant. ............................................................................................18

        3.      The Laches Doctrine Is Inapplicable..............................................18

    D.      Plaintiffs State a Claim for Relief Against Endeavor.................................19

    E.      Plaintiffs Do Not Oppose Consolidation...................................................23

IV.     CONCLUSION...................................................................................................24

# TABLE OF AUTHORITIES

Page(s)

Cases

*American Pipe & Construction Co. v. Utah*,
 414 U.S. 538 (1974)................................................................................................ 19

*Arandell Corp. v. Centerpoint Energy Services, Inc.*,
 900 F.3d 623 (9th Cir. 2018) ............................................................................. *passim*

*Arnold Chevrolet LLC v. Tribune Co.*,
 418 F. Supp. 2d 172 (E.D.N.Y. 2006) ................................................................. 23

*Aurora Enterprises, Inc. v. National Broadcasting Co.*,
 688 F.2d 689 (9th Cir. 1982) ................................................................................ 18

*Bay Area Surgical Management LLC v. Aetna Life Insurance Co.*,
 166 F. Supp. 3d 988 (N.D. Cal. 2015) .................................................................. 6

*Besser Publishing Co. v. Pioneer Press, Inc.*,
 571 F. Supp. 640 (N.D. Ill. 1983) ......................................................................... 6

*Columbia Steel Casting Co. v. Portland General Electric Co.*,
 111 F.3d 1427 (9th Cir. 1996) .............................................................................. 15

*Complete Entertainment Resources LLC v. Live Nation Entertainment, Inc.*,
 No. CV 15-9814, 2016 WL 3457177 (C.D. Cal. May 11, 2016).......................... 18

*Copperweld Corp. v. Independence Tube Corp.*,
 467 U.S. 752 (1984).............................................................................................. 20

*Costco Wholesale Corp. v. Maleng*,
 522 F.3d 874 (9th Cir. 2008) ................................................................................ 15

*Danjaq LLC v. Sony Corp.*,
 263 F.3d 942 (9th Cir. 2001) ................................................................................ 19

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
 504 U.S. 451 (1992)................................................................................................ 9

*Faircloth v. AR Resources, Inc.*,
 No. 19-cv-5830, 2020 WL 820307 ....................................................................... 18

*Golden Boy Promotions LLC v. Haymon*,
 No. CV-15-3378-JFW-(MRWx), 2017 WL 460736 (C.D. Cal. Jan. 26, 2017) ................. 6

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
 392 U.S. 481 (1968)............................................................................................... 15

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Hennegan v. Pacifico Creative Service, Inc.*,
    787 F.2d 1299 (9th Cir. 1986) ..................................................................... 15

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ...................................................................... 7

*Hightower v. Celestron Acquisition, LLC*,
    No. 5:20-cv-03639, 2021 WL 2224148 (N.D. Cal. Jun. 2, 2021)..................... 21

*In re Animation Workers Antitrust Litigation*,
    87 F. Supp. 3d 1195 (N.D. Cal. 2015)..................................................... 15, 18

*In re Dealer Management Systems Antitrust Litigation*,
    No. 18-CV-864, 2018 WL 6629250 (N.D. Ill. Oct. 22, 2018) ......................... 22

*In re Google Digital Advertising Antitrust Litigation*,
    No. 20-cv-3556, 2021 WL 2021990 (N.D. Cal. 2021) .............................. 16, 17

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litigation*,
    No. 13-MD-2445, 2015 WL 12910728 (E.D.Pa. Apr. 14, 2015)..................... 23

*Industrial Building Materials, Inc. v. Interchemical Corp.*,
    437 F.2d 1336 (9th Cir. 1970) ..................................................................... 24

*Kleen Prod. LLC v. International Paper Co.*,
    831 F.3d 919 (7th Cir. 2016) ....................................................................... 24

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)............................................................................... 15, 17

*Las Vegas Sun, Inc. v. Adelson*,
    No. 2:19-cv-01667, 2020 WL 7029148 (D. Nev. Nov. 30, 2020) .................. 21

*Le v. Zuffa,LLC*,
    216 F. Supp. 3d 1154 (D. Nev. 2016)...................................................... *passim*

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
    847 F.3d 1221 (10th Cir. 2017) ................................................................... 21

*McNeil v. NFL*,
    790 F. Supp. 871 (D. Minn. 1992) .............................................................. 5, 9

*Midwestern Machinery Co. v. Northwest Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) ...................................................................... 17

*Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.*,
    311 F. Supp. 2d 1048 (D. Colo. 2004) ......................................................... 22

*O'Bannon v. National Collegiate Athletic Association,*
    802 F.3d 1049 (9th Cir. 2015) ........................................................................ 4

*Oliver v. SD-3C LLC,*
    751 F.3d 1081 (9th Cir. 2014) ............................................................... *passim*

*Pace Industries, Inc. v. Three Phoenix Co.,*
    813 F.2d 234 (9th Cir. 1087) ......................................................................... 18

*Rebel Oil Co v. Atlantic Richfield Co.,*
    51 F.3d 1421 (9th Cir. 1995) ........................................................................ 10

*Reveal Chat Holdco, LLC v. Facebook Inc.,*
    471 F. Supp. 3d 981 (N.D. Cal. 2020) ......................................................... 18

*Samsung Electronics Co. v. Panasonic Corp.,*
    747 F.3d 1199 (9th Cir. 2014) ................................................................. 15, 17

*Tele Atlas N.V.  v. NAVTEQ Corp.,*
    No. C-05-1673, 2008 WL 4809441 (N.D. Cal. Oct. 28, 2008) ...................... 15

*Times-Picayune Pub. Co. v. U.S.,*
    345 U.S. 594 (1953) ........................................................................................ 9

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2d Cir. 2001) ............................................................................ 8

*Twin City SportService, Inc. v. Charles O. Findley & Co.,*
    512 F.2d 1264 (9th Cir. 1975) ................................................................. 17, 18

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc,*
    676 F.2d 1291 (9th Cir. 1982) ................................................................... 7, 10

*United States v. E.I. du Pont de Nemours & Co.,*
    351 U.S. 377 (1956) ........................................................................................ 7

*United States v. Syufy Enterprises,*
    903 F.2d 659 (9th Cir. 1990) .......................................................................... 4

*Z Technologies Corp. v. Lubrizol Corp.,*
    753 F.3d 594 (6th Cir. 2014) ........................................................................ 17

**Statutes**

15 U.S.C. § 2 .................................................................................................. 20, 21

15 U.S.C. § 18 .................................................................................................... 17

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**Rules**

Fed. R. Evid. 201(b)...................................................................................................... 11

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1

I.        **INTRODUCTION**

2        Defendants[1] filed a motion to dismiss (the "Motion to Dismiss," "Motion," or "Mot.") the class

3    action complaint of plaintiffs Kajan Johnson and Clarence Dollaway ("Plaintiffs").

4        None of Defendants' arguments has merit. That should be unsurprising. For seven years, the

5    plaintiffs in the pending *Le* action ("*Le*") have been prosecuting essentially the same case. They have

6    amassed copious evidence that the UFC has engaged and continues to engage in the alleged scheme (the

7    "Scheme"), causing the alleged anticompetitive harms. The UFC imposes exclusive contracts on its

8    professional mixed martial arts ("MMA") fighters ("Fighters") that are long-term on paper and perpetual

9    in practice (the "Contracts"). It has signed the vast majority of Fighters ranked highly in their respective

10   weight classes to exclusive Contracts. It acquires (the "Acquisitions") and otherwise forecloses potential

11   competitors. It coerces Fighters—especially those that win and attract large audiences—into new long-

12   term Contracts (the "Coercion"). It does so in part by forcing Fighters to sign new Contracts before the

13   old ones expire on pain of being deprived of fights—and thus pay—or being forced to face undesirable

14   opponents. Moreover, the strands of the Scheme—Contracts, Acquisitions, and Coercion—are

15   inextricably intertwined. For example, the Acquisitions and the Coercion lock Fighters into the Contracts.

16   Similarly, the Contracts require Fighters to compete only in UFC bouts, depriving potential competitor

17   MMA promotions of a critical mass of top-ranked Fighters.

18       This same Scheme is the basis both for *Le* and the new *Johnson* complaint (the "Complaint" or

19   "Compl.," ECF No. 1), which Plaintiffs filed for two limited purposes: (1) to hold accountable Endeavor,

20   the majority owner of Zuffa since 2016, for its active involvement in suppressing Fighter compensation

21   ("Fighter Compensation"); and (2) to preserve the rights of Fighters injured by Defendants' conduct after

22   June 30, 2017 (when the *Le* Class Period closed).

23       Those efforts should be uncontroversial. Endeavor and its affiliates paid approximately $4 billion

24   in 2016 for the UFC. Compl. ¶29. Endeavor itself acquired a controlling interest, in part to oversee the

25   management of the UFC. *Id.* Further, Fighters who began competing for the UFC after June 30, 2017

26

27   _____
     [1] "Defendants" means Zuffa, LLC d/b/a Ultimate Fighting Championship and UFC ("Zuffa" or the
     "UFC") and Endeavor Group Holdings, Inc. ("Endeavor").

28

have a right to pursue their legal claims. It would have been more efficient for Defendants simply to acknowledge that this new *Johnson* case may proceed—as *Le* has—and that *the evidence* should determine whether it succeeds.

Defendants nonetheless have filed their Motion to Dismiss, just as the UFC did unsuccessfully in *Le. Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154 (D. Nev. 2016). They have done so even though this new Motion should fail for many of the same reasons as the one in *Le* did.

The Motion makes four arguments. First, Defendants contend that Plaintiffs do not allege a plausible product market. *See* Mot. at 17-23. Plaintiffs' market definitions are so narrow, Defendants assert, that the Court should take the extraordinary step of rejecting them without even reviewing evidence. In fact, the Complaint here defines the relevant markets based on all Professional MMA Fighters, Compl. ¶¶42, 50, 63 & 72, a broad market definition that is favorable to Defendants and, in fact, is the same approach *Zuffa itself proposed* in its motion to dismiss in *Le*. Motion to Dismiss, *Le v. Zuffa, LLC*, No. 15-cv-1045, ECF No. 64 (D. Nev. Feb. 27, 2015) ("*Le* MTD"), at 14-15, 17-19. Nonetheless, Defendants take the absurd position that amateur fighters, who do not *sell* their services, must be considered in defining a market for the *sale* of MMA services. Plaintiffs' market is plausible and, in any event, the evidence should determine the relevant product market, not Defendants' implausible assertions.

Second, Defendants attack Plaintiffs' allegations of monopolization and monopsonization based on the false claim that Plaintiffs improperly assume that "the competitive landscape has frozen over since 2014." Mot. at 7. Plaintiffs make no such assumption. On the contrary, Plaintiffs allege Defendants' market power has *grown* over time including through the proposed Class Period in this case. *See*, *e.g.*, Compl. ¶¶100-101, 107 & 110.

Similarly, Defendants improperly ask this Court to resolve disputed factual matters contrary to Plaintiffs' allegations, citing numerous internet articles that they (wrongly) claim show increasing competition in professional MMA. Mot. at 10-12. As Defendants themselves acknowledge, the Court cannot consider such assertions by a defendant on a motion to dismiss.

Third, Defendants argue that the Complaint is untimely. In doing so, Defendants improperly try to isolate each of the three intertwined strands of the Scheme: (1) the Contracts; (2) the Acquisitions; and

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

(3) the Coercion. Defendants characterize these strands as "clusters." Mot. at 2. They then assume examples from each "cluster" had to occur during the statutory period for Plaintiffs to rely on that "cluster." That assumption is incorrect. This Court already correctly held that the Scheme should be assessed *as a whole*. *Le*, 216 F. Supp. 3d at 1168-69.

Moreover, the very cases on which Defendants rely are fatal to their position. They hold that the continuing violation doctrine allows a plaintiff to bring a claim based on *all* of the elements of an anticompetitive scheme if, during the statutory period, the Defendants took *any* relevant actions in furtherance of it and the plaintiff suffered resulting damages. The Complaint exceeds this standard in that Plaintiffs allege that all three strands continue to the present—the Contracts (Compl. ¶¶100-01); the Acquisitions (*id*. ¶110); and the Coercion (*id*. ¶107)—when the persistence of any one would suffice.

Fourth, Defendants assert that Plaintiffs do not adequately allege Endeavor's involvement in the anticompetitive conduct. Defendants claim, "Plaintiffs' sole basis for naming Endeavor as a defendant is that it owns Zuffa." Mot. at 1. Not so. Plaintiffs allege that Endeavor played an active role in the anticompetitive Scheme. Compl. ¶¶29-30. Relevant cases—including controlling Ninth Circuit precedent that Defendants ignore—hold that those allegations suffice. *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 629-32 (9th Cir. 2018).

For these reasons, Defendants' Motion to Dismiss should be denied in its entirety.

## II.      LEGAL STANDARD

The Court should take Plaintiffs' non-conclusory allegations as true, view them in the light most favorable to Plaintiffs, and determine whether they plausibly satisfy the elements of a claim. *Le*, 216 F. Supp. 3d at 1163-64. Further, contrary to Defendants' Motion, the Court should consider only the allegations in the Complaint, not assertions by Defendants, articles that appear on the internet, or other sources that are not properly subject to judicial notice. *Id.* at 1164.

III.      <u>ARGUMENT</u>

    A.      **Plaintiffs Allege Plausible Relevant Markets**

        Defendants argue that Plaintiffs fail to allege a plausible market to support their allegations of monopsony and monopoly power. That argument fails for numerous reasons.

        1.      **Plaintiffs' Allegations of Monopsony Power Defeat Defendants' Motion.**

           a.      ***Monopsony* Power Suffices to Support a *Monopsony* Claim.**

        As this Court held in *Le*, a claim based on an illegal monopsony does not require proof of monopoly power—the power to cause harm on the "seller side"—but only proof of monopsony power—the power to cause harm on the "buyer side." *Le*, 216 F. Supp. 3d at 1163 (quoting *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1161 (9th Cir. 2011)). Antitrust law "condemns market actors who distort competition, whether on the buyer side or seller side." *Id*.

        Defendants do not deny that a market actor with *monopoly* power can distort the *seller side* by raising the prices it charges above competitive levels. Symmetrically, in a case based on *monopsony* power, it is enough if a defendant can distort the market on the *buyer* side by suppressing fighter wages below competitive levels. *Le*, 216 F. Supp. 3d at 1163 ("Monopsony power is market power on the buy side of the market. As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'") (quoting *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007)). Suppressed wages in a monopsony case are a distortion of competition, just as are inflated prices in a monopoly case. *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1070-71 (9th Cir. 2015) (suppression of worker compensation is sufficient by itself to demonstrate "an anticompetitive effect;" purported requirement that plaintiffs must "show a decrease in output" is "simply incorrect").[2]

---

[2] Defendants may cite *United States v. Syufy Enterprises*, 903 F.2d 659 (9th Cir. 1990), as Zuffa did in *Le*, and argue that monopoly power in the output market is required for liability in a monopsony case. There, the Ninth Circuit expressed skepticism that a regional movie theater company that lacked market power over consumers downstream could have monopsony power over giant movie studios. *Id*. at 663. But *Syufy* did not hold that proof of monopoly power is necessary in a monopsony case; it merely made a factual observation relevant to the distinctive circumstances of that case. *Syufy*, which predates *O'Bannon*, has no bearing on the situation here.

To be sure, Plaintiffs allege that Defendants have sufficient monopoly power to distort the seller side, inflating prices to MMA fans and reducing output of MMA events. Compl. ¶¶132, 139. Those anticompetitive effects are relevant, but they are not necessary.[3]

### b.   Direct Allegations Suffice to Establish Monopsony Power.

As this Court also held in *Le*, direct proof of market power suffices. *Le*, 216 F. Supp. 3d at 1161. Just as direct allegations of supracompetitive prices establish monopoly power, *id*., so too do direct allegations of suppressed compensation establish monopsony power. *Id*. at 1163 (recognizing the symmetry between monopoly and monopsony cases). Defendants ignore that holding. Plaintiffs make detailed allegations about how Defendants could and did suppress fighter compensation below competitive levels. *See* Compl. ¶¶79-81, 95, 130-32 & 138. Defendants' argument about monopsony power therefore fails.

### c.   The Market Definition Should Be Based on Professional MMA Fighters.

Plaintiffs also make independently sufficient indirect (or circumstantial) allegations of monopsony power. Compl. ¶¶77-82. They have done so by defining a relevant market based on those promotions that *professional* Fighters would see as reasonable substitutes. *Id*. Defendants' Motion takes the extreme position that Plaintiffs cannot define a market from the perspective of *professional* Fighters but also must extend the market to *amateur* fighters. That position is meritless for numerous reasons.

First, in *Le*, Zuffa argued that the relevant market should be defined in just this way: based on all professional Fighters. *Le* MTD at 17-18. Even adopting that broad market definition—favorable to Defendants—Zuffa has monopsony power.

Second, the Court's ruling in *Le* precludes Defendants' argument. Plaintiffs there defined the market more narrowly, basing it on only those professional MMA Fighters that qualify as "elite." The Court held that the plaintiffs in *Le* appropriately defined the market for purposes of the pleadings. *Le*, 216 F. Supp. 3d at 1165-67. If a market definition based on elite professional MMA Fighters is not too narrow, neither is a market definition based on the broader group of *all* professional MMA Fighters. The same

---

[3] *McNeil v. NFL*, 790 F. Supp. 871, 895-96 (D. Minn. 1992) (showing effects on seller side relevant but not necessary in monopsony case).

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

holding in *Le* also defeats Defendants' contention that defining markets based on "top" fighters (Mot. at 21) is too vague; that is the very argument Zuffa made and this Court rejected about "elite" fighters in *Le*. 216 F. Supp. 3d at 1165-67. Further, Plaintiffs' market definitions do not use the term "top" at all. The characterization of "top" Fighters is relevant solely for assessing market power and foreclosure, *i.e.*, which MMA Fighters does a promotion need to control to dominate the market. Thus, none of the cases Defendants cite about "vague" market allegations is relevant.[4]

Third, the differences between professional and amateur Fighters is obvious, as is the difference between MMA Fighters and athletes in other sports. This Court held that "the Supreme Court has recognized distinctions in different levels of athletic competitions" in defining relevant markets. *Le*, 216 F. Supp. 3d at 1166 (citing *Int'l Boxing Club*, 358 U.S. at 252). The Court thus endorsed the distinction between elite and non-elite. *Id. A fortiori*, professional Fighters would not perceive fighting for free as an adequate substitute for fighting for pay.

Similarly, it is plausible that, faced with artificially suppressed pay, too few Fighters would turn to other combat sports or non-combat sports to drive their compensation up because their skills are "highly specialized and unique." *See* Compl. ¶¶67-71; *see also id.* ¶¶82, 96.[5]

---

[4] *See* Mot. at 21 (citing *Universal Grading Serv. v. eBay, Inc.*, No. C-09-2755 RMW, 2012 WL 70644, at *7 (N.D. Cal. Jan. 9, 2012); *Besser Pub. Co. v. Pioneer Press, Inc.*, 571 F. Supp. 640, 642 (N.D. Ill. 1983)); *id.* (discussing *Int'l Boxing Club of N.Y. v. U.S.*, 358 U.S. 242, 250-51 (1959); *Intel Corp. v. Fortress Inv. Grp. LLC*, No. 19-cv-07651-EMC, 2020 WL 6390499, at *8 (N.D. Cal. July 15, 2020); *Reudy v. Clear Channel Outdoors, Inc.*, 693 F. Supp. 2d 1091, 1127 (N.D. Cal. 2010)); *id.* at 20 (citing *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 997 (N.D. Cal. 2015)).

Defendants' reliance (Mot. at 22) on *Golden Boy Promotions LLC v. Haymon*, No. CV-15-3378-JFW-(MRWx), 2017 WL 460736, at *10 (C.D. Cal. Jan. 26, 2017), fares no better. *Golden Boy* focused on managers, not athletes, and the plaintiff there offered "no explanation why managers of non-Championship-Caliber Boxers would not be in the same economic market. . . particularly in light of the fact that a non-Championship-Caliber Boxer can become a Championship Caliber Boxer as the result of a single fight." *Id.* at *11. Plaintiffs' allegations here concern the importance of having the services of top-ranked Fighters as compared with other Fighters to dominate the relevant markets. Here, a promotion's roster of a *critical mass* of top-ranked Fighters is the critical attribute Fighters consider in determining whether a promotion is a reasonable substitute for the UFC, and a promotion's access to a stable of top-ranked Fighters to generate compelling matchups is an *essential element* of the promotion's ability to compete with the UFC. *See, e.g.*, Compl. ¶96.

[5] The cases on which Defendants rely are inapposite. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018), applied the traditional "reasonable interchangeability of use" standard, not a novel standard, to advertising on the bibs of professional caddies at golf tournaments, *id.* at 1120-21, and accepted "that

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Fourth, monopsony power—like monopoly power—should be weighted based on the amount of money at stake. *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc*, 676 F.2d 1291, 1298 n.5 (9th Cir. 1982) ("*Twin City II*") (endorsing weighting concessions based on share of revenues). It goes without saying that the NBA has more market power than the organizers of a pick-up basketball game. The same is true for the UFC compared to some promotion of unpaid Fighters. Amateur Fighters, by definition, get paid nothing. Events involving amateurs have little or no bearing on the economics of the MMA fight industry, notwithstanding Defendants' assertion to the contrary. As a result, defining the market based on all Fighters—even amateurs—not only makes no sense, but also would have no material effect on Plaintiffs' allegations that Defendants have monopsony power.

### d.    Monopsony Power Is Defined by Promotions, Not Fighters.

As Defendants acknowledged in *Le*,[6] but miss here, the relevant market for purposes of monopsony power consists of MMA promotions, not Fighters. For monopsony power, the issue is which buyers purchase services or products on terms that make them substitutes from the perspective of sellers.[7] In other words, the relevant market consists of those promotions a professional MMA Fighter would see as reasonable substitutes for the UFC. Defendants' error—defining the market in terms of fighters, not promotions—renders confused and baseless their contention that Plaintiffs have not defined an appropriate geographic market. Mot. at 19.

---

advertisements to golf fans constitute a unique product market." *Id*. What the court rejected was that "'in-play' or 'in-action' advertising during professional golf tournaments . . . constitutes a unique submarket." *Id*. *Hicks* did not suggest that advertisements through different sports are interchangeable or that advertisements on bibs of amateur caddies could substitute for advertisements on bibs of professional caddies. *Hicks* has no bearing on this case.

Defendants also cite *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956), for the "reasonably interchangeable" standard. Here, Plaintiffs allege that Professional MMA Fighters do not view promotions of amateur bouts as a reasonable substitute for promotions of professional bouts, Compl. ¶¶72-75, nor do MMA consumers view bouts featuring amateur Fighters or bouts in other countries as reasonable substitutes for professional MMA U.S. Events. *Id*. ¶¶45-49. Plaintiffs' allegations therefore suffice under the "reasonably interchangeable" standard.

[6] Zuffa, LLC's Motion to Exclude the Testimony of Dr. Hal Singer at 28-29, *Le v. Zuffa, LLC*, No. 15-cv-1045, ECF No. 524 (D. Nev. Feb. 16, 2018) ("[M]arket definition for an input market requires a 'focus on the alternatives available to sellers,'" that is, the alternative promotions for which the Fighters can work) (citations and emphasis omitted).

[7] *Todd v. Exxon Corp*., 275 F.3d 191, 202 (2d Cir. 2001) ("'the market is not the market of competing sellers but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes'" (quoting Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 324 (1991))).

The relevant geographic market for assessing monopsony power includes U.S.-based promotions—or, alternatively, North American-based promotions—that hold professional MMA events taking place in the U.S. or broadcast in the U.S. ("U.S. Events"). Compl. ¶¶74-75. The Complaint alleges that non-U.S.-based promotions do not compete with the UFC in holding U.S. Events. *Id*. Defendants cannot challenge that allegation on a motion to dismiss.

Defendants claim that Plaintiffs' geographic market definition is improper because it excludes foreign Fighters even if they could compete in U.S. Events or do compete in U.S. Events. Mot. at 19. Untrue. That argument muddles Fighters and promotions. If a U.S.-based *promotion* hires foreign fighters to compete in U.S. Events, it falls within the relevant geographic market. So the geographic market includes U.S.-based promotions that can and do hire foreign Fighters. Plaintiffs' allegations of monopsony power reflect the revenues generated by those foreign Fighters and their rankings. Defendants' assumption to the contrary is mistaken.

### e. Plaintiffs Properly Allege Market Power in a Global Market.

Plaintiffs also allege, in the alternative, that the UFC has monopsony power even if the market is defined to include all MMA promotions in the world. Compl. ¶77. That is because of the UFC's dominant position in purchasing Fighter services. Indeed, Plaintiffs allege that the UFC at times hires foreign fighters to compete in U.S. Events. *Id*. ¶76. Defendants concede that point. Mot. at 19. To be sure, the UFC may contest at summary judgment or trial that it has monopsony power if the market is defined on a world-wide basis. Whether it wins should depend on the evidence, not the pleadings.

### 2. Plaintiffs Adequately Allege Monopoly Power.

Defendants' arguments about monopoly power would not support dismissal, even if they were persuasive. As explained in Section III.A.1 above, Plaintiffs' sole claim requires only monopsony power, not monopoly power. Nonetheless, although not required to state a claim, Defendants' monopoly power is relevant,[8] as Plaintiffs allege that the Scheme reduced output and inflated prices for consumers of "live

---

[8] *McNeil*, 790 F. Supp. at 895-96 ("[T]he existence of defendants' monopoly power is relevant for purposes of determining whether the challenged restraints are more anticompetitive because they have been imposed by a monopolist[;] although defendants argue that monopolization of an output product

1    Professional MMA bouts." Compl. ¶¶44-49.

2         Defendants contest Plaintiffs' allegations of monopoly power, arguing, as they did unsuccessfully

3    in *Le*, that the market should include other combat and non-combat sports. Mot. at 22-23. They suggest

4    that all combat sports *must* be in the same market as MMA bouts because "*a* MMA fan *could* turn to

5    other combat sports (or sports in general) for entertainment if the cost of MMA content increased

6    significantly." *Id.* at 23 (emphases added). But that is the wrong standard. The issue is not whether a

7    fan—or several of them—might switch to other sports when prices are artificially inflated. It is whether

8    *so many* fans would switch that it would be unprofitable for Defendants to inflate prices for MMA events

9    above competitive levels. *See, e.g., Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482

10   (1992). That *a limited number* of MMA fans *could* switch does not suffice. *See Times-Picayune Pub. Co.*

11   *v. U.S.*, 345 U.S. 594, 612 n.5 (1953) (a "circle must be drawn narrowly to exclude any other product to

12   which, within reasonable variations in price, only a limited number of buyers will turn").

13        Thus, for example, this Court recognized that championship boxing can define a market even

14   though some fans—perhaps a non-trivial number—might turn to non-championship boxing in the face of

15   inflated prices. *Le*, 216 F. Supp. 3d at 1166 (quoting *Int'l Boxing Club*, 358 U.S. at 252). The key point is

16   that enough fans would remain loyal to championship boxing for a monopolist to increase its profits by

17   inflating its prices above competitive levels. Plaintiffs make a plausible, non-conclusory allegation that

18   the same is true for live Professional MMA bouts. Compl. ¶¶44-49. That allegation should be taken as

19   true on a motion to dismiss.

20        To prevail now, Defendants have to establish that Plaintiffs' market definition is so obviously

21   flawed that the Court need not even consider evidence in rejecting it. *Twin City II*, 676 F.2d at 1299 ("The

22   definition of the relevant market is [] a fact question dependent upon the special characteristics of the

23   industry involved."). Defendants cannot satisfy that standard for three reasons. First, it is plausible that

24   many fans prefer MMA events to other combat sports and other sports in general. As this Court

25

26   market . . . is irrelevant to a determination of the legality of restraints in an input labor market . . . they
     nevertheless premise their entire rule of reason defense on the alleged necessity of implementing player
27   restraints in the relevant input market in order to strengthen their ability to compete in the output
     market") (citations omitted).
28

previously held, "An antitrust complaint [] survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect. And since the validity of a 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing." *Le*, 216 F. Supp. 3d at 1165 (quoting *Newcal Indus, Inc.. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)). Second, Plaintiffs have alleged direct evidence of monopoly power in the form of reduced output and elevated prices, Compl. ¶¶132, 139, which suffices under this Court's holding in *Le* and the Ninth Circuit opinion in *Rebel Oil Co v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). *Le v. Zuffa, LLC*, 216 F. Supp. 3d at 1161 (quoting *Rebel Oil*, 51 F.3d at 1434). Third, extensive evidence has come to light in *Le* that the UFC was able to inflate prices and suppress output of live MMA events through its monopoly power—direct evidence that should defeat summary judgment, much less a motion to dismiss.

### B.   Plaintiffs State a Claim for Monopsonization (and Properly Allege Monopolization)

Defendants also move to dismiss based on: (1) an allegation that they pretend Plaintiffs make that the MMA market has been frozen since 2014, contrary to Plaintiffs' allegations; and (2) improper (and inaccurate) factual assertions that Defendants make about the MMA market.

#### 1.   Defendants Invent an Allegation that "the Market Is Frozen."

Defendants claim that Plaintiffs assume the market has remained frozen since 2014. Mot. at 7-8. Untrue. The Complaint here—as in *Le*—alleges that the UFC's market power *increased* over the life of the Scheme. *See*, *e.g.*, Compl. ¶102 ("the UFC gained and then maintained market and monopsony power through this anticompetitive scheme"); *id*. ¶110 ("continuing into the present, the UFC accelerated its aggressive anticompetitive campaign").

Plaintiffs allege—and have already presented extensive evidence to the Court in *Le*—that the UFC's Scheme has caused a dramatic *decrease* in the number of professional MMA events in the U.S. and North America. *Id*. ¶132. Such a decrease in output is by definition monopoly power. Monopoly power includes the ability to decrease output below competitive levels profitably on an ongoing basis (or, the economic equivalent, to charge supracompetitive prices profitably on an ongoing basis, *id*. ¶139). *See*

Section III.A.1.b above.[9]

## 2.    Defendants Premise Their Motion on Improper Factual Assertions.

Defendants rely on "public information" supposedly "revealing a market that has changed dramatically since 2014." Mot. at 9. They do so even though they claim that they "do *not* ask the Court to decide factual matters on a motion to dismiss." *Id.* (emphasis in original). But that is precisely what they (improperly) ask the Court to do. They pack eleven citations to internet articles into ten footnotes, though they do not even argue that it would be proper for the Court to take judicial notice of such reasonably disputed (and hearsay) sources of information. Mot. at 9-12, nn. 2-11; Fed. R. Evid. 201(b) (limiting judicial notice to facts that are "not subject to reasonable dispute"). Defendants pretend that they are appealing to the Court's "judicial experience and common sense." Mot. at 9 (quotation and citations omitted). But neither judicial experience nor common sense can reveal facts reported on the internet. That would require relying on internet sites—which is not permitted—or clairvoyance.

Nor are Defendants' improper factual arguments reflective of reality. They claim, for example, that Plaintiffs' allegations fail to account for the purported "emergence of meaningful competitive threats." Mot. at 11. Of course, that assertion contradicts non-conclusory allegations in the Complaint that no other promotion has a sufficient number of top Fighters to constitute a meaningful competitive threat to the UFC. Compl. ¶¶115-29 (describing how UFC relegated other promotions to minor league status).

Defendants specifically cite two former UFC champions on the tail ends of their careers who signed with other promotions in 2018 and 2020 after the UFC declined to exercise its right to match the other promotions' offers. *See* Mot. at 11 & n.10. But the UFC does not and cannot contest the non-conclusory allegation that the UFC would have had a contractual right to match any offer made by another promotion to those Fighters and, thus, the only reason those Fighters were able to defect to another promotion is because the UFC no longer wanted them. Compl. ¶101(c) (describing right to match). Further, even if, counterfactually, those two former champions at the end of their careers were

---

[9] As explained above in Section III.A.1, to state an antitrust claim for underpayments to Fighters, Plaintiffs need to establish only *monopsony* power; they need not establish also *monopoly* power (although here they allege both, Compl. ¶¶42-82). Those allegations sufficed to state a claim in 2014— which Defendants do not deny, Mot. at 9 ("these allegations may have been sufficient to survive a motion to dismiss in 2014")—and they do now, too.

1  actually highly-sought-after Fighters in their primes, that alone would not establish those other

2  promotions as the UFC's meaningful rivals. Sporadic defections would not provide the necessary

3  "critical mass" of top Fighters for a promotion to compete with the UFC. *Id.* ¶¶4, 45, 60, 62, 82, 96, 136

4  & 147.

5        Defendants contend that the Complaint ignores "rivals that exist today," including the

6  Professional Fighters League ("PFL")[10] and ONE Championship ("ONE") and argue that Plaintiffs fail to

7  account for Bellator's supposed growth. Mot. at 7, 9-11. Defendants note that the PFL amassed $175

8  million in investor financing in recent years and boasted that it would use some of those funds to "acquire

9  'top talent.'" *Id.* at 11-12. Even if the Court were to consider those factual assertions, they would not

10  defeat Plaintiffs' allegations of market power or market share. The PFL's $175 million pales compared to

11  the UFC's valuation of over $9 billion.[11] Further, investor funds do not inform market share analyses and

12  Defendants offer no basis for concluding otherwise. Regardless, Defendants' conduct forecloses access to

13  a critical mass of top Fighters. *See* Compl. ¶¶4, 45, 60, 62, 82, 96, 136, 147.

14        As to ONE, Defendants rely only on the purported valuation of the promotion and broadcast

15  deals. Mot. at 11. Defendants' sole cited source for ONE's purported "valuation approaching $1 billion

16  by 2016" is Dr. Singer's expert report in the *Le* matter, which *conservatively* included ONE in its market

17  power analyses notwithstanding that (1) ONE's executive stated that it was a mere "feeder organization

18  to the UFC," SR1 ¶127, and (2) the $1 billion valuation of ONE is likely too high. *See, e.g., id.* ¶128,

19  n.350. After Dr. Singer's reports in *Le*, ONE's annual financial reports filed with Singaporean regulators

20

21

---

22  [10] PFL is the new name for the promotion formerly known as the World Series of Fighting. As the Court
is aware, plaintiffs in the *Le* matter included PFL in their analyses that showed the UFC's dominance in

23  the relevant markets through June 2017. *See* Pls.' Opp. to Zuffa's Mot. for Summ. J., *Le v. Zuffa, LLC*,
No. 2:15-cv-01045, ECF No. 596 (D. Nev. Sep. 21, 2018), at 25-26 (explaining that PFL is included in

24  the "Ranked" submarket); *see also* Expert Report of Hal J. Singer, Ph.D., *Le v. Zuffa*, No. 2:15-cv-01045,
ECF Nos. 727-1-727-5 (D. Nev. Aug. 27, 2019) ("SR1"), at 76, ¶¶111, 131 & Tbl. 3.

25  [11] *Compare* Mot. at 10 (referring to PFL's $175 million financing raised), *with* Cole Shelton, *How Much
is the UFC Worth? Dana White Reveals Its Estimated Value*, Sportskeeda.com (July 20, 2021),

26  https://www.sportskeeda.com/mma/news-how-much-ufc-worth-dana-white-reveals-estimated-value
(quoting Dana White as valuing the UFC at $9 billion to $10 billion). At those relative valuations, even if

27  valuation were a proper market share metric, PFL's market share would be minuscule (less than 2%).

28

began circulating in MMA media circles.[12] A ONE financial report from those regulators shows revenue and loss information from 2017, 2018, and 2019 (attached as Exhibit A). ONE is hemorrhaging money, with only approximately $46.1 million in annual revenue in 2019,[13] and over $97 million in after tax *losses*. *See* Exhibit A.[14] As with the PFL, these numbers demonstrate that ONE poses no significant competitive threat to Defendants' dominance.

As to Bellator, Defendants rest their argument on their assertion that Plaintiffs' allegations are similar to those in the *Le* plaintiffs' 2014 complaint—that Bellator's fighter compensation and revenues are "minimal." *See* Mot. at 9-10. Defendants assert that whatever minimal "may have meant in 2014, its bare repetition in 2021 cannot plausibly" support an allegation of market power. *Id.* at 10. But Defendants ignore that both complaints allege that Bellator's revenues and fighter compensation levels are minimal as "compared to those obtained by the UFC." Mot. at 10 (quoting Compl. ¶127; *Le* Compl. ¶147). The UFC's revenues have skyrocketed since 2014, so an increase in Bellator's revenues would not necessarily make it a competitive threat to the UFC. Plaintiffs' allegations—which should be taken as true—establish that it isn't one. Compl. ¶127.

In short, the Court should ignore Defendants' improper factual assertions and accept as true the non-conclusory allegations in the Complaint that the UFC remains dominant.

## C.   The *Johnson* Complaint Was Timely

### 1.   The Court Can Consider All Conduct in Furtherance of Defendants' Scheme.

Defendants argue that the Court cannot consider some parts of the Scheme—Acquisitions and Coercion—under the statute of limitations because they purportedly occurred too long ago. But the very cases Defendants cite define the continuing violation doctrine as follows: when different parts of a

---

[12] *See, e.g.*, John S. Nash, *An In-Depth Look at ONE Championship's Finances*, Bloodyelbow.com (Oct. 17, 2018), https://www.bloodyelbow.com/2018/10/17/17976862/one-championship-look-finances-mma-one-fc-losses (reviewing ONE's finances as reported in their 2016 and 2017 financials).

[13] Exhibit A reflects financial figures in Singapore Dollars, which are each equal to roughly $0.74 U.S. Dollars.

[14] Nor was 2019 an anomaly. In 2018, ONE's revenues were only approximately $27.6 million with losses of approximately $60.6 million, and in 2017, ONE reported less than $12.5 million in revenues and over $25 million in losses. *Id.* In short, from 2017 to 2019, ONE's after-tax losses increased from $25 million to $97 million.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Scheme operate *in concert*, if Defendants commit *any* new overt acts in furtherance of the Scheme and cause new injury to the Plaintiffs during the statutory period, *all* aspects of the Scheme can be considered in assessing liability. Here, the strands of the Scheme are inextricably intertwined. Further, acts in each strand occurred during the statutory period, as did the UFC's resulting underpayments to Fighters.

Defendants mistakenly *assume* that the Court should separate the alleged Scheme into distinct "clusters," pertaining to Contracts, Acquisitions, and Coercion. Mot. at 2. Defendants then *further assume* that Plaintiffs can rely on Defendants' anticompetitive conduct in a "cluster" only if some of the Defendants' actions *in that cluster* occurred during the statutory period, that is, within four years of filing the complaint.

But Defendants have invented their "cluster theory." It is not the law. In fact, this Court has already rejected Defendants' efforts to dismember the Scheme and attack each part in isolation. In denying the motion to dismiss in *Le*, this Court recognized that binding law holds an alleged anticompetitive scheme should be assessed in its entirety. *Le*, 216 F. Supp. 3d at 1168. The Court explained, "As the Ninth Circuit has held, 'in the antitrust context, the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."'" *Id*. (quoting *Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 886 (9th Cir. 2008) (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690, 699 (1962))); *see also Tele Atlas N.V.  v. NAVTEQ Corp.*, No. C-05-1673, 2008 WL 4809441, at *23 (N.D. Cal. Oct. 28, 2008) ("the court should consider the defendant's various acts and examine them collectively for any 'synergistic result'") (quoting *California Comput. Prods., Inc. v. Int'l Bus. Machs. Corp*., 613 F.2d 727, 746 (9th Cir. 1979)).

That same principle is fatal to Defendants' statute of limitations argument. Courts have so held at least since *Hanover Shoe, Inc. v. United Shoe Machinery Corp*., 392 U.S. 481 (1968), when the plaintiff was permitted to sue in 1955 for a "lease only policy" that began in 1912. *Id*. at 502, n.15. The plaintiff in *Hanover Shoe* could sue based on a policy in place for over 40 years because the Court was "dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and

1   accumulating harm on" the plaintiff. *Id*.[15]

2          As the Ninth Circuit explained in *Oliver v. SD-3C LLC*, 751 F.3d 1081 (9th Cir. 2014), when

3   defendants engage in an anticompetitive scheme, commit acts during the statutory period in furtherance

4   of that scheme, and cause new harm to a plaintiff, the continuing violation doctrine applies. *Id*. at 1086

5   (applying *Klehr* to an antitrust case).[16]

6          Under these circumstances, Plaintiffs can rely on *all* of the Defendants' exclusionary conduct in

7   furtherance of the Scheme—including acquisitions that took place before the statutory period—to

8   establish liability. *See In re Google Digital Advert. Antitrust Litig.*, No. 20-cv-3556, 2021 WL 2021990,

9   at *5 (N.D. Cal. 2021) (holding plaintiffs can rely on acquisitions that occurred before the statutory

10  period in support of liability provided those "acquisitions were made *in concert with* the company's other

11  anticompetitive conduct") (emphasis added).[17]

12         Indeed, Defendants admit that Plaintiffs "state a continuing violation of antitrust law" if they

13  "allege that—during the [statutory] period—the defendant completed 'a new and independent' overt act

14  and inflicted 'new and accumulating injury on the plaintiff.'" Mot. at 13 (quoting *Samsung Elecs.*, 747

15  F.3d at 1202). That is *precisely* what Plaintiffs allege here: during the statutory period, Defendants

16  committed new, independent overt acts in furtherance of the Scheme, causing new and accumulating

17

18  [15] *See also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[I]n the case of a 'continuing
19  violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a
    period of years . . . each sale to the plaintiff 'starts the statutory period running again.'") (quoting 2 P.
20  Areeda & H. Hovenkamp, *Antitrust Law* ¶338b, at 145 (rev. ed. 1995)); *In re Animation Workers
    Antitrust Litig.*, 87 F. Supp. 3d 1195, 1208-09 (N.D. Cal. 2015) ("'[E]ach time a plaintiff is injured by an
21  act of the defendants a cause of action accrues to him to recover damages caused by that act and that, as
    to those damages, the statute of limitations runs from the commission of the act.'") (quoting and applying
    *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) in antitrust case).
22  [16] *See also Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1203-04 (9th Cir. 2014) (entering new
    licensing agreement and enforcing existing agreement each sufficient for continuing violation doctrine);
23  *Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 111 F.3d 1427, 1444–45 (9th Cir. 1996) (actions
    taken in accordance with a pre-statutory period anticompetitive contract were sufficient for continuing
24  violation doctrine); *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir. 1986)
    (holding new overt act occurred under continuing violation doctrine each time tour operators shepherded
25  tourists away from plaintiffs' shop in exchange for payment).
    [17] *Google* was dismissed under the statute of limitations, but only because—unlike here where the acts
26  are intertwined and synergistic—plaintiffs there had not alleged the acquisitions were made in concert
    with the more recent anticompetitive conduct and plaintiffs in *Google* were granted leave to amend to
27  make appropriate allegations. *Id*. at *5-6.

28

injuries to Plaintiffs. For example, Defendants entered and continue to enter into new exclusive Contracts with Fighters on a routine basis. Compl. ¶¶97-103 (using present tense to describe exclusive Contracts); *id*. ¶101 (listing the UFC's standard restrictive provisions "continuing into the Class Period"). Defendants also continue to engage in Coercion, *see, e.g., id*. ¶107 ("UFC punished and continues to punish Fighters that refuse, or consider refusing, the UFC's contractual terms"), *id*. ¶¶104-07, and to acquire rivals or impede their growth through anticompetitive conduct. *Id*. ¶110 ("continuing into the present, the UFC accelerated its aggressive anticompetitive campaign" of driving rivals out of business or acquiring them); *see also id*. ¶¶108-114. Defendants also continue to pay Fighters much less than they would in the absence of the Scheme.[18]

Moreover, Plaintiffs allege that the three strands of Defendants' conduct—Contracts, Acquisitions, and Coercion—operate *in concert* and have a synergistic effect. *See id*. ¶¶4, 95-96. The acquisitions not only increase Defendants' monopsony (and monopoly) power, but also trap Fighters in anticompetitive Contracts. *Id*. ¶¶4, 95-96, 114. So does Defendants' Coercion. *Id*. ¶¶4, 95-96, 104. And the Contracts not only trap Fighters but also deprive rival promotions of a critical mass of Fighters, preventing potential competitors from competing effectively with the UFC and making those potential competitors more susceptible to acquisition. *See, e.g., id*. ¶¶4, 95-96, 136, 147. Each strand of the Scheme is intertwined with and reinforces the others. As a result, any new overt acts causing new harms render *all* acts in furtherance of the Scheme actionable. *Klehr*, 521 U.S. at 189; *Oliver*, 751 F.3d at 1086; *Samsung Elecs.*, 747 F.3d at 1202; *Twin City SportService, Inc. v. Charles O. Findley & Co.*, 512 F.2d 1264 (9th Cir. 1975) ("*Twin City I*"); *Google*, 2021 WL 2021990 at *5.[19]

---

[18] *See, e.g., id*. ¶132 ("As a result of the UFC's scheme, compensation associated with fighting in MMA bouts to members of the Class has been *and continues to be* artificially suppressed.") (emphasis added); *id*. ¶138 ("As a result of the anticompetitive scheme, the UFC *is able* to compensate Fighters below competitive levels even though UFC events have among the highest average ticket prices in all of sports.") (emphasis added); *id*. at ¶140 ("The Conduct comprising the UFC's anticompetitive scheme is continuing and so are the damages suffered by the members of the Class.").

[19] The intertwined nature of Defendants' anticompetitive conduct also renders the primary cases on which they rely inapplicable. The two main ones are *Z Technologies Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014) and *Midwestern Machinery Co. v. Northwest Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004). Mot. at 13. *Z Technologies* is inapposite because the plaintiff there had not alleged that the defendant committed *any* new and independent acts that caused harm during the statutory period. 753 F.3d at 600-

Here, Plaintiffs allege that Defendants enter new exclusive Contracts with Fighters on an ongoing basis, Compl. ¶¶97-103, as well as engage in other conduct as part of the ongoing Scheme. *Id*. ¶¶104-114. Just as entering into a new licensing agreement and enforcing existing agreements each sufficed under the continuing violation doctrine in *Samsung Electronics*, 747 F.3d at 1203-04, so does entering each new exclusive Contract with a Fighter suffice under the continuing violation doctrine. *Each* such act renders *all* of Defendants' conduct in furtherance of its Scheme actionable under the continuing violation doctrine for damages Plaintiffs suffered during the statutory period.[20]

As the Ninth Circuit has held, anticompetitive schemes that are exempt from the continuing

---

04. Indeed, *Z Technologies* acknowledged a case in which a defendant *had* finalized and enforced a pre-existing anticompetitive policy during the statutory period and so the continuing violation *did* apply. *Id*. at 601 (discussing *DXS, Inc. v. Siemens Med. Sys., Inc*., 100 F.3d 462, 467-68 (6th Cir. 1996)).

Similarly, *Midwestern Machinery* refused to apply the continuing violation doctrine because the *sole* anticompetitive act at issue was a merger. Further, the Eighth Circuit explicitly distinguished the pure merger case before it—where the doctrine does not apply—from a conspiracy or *maintenance* of a monopoly—where it *does*. 392 F.3d at 271 ("Unlike a conspiracy *or the maintaining of a monopoly*, a merger is a discrete act, *not an ongoing scheme*. . . . Even if the initial merger violated § 7 [of the Clayton Act, 15 U.S.C. § 18], it makes little sense to hold that policies were pursued to effectuate the illegal merger as we might in a conspiracy violation §1 (e.g., cartel meetings occurred to effectuate a price-fixing agreement) or *a case violating §2* (e.g., ongoing policy of predatory pricing undertaken to effectuate monopolization).") (emphasis added).

[20] None of the cases on which Defendants relies (Mot. at 13, 16) is to the contrary. *Aurora Enterprises, Inc. v. National Broadcasting Co*., 688 F.2d 689 (9th Cir. 1982), held that the only relevant act was the formation of a contract that occurred more than four years before the complaint was filed, not the passive receipt of profits, *id*. at 694, but the Ninth Circuit observed that it had held in the past that the continuing violation doctrine *does* apply in a monopolization case based on exclusive contracts. *Id*. (discussing *Twin City I*, 512 F.2d 1264); *see also Pace Indus., Inc. v. Three Phoenix Co*., 813 F.2d 234 (9th Cir. 1087) (noting the *Twin City I* "holding that [an anticompetitive, exclusive] contract was a continuing antitrust violation").

*Complete Entertainment Resources LLC v. Live Nation Entertainment, Inc*., No. CV 15-9814, 2016 WL 3457177 (C.D. Cal. May 11, 2016), cited at Mot. at 13-14, is also inapposite. There the court did not find that the merger at issue was in concert with the later anticompetitive conduct, and it rejected the notion that "if a merger leads to monopoly power, then *anything* anticompetitive that the newfound monopolist does is a 'continuing violation' that began with the merger." *Id*. at *2 (emphasis added). Here, the contracts, acquisitions, and coercion were and are in concert. *See also Faircloth v. AR Res., Inc*., No. 19-cv-5830, 2020 WL 820307, *7, n. 4 (N.D. Cal. Feb. 19, 2020) (plaintiff asserted the continuing violation doctrine applied to a pattern of conduct but did not identify *any* actions that were part of the pattern and occurred during the statutory period); *Reveal Chat Holdco, LLC v. Facebook Inc.*, 471 F. Supp. 3d 981, 994-95 (N.D. Cal. 2020) (granting motion to dismiss because plaintiffs challenged acquisition more than four years after it occurred and did not allege any new and independent acts nor did they allege new and accumulating injury on plaintiffs during the statutory period); *Animation Workers*, 87 F. Supp. 3d at 1211-14 (continuing violations doctrine did not apply because plaintiffs did not allege any overt acts—not even reaffirming the allegedly anticompetitive scheme—and did not allege any new or accumulating injuries during the statutory period).

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

violation doctrine are "the exception, not the rule." *Oliver*, 751 F.3d at 1085 n.5 (quoting *Samsung Elecs.*, 747 F.3d at 1203). The rule is that if defendants continue to commit acts that cause harm during the statutory period—such as charging above-competitive prices or entering contracts that pay below-competitive compensation—plaintiffs' claims arising from those harms are timely. *Id*.

Here, Plaintiffs allege new acts during the statutory period—including entering new anticompetitive Contracts on an ongoing basis—and new and accumulating injuries—particularly the ongoing suppression of class member compensation. Thus, *all* of Defendants' actions in furtherance of the Scheme should be considered in assessing Defendants' liability.

### 2.   Defendants' Argument About *American Pipe* Tolling Is Irrelevant.

Defendants contend that filing *Le* did not preserve the claims in this action under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 552-53 (1974). Mot. at 15-16. That argument is irrelevant. The *Le* proposed class action ensures the timeliness of all claims based on fights that occurred during the *Le* class period—from December 16, 2010 through June 30, 2017. This proposed class action ensures the timeliness of all claims based on fights that occurred during the *Johnson* class period—starting on July 1, 2017 and continuing to the present. All damages claims are timely.[21]

### 3.   The Laches Doctrine Is Inapplicable.

Defendants claim that laches prevents Plaintiffs from seeking injunctive relief in this action. Mot. at 16. Defendants, however, cannot carry their burden of proving the elements of laches: unreasonable delay *and* prejudice.[22]

---

[21] Put more technically, members of the proposed *Johnson* class who fought for the UFC before the *Johnson* class period—that is, before July 1, 2017, Compl. ¶34—are also members of the proposed *Le* class. *American Pipe* tolls the statute of limitations arising from compensation for those fights for members of the proposed *Le* class. Defendants do not claim otherwise. On the other hand, members of the proposed *Johnson* class who fought only on or after July 1, 2017 have timely claims based on the *Johnson* complaint. Again, that is true under *American Pipe*. The only claims that could be affected by Defendants' argument—claims by members of the *Johnson* class who are not also members of the *Le* class and seek to recover based on fights that occurred before July 1, 2017—form a null set. Defendants' argument is thus irrelevant.

[22] *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950-51 (9th Cir. 2001) ("To demonstrate laches, the 'defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself.'") (quoting *Couvea v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000)); *Oliver*, 751 F.3d at 1085 n.4 ("Under the doctrine of laches, a suit seeking equitable relief will be barred if a party has inexcusably delayed

Plaintiffs did not delay filing the *Johnson* action unreasonably. They waited for sound, practical reasons. There was no need to file earlier to protect the *Johnson* Plaintiffs' claims for damages. And the *Le* plaintiffs were already pursuing the very same equitable relief.

For similar reasons, Defendants cannot show prejudice. The UFC should have been—and presumably has been—preparing its defense to a request for equitable relief since the *Le* plaintiffs filed their class action complaint. The UFC has known that the *Le* plaintiffs seek and have always sought injunctive relief.[23] So any delay in filing *Johnson* could not have prejudiced Defendants. In addition, the Ninth Circuit has held that the continuing violation analysis, as addressed in Section III.C.1 above, also defeats the laches argument.[24]

### D.  Plaintiffs State a Claim for Relief Against Endeavor

Defendants claim that Plaintiffs seek to hold Endeavor liable "purely based on the fact of its ownership" of Zuffa. Mot. at 6 (citing *U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998)). Not so. Plaintiffs seek to hold Endeavor liable because of *its own conduct*. All that is necessary to do so is to establish that: (1) the corporate family that includes Endeavor and Zuffa as a whole violated Section 2 of the Sherman Act, 15 U.S.C. § 2; and (2) in that violation, Endeavor played a role. *Arandell*, 900 F.3d at 631 (discussing *Lenox MacLaren Surgical Corp. v. Medtronic, Inc*., 847 F.3d 1221 (10th Cir. 2017)). Defendants ignore this point and the Ninth Circuit's controlling opinion in *Arandell*.

*Arandell* addressed when one entity is liable for an antitrust violation involving another entity in the same corporate family. 900 F.3d at 629-632 (discussing the so-called *Copperweld* doctrine that

---

pursuing his claim and his adversary has been prejudiced as a result.") (citing *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp*., 518 F.2d 913, 929 (9th Cir. 1975)).

[23] *Compare* Am. Compl., *Le v. Zuffa*, No. 2:15-cv-01045, ECF No. 208 (D. Nev. Dec. 18, 2015) ¶172(d), with *Johnson* Compl. ¶151(d); *see also* Reply in Support of Pls. Mot. for Class Cert., *Le v. Zuffa*, No. 2:15-cv-01045, ECF No. 554 (D. Nev. May 30, 2018), at 25 & n.55 ("because a class certified under Rule 23(b)(3) may still seek injunctive relief, there was no reason for the Court to assume that Plaintiff sought certification of a damages only Rule 23(b)(3) class") (quoting *Tigbao v. QBE Fin. Inst. Risk Servs., Inc*., No. CV 13-177, 2014 WL 5033219, at *1 (C.D. Cal. Sept. 22, 2014)).

[24] The continuing violation doctrine applies to laches. *Oliver*, 751 F.3d at 1086-87. The Ninth Circuit held in *Oliver*, "Because Plaintiffs allege that they were injured within the four-year limitations period, Plaintiffs have sufficient facts to show that laches does not bar their federal antitrust claim." *Id*. In other words, the very same showing that suffices for the continuing violation doctrine to overcome the statute of limitations regarding damages, as explained in Section III.C.1 above, also defeats laches regarding injunctive relief. *Id*.

1    governs, *inter alia*, when different related corporations can be liable for anticompetitive conduct) (citing

2    *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)). In doing so, the Ninth Circuit held that it

3    and the Tenth Circuit in *Lenox* "reached the same conclusion." *Arandell*, 900 F.3d at 631. *Arandell*—

4    relying on reasoning in *Lenox*—set forth a two-step analysis for a Section 2 claim, like the one before the

5    Court here.

6          As applied in this context, the first step is to determine whether Plaintiffs have alleged that *the*

7    *enterprise—or corporate family—as a whole* committed a Section 2 violation. *Id.* ("in a single-enterprise

8    situation, it is the affiliated corporations' collective conduct—*i.e.*, the conduct of the *enterprise* they

9    jointly compose—that matters; it is the *enterprise* which must be shown to satisfy the elements of a

10   [Section 2] claim") (emphasis and alterations in original) (quoting *Lenox*, 847 F.3d at 1236). Plaintiffs do

11   *not* need to allege "that 'specific Defendants' independently satisfied each necessary element of the

12   claims." *Id.* (emphasis and alterations in original) (quoting *Lenox*, 847 F.3d at 1236); *see also Las Vegas*

13   *Sun, Inc. v. Adelson*, No. 2:19-cv-01667, 2020 WL 7029148, at *10 (D. Nev. Nov. 30, 2020) (denying

14   motion to dismiss under *Arandell* for monopolization by corporate owners); *Hightower v. Celestron*

15   *Acquisition, LLC*, No. 5:20-cv-03639, 2021 WL 2224148 at *11 (N.D. Cal. Jun. 2, 2021) (same).

16         The second step is to assess whether plaintiffs have alleged that each defendant in a corporate

17   family *played a role* in the antitrust violation. According to the Ninth Circuit, the Tenth Circuit in *Lenox*

18   "agreed" that a plaintiff's "burden of establishing any individual defendant's liability required showing

19   only that the defendant's conduct played a 'role' in the overall anticompetitive scheme perpetrated by the

20   enterprise as a whole." *Arandell*, 900 F.3d at 631 (quoting *Lenox*, 847 F.3d at 1230). As *Arandell* further

21   explained, "*Copperweld* 'forecloses' a result that would allow sophisticated companies to evade Section 2

22   liability by spreading anticompetitive schemes over multiple affiliates." *Id.* at 632 (quoting *Lenox*, 847

23   F.3d at 1236). Also, under *Arandell*, a corporation is liable if it charged inflated prices as part of its

24   corporate family's antitrust violation. *Id.* at 634.

25         Defendants argue that to establish Endeavor's liability, the Plaintiffs here "must allege that 'the

26   subsidiary is the alter ego of the parent' or that the parent 'controls, dictates or encourages the

27   subsidiary's anticompetitive conduct.'" Mot. at 6 (quoting *Climax Molybdenum Co. v. Molychem, L.L.C.*,

28

1   414 F. Supp. 2d 1007, 1012 (D. Colo. 2005)). But that is the very standard that the Tenth Circuit in *Lenox*

2   considered (*Lenox*, 847 F.3d at 1237-39), that the Ninth Circuit found that *Lenox* rejected (*Arandell*, 900

3   F.3d at 631-32), and that the Ninth Circuit itself rejected, including as applicable to Section 2 cases. *Id*.

4   Again, *Arandell* held it is enough that Endeavor *played a role* in the Scheme, such as by charging inflated

5   prices. *Id*. at 631-34.[25]

6           Plaintiffs allege that Endeavor played a role in the Scheme—for example, that Endeavor

7   negotiates and executes pay-per-view ("PPV"), media, and sponsorship agreements on behalf of the UFC

8   and its Fighters, Compl. ¶29 (citing Endeavor Group Holdings, Inc., Amendment No. 1 to Form S-1

9   Registration Statement (Apr. 20, 2021) ("Endeavor S-1"), at 4-7, 108-09, 121, 148, 150-51),[26] and that

10  the Scheme has inflated the UFC's PPV prices significantly above competitive levels. *Id*. ¶¶44, 139. In

11  other words, Endeavor charged inflated prices, an act that renders it liable for the Scheme. *Arandell*, 900

12  F.3d at 634.

13          The Complaint alleges that Defendants' Scheme involves blocking sponsors from working with

14  actual or potential rivals and using sponsorship agreements to threaten, intimidate, and retaliate against

15  MMA Fighters who work with or for would-be rivals or speak out against the UFC. Compl. ¶¶101(g),

16  104-05, 110(a), 112. The Complaint similarly alleges that the UFC enhanced its control over Fighters by

17  imposing other restrictions in Fighter Contracts regarding sponsorship agreements. *Id.* ¶102. Endeavor

18  negotiated such sponsorship agreements. *Id*. ¶29 & n.5 (citing Endeavor S-1 at 4-7, 109, 121, 148).

19          The Complaint alleges that Endeavor claims to operate the UFC's online video streaming

20  platform, which the UFC uses to deprive would-be rivals of necessary inputs to promote MMA events.

21  *Id.* ¶29 & n.7 (citing Endeavor S-1 at 5, 49, 108, 150-51) ; *id.* ¶62.

22

23  [25] *See also In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-CV-864, 2018 WL 6629250, at *5 (N.D. Ill. Oct. 22, 2018) (denying motion to dismiss monopolization claims against parent and subsidiary corporations); *Nobody in Particular Presents, Inc. v. Clear Channel Comm'ns., Inc.*, 311 F. Supp. 2d

24  1048, 1072 (D. Colo. 2004) (denying summary judgment on monopolization claims based on evidence that parent corporation "operates as an operating company, controlling and managing the conduct of its

25  subsidiaries, rather than as a holding company").

26  [26] *Compare* Compl. ¶29 & nn. 5-6 (citing Endeavor S-1 at 4-7, 109, 121, 148, 150), with *id.* ¶44 (explaining that promotions in the Relevant Output market generate revenue through "broadcast of the

27  event on PPV, television, or over the Internet as well as through the sale of live and taped television programming, video-on-demand, merchandise . . ., event sponsorships, and the collection of MMA-

28  related copyright and trademark royalties").

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

The Complaint also supports the plausible inference that Endeavor's involvement in the Scheme runs even deeper. It alleges Endeavor's direct participation in the UFC's day-to-day business activities involving the promotion of live professional MMA bouts and events featuring members of the Class. Compl. ¶¶29-30, 42-49, 95-96. Those allegations include statements from Endeavor's own SEC filings wherein it purports to operate all aspects of the UFC's business, including managing and promoting the UFC's live professional MMA bouts and producing and distributing the UFC's live professional MMA programming. *Id.* ¶29 & n.3 (citing Endeavor S-1, at 108).[27] Endeavor even boasts that the corporation and its employees hold promotions' and matchmakers' licenses in various states allowing them to organize and promote the UFC's live Professional MMA events. *Id.* ¶29 & n.4 (citing Endeavor S-1 at 159).

Non-conclusory allegations in the Complaint thus plausibly establish that Endeavor plays various central roles in the alleged Scheme—just as it plays various roles in running the UFC. *Id.* at ¶¶29-30. That more than satisfies the standard for stating a claim against Endeavor—that it must play "a role" in the alleged Scheme. *Arandell*, 900 F.3d at 631.

Defendants also make an additional misleading assertion: "most, if not all, of the conduct alleged in the Complaint predated Endeavor's *full* acquisition of Zuffa in 2021." Mot. at 7 (emphasis added). While Endeavor was not the *sole* owner of Zuffa until 2021, Endeavor acquired a *controlling* interest in Zuffa—50.1%—in August 2016, as Defendants admit. Mot. at 7 (citing Compl. ¶29). Endeavor's conduct is thus relevant dating back to 2016.[28]

---

[27] The detailed allegations in the Complaint here are unlike the pleadings in *Arnold Chevrolet LLC v. Tribune Co.*, 418 F. Supp. 2d 172, 178 (E.D.N.Y. 2006) (cited in Mot. at 6), where "there [we]re no allegations in the Amended Complaint that even suggest that [the parent company] was involved in [the subsidiary]'s actions in any way" and the "[p]laintiffs' failure to articulate *any* specific allegations against [the parent corporation] [wa]s fatal to their claims." (emphasis in original). Similarly, in *In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litigation*, the plaintiffs "failed to allege that [the parent corporation] exercised sufficient control or pervasive domination over [the subsidiary] to support attributing [the subsidiary]'s market power to [the parent]." No. 13-MD-2445, 2015 WL 12910728, at *3 (E.D. Pa. Apr. 14, 2015) (cited at Mot. 6-7).

[28] Endeavor may argue in reply that its controlling share of Zuffa is insufficient under *Arandell* and so it is not liable for the role it played in the Scheme before 2021. It would be too late, however, for Defendants to raise that argument for the first time in a reply brief. Further, if Endeavor were not liable under *Arandell* as part of Zuffa's corporate family until 2021 when it fully owned Zuffa, then it would be

Notably, the Motion does not claim that the statute of limitations or laches applies differently to Endeavor than to Zuffa. Doing so would fail for two reasons. First, Plaintiffs seek damages here only for underpayments that occurred starting on July 1, 2017, almost a year *after* Endeavor acquired a controlling interest in Zuffa in August 2016. Compl. ¶29. Those underpayments would not have occurred without the ongoing exclusive Contracts. *Id.* ¶¶97-103. Second, in the Ninth Circuit, a participant is liable for acts taken in furtherance of an antitrust scheme, even if those acts occurred before it joined the scheme, provided the participant was aware of what had occurred in the past and had the intent to pursue the same objective. *Indus. Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970) (comparing *U.S. v. Bausch & Lomb Optical Co.*, 34 F. Supp. 267 (S.D.N.Y. 1940) with *Rayco Mfg. Co. v. Dunn*, 234 F. Supp. 593, 598 (N.D. Ill 1964)) ("One who enters a conspiracy late, with knowledge of what has gone before, and with the intent to pursue the same objective, may be charged with preceding acts in furtherance of the conspiracy."); *see also Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 930 (7th Cir. 2016).

### E.   Plaintiffs Do Not Oppose Consolidation

Plaintiffs do not oppose Defendants' request to consolidate *Le* and this action, Mot. at 16, n.12, provided consolidation does not delay class certification, summary judgment, or a trial on liability and damages in *Le*. As Plaintiffs will explain in the forthcoming [Proposed] Discovery Plan and Scheduling Order, the *Le* jury trial on liability and damages should proceed on its own first, and subsequent proceedings should address liability and damages in this action and injunctive relief in both actions. Further, the discovery record in *Le*, including expert reports, should be available as if taken in this action.

---

liable for *conspiring* with Zuffa from 2016 until 2021. Endeavor cannot claim that it could not have conspired with Zuffa because it had a *controlling* ownership share starting in 2016 and that it is also not liable under *Arandell* for the role it played in the alleged Scheme because it did not *wholly* own Zuffa until 2021. *See Arandell*, 900 F.3d at 631-32 ("Defendants cannot have the *Copperweld* doctrine both ways.").

1

## IV.    <u>CONCLUSION</u>

2      For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

3      DATED this <u>22nd</u> day of October, 2021.

4                     Respectfully submitted,

5                     KEMP JONES, LLP

6                     By:  */s/ Don Springmeyer*

7    Don Springmeyer (Bar No. 1021)
3800 Howard Hughes Parkway, 17th Floor

8    Las Vegas, Nevada 89169

9    Eric L Cramer (*pro hac vice*)

10    Michael Dell'Angelo (*pro hac vice*)
Patrick F. Madden (*pro hac vice*)

11    Mark R. Suter (*pro hac vice*)
BERGER MONTAGUE PC

12    1818 Market St., Suite 3600
Philadelphia, PA 19103

13

14    Richard A. Koffman (*pro hac vice*)
Benjamin Brown (*pro hac vice*)

15    Daniel Silverman (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL, PLLC

16    1100 New York Ave., N.W., Suite 500 East, Tower
Washington, DC 20005

17

18    Joseph R. Saveri (*pro hac vice* forthcoming)
Joshua P. Davis (*pro hac vice* forthcoming)

19    Kevin E. Rayhill (*pro hac vice* forthcoming)
JOSEPH SAVERI LAW FIRM, INC.

20    601 California St., Suite 1000
San Francisco, CA 94108

21

22    Robert C. Maysey (*pro hac vice*)
Jerome K. Elwell (*pro hac vice*)

23    WARNER ANGLE HALLAM JACKSON &
FORMANEK PLC

24    2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016

25

26    *Counsel for Plaintiffs Kajan Johnson and
Clarence Dollaway and the Proposed Class*

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that on this  22<u>nd</u> day of October, 2021, a true and correct copy of

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** was served via the United States District

Court CM/ECF system on all counsel of record who have enrolled in this ECF system.


                 _/s/ Pamela Montgomery_
                 An employee of Kemp Jones, LLP

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Don Springmeyer (Nevada Bar No. 1021)
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Fl.
Las Vegas, Nevada 89169
Tel: (702) 385-6000
Fax: (702) 385-6001
Email: dspringmeyer@kempjones.com

*Counsel for Plaintiffs Kajan Johnson and*
*Clarence Dollaway and the Proposed Class*

[Additional counsel listed on signature page]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| Kajan Johnson and Clarence Dollaway, on behalf of themselves and all others similarly situated, | Case No.: 2:21-cv-01189-RFB-BNW |
| Plaintiffs, | **DECLARATION OF ERIC L. CRAMER, ESQ.** |
| vs. | |
| Zuffa, LLC (d/b/a Ultimate Fighting Championship and UFC) and Endeavor Group Holdings, Inc., | |
| Defendants. | |

I, Eric L. Cramer, Esq. declare and state as follows:

1.      I am Chairman of Berger Montague PC and an attorney for Plaintiffs Kajan Johnson and Clarence Dollaway. I am a member in good standing of the State Bars of Pennsylvania and New York and have been admitted *pro hac vice* in this Court. I am over 18 years of age and have personal knowledge of the facts stated in this Declaration. If called as a witness, I could and would testify competently to them.

2.      I make this Declaration in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss (ECF No. 17).

3.      Attached as Exhibit A is a true and correct copy of Group One Holding PTE, LTD's Corporate Compliance and Financial Profile, as obtained by the Singapore Accounting and Regulatory Authority.

4.      I declare under the penalty of perjury and the laws of the United States that the foregoing is true and correct.

 */s/ Eric L. Cramer*
Eric L. Cramer

DECLARATION OF ERIC L. CRAMER