# Exhibit A

Petition for a Writ of Mandamus

No. 26-_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE ZUFFA, LLC, TKO OPERATING COMPANY, LLC F/K/A ZUFFA PARENT
LLC (D/B/A ULTIMATE FIGHTING CHAMPIONSHIP AND UFC),
ENDEAVOR GROUP HOLDINGS, INC.,

*Petitioners.*

ZUFFA, LLC, TKO OPERATING COMPANY, LLC F/K/A ZUFFA PARENT LLC
(D/B/A ULTIMATE FIGHTING CHAMPIONSHIP AND UFC),
ENDEAVOR GROUP HOLDINGS, INC.,

*Petitioners-Defendants,*

v.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA,

*Respondent,*

v.

KAJAN JOHNSON, CLARENCE DOLLAWAY, AND TRISTAN CONNELLY,
ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

*Real-Parties-in-Interest-Plaintiffs.*

## PETITION FOR A WRIT OF MANDAMUS TO THE UNITED STATES
## DISTRICT COURT FOR THE DISTRICT OF NEVADA

William A. Isaacson
DUNN ISAACSON RHEE LLP
401 Ninth Street, NW
Washington, DC 20004
(202) 240-2900

Samir Deger-Sen
Nicolas Luongo
LATHAM & WATKINS LLP
1270 Avenue of the Americas
New York, NY 10020
(212) 906-1200

January 20, 2026

*Counsel for Petitioners*
*(Additional counsel listed on inside cover)*

J. Colby Williams
Donald J. Campbell
CAMPBELL & WILLIAMS
710 South Seventh Street, Suite A
Las Vegas, NV 89101
(702) 382-0540

Christopher S. Yates
Aaron T. Chiu
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

Joseph Axelrad
LATHAM & WATKINS LLP
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
(424) 653-5500

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ................................................................................... 1

RELIEF SOUGHT .................................................................................. 4

ISSUES PRESENTED ............................................................................. 5

FACTUAL AND PROCEDURAL BACKGROUND ........................................... 5

    A.    Plaintiffs File Overlapping Putative Class Actions ............................. 6

    B.    The District Court Rejects A Proposed Global Settlement .................... 7

    C.    Plaintiffs' Counsel File Additional Class Actions After The District Court Refuses To Approve The Parties' Stipulation Narrowing The *Johnson* Class ................................................... 8

    D.    Fact Discovery Commences In *Johnson* ...................................... 9

    E.    The District Court Issues Its Unprecedented Discovery Order .......... 12

REASONS FOR GRANTING THE WRIT .................................................... 14

I.    The District Court Clearly Erred In Issuing Its Unprecedented Disclosure Order .............................................................................. 17

    A.    The District Court Erred In Authorizing Wide-Ranging Discovery Into Privileged Legal-Strategy Communications And Documents ............................................................................... 17

    B.    The District Court's Order To Disclose Future Attorney-Client Communications Violates The First Amendment .............................. 28

II.    Mandamus Relief Is Necessary To Correct The District Court's Error And Prevent Irreparable Harm To Defendants ..................................... 31

**Page**

III.   This Court Should Grant Mandamus To Resolve An Entrenched Split
       In The Lower Courts On This Enormously Important Issue........................33

IV.    Reassignment Is Warranted On Remand.......................................................35

CONCLUSION .......................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Admiral Insurance Co. v. United States District Court*,
  881 F.2d 1486 (9th Cir. 1989) ..........................................................4, 16, 25, 31

*Al Otro Lado, Inc. v. Wolf*,
  No. 17-cv-02366, 2020 WL 4432026 (S.D. Cal. July 31, 2020).................19, 20

*Americans for Prosperity Foundation v. Bonta*,
  594 U.S. 595 (2021)...........................................................................................29, 30

*Barnes v. Sea Hawaii Rafting, LLC*,
  889 F.3d 517 (9th Cir. 2018) .............................................................................15

*Bauman v. United States District Court*,
  557 F.2d 650 (9th Cir. 1977) .............................................................................15

*In re Benvin*,
  791 F.3d 1096 (9th Cir. 2015) ...........................................................................35

*Brown v. Baden*,
  815 F.2d 575 (9th Cir. 1987) .............................................................................35

*Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*,
  964 F.2d 159 (2d Cir. 1992) ..............................................................................32

*Chirac v. Reinicker*,
  24 U.S. (11 Wheat.) 280 (1826) ........................................................................17

*City of Las Vegas v. Foley*,
  747 F.2d 1294 (9th Cir. 1984) ...........................................................................33

*Credit Suisse v. United States District Court*,
  130 F.3d 1342 (9th Cir. 1997) ...........................................................................15

*Denius v. Dunlap*,
  209 F.3d 944 (7th Cir. 2000) ...............................................................28, 29, 30

**Page(s)**

*Doe v. Reed*,
    561 U.S. 186 (2010)..................................................................30

*FTC v. Amazon.com, Inc.*,
    No. 23-cv-01495, 2024 WL 3342701
    (W.D. Wash. July 9, 2024) ...................................................19, 20, 34

*In re Grand Jury Investigation*,
    974 F.2d 1068 (9th Cir. 1992) ..............................................22

*In re Grand Jury Proceedings Grand Jury No. 97-11-8*
    162 F.3d 554 (9th Cir. 1998) ................................................17, 24

*Greater Los Angeles Agency on Deafness, Inc. v.*
    *Cable News Network, Inc.*,
    742 F.3d 414 (9th Cir. 2014) ................................................30

*Greenberg v. Amazon.com, Inc.*,
    No. 21-cv-00898, 2025 WL 2639221 (W.D. Wash. Sept. 12, 2025)................34

*Gregory v. Montana*,
    118 F.4th 1069 (9th Cir. 2024) .......................................18, 19, 22, 23

*Hernandez v. Tanninen*,
    604 F.3d 1095 (9th Cir. 2010) ........................................15, 16, 31, 32

*Hickman v. Taylor*,
    329 U.S. 495 (1947)...............................................................25

*Howard Jones Investments, LLC v. City of Sacramento*,
    No. 15-cv-954, 2024 WL 4545887 (E.D. Cal. Oct. 22, 2024) ..........................35

*ICTSI Oregon, Inc. v. International Longshore & Warehouse Union*,
    22 F.4th 1125 (9th Cir. 2022) ................................................32

*Jones v. Riot Hospitality Group LLC*,
    95 F.4th 730 (9th Cir. 2024) ................................................23

*Kahre v. United States District Court*,
    289 F. App'x 169 (9th Cir. 2008) ............................................35

**Page(s)**

*In re Kellogg Brown & Root, Inc.*,
  756 F.3d 754 (D.C. Cir. 2014) ................................................................. 16, 32

*In re Kirkland*,
  75 F.4th 1030 (9th Cir. 2023) .................................................................... 33

*Lee v. County of Los Angeles*,
  No. 23-cv-06875, 2025 WL 2505484 (C.D. Cal. Aug. 29, 2025),
  *reconsideration denied*, 2025 WL 3211209 (C.D. Cal. Oct. 14,
  2025) ................................................................................................ 18, 26, 27

*Little Hocking Water Association, Inc. v. E.I. Dupont de
  Nemours & Co.*,
  No. 09-cv-1081, 2013 WL 5311292 (S.D. Ohio Sept. 20, 2013) ...................... 27

*Martin v. Lauer*,
  686 F.2d 24 (D.C. Cir. 1982) ..................................................................... 28

*MedImpact Healthcare Systems, Inc. v. IQVIA, Inc.*,
  No. 19-cv-1865, 2022 WL 1694428 (S.D. Cal. May 26, 2022) ........................ 24

*Mothershed v. Justices of Supreme Court*,
  410 F.3d 602 (9th Cir. 2005) ..................................................................... 28

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958) ................................................................................. 29

*O'Connor v. Uber Technologies, Inc.*,
  904 F.3d 1087 (9th Cir. 2018) ..................................................................... 8

*Perry v. Schwarzenegger*,
  591 F.3d 1147 (9th Cir. 2010) ........................................................... 14, 31, 33

*Republic of Ecuador v. Mackay*,
  742 F.3d 860 (9th Cir. 2014) ................................................................... 1, 22

*RG Abrams Ins. v. Law Offices of C.R. Abrams*,
  No. 21-cv-00194, 2021 WL 10312431 (C.D. Cal. Dec. 22, 2021) .................... 23

*SG Cowen Securities Corp. v. United States District Court*,
  189 F.3d 909 (9th Cir. 1999) ................................................................. 32, 33

**Page(s)**

*Shenwick v. Twitter, Inc.*,
No. 16-cv-05314, 2018 WL 833085 (N.D. Cal. Feb. 7, 2018)...........................34

*Swidler & Berlin v. United States*,
524 U.S. 399 (1998).................................................................................18, 24

*Thomas v. Cricket Wireless, LLC*,
No. 19-cv-07270, 2021 WL 1017114
(N.D. Cal. Mar. 16, 2021)....................................................................19, 20, 34

*Trammel v. United States*,
445 U.S. 40 (1980).........................................................................................17, 26

*Unigene Laboratories, Inc. v. Apotex, Inc.*,
655 F.3d 1352 (Fed. Cir. 2011) ...........................................................................17

*United States v. Bauer*,
132 F.3d 504 (9th Cir. 1997) ...............................................................................17

*United States v. Harper*,
729 F.2d 1216 (9th Cir. 1984) .............................................................................15

*United States v. Mett*,
178 F.3d 1058 (9th Cir. 1999) .............................................................................24

*United States v. Philip Morris Inc.*,
314 F.3d 612 (D.C. Cir. 2003)..............................................................................32

*United States v. Zolin*,
491 U.S. 554 (1989)..........................................................................................22, 24

*Upjohn Co. v. United States*,
449 U.S. 383 (1981)..........................................................................17, 18, 25, 35

**Page(s)**

**STATUTES**

28 U.S.C. § 1651 ...................................................................................................14

**OTHER AUTHORITIES**

Fed. R. Civ. P. 37(e) ...........................................................................................27

Fed. R. Civ. P. 37(e)(1) ................................................................................19, 23

Fed. R. Civ. P. 37(e)(2) ................................................................................19, 30

16 Wright & Miller's Federal Practice & Procedure (3d ed. 2025) ........................31

## INTRODUCTION

This petition concerns an unprecedented discovery order of breathtaking scope that contravenes this Court's precedent and violates the First Amendment by impeding Defendants' ability to even discuss the order with counsel.  On January 6, 2026, the district court below ordered compulsory testimony and the production of a vast number of attorney-client privileged documents and communications— including *future* communications between clients and counsel—based solely on what it described as a "preliminary showing" that certain documents had not been adequately preserved.  This includes even legal strategy documents and defense counsel's opinion work product, which this Court has described as "virtually undiscoverable."  *Republic of Ecuador v. Mackay*, 742 F.3d 860, 869 n.3 (9th Cir. 2014).  Absent this Court's intervention, the district court—and potentially even Plaintiffs themselves—will gain access to confidential documents, the disclosure of which will irreparably harm Defendants' ability to fairly defend this litigation.  This Court has long recognized that an improper incursion into the attorney-client privilege is the quintessential circumstance in which mandamus review is warranted. The district court's extraordinary order demands urgent review.

Federal Rule of Civil Procedure 37(e) governs sanctions for a party's failure to preserve electronically stored information (ESI).  To accommodate Rule 37(e)'s inquiry into the alleged spoliator's mental state, district courts have authorized

limited discovery into that party's attorney-client communications, typically calibrated to shed light on the basic facts of its data-preservation efforts, after a preliminary showing that spoliation is made.  In this litigation, Defendants have already produced more than a million documents, totaling nearly five million pages, from thirty-five current and former employees of Defendants.  Plaintiffs have nonetheless asserted, without moving under Rule 37(e), that discovery into Defendants' privileged communications is warranted because certain data from the cellphones of Zuffa, LLC (Zuffa) executives Dana White and Tracy Long has not been produced to date, although diligent efforts to retrieve the data are ongoing and more than 295,000 documents from Mr. White and Ms. Long have been produced to date.  Plaintiffs offered no evidence of improper conduct or mal-intent, other than the inability to locate the particular cellphone data at issue.

On that reed-thin basis–without making the rule's required threshold findings–the district court compelled discovery into privileged communications far beyond that which any court has ever ordered under Rule 37(e).  The court ordered Defendants to produce all privileged communications with Mr. White or Ms. Long involving any discussion of "the litigation hold" and "the preservation of records" on "all forms of communications" and "all digital platforms," including "specific advice" given by counsel and information shared with counsel in investigatory

interviews.  Ex. A at 6, 18-20, 29-30.[1]  The court required this production from

January 1, 2014, the start of the discovery period in a different case that settled,

"literally up to" the date it set for production, January 26, 2026—including (1)

communications for over a year *after* the alleged spoliation, even though the inquiry

under Rule 37(e) is limited at most to the "intent" of a party at the time the spoliation

occurred; and (2) *future* communications that post-date the order itself.  *Id.*  The

court made clear that these communications must include any and all legal strategy

conversations involving the alleged spoliation, including strategy conversations

regarding the spoliation hearing itself, scheduled for February 4 and 5, 2026.  And

the district court presumptively contemplated that these confidential strategy

documents would be revealed to Plaintiffs as well, placing the burden on Defendants

to establish via briefing that the privileged "material should not be produced . . . to

plaintiffs' counsel."  *Id.* at 6.

The district court's decision is egregiously wrong and demands immediate

correction.  While district courts in this Circuit are divided over the permissible

scope of inquiry into privileged materials under Rule 37(e), no court has come close

to issuing an order of the scope and magnitude here.  Certainly, this Court has never

held that a preliminary showing of spoliation grants a litigant an all-access pass to

---

[1]    All alphabetical exhibits cited herein are to those in support of this Petition.

its adversary's confidential legal-strategy communications and documents.  That the district court also pierced Defendants' privilege as to *future* attorney-client communications (*i.e.*, after its order) currently impedes Defendants' ability to freely communicate with their counsel on an ongoing basis, in clear violation of Defendants' First Amendment rights.  Defendants' legal defense has already suffered as a consequence, and it continues to be irreversibly harmed.  Indeed, Defendants cannot adequately prepare for the upcoming hearing—or properly defend this case going forward—while under the shadow of an order that inhibits "communicating sensitive information for fear of subsequent forced disclosure." *Admiral Ins. Co. v. U.S. Dist. Ct.*, 881 F.2d 1486, 1494 (9th Cir. 1989).  Mandamus is the only means through which Defendants can obtain relief from the district court's unprecedented intrusion into the privilege.  The petition should be granted.

## RELIEF SOUGHT

Defendants respectfully request that this Court issue a writ of mandamus directing the district court to vacate its January 6, 2026 oral order (1) requiring Defendants to produce, for *in camera* review, privileged materials covering Mr. White's and Ms. Long's past and future communications with counsel relating to the above-listed topics, and contemplating disclosure of those privileged materials to Plaintiffs; (2) requiring Defendants to produce to Plaintiffs and the district court a privilege log covering those materials; and (3) compelling Mr. White and Ms. Long

to testify regarding the substance of their past and future privileged and confidential communications with counsel relating to the above-listed topics.

## ISSUES PRESENTED

1. Whether a court may pierce the attorney-client privilege as to past, and even future, communications with counsel, including discussion of legal strategy, based solely on a "preliminary showing" that potentially "relevant information is missing."

2. Whether an order compelling a litigant to prospectively waive the attorney-client privilege violates the First Amendment.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves claims against Zuffa, which owns and operates the Ultimate Fighting Championship (UFC), one of the world's premier mixed martial arts (MMA) promotions.[2]  Mr. White serves as the CEO of Zuffa, and Ms. Long is a Vice President.

Over the past two decades, the UFC's efforts to improve and expand interest in MMA have met with tremendous success, transforming what had been a niche sport into a global phenomenon.  But, in recent years, that success has made UFC the target of putative class actions by former UFC fighters, seeking billions of dollars in additional compensation.  These fighters contend that Zuffa violated the antitrust

---

[2] TKO Operating Company, LLC and Endeavor Group Holdings are the remaining two defendants.  Zuffa is a subsidiary of TKO Operating Company, LLC, which is majority-owned by Endeavor Group Holdings.

laws by restricting the supply of athletes available to other MMA promoters via exclusive contracts and by using its purported market power to suppress the fighters' compensation.

## A.    Plaintiffs File Overlapping Putative Class Actions

In 2014, three former UFC fighters filed *Le v. Zuffa*, No. 15-cv-1045-RFB-BNW ("*Le*"), in the District of Nevada, alleging antitrust violations by Zuffa.  They brought a putative class action on behalf of fighters who competed in one or more live professional UFC-promoted MMA bouts from December 16, 2010, to June 30, 2017.  *Le* Pls.' Mot. for Class Cert. i, Dkt. 518.

In June 2021, while class certification remained pending in *Le*, two former UFC fighters, represented by the same counsel as the *Le* plaintiffs, filed a second putative class action, *Johnson v. Zuffa, LLC*, No. 21-cv-1189-RFB-BNW, in the same district court.  They alleged claims substantively identical to those in *Le*, but for a class period of July 1, 2017 to June 23, 2021.  Compl. ¶ 1, Dkt. 1.[3]  Notably, at least 862 out of the 1,395 fighters in the putative class (whom Plaintiffs seek to represent) agreed to arbitrate any and all claims arising from or relating to their relationship with Zuffa, and to a class action waiver that prevents participation in a class action relating to claims covered by the arbitration agreement.  And as new

---

[3]    Unless indicated otherwise, "Dkt." citations refer to documents filed in *Johnson v. Zuffa, LLC*, No. 21-cv-1189-RFB-BNW (D. Nev.).

contracts are signed, the number of fighters without arbitration clauses in the class has considerably shrunk, and now represents only a small fraction of the putative class. Unlike the vast majority of the putative class, however, the named Plaintiffs in *Johnson* did *not* have mandatory arbitration and class action waiver provisions in their respective contracts with Zuffa, which prevented Defendants from moving to compel arbitration of the claims in *Johnson*.

### B.    The District Court Rejects A Proposed Global Settlement

In May 2024, the parties notified the district court that they had reached a global, class-wide settlement of the claims in *Le* and *Johnson*. *Le* Mot. for Prelim. Approval, Dkt. 1024. In setting out the proposed settlement, Plaintiffs' counsel informed the court that the claims in *Johnson* were largely unviable and "ha[d] little value" in light of the arbitration clauses: "So if I were and am representing these absent class member fighters, I would tell them and am telling them that it is in their interests to be involved in this settlement, to support this settlement, and to get involved in ways other than a likely doomed trip to the Ninth Circuit and the Supreme Court relating to trying to overturn arbitration clauses that the Supreme Court has said time and again should be enforced," *Le* Hr'g Tr. 86-68, Dkt. 1036. But in July 2024, the district court rejected the parties' proposed settlement. *Le* Minute Order, Dkt. 1038.

In late 2024, the parties reached a settlement resolving only the claims in *Le*. *Le* Mot. for Prelim. Approval, Dkt. 1045.  In March 2025, the district court approved the class action settlement and entered final judgment in *Le*.  *Le* Final J. & Approval Order, Dkt. 1064.

### C.    Plaintiffs' Counsel File Additional Class Actions After The District Court Refuses To Approve The Parties' Stipulation Narrowing The *Johnson* Class

Defendants next sought to resolve what the parties agreed was the key issue in the *Johnson* case—the validity of the arbitration clause that governed the vast majority of the putative class.  Plaintiffs' choice to proceed with atypical named plaintiffs, who had not signed the arbitration agreements, left Defendants with no clear way to resolve the appropriate forum for those claims prior to class discovery. Accordingly, in April 2025, Defendants moved in *Johnson* to deny class certification or strike the class allegations on the ground that the named Plaintiffs could not possibly represent a class the vast majority of which was bound to arbitrate their claims.  Defs.' Mot. to Deny Class Cert. 9-14, Dkt. 179; *see, e.g.*, *O'Connor v. Uber Techs., Inc*., 904 F.3d 1087, 1094 (9th Cir. 2018) (decertifying a class because the putative class included members bound to arbitrate).  Plaintiffs did not oppose that motion.  Instead, the parties proposed a joint stipulation that would have allowed Plaintiffs to file a further amended complaint with a narrowed class definition that excluded any fighter whose contract with Zuffa contained an arbitration agreement

and/or class action waiver.  Apr. 30, 2025 Joint Stip., Dkt. 191; *see also* May 9, 2025 Joint Stip., Dkt. 194 (further stipulation regarding amended complaint).  In other words, the parties *agreed* that the putative class should be substantially narrowed to less than a third of its present size.  But the district court denied that stipulation without explanation in a minute order.  Minute Order, Dkt. 195.

Plaintiffs' counsel then filed a third overlapping putative class action in May 2025, in the same court, alleging claims identical to those in *Johnson* but on behalf of former UFC athletes whose contracts with Zuffa include arbitration agreements and/or class action waivers.  *See Cirkunovs v. Zuffa, LLC*, No. 25-cv-914-RFB-BNW ("*Cirkunovs*").

### D.    Fact Discovery Commences In *Johnson*

After the district court denied Defendants' motion to dismiss, fact discovery began in *Johnson*.  *See* Mot. to Dismiss Order, Dkt. 176.  Plaintiffs sought broad class-wide discovery, notwithstanding that the parties appeared to agree that the named plaintiffs could not validly represent the class they were seeking discovery on behalf of (and that those putative class members were separately pursuing recovery in *Cirkunovs*, *see Cirkunovs* Compl., Dkt. 1).[4]

---

[4]    On August 25, 2025, Defendants moved to compel arbitration in *Cirkunovs*, Dkt. 38, and that case is presently stayed pending appeal to this Court, Ex. A at 42; *see Cirkunovs v. Zuffa, LLC*, No. 25-7906 (9th Cir.) (appeal docketed Dec. 17, 2025). That appeal, and any proceedings in *Cirkunovs*, will determine the appropriate forum

To date, Defendants have produced more than a million documents from thirty-five current and former employees, collected from a wide array of sources, including email, Microsoft Teams, personal storage drives, company files, and mobile devices.  These include more than 295,000 records from Mr. White and Ms. Long.  In compliance with the Court's instructions, Defendants have also provided Plaintiffs with a series of disclosures identifying the electronic devices used by document custodians in the relevant period.  For example, on October 13 and December 15, 2025, Defendants provided Plaintiffs disclosures identifying each of the cellphones collected and imaged by defense counsel.  *See* Pls.' Nov. 8, 2025 Statement Ex. 35, Dkt. 288-35; Pls.' Dec. 16, 2025 Statement Ex. 3, Dkt. 331-5 ("Dec. 16 Statement Ex. 3").  That disclosure set out detailed information regarding the type and amount of data contained in each device.  *Id*.  It also identified certain temporal gaps in the data found in the cellphones of Mr. White and Ms. Long.  *Id*.

Defense counsel is continuing to investigate these gaps in cellphone data—including a full review of all text messages from twenty-nine mobile devices and seventeen unique custodians, due for production by March 7, 2026, including Mr. White and Ms. Long (due January 26, 2026).  *See* Ex. A at 55-62; Ex. B at 14.  While there have not been any definitive findings so far, there are certain gaps in Mr.

for the vast majority of those within the putative *Johnson* class who agreed to arbitrate claims against Zuffa.

White's cellphone data for certain times, including from 2015 to 2020 and when a data collection took place in 2022 to 2024. As for Ms. Long, at this preliminary stage, the gaps in her cellphone data appear to correspond to the 2015 to 2020 and 2022 to 2023 periods. Plaintiffs have not identified anything that suggests any indication of deliberate or selective deletion. Indeed, Plaintiffs concede that Defendants produced in *Le*, and reproduced in *Johnson*, Excel files "from Mr. White's custodial files" that "contain[] hundreds of pages of texts—nearly ten thousand individual messages." Dkt. 217-37; Dkt. 253-8.

Still, Plaintiffs charged that Mr. White and Ms. Long must have *spoliated* evidence. But Plaintiffs did not file a motion under Rule 37(e) (and have not done so to date).

Nevertheless, at a routine status conference on November 20, 2025, the district court took up what it termed "the spoliation issue." Ex. D at 61-62. Citing Plaintiffs' speculation regarding spoliation, the district court ordered Mr. White and Ms. Long to testify at an evidentiary hearing that it would hold in February 2026. *See id.* The district court directed the parties to submit a list of anticipated topics on which the witnesses would be questioned. Ex. C at 30.

On December 16, 2025, Defendants submitted their list of questions that, they contemplated, would head off undue intrusion into attorney-client privileged matters. *See* Defs.' Status Report 6, Dkt. 334. Plaintiffs, however, proposed delving into "the

substance" of Defendants' attorney-client privileged communications.    Dec. 16

Statement 24-25, Dkt. 331.  On December 18, 2025, the district court further directed

Defendants "to present some proffer of what they anticipate will be potential reliance

on counsel and the extent of that."  Ex. B at 20.  The court acknowledged that its

inquiry into Plaintiffs' spoliation allegations "can get very messy very quickly

depending on what's said."  *Id.*

On December 30, 2025, Defendants filed their submission, arguing that any

spoliation issue was not ripe because defense counsel was still actively investigating

the gaps in cellphone data.  Defendants also raised grave concerns that their attorney-

client privilege would be invaded by Plaintiffs' questioning of Mr. White and Ms.

Long at the evidentiary hearing.  Defs.' Spoliation Position, Dkt. 347.  In an effort

to mitigate this risk, Defendants proposed that the district court permit Mr. White

and Ms. Long to submit declarations addressing facts relevant to their data-

preservation efforts.  *Id.* at 3, 13-14, 17.

### E.    The District Court Issues Its Unprecedented Discovery Order

At the next status conference, on January 6, 2026, the district court issued its

sweeping discovery order.    The district court found that Plaintiffs made "a

preliminary showing" of spoliation simply because they had "indicated" that

potentially "relevant information is missing."  Ex. A at 13-14.  On this basis, the

district court held that Plaintiffs were entitled to access Defendants' confidential

communications that "would otherwise implicate the [attorney-client] privilege." *Id.* The discovery order pierced Defendants' attorney-client privilege with respect to a vast array of confidential communications that (as the court acknowledged) are unquestionably protected by the privilege:

- *Testimony on the substance of attorney-client communications*: The court compelled Mr. White and Ms. Long to testify at an evidentiary hearing, scheduled for February 4 and 5, 2026, on the "whole universe," *id.* at 29, of their communications with counsel—including "specific advice" given by counsel and information shared with them in "interviews"—relating to "the litigation hold" and "the preservation of records" on "all forms of communications" and "all digital platforms." *Id.* at 19-20. The court ruled that it would permit questioning by Plaintiffs on "the substance" of Mr. White's and Ms. Long's communications with counsel, including any and all legal strategy discussed in response to "discovery correspondence or Court orders." *Id.* at 20.

- *Production of past and future attorney-client communications*: The court ordered Defendants to submit for its *in camera* review—to be followed by potential disclosure to Plaintiffs, subject to further briefing—"any and all" communications with Mr. White or Ms. Long relating to "the litigation hold" and "the preservation of records," including records of "conversations" with attorneys regarding "the steps taken to preserve records, whether or not there were any steps taken to delete records, whether or not these individuals knew or participated in a routine or systemic deletion of records." *Id.* at 29.

- *Production of attorney-client documents that post-date any alleged spoliation and relate to legal strategy surrounding the hearing itself*: The court stated that the privileged documents it had ordered Defendants to turn over would "not [be] cut off at a certain period of time" in which spoliation allegedly occurred. *Id.* Rather, it required Defendants to produce privileged documents from the start of the discovery period in the *Le* (not *Johnson*) case, January 2014, "literally up to" the deadline it had set for production, January 26, 2026. *Id.* at 5, 29. The court specifically noted that it expected "communications that involved discussions with [Mr. White and Ms. Long] in the past three or four months" involving "the

preservation of records." *Id.* at 29-30.  In other words, the order compelled production of any legal strategy conversation *about the spoliation hearing itself*—even though such communications could not possibly bear on whether spoliation had occurred years earlier.  *Id.* at 29-30 ("So [the production] will be up to [January 26], because I would assume that there have been further conversations between now and then with respect to the preservation of records.").

- *Privilege log*: The court ordered Defendants to produce to Plaintiffs and the court a privilege log that covers "any and all" communications on those issues from 2014 through the date of filing.  *Id.* at 28-30.

After ordering this wide-ranging discovery, the district court directed Defendants to file a brief addressing why its attorney-client communications "shouldn't be produced to plaintiffs' counsel prior to the spoliation hearing."  *Id.* at 6.

## REASONS FOR GRANTING THE WRIT

The district court's staggering overreach warrants mandamus relief.  In determining whether to issue a writ of mandamus under the All Writs Act, *see* 28 U.S.C. § 1651, this Court considers five "guidelines":  "(1) whether the petitioner has no other means, such as a direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in any way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft repeated error or manifests a persistent disregard of the federal rules; and (5) whether the district court's order raises new and important problems or issues of first impression."  *Perry v. Schwarzenegger*,

591 F.3d 1147, 1156 (9th Cir. 2010) (citing *Bauman v. U.S. Dist. Ct.*, 557 F.2d 650, 654-55 (9th Cir. 1977)).

Although informative, these five guidelines "'are not exhaustive,' and need not all be met in order to grant mandamus relief." *Barnes v. Sea Haw. Rafting, LLC*, 889 F.3d 517, 535 (9th Cir. 2018) (citation omitted). Indeed, "rarely will a case arise where all these guidelines point in the same direction or where each guideline is even relevant or applicable." *Credit Suisse v. U.S. Dist. Ct.*, 130 F.3d 1342, 1345 (9th Cir. 1997); *accord United States v. Harper*, 729 F.2d 1216, 1222 (9th Cir. 1984).

Here, the mandamus factors strongly favor this Court's intervention. *First*, the district court's order is "clearly erroneous as a matter of law." *Hernandez v. Tanninen*, 604 F.3d 1095, 1099 (9th Cir. 2010). The court's order authorizes wide-ranging discovery into past and future privileged legal-strategy communications and documents, in a manner completely unmoored from Rule 37(e)'s text and purpose. No court has *ever* endorsed anything approaching the sweeping incursion into privilege that the district court sanctioned here under Rule 37(e), much less on the basis of a sparse "preliminary showing" that certain data has not yet been located. The district court's outlier decision reflects an extraordinary disregard of the law's historic solicitude for the privilege, violates the First Amendment, and will have devastating and irreversible effects on Defendants' ability to fairly defend this litigation. It cannot be permitted to stand.

*Second*, Defendants "ha[ve] no other adequate means" to obtain relief and, absent this Court's intervention, will continue to "be damaged or prejudiced in [a] way not correctable on appeal." *Hernandez*, 604 F.3d at 1100 (citation omitted). This Court has recognized that mandamus is "the only method available" to challenge orders piercing the attorney-client privilege prior to final judgment. *Admiral Ins. Co.*, 881 F.2d at 1491; *Hernandez*, 604 F.3d at 1101. The district court's order requires Defendants to expose their legal strategy communications to the court, and even their adversary. Once those documents have been viewed, "'the cat is out of the bag,'" and "very purpose of" the privilege has been defeated. *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 761 (D.C. Cir. 2014) (Kavanaugh, J.) (citation omitted). Defendants "will be injured in a way not correctable on appeal," and have no adequate alternative remedy to protect their privilege. *Admiral Ins. Co.*, 881 F.2d at 1491.

*Third*, this case also implicates a recurring issue over which district courts in this Circuit are deeply divided. While no court has ever come close to mandating the disclosure here, district courts have fractured on the permissible scope of inquiry into privileged materials upon a preliminary showing of spoliation. There is no practical way for this Court to resolve this confusion absent mandamus relief.

## I. THE DISTRICT COURT CLEARLY ERRED IN ISSUING ITS UNPRECEDENTED DISCLOSURE ORDER

### A. The District Court Erred In Authorizing Wide-Ranging Discovery Into Privileged Legal-Strategy Communications And Documents

**1.** The attorney-client privilege is a bedrock principle of Anglo-American law. Not only is the attorney-client privilege "'the oldest'" but it is also "perhaps, the most sacred of all legally recognized privileges" for confidential communications. *United States v. Bauer*, 132 F.3d 504, 510 (9th Cir. 1997) (citation omitted). The privilege is "rooted in the imperative need for confidence and trust" between attorneys and their clients. *Trammel v. United States*, 445 U.S. 40, 51 (1980). And its "purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The privilege is thus "indispensable," *Chirac v. Reinicker*, 24 U.S. (11 Wheat.) 280, 294 (1826) (Story, J.), and "essential to the just and orderly operation of our legal system." *Bauer*, 132 F.3d at 510.

Given the privilege's vital role in "the administration of justice," courts are loath to "create new exceptions" to the privilege's applicability. *In re Grand Jury Proc. Grand Jury No. 97-11-8* (*Grand Jury No. 97-11-8*), 162 F.3d 554, 556 (9th Cir. 1998). And courts recognize that "piercing the attorney-client privilege" is an "extreme remedy." *Unigene Laboratories, Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1359

(Fed. Cir. 2011).  Ad hoc, judicially created exceptions are disfavored not only because they "contribute to the general erosion of the privilege," but also because they create unpredictability regarding the privilege's protections.  *Swidler & Berlin v. United States*, 524 U.S. 399, 410 (1998).  An "uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all."  *Upjohn*, 449 U.S. at 393; *see also, e.g.*, *Swidler & Berlin*, 524 U.S. at 409 (rejecting "proposed exception" to the attorney-client privilege because it would "introduce[] substantial uncertainty into the privilege's application").

Courts have recognized a limited exception to the attorney-client privilege to accommodate the spoliation inquiry called for by Federal Rule of Civil Procedure 37(e), which governs sanctions for the failure to preserve ESI.  *See Gregory v. Montana*, 118 F.4th 1069, 1078 (9th Cir. 2024).  Rule 37(e) provides that a court may impose such sanctions if four threshold requirements are met: "(1) the information should have been preserved in anticipation or conduct of litigation, (2) a party failed to take reasonable steps to preserve the information, (3) the information was lost as a result, and (4) the information could not be restored or replaced by additional discovery."  *Lee v. County of Los Angeles*, No. 23-cv-06875, 2025 WL 2505484, at *6 (C.D. Cal. Aug. 29, 2025), *reconsideration denied*, 2025 WL 3211209 (C.D. Cal. Oct. 14, 2025); *see Gregory*, 118 F.4th at 1077-78.  Once those

threshold requirements are met, paragraph (1) of the Rule authorizes the court, "'upon [a] finding of prejudice to another party from loss of the information,'" to impose "remedial sanctions" that are "'no greater than necessary to cure the prejudice'" resulting from the loss. *Gregory*, 118 F.4th at 1078 (alteration in original) (quoting Fed. R. Civ. P. 37(e)(1)). Paragraph (2) establishes "a more demanding standard before the court may impose certain types of severe sanctions," which may be imposed "only upon finding that the party [who caused the loss] acted with *the intent* to deprive another party of the information's use in the litigation." *Id.* (quoting Fed. R. Civ. P. 37(e)(2)) (alteration in original) (emphasis added).

To facilitate the Rule 37(e) inquiry, courts have ordered modest discovery into an alleged spoliator's document-preservation efforts *after* the party alleging spoliation has made "a sufficient preliminary showing of spoliation." *FTC v. Amazon.com, Inc.*, No. 23-cv-01495, 2024 WL 3342701, at *1 (W.D. Wash. July 9, 2024) (citation omitted); *see* Pls.' Mot. to Compel 11-12, *FTC v. Amazon.com, Inc.*, No. 23-cv-01495 (W.D. Wash. Apr. 25, 2024), Dkt. No. 198 (motion for sanctions under Rule 37(e)). Courts have found this "preliminary showing" adequate, for example, where it was clear from the record that the alleged spoliator did not timely issue a litigation hold or admitted to deliberately destroying potentially relevant information. *See, e.g.*, *Al Otro Lado, Inc. v. Wolf*, No. 17-cv-02366, 2020 WL 4432026, at *2 (S.D. Cal. July 31, 2020); *Thomas v. Cricket Wireless, LLC*, No. 19-

cv-07270, 2021 WL 1017114, at *2, *5 (N.D. Cal. Mar. 16, 2021). Even in those circumstances, however, courts have allowed limited discovery into the facts relating to a party's litigation hold, general facts regarding retention efforts, or production of portions of the litigation hold notice itself. *See Al Otro Lado, Inc.*, 2020 WL 4432026, at *2; *Thomas*, 2021 WL 1017114, at *5. Some courts have limited discovery to a Rule 30(b)(6) deposition of a corporate representative regarding "the basic details surrounding the [litigation] hold[s]," *FTC*, 2024 WL 3342701, at *1 (citation omitted), while others have ordered production of privileged litigation hold letters *after* a showing that the alleged spoliator "*admittedly* destroyed information and documents" and "refused to answer [related questions] through written discovery and . . . two Rule 30(b)(6) depositions," *Thomas*, 2021 WL 1017114, at *5.

**2.** Under the apparent guise of Rule 37(e) discovery, the district court here greenlit a wide-ranging fishing expedition into Defendants' past and future communications with counsel. As outlined above, the district court ordered Defendants to produce, for *in camera* review, a wide range of privileged communications with Mr. White or Ms. Long touching upon "document preservation," including "specific advice" given by counsel and information shared with counsel in investigatory interviews. Ex. A at 18-20, 29-30. What is more, the

district court contemplated production of these legal strategy documents to Plaintiffs themselves. *Id.*

The district court's order is breathtakingly overbroad. It requires production not just of privileged communications regarding Defendants' decision-making prior to the alleged destruction of documents, but also communications that *post-date* any such actions. And it requires production not just of communications regarding the alleged spoliation but also communications between Defendants and their attorneys "either in response to plaintiffs' request to disclose information in discovery correspondence or Court orders." *Id.* at 20. The district court's order therefore encompasses all manner of highly confidential communications disclosing Defendants' legal strategy: internal deliberations regarding Plaintiffs' spoliation allegations, counsel's investigation and assessment of those allegations, counsel's advice in response to the court's inquiries into those allegations, counsel's assessment of and advice regarding the very discovery order that is at issue here, and even counsel's opinion work product and strategy for the evidentiary hearing that the court ordered. For example, under the court's order, all communications and documents relating to witness preparation with Mr. White or Ms. Long with counsel for the hearing itself will be required to be disclosed. This might include communication and analysis regarding the judge, his temperament, or his

inclinations.  It might include an assessment of the strength of Defendants' or Plaintiffs' case, or even a description of Defendants' overarching litigation strategy.

Even *in camera* review of such communications—let alone disclosure to Plaintiffs—could severely color a judge's perspective on a case, and irreparably prejudice Defendants.  As the Supreme Court has explained, "examination" of such materials "even by the judge alone, in chambers" threatens to "jeopardize the security which the privilege is meant to protect." *United States v. Zolin*, 491 U.S. 554, 570 (1989) (citation omitted); *see also, e.g.*, *In re Grand Jury Investigation*, 974 F.2d 1068, 1074 (9th Cir. 1992) ("[I]n camera review of documents . . . is an intrusion [into the attorney-client privilege] which must be justified.").  Those fundamental precepts of our adversarial system apply with even greater force here, because the district court ordered Defendants to disclose privileged materials revealing *legal strategy* developed by their attorneys, which is "virtually undiscoverable" in the ordinary course.  *Mackay*, 742 F.3d at 869 n.3 (citation omitted) (discussing protections for attorneys' opinion work product).

The district court's extraordinary order does not comport with the text or purpose of Rule 37.  Rule 37(e) "careful[ly]" specifies the findings that a court "*must*" make: "prejudice to another party" for level-one sanctions and specific intent for level-two sanctions.  *Gregory*, 118 F.4th at 1078-79 (citation omitted).  These "specific requirements" "preclude[] a court from resorting to inherent authority to

22

evade [the Rule's] strictures." *Id*. at 1079-80. A court's inquiry into spoliation accordingly must be anchored in the "specific" findings that the Rule requires. But the district court here ordered free-wheeling discovery into Defendants' privileged attorney-client documents without calibrating the scope of disclosure to Rule 37(e)'s requirements—indeed without ever requiring Plaintiffs to even file a motion under Rule 37(e). Defendants' documents do not shed light on any alleged "prejudice to [Plaintiffs] from loss of the information." Fed. R. Civ. P. 37(e)(1). And Defendants' communications with their lawyers that post-date the alleged spoliation are necessarily going to be of limited value in assessing their contemporaneous mental state, so the order is not anchored to specific intent findings either. *See Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024) (discussing Rule 37(e)(2)'s intent requirement).

Moreover, the district court compelled this broad and indiscriminate disclosure without a scintilla of evidence of Defendants' mal-intent. The *only* non-speculative basis that Plaintiffs have ever offered for prying into Defendants' privileged communication is that certain data from Mr. White's and Ms. Long's cellphones has not been produced to date. But courts routinely have refused discovery of privileged materials where a party has alleged a "preliminary showing" based on nothing more than the fact that certain data is missing from the discovery record. *See RG Abrams Ins. v. Law Offs. of C.R. Abrams*, No. 21-cv-00194, 2021

WL 10312431, at *12 (C.D. Cal. Dec. 22, 2021); *MedImpact Healthcare Sys., Inc. v. IQVIA, Inc.*, No. 19-cv-1865, 2022 WL 1694428, at *3 (S.D. Cal. May 26, 2022). That is for good reason: Under the district court's approach, a plaintiff need only identify some missing data in the relevant discovery period to obtain access to troves of privileged documents reflecting its adversary's litigation strategy.

That is not and cannot be the law. No other court has permitted the kind of roving inquiry into privileged communications that the district court has sanctioned here, much less on the basis of a sparse "preliminary showing" that certain data has not yet been located. Ex. A at 14. This Court has never suggested that such a showing somehow grants a litigant access to its adversary's confidential legal-strategy documents. On the contrary, the Supreme Court and this Court have long maintained stringent requirements preventing "opponents of the privilege [from] engag[ing] in groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents." *Zolin*, 491 U.S. at 571; *see also United States v. Mett*, 178 F.3d 1058, 1065 (9th Cir. 1999) (any doubts as to the attorney-client privilege's applicability "should be resolved in favor of the privilege, not in favor of disclosure"). The district court's decision here to authorize the sweeping disclosure of privileged materials is fundamentally at odds with the case law's deep solicitude for the privilege. *See, e.g.*, *Swidler & Berlin*, 524 U.S. at 410; *Grand Jury No. 97-11-8*, 162 F.3d at 556; *Mett*, 178 F.3d at 1065.

The district court's order not only undermines the vital purposes served by the attorney-client privilege, but it will also have a far-reaching chilling effect in this litigation. By piercing the privilege for such a wide range of attorney-client communications, the order generates crippling "uncertain[ty]" as to the privilege's availability in *any* context within this litigation, which "is little better than no privilege at all." *Upjohn*, 449 U.S. at 393. The threat of Plaintiffs leveraging some perceived gap in ESI into an all-access pass to Defendants' privileged communications has already chilled attorney-client communications and prejudiced Defendants' ability to defend this litigation, and will continue to "force counsel to warn their clients against communicating sensitive information for fear of subsequent forced disclosure." *Admiral Ins. Co.*, 881 F.2d at 1494. The unpredictability generated by the district court's order leaves Defendants uncertain about whether any of their requests for legal advice will be adequately protected. That gravely undermines counsel's ability to engage in open communication with their clients, and ultimately undermines their ability "to ensure their clients' compliance with the law." *Upjohn*, 449 U.S. at 392; *cf. Hickman v. Taylor*, 329 U.S. 495, 511 (1947) ("Were [legal strategy] materials open to opposing counsel on mere demand . . . [i]nefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial."). Indeed, it is difficult to see how Defendants could ever freely communicate with counsel again

in this litigation, with the looming threat that the privilege could be invaded based on so little. This Court's intervention is urgently needed to secure the "confidence and trust" that vigorous legal advocacy depends on. *Trammel*, 445 U.S. at 51 (1980).

**3.** The district court further erred by entering its unprecedented discovery order without even making the threshold findings required by Rule 37(e). Rule 37(e) authorizes courts to impose sanctions for a litigant's failure to preserve ESI, *provided that* four threshold requirements are met: "(1) the information should have been preserved in anticipation or conduct of litigation, (2) a party failed to take reasonable steps to preserve the information, (3) the information was lost as a result, and (4) the information could not be restored or replaced by additional discovery." *Lee*, 2025 WL 2505484, at *6. The district court did not even purport to make the requisite findings for two of those requirements.

With respect to the second threshold requirement, Plaintiffs have not shown, and the district court did not find, that Defendants "failed to take reasonable steps to preserve" the allegedly missing ESI. On the contrary, Plaintiffs conceded that Defendants placed Mr. White and Ms. Long on timely litigation holds. *See Cirkunovs* Dec. 9, 2025 Statement Ex. 14, Dkt. 98-16 ("On December 18 2014, the day the UFC was served the *Le* Complaint, then-Chief Legal Officer Kirk Hendrick sent letter to all UFC employees instructing them to preserve information and documents."); Mot. for Sanctions 6 n.8, Dkt. 217 (citing Mot. for Sanctions Ex. 15,

at App. A, Dkt. 217-17) (Plaintiffs' acknowledgment that "Zuffa did provide a list of individuals [which included Dana White and Tracy Long] subject to a litigation hold [in *Johnson*]").

Nor did the district court make a finding that the cellphone data at issue "could not be restored or replaced by additional discovery." Fed. R. Civ. P. 37(e). And the facts cannot support such a finding. As Defendants informed the district court, defense counsel is actively investigating the allegedly missing cellphone data and has identified to Plaintiffs all pertinent cellphone carriers. *See*, Ex. B at 14; Dec. 9 Statement Ex. 3, Dkt. 331-5. And Plaintiffs have since served subpoenas on each of the respective cellphone carriers. *See* Ex. B at 20-21. With the carriers' responses still pending, Plaintiffs have yet to determine whether the allegedly missing data can be "restored" or "replaced." *See Lee*, 2025 WL 2505484, at *8 ("Having failed to convince the Court that the 'irreplaceable' prong of spoliation had been satisfied at that time, Plaintiffs withdrew the motion and engaged in third-party discovery directed at determining whether the Missing ESI could be obtained through other means, as required by Rule 37(e)."); *Little Hocking Water Ass'n, Inc. v. E.I. Dupont de Nemours & Co.*, No. 09-cv-1081, 2013 WL 5311292, at *4 (S.D. Ohio Sept. 20, 2013) ("It is only after a determination of what information actually can be produced will this Court ever be in a position to determine whether spoliation occurred. On the present record, the Court declines to broaden sanctions-related discovery.").

27

The lack of these threshold findings means that there should never have been any invasion of the privilege here—let alone the extraordinary production compelled by the district court.

### B.    The District Court's Order To Disclose Future Attorney-Client Communications Violates The First Amendment

The district court's order also cannot stand under the First Amendment.  As noted, the district court's order pierced Defendants' privilege over *future* communications between counsel and Mr. White and Ms. Long that occur between the date of the order (January 6, 2026) and the date of the production (January 26, 2026).  *See* supra at 13-14.  Such communications could involve, for example, witness preparation and advice regarding the spoliation hearing itself, scheduled for February 4 and 5, 2026.  The First Amendment plainly does not tolerate such an intrusion, on a prospective basis, into Defendants' attorney-client communications.

This Court has recognized that "the right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition." *Mothershed v. Justs. of Supreme Ct.*, 410 F.3d 602, 611 (9th Cir. 2005) (citation omitted).  Because "the maintenance of confidentiality in attorney-client communications is vital to the ability of an attorney to effectively counsel her client, interference with this confidentiality impedes the client's First Amendment right to obtain legal advice." *Denius v. Dunlap*, 209 F.3d 944, 954 (7th Cir. 2000); *Martin v. Lauer*, 686 F.2d 24, 32 (D.C. Cir. 1982) ("[T]he right to confer with counsel would

28

be hollow if those consulting counsel could not speak freely about their legal problems.").

By compelling disclosure of *future* confidential communications between Defendants and their lawyers, the district court's order plainly "chills the protected speech involved in [its] consultation with an attorney on legal matters." *Denius*, 209 F.3d at 954. It is well established that "compulsory disclosure" can have a "repressive effect" on such First Amendment-protected activity. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462-63 (1958); *see also, e.g.*, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607-08 (2021) (recognizing the "deterrent effect on the exercise of First Amendment rights that arises as an inevitable result of . . . requiring disclosure" (citation omitted)). The "repressive effect" of the district's order is clear: Counsel cannot possibly give candid strategic advice regarding the spoliation hearing, knowing that those communications will be disclosed to the district judge, or even Plaintiffs. As noted above, any witness preparation by counsel of Mr. White and Ms. Long for their testimony on alleged spoliation is subject to the district court's wide-ranging intrusion into the attorney-client privilege. As a form of compelled disclosure, the order is subject to "exacting scrutiny" under the First Amendment: There must be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest, and . . . the disclosure requirement [must] be narrowly tailored to the interest it promotes."

*Ams. for Prosperity Found.*, 594 U.S. at 611 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)).  Indeed, the chilling effect here is so great that this "judicial order" effectively functions as a "[p]rior restraint[] on speech," which "carr[ies] a heavy presumption of invalidity." *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 430 (9th Cir. 2014) (citation omitted); *see Denius*, 209 F.3d at 955 ("[A]bsent appropriate justification the state cannot compel the revelation of privileged attorney-client communications.").

The district court's order does not withstand "exacting scrutiny"—or even come close.  The disclosure required by the district court serves no discernible purpose whatsoever, much less "a sufficiently important one" that reflects "the seriousness of the actual burden" on Defendants' First Amendment rights.  *Ams. for Prosperity Found.*, 594 U.S. at 615 (citation omitted).  Even assuming that some contemporaneous attorney-client communications might bear on the question of Defendants' "intent" for purposes of Rule 37(e)(2), future communications cannot possibly inform alleged spoliation that occurred years earlier—especially when the parties to those communications know that they will be disclosed to the court.  *See* Fed. R. Civ. P. 37(e)(2).  And the district court itself offered no justification, or even explanation, for this extraordinary intrusion.  The forward-looking component of the district court's order is plainly unconstitutional.

## II.    MANDAMUS RELIEF IS NECESSARY TO CORRECT THE DISTRICT COURT'S ERROR AND PREVENT IRREPARABLE HARM TO DEFENDANTS

Mandamus relief is also necessary because the district court's error is not correctable after final judgment, and Defendants have no other adequate means of relief.

**1.** A discovery ruling "injurious" to the attorney-client privilege is the paradigm case for mandamus relief. *Hernandez*, 604 F.3d at 1101. This Court has consistently found mandamus relief necessary to correct "erroneous" rulings narrowing the privilege's protections, *id.* at 1101, and "to define the scope of an important privilege," *Perry*, 591 F.3d at 1157 (9th Cir. 2010); *see also Admiral Ins. Co.*, 881 F.2d at 1491 ("[M]andamus is the only method available to Admiral to obtain review, prior to final judgment, of the district court's order compelling production of a statement Admiral contends is privileged."). In courts around the country, "[w]rit review is rather frequently provided . . . to protect against discovery of information that is claimed to be protected by . . . [the attorney-client] privilege." 16 Wright & Miller's Federal Practice & Procedure § 3935.3 (3d ed. 2025) (collecting cases).

Courts liberally grant mandamus relief to decide privilege claims because "'an appeal after disclosure of the privileged communication is an inadequate remedy' for the 'irreparable harm a party likely will suffer if erroneously required to disclose

privileged materials or communications.'" *Hernandez*, 604 F.3d at 1101 (citation omitted). An appeal after final judgment "will come too late" once "'the cat is out of the bag.'" *Kellogg Brown & Root, Inc.*, 756 F.3d at 761 (citation omitted). Plaintiffs' counsel "cannot unlearn what has been disclosed to them" and the disclosed materials "may alert adversary counsel to evidentiary leads or give insights regarding various claims and defenses." *Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*, 964 F.2d 159, 165 (2d Cir. 1992). Moreover, "[t]he implications" of a litigant's use of privileged material are "very difficult to remedy on appeal" of the final judgment. *United States v. Philip Morris Inc.*, 314 F.3d 612, 622 (D.C. Cir. 2003). Unless this Court intervenes, Defendants will plainly continue to suffer "irreparable harm." *Hernandez*, 604 F.3d at 1101 (citation omitted). And Defendants will continue to be deprived of their ability to freely communicate with and receive candid advice from counsel, irreversibly damaging their legal defense.

**2.** Defendants lack the ordinary avenues for appellate review. They "may not directly appeal" because "discovery orders are not final, appealable orders under 28 U.S.C. § 1291." *SG Cowen Sec. Corp. v. U.S. Dist. Ct.*, 189 F.3d 909, 913 (9th Cir. 1999). Interlocutory appeals under 28 U.S.C. § 1292(b) are also unavailable, as discovery orders like these do not decide "controlling" merits issues and review of such orders does not "materially advance the ultimate termination of the litigation." *ICTSI Or., Inc. v. Int'l Longshore & Warehouse Union*, 22 F.4th

1125, 1130 (9th Cir. 2022) (citation omitted). "Neither does Federal Rule of Procedure 54(b) apply," since it "applies [only] to situations in which final judgment is entered as to some but not all claims or parties." *SG Cowen*, 189 F.3d at 913. And an appeal is similarly "not allowed under 28 U.S.C. § 1292(a)(1)" because discovery orders "do[] not grant or deny an injunction." *City of Las Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984). Mandamus is the only path through which Defendants can obtain review of the district court's extraordinary order.

## III. THIS COURT SHOULD GRANT MANDAMUS TO RESOLVE AN ENTRENCHED SPLIT IN THE LOWER COURTS ON THIS ENORMOUSLY IMPORTANT ISSUE

Mandamus review is also warranted because district courts in this Circuit are deeply divided over the permissible scope of inquiry into privileged materials upon a preliminary showing of spoliation. This disagreement has created "substantial uncertainty and confusion in the district courts" which additionally calls for this Court's intervention on mandamus. *Perry*, 591 F.3d at 1157. The issue is a "'particularly important question[] of first impression' regarding discovery" that will otherwise "'elude appellate review.'" *In re Kirkland,* 75 F.4th 1030, 1041 (9th Cir. 2023) (quoting *Perry*, 591 F.3d at 1157).

On one side of the split, some courts have shown great solicitude for the privilege and hold that "[a]ny concerns that Plaintiffs have about spoliation can be addressed through means other than forcing Defendants to reveal attorney-client

33

privileged documents or documents protected by the work product doctrine." *Shenwick v. Twitter, Inc*., No. 16-cv-05314, 2018 WL 833085, at *4 (N.D. Cal. Feb. 7, 2018).  They have refused discovery of materials protected by the attorney-client privilege where a party has alleged a "preliminary showing" based on nothing more than the fact that certain ESI is missing from the discovery record.  *See FTC*, 2024 WL 3342701, at *2 (noting the split); *Thomas*, 2020 WL 7344742, at *2-3 (same); *Shenwick*, 2018 WL 833085, at *4.  Before permitting discovery into *any* privileged materials, these courts have required the exhaustion of less intrusive means of developing facts relevant to a Rule 37(e) motion, including "(1) when and to whom the litigation hold notices were given, (2) what kinds and categories of information and data [d]efendant's employees were instructed to preserve and collect, and (3) what specific actions they were instructed to take to that end."  *FTC*, 2024 WL 3342701, at *2.  "If" a party alleging spoliation has "still not obtained the information necessary to analyze the 'full extent of the possible spoliation'" from non-privileged materials, then these courts have permitted discovery into privileged materials.  *Id.* (citing *Thomas*, 2020 WL 7344742, at *3).

On the other side of the split, several courts have been substantially less solicitous of the attorney-client privilege.  They have found a lesser "preliminary showing" of spoliation sufficient to justify disclosure of privileged materials.  *See Greenberg v. Amazon.com, Inc*., No. 21-cv-00898, 2025 WL 2639221, at *4 (W.D.

Wash. Sept. 12, 2025); *Howard Jones Invs., LLC v. City of Sacramento*, No. 15-cv-954, 2024 WL 4545887, at *2 (E.D. Cal. Oct. 22, 2024). But even when they have done so, these courts have limited discovery to the alleged spoliator's litigation hold notice(s) in the first instance—a far cry from the wide-ranging discovery ordered by the district court here.

Mandamus relief is thus necessary here not only to correct the district court's error but also to resolve this entrenched split.

## IV.    REASSIGNMENT IS WARRANTED ON REMAND

Where this Court has granted the mandamus petition, it has also routinely reassigned the case to a different district judge on remand. *See, e.g.*, *In re Benvin*, 791 F.3d 1096, 1104 (9th Cir. 2015); *Kahre v. U.S. Dist. Ct.*, 289 F. App'x 169, 171 (9th Cir. 2008); *Brown v. Baden*, 815 F.2d 575, 577 (9th Cir. 1987) (per curiam). That would be especially appropriate here, because the district court's invasion of the privilege will continue to have a chilling effect on attorney-client communications, even if the order under review is vacated. The only way to restore "full and frank communication between attorneys and their clients" would be reassignment. *Upjohn Co.*, 449 U.S. at 389.

## CONCLUSION

This Court should grant a writ of mandamus directing the district court to vacate its January 6, 2026 oral order.

Dated:   January 20, 2026

William A. Isaacson
DUNN ISAACSON RHEE LLP
401 Ninth Street, NW
Washington, DC 20004
(202) 240-2900

J. Colby Williams
Donald J. Campbell
CAMPBELL & WILLIAMS
710 South Seventh Street, Suite A
Las Vegas, NV 89101
(702) 382-0540

Respectfully submitted,

*s/ Samir Deger-Sen*

Samir Deger-Sen
Nicolas Luongo
LATHAM & WATKINS LLP
1270 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Christopher S. Yates
Aaron T. Chiu
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

Joseph Axelrad
LATHAM & WATKINS LLP
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
(424) 653-5500

*Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE

This foregoing document complies with the type-volume limitation of Circuit Rules 21-2(c) and 32-3(2) because the document contains 8,364 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word 365 Times New Roman 14-point font.

*s/ Samir Deger-Sen*
Samir Deger-Sen

## EXHIBITS TO PETITION FOR WRIT OF MANDAMUS

**Exhibit**

Transcript of Status Conference Held January 6, 2026 Regarding
　　Discovery Dispute, Dkt. 353[1] ........................................................................A

Transcript of Status Conference Held December 18, 2025 Regarding
　　Discovery Dispute, Dkt. 339 (*see* Dkt. 342) (excerpt) ...................................B

Transcript of Status Conference Held December 4, 2025 Regarding
　　Discovery Dispute, Dkt. 323 (excerpt) ............................................................C

Transcript of Status Conference Held November 20, 2025 Regarding
　　Discovery Dispute, Dkt. 306 .........................................................................D

---

[1]　"Dkt." refers to docket numbers in *Johnson v. Zuffa, LLC*, No. 21-cv-1189-RFB-BNW (D. Nev.).

# EXHIBIT A

|   |   |   |   |
|---|---|---|---|
| 1 | UNITED STATES DISTRICT COURT | | |
| 2 | DISTRICT OF NEVADA | | |

3

| 4 | KAJAN JOHNSON, et al., | ) | Case No. 2:21-cv-01189-RFB-BNW |
|---|---|---|---|
|   |   | ) |   |
| 5 | MIKHAIL CIRKUNOVS, et al., | ) | Case No. 2:25-cv-00914-RFB-BNW |
|   |   | ) |   |
| 6 | PHIL DAVIS, et al., | ) | Case No. 2:25-cv-00946-RFB-BNW |
|   |   | ) |   |
| 7 |   | ) |   |
|   | Plaintiffs, | ) | Las Vegas, Nevada |
| 8 |   | ) | Tuesday, January 6, 2026 |
|   | vs. | ) | 11:18 a.m. |
| 9 |   |   |   |
|   | ZUFFA, LLC; TKO OPERATING | | STATUS CONFERENCE |
| 10 | COMPANY, LLC f/k/a Zuffa | | |
|   | Parent, LLC (d/b/a Ultimate | | *C E R T I F I E D   C O P Y* |
| 11 | Fighting Championship and | | |
|   | UFC); and ENDEAVOR GROUP | | |
| 12 | HOLDINGS, INC., | | |
| 13 | Defendants. | | |

14

15

16                    REPORTER'S TRANSCRIPT OF PROCEEDINGS

17               THE HONORABLE RICHARD F. BOULWARE, II,
                      UNITED STATES DISTRICT JUDGE
18

19

20  APPEARANCES:        See Pages 2 and 3

21

22  COURT REPORTER:       Patricia L. Ganci, RMR, CRR
                          United States District Court
23                        333 Las Vegas Boulevard South, Room 1334
                          Las Vegas, Nevada  89101
24

25  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.

```
 1  APPEARANCES:
    For the Plaintiffs:
 2
            MICHAEL GAYAN, ESQ.
 3          CLAGGETT & SYKES
            4101 Meadows Lane, Suite 100
 4          Las Vegas, Nevada 89107
            (702) 903-1353
 5
            MICHAEL C. DELL'ANGELO, ESQ.
 6          PATRICK F. MADDEN, ESQ.
            JEREMY GRADWOHL, ESQ.
 7          BERGER & MONTAGUE, P.C.
            1818 Market Street, Suite 3600
 8          Philadelphia, Pennsylvania 19103
            (215) 875-3000
 9
            DANIEL GIFFORD, ESQ.
10          COHEN MILSTEIN SELLERS & TOLL, PLLC
            88 Pine Street, 14th Floor
11          New York, New York 10005
            (617) 877-0508
12
            JOSEPH SAVERI, ESQ.
13          THE JOSEPH SAVERI LAW FIRM, INC.
            601 California Street, Suite 1505
14          San Francisco, California 94108
            (415) 500-6800
15
    For the Defendants:
16
            J. COLBY WILLIAMS, ESQ.
17          SAMUEL MIRKOVICH, ESQ.
            CAMPBELL & WILLIAMS
18          700 South 7th Street
            Las Vegas, Nevada 89101
19          (702)382-5222

20          JOSEPH AXELRAD, ESQ.
            ROBERT MEDINA, ESQ.
21          ADAM B. PETERSON, ESQ.
            LATHAM & WATKINS, LLP
22          10250 Constellation Boulevard, Suite 1100
            Los Angeles, California 90067
23          (424) 653-5500


24

25  ////
```

1  APPEARANCES CONTINUED:

2      **KRISTIN HOLLADAY, ESQ.**
       LATHAM & WATKINS, LLP
3      1271 Avenue of the Americas
       New York, New York 10020
4      (212) 906-1200

5

6      LAS VEGAS, NEVADA; TUESDAY, JANUARY 6, 2026; 11:18 A.M.

7                      --oOo--

8                P R O C E E D I N G S

9          THE COURT:  Please be seated.

10         COURTROOM ADMINISTRATOR:  We have three matters now

11 before the Court:  Case Number 2:21-cv-1189-RFB, *Johnson v.*

12 *Zuffa*; Case Number 2:25-cv-914-RFB, *Cirkunovs v. Zuffa*; and Case

13 Number 2:25-cv-946-RFB, *Davis v. Zuffa*.

14         Counsel, please make your appearances, beginning with

15 the plaintiffs.

16         MR. DELL'ANGELO:  Hello, Your Honor.  Michael

17 Dell'Angelo from the law firm of Berger Montague on behalf of

18 plaintiffs.

19         MR. MADDEN:  Hello, Your Honor.  Patrick Madden from

20 Berger Montague for plaintiffs.

21         MR. GRADWOHL:  Hello, Your Honor.  Jeremy Gradwohl,

22 Berger Montague, on behalf of plaintiffs.

23         MR. GIFFORD:  Hello, Your Honor.  Daniel Gifford, Cohen

24 Milstein, on behalf of plaintiffs.

25         MR. SAVERI:  Good morning, Your Honor.  Joseph Saveri

 1  for plaintiffs.

 2          MR. GAYAN:  Good morning, Your Honor.  Michael Gayan,

 3  Claggett & Sykes, for plaintiffs.

 4          THE COURT:  Good morning.

 5          MR. AXELRAD:  Good morning, Your Honor.  Joseph Axelrad

 6  on behalf of defendants.

 7          MR. WILLIAMS:  Good morning, Your Honor.  Colby

 8  Williams on behalf of the defendants.

 9          MR. MEDINA:  Good morning, Your Honor.  Robert Medina

10  for defendants.

11          MR. PETERSON:  Good morning, Your Honor.  Adam Peterson

12  from Latham & Watkins on behalf of defendants.

13          MS. HOLLADAY:  Good morning, Your Honor.  Kristin

14  Holladay for defendants, appearing only in the Cirkunovs case.

15          MR. MIRKOVICH:  Good morning, Your Honor.  Samuel

16  Mirkovich appearing on behalf of defendants.

17          THE COURT:  Good morning.  So we have a few things to

18  do today.

19          First, I want to address the hearing that we're going

20  to have on the 4th and the 5th.  So the hearing will proceed as

21  I've indicated on the 4th and 5th, starting with Mr. White and

22  Ms. Long will follow.

23          In reviewing the defendants' submission, it appears

24  that, perhaps, they were under the misapprehension that I had

25  not made findings that there was sufficient indicia of

1  spoliation to have a hearing.  I thought that I had, but to the

2  extent that it was unclear, I do find there's sufficient indicia

3  here of spoliation as it relates to relevant evidence.

4         The Court finds that there are years of missing digital

5  messages by Mr. White and Ms. Long and others related to

6  relevant contract negotiations which are relevant to the

7  discovery here -- relevant to the discovery here.  The Court

8  finds that this missing evidence occurred in a timeframe in

9  which there was a litigation hold and there was an obligation by

10  the defendants to preserve this evidence.  The Court finds that

11  this evidence, again, would have been subject to the litigation

12  hold, is, and is clearly relevant.  At this point in time it has

13  been missing for years when there was an obligation to produce

14  it previously.

15         So based upon that and all the evidence in this record,

16  there's clearly a basis for there to be a spoliation hearing in

17  this case.  The question becomes the extent of the requests as

18  it relates to questioning.  So one of the things I'm going to do

19  in this case is I'm going to order that the defendants produce a

20  privilege log for all communications starting from 2014 through

21  the present between Mr. White and Ms. Long of discussion

22  regarding the litigation hold and the obligation of the

23  defendants and these two particular individuals to preserve

24  records.  The privilege log will, again, cover just those

25  communications by attorneys, but, again, if there's

1  communications by non-attorneys, those are not privileged and

2  those should be produced.

3       So if there are other communications regarding the

4  privilege log that don't involve counsel, Mr. Axelrad, they

5  obviously need to be produced.  There would be no reason for

6  privilege that I see for those communications, unless somehow

7  counsel is copied or is looped in on that type of a

8  communication.  I am sure you have experience with being able to

9  make those types of distinctions, so I will let you all do that.

10      I'm also going to require the defendants to gather the

11  documents that are covered by the privilege log and produce them

12  in camera to the Court prior to the hearing.  I'm going to give

13  the defendants until February -- excuse me -- until January 26th

14  to produce the privilege log to plaintiffs' counsel and to

15  provide to the Court the privilege log and all underlying

16  material.

17      With the filing that would be under seal, Mr. Axelrad,

18  the defendants can submit a letter or some other briefing that

19  would cover why the defendants believe the underlying in camera

20  material should not be produced.  And I will review that to make

21  a determination about whether or not it should or shouldn't be

22  produced to plaintiffs' counsel prior to the spoliation hearing.

23      Any questions about that, Mr. Axelrad?  I see that you

24  are standing.

25      MR. AXELRAD:  Well, Your Honor, that's something to

1  digest.  You know, my -- my first reaction is that that's a

2  quick turnaround, January 26th, to collect and review all of

3  these communications going back as far as 2014, brief it,

4  compile it in a privilege log, and certainly begin to prepare

5  our witnesses to address that stuff.  So, that, I think -- at

6  first blush, that gives me some -- some real pause, given the

7  gravity of the hearing and certainly what the witnesses are

8  going to be -- it sounds like essentially asked about if we're

9  going to be preparing the witnesses to discuss communications

10  over 10 years ago --

11          THE COURT:  The issue for me, Mr. Axelrad, is I don't

12  know how much there is.

13          MR. AXELRAD:  Okay.

14          THE COURT:  I was led to believe, at least by your

15  briefing, there isn't actually that much, I mean.  So in my

16  experience, there can be communications about a litigation hold,

17  but their -- generally other more extensive, privileged

18  communications don't involve that, right, that the litigation

19  hold communications are often, "Remember, you have to keep track

20  of all these messages," right --

21          MR. AXELRAD:  Certainly.

22          THE COURT:  -- and then a question from a corporate

23  officer, "Do I have to keep track of this?  This is my personal

24  message," and an answer "yes" or "no," right.  So in my

25  experience, this is different than, sort of, extensive legal

1   advice or other advice, Mr. Axelrad.  So that's why I don't

2   think it's a quick turnaround because, I mean, I think there are

3   ways to do this that would minimize that amount in terms of the

4   review.

5           And the other issue, Mr. Axelrad, which I just don't

6   know, again, because this isn't clear from what you all filed,

7   is what the witnesses are going to say, right.  It would help

8   me, right, if you all said, "Mr. White, I'm going to proffer,

9   will say that he recalls on these occasions being told this,"

10  right, "and this is what he did," right, but I'm in a position

11  now where I have no information about that, right.  And I

12  believe that they're entitled to it for the reasons I've

13  indicated, right.  And so, you know, previously, like, Mr. Chiu

14  had told me nothing about that, and I had previously tried, as

15  you know, to tee this up for you all to say, "Let me know about

16  this ahead of time."

17          And so that's why I appreciate you saying that about

18  the timing, but I actually let you all know that this was going

19  to be an issue, right, last year so you could start this

20  process, which I assume that you did.  And, in fact, I would

21  have assumed, given what I reviewed from you all, that you've

22  done some of this preliminary work already in order to be able

23  to respond in the way that you have.

24          And so can you provide further information?  Because if

25  you have further information, that might lead me to reconsider

1  some of what I'm ordering.

2          MR. AXELRAD:  Certainly, Your Honor.  And let me try

3  and, Your Honor, obviously acknowledge that Your Honor has

4  determined that the -- some body of information is appropriate

5  to delve into here.

6          THE COURT:  And just for the record, Mr. Axelrad, to

7  save you, I will acknowledge for the record -- you don't have to

8  continue to object -- obviously I take from your filing that you

9  object to the spoliation hearing being conducted.  You don't

10  think there's been a showing of that, and you would object to

11  the -- this production.  I'm just saying that so I can

12  acknowledge for you that that record is preserved.

13          MR. AXELRAD:  Yes.

14          THE COURT:  I assume that that's an argument you're

15  going to make so we can move past that, but I want to be clear

16  that is an objection that is preserved for the record.

17          MR. AXELRAD:  I appreciate that, Your Honor.  Thank

18  you.

19          (Court reporter admonition.)

20          MR. AXELRAD:  Certainly.

21          You know, I think to answer Your Honor's question

22  specifically about the expected testimony at the -- at the

23  hearing, after we had our most recent conversation with Your

24  Honor and Your Honor gave us the marching orders to brief the

25  privilege question and brief the privilege issues that we

 1  anticipate at an evidentiary hearing, it really, I think, helped

 2  to, sort of, crystallize and focus for us that the contours of

 3  the evidentiary hearing and what very specific questions are

 4  going to be permitted -- in fact, the actual words of the

 5  questions that are going to be permitted -- will, I think, then

 6  dictate what sort of questions -- excuse me -- what sort of

 7  answers our witnesses may give.  But not knowing the precise

 8  questions or frankly, at this point, the precise topics that the

 9  Court is inclined to allow at the hearing, I think it's become

10  very difficult for us to determine exactly all of the ways that

11  privilege will be implicated.

12          You know, when we last spoke, Your Honor indicated a

13  series of potential topics that Your Honor was considering.

14  Those were I think, you know, articulated to us in the form of

15  potential topics, but not knowing, again, the specific questions

16  that are going to be asked as to those topics leaves us sort of

17  guessing as to how our witnesses might respond to them.  And

18  then at the same time, you know, plaintiffs have also proposed a

19  whole litany of proposed topics that, you know, frankly would

20  drive a Mack truck through the attorney-client privilege.

21          And, again, not knowing exactly what is going to be the

22  permitted contours of the hearing or what the guardrails will be

23  specifically, it makes it a little difficult for us to predict

24  exactly how our witnesses are going to respond to that stuff.

25          THE COURT:  Well, Mr. Axelrad, I guess my question is,

1  and I asked Mr. Chiu this, Ms. Long or Mr. White will say, "I

2  was told to preserve these" or "I wasn't" -- I mean, there are

3  certain basic questions --

4       MR. AXELRAD:  Sure.

5       THE COURT:  -- that they will say -- or questions they

6  will be asked which I think you can reasonably anticipate, "Were

7  you told by someone within the company who's an attorney to

8  preserve your messages?"  I don't think that there's any, sort

9  of, ambiguity or confusion about that basic question.  But the

10 answer to that basic question, Mr. Axelrad, will drive, right,

11 this issue about the privilege log and what's being produced,

12 right.

13      And so, on the one hand, I can appreciate wanting to

14 know specific questions, but there are certain basic questions

15 that I have not heard you all proffer an answer to.  Are they

16 going to say, "We were told that we had an obligation to

17 preserve records," right, "and here are the steps that we took,"

18 or are they going to say, "We were never specifically told that

19 and I didn't know that I had a specific obligation to preserve

20 these records"?  Those are basic questions, right, and a basic

21 proffer that I need an answer to.

22      MR. AXELRAD:  And certainly, Your Honor, we appreciate

23 that.  I think the minefield that we're trying to navigate here

24 is that, yes, those are relatively basic questions, but the way

25 that our witnesses are going to answer those questions on the

1  stand under oath could implicate privilege in all sorts of ways

2  that I think we can anticipate --

3          THE COURT:  Can you give me an example of how that --

4  what that would look like?

5          MR. AXELRAD:  Certainly.  If Your Honor were to permit

6  a question, for example, along the lines of, you know, to a

7  particular custodian, you know, "What steps did you take to

8  preserve records in accordance with a particular litigation

9  hold?"  And that witness were to respond something along the

10  lines of, "In my conversations with the following people, some

11  of whom are attorneys and some of whom are not, I understood

12  that the litigation hold was meant to cover the following

13  categories of documents."  That could, I think, very well

14  implicate privilege.  And you can imagine --

15          THE COURT:  So let me just be clear about one thing,

16  and maybe I wasn't clear in my finding.  Because I've made a

17  determination that spoliation is indicated here and there's a

18  hearing, I think there's clear law that allows for questions to

19  custodians that would ask them, "Who told you, including whether

20  or not it was an attorney, about what your obligations were?

21  How were you instructed to preserve records?  What were you told

22  about what records to keep and not keep?"

23          I think the law is very clear from my perspective --

24  and, again, I'll preserve whatever objection you have to that,

25  Mr. Axelrad -- but I think the law is very clear that if a

1  witness gets on the stand and says, "I was told that I could --
2  I had to preserve these records, but not others and I was told
3  by these five people and two of them are attorneys," that's not
4  covered in this situation with spoliation.

5       And those attorneys can potentially be implicated.  As
6  you know, when it comes to spoliation, the attorneys have a
7  separate ethical and other obligations that come up.  Now, I
8  agree with you that this could become a challenge as it relates
9  to some of the attorneys involved because they may have to be
10 asked, "Did you tell this person to preserve records?"  But I
11 think that that area is clearly permissible under the law in
12 terms of questioning even if it would otherwise implicate the
13 privilege because of the Court's finding regarding indicia of
14 spoliation here.

15      So I'm not clear about why there would be privilege for
16 the answer that you proposed as a hypothetical given my
17 findings.

18      MR. AXELRAD:  Yeah, Your Honor, and I -- you know,
19 knowing that Your Honor has preserved our objections for us, I'm
20 mindful of that.  I think, you know, what I would hope to
21 persuade Your Honor of is the questions and the topics that Your
22 Honor has articulated as a potential, sort of, contour of the
23 hearing are actually the questions and topics that go to the
24 existence of the preliminary showing.

25      Your Honor, if -- we're -- I refer Your Honor back to

1  the December 18th conversation we had where Your Honor

2  articulated Mr. White and Ms. Long's respective duties, their

3  relationship to record-keeping practices, the awareness of the

4  litigation hold, the efforts to preserve data, and the basic

5  facts and details of the litigation hold themselves.

6       The answers and responses to those topics are, in fact,

7  what the case law describes as the preliminary showing.

8       THE COURT:  Well, I -- so let me just help you here.  I

9  disagree with that.  Based upon the findings that I've made, I

10 believe there's been a preliminary showing because of

11 information that's not been produced that relevant information

12 is missing, right.  And I appreciate your arguments with respect

13 to that, but the fact that there is no information, digital

14 information for years, as indicated by the plaintiffs, which is

15 unrebutted at this point, and I find that these individuals have

16 relevant duties and would have relevant evidence here, I think

17 the preliminary showing has been made.

18      MR. AXELRAD:  I --

19      THE COURT:  So I think, Mr. Axelrad, I appreciate you

20 again preserving that.  I'm unpersuaded.  So I want us to move

21 to the issue of the questioning because at this point I'm going

22 to permit that questioning as it relates to a litigation hold

23 and I'm trying to allow for any protection of otherwise

24 privileged material, but I'm not hearing from you what would be

25 the other material that you want protected that wouldn't be

1  covered in a situation like we have here where I've ordered the

2  spoliation hearing.

3          MR. AXELRAD:  Certainly, Your Honor.  And I think just

4  if I could make two points.  The first of which is that, you

5  know -- and I think we just may have a difference of opinion in

6  terms of what the case law permits once a preliminary showing

7  has been made.  And, you know, our read of the case law is that

8  once a preliminary showing has been made, the contents of a

9  litigation hold is fair game.  And, you know, I see that Your

10  Honor is willing to permit the substantive communications around

11  the litigation hold.  Now, I think we just obviously

12  respectfully disagree.

13          I think the outstanding or the, sort of -- the X factor

14  here is that both parties are in the process of trying to

15  determine whether or not this information is, in fact,

16  unrecoverable, is, in fact, not obtainable through other

17  mechanisms and other means.  And we have some updates for the

18  Court that we'd like to provide on that as well, but I know

19  certainly the plaintiffs have outstanding subpoenas to the

20  carriers.

21          And what I think would be an unfortunate circumstance

22  is that if we proceeded with the hearing on February 4th and 5th

23  under the premise that this information is -- that no version of

24  this information or no relevant information is obtainable in any

25  way and then we were to determine down the line that there is

1  some amount of information that is relevant, it would seem that

2  we've maybe put the cart in front of the horse a little bit.

3  And so running all those things to ground first, I think, would

4  be maybe the more prudent and cautious approach.

5       I -- look, you know, and I certainly want to respect

6  what sounds like Your Honor's rulings, but after we last spoke

7  and we -- Your Honor gave us the charge of briefing the

8  privilege issues, really getting our arms around the case law

9  and what we view as the minefield of privilege here, and knowing

10  that Your Honor has thought about and considered the permitted

11  topics, in our mind the best and most cautious way to proceed

12  here is at least through declarations in the first instance.

13       THE COURT:  Mr. Axelrad let me, again, spare you

14  additional time.  I am not -- we're not doing that, right.  From

15  my standpoint, there's been sufficient time to produce this

16  material.  It should have been preserved and produced months ago

17  pursuant to my schedule.  It wasn't.  And so at this point, I

18  find that the material is unavailable, and if it becomes

19  available later, then that's something that can be raised with

20  me if I were to make a finding that there has to be some remedy.

21  I haven't even made that finding yet because I don't even know

22  about how it may or may not have been missing.

23       But, right now, I don't find there's any dispute about

24  the fact that it's not currently available, that there was an

25  obligation to provide it earlier.  That was not met.  And what I

1  have to do now is figure out what happened as relates to that

2  evidence.

3          Again, if something comes up with the parties later, I

4  will consider that.  I'm not going to prevent you all from

5  raising it with me later.  But this case needs to move forward

6  and this issue needs to move forward because it's pending for

7  sometime.  And so we're going to proceed with the hearing as

8  indicated.

9          But I'm still, Mr. Axelrad, not getting a clear picture

10  from you of what other privilege issues would apply, right.  I

11  have made the findings that a spoliation hearing will apply --

12  will occur.  There's sufficient indicia of that.  I think that

13  that finding and the findings underlying it clearly support,

14  then, questions being asked on the litigation hold itself.

15          We can address later whether or not or how the

16  attorneys may get questioned who may be identified, but other

17  than attorneys who may have been involved with conversations

18  about preservation of records, what other privilege issue might

19  exist here that I should be prepared to address?

20          MR. AXELRAD:  Well, Your Honor, and I -- I want to

21  answer Your Honor's question directly, but without knowing what

22  Your Honor will permit plaintiffs to ask at the hearing, I sort

23  of feel like --

24          THE COURT:  Well, what's a question that they could ask

25  that you think would go into a different privilege area other

1   than the litigation hold?  Right.  They're going to ask, and

2   I've said they can ask about the litigation hold, "Who told you

3   to preserve records?  What was your understanding of the

4   obligation?  Who explained it to you?  How many conversations

5   did you have about it?  Did you have follow-up conversations

6   about it?"

7           MR. AXELRAD:  Sure.

8           THE COURT:  These are all, I think, reasonably

9   foreseeable questions.

10          MR. AXELRAD:  And those are technical questions, Your

11  Honor.  If the plaintiffs were to go a step further and say,

12  "What did counsel say to you about the litigation hold" --

13          THE COURT:  I will permit that.  Yes, I will permit

14  that.  I think that's permissible under the law, right.  They're

15  going to -- because otherwise the witness, he or she or they,

16  can't provide context, right.  They can't say, "I was given

17  information," and not provide -- and not say what the

18  information is.

19          So I think the law clearly supports their ability and

20  my ability and your ability, if you wanted to, to ask them,

21  "What were you told specifically about preservation," and down

22  to the granular level of for WhatsApp, for this phone, for these

23  chat messages, for Instagram, for X.  They will be permitted to

24  ask those specific questions about all forms of communications,

25  all digital platforms for these two witnesses.  I think that,

1  again, the findings support that.  I will permit that.  So --

2  and they will be permitted to ask, "What was the specific advice

3  that you were given for each of these different forms of digital

4  media?"

5          So with that specific guidance, Mr. Axelrad, what other

6  issues come up?  Again, I will acknowledge for the record

7  obviously that you all object to that, but I find based upon the

8  record that the Court can and should permit that.  So is there

9  anything else besides that?  Because I understand, Mr. Axelrad,

10  your objections to, again, the specific questions on the

11  litigation hold.  It wasn't clear to me, though, however,

12  whether or not you were saying there's some other type of

13  privilege communications that might be involved here.

14          Is there anything else beyond the litigation hold

15  questions that you think that they're going to ask that would

16  create privilege?  For example, were you advised about whether

17  or not to discuss an arbitration clause with -- in contracts?

18  That seems to me that that might be outside the scope of the

19  preservation issue, but I'm not hearing any question that you've

20  presented to me that would fall outside the scope of what I

21  think is permissible as it relates to a spoliation hearing.

22          MR. AXELRAD:  Well, Your Honor, again, it's a little

23  difficult to predict all of the different ways that privilege

24  will be implicated without knowing the precise questions that

25  are going to be asked, but just looking at plaintiffs' proposed

1   topics, you know, and I'm -- I'm quoting here, "substance of any

2   communications with defendants' counsel in efforts to obtain

3   information either in response to" a plaintiff's -- "either in

4   response to plaintiffs' request to disclose information in

5   discovery correspondence or Court orders."  That has nothing to

6   do with litigation holds.

7           You know, the substance of custodial interviews, that

8   has nothing to do with litigation holds.  And, you know, these

9   are just some examples, Your Honor.  Again, we're --

10          THE COURT:  Well, again, I understood those questions

11  to be related to the context of litigation hold.  If they were

12  just general questions, I would agree, and I'm certainly happy

13  to direct the witness to answer them in the context of the

14  preservation of records, right.  It would be overly broad to,

15  for example, ask Mr. White to talk about all his interviews with

16  fighters over the course of a certain period of time.  I didn't

17  understand that that's what they were going to be asking.

18          What I thought they meant by interviews and these other

19  questions was did they have a conversation with counsel

20  specifically about the records and what was the content of that,

21  unless I'm mistaken.

22          Mr. Dell'Angelo, am I wrong about that?

23          MR. DELL'ANGELO:  You are not incorrect, Your Honor.

24  That's exactly what we had.

25          THE COURT:  Okay.

1          MR. AXELRAD:  I think the problem that we're

2    confronting, Your Honor, is that we just don't have a good sense

3    of exactly what is going to be covered at the hearing.  I know

4    that we're talking about the litigation hold and communications

5    around the litigation hold, but, you know, frankly, Your Honor,

6    those are questions and topics that could be responded to in a

7    one- or two-page declaration and, you know, we have been talking

8    about a multiday hearing.  And so, you know, when there is a --

9          THE COURT:  Well, I have to make a decision about

10   whether or not, as you know, Mr. Axelrad, this was deliberately

11   and intentionally destroyed.  I can't do that based upon a

12   declaration, right.  I have to be able to hear from the

13   witnesses, right, because you will argue to me, "These witnesses

14   were credible.  You heard them," right.  But you've been

15   involved in these cases.  These spoliation hearings often turn

16   on whether or not a Court finds, one, that there was deliberate

17   or not destruction, and that occurs in the context of hearings

18   or other ways of acquiring that information.

19          So I don't want to go over the same material over and

20   over again, Mr. Axelrad.  The hearing's going to go forward.

21   The questions that are going to be asked of the witnesses are

22   the questions that I have outlined in terms of the area.  If you

23   all have an objection, you certainly can raise it at the

24   hearing.  I'm not preventing you from objecting, but right now

25   I'm not hearing anything that would in any way suggest to me

1  that the hearing shouldn't go forward as indicated and that the

2  plaintiffs can't ask questions in the context of the litigation

3  hold.

4       So I don't know if you have anything else we need to

5  discuss, but I don't think that we need to go over this area any

6  further.

7       MR. AXELRAD:  You know, Your Honor, I suppose the only

8  point I would add is that, you know, the question of intent is a

9  question that is typically addressed at the end of a spoliation

10  inquiry, not at the very beginning.  And right now we're sort of

11  presupposing the answers to all sorts of --

12       THE COURT:  I'm not presupposing anything.

13  Mr. Axelrad, that's the whole point of having the spoliation

14  hearing, right.  Part of it is to provide context, right.  I

15  haven't -- I have not made a decision one way or the other about

16  whether or not this evidence was intentionally, inadvertently,

17  accidentally, or some act of God resulted in its destruction or

18  it being missing, right.  What I found is that it's missing;

19  that it should have been preserved; that there was a legal

20  obligation to preserve it, right, at least based upon the record

21  that I've seen thus far.  Beyond that, I have made no

22  preliminary findings and I haven't prejudged anything.  And

23  that's exactly the intent of the spoliation hearing because I

24  have an obligation to inquire further to determine what, if any,

25  should be any remedy for that.

1        I do think one of the things we haven't addressed which
2  I think you -- we should discuss is, one, additional dates
3  regarding the spoliation hearing because I will permit the
4  plaintiffs and the defendants to present information regarding
5  whether or not there's other evidence that could replace or not
6  replace this information.  That may not come from these two
7  witnesses.  I would anticipate, for example, one of the
8  arguments you all might raise is to the extent this evidence is
9  missing, right, there's minimal or de minimis prejudice because
10 there are other pieces of evidence that can replace that.  I
11 don't have a record sufficient for me to do that.  You all would
12 be permitted to do that.

13       And so I think, Mr. Axelrad, you also want to think
14 about that because I don't want to do that months later either,
15 but in reading your briefs, one of the things I clearly take
16 from your brief is that even if this evidence is missing, they
17 have other ways of being able to obtain similar information.  I
18 don't know what those are, Mr. Axelrad.  I think you all are
19 going to need to provide that.  They're going to need to provide
20 information about that.  That's a separate part of the
21 spoliation hearing.

22       But to your point earlier about the process, right, I'm
23 not beginning with intent.  I will make a determination about
24 intent as it relates to the evidence after I've heard all of
25 that other evidence, right.  So I'm not going to make that

1  decision up front.  But that's going to be based upon witness

2  testimony of custodians, right, testimony about what devices

3  existed and whether or not they were preserved, what other

4  evidence may exist in the possession of the defendants or the

5  plaintiffs that could replace what's alleged to be missing or

6  have been destroyed, and whether or not there were any

7  individual efforts by custodians or the defendants to

8  deliberately delete the evidence or whether or not, again, there

9  was some other form of misconduct or whether or not this was

10  inadvertent or somehow it still exists, for example.

11       But that's what I anticipate will happen at this

12  spoliation hearing.

13       MR. AXELRAD:  Thank you, Your Honor.

14       THE COURT:  Okay.  So do you have, though, Mr. Axelrad,

15  any indication of who you might call or who might be called as

16  it relates to replacement evidence?

17       MR. AXELRAD:  Your Honor, at this point I think we --

18  we -- at this point we need to see, sort of, what is going to be

19  elicited at the hearing.  I think we -- we have some ideas, but

20  I just don't know that we're prepared to commit one way or the

21  other to any particular evidence.  But it's certainly something

22  that we are thinking seriously about and understanding that Your

23  Honor has an interest in moving forward quickly.

24       THE COURT:  Look, the other question I have,

25  Mr. Axelrad, which I don't know that I have a clear answer to,

1  are your witnesses going to say that they were told by attorneys

2  to preserve records or not?

3          MR. AXELRAD:  Are they going to say -- I mean, I --

4          THE COURT:  Are they going to say that they had any

5  conversations whatsoever with attorneys about the preservation

6  of records or their obligations to preserve records?

7          MR. AXELRAD:  Well, I want to choose my words carefully

8  here, Your Honor, and I don't want to get ahead of our

9  witnesses, but, you know, I think it is fair to say that

10  litigation holds were disseminated.  I don't know if there

11  were -- as I stand here today, I don't know if there were

12  specific conversations with each custodian about a litigation

13  hold.  As Your Honor knows, oftentimes litigation holds are

14  disseminated across a company, and that doesn't necessarily mean

15  that there was a specific conversation with an attorney at the

16  company and a particular custodian.  It may have just come -- I

17  mean, at my law firm, I get litigation holds and that -- I would

18  consider that to be a communication, but I don't know that it

19  constitutes a specific conversation --

20          THE COURT:  Okay.

21          MR. AXELRAD:  -- that Your Honor is referring to.

22          THE COURT:  Well, that's helpful because, Mr. Axelrad,

23  I would expect that if there was a dissemination of a litigation

24  hold, that that would be listed in the privilege log materials

25  that I have ordered, okay, at a minimum, in addition to any

1  individual communications.

2          MR. AXELRAD:  Thank you.

3          THE COURT:  So I don't think that the timeframe is too

4  quick because of the limited nature of what I'm requesting, but

5  that will be the order of the Court as it relates to the

6  privilege log and the production of that material in camera.

7  Okay?

8          MR. AXELRAD:  Thank you, Your Honor.

9          THE COURT:  Mr. Dell'Angelo, is there anything else you

10  wanted to add as related to the privilege log and the request

11  for information and the questioning?  At this point we're set

12  for the 4th and the 5th.  I'll make a decision around the week

13  of the 26th to decide whether or not there's going to be

14  information released to the plaintiffs regarding spoliation.

15          What I would expect from the plaintiffs,

16  Mr. Dell'Angelo, is a clear record going through the evidence

17  that you believe is specifically missing for each device.  I

18  will permit you to ask each of the witnesses about particular

19  phone numbers, devices, their knowledge about whether or not the

20  records were preserved, whether or not they specifically

21  requested the preservation of the records or not, whether they

22  took any acts to have messages preserved or deleted for each of

23  their accounts.  So I just want to be clear that you will be

24  permitted to do that.  That's why this will probably take a

25  little bit of time because my understanding is these individuals

1  had various different types of accounts that they used for

2  business across the relevant timeframe.

3          So you will be permitted to ask those questions based,

4  I would assume, on the chart that I've seen about the different

5  numbers and you've also referenced in your submission the use of

6  WhatsApp and Instagram and X in terms of communications.

7          So is there anything that you want to add to that or

8  any questions or comments you have regarding defendants'

9  argument?

10         MR. DELL'ANGELO:  Thank you, Your Honor.  I appreciate

11  the opportunity to address the Court on that.

12         First with respect to what you had just outlined, that

13  generally comports with our intention and how we had anticipated

14  going through the testimony.

15         The -- I -- the only thing I would like to do is just

16  ask for one small clarification to avoid complexity down the

17  line because, given the history, I actually think the Court's

18  January 26th deadline is, frankly, generous and we don't need to

19  get into that, but it's pretty close to the hearing.  What --

20  the clarification I would just like to ask about, Your Honor, is

21  I understood you to say that the defendants had to provide a

22  variety of materials regarding the litigation hold.  And I just

23  wanted to clarify whether or not that would include

24  communications about the implementation or compliance and

25  collection that -- that was -- flowed from those litigation

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

 1   holds.

 2          THE COURT:  Give me a specific example, right, in terms

 3   of what it is you are trying to clarify --

 4          MR. DELL'ANGELO:  Yes.

 5          THE COURT:  -- or you're requesting.  Right now --

 6   because obviously what will happen is I'm going to issue a

 7   minute order.

 8          MR. DELL'ANGELO:  Okay.

 9          THE COURT:  They're going to scrutinize that minute

10   order very carefully and provide what is exactly requested and

11   nothing more, which is what I would expect, than what is

12   ordered, right.  And right now my focus is on any

13   communications, right, to or from these individuals or

14   communications on which they were copied that would concern the

15   preservation or not of records.

16          MR. DELL'ANGELO:  Yes.

17          THE COURT:  So not just the litigation hold.  So --

18   right, because the "litigation hold" is a specific term.

19          MR. DELL'ANGELO:  Yes.

20          THE COURT:  So it's not just going to be about whether

21   or not they had a conversation about the hold.  It's also going

22   to be about whether or not they understood their obligation to

23   preserve records and whether or not they had any conversations

24   with anyone about the preservation or not of records relevant to

25   this case.

1           MR. DELL'ANGELO:  Right.

2           THE COURT:  So we use the term "litigation hold" as

3    shorthand, but the order itself will order the defendants to

4    provide a privilege log as to any and all communications

5    regarding the litigation hold or any conversations or

6    communications about the preservation of records, the steps

7    necessary -- excuse me -- the steps taken to preserve records,

8    whether or not there were any steps taken to delete records,

9    whether or not these individuals knew or participated in a

10   routine or systemic deletion of records, right.  The whole

11   universe of those types of questions will be part of the

12   privilege log that has to be provided in the in camera

13   materials.

14          Now, again, my understanding is that while there may be

15   a fair amount of years that are covered here, these are fairly

16   specific conversations.  Now, there may be more detailed recent

17   conversations, and I want to be clear just so we are clear,

18   Mr. Axelrad, the privilege log is literally up to January 26th,

19   2026.  It is not cut off at a certain period of time.  So it

20   will be up to that date, because I would assume that there have

21   been further conversations between now and then with respect to

22   the preservation of records.

23          So I would be surprised, Mr. Axelrad, if I got a

24   privilege log that didn't have some communications that involved

25   discussions with these witnesses in the past three or four

1  months.  I would imagine there's probably more communications

2  then than there may have been previously, but I do want to be

3  clear that it covers up to January 26th, 2026.

4          Mr. Dell'Angelo?

5          MR. DELL'ANGELO:  Yes, on that date point, Your Honor,

6  I think when you started the conversation about the privilege

7  log, you referenced 2014.  I just wanted to point out -- and

8  this is at ECF 344, Exhibit 5.  I think it's that chart that you

9  were referring to.

10          THE COURT:  Right.

11          MR. DELL'ANGELO:  When we had asked the defendants

12  about the litigation holds, they gave us the dates on which

13  certain litigation holds were implemented, and one of them

14  actually is listed as October 29, 2013, for Mr. White.  That

15  appears at Rows 24c and 24 -- I'm sorry -- 24d and 24e.  So

16  just -- I just wanted to make sure that we swept in that period

17  just a little further back to get that first litigation hold.

18          THE COURT:  Okay.  Well, I mean, that's -- I mean,

19  that's -- I would actually anticipate that they would want to

20  include that in their production because it would show --

21          MR. DELL'ANGELO:  I would think so, yeah.

22          THE COURT:  -- that it was communicated, but --

23          MR. DELL'ANGELO:  Yeah.

24          THE COURT:  -- I'm just going to stick with the date of

25  January -- stick with 2014 as the start period.  But I will

1   recognize and acknowledge on the record that they have

2   communicated a litigation hold that was disseminated in October

3   2013.

4           MR. DELL'ANGELO:  Okay.  Thank you, Your Honor.

5           THE COURT:  All right.

6           MR. DELL'ANGELO:  And if you -- you had asked a

7   question a little bit earlier, and I just want to -- I think

8   your clarification really addressed what I was concerned about,

9   but, you know, an example would be, you know, counsel

10  communicates or transmits the litigation hold and then the

11  witness says, in effect, "Well, what -- what do I need to do to

12  preserve, you know, this data," that kind of thing.  So that's

13  what I was talking about when I said I want to make sure the

14  privilege log covered the implementation and compliance, those

15  conversations.

16          THE COURT:  Well, implementation and compliance from my

17  standpoint would be if the witness had clarifying questions --

18          MR. DELL'ANGELO:  Yeah.

19          THE COURT:  -- the witness asked for further advice as

20  to what specific steps need to be taken, that would be

21  included --

22          MR. DELL'ANGELO:  Right.

23          THE COURT:  -- in the material that would be covered by

24  the privilege log and the material that would be provided to the

25  Court in camera.

1          MR. DELL'ANGELO:  Okay.  Thank you, Your Honor.

2          THE COURT:  Okay.  Let's see here.

3          I don't have anything else on the spoliation hearing

4   except -- Darci.

5          (Court conferring with courtroom administrator.)

6          THE COURT:  Mr. Dell'Angelo, do you have any

7   information about to the extent that there was communication

8   about the privilege log with other employees, say, for example,

9   Mr. Epstein?  Do you have any information about that as it

10  relates to the litigation hold from other sources in the

11  discovery?

12         MR. DELL'ANGELO:  I just want to make sure I understand

13  your question, Your Honor.

14         THE COURT:  Here's what I'm trying to anticipate.

15         MR. DELL'ANGELO:  Yeah.

16         THE COURT:  Right.  I have a fairly busy calendar.  You

17  all are fairly busy.  I don't want these spoliation hearings to

18  continue into, like, May of next year.  If you think, for

19  example, that there's evidence that Mr. Epstein might have been

20  involved with the communications about the litigation hold and

21  you want to potentially -- or other witnesses and you think that

22  that will come up in these witnesses' testimony, it is helpful

23  to let me know because then I can plan accordingly.

24         Right now I have time the following week to have a day

25  or two of a follow-up hearing.  It seems to me that it's very

1   possible that the questioning could go two days, maybe longer

2   just because we'd have to go through a list of all these

3   different devices.  So that's something potentially to think

4   about.

5           MR. DELL'ANGELO:  Yeah, and I -- I think that might

6   also apply not only to Mr. Epstein, but Mr. Hunter Campbell as

7   well, who at some point, you know, becomes chief legal officer

8   of UFC.

9           THE COURT:  Right.  Well, I know these are obviously --

10  we're all busy.  They're busy individuals, but some of them, I

11  think, are -- as UFC's based here locally, they may be here

12  locally, so it may be easier to schedule them.

13          Anyway, all right.  Is there anything else we need to

14  address?

15          MR. DELL'ANGELO:  Not on that, Your Honor.  Thank you.

16          THE COURT:  Okay.

17          All right.  I want to address the issue of third-party

18  subpoenas and other subpoenas for records, Mr. Dell'Angelo.

19          MR. DELL'ANGELO:  Okay.

20          THE COURT:  As relates to the third-party subpoenas,

21  let me just be very clear about this.  I'm happy to approve

22  them, but in order for me to so order them, I need a motion to

23  compel that tells me that the individuals refused to comply and

24  then I can issue the order.  If you want to file an omnibus

25  motion to compel and issue subpoenas that way, that's fine.

1          MR. DELL'ANGELO:  Okay.

2          THE COURT:  I want to distinguish between those

3   subpoenas to third parties and subpoenas to UFC employees.

4          And the other question I had, because this relates to

5   spoliation, too, is there seems to be some suggestion that you

6   want to send individual subpoenas to all these individuals who

7   are UFC employees because you believe there may be an issue

8   about personal devices being used for UFC business and, perhaps,

9   that not having been identified to defense counsel, but these

10  individuals still have an obligation to provide that material.

11  Is that accurate?

12         MR. DELL'ANGELO:  Close.  So we actually sent -- we

13  actually served subpoenas or -- and in some cases counsel for

14  defendants accepted service of, I believe, 19 subpoenas for

15  current and former employees, officers, and directors of the

16  three defendants.  This is back, I believe, in March.  It

17  followed a series of meet-and-confers that began in April of

18  2025 where we were receiving information from the defendants

19  where they were essentially saying, "We do not have possession,

20  custody, or control over these individuals' mobile devices."  So

21  we said, "Fine, then we'll send them subpoenas."

22         The response that we got back every -- for the 19 that

23  they represent was -- and I could get you the exact quote.  It's

24  in our filing last night, I believe, but that the defendants

25  essential- -- or counsel representing those 19 individuals in

1  their personal capacity said that they will not respond to the

2  subpoenas without an order of the Court, right.

3          THE COURT:  So if you want to file an omnibus motion to

4  compel --

5          MR. DELL'ANGELO:  Yes.  Thank you, Your Honor.

6          THE COURT:  -- then you can -- you have leave of the

7  Court to do that.

8          MR. DELL'ANGELO:  We will do that.  Thank you, Your

9  Honor.

10         THE COURT:  I'd like for you to do that for these

11 witnesses and for the third parties this week.

12         MR. DELL'ANGELO:  Okay.  We can do that.  Thank you,

13 Your Honor.

14         THE COURT:  Because I will order production of that

15 material prior to the spoliation hearing.

16         MR. DELL'ANGELO:  Okay.

17         THE COURT:  Okay?  Anything else, Mr. Dell'Angelo?

18         MR. DELL'ANGELO:  Not on that.  Thank you, Your Honor.

19         THE COURT:  Okay.

20         Let's turn to the issue of discovery in this case.  And

21 you all filed a joint report with me regarding outstanding

22 discovery issues.  So, Mr. Dell'Angelo, why don't we just go

23 through those issues in order --

24         MR. DELL'ANGELO:  Sure.

25         THE COURT:  -- so you can give me an update on whether

1   or not there have been further conversations since anything was

2   filed regarding outstanding interrogatory responses, requests

3   for admissions, or other document requests that are outstanding.

4           MR. DELL'ANGELO:  Okay.

5           THE COURT:  And we can go off of -- I'm trying to pull

6   up the document so we have --

7           MR. DELL'ANGELO:  I have -- for your convenience, Your

8   Honor, I have ECF 344 in Johnson as the Joint Status Report of

9   December 30th.

10          THE COURT:  Right, there you go.  Yep.

11          So you have that document in front of you?

12          MR. DELL'ANGELO:  Yes, Your Honor.

13          THE COURT:  Mr. Axelrad, do you have that in front of

14  you as well?

15          MR. AXELRAD:  Yes, Your Honor.  Thank you.

16          THE COURT:  Uh-huh.

17          All right.  Go ahead, Mr. Dell'Angelo.

18          MR. DELL'ANGELO:  Okay.

19          THE COURT:  Let's just take it point by point.

20          MR. DELL'ANGELO:  Yeah.  So looking at Page ECF 2,

21  Plaintiffs' Position A, the first issue is -- so Your Honor had

22  us share arbitration-related search terms with the defendants.

23  You know, you had made those findings that the search terms that

24  the defendants had unilaterally opposed were, quote,

25  disingenuous and resulted in a minimal production of documents.

1  To date, there are about 300,000 Johnson-specific documents.  So

2  what we had proposed following the arbitration search term

3  process was a set of search terms that would get the remainder

4  of the documents, you know, that are not arbitration-specific

5  through the process your Court had -- the Court had ordered.

6         THE COURT:  Okay.

7         MR. DELL'ANGELO:  So what we are asking is that

8  defendants be required to run the search terms at Exhibit 1 to

9  the JSR, the December 30 JSR, and review and produce those

10  documents.  And I guess to that extent, Your Honor, I don't

11  think that there's an order, per se, from this Court that the

12  defendants also apply the arbitration search terms.  Since the

13  arbitration documents are not only applicable to Cirkunovs, but

14  Johnson as well, I think that those -- we would ask that the

15  Court order that the defendants run those search terms and

16  produce documents as well.

17         THE COURT:  What timeframe are you looking at?

18         MR. DELL'ANGELO:  Well, substantial completion was

19  July 17th, 2025, Your Honor.  We're about six months passed

20  that.  So I think that they should run them -- I mean, there's

21  no reason why they can't be run now.  The defendants have said

22  that they've already collected tens of millions of documents.

23  That's a -- in a letter that they sent to us last night.

24         THE COURT:  So what it seems to me, Mr. Dell'Angelo, I

25  would like to do --

1          MR. DELL'ANGELO:  Yeah.

2          THE COURT:  -- just to avoid a back-and-forth where I

3    order them to do this and then they essentially provide you

4    with, who knows, 20 million documents and you want to run a

5    follow-up search --

6          MR. DELL'ANGELO:  Yep.

7          THE COURT:  -- that we follow a similar schedule to

8    what we did previously with the arbitration documents, which is

9    a staged series of searches where you all go back and forth --

10         MR. DELL'ANGELO:  I see.

11         THE COURT:  -- right, because what will happen is, at

12   least from my experience in this case, they'll run the term as I

13   order them to and they will give you exactly those documents.

14         MR. DELL'ANGELO:  Yep.

15         THE COURT:  They may not have been deduped.  They may

16   have other steps you're going to want me to order them to do.

17   And then you'll be filing a motion to compel, and it will take

18   us three weeks, four weeks to get back on the schedule.

19         MR. DELL'ANGELO:  Understood, Your Honor.

20         THE COURT:  So when it comes to these search terms, I

21   want us to have a process where we have different stages of

22   that.  So as we did with the arbitration clause issue, we need

23   to have some sort of staged searching in this case and you need

24   to be specific about what it is that you would want them to do.

25   If you're going to ask them to dedup or do other things --

1           MR. DELL'ANGELO:  Yeah.

2           THE COURT:  -- then I need to know what that is.  So

3    why don't you tell me specifically what it is you'd like them to

4    do beyond just searching, and how many back-and-forth rounds

5    would you like as it relates to this?

6           MR. DELL'ANGELO:  Sure.  So taking Your Honor's

7    guidance regarding the arbitration terms --

8           THE COURT:  Well, let me just make this finding --

9           MR. DELL'ANGELO:  Yeah.

10          THE COURT:  -- so we're clear.  The arbitration terms I

11   find are equally relevant to Johnson, and there are search terms

12   for Johnson that I didn't order for the arbitration clause issue

13   that would be relevant for Johnson.  So I'm not limiting that.

14   Your search terms I think -- the arbitration terms are also

15   relevant for Johnson for different reasons, and so you can

16   include them.

17          So with that finding, Mr. Dell'Angelo, what would you

18   propose?

19          MR. DELL'ANGELO:  Okay.  So I would propose, Your

20   Honor -- I'm referring to the non-arbitration-related search

21   terms that are at ECF 344-1.

22          THE COURT:  Yep.

23          MR. DELL'ANGELO:  So today is Tuesday.  If the

24   defendants could provide us with a hit report by Thursday of

25   this week --

1          THE COURT:  Okay.

2          MR. DELL'ANGELO:  -- we could respond by Monday, if

3     they could respond by Wednesday of that week.

4          THE COURT:  Okay.  When you say "respond," I just --

5          MR. DELL'ANGELO:  Yeah.

6          THE COURT:  -- again, I want us to be clear about what

7     we're talking about, right.  So they run the search that I may

8     order --

9          And, Mr. Axelrad, you'll have an opportunity to

10    comment.  So I'm not saying I'm ordering it now, but I just want

11    to hear their proposal in full before I ask you to comment.

12         MR. AXELRAD:  Certainly, Your Honor.

13         THE COURT:  So they run the search.  They give you the

14    results, let's say, by --

15         MR. DELL'ANGELO:  I had said Thursday, but --

16         THE COURT:  Let's just say the end of the week,

17    the 9th, the search report.  And then you respond on Monday or

18    Tuesday, let's say --

19         MR. DELL'ANGELO:  We can do it by Monday, Your Honor.

20         THE COURT:  Right.  And what are you then going to be

21    responding to?  What are you going to be asking?

22         MR. DELL'ANGELO:  Well, what we would do is we would

23    look at the hits.  We would try to adjust terms that maybe are

24    getting too many hits or, you know, try to break them apart or

25    revise the hits to just, you know, continue to refine the

 1  process to make the search term more efficient.

 2           THE COURT:  Right.

 3           MR. DELL'ANGELO:  And, you know -- and as we did last

 4  time maybe ask some questions, for example, you know, like,

 5  what -- what is the source of this because it's getting a lot of

 6  hits, right, or is there some way that we can narrow this term.

 7           THE COURT:  Right.

 8           MR. DELL'ANGELO:  It's exactly what we did with the

 9  arbitration terms, and it was pretty effective.  It

10  substantially reduced the total.

11           And so if we -- we would provide that information on

12  Monday, any questions or proposed clarifications.  They would

13  rerun the terms, and if they could give us the report back by

14  Wednesday of next week, we would then propose a further, you

15  know, revision with maybe some clarifying questions by Friday of

16  next week, which would be the 16th.  And then if they could give

17  us --

18           THE COURT:  I'm sorry.  The 16th is when you would

19  respond?  Is that what you're proposing?

20           MR. DELL'ANGELO:  Yes.

21           THE COURT:  They would --

22           MR. DELL'ANGELO:  Yes, and then if they could give us

23  the final report on -- that would be Monday, January 19th.

24           And I think that -- that would result in a, kind of,

25  refined set like we did with the arbitration terms.

1          THE COURT:  Okay.

2          All right.  Mr. Axelrad?

3          MR. AXELRAD:  Thank you, Your Honor.

4          You know, I -- I think that all sounds fine.  You know,

5   the plaintiffs have proposed a new set of search terms related

6   to Johnson separate from the arbitration-related discovery.  And

7   I think the, sort of, iterative search-term-hit-report process

8   can work to refine down those search terms.  I think obviously

9   the devil's in the details.  You know, this is a quick

10  turnaround, but, you know, we will certainly make it happen.

11          I think the one, sort of, outstanding issue that we do

12  have, Your Honor, is that following the iterative process in

13  terms of search terms and arbitration-related discovery as to

14  Cirkunovs, and knowing that our position is that Cirkunovs

15  should be stayed, we still, I think, have the last of the

16  Cirkunovs-related search term filing that -- that's hanging out

17  there.  I think in our section of the Joint Status Report we

18  indicated to Your Honor that plaintiffs' latest round of search

19  terms results in 3,800,058 documents, and so that's, sort of,

20  where things stand on the arbitration-related search terms.

21          THE COURT:  Well, I am right now assuming that

22  Cirkunovs is stayed, and this is unrelated -- well, obviously

23  you all can consider what's already been done in Cirkunovs as it

24  relates to searches, but this will be an entirely new process.

25  Okay.

1          So I'm going to go ahead and order that schedule as it

2    relates to the searches.  I'm going to go ahead and order that

3    the search terms be used that are suggested by the plaintiffs in

4    Exhibit 1.

5          Okay.  What's next, Mr. Dell'Angelo?

6          MR. DELL'ANGELO:  Sorry.  May I just ask a

7    clarification, Your Honor?  Because there are the -- the

8    documents in Cirkunovs, but I think the Court has already found

9    that arbitration is generally applicable or relevant to Johnson.

10          THE COURT:  Yes.

11          MR. DELL'ANGELO:  So a lot of the terms that were in

12   those Cirkunovs arbitration terms are still relevant to Johnson.

13   So I just want to make sure we're not leaving those aside

14   that --

15          THE COURT:  No, no, you can -- I think I was clear.

16   You can include them.

17          MR. DELL'ANGELO:  Okay.  Okay.

18          THE COURT:  Right.

19          MR. DELL'ANGELO:  Thank you.

20          Then, just given that for clarify, I referred to

21   Exhibit 1.  I think what we'll do is get the defendants a

22   combined proposed set of search terms.

23          THE COURT:  Right.  It would be Exhibit 1 plus the

24   additional terms --

25          MR. DELL'ANGELO:  Yes.  Okay.

 1           THE COURT:  -- that might apply to arbitration.

 2           MR. DELL'ANGELO:  Thank you, Your Honor.  Okay.

 3           So to your question, the next issue in the JSR was

 4  conducting a linear review of chat messages.  This is something

 5  that defendants had -- did in *Le*.  It's something that they had

 6  initially agreed to do at least for part of the chats here.  And

 7  what we're asking is the Court order, to the extent that, you

 8  know, they have these chat messages, that instead of applying

 9  a -- search terms, they do a linear review.  And this is fairly

10  common in litigation for, frankly, obvious reasons, which --

11  text messages often use a lot of shorthand.  They tend to be

12  short on specifics, particularly as the communication goes,

13  and -- such that they're not really susceptible to search terms

14  and somebody just needs to read them.

15           We had proposed a couple ways that we think we could

16  reduce that -- the scope of the review that the defendants had

17  been resistant to, but regardless of that, we think it's very,

18  very -- it's really critical, frankly, that they're required to

19  do a linear review.  As the Court may remember in *Le*, there

20  was --

21           THE COURT:  Again, I just want to be clear about linear

22  review of what for whom?

23           MR. DELL'ANGELO:  Of -- of all chats.  So text

24  messages, app communications, i.e., non-e-mail communications,

25  you know, Teams communications, just chat-type communications,

1  so text messages, if it's on Instagram or X or WhatsApp, you

2  know, where people tend to communicate in a more colloquial,

3  short-term abbreviations, those sorts of things.

4          THE COURT:  Okay.  By whom?  For what?  I just want to

5  be clear.

6          MR. DELL'ANGELO:  Oh, yeah.  For whatever devices they

7  have collected.

8          THE COURT:  Okay.  For who?  For the 30 custodians?  I

9  mean, I'm trying to --

10          MR. DELL'ANGELO:  Yeah, yeah.  So I think there are

11  35 custodians, but my understanding is there are only devices

12  for about 19 of them that they've actually collected.  But for

13  whatever devices -- whatever chats they've collected for their

14  employees, we would ask that they be required to do a linear

15  review of them.

16          THE COURT:  And your understanding is they have chats

17  for at least 19 employees?

18          MR. DELL'ANGELO:  Yes.

19          THE COURT:  Because you're not asking for, like, every

20  single employee.  Some people may not be relevant.

21          MR. DELL'ANGELO:  No, no, only the ones that are --

22  that from whom they have collected or if they were to collect in

23  the future and find something, but, yeah, not every employee in

24  the company.

25          THE COURT:  Who are those people as we understand them

1   to be?

2          MR. DELL'ANGELO:  Yeah, so --

3          THE COURT:  Are they identified as the custodians that

4   we had earlier identified or is it additional people?  I just

5   wanted the record to be clear who we're talking about.

6          MR. DELL'ANGELO:  Yes.  Okay.  So I think I had

7   referred Your Honor to that chart at Exhibit 5 of Exhibit -- was

8   it ECF 344?  No.  So it's actual -- sorry.  Let me just take a

9   look.

10          Yes, this is attached to our JSR, the document we're

11   talking about right now, ECF 344 in Johnson.  Exhibit 5 has a

12   listing, and the row -- Column A -- the rows are numbered.  And

13   if you go through there, there are a whole series of custodians

14   and it shows the devices that have been collected --

15          THE COURT:  Right.

16          MR. DELL'ANGELO:  -- and where -- you know, what the

17   volume of daily chat threads are in that.  So we're really just

18   talking about whoever has a chat on Exhibit 5 of 340- -- of

19   ECF 344.

20          THE COURT:  Okay.

21          And what are you proposing as the timeframe for that?

22          MR. DELL'ANGELO:  You know, it -- my understanding is,

23   you know, looking from this, they've identified, they've

24   collected, I would say within 30 days.  And, frankly, that would

25   at least -- I mean, it would be very challenging for us, but it

1    would at least give us some insight in the materials before the

2    February 4th hearing.

3              THE COURT:  Okay.

4              MR. DELL'ANGELO:  Well, actually, I guess we're at

5    January 5th, so 30 days would not quite hit that.  Maybe three

6    weeks.

7              THE COURT:  Well, do we have a sense of -- the chart, I

8    think it has some sense of the number of things they'd have to

9    review, correct?

10             MR. DELL'ANGELO:  Yes.  I mean, I would --

11             THE COURT:  You're talking about the things that are in

12   pink in Columns J, K --

13             MR. DELL'ANGELO:  Well, no, K, because K is the daily

14   threads.  The -- J is with family, so that...

15             THE COURT:  So just K.

16             MR. DELL'ANGELO:  Right.  And J, I think, has e-mails

17   included in it.  So it would be just K.

18             THE COURT:  Okay.

19             MR. DELL'ANGELO:  Would you like me to move onto the

20   next item, Your Honor, or did you have --

21             THE COURT:  No.  Here's what we're going to do,

22   though --

23             MR. DELL'ANGELO:  Okay.

24             THE COURT:  -- because I'm going to stagger this --

25             MR. DELL'ANGELO:  Okay.

1          THE COURT:  -- because I think a linear review is
2    appropriate here, given the issue of the missing evidence.  I'm
3    going to require the defendants to provide a -- do a linear
4    review of the messages of Mr. White and Ms. Long and produce
5    that on the same date that they have to provide the privilege
6    log and everything else.

7          MR. DELL'ANGELO:  Okay.

8          THE COURT:  That would be the 26th of January, and then
9    they'll have an additional three weeks to provide linear review
10   results for the remaining individuals.

11         MR. AXELRAD:  Your Honor, if I could just interject.  I
12   think, given that it's January 6th right now, a linear review of
13   text messages for Mr. White and Ms. Long could -- I just don't
14   have the numbers at my fingertips -- could be an extraordinary
15   amount of information.

16         THE COURT:  Well, I'm looking at what they have on the
17   chart.  That's why I had made that decision, right.  And the
18   other reason why I say that, Mr. Axelrad, is it's hard for me to
19   imagine you all wouldn't be looking at these things as part of
20   the review for the privilege log or other things anyway.  I
21   mean, these are -- these are chats I would assume would have or
22   should have already been reviewed, particularly given the
23   significance of those two witnesses.

24         What I'm looking at right now for Mr. White is maybe,
25   for him, by himself, 17,000 chat threads, which is not a lot

1    because they're very short, right.  And for Ms. Long, it is a

2    little bit more, closer to --

3            MR. DELL'ANGELO:  Sorry to interject, Your Honor.

4            THE COURT:  -- I'm sorry -- a little less.  I'm sorry.

5            MR. DELL'ANGELO:  It's quite a bit less.  It's just

6    over 7,000.

7            THE COURT:  Yes.  I don't think that that's

8    insufficient time for those two witnesses in terms of chats.  So

9    if you ask for more time for the other witnesses, I could see

10   that, but we have this hearing.  I think these chats are going

11   to be relevant for that, so -- and I think we need to have the

12   evidence of that prior to that.

13           MR. AXELRAD:  Your Honor, my colleague just informed

14   me, it's approximately 134,391 documents.  I mean --

15           THE COURT:  And why is that not -- I'm confused because

16   I looked in the chart and it says something different.

17           MR. AXELRAD:  Well, I think it has something to do with

18   the way we're referring to "chats."  A chat could be a very long

19   conversation, and what plaintiffs are proposing is that every

20   message in that long conversation be reviewed for every chat

21   that has been collected.  You know, we want to make sure that we

22   are complying with the Court's order and being careful and

23   considerate here.  So --

24           THE COURT:  Again, Mr. Axelrad, I'm confused about the

25   134,000-document number, right.  I don't really know what that

1    means.  Maybe you could help me understand a little bit more so

2    that I could better contextualize your argument here.

3              MR. AXELRAD:  Yeah.  And, again, Your Honor, I think

4    it's a question of families being associated with the particular

5    messages, so there may be attachments.  There are a whole host

6    of, sort of, additional factors that go into ballooning what the

7    number actually looks like in plaintiffs' chart.  And, you know,

8    again, Your Honor, if Your Honor is ordering --

9              THE COURT:  So I guess, again, I'm -- you're saying --

10   they say that there are, I don't know, looks like 17,000, in

11   another case 7,000, chat threads, right, which to me does not

12   seem like a lot to review in three weeks for two witnesses,

13   particularly where you're going to be prepping these witnesses

14   anyway and looking at their material anyway in relation to my

15   prior order.

16             Where is this 134,000-document number coming from in

17   relation to these chats?  I don't -- I still don't understand,

18   Mr. Axelrad, what that means.

19             MR. AXELRAD:  Yeah, Your Honor, and, again, I'm just

20   speaking off the cuff here, so I want to be careful.  But,

21   typically speaking, when you see a number for -- a number of

22   documents, that -- that number could be just the message itself,

23   or if you then add in families as a family consideration, the

24   other attachments to the documents, that number can get much

25   larger.  So one e-mail with five attachments is actually six

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1  documents.

2         THE COURT:  So I guess my question is, first of all,

3  why -- these would have been required to have been produced

4  earlier anyway.  I'm not sure why, if that's the case, this

5  actually wasn't done earlier, Mr. Axelrad, because it would be

6  directly relevant to what I had previously ordered, and you're

7  making it sound like you all have not looked at these at all.

8         MR. AXELRAD:  Not at all, Your Honor.

9         THE COURT:  Okay.  So help me understand.

10        MR. AXELRAD:  Yeah.  No, we produced text messages, for

11 example, from Mr. White and Ms. Long.  There are obviously gaps

12 that the Court is concerned about as it relates to the

13 spoliation hearing.  But a linear review, what plaintiffs are

14 talking about, is us putting -- is us reviewing every single

15 message that as -- separate from applying search terms, because

16 what they're asking for is not the use of search terms that

17 bring to the fore --

18        THE COURT:  Right.

19        MR. AXELRAD:  -- relevant documents that relate to, for

20 instance, this litigation, but instead -- and sift out things

21 that are of a purely personal nature and instead want us to

22 review every single message.  Now, when we review this stuff

23 beforehand, we review it with the application of search terms.

24        Plaintiffs' position is that search terms are not

25 appropriate, and we just frankly disagree.  If we were able to

1   apply search terms here, we would have a much easier time
2   capturing what is specifically relevant as opposed to reading
3   messages from Mr. White or Ms. Long that relate to purely
4   personal family things, for example.

5           And so, you know, I can't sit here and tell you the
6   precise makeup of these 17,000 messages, whether 5,000 relate to
7   business and 12,000 are personal, but what they're contemplating
8   is a review of all 17,000.  And if we're able to apply search
9   terms, this becomes a much different proposition.  But
10  plaintiffs are of the mind that there is a certain type of
11  language that's used in text messages that don't make them
12  susceptible to search terms.  We just disagree with that.  You
13  can craft search terms that go to the type of shorthand or
14  slang, to the extent that's even being used, that would allow us
15  to facilitate the review that Your Honor is contemplating here.

16          And so I think, you know, given this extraordinarily
17  tight turnaround and all the other things that are going on, I
18  think it's reasonable for us to want to apply search terms here
19  so we can capture just what is relevant as opposed to, you know,
20  spending a lot of man-hours reviewing what could be largely
21  personal or irrelevant information.

22          THE COURT:  Well, there are two issues here,
23  Mr. Axelrad, which is why I'm focussing on these two witnesses.
24  I'm going to order you to do this anyway because I'm going to
25  need to know about this as relates to spoliation.  This is

1  actually not something, particularly for these two witnesses,

2  that's not going to be something I'm still -- I'm not going to

3  order.  And we can talk about the timing of that, right, which I

4  can appreciate the timing of that.

5          MR. AXELRAD:  I think that's just the only --

6          THE COURT:  And I think it's a different issue for the

7  other witnesses in terms of linear review and a time for that.

8  But for these two witnesses that have been highlighted by the

9  plaintiffs as being crucial witnesses, I'm going to order a

10  linear review for that because I'm going to want to be clear

11  with plaintiffs and with you, to the extent evidence is missing,

12  that there's nothing else.  And so you're going to have to go

13  through that anyway because you --

14          MR. AXELRAD:  Certainly.  And we want the same.  We

15  want the same, Your Honor.

16          THE COURT:  Right, right.

17          MR. AXELRAD:  But to do a linear review of all of these

18  messages in addition to the privilege log, the in camera filing,

19  prepping our witnesses for this hearing, that is quite a bit

20  that we're talking about in the next 20-odd days.

21          THE COURT:  I appreciate that because the only concern

22  I have, Mr. Axelrad, is it looks like these witnesses may have

23  to come back.  I was trying to get -- trying to get this done

24  before they testified.  And I want to stay on a schedule because

25  I don't want to push it back.  But if they have to come back, I

 1   guess they have to come back.  Because I agree that this is a

 2   fair amount of chats to review to do a linear review beforehand.

 3            MR. AXELRAD:  Well, could I suggest, Your Honor, as

 4   a -- not even a middle ground, but what would be helpful for us

 5   is if we had a chance to go back, speak to our e-discovery

 6   vendor, speak to our reviewers, and speak to everyone who would

 7   be involved in this and really get our arms around how long this

 8   would take.  You know, as I stand here right now, I think it

 9   would take quite a bit of time to do it properly.  But I don't

10   want to, you know, misdirect Your Honor in any way, and I

11   certainly don't want our witnesses to have to come back for

12   another hearing if that's not necessary.

13            So if we could, you know, provide Your Honor an update

14   tomorrow or the next day as to how long we expect a linear

15   review of these messages to take, that would be helpful.

16            THE COURT:  So why don't we do this.  I'm going to

17   order a linear review for those two witnesses and it be provided

18   by the 26th, but I will give you leave to file a request to have

19   that date extended based upon your conversations with your

20   vendors.

21            MR. AXELRAD:  Thank you very much.

22            THE COURT:  Because you may decide in reviewing this --

23            MR. AXELRAD:  Certainly.

24            THE COURT:  -- we can get it done before.

25            MR. AXELRAD:  Yeah.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1        THE COURT:  I'm just letting you know that I'm trying

2   to get this all the -- excuse me -- all of the evidence for

3   these two witnesses out so that I don't have the plaintiffs

4   coming back to me after they've already testified saying, "We

5   want to call them back because now we've found these chats and

6   we want to ask them about them," right.  I want to avoid that to

7   the extent that's necessary, Mr. Axelrad.  And so that's why I'm

8   saying let's focus on these two witnesses.

9        Now, I do think we haven't addressed the other issue,

10  and I'm going to ask Mr. Dell'Angelo about that, which is the

11  other individuals who are on this chart.  But for now what we're

12  going to do is I'm going to order a linear review for those two

13  witnesses for the chats be provided by January 26th, but I will

14  give you leave to file by the end of this week a request to

15  extend that timeframe.  And then the plaintiffs can respond to

16  that the following Monday or Tuesday.

17        MR. AXELRAD:  Thank you, Your Honor.

18        THE COURT:  All right.

19        So, Mr. Dell'Angelo, for these other individuals,

20  there's a fair number of chats here.  So what timeframe would

21  you propose?  Again, it's difficult for me to know and I think

22  it's difficult --

23        MR. DELL'ANGELO:  Yeah.

24        THE COURT:  -- for the defendants to know how long this

25  process will take.

1          MR. DELL'ANGELO:  Sure.

2          THE COURT:  But it does seem to me that this

3  information should be provided.  But the question becomes why

4  you think search terms won't work for these chats.

5          MR. DELL'ANGELO:  Sure.

6          Well, it's -- it's not what we think.  It's what we

7  know.

8          THE COURT:  Okay.

9          MR. DELL'ANGELO:  And I can -- we can pull up the

10  reference for you, but I believe in the filing that we made in

11  advance of the November 20th hearing that Your Honor held where

12  you found the various indicia of spoliation, one thing that we

13  demonstrated very clearly is we took the text messages or chats

14  that Your Honor relied on in the class certification opinion in

15  *Le*, some of which were, you know, some of the most compelling

16  evidence in that case, and we ran the defendants' search terms

17  against them here, and it did not hit on a single one of those

18  chats.

19          So what we were, I think, able to demonstrate is that

20  those documents are not really susceptible to, you know,

21  identification and retrieval by search terms.  And we know

22  that -- we know in *Le* they agreed -- that is, Zuffa agreed -- to

23  do a linear review of chats, so they were found without search

24  terms in *Le*.  And we showed that the search terms here --

25          THE COURT:  How long did that take in *Le*?  I don't

1  recall how long that process --

2          MR. DELL'ANGELO:  How long it took in *Le*?

3          THE COURT:  Yes, because I think they were given

4  several months to do that, if I recall.

5          MR. DELL'ANGELO:  Well, I can give you a couple of

6  important -- I don't know the answer to that.  Maybe Mr. Madden,

7  my colleague here, may be able to look it up while we're

8  talking, but maybe I can give you in the interim just two

9  important data points.

10         So in the arbitration back-and-forth on these search

11 terms and our request for a linear review, we made a few

12 proposals, so -- and, actually, one of them is really salient to

13 what Mr. Axelrad had talked about.  He talked about personal

14 chats.  One of the things that we proposed is, say, you just

15 take out the personal chats.  So if Mr. White has a chat thread

16 with his spouse, for example, that's something that you could

17 just say, you know, that's highly unlikely to be relevant.  It's

18 of a personal nature and with your spouse.  If there's one with

19 a medical professional, you take those out.

20         So our understanding is the chats that you're seeing in

21 Column K here would include those sorts of threads.  They don't

22 need to be linearly reviewed.  They should just be removed

23 entirely because they're not -- they're not relevant, right, so

24 that alone is going to start reducing it.

25         But another important data point that I could give to

1  you is the plaintiffs complied with the July 17th substantial

2  completion deadline for their productions.  We collected

3  documents, and it included many chats like the ones we're

4  talking about as well as social media postings and whatever.

5  And as we were coming up on the substantial completion deadline,

6  we hit a -- we hit a point where we were about two or two and a

7  half weeks out from the deadline and still had 300,000 of those

8  to get through.  And we got through them in two weeks, two and a

9  half -- two to two and a half weeks and met the substantial --

10 it is eminently doable, and we've done it in many cases.

11         The other thing I would point out, Your Honor, is, you

12 know, there's been a lot of back-and-forth with the defendants

13 on this question of the deduplication of chat threads.  And what

14 they have told us repeatedly, and the Court, is that their

15 vendor says that chat threads -- the chat threads that they have

16 are not susceptible to deduplication.  We believe that they are.

17         So it's at JC- -- sorry -- the JSR at Exhibit -- sorry,

18 ECF 344, we have Exhibits 6 and 7.  And what we did was we took

19 two chats that we found of the very few, the very few that the

20 defendants have actually produced here, and we have identical

21 chats.  They have different Bates numbers, so they're sourced

22 differently.  But what we also did is we pulled the metadata

23 that was produced with those chats, and you'll see that that's

24 the second page of Exhibits 6 and 7, respectively, and they are

25 identical.  What that means is -- and we checked with our vendor

 1  as well -- is that with this metadata, those two chats could

 2  have been deduplicated, right.  That's just another way to

 3  reduce the burden.

 4          So we've made a number of proposals that -- I mean, it

 5  may be that the defendants have somehow uniquely found a vendor

 6  that's incapable of doing this relatively routine and standard

 7  method of metadata deduplication, but I don't really think that

 8  should delay the process.  But we have -- there are ways to do

 9  this and reduce the burden, even for the relatively modest

10  number of documents here.

11          THE COURT:  Okay.  Let's do this.  For now, I'll set it

12  60 days.

13          I will give you, Mr. Axelrad, the same opportunity to

14  be able to request additional time.

15          MR. AXELRAD:  I appreciate that, Your Honor.  I -- you

16  know, just for the record, I understand, just from my colleague

17  doing a back-of-the-napkin calculation here, for all of the

18  collected mobile devices so far, we have 3,071,486 documents

19  with families.  So I think, you know, knowing Your Honor is

20  amenable to -- to leave here, I think we would just like the

21  opportunity to discuss internally.  We can certainly come up

22  with an estimate for how long it will take to conduct a linear

23  review of that 3,000 -- 3 million or so documents because I

24  don't want to -- I want to be careful.  I don't want to over- --

25  overpromise anything.  I want to be careful with Your Honor's

1   expectations.

2          THE COURT:  Well, again, Mr. Axelrad, here's part of

3   the challenge, right.  These particular custodians are going to

4   be the very custodians that you all are going to at some point

5   argue to me may have relevant information that could remedy any

6   alleged or missing information.

7          I'm trying not to push out the timeframe for the

8   decision as to what happens in terms of spoliation.  The reason

9   why I'm pushing this schedule is to avoid that.  Because, again,

10  assuming for the moment that the record continues to be what it

11  is which is certain evidence is not available, one of the

12  factors I have to look at is what is available, and you're --

13  you've already said you're going to be arguing that to me.

14         MR. AXELRAD:  Certainly.

15         THE COURT:  But I want to give you the opportunity to

16  be able to do that.  So this is as much for the defendants to be

17  able to argue this to me as it is for the plaintiffs, and the

18  sooner we get to that, the better because it pushes out, right,

19  potentially my decision as it relates to what to do about

20  missing evidence.  You know, assuming that it's still missing at

21  that point in time, I'll have to make a decision about that.

22  And I fully anticipate -- and as I said, I will give you an

23  opportunity to be able to argue, "You shouldn't take these

24  measures because this is available," but you can't argue that to

25  me until some of this is made available.  And this is exactly

1  the nature of the type of evidence that I suspect that you would

2  point to to say, "This is available as an alternative."

3          So --

4          MR. AXELRAD:  We share that interest, Your Honor.

5          THE COURT:  Okay.

6          MR. AXELRAD:  We certainly do.  I just want to be

7  careful, you know, with Your Honor setting a deadline and, you

8  know, I don't want to get us into a position where we are

9  confirming for Your Honor that we can review 3 million documents

10  in X days when it turns out that we're actually not able to.  I

11  want to be able to confer with our colleagues first.

12          THE COURT:  That's fine.  I'm going to set it for

13  60 days with the same opportunity to review.  And, again, you

14  all can meet and confer.  As Mr. Dell'Angelo indicated, you

15  don't have to review threads about personal messages or doctor

16  appointments or other social engagements.  I would anticipate

17  that's going to be a fair number of these chats that could be

18  easily dismissed in a review.

19          And so I think sometimes because they can be short,

20  like, three-word messages, the number of actual, quote/unquote,

21  documents can be misleading, and there's no way for me to know

22  and for you to know, in fact, how long those chats are.  Some

23  people, as we know, like to write a novella in their chats, and

24  some people write, you know, as my son does, three words to me.

25          So, right, I mean, it really just depends on what that

 1   looks like.  So I will give you the opportunity to be able to do

 2   that, but I do want to emphasize this, Mr. Axelrad, which is

 3   that I don't want the defendants to come back to me later and

 4   say, as we get to the issue of spoliation and potential

 5   remedies, "Oh, we found this additional information in chats

 6   that we had not found with this review."  That to me would be

 7   problematic.

 8          So I want you to be -- just be clear about that because

 9   I have been concerned again about some of what's happened here.

10   And, again, I'm not saying that you're personally responsible

11   for this, but as I said to Mr. Chiu last time, there has not

12   been complete disclosure here -- I know you all disagree about

13   that -- as relates to your clients providing information.  So I

14   just want to be clear that what I'm not going to allow to happen

15   is that somehow information is discovered in chats later that

16   should have been provided in this review.

17          So I will hold you all to that.  So I will give you the

18   60 days starting from today, and then you all can let me know if

19   there's additional information.  And that's for the chats that

20   are identified in this exhibit which is 344-, I think, 5.  Is

21   that right?

22          MR. DELL'ANGELO:  Yes, Your Honor.  That's correct.

23   ECF 344-5.

24          THE COURT:  Those are the chats we're talking about in

25   Column K.

1          MR. DELL'ANGELO:  K, yeah, because an important

2     distinction, Your Honor, is J, as we understand it from the

3     meet-and-confer process about the arbitration document or the

4     arbitration search terms and others, that J -- that with

5     families includes e-mails and other documents.  And, you know,

6     just the other point I'd make generally, Your Honor, is -- so I

7     think the total that you see in J is going to be much larger --

8          THE COURT:  Uh-huh.

9          MR. DELL'ANGELO:  -- because we understand that K are

10    just the chats.  And then, of course, I think something Your

11    Honor indicated, you know, a lot of times these chats -- and

12    we've seen some of them in this case -- it's just a picture

13    that's in the -- you know, it's -- or there's a link to an

14    article, I mean --

15         THE COURT:  Right.

16         MR. DELL'ANGELO:  -- you know.  So the -- the volume

17    is -- it moves a lot.

18         THE COURT:  Well, that's what we're going to let

19    Mr. Axelrad figure out --

20         MR. DELL'ANGELO:  Yeah.

21         THE COURT:  -- because then there's actually --

22         MR. DELL'ANGELO:  Yeah.

23         THE COURT:  -- they are supposed to be able to identify

24    that.

25         MR. DELL'ANGELO:  Right.

1           THE COURT:  They can tell the type of images -- I mean,
2  the type of files that are there.
3           MR. DELL'ANGELO:  Yeah.
4           THE COURT:  They should be able to tell the amount of
5  data within the message, and that will give him and you and me
6  some indication of what's available.
7           MR. DELL'ANGELO:  Right.  Understood.  Yeah.
8           THE COURT:  Okay.  All right.  Let's move on.  What's
9  next, Mr. Dell'Angelo?
10           MR. DELL'ANGELO:  Okay.
11           THE COURT:  I'm sorry.  Hold on.
12           MR. DELL'ANGELO:  Yeah.  So it can be -- well --
13           THE COURT:  I'm sorry, Mr. Dell'Angelo.  Hold on.
14           (Court conferring with court reporter.)
15           THE COURT:  We've been going at it for a while, about
16  an hour and 45 minutes.  Why don't we take about a 10-minute
17  recess, and then we'll come back and finish up.
18           MR. DELL'ANGELO:  Thank you, Your Honor.
19           MR. AXELRAD:  Thank you, Your Honor.
20           (Recess taken at 12:44 p.m.)
21           (Resumed at 12:59 p.m.)
22           THE COURT:  Please be seated.
23           Okay.  Mr. Dell'Angelo, I believe you were in the midst
24  of making a statement or a request.  We were talking about the
25  next issue.

 1          MR. DELL'ANGELO:  Yes.  I believe -- thank you, Your

 2    Honor.  I believe the next issue on the Joint Status Report at

 3    ECF 344 in Johnson is on Page 3, Item C, plaintiffs' proposal

 4    for defendants' employees to be searched.  Those are listed on

 5    the Exhibit 5 we were looking at before with the daily chat

 6    threads, if you recall, Your Honor, with the Columns J and K.

 7          What we -- what we did -- as Your Honor may recall, it

 8    took considerable effort to get information from the defendants

 9    about their employees.  We did a lot of back-and-forth about org

10    charts and whatnot, but once we were able to gather that

11    information, plaintiffs made some proposals for employees that

12    we believe should be searched.  And if you're looking at

13    Exhibit 5, it begins with Row 27, then goes through 56.  The

14    defendants have actually included a couple of those people,

15    Mr. Harris and Mr. Ratner.  They -- as we understand it, they at

16    least collected their mobile devices.  But --

17          THE COURT:  Excuse me.

18          MR. DELL'ANGELO:  Bless you, Your Honor.

19          THE COURT:  Thank you.

20          MR. DELL'ANGELO:  But what we're asking for here -- for

21    here, Your Honor, is that those individuals beginning at Row 27

22    through the end of Exhibit 5 also be included among the

23    employees that the defendants are required to search.

24          THE COURT:  Okay.

25          And search for what?

 1          MR. DELL'ANGELO:  For devices and then their files,

 2    like e-mail, for example, and whatever other --

 3          THE COURT:  Well, I'm confused.  They're already on

 4    this list, right?

 5          MR. DELL'ANGELO:  Exhibit 5?

 6          THE COURT:  Yes.

 7          MR. DELL'ANGELO:  Yeah, they're only -- they're only on

 8    this list because we have identified them as people we've

 9    proposed.  So there are a few instances where they have given us

10    some information.  So like Number 39 is Mr. Harris.  They've

11    given us some information.  And Mr. Ratner, they've -- we

12    understand with respect to Mr. Harris at Row 39 and Mr. Ratner

13    at 45a and 45b, they've at least collected their mobile devices.

14    Same thing with Mr. Whitesell at 52a, but really -- so two

15    things.  One is it's our understanding that most of these

16    employees that we've identified are not employees that

17    defendants have agreed to search, and so we're asking that the

18    Court require them to be searched as well.

19          THE COURT:  And for what specific information?

20          MR. DELL'ANGELO:  I think the way to do it, Your Honor,

21    would be two things.  One is to collect mobile devices, and then

22    the second is just with respect to their other files like

23    e-mail, just to run search terms.  And then -- because obviously

24    the search terms --

25          THE COURT:  Well, I'm confused.  I'm ordering them to

1   run the search terms from Exhibit 1.  How is that not covered

2   for these individuals?

3           MR. DELL'ANGELO:  Well, so let's just take the first --

4   let's take the first one at Row 27, Acosta.  If -- if they don't

5   run the search terms against that person's e-mail box, then they

6   don't collect their documents.

7           THE COURT:  Okay.  So when you're talking about the

8   search terms from Exhibit 1 --

9           MR. DELL'ANGELO:  Yes.

10          THE COURT:  -- you want them to be run against these 30

11  additional individuals.

12          MR. DELL'ANGELO:  That's correct.

13          THE COURT:  Okay.

14          MR. AXELRAD:  Your Honor, I think what -- where we are

15  is -- and I'm just not sure why plaintiffs aren't using the

16  magic word here -- they're proposing an additional 30

17  custodians, and they're proposing a collection and review of 30

18  additional custodians.

19          THE COURT:  Okay.  And I guess I want to be clear,

20  Mr. Dell'Angelo, in terms of what Mr. Axelrad is asking.  Are

21  you asking them to also just collect the device information for

22  those 30 individuals?

23          MR. DELL'ANGELO:  Yes, and it looks like for some like

24  Harris, Ratner, Whitesell, they've already done that.

25          THE COURT:  Okay.  So you want them to collect device

 1  information for these individuals and then search?

 2        MR. DELL'ANGELO:  Search their files.

 3        THE COURT:  Search the -- their individual devices

 4  apart from searching, like, Zuffa's general, I guess, database

 5  or files from Exhibit 1.  Is that right?

 6        MR. DELL'ANGELO:  Yes, that's correct, because what

 7  we're trying to solve for, Your Honor, is, you know, if you're

 8  searching -- if you run the search terms against Mr. White's

 9  e-mail box, for example, you know, Mr. Gardner, for example, is

10  very involved in FightMetric, right.  We want to make sure --

11  Genauer.  Sorry.  We want to make sure that we're also running

12  those search terms against Mr. Genauer's e-mail box.

13        THE COURT:  So I'm a little confused here.  There's --

14  search terms against what exactly?  So right now we don't have

15  these devices, but I assume that you asked them to request that

16  the searches be run against some broader files or databases that

17  are at Zuffa.  So I want to be clear.  Are you saying that you

18  want an additional 30 custodians added to the list, you want

19  their device information collected, and you want search terms

20  run against those particular devices?

21        MR. DELL'ANGELO:  Well, no, so two different things.

22  There are devices, and then there are their other files, which

23  for simplicity I would say, like, their e-mail box --

24        THE COURT:  Right.

25        MR. DELL'ANGELO:  -- for example.  We would like the

1  search terms to be run against their e-mail boxes of these

2  additional people as well as a collection of their mobile

3  devices.  And I think to the extent that there are chats on

4  those mobile devices, you know, per our prior discussion, we

5  don't think that they should be subject to search terms.

6          So it would be collect the files of these individuals,

7  run search terms against their files other than chats, and I

8  think we -- you know, we don't even have the volume data for

9  their mobile devices, so it may be that that's a discussion that

10 we continue with the Court, but, you know, we'd continue to

11 suggest, given the nature of search terms, that they would not

12 be susceptible.

13         THE COURT:  Okay.

14         Mr. Axelrad.

15         MR. AXELRAD:  Your Honor, I -- you know, I -- I think

16 what plaintiffs -- and I don't want to put words in their

17 mouth -- what they're proposing is 30 additional custodians and

18 linear review of all chat messages for these 30 additional

19 custodians.

20         THE COURT:  I didn't hear linear review, but if that's

21 what they're going to be asking for, then I need to know that,

22 too.

23         MR. DELL'ANGELO:  Well, what I'm saying is likely we

24 would ask for a linear review of just their chats, but we don't

25 really have the data for most of them.  So what I'm suggesting

 1   is if they want to collect their devices, give us the totals,

 2   you know -- because one thing that I think is important to

 3   understand here is these custodians come from the three

 4   defendants, but many of them are Endeavor employees who also

 5   show up on the org charts for Zuffa, right.  So these are people

 6   who are kind of spanning the two organizations, and it's an

 7   important component if you think back to our discussion about

 8   Endeavor and the defendants', you know, contention that Endeavor

 9   had no role in Zuffa, but these are -- many of them are Endeavor

10   people who are on Zuffa's org chart.

11        THE COURT:  So why wouldn't I just order them to run

12   the search terms against, whatever, let's say the non-device

13   files for these individuals, if they have e-mails, have them

14   just collect the information, not do a linear review yet, just

15   have them figure out how much data there is?

16        MR. DELL'ANGELO:  I think.

17        THE COURT:  Because that seems to me that that would be

18   a reasonable approach --

19        MR. DELL'ANGELO:  Yes.

20        THE COURT:  -- to addressing this issue where they run

21   them against these larger files, whether it's an e-mail or

22   whatever it is, run the searches for these individuals, and then

23   simply collect the information for this device disclosure chart.

24        MR. DELL'ANGELO:  I think -- I apologize.  I didn't

25   mean to speak over, Your Honor.  I think that works perfectly.

1   Thank you.

2            THE COURT:  Mr. Axelrad, why wouldn't we do that?

3            MR. AXELRAD:  I mean, Your Honor, I think...  I think

4   the potential here -- and, again, we have to look at the -- the

5   data associated with these 30 additional custodians -- is to

6   dramatically elongate the discovery process here.  Again, I'm

7   speaking off the cuff, but if the 30 or so custodians that we've

8   already looked at are any indication of what these 30 custodians

9   would be plus their mobile devices, plus the prospect that

10  plaintiffs --

11           THE COURT:  Well, we're not doing the mobile -- all

12  we're doing is collecting information about the mobile devices

13  now.  We're not searching them yet.  But as has previously been

14  found in this case, Mr. Axelrad, the amount of relevant

15  discovery that has been yielded from the searches of even the

16  prior custodians has been, for the number of documents, not that

17  significant a volume.

18           So I know that there may be a larger universe, but it's

19  not clear to me that the larger universe in this case is

20  producing an equally large number of documents for production

21  or, sort of, search results yet.

22           MR. AXELRAD:  Well, Your Honor, I -- you know, it's

23  a -- I think what -- and maybe we're saying the same thing, Your

24  Honor, but I think what we can do in response to Your Honor's

25  comments is take a look at the size of the universe for these

1   30 custodians, certainly provide the information related to

2   their devices, and then maybe we can have some further

3   discussion with Your Honor about the propriety of, you know, in

4   some ways restarting a very long process as it relates to 30

5   additional custodians.  So we can -- we can certainly provide

6   that information to Your Honor.

7          THE COURT:  So, yes, let me ask Mr. Dell'Angelo

8   because, Mr. Dell'Angelo, I want to make sure I'm understanding

9   what it is you're asking the defendants to do apart from

10  collecting the device disclosure information, right.  Because,

11  again, I want to understand, when you're doing the searches,

12  what are they searching?

13         MR. DELL'ANGELO:  They -- they would be running the

14  search terms, the sets of search terms that we've discussed

15  earlier, against their custodial files, like e-mail and other

16  files that they may have.  And I -- I think your suggestion

17  makes sense, Your Honor, to just identify mobile devices and

18  provide --

19         THE COURT:  So what other custodial files have been

20  searched for the prior custodians that were identified?

21         MR. DELL'ANGELO:  I -- respectfully, I think that's a

22  question the defendants probably have to answer.  I think what

23  we understand is that it's their e-mail, Teams -- Teams

24  communications, central files.  Those are, sort of, the general

25  ones, and if they have specific drives, my understanding is that

1  those would have been searched.

2          THE COURT:  So why wouldn't we just add these

3  individuals to the search terms that we're going to be running

4  in January?

5          MR. DELL'ANGELO:  That -- that's exactly what we would

6  like to do, Your Honor.

7          THE COURT:  Okay.

8          MR. AXELRAD:  I think the complicating factor is, Your

9  Honor, is that because these have not been custodians that have

10 been agreed on or that the defendants have been ordered to

11 collect discovery for, we now have to go out and collect the

12 discovery for all of these 30 custodians.

13         THE COURT:  Well, when you say "collect," Mr. Axelrad,

14 I'm not sure I understand what that means.  I mean, these would

15 be files that you all have in your possession.  So when you say

16 "collect" --

17         MR. AXELRAD:  Yeah.

18         THE COURT:  -- right, I don't understand what that

19 means.  You certainly have to collect the device information,

20 but that doesn't seem to be particularly burdensome.

21         MR. AXELRAD:  Yeah, the devices are, I think, a

22 separate question, Your Honor, because that's, you know, the

23 equivalent of just picking up someone's device and having it

24 imaged.  For each of the 30 custodians that they're talking

25 about, it would be going out, talking to those custodians;

1  figuring out where they saved documents, what sort of programs

2  they used, if it's e-mails, if it's Microsoft Teams, if it's

3  OneDrive, if it's various other central files; then downloading

4  all of those -- I don't know how many gigabytes of documents --

5  then bringing those over to a review platform, then reviewing

6  them, the same process that we've gone through with all of the

7  custodians so far.

8       It is -- you know, I -- it's hard to overstate, and I

9  don't want to overstate it here.  So I want to be careful.  I

10  just would say what plaintiffs are -- and I'm not sure why we're

11  not just calling it what it is -- they're proposing the same

12  process that has existed with the current custodians for 30

13  additional ones.

14       THE COURT:  I think that's accurate, but I think I'm

15  going to authorize it.  So let's just move forward with the

16  understanding what we'll do is I'm going to authorize the

17  30 additional custodians and have their files be searched.  I'm

18  going to give you all the same 60 days to do that.

19       I'm not going to put them on the schedule that we're on

20  for January, Mr. Dell'Angelo, because I think that, as

21  Mr. Axelrad indicated, they need to go speak to these people.

22  But 60 days seems to be sufficient time to be able to provide

23  search results for these additional 30 individuals.  However,

24  I'm only going to require that they collect the device

25  disclosure information for those 30 individuals without

1  searching those chats or other messages or doing the linear

2  review of that information yet.

3          MR. DELL'ANGELO:  Okay.

4          MR. AXELRAD:  Your Honor, just to be clear.  We have

5  60 days as it relates to the 30 custodians to -- to provide...

6          THE COURT:  The search results.  Download the

7  information, they'll give you the search terms, and you all have

8  to search them and provide them with the results.

9          MR. AXELRAD:  Your Honor, I think what complicates that

10  is that we apply search results -- we apply search terms to this

11  body of documents which could be many, many hundreds of

12  thousands, if not millions, of pages.  Once we get those search

13  term results applied, it is a smaller set.  Then we have to read

14  through all of these before we can produce them.  60 days to --

15  to do that, I think, is fast by any description for

16  30 custodians on top of what we've already been charged with

17  doing for Mr. White and Ms. Long as well as the others and the

18  spoliation hearing is a pretty extraordinary timeline.

19          THE COURT:  It is, Mr. Axelrad, and I appreciate that,

20  but I will tell you this is information, quite honestly, that I

21  feel like -- and because of the history of this case, could have

22  potentially been addressed or we could have dealt with sooner

23  because we're at this point now because the defendants have not

24  adequately provided discovery.  They now have to deal with the

25  consequences of that.  The defendants blew through the discovery

1   deadlines.  I've already made findings about that.  I know your

2   position about that.  I appreciate that.

3          What I'm saying to you is that this is the circumstance

4   brought on by the defendants' own failure to properly go through

5   discovery in this case, and there's been discovery violations in

6   this case and violations of my orders.  So I'm sticking with the

7   60 days for now.  We'll see what else comes up on the list, and

8   then at the end of this list, Mr. Axelrad, I will give you an

9   opportunity to come back to me and say, "Given this whole list,

10  can we get relief on these different things?"

11         So let's just say I'm going to put 60 days as a

12  placeholder for now in terms of production, but we'll see,

13  Mr. Axelrad, what else ends up on the list.  Let's go through it

14  all, and then I'll come back.

15         MR. AXELRAD:  Certainly, Your Honor.

16         And I just would note, you know, some of these issues

17  and I think these additional custodians was an issue that we

18  raised with Judge Weksler as part of the process that Your Honor

19  referred us to.  And it was briefed in front of Judge Weksler.

20  It was argued in front of Judge Weksler.  And there -- you know,

21  we didn't get a resolution there.  So several months passed

22  without us having resolution of this issue.  I just -- you know,

23  to be -- to make sure that there is a level of fairness here,

24  you know, and I'm not disagreeing with Your Honor in any way,

25  there was a pretty significant time gap between the time that

1   this was teed up for Judge Weksler and then the time that Your

2   Honor resolved the issues.  And that's time that, you know, if

3   we had had some resolution of it, we could have been pursuing

4   the review as Your Honor contemplates.  I just would note that

5   for the record.

6           THE COURT:  Well, Mr. Axelrad, as I've indicated, I'm

7   going to give you an opportunity to come up with a schedule

8   here, because I'm certainly ordering a fair amount of discovery

9   here, and then we can talk about that at the end.  Okay?

10          All right.  What's next, Mr. Dell'Angelo?

11          MR. DELL'ANGELO:  Okay, Your Honor.  Yeah.  The next

12  thing is Item D, central files.  I think we've made progress on

13  the first thing that's referenced under Section D here, the

14  fighter files, but maybe while we're with Your Honor, we could

15  just clarify one thing and try to bring it to a close.

16          So we got a letter late last night from the defendants,

17  January 5th, that talked about their willingness to produce at

18  least a portion of the fighter file material that we've been

19  asking for.  The issue that -- and I have -- I could hand you up

20  a copy if you'd like.  Would you like me to hand you up a copy

21  of the letter?

22          THE COURT:  No.

23          MR. DELL'ANGELO:  Okay.  Okay, Your Honor.

24          But what the letter says, and I'll just -- says -- it

25  says -- and I'm reading just the second portion of the sentence

1   here:  "Defendants will collect, review, and produce responsive

2   documents from UFC's fighter files" -- excuse me -- "UFC

3   fighters' subfolder within UFC's fighter file."

4           So we have been asking for this fighter file for many,

5   many months now.  We now have confirmation that it exists, and

6   we have an agreement that at least a subfolder will be produced.

7           What we don't know is what else is in there.  You know,

8   so, for example --

9           THE COURT:  So what are you asking?

10          MR. DELL'ANGELO:  Well, really just for the defendants

11  to identify what else is in the fighter file, and so --

12          THE COURT:  When you say "what else is in there," are

13  you asking for identification of the file folders?

14          MR. DELL'ANGELO:  Yes.

15          THE COURT:  Are you asking for, like, a little data

16  tree, something like that?

17          MR. DELL'ANGELO:  Something like either of those two

18  things would be helpful.  You know, one would expect the fighter

19  file may have things like maybe if there's competitive

20  intelligence, right.  There's a -- maybe there's a PFL fighter

21  file.  But we don't know that.  So we've been told that there's

22  the subfolder.  Some identification or description that's, you

23  know, sufficiently substantive that would tell us what else is

24  in the fighter file.  We know that documents were pulled from

25  that in the *Le* case.

1          And so when we got this letter, I mean, we appreciate

2    that it was progress, but when it just refers to the subfolder,

3    you know, it's something that we needed to get --

4          THE COURT:  Well, why don't you just search at -- just

5    have the fighter folder searched or give me search terms to

6    search it.  Rather than us having them do a summary --

7          MR. DELL'ANGELO:  Sure.

8          THE COURT:  -- then you come back, and then you're

9    going to ask me to have it searched, why don't you just do a

10   search of it?

11         MR. DELL'ANGELO:  That -- you know, that's a great

12   idea, Your Honor.  I think we hadn't really thought of it that

13   way because the subfolder thing is new.  So maybe the solution

14   is just to have the search terms run against the whole fighter

15   file.

16         THE COURT:  There you go.

17         MR. DELL'ANGELO:  Problem solved.  Okay.  Thank you,

18   Your Honor.

19         THE COURT:  Any reason why we can't do that,

20   Mr. Axelrad?  I know that you're going to have to go back and

21   check.  So as you stand here today, right, is there anything

22   that you're aware of -- and, again, I'm going to give you a

23   chance, Mr. Axelrad, to go back and figure these things out as

24   it relates to how much is there, what it looks like.  And that

25   may impact, for example, the ability to respond to search

1   requests.

2         But the search itself of the folder, I mean, that

3   doesn't seem to be particularly burdensome, but it does seem to

4   me like having to go back to the results or what the results

5   look like and figure out what can be produced or not obviously

6   can be more burdensome or less, depending on what's there.  I

7   mean, I don't know what's there.  You don't know what's there.

8         MR. AXELRAD:  Your Honor, what I can tell Your Honor is

9   that my understanding is that the fighter file contains a lot of

10  information.  It -- you know, this is --

11        THE COURT:  Well, is there a summary of it?  Okay.

12  Fine.  That's fine.  If you have, like, a summary of that, if

13  you have a summary of all that's there, right, then you can give

14  that to them, then I can narrow this down.

15        I mean, part of the issue that I've had to deal with in

16  this case and Judge Weksler has had to deal with, Mr. Axelrad,

17  is that the parties aren't close enough on an understanding of

18  even what the universe of data is, so we have these arguments

19  that are -- people talking past each other because I don't know

20  what's in there.  If you said to me, "Look, there are five

21  folders in there.  One involves contracts.  One involves

22  compensation.  Another involves health benefits," that -- then I

23  could know, they could know, sort of, what it is that would be

24  searched.

25        So if you could give me a summary of that, for example,

1   or give them a summary of that, let's say, of what's in there,

2   let's say by next week, a week from today, then we can -- they

3   could submit a request, which I'd let them do, as to what could

4   be searched and we could have a conversation about that.

5            MR. AXELRAD:  Certainly.  I can do that, Your Honor.

6            THE COURT:  Okay.  So, Mr. Dell'Angelo, what we're

7   going to do is I'm going to require them to provide a summary of

8   the universe of information that's in the fighter folder to you

9   all by a week from today.  And then you all can request -- what

10  I'm going to do for now is you can make a request for the

11  search -- what to search by January 19th, right, and then I will

12  require the -- because we're going to do the same thing we did

13  with the other things.  I'm just going to put it on a different

14  timeframe because we have different issues.

15           MR. AXELRAD:  Your Honor, if I could just interrupt.

16  Please forgive me.

17           THE COURT:  Yes.

18           MR. AXELRAD:  My colleague reminded me that on

19  December 17th, we sent a letter detailing what was in the

20  fighter file.  I'd be happy to share it with Your Honor, but --

21           THE COURT:  Well, why don't you just -- why don't you

22  tell us what the letter says, and then Mr. Dell'Angelo and

23  whomever on his side can actually let me know if that's what

24  their understanding is.

25           MR. AXELRAD:  Certainly.  And I'm quoting from our

1  letter, "The fighter file includes various categories of

2  documents including spreadsheets, contract extensions, extension

3  letters, fighters, events," rank -- event rank -- "events,

4  rankings, bout review, termination letters, blank agreements,

5  merchandise agreements, WEC merchandise rights agreements, TUF

6  option letters, documents" --

7           THE COURT:  What was the last one?  I'm sorry.

8           MR. AXELRAD:  TUF option letters.

9           THE COURT:  I'm not sure I understand what that is.

10          MR. DELL'ANGELO:  I believe that's The Ultimate

11  Fighter, Your Honor, TUF.

12          MR. AXELRAD:  Yeah, The Ultimate Fighter.

13          MR. DELL'ANGELO:  Excuse me.

14          THE COURT:  Okay.

15          MR. AXELRAD:  -- "documents related to Pride,

16  Strikeforce and Top Tier, including Pride mutual releases,

17  fighter development program, THQ amendment, Octagon Girls, and

18  COVID-19 testing protocols."

19          THE COURT:  So other than the COVID-19 testing

20  protocols, Mr. Axelrad, the rest of that seems relevant to this

21  case, right.  And so why don't we figure out how we run the

22  searches against that same file folder.  The question is the

23  timing of that.

24          Mr. Dell'Angelo, what would you propose as a schedule?

25          And then I'll ask you, Mr. Axelrad, your response.

1          MR. DELL'ANGELO:  Well, since it's a central file and

2   the defendants have identified and knows -- knows where it is, I

3   would suggest, Your Honor, that the search term process that we

4   just outlined a little while ago before the break, they should

5   just run the search terms against that central file.

6          THE COURT:  Okay.

7          MR. DELL'ANGELO:  Let's get it done now.

8          THE COURT:  Well, there's two separate issues here --

9          MR. DELL'ANGELO:  Yeah.

10         THE COURT:  -- when we do the search terms.  One is --

11  which I think they can do fairly quickly, is run the searches,

12  and if you have revision, run the searches --

13         MR. DELL'ANGELO:  Yeah.

14         THE COURT:  -- revised searches.  There's a separate

15  issue about producing what's in the report.

16         MR. DELL'ANGELO:  Yes.

17         THE COURT:  From what I hear from Mr. Axelrad is they

18  don't have an issue with running the searches.  That's not

19  what's time-consuming.

20         MR. DELL'ANGELO:  Okay.

21         THE COURT:  What's time-consuming is you get it

22  narrowed down to a group of documents, which is still going to

23  be somewhat voluminous, and now they have to do their due

24  diligence and review those and decide what should be produced.

25         So I think the question is we don't know how long it

1  would take to produce the material --

2       MR. DELL'ANGELO:  Right.

3       THE COURT:  -- until we know what the search results

4  are.

5       MR. DELL'ANGELO:  Right.

6       THE COURT:  And if I'm -- if I'm understanding you,

7  Mr. Axelrad, in terms of what your position is regarding the

8  timeframe.  Is that accurate?

9       MR. AXELRAD:  That's correct, Your Honor.  You know, I

10 mean, in the first instance, we'll have to extract all this

11 information from the company's servers --

12      THE COURT:  Right.

13      MR. AXELRAD:  -- which is not a -- and it doesn't

14 download on a zip -- on, like, a thumb drive, right.

15      THE COURT:  Right.

16      MR. AXELRAD:  We've got to get, like, vendors to show

17 up and do all this stuff and then get it up on a review

18 platform, have search terms applied, have it reviewed, and then

19 we -- then we can make a determination of what the universe of

20 documents is that hit on plaintiffs' search terms.  Then we can

21 determine how many man-hours it's going to take to review these

22 millions and millions of documents or however many --

23      THE COURT:  Right.

24      MR. AXELRAD:  -- hundreds of thousands of documents.

25      THE COURT:  So let me ask you this one question,

 1  Mr. Axelrad, as relates to the fighter file.  I thought that

 2  that had already been downloaded for a vendor to review because

 3  it sounds like you all have done some review of that.  So maybe

 4  you reviewed at least subfolders or some portion of that.  So

 5  I'm trying to figure out why I shouldn't put the search schedule

 6  for that file folder on the same schedule that I set earlier.

 7          Is that inaccurate?

 8          MR. AXELRAD:  I don't believe that the fighter file in

 9  its entirety has been extracted from the company's servers.

10          THE COURT:  Okay.

11          MR. AXELRAD:  And so we will certainly set about doing

12  that immediately today.

13          THE COURT:  Okay.  So what we're going to do is this,

14  right.  I'll give you all a week to extract the fighter file.  I

15  think that's sufficient time.  And then what will happen is,

16  Mr. Dell'Angelo, you all will have to give them search terms by

17  January 19th.

18          MR. DELL'ANGELO:  Okay.

19          THE COURT:  Okay?

20          MR. DELL'ANGELO:  Yes, Your Honor.

21          THE COURT:  And so I'm going to do the same thing that

22  I did with the other one.  So January 19th, you do the first --

23  give them the information.  They run the report that day.  You

24  respond on, let's see, January 22nd, and they run another search

25  on January 26th, right.

1          And then you respond February 3rd, and then they run

2  their final report on February 6th for the fighter file.

3          MR. DELL'ANGELO:  Okay.  Thank you, Your Honor.

4          THE COURT:  All right.

5          MR. DELL'ANGELO:  And then the other thing, you know,

6  we'll at least try to communicate with the defendants about is

7  there is this whole concept in this process called go-gets,

8  right.  So if we understand that there are certain types -- so,

9  you know, I'm looking at the January --

10          THE COURT:  Mr. Dell'Angelo, I don't need to know these

11  details.

12          MR. DELL'ANGELO:  Okay.  Very well.  Thank you, Your

13  Honor.

14          THE COURT:  You all can work them out.

15          MR. DELL'ANGELO:  Okay.  I'll move on.  So continuing

16  with the JSR, then.

17          THE COURT:  Yes.

18          MR. DELL'ANGELO:  The next page, ECF Page 4 --

19          (Plaintiffs' counsel conferring.)

20          MR. DELL'ANGELO:  -- is the granular compensation data,

21  which is responsive to RFP Number 27.  There's been a bit of

22  discussion about this.  This is information that comes out of

23  the defendants' HUB database.  I think if I understand, you

24  know, where the parties are given the most recent

25  developments -- and maybe this can, sort of, be a colloquy here

1  with defendants -- that they're open to producing the granular

2  fighting, excuse me, data -- compensation data that plaintiffs

3  are seeking, but if I'm understanding correctly what they're

4  saying that there is, sort of, you know, unique categories or

5  file types or whatever within that system that we need to meet

6  and confer about to, sort of, resolve that.  Is that -- is

7  that --

8            THE COURT:  Is that accurate, Mr. Axelrad?

9            MR. AXELRAD:  I mean, what's happened so far, Your

10  Honor, is that we have produced compensation data.  If

11  plaintiffs would like additional, more granular compensation

12  data, we're not opposed to producing that to them.  And I think

13  we have set about trying to collect that data and will produce

14  it to --

15            THE COURT:  Okay.

16            MR. AXELRAD:  -- to --

17            THE COURT:  Well, initially, Mr. Axelrad, and I think

18  you were here for this, there was a discussion about whether or

19  not you had the same granular data.  But it turns out, as I

20  understand it now, that you all have gone back and looked at

21  that.  And I think I had that conversation with Mr. Chiu, if you

22  recall, I said -- there was this chart that I think Mr. Madden

23  had that he produced where he said, "This is missing.  We had it

24  in *Le*, but we don't have it here."  And you all said, "Well,

25  let's go look and see because we're not sure where it is."

1     So my understanding is that now you've had a chance to

2  look at that and you're aware that there may be more granular

3  data than was provided.  You're not sure it's to the same extent

4  that it was provided in *Le*, but there's more out there.

5     So what I am going to order you all to do is meet and

6  confer.  I'll give you until the end of this week to meet and

7  confer about the granular fighter data, right, and then you all

8  can have a discussion as to how it should be produced.  I think

9  it's relevant and I am going to order that it be produced, but

10  my understanding was that there was no objection to that from

11  the defendants.  The question was whether or not you all had it

12  and where it was and how you could produce it.

13     MR. DELL'ANGELO:  Thank you, Your Honor.

14     THE COURT:  So, Mr. Axelrad, I'm going to set the same

15  60-day timeframe for that with, I think, the understanding for

16  this one that this actually should hopefully be easier, but

17  we're going to go back -- I'm starting with a default of 60, and

18  then I may add to certain portions of this once you see the

19  entire list of what we're doing.  Okay?

20     But you all meet and confer about that.  The granular

21  data will be provided 60 days from today.

22     Anything else on this point, Mr. Dell'Angelo?

23     MR. DELL'ANGELO:  No, Your Honor.  Thank you, Your

24  Honor.

25     THE COURT:  All right.  Okay.  Let's move on.

1          MR. DELL'ANGELO:  Okay.  So the next item is Number F

2  -- sorry -- is Letter F, FightMetric data.  Again, I think we've

3  discussed this some with the Court, but basically there's two

4  things.  There's FightMetric data, and there's this Record Book

5  system.  And really, you know, we're just asking for a complete

6  response or a complete set of data from the FightMetric and

7  Record Book.  I think part of the response we've gotten from the

8  defendants before is some of its available from, you know,

9  online, go scrape the data.  There are a lot of --

10          (Court reporter interruption and clarification.)

11          MR. DELL'ANGELO:  Scrape, S-C-R-A-P-E, yeah, sorry.

12          There are a lot of, kind of, technical issues with

13  that.  But the bottom line is, you know, it's some highly

14  relevant information to the case, and we'd just like to have the

15  FightMetric and Record Book data produced.

16          THE COURT:  I think reviewing the submissions, I agree.

17  I'm going to order the same information be produced in 60 days.

18          MR. DELL'ANGELO:  Okay.

19          THE COURT:  Let's move on.

20          MR. DELL'ANGELO:  Thank you, Your Honor.

21          The next one is G.  There are a variety of missing

22  categories of documents.  And I think maybe based on, kind of,

23  how we've been working through this, Your Honor, the way to,

24  kind of, cut through this I would say is, you know, there are

25  negotiation documents.  There are --

1          THE COURT:  I'm going to stop you, Mr. Dell'Angelo.

2          MR. DELL'ANGELO:  Yeah.

3          THE COURT:  I'm ordering the defendants to produce a

4   wrath of material.  You're not going to know what's missing

5   until you've looked at all of that.

6          MR. DELL'ANGELO:  Right.

7          THE COURT:  So on this issue, I'm not ordering anything

8   because you're getting a whole bunch of new material.  And so

9   it's not clear to me that there's anything in here that you

10  might not get from what I've already ordered.

11         MR. DELL'ANGELO:  Right.

12         THE COURT:  Is there something specifically that is in

13  this missing category that's not part of what I have thus far

14  ordered the defendants to provide?

15         MR. DELL'ANGELO:  Yeah, I think -- I think the only

16  thing that may fall in that is to the extent that there are

17  responsive documents -- relevant responsive documents in the,

18  you know, accounting or finance files that are not subject that

19  you -- you can't find --

20         THE COURT:  And what would those be that they have not

21  already produced?  Right.  We have fighter contract and the

22  compensation data.  That's going to be in the fighter file.

23         MR. DELL'ANGELO:  Yep.

24         THE COURT:  I'm not sure what sort of information

25  you're talking about that has not already been produced that's,

 1   quote/unquote, missing.

 2           MR. DELL'ANGELO:  Right.  So there are these loan

 3   documents that we've talked about.  There are -- there are the

 4   broadcast deals.  I mean, these are some of the types of things

 5   that, you know -- that we think may live in the, kind of,

 6   accounting or finance side and not necessarily get captured by

 7   search terms.

 8           THE COURT:  Yes, I'm not sure how relevant some of

 9   those documents are to some of the substantive issues in this

10   case.

11           MR. DELL'ANGELO:  Yeah.

12           THE COURT:  So what we're going to do is I'm going to

13   table that for now because I think that we need to spend time

14   going through --

15           MR. DELL'ANGELO:  Yeah.

16           THE COURT:  -- what you're going to receive, and then

17   you can come back to me if you'd like to.

18           MR. DELL'ANGELO:  Right.

19           THE COURT:  But let's see what the other searches yield

20   first.

21           MR. DELL'ANGELO:  Sure.  The one thing on that, though,

22   Your Honor, I think we do need to address and there's some -- is

23   this Fighter Cost Walkthrough.  So on December 30th, the

24   defendants produced the first document about the Fighter Cost

25   Walkthrough.  I think there was some confusion where they

1  thought they had produced it before.  But, you know, again,

2  these are some -- really some of the most relevant documents in

3  the case.

4           You know --

5           THE COURT:  So I'm sorry.  For the Fighter Cost

6  Walkthrough, are they saying that they're not going to produce

7  it?

8           MR. DELL'ANGELO:  No.  It just -- we had discussed it

9  in our central file section of the JSR, so I just didn't want to

10 get it swept into something like now they don't have to produce

11 it.

12          THE COURT:  All right.  So have you requested it?

13          MR. DELL'ANGELO:  Yes.

14          THE COURT:  Have they said that they're not going to

15 produce it?

16          MR. DELL'ANGELO:  They have not.

17          THE COURT:  Okay.

18          MR. DELL'ANGELO:  And we've -- well, what they -- I

19 guess, yeah, what they've said is that they have produced it.

20 The only thing we really have is this December 30th document

21 that they produced that is a draft of the walkthrough.  And my

22 understanding is they do them every year, so we're just looking

23 for a complete set of the Fighter Cost Walkthrough.

24          THE COURT:  Okay.  So just request that, and they can

25 look for that.

 1          MR. DELL'ANGELO:  Okay.  Thank you, Your Honor.

 2          And then, you know, I think we can kind of cut through

 3   the rest of the JSR pretty quickly.  The second set that --

 4   Item H was the plaintiffs' second set of RFPs.  I mean, this is

 5   something we find -- we're a little perplexed by the defendants'

 6   position.  I mean, essentially their position is, "We're not

 7   going to respond to your second set of -- plaintiffs' second set

 8   of requests for production because you took too long to respond

 9   in the meet-and-confer process, and so you've therefore somehow

10   abandoned them even though, you know" --

11          THE COURT:  So here's what you're going to do.

12          MR. DELL'ANGELO:  Yeah.

13          THE COURT:  Based upon what I've already ordered

14   today -- not today.  I'll give you until the end of the week to

15   file a new request for production of documents by Friday.

16          MR. DELL'ANGELO:  Okay.

17          THE COURT:  Right.

18          MR. DELL'ANGELO:  Thank you, Your Honor.

19          THE COURT:  I'll give them 60 days from then to

20   respond.

21          MR. DELL'ANGELO:  Okay.

22          THE COURT:  And if you've already produced it,

23   Mr. Axelrad, you can let me know, and if there's some other

24   issue about timing, you can let me know.  What we will do,

25   Mr. Axelrad, and I will set aside time for us to do this, I

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1   would fully expect on the 4th and the 5th, we'll cut out a

2   little bit of time to talk about where we stand with some of

3   these discovery issues.

4           MR. AXELRAD:  Certainly, Your Honor.

5           THE COURT:  Okay.  Because by that time, you all should

6   have had sufficient time to meet and confer and get search

7   results to be able to tell me about the timing.  So why don't we

8   do this, Mr. Axelrad.  I'm going to set these all for 60 days.

9   Rather than you having to file in each of these cases a request

10  for additional time, we will set aside an hour or two on the 4th

11  and 5th to go through that.  That way, you're not having to

12  spend the time filing for each of these requests some document.

13          I'll just expect that before the 4th or the 5th --

14  here's what we'll do as it relates to that.  Before the 4th or

15  the 5th, let's say, January 26th which the same date you're

16  doing everything else, Mr. Axelrad -- so I'm sorry.  Let's do

17  January 30th.  On January 30th, the parties will file with me a

18  joint -- another Joint Status Report that covers these areas,

19  and in that what I expect, Mr. Axelrad, is the parties' position

20  as to the timing of when things should be produced for these

21  different categories, right.

22          MR. AXELRAD:  That's very helpful, Your Honor.  Thank

23  you.

24          THE COURT:  Right.  So you can go through and say --

25  the plaintiffs can say, "We think it should take this amount of

1    time."  They say -- the defendants can say, "We think it should

2    take this amount of time.  Here's where we've met and conferred

3    and we've agreed, and here's where we've differences.  We are

4    willing to produce that, but we think this is irrelevant."  Just

5    like you've all done in this other Joint Status Report, do that

6    by January 30th.  And then when we come back on the 4th and 5th,

7    we'll set aside sometime to do this.

8           Now, hopefully, again -- I think I want to set a page

9    limit because you guys can go on for a little bit of time,

10   right.  No more, I think at this point, than 15 pages.  That

11   should cover all of what we have, right.  And we'll be able to

12   discuss more, but I would fully expect at that point in time to

13   hear back from you.

14          And so what I'm looking for in that report,

15   Mr. Dell'Angelo and Mr. Axelrad, is "We did the search on the

16   fighter file.  It yielded this many documents.  We deduped it.

17   We did these other things.  It still yielded 2 million

18   documents.  We think that process will take 60 days, 90 days to

19   go through it, and here 's what we think will happen in that

20   process."  Plaintiffs can say, "Well, we'd like for them to do

21   some additional work.  We think it will take less time.  Here's

22   why" or "We want additional searches."  But, again, 15 pages

23   summarizing that.

24          It will be really helpful, Mr. Axelrad and

25   Mr. Dell'Angelo, for you all to be as specific as possible about

1  the volume, the timeframe, and the categories of information.

2         MR. AXELRAD:  Certainly, Your Honor.  And this may be

3  wishful thinking, but I assume that Your Honor means 15 pages

4  total, so seven and a half pages per side.

5         THE COURT:  Yes.

6         MR. AXELRAD:  Thank you, Your Honor.

7         THE COURT:  Mr. Dell'Angelo.

8         MR. DELL'ANGELO:  Yes.  So the next item, Your Honor, I

9  think you preemptively addressed already, which is the

10  individual subpoena recipients.  I think you directed us to file

11  a motion to compel, and we'll do that.

12         THE COURT:  Yep.

13         MR. DELL'ANGELO:  The next is the defendants' trackers.

14  If you remember the summary, you'd ordered defendants to

15  produce -- to provide these trackers.  I would respectfully

16  suggest, Your Honor, that we can table this unless the Court

17  wants it updated.  It sounds like there's a lot of stuff

18  that's --

19         THE COURT:  No.  Move on.  That's good.

20         MR. DELL'ANGELO:  All right.  Very well.

21         And really I think the same thing with the -- the

22  disclosure requests we'd made.  I mean, we'd ask the defendants

23  to provide these spreadsheets.  We've -- or to fill in some

24  basic information about litigation holds and when they did

25  collections.  I think it would still be helpful if the Court

1    required them, you know, particularly as we come up to

2    September 4th or, sorry, February 4th to have that information.

3    I think one way or another, we'll get it.

4            THE COURT:  Well, you're going to get it as a result of

5    the searches --

6            MR. DELL'ANGELO:  Right.  Yeah.

7            THE COURT:  -- right, and the privilege logs.  So I'm

8    not sure why we would need to order it other than that.

9            MR. DELL'ANGELO:  Understood, Your Honor, and I think

10   that's kind of the thinking.

11           And then the last item here is the request for

12   admission, but I think I understood Your Honor to suggest that

13   to the extent that there are issues about the videos for which

14   we have served requests for admission, that the parties should

15   address that through a motion to compel.

16           THE COURT:  Well, no.  Okay.  I'm glad you asked that.

17   No.  So there's two separate issues here, right --

18           MR. DELL'ANGELO:  Okay.

19           THE COURT:  -- I want to separate.  Requests for

20   production of documents, you're going to file those at the end

21   of this week.

22           MR. DELL'ANGELO:  Yes.

23           THE COURT:  The request for admissions, I want to make

24   sure I'm understanding what would be outstanding from what's

25   being ordered and what you've requested --

1            MR. DELL'ANGELO:  Yeah.

2            THE COURT:  -- in terms of being admitted that would

3    still need to be responded to at this point.

4            MR. DELL'ANGELO:  So --

5            THE COURT:  Sorry.  And let me ask this, and is it not

6    better for me to order the same thing that I've done previously

7    to say update a new request for admissions, right, file it this

8    Friday.  I give -- they have to respond to that within 30 days,

9    and then we can have a conversation when we come back.

10           MR. DELL'ANGELO:  Yeah.  So I think the -- the issue,

11   Your Honor, is I'm not sure that our request for admission in

12   this instance would be susceptible to that process because the

13   dispute is we have asked the defendants -- we've provided them

14   with two types of videos, videos that we understand emanated

15   from the defendants and third-party videos.  And what we have

16   asked them to do is authenticate those statements.  And the

17   response in sum essentially is that they cannot authenticate

18   those statements, either because they're third-party videos or

19   they may not be complete.  And so there's just a dispute about

20   whether or not they can be authenticated by the defendants.  It

21   is something that they did in *Le*.  So, you know, reissuing the

22   RFAs, the requests for admission, wouldn't really change that.

23           THE COURT:  So that's the sole issue, then.

24           MR. DELL'ANGELO:  That is.

25           THE COURT:  Okay.  That's a little confusing.

1          Mr. Axelrad, maybe you can provide some detail.

2          MR. AXELRAD:  Certainly, Your Honor.

3          You know, what we got from plaintiffs was a request for

4   admissions based on various different video clips.

5          THE COURT:  Right.

6          MR. AXELRAD:  And where there are clips of the video,

7   but we are not provided with the entirety of the video, it's

8   hard for us to verify the authenticity of the video.

9   Typically --

10          THE COURT:  Now, were these videos that you all

11   produced or these were videos that they provided to you and

12   asked you to --

13          MR. AXELRAD:  I believe they're videos they provided to

14   us.  That's --

15          THE COURT:  Okay.  So none of them are videos that you

16   all produced.

17          MR. AXELRAD:  You know, I have to confirm, but either

18   they are videos that we produced and they are only asking us to

19   confirm a clip of them or they're videos that they're producing

20   to us from other sources, but I'll let Mr. Dell'Angelo --

21          THE COURT:  Because I'm trying to figure out,

22   Mr. Axelrad, if it's your own video, I don't see the difficulty

23   in confirming the statement within them in terms of what you

24   provided.  If it's not your own, right, and you're not clear

25   about whether or not there are missing portions of the video, I

1  can completely understand you saying, "We're not going to admit

2  to anything in the video without seeing the entire portion."

3          MR. DELL'ANGELO:  Yeah.  So, Your Honor, if I can help

4  with this --

5          THE COURT:  Sure.

6          MR. DELL'ANGELO:  -- issue.  There's two categories of

7  videos.  So some are videos that we understand are UFC videos.

8  They haven't been produced necessarily by the UFC, but we

9  understand it's a UFC video.

10          THE COURT:  Okay.

11          MR. DELL'ANGELO:  What we understood the defendants to

12  say with respect to that category of video is that they would

13  produce a complete version of that, but we don't have that yet.

14  So I think maybe Step 1 would be for anything that's a UFC

15  video, a defendant video, for them to produce a complete set.

16          THE COURT:  Well, they've said they're going to do

17  that, right?

18          MR. DELL'ANGELO:  Yes, but it's been quite a long time.

19          THE COURT:  Okay.  All right.  So we need a timeline

20  for that.

21          MR. DELL'ANGELO:  Yes.

22          THE COURT:  Okay.  All right.  But then you have

23  another category.

24          MR. DELL'ANGELO:  Yes.  Then the other issue is there

25  are sometimes third-party videos.  So I'll give you an example.

1  I don't know if this is an exact example from our RFAs, but it

2  would be consistent with them generally.  So maybe there's an

3  interview on ESPN where Mr. White is making statements.  And

4  what we did is we took that video and we said, "We would like

5  you to authenticate that that is Mr. White -- Mr. White is the

6  speaker in that video."

7          What we understood the response to be is, "We cannot

8  and will not do that because we don't know if that's a complete

9  version of the video."  And our question really is, A, do you

10  have it and, B, notwithstanding that, you can at least confirm

11  that that's in fact Mr. White as the speaker, you know.

12          THE COURT:  Well, I would say this, Mr. Dell'Angelo.

13  In this current era of technology and hallucinations and things,

14  I don't know that they could do that.

15          I think, Mr. Axelrad, what you could confirm is that he

16  gave an interview on a particular date.  That seems to me

17  something that you could confirm.  And if you had a copy of

18  that, perhaps you could do that.

19          MR. AXELRAD:  Yeah, I mean --

20          THE COURT:  I think that that's -- that to me -- but I

21  don't know that -- unless you had your own official version of

22  it, I'm not going to require them to confirm it --

23          MR. AXELRAD:  Yeah, in the normal course, Your Honor,

24  plaintiffs would put a video or a screenshot of a video in front

25  of a witness and ask them to confirm that that was them speaking

 1    on that day and the witness could lay the foundation for that

 2    particular video.

 3              THE COURT:  Or whoever produced the video.

 4              MR. AXELRAD:  Certainly, or whoever produced it.  I

 5    think the challenge that we're having here is that, for example,

 6    ESPN, we're not ESPN.

 7              THE COURT:  Right.

 8              MR. AXELRAD:  And if they want this video from ESPN,

 9    they need to ask ESPN for it.

10              THE COURT:  Right.

11              MR. AXELRAD:  You know, what I can say to Your Honor is

12    that we will take this back and look.  If there are particular

13    videos that they want us to determine, for instance, this ESPN

14    video that counsel is referring to, if we have the original,

15    that we can -- I don't see why we can't produce that.

16              THE COURT:  So here's what we're going to do.  For the

17    videos that the UFC has in its possession, it can provide the

18    full video within 60 days.  For videos that are -- that were

19    provided to you, but that are not your videos that you created,

20    within the same 60 days, you can provide, Mr. Axelrad, to the

21    plaintiffs what you received.  So if ESPN sent you the video,

22    you can give them what you received.

23              I'm not going to require, Mr. Dell'Angelo, the UFC to

24    affirm any of the statements except for videos that they

25    themselves actually produced.  Other than that, they won't be

1   required to do that.

2           Okay.  Any questions about that?

3           MR. DELL'ANGELO:  Not at this time, Your Honor.

4           THE COURT:  All right.  Mr. Axelrad, any questions

5   about that?

6           MR. AXELRAD:  Nothing, Your Honor, other than -- no.

7   Thank you, Your Honor.

8           THE COURT:  All right.

9           All right, Mr. Dell'Angelo.

10          MR. DELL'ANGELO:  That was -- that completes the list

11  in the JSR, Your Honor.

12          THE COURT:  Okay.

13          So as I've indicated, Mr. Axelrad, what we're going to

14  do, rather than filing the individual request for time, a Joint

15  Status Report on the 30th.  At that point in time you'll have

16  run, I think, almost all of these searches, and you'll have at

17  least, I would expect, conducted a preliminary review.

18          Now, the one thing I do want to be clear about,

19  Mr. Axelrad, what I don't want to have happen is for you to come

20  back to me and say to me, "I don't know how long it's going to

21  take.  I don't know how much there is."  I would expect by that

22  point in time you will have information that you can tell me

23  about the documents.

24          Now, when I say "I don't know how long it's going to

25  take," I don't mean that you're going to be able to identify it

1   down to the minute.  What I do mean is that I don't want you to

2   come back to me and say, "Well, this could take 100 hours or

3   this could take 1,000 hours, and I don't know now."

4         I will expect that the report on January 30th will

5   identify what you believe it will take.  I'm not saying I'll

6   give you that, but at least identify what you think it will take

7   as it relates to production of certain material.  And that way,

8   we can have a productive conversation on the 4th or the 5th.

9         MR. AXELRAD:  Certainly, Your Honor.  And I -- I would

10  just note that, for example, the 30 additional custodians was an

11  issue that was raised I think as early as September.  And so I

12  just want to be mindful that this has been an issue that's been

13  out there, and certainly we will give Your Honor a very

14  aggressive estimate for reviewing this stuff.  But I don't want

15  there to be an impression that we have been sitting on our hands

16  as it relates to these 30 additional custodians.

17        THE COURT:  No, look, Mr. Axelrad, I think I have tried

18  to be very clear as possible where I feel like there was a

19  violation of my discovery orders and where there wasn't, and

20  where you all have not been at fault for anything, I tried to

21  acknowledge that.  So as far as I know right now, I don't see

22  anything in the record that indicates you've been sitting on

23  your hands as relates to these 30 additional custodians.  They

24  had not been previously identified by the Court as such

25  explicitly in the same way in terms of production.  So now I'm

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1  doing that, and so now we can move forward.

2          MR. AXELRAD:  Thank you, Your Honor.

3          THE COURT:  All right.

4          MR. DELL'ANGELO:  And if I may, Your Honor.  Just so

5  the record's clear, we initially requested those 30 custodians

6  in July of 2025, just so there's no misunderstanding about --

7          THE COURT:  I understand there wasn't resolution.

8          MR. DELL'ANGELO:  I understand.

9          THE COURT:  I think what Mr. Axelrad was saying was

10 that they had not been explicitly ordered to provide information

11 and so it wasn't as if they had been ordered to provide

12 information or take action and they hadn't done it.  That's what

13 I understood to be his point.

14         MR. AXELRAD:  That's absolutely correct, Your Honor.

15 Thank you.

16         MR. DELL'ANGELO:  Okay.  Understood, Your Honor.  Thank

17 you.

18         THE COURT:  All right.

19         Okay.  I almost hesitate to ask this, but is there

20 anything else we need to address today?  Mr. Dell'Angelo?

21         MR. DELL'ANGELO:  I -- I think the only other thing,

22 Your Honor, that you had suggested you may want to address in

23 the minute order for today was the pending motion at 234 which

24 was the motion to compel and the interrogatories and any costs

25 and fees associated with that.

1              THE COURT:  I think that's something I can just do in a

2    written order.  I don't know that I need anything else.  The

3    same with the motion to dismiss in Davis.

4              MR. DELL'ANGELO:  Okay.

5              THE COURT:  I mean, but I'm not going to be coy here.

6    I'm going to deny the motion to dismiss.  I just have to issue

7    the written order and you'll see it.

8              MR. DELL'ANGELO:  Okay.  Thank you, Your Honor.

9              THE COURT:  All right.

10             Diego.

11             (Court conferring with law clerk.)

12             THE COURT:  I had one other question for you,

13   Mr. Dell'Angelo.  We do have this pending motion to compel

14   interrogatory responses.

15             MR. DELL'ANGELO:  Yes, Your Honor.

16             THE COURT:  And I've ordered a fair amount today, and

17   I'm wondering whether or not we should address that today, but

18   there's some overlap.  But some of it isn't.  Now, some of the

19   argument really has been just about evasiveness.

20             MR. DELL'ANGELO:  Right.

21             THE COURT:  But it does feel to me that you're going to

22   get some answers to some of this information based upon what I'm

23   ordering.  So I'm not sure it makes sense to address that today

24   until you see what you are going to get from what I've ordered.

25             MR. DELL'ANGELO:  So the --

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1           THE COURT:  Unless -- if you think there's something we

2    need to address today, we're all here, then you should bring it

3    up now.

4           MR. DELL'ANGELO:  Yeah, I do think that there's

5    something that would be particularly helpful with respect to

6    that motion and those interrogatories because part of what they

7    asked for are who are the negotiators, for example, and at what

8    time.  And I actually think that that may be information that

9    would be very helpful to have in our -- our -- on February 4th

10   and February 5th, right, to just have an actual definitive

11   answer.

12          THE COURT:  So here's what I want to make sure I'm

13   understanding.

14          MR. DELL'ANGELO:  Yeah.

15          THE COURT:  And, Mr. Axelrad, I'm sure you'll correct

16   me.  I thought Mr. Chiu had said they provided this information.

17          MR. DELL'ANGELO:  He did.

18          THE COURT:  And so I want to be clear about what

19   specific additional information you're requesting because I

20   don't know that it would be fair to them to say, you know, "Can

21   you be specific about which three people for this particular

22   contract for this fight negotiated that?"  So I'm trying to make

23   sure I'm understanding --

24          MR. DELL'ANGELO:  Yeah.

25          THE COURT:  -- what you're requesting because I feel

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1    like the parties are sort of talking, again, past each other.

2    What is it that you think they haven't provided?  Give me a

3    specific example.

4            And then, Mr. Axelrad, I'll ask you to respond to that.

5    Okay?

6            MR. DELL'ANGELO:  Sure.  I will say, though, as we

7    get -- Mr. Madden to my left here had prepared to argue this

8    motion, so I may defer to him on some of the details.  But to

9    give you an example and to answer your question, the

10   interrogatories don't ask, "Identify who negotiated each and

11   every contract."  It was, "Who are your negotiators during the

12   relevant time period?"  And what we got was, "Go see this

13   document" and, for example, it's a 2019 document.  And our

14   response is, "Well, okay, but that doesn't tell me who's your

15   negotiator in '18 or '20 or whatever."  And we're really just

16   saying, "Identify the person and the applicable timeframe."

17           So, for example, if the Court may remember Sean --

18   Mr. Silva --

19           THE COURT:  Right.

20           MR. DELL'ANGELO:  -- right, was a negotiator of many

21   contracts during the *Le* period, but by the time we got to the

22   class certification in 2017, no longer employed by the UFC.

23   Really -- so it's really just a matter --

24           THE COURT:  Okay.  So let's just be clear about the

25   information.

1           MR. DELL'ANGELO:  Sure.

2           THE COURT:  You want a list of individuals who are

3    negotiators by year for -- from what date to what date?

4           MR. DELL'ANGELO:  So I'm going to -- if you -- with

5    your indulgence, Your Honor --

6           THE COURT:  Because I just want to be very specific --

7           MR. DELL'ANGELO:  Yeah.

8           THE COURT:  -- about the list.  I'm going to ask you

9    about it, Mr. Axelrad, but I ask you to be specific about the

10   list.

11          MR. MADDEN:  We would like a list of negotiators from I

12   believe it's July 1, 2015, to the present, or at least till we

13   served these in early 2025.

14          THE COURT:  Okay.  So -- okay.

15          MR. MADDEN:  And there are two ways to do that, right.

16   You could do it by year, here are our people, or you could do it

17   by people and here are the years that they covered.

18          THE COURT:  Okay.

19          MR. MADDEN:  But what we have are, as Mr. Dell'Angelo

20   said, a series of documents and then a disclaimer that says,

21   "You can't rely on these documents," indicating that they were

22   negotiating or approving contracts for the entirety of the

23   period.

24          THE COURT:  Right.  Okay.

25          All right.  Well, okay.  Any reason why you cannot

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1  provide that, Mr. Axelrad?

2          That seems fairly straightforward.  That does not seem

3  a complicated piece of information.

4          MR. AXELRAD:  Your Honor, I guess the -- the

5  complicating factor here is that defendants filed -- excuse

6  me -- plaintiffs filed a motion to compel interrogatory

7  responses.  We gave responses, and I'm looking at our Amended

8  Interrogatory Response Number 5 which identifies a whole series

9  of individuals responsible for negotiating fighter contracts.

10  And I can list them out for you, but there's a whole --

11          THE COURT:  I'm sorry.  Is that filed in the record?

12  Maybe I missed it.

13          MR. AXELRAD:  It might be -- this might be a piece of

14  discovery transmitted between the parties.

15          THE COURT:  Okay.  So I guess my basic question is,

16  have you provided them with a list of all the negotiators for

17  contracts between July 1, 2015, and July 1, 2025?

18          MR. AXELRAD:  What we did, Your Honor, is provide them

19  a series of sample contracts that identify the fighter

20  negoti- -- those individuals responsible for fighter

21  negotiations.  If what they're asking for now, Your Honor, is

22  additional information that they just articulated for the Court

23  here about who was responsible for which dates, we can provide

24  that as well.  But this goes to the issue of the motion to

25  compel, which was originally as to compelling responses.  When

1  we gave the responses, plaintiffs changed their position and

2  said, "No, no, now what we're objecting to is the sufficiency of

3  your responses."

4         So that's a new -- new request in terms of the motion

5  to compel where we can provide that information, but I just want

6  to be clear about what's actually teed up in the motion to

7  compel.

8         THE COURT:  Okay.  Well, let's just -- because what I

9  want to do is I want to get a resolution for these issues.

10        MR. AXELRAD:  And we can provide that information, Your

11 Honor.

12        THE COURT:  Okay.

13        MR. MADDEN:  Your Honor, do you want to see the

14 response?

15        THE COURT:  No, I don't want to, Mr. Madden.  I'm just

16 going to order them to do it, and then we can go through each of

17 the interrogatories.  We don't need to go back and forth about

18 what may or may not have happened.

19        So what's the next -- so let's just go through it

20 again -- we might as well.  We're here -- for the

21 interrogatories.  Interrogatory Number 3, right, Mr. Madden, is

22 that you, too?

23        MR. MADDEN:  Yes.

24        So Interrogatory Number 3 asks them to identify each

25 and every person who's posted comments or information on

1  sports-related websites, social media, or other websites such as

2  YouTube with content relating to the MMA industry.  And we're

3  asking for both their employees and anyone that they used that's

4  not an employee --

5          THE COURT:  Right.

6          MR. MADDEN:  -- to post such material.  And they gave

7  us an organizational chart about their social media team as well

8  as one website for the UFC.  We asked them for the websites and

9  social media accounts.  They gave us one website for the UFC,

10  none for TKO, and said, "You can find TKO's website on the

11  Endeavor website."  That's the extent of their response there.

12          So we have identified, for example, that Mr. White had

13  engaged a woman who was referred to in a news article as Kristin

14  Twitter Baby.  There's a news article about that arrangement.

15  We have up until -- I believe it's January of 2015 from the *Le*

16  case.  We have a whole series of text messages between Mr. White

17  and her.

18          We don't know whether that arrangement continued beyond

19  that into our relevant time period, but that's what we're asking

20  for.  And what they have shown us is not a complete list.  It

21  doesn't answer all of the subparts.  It doesn't tell us what the

22  usernames or aliases that they were posting on.  It doesn't tell

23  us the websites that they were posting on.  So we're seeking a

24  complete response to that interrogatory.

25          THE COURT:  Okay.

 1          Mr. Axelrad.

 2          MR. AXELRAD:  Yeah, Your Honor, I'm not sure if --

 3  again, the goalposts have been moving here a little bit.  First

 4  they moved to compel responses to these interrogatories.  Now

 5  they're dissatisfied with the responses that they've gotten.

 6          THE COURT:  Well, but they can compel -- a motion to

 7  compel, Mr. Axelrad, can involve people providing or ordering to

 8  be provided a more complete response.

 9          MR. AXELRAD:  Certainly.  Certainly.

10          THE COURT:  So I guess I'm a little confused when you

11  say they're moving the goalposts because when I looked at my

12  notes about the interrogatories, these are the actual

13  interrogatories that they submitted.  It's not as if they're not

14  quoting the interrogatories that they actually propounded.  So I

15  guess maybe help me, when you say they're moving the goalposts,

16  what does that mean exactly?

17          MR. AXELRAD:  Well, the original motion to compel was

18  to compel responses, and at the time the motion to compel was

19  filed, we hadn't yet responded to these interrogatories.

20  They're amended responses.  We had indicated the date on which

21  we would be responding to them.  Nevertheless, plaintiffs filed

22  the motion to compel anyway, knowing that we were going to be

23  responding forthwith.

24          We amended our responses.  We then had a

25  meet-and-confer process where plaintiffs acknowledged that we

1  had amended our responses and withdrew their motion to compel as

2  to several different interrogatories.  They refused to withdraw

3  as to others and then filed a reply suggesting that their motion

4  was now as to the sufficiency of different responses.

5          We are certainly willing to engage in the

6  meet-and-confer process with them and work on these things, but

7  we didn't want to balloon the -- I think we were on a

8  sur-sur-sur-reply --

9          THE COURT:  Right.

10         MR. AXELRAD:  -- for Your Honor.  And so what I think

11 would be productive is if the parties were to go back, talk

12 through these amended interrogatory responses, find places if

13 Your Honor is inclined to --

14         THE COURT:  So, Mr. Axelrad, what I would like to do is

15 just go through them now --

16         MR. AXELRAD:  Sure.

17         THE COURT:  -- because, you know what, you all

18 unfortunately -- or fortunately, I mean, you're representing

19 your clients -- can't agree.  What I suspect will happen is

20 you'll come back to me where you all disagree.  So we're here

21 today.  We have time.  Let's just go through the interrogatory

22 responses, right, right now as relates to this.

23         So let's take Interrogatory Response Number 3 --

24         MR. AXELRAD:  Certainly.

25         THE COURT:  -- Mr. Axelrad.  I don't see why the

1  defendants can't provide that specific information.  And it

2  sounds to me like what you're saying is, "We provided some.

3  We're not saying we wouldn't provide more detailed information.

4  We simply got caught in the middle of the process of doing

5  that."

6         So is there any reason why you can't provide specific

7  detailed responses to Interrogatory Number 3?

8         MR. AXELRAD:  We can, Your Honor.

9         THE COURT:  Okay.  Perfect.

10         Interrogatory I think it's Number 5, is that the next

11  one?

12         MR. MADDEN:  So we've addressed part of 5 on the

13  negotiators of fighter contracts.  I guess what remains is

14  acquisitions and deals with broadcasters.

15         For acquisitions, they -- from what we can tell from

16  their response, because, again, the responses aren't clear --

17  and if Your Honor wants the responses, they are at 255-4 on the

18  Johnson docket.  So their response, as we understand it, lists a

19  number of acquisition and strategy personnel, organizational

20  charts, and a presentation that names Denitza Batchvarova as

21  someone with responsibility for negotiating these acquisition

22  contracts, but the response still doesn't include -- it doesn't

23  specifically say so.  When they say, "Here's a bunch of

24  documents that have strategy and acquisition personnel," they're

25  not saying that it's just her.

1          And the purpose, remember, of an interrogatory is so

2  that we can get admissions on the record, narrow issues for

3  trial.  And if we came to you down the road and we said, "This

4  is their response, it says it's just Denitza Batchvarova," they

5  would say, 'Well, no, that's not in fact" --

6          THE COURT:  Okay.  So, Mr. Madden, for Number 5, what

7  is it that you are asking?

8          MR. MADDEN:  Again, a list of who was responsible for

9  negotiating and approving acquisitions for the relevant time

10 period -- for all the years in the relevant time period.

11         THE COURT:  When you say "acquisitions," what do you

12 mean by "acquisitions"?

13         MR. MADDEN:  Acquisitions of any MMA promoter is the --

14 so it's regarding the acquisition of assets, income, or equity

15 interests of any MMA promoter is the --

16         THE COURT:  So when you say "responsible," who would

17 that be?  For example, obviously someone like Mr. White would

18 have been involved with this.  I'm not sure when you say

19 "responsible," what that means exactly.

20         MR. MADDEN:  Well, so if Mr. White is someone who's

21 responsible for negotiating the acquisition of an MMA promoter,

22 he should be listed in their response, but he is not.  So you're

23 sure he is, but they don't list him in the response.

24         THE COURT:  Yeah.  So, Mr. Axelrad, that doesn't really

25 make much sense to me as to why, for example, he wouldn't be

1  listed.  I mean, the record clearly indicates that he's involved

2  in these acquisitions.  And I want to avoid, Mr. Axelrad, this

3  sort of -- the whole cat-and-mouse thing --

4        MR. AXELRAD:  Yeah.

5        THE COURT:  -- with parties, and that happens all the

6  time in interrogatory responses and discovery, which is why

7  Courts have to get involved, but it cannot just be one person

8  who's involved with Interrogatory Number 5.

9        MR. AXELRAD:  Yeah.  No, it's not, Your Honor.  And I

10 think the response to Interrogatory Number 5 lists a number of

11 people.  And I'm just looking here.  I think it lists Lorenzo

12 Fertitta, Dana White --

13        (Court reporter interruption and clarification.)

14        MR. AXELRAD:  -- Lorenzo Fertitta, Dana White, Kirk

15 Hendrick, Joe Silva, Hunter Campbell, Ike Lawrence -- excuse

16 me -- Ike Epstein, Sean -- Sean Shelby, Mick Maynard, Tracy

17 Long.  It's not as if --

18        THE COURT:  Because we allowed sur-replies, right, and

19 you're saying those are the people you've identified

20 subsequently who are responsive.

21        MR. AXELRAD:  Those are the people we identified in our

22 amended interrogatory responses.

23        THE COURT:  Okay.  Mr. Madden?

24        MR. MADDEN:  That -- the plain language of their

25 interrogatory response that he omitted before that list of

1 people is those are the people who are involved in the sample

2 negotiations between Zuffa and professional MMA fighters.  So we

3 were just talking about acquisitions --

4           THE COURT:  So I accept that their representation today

5 is that that is a complete list in response to the interrogatory

6 that you have -- we just discussed, 5.

7           MR. MADDEN:  For all of the categories?

8           THE COURT:  Yep.  He's telling me that's what it is, so

9 that's what it will be.

10           MR. AXELRAD:  I'm sorry, Your Honor.  We may be talking

11 past each other.  I'm talking about negotiations.  Mr. Madden is

12 talking about acquisitions.

13           THE COURT:  Okay.  Well, that's why we're here.  So one

14 of these issues is negotiations.

15           What are you talking about, Mr. Madden, as it relates

16 to the list of names and acquisitions?

17           MR. MADDEN:  Yes, so the interrogatory has several

18 parts.

19           THE COURT:  Okay.

20           MR. MADDEN:  It's asking for the individuals

21 responsible for, quote, negotiating or approving any of four

22 types of agreements.  The first type of agreement is for the

23 acquisition of an MMA promoter.  The second and third types

24 relate to negotiations with fighters for their services.  And

25 the fourth is broadcast agreements.  And so he keeps quoting

1  just the part about negotiations with fighters and not the other

2  parts.

3       THE COURT:  Okay.  So, Mr. Axelrad, are those

4  individuals also involved in the sub- -- other subparts?

5       MR. AXELRAD:  Your Honor, I think we cited -- what we

6  did was cite, under Rule 33, the plaintiffs to a number of

7  different Bates-stamped documents.

8       THE COURT:  Okay.  No.  But that's not my question.  My

9  question is are those individuals responsible for the other

10  subparts of the interrogatory.

11      MR. AXELRAD:  I -- you know, without looking at those

12  Bates-stamped documents in front of me, I can't say, but we

13  could certainly break that out.

14      THE COURT:  Okay.  So what I'm going to direct you to

15  do is to provide an affirmative "yes" or "no" or provide other

16  information to the subparts.

17      MR. AXELRAD:  Certainly, Your Honor.

18      THE COURT:  Okay.  Let's move on.

19      MR. MADDEN:  Interrogatory Number 6, Your Honor,

20  relates to those involved with negotiating or approving

21  compensation for any professional MMA fighter and the

22  matchmaking function that's related to that.

23      THE COURT:  So that seems to me similar to what I

24  ordered for Interrogatory Number -- was it 1 that we had here,

25  too?

1           MR. MADDEN:  I think it was 5.  It's the portion that

2  relates to negotiating --

3           THE COURT:  Oh, 5.  I'm sorry.

4           MR. MADDEN:  -- and approving the contracts.

5           THE COURT:  Right.

6           MR. MADDEN:  And so I guess the piece that's sort of

7  missing here are two things.  One relates to matchmaking, and

8  one relates to the setting of compensation levels more broadly.

9  So if you'll recall, Your Honor, we had evidence in the *Le* case

10 where they changed the structure of their standard contracts.

11 They had an entry-level contract.  They had a second contract.

12 And they, quote, moved the minimum.  That analysis and process

13 was run by individuals.  And we found out about that very late

14 in the *Le* process, and we want to find out about it in this case

15 now.

16          And all that --

17          THE COURT:  So I'm sorry.  You want to find out

18 specifically what information again, Mr. Madden?

19          MR. MADDEN:  About the compensation structure of their

20 fighters.  So they have a standard initial contract that they

21 offer to fighters.

22          THE COURT:  Right.

23          MR. MADDEN:  And so who's involved in deciding what the

24 levels of compensation are on those standard contracts, who's

25 involved at the second level.

1          THE COURT:  Right.

2          MR. MADDEN:  And is there a contention that it is just

3    these two matchmakers that they have identified or -- and they

4    need to be clear about that, then.  Or --

5          THE COURT:  So who are the two people again who they've

6    identified?

7          MR. MADDEN:  Well, so I infer from their talent

8    relations personnel citation and their, quote/unquote,

9    references to UFC matchmakers that they are referring to Sean

10   Shelby and Mick Maynard, but we have other indications that the

11   matchmakers extent beyond that and include Hunter Campbell and

12   Dana White along with those other two on a group text that does

13   matchmaking functions.  We have a couple of examples of this

14   matchmaking-labeled group text.

15         THE COURT:  Okay.

16         MR. MADDEN:  And then just generally, again, what we

17   found out late in the *Le* case is that their accounting and

18   finance groups were involved in setting compensation.  So we --

19   we also want that identified to us.

20         THE COURT:  Hold on a moment.

21         (Pause.)

22         THE COURT:  So again, thus far, who's been identified

23   for Interrogatory Number 6?

24         MR. MADDEN:  So the, quote, key talent relations

25   personnel, and I'm going off of memory here, they have three

 1  identified here.  It would include, I believe -- I want to say

 2  Dana White's on it.  I'm not certain on that.  But that includes

 3  Sean Shelby and Mick Maynard, and one of them includes a person

 4  named Christoph Goessing, or Goessing, who is not a custodian in

 5  this case, but he's on the list of 30 that we've proposed.

 6           THE COURT:  So you just wanted confirmation of the

 7  individuals who were involved with that process.

 8           MR. MADDEN:  So, yes, and -- so those are the

 9  individuals in -- to some extent who are doing the negotiations

10  with fighters who are -- who are discussing with White and

11  Campbell matchmaking functions, but we also want the accounting

12  and finance folks who are charged with setting compensation

13  levels more structurally.

14           THE COURT:  I'm not sure what that means because if --

15  my recollection --

16           MR. MADDEN:  Yeah.

17           THE COURT:  -- from the Le case is -- let's just take

18  Mr. Silva, right.  They had a -- they had a structured level, a

19  tier level, for the compensation.  He, in consultation with

20  Mr. White, I think, and maybe Mr. Fertitta, they set that, and

21  then it was his job basically to apply it as it related to

22  matchmaking.  I don't recall anyone being discussed in a

23  substantive way from the finance department, other than maybe

24  producing the compensation, as connected to that.

25           So I'm not sure what it -- who you're looking for

1   because certainly someone in finance might have had to draw up

2   the contract or something to that effect, but my understanding

3   from at least the prior case was that the matchmaker, whoever

4   that person was, was the one who slotted people into whatever

5   the tier levels that had previously been agreed to.

6          MR. MADDEN:  So I think you're -- we're partially

7   understanding each other -- understanding each other here.  So

8   when you say "slotted into the tier levels," what I'm getting at

9   here is there were materials in *Le* that set those tier levels.

10  There was an analysis performed within finance, it was approved

11  by the executives, and that's what we're trying to get at here.

12         THE COURT:  You want to get the documents or you want

13  to get the person who was responsible for doing that?

14         MR. MADDEN:  Well, the first step is figuring out who

15  the person is responsible, and then it's making sure that they

16  have been targeted with the document collections.

17         THE COURT:  Okay.

18         Mr. Axelrad?

19         MR. AXELRAD:  Your Honor, I mean, if Your Honor is --

20  is ordering us to search for and locate that information, we

21  can.  I would just note that the response to Interrogatory

22  Number 6 includes an organizational chart that identifies talent

23  relations leadership Dana White, Sean Shelby, and Mick Maynard.

24         THE COURT:  Well, I don't want to go back and forth

25  with an org chart.  I want you just to provide specific

1   information in response that identifies the individuals, right.

2   So I don't want to go back and forth, Mr. Axelrad, with, like,

3   "I'm pointing you to this document."  I want there to be a

4   specific answer that says, "Here are there individuals

5   responsible."

6        And so in the Le case, it was very clear, Mr. Silva did

7   this for this group of fighters for this period of time.

8   Mr. White or Mr. Fertitta would come and in, and they would

9   approve this, and this was the process.  I don't think that

10  there's any, honestly, confusion about how this process works at

11  the UFC.  There's plenty of information in the record that

12  identifies the relatively small group of individuals who are

13  involved with this process, right.  What they're looking for,

14  which they are entitled to, is the defendants saying, "These are

15  the people," even though there's a good idea of who the people

16  are.

17       So just a clear statement as to who the individuals are

18  in response to Interrogatory Number 6 seems to me to be what is

19  needed.  So I'm going to order a response to that.

20       All right.  Let's move on.  Mr. Madden.

21       MR. MADDEN:  Yes.  I think 7 and 8 are -- are sort of

22  paired in that they go together.  So what 7 asks for is for them

23  to identify who the competitors were for both putting on events

24  and for signing fighters.  And what their response does is it

25  cites three documents.  One of them is a 2016 presentation where

1  they say, "This lists MMA competitors including," and they list

2  a handful of competitors.  And then the second document is

3  viewership data also from 2016, and then the third document is

4  TKO's 2023 annual report.

5       THE COURT:  So let me ask you this question.  What you

6  want is who they viewed as their competitors for the relevant

7  period.

8       MR. MADDEN:  Yes, but both for putting on events and

9  the audience, sort of, competitors.  And then the other one is

10 for signing fighters, and that's where Interrogatory Number 8

11 comes in, which asks, "Who are the promoters that signed

12 fighters that you wanted that you couldn't get because they were

13 signed by someone else."  And they only, in fact, in that

14 response, in response to 8, list I believe seven fighters that

15 went to three different promoters over a nonoverlapping period

16 from 2018 to 2023.

17      And so I don't have a clear statement in response to

18 Interrogatory Number 7 that is those three.

19      THE COURT:  All right.  Thank you.  All right.  I got

20 you.

21      So, Mr. Axelrad, again, this seems fairly

22 straightforward to me about identifying these individuals

23 because what I will tell you is that if they're not identified

24 in an interrogatory response, if the case were to move forward,

25 you couldn't use them in any other context here.  You couldn't

 1  use them in an opposition to a certification motion, and you

 2  couldn't use them in an opposition to a summary judgment motion.

 3  And I know that you're going to do that because you've

 4  essentially said that you're going to do that in some of your

 5  motions already.

 6          So is there any reason why, where we are now, you can't

 7  give those specific answers?

 8          MR. AXELRAD:  Your Honor, we are certainly prepared on

 9  Your Honor's order to supplement our amended responses.

10          THE COURT:  Because what I don't want to have happen,

11  Mr. Axelrad, I don't want any more interrogatory responses that

12  point to documents.  I want the response to be the response,

13  right, so that there's no discussion about, "Well, we pointed to

14  this org chart that told us this," right.  The interrogatory

15  response should be very clear and specific, and it should say,

16  "Here were the people we viewed as our competitors," right.

17          You all have actually partially already done this in

18  some of the documents that you've filed, so it's not, again, a

19  mystery, but it has to be acknowledged, as you know, in an

20  interrogatory response so that it's clear in the record who you

21  all viewed as your competitors, what were fighters that were not

22  signed, and I know that you all have a list of those because you

23  referenced that in terms of arguments to me.  So I just want it

24  to be clear for Interrogatories 7 and 8 that that be listed out.

25  Okay?

1          MR. AXELRAD:  We can do that, Your Honor.

2          THE COURT:  All right.  Thank you.

3          Last one is Interrogatory Number 9.  Is that right?

4          MR. MADDEN:  Well, I'd like to just revisit just

5    another part of 8.  8 had several subparts for which we don't

6    have a response including, like, what the offers were that the

7    UFC made to the fighter before the fighter decided to go with

8    someone else.  And so we'd like that to be included in any

9    listed fighter in Number 8.

10          And Number 9 is the fighters that they cut and --

11          THE COURT:  Well, okay.  So, again, I'm going to just

12    order them to respond with specific information.  I do want to

13    be clear, Mr. Axelrad, if it's not in the interrogatory

14    response, it can't be brought up to me later.  And I say that

15    because this is going to be a crucial part of me understanding

16    whether or not, in fact, there was market power and whether or

17    not there was market dominance.  And, right, I'm going to want

18    to consider, as I did in the first case, what other promoters

19    may have offered, what the wages may have been, who the

20    competitors were.  So I just want to be clear to both sides, but

21    particularly to the defendants, that if you want to use it as

22    you did like in the first case and as you've referenced in some

23    filings, just make sure it's in the interrogatory response.

24          Now, if it gets to the point where some of this

25    granular data requires further time to provide it, that's a

1  separate issue because I do think if you're asking, Mr. Madden,

2  for them to provide every single offer or counteroffer as

3  relates to fighters who they didn't sign, that's not necessarily

4  a small -- it's not six or seven or eight fighters.  I would

5  imagine that it's potentially many more than that.

6         And so, Mr. Axelrad, I'll certainly give you the

7  opportunity to be able to provide that, but what I don't want to

8  have happen, Mr. Axelrad, is that down the road when I

9  eventually get a class cert motion and there are experts here,

10  the experts say, "Well, we considered all these other offers

11  that were never referenced, for example, in an interrogatory

12  response."

13         MR. AXELRAD:  So, Your Honor, I certainly appreciate

14  that.  What we're talking about here as it relates to amending

15  the responses -- I guess amending the amended responses here,

16  includes some pretty specific details and some pretty specific,

17  sort of, inquiry on our part to make sure that we have our arms

18  around this, especially given the seriousness and gravity of the

19  answers themselves.  So I just want to make sure that defendants

20  are afforded a sufficient amount of time to get our arms around

21  this, again, knowing that we have a number of other balls in the

22  air in the next couple months.

23         THE COURT:  So what I will do is I will give you 30

24  days for the interrogatory responses, given what we've talked

25  about with the understanding, Mr. Axelrad, you can come back to

1  me particularly on the issue of the counteroffers, because that

2  one seems to me to be the one that may go into some sort of

3  expert analysis and may in fact be -- I don't know -- could be

4  hundreds potentially of counteroffers that could take time.  On

5  that one, I will give you 60 days.  So that's Interrogatory

6  Response Number 8.

7       But you can come back to me when we have our meeting on

8  the 4th and discuss with me if you think you need more time

9  because, I mean, if the case proceeds, that's going to be

10  obviously not the entire ball of wax.  But that's a significant

11  area of dispute where the parties are going to be relying upon

12  that granular data to make arguments about the existence or not

13  of monopsony or monopoly power in the context of antitrust law.

14       So I'll give you 60 days for Interrogatory Number 8, 30

15  days for the rest, and then we'll talk about if there are any

16  other issues when we come back.

17       MR. AXELRAD:  Thank you, Your Honor.

18       THE COURT:  All right.

19       Okay.  Mr. Madden, anything else?

20       MR. MADDEN:  I have nothing further on this motion.

21       THE COURT:  Okay.  Well, I don't have any other...

22       I have nothing else that I have in my notes that we

23  need to address.

24       Mr. Axelrad, anything else from the defendants?

25       MR. AXELRAD:  No.  Thank you, Your Honor.

1          THE COURT:  All right.

2          Okay.  Thank you all for your time today.  I appreciate

3   your time.  We'll be adjourned on this matter.  Safe travels

4   back home.

5          MR. DELL'ANGELO:  Thank you, Your Honor.

6          MR. AXELRAD:  Thank you, Your Honor.

7          (Whereupon the proceedings concluded at 2:20 p.m.)

8                         --oOo--

9               COURT REPORTER'S CERTIFICATE

10

11       I, PATRICIA L. GANCI, Official Court Reporter, United

12   States District Court, District of Nevada, Las Vegas, Nevada,

13   certify that the foregoing is a correct transcript from the

14   record of proceedings in the above-entitled matter.

15

16   Date:  January 6, 2026.

17                              /s/ **Patricia L. Ganci**

18                              Patricia L. Ganci, RMR, CRR

19

20

21

22

23

24

25

# EXHIBIT B

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4   KAJAN JOHNSON, et al.,        ) Case No. 2:21-cv-01189-RFB-BNW
                                  )
5   MIKHAIL CIRKUNOVS, et al.,    ) Case No. 2:25-cv-00914-RFB-BNW
                                  )
6   PHIL DAVIS, et al.,           ) Case No. 2:25-cv-00946-RFB-BNW
                                  )
7                                 )
                   Plaintiffs,    ) Las Vegas, Nevada
8                                 ) Thursday, December 12, 2025
         vs.                      ) 10:53 a.m.
9
    ZUFFA, LLC; TKO OPERATING        STATUS CONFERENCE
10  COMPANY, LLC f/k/a Zuffa
    Parent, LLC (d/b/a Ultimate     **C E R T I F I E D   C O P Y**
11  Fighting Championship and
    UFC); and ENDEAVOR GROUP
12  HOLDINGS, INC.,

13                 Defendants.
    _____

14

15

16              REPORTER'S TRANSCRIPT OF PROCEEDINGS

17          THE HONORABLE RICHARD F. BOULWARE, II,
                  UNITED STATES DISTRICT JUDGE
18

19

20  APPEARANCES:        See Pages 2 and 3

21

22  COURT REPORTER:     Patricia L. Ganci, RMR, CRR
                        United States District Court
23                      333 Las Vegas Boulevard South, Room 1334
                        Las Vegas, Nevada  89101
24
    Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

```
 1  APPEARANCES:
    For the Plaintiffs:
 2
            MICHAEL GAYAN, ESQ.
 3          CLAGGETT & SYKES
            4101 Meadows Lane, Suite 100
 4          Las Vegas, Nevada 89107
            (702) 903-1353
 5
            MICHAEL C. DELL'ANGELO, ESQ.
 6          PATRICK F. MADDEN, ESQ.
            JEREMY GRADWOHL, ESQ.
 7          BERGER & MONTAGUE, P.C.
            1818 Market Street, Suite 3600
 8          Philadelphia, Pennsylvania 19103
            (215) 875-3000
 9
            DANIEL GIFFORD, ESQ.
10          COHEN MILSTEIN SELLERS & TOLL, PLLC
            88 Pine Street, 14th Floor
11          New York, New York 10005
            (617) 877-0508
12
            ITAK MORADI, ESQ.
13          THE JOSEPH SAVERI LAW FIRM, INC.
            601 California Street, Suite 1505
14          San Francisco, California 94108
            (415) 500-6800
15
    For the Defendants:
16
            J. COLBY WILLIAMS, ESQ.
17          SAMUEL MIRKOVICH, ESQ.
            CAMPBELL & WILLIAMS
18          700 South 7th Street
            Las Vegas, Nevada 89101
19          (702)382-5222
20          AARON T. CHIU, ESQ.
            LATHAM & WATKINS, LLP
21          505 Montgomery Street, Suite 2000
            San Francisco, California 94111
22          (415) 391-0600

23

24  ////

25
```

1 APPEARANCES CONTINUED:

2       **JOSEPH AXELRAD, ESQ.**
        **ROBERT MEDINA, ESQ.**
3       **ADAM B. PETERSON, ESQ.**
        LATHAM & WATKINS, LLP
4       10250 Constellation Boulevard, Suite 1100
        Los Angeles, California 90067
5       (424) 653-5500

6

7     LAS VEGAS, NEVADA; THURSDAY, DECEMBER 12, 2025; 10:53 A.M.

8                        --oOo--

9                   P R O C E E D I N G S

10          THE COURT:  Please be seated.

11          COURTROOM ADMINISTRATOR:  Good morning.  We have three

12 matters now before the Court, the first being *Johnson v. Zuffa,*

13 *et al.*, Case Number 2:21-cv-1189-RFB; the second, *Cirkunovs v.*

14 *Zuffa, et al.*, Case Number 2:25-cv-914-RFB; and the third being

15 *Davis v. Zuffa, et al.*, Case Number 2:25-cv-946-RFB.

16          Counsel, please make your appearances, beginning with

17 the plaintiffs.

18          MR. DELL'ANGELO:  Hello, Your Honor.  Michael

19 Dell'Angelo from Berger Montague on behalf of the plaintiffs.

20          MR. MADDEN:  Your Honor, Patrick Madden from Berger

21 Montague on behalf of the plaintiffs.

22          MR. GRADWOHL:  Hello, Your Honor.  Jeremy Gradwohl from

23 Berger Montague on behalf of the plaintiffs.

24          MR. GIFFORD:  Hello, Your Honor.  Daniel Gifford from

25 Cohen Milstein for the plaintiffs.

1         MR. GAYAN:  Good morning, Your Honor.  Michael Gayan,

2 Claggett & Sykes, also for plaintiffs.

3         MS. MORADI:  Good morning, Your Honor.  Itak Moradi for

4 the plaintiffs.

5         MR. CHIU:  Good morning, Your Honor.  Aaron Chiu of

6 Latham & Watkins for the defendants.

7         MR. AXELRAD:  Good morning, Your Honor.  Joseph Axelrad

8 on behalf of the defendants.

9         MR. WILLIAMS:  Good morning, Your Honor.  Colby

10 Williams, Campbell & Williams, for the defendants.

11        MR. MIRKOVICH:  Good morning, Your Honor.  Samuel

12 Mirkovich, Campbell & Williams, on behalf of the defendants.

13        MR. MEDINA:  Good morning, Your Honor.  Robert Medina,

14 Latham & Watkins, on behalf of the defendants.

15        MR. PETERSON:  Good morning, Your Honor.  Adam

16 Peterson, Latham & Watkins, also on behalf of defendants.

17        THE COURT:  Good morning.  So we're here on a couple

18 different matters that I want to address.

19        Now, in this case, Mr. Dell'Angelo, I know obviously

20 that you know that an appeal was filed in the Cirkunovs case.

21 And what I'd like for you all to address is, as I look at the

22 law in this, it certainly looks to me like you need a final

23 order to appeal as it relates to the case law.

24        The other question is whether or not the Court should

25 consider this to be a strategic or frivolous appeal given the

1  fact the Court's made findings that the reason why there's a

2  delay in this case is because of the defendants' violations of

3  the Court's orders.  And so in that instance, the Court does not

4  have to give up jurisdiction over the case.  The Court can, in

5  fact, proceed.

6        So, Mr. Dell'Angelo, I'll give you an opportunity to

7  respond to the issues that I've raised.

8        MR. DELL'ANGELO:  Sure.  Thank you, Your Honor.

9        In short, we agree with you.  The Ninth Circuit's

10  decision in *Van Dusen* makes it clear that a scheduling order or

11  a case management order, as it exists here, is not appealable

12  under the FAA.  And *Knapke* and *Hansen*, at the I believe

13  November 20th hearing, I had indicated that those cases or at

14  least the *Hansen* case made clear that a District Court's not

15  even authorized to dispose of a motion to compel arbitration

16  until it's resolved discovery disputes.

17        And even so -- and, you know, none of those authorities

18  appear in the defendants' filing, but even so, looking to the

19  *Coinbase* case, it makes clear that there needs to be a

20  determination on a motion to compel arbitration and that

21  District Courts do have a mechanism for determining whether or

22  not an appeal is frivolous.

23        The *Chuman* case out of the Ninth Circuit, sort of,

24  articulates that principle, and it was actually applied recently

25  in *Berland v. X CORP.*, 2025 Westlaw 3145181, out of the Northern

1  District of California where there the Court, on a question --

2  an appeal from a motion to compel arbitration, the Court looked

3  to the *Chuman* decision in the Ninth Circuit and said, "Yes, this

4  is the District Court.  I have the right to make a determination

5  about whether or not the motion to compel arbitration is

6  frivolous and other -- you know, whether the underlying case

7  should otherwise proceed."

8             So I think you're absolutely right, Your Honor.

9             THE COURT:  Okay.

10            Mr. Chiu.

11            MR. CHIU:  Your Honor, our position has always been

12  that -- coming out of the November 20th hearing where the Court

13  essentially ordered wide-ranging discovery into arbitration

14  issues, which we have objected to as essentially an effective

15  denial of the motion to compel arbitration, our position is that

16  that is an order that is appealable to the Ninth Circuit, which

17  we filed a notice of appeal, you know.  And we've made those

18  objections clear and --

19            THE COURT:  Well, I mean, I appreciate, Mr. Chiu, that

20  you all are not agreeing you violated discovery orders.  I mean,

21  obviously, I'm putting you in a position where I want to give

22  you a chance to state your position on the record.  To be fair,

23  obviously you've taken the position by filing the appeal that

24  you believe that the delay and the discovery that's ordered is

25  appealable, and we'll, I guess, hear back from the Circuit.  But

1   I wanted to, again, give you an opportunity to be able to raise

2   any additional arguments if you wanted to.

3          MR. CHIU:  Yes, I mean, that -- I think our position

4   has been clear.  We've -- on the -- on the motion to compel

5   arbitration, again, defendants have fully produced all the --

6   all the documents related to Mr. Cirkunovs' negotiations and

7   claims that we believe are more than sufficient for plaintiffs

8   to respond and for the Court to make a determination on the

9   pending motion and the ordering of additional discovery beyond

10  the scope of that which would map onto, as the Court has

11  recognized, merits issues and have little -- almost entire

12  overlap with the Johnson and Davis cases, in our view, is an

13  order effectively denying the motion to compel.

14         THE COURT:  Okay.  Thank you.

15         Well, and, Mr. Dell'Angelo, you referenced some cases.

16  I'm just going to ask you to file something in -- with the

17  record with the cites.  You don't have to do that necessarily

18  now.

19         MR. DELL'ANGELO:  Sure.

20         THE COURT:  You can file something later.  But you

21  referenced cases, and I typically like for the parties to have

22  the cites as well as the Court to have the cites.

23         MR. DELL'ANGELO:  Of course.

24         THE COURT:  So if you could file something that

25  references those cases --

1           MR. DELL'ANGELO:  I'll --

2           THE COURT:  -- I'll make a decision about that, but --

3           MR. DELL'ANGELO:  Okay.

4           THE COURT:  Because I want the record to be complete.

5           MR. DELL'ANGELO:  Sure.  I'll certainly do that, Your

6  Honor, and I would just note one -- one point with respect to

7  what Mr. Chiu said.  The *Van Dusen* decision, which is *Van Dusen*

8  *versus Swift Transport* -- it's 830 F.3d 893 (Ninth Circuit

9  2016) -- one of the factors that the Court made or considered in

10 making the decision there when it found that a decision-making

11 mechanism like a scheduling order, et cetera, is not a denial of

12 a motion to compel arbitration, it explicitly said that there's

13 not an effective -- it explicitly rejected the effective denial

14 theory, which I think is something that we just heard, and we've

15 consistently heard that delay or discovery examination, the

16 spoliation constitutes effective denial.  And I just wanted to

17 make clear that *Van Dusen* -- the Ninth Circuit's decision in *Van*

18 *Dusen* makes clear that it explicitly rejects the effective

19 denial theory.

20          THE COURT:  Well, I think there are two issues here

21 which I'm going to consider.  One is the effective denial

22 theory.  The other is the Court's prior findings that my

23 discovery orders were violated.  I don't know that there's any

24 case that would indicate that the Court should proceed with a

25 decision on a motion to compel arbitration where it finds that,

1    in fact, the party which has filed the motion has not complied

2    with prior orders.

3            MR. DELL'ANGELO:  Right.

4            THE COURT:  But I'll take a look at that and issue a

5    final decision on that.  That being said, I don't think it would

6    be appropriate until I decide that completely to address the

7    outstanding issues after we set that schedule for the hit lists

8    and all of that, other than just to check in to see prior to the

9    appeal being filed, I assume that the parties had followed the

10   schedule that the Court had set.

11           Is that correct, Mr. Dell'Angelo?

12           MR. DELL'ANGELO:  Plaintiffs certainly did.  There were

13   some opportunities that the Court gave to defendants such as --

14   one was to make discovery -- ask for specific discovery for

15   Mr. Cirkunovs, I believe it was by December 11th, and they did

16   not do that.  The other was to submit a competing list of search

17   terms and give detail about, you know, why they may or may not

18   work, as the Court discussed on December 4th, and to do that by

19   December 12th.  They have not done that as well.

20           That said, Your Honor -- well, let me just -- I've

21   answered that question, so...

22           THE COURT:  Right.  I mean, again, I know there's the

23   jurisdictional issue, but I want to at least figure out where we

24   are up to that point when the appeal was filed.

25           Mr. Chiu?

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1          MR. CHIU:  Yeah, Your Honor.  We have complied with

2     what the Court ordered in terms of with respect to providing

3     multiple hit reports in response to plaintiffs' three attempts

4     to narrow down.  You know, as the Court saw in the status

5     report, that still got us to around 3.8 million documents.

6          In terms of the defendants' counterproposal, you know,

7     that was an optional proposal.  We have not -- we did not

8     provide that, and that's because we were -- we rest on our

9     objection that based on what we have produced, it is complete

10    and that is the responsive universe for what would be necessary

11    for the Court -- for the plaintiffs to first respond to the

12    motion to compel arbitration and for the Court to decide.

13          THE COURT:  Okay.  Thank you.

14          The next issue which I want to address is the date for

15    the spoliation hearing because obviously that applies to the

16    other cases and discovery is proceeding in those cases.  And so,

17    as I indicated, the spoliation hearing will still proceed in

18    February.

19          Mr. Williams, you were going to give me dates, if I

20    recall, for those first two weeks.

21          MR. WILLIAMS:  Yes, Your Honor.

22          (Court reporter interruption and admonition.)

23          MR. WILLIAMS:  Your Honor, I have several dates to

24    provide the Court.

25          THE COURT:  Okay.

1          MR. WILLIAMS:  I did my best for the first two weeks of

2  February, but they go a little beyond that.  So for the first

3  week of February, I have February 4, 5, or 6.

4          THE COURT:  Okay.

5          MR. WILLIAMS:  And then because of other commitments

6  that were previously scheduled, Your Honor, I -- the next dates

7  I have are February 17, 18, 24, and 25.

8          THE COURT:  Okay.  Hold on just a moment.

9          (Court conferring with courtroom administrator.)

10          THE COURT:  Okay.  Thank you, Mr. Williams.

11          MR. WILLIAMS:  You're welcome.  Thank you.

12          THE COURT:  For the plaintiffs, the 4th or the 5th?

13          MR. DELL'ANGELO:  We'll make those -- we'll make those

14  work, Your Honor.

15          THE COURT:  Okay.  We'll set the spoliation hearing for

16  the 4th and 5th of February.  I'm just going to block the whole

17  day.  And we'll take Mr. White first and Ms. Long second.

18          Now, I wanted to talk a little bit about the testimony

19  and the issues there because we may or may not have an answer

20  back from the Circuit as it relates to the appeal on the motion

21  to compel arbitration.  I don't know.  But assuming that the

22  Court finds that it will defer its jurisdiction based upon the

23  appeal, we still have obviously the issue of Johnson and Davis

24  for the spoliation issues.

25          And, again, it seems to me that these witness

 1   interviews -- or I should say testimony will involve a few

 2   different areas.  One will essentially be to identify the

 3   respective duties of the individuals regarding the operations of

 4   Zuffa and the UFC, and then we can explore further their

 5   relationship to the record-keeping practices and their

 6   understanding of what records were and were not kept.  And then

 7   we can further explore what efforts they made or didn't make in

 8   relation to the preservation of documents and their awareness or

 9   not of the litigation hold in this case.

10          And I think particularly for Mr. White, given his

11   position and his apparent management of various details of the

12   organization, that could take the better part of the day or a

13   day and a half.

14          Now, I was going to ask both the plaintiffs and the

15   defendants if they thought there was any additional custodian or

16   individual who should be called who could provide further

17   details as it relates to the record-keeping of Zuffa.

18          Mr. Dell'Angelo.

19          MR. DELL'ANGELO:  So I'd like to give that a moment of

20   thought, Your Honor, but I think the short answer is yes.  And

21   there are -- you know, I think the complication I'm trying to

22   think through, Your Honor, is that the spoliation -- spoliation

23   issues potentially go far beyond Mr. White and Ms. Long and

24   trying to think about who else we might want to include in there

25   to make -- sorry -- to make that session productive, but also,

1   you know, whether or not there are, sort of, individuals at the

2   company who are responsible for retention, for retention

3   policies, collection, phones, that, you know, we're -- we're not

4   aware of those people, but could identify them kind of topically

5   that I think may aid the Court's inquiry as well.

6        THE COURT:  Well, I would fully anticipate,

7   unfortunately, that those two dates will not be the final dates

8   of the spoliation hearing.

9        MR. DELL'ANGELO:  Okay.

10        THE COURT:  In part, I want to give both the plaintiffs

11   and the defendants an opportunity, if something's referenced, to

12   be able to provide further detail.

13        So, Mr. Chiu, obviously the Court's determination of

14   potentially good or bad faith or issues of that matter may turn

15   on potentially the testimony of other individuals or records

16   that you may want to reference or the plaintiffs may want to

17   reference.

18        And so I just want to be clear to both sides that I

19   anticipate that we may have to have a follow-up day or two to

20   provide further context regarding the records because, as I

21   understand it, obviously Mr. White and Ms. Long are not, in

22   terms of the primary duties, record-keepers for the

23   organizations.  Now, they're obviously involved with the

24   creation of the records, but there may be other individuals.

25        So, Mr. Chiu, I don't know if you have anyone that you

1   all are going to request now or you want to think about that,

2   but it does seem to me that there's likely going to be at least

3   one or two people at Zuffa who might be able to provide some

4   context and potentially confirm or corroborate details regarding

5   representations made by Mr. White and Ms. Long.  Any thoughts

6   about that?

7          MR. CHIU:  Yeah, Your Honor, I mean, I think we could

8   think of potential individuals.  I think the issue, though, as I

9   understand it, is that right now there are -- there are two

10  custodians whose potential issues -- documents are at issue,

11  Mr. White and Ms. Long.  We're obviously continuing to work and

12  investigate that, and we're continuing efforts to try to figure

13  that out.

14          I think the issue -- the suggestion by Mr. Dell'Angelo

15  that there's potential other spoliation I guess is putting the

16  cart before the horse in terms of bringing other witnesses.  We

17  have not been faced with, you know, any argument or motion to

18  say that there's other sources.  We have not had a chance to

19  respond.  That issue's not teed up.  So, you know, the idea that

20  we're going to kind of jam in other witnesses there I think is

21  premature.

22          THE COURT:  It is.

23          MR. CHIU:  Yeah.

24          THE COURT:  I just don't want to be in a situation

25  again where it gets dragged out.  I would anticipate, for

1  example, that these witnesses may come in and say, "Well, that's

2  not my job.  That is Ms. Smith's job, and I trusted Ms. Smith to

3  do X, Y, and Z."  And that person's going to be named.  And then

4  of course it's going to lead potentially to Ms. Smith being

5  called, right, and you all potentially wanting to call this

6  individual or the plaintiffs wanting to call this individual.

7        And all I'm saying is it could certainly expedite

8  matters if you all met and conferred or you have any idea who

9  those individuals might be because it's hard for me to imagine,

10 Mr. Chiu, that they're not going to reference other employees as

11 having potentially some responsibility for some of the records

12 they participated in.  Because it's not simply their records,

13 but they may have in their records referenced other records.  So

14 then you're going to need to tell me, "That has already been

15 produced" or "It hasn't been produced" or "This person's

16 responsible for that."

17        And so given how much of the organization's operations

18 that both Mr. White and Ms. Long touched, it seems almost

19 impossible, Mr. Chiu, that we're not going to have some

20 follow-up with witnesses and/or briefing or documents that would

21 reference what they are going to say.  So that's why I'm asking

22 you this now, at least to think about that now, because to the

23 extent that the records remain unavailable, obviously then there

24 are arguments that have to be made about good and bad faith by

25 the Court and other efforts to retain the records.  And I assume

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1   you're going to want to present evidence of that.

2          So you don't have to answer now, but what I am saying

3   is if you all have information about that now, it works out

4   better in terms of scheduling for us to know that ahead of time.

5          MR. CHIU:  Just -- if I may, Your Honor.

6          THE COURT:  Go ahead.

7          MR. CHIU:  Just trying to -- the scope of the alleged

8   spoliation with respect to Mr. White and Ms. Long really relate

9   to a couple of devices, right.  So it's not -- there's no --

10  there's no issue with the e-mails and whatnot.  One thing that

11  comes to mind is, you know, to this idea of who else in the

12  organization was responsible for, for example, preservation and

13  whatnot could be done through, you know, declarations or things

14  like that to provide to the Court to tee up, you know, the

15  hearing if there are further questions about -- to the

16  individuals.  So we could do it that way.  I -- just sitting

17  here, you know, it seems premature to me just to offer up a

18  number of other witnesses on these issues as our investigation

19  is ongoing.

20         THE COURT:  You don't have to offer them up now.  I do

21  want to be clear about, sort of, the extent of the spoliation

22  hearing, Mr. Chiu, is that it's difficult for me to assess the

23  impact of the records being missing without knowing what's

24  already been produced.  So if you all are going to effectively

25  argue to me at some point, "They have everything that would have

1   been in these records," I need to know that, right.  And part of

2   that know is knowing who else might have touched the records

3   that are relevant.

4          And so while it is their records, in terms of assessing

5   the impact of the records being unavailable, I need to know

6   whether there are other sources for that information that had

7   been produced or in the process of being produced, right.  And

8   so I don't know, again, that you have to decide that now, but I

9   will tell you in terms of me deciding this issue, that's going

10  to be crucial information, as I'm sure you can --

11         MR. CHIU:  Yeah.

12         THE COURT:  -- imagine.  And so I just want to be able

13  to avoid a serial drip, drip, drip of the spoliation hearing to

14  the extent that can be worked out.  And, again, I know it's

15  going to be probably at least a few different hearings, but to

16  the extent that you all can meet and confer and discuss that, I

17  will leave that up to you, but I just wanted to identify that as

18  an issue moving forward.

19         MR. CHIU:  Just --

20         THE COURT:  I also want to identify or talk to you,

21  Mr. Chiu, about attorney-client privilege issues.  We have

22  hearing dates set.  And, I mean, I don't know if you've thought

23  about that or talked about that with your clients who are going

24  to be testifying.  But if they're going to get up there and say,

25  "I was told by counsel I didn't need to preserve these records

1  because someone else was doing it" or this, that, and the other,

2  we need to address that.

3          And I want to start with you to figure out how you'd

4  like to address that.  I don't want to stop the hearing in the

5  middle of it and then have to go into this.

6          MR. CHIU:  Yeah, I think our proposal would be if we

7  could, frankly, provide a brief to the Court on, kind of, these

8  privileged issues in the context of, for example, document

9  preservation, whatnot, and from there frame up, you know, what

10  the scope of -- of the potential questioning might be that, you

11  know, would not run afoul of privilege issues.  I think that --

12  you know, I think that's how we envisioned proceeding.

13          I think, you know, the Court is -- is right, and I was

14  just going to raise that next issue of how do we -- how do we,

15  kind of, sort through the potential attorney-client privilege

16  issues.  You know, my sense is there is a way to thread that

17  needle in terms of, you know, not invading the privilege, asking

18  the questions to the witnesses, but we would -- we would request

19  the ability to, kind of, brief the legal issues to the Court and

20  from there, kind of, frame up what our proposal would be --

21          THE COURT:  Right.

22          MR. CHIU:  -- as to, you know, what the -- what the

23  questioning -- scope of questioning would be.

24          THE COURT:  Right.  Because the central question's

25  going to revolve around knowledge of litigation holds, Mr. Chiu,

 1  right, I mean.

 2          MR. CHIU:  Right.

 3          THE COURT:  That's going to be the central issue.

 4          MR. CHIU:  The delicate part would be, you know, when

 5  does it invade into attorney advice, right, versus knowledge

 6  or -- knowledge of obligations or --

 7          THE COURT:  Right.

 8          MR. CHIU:  So...

 9          THE COURT:  Right.  And it would be helpful, Mr. Chiu,

10  if you all could offer some proffer about what extent there's

11  going to be a reliance on counsel in the briefing.

12          So I wouldn't want it to be the case that at the

13  hearing is the first time that I'm hearing about a certain type

14  of reliance or a certain type of a legal issue in terms of

15  privilege with respect to these two individuals testifying.  I

16  would anticipate that you all will speak with them and raise any

17  issues about privilege that are going to come up.

18          And, again, sometimes you can't anticipate all of the

19  questions, but, for example, if one of the witnesses is going to

20  say, "I had a specific conversation with Mr. Epstein and he told

21  me this is what I had to do versus this is what I didn't have to

22  do," I'd like to know that, Mr. Chiu ahead of time.  And that

23  seems like something that would come up in the context of

24  preparation of these individuals for their testimony, but that's

25  the kind of issue that could completely derail the hearing day

1    that we set aside because then we have to stop and address it.

2            So we'll set a hearing -- I'll set a briefing schedule,

3    but I do want the defendants in the briefing schedule to present

4    some proffer of what they anticipate will be potential reliance

5    on counsel and the extent of that.  Now, if you want to file

6    that under seal, you want to propose something to that extent

7    until I decide privilege issues, that's fine with some sort of

8    protective order.  But in the spoliation context, as you know,

9    the privilege actually is a little bit different than in other

10   contexts, particularly if there's going to be an implication

11   that counsel indirectly allowed an individual to destroy records

12   because then I have to give that attorney an opportunity, right,

13   to be able to address that.

14           So I want to know that, Mr. Chiu, ahead of time

15   because, as I'm sure you know, this can get very messy very

16   quickly depending upon what's said.  So I know you may not know

17   that now, but just to think about that, and I would expect it in

18   the briefing that you'll cover that.

19           MR. CHIU:  Understood.

20           THE COURT:  Okay.  I'm sorry, Mr. Chiu.  Is there

21   something else you wanted to raise?

22           MR. CHIU:  There was one other thing, and just so the

23   Court understands, you know, as it relates to Mr. White and

24   Ms. Long's devices, plaintiffs have -- and as part of the

25   disclosure with the carrier information, plaintiffs have now

1  subpoenaed a number of the carriers.  So as it relates to, kind

2  of, closing the gap and trying to figure out if, for example,

3  there are gaps in -- in device information that's lost, that

4  process has started.  I don't know that that -- you know, I

5  think that does bear on, kind of, what the Court is ultimately

6  going to need to determine in terms of if there was, in fact,

7  information that was lost, whether it's recoverable.  We're

8  obviously continuing to investigate, but just --

9         THE COURT:  Well, let me ask you this question about

10  that, Mr. Chiu.  Have these individuals requested that this

11  information be recovered?  Because they can specifically request

12  from these carriers access apart from the plaintiffs subpoenaing

13  information.  Has that been done?

14         MR. CHIU:  That process is in place, yeah -- happening,

15  yeah.

16         THE COURT:  So they have requested it, this information

17  from the carriers?

18         MR. CHIU:  My understanding is.

19         THE COURT:  Okay.  Because it would be helpful to know

20  that, too.  Look, if this information is later produced or is

21  able to be recovered, that presents separate issues.  And I

22  assume, as we've discussed previously, Mr. Chiu, if that

23  happens, you'll immediately let us know, but right now we're

24  going to move forward.  So thank you, Mr. Chiu.

25         Mr. Dell'Angelo, I don't know if you have anything else

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

 1  you wish to add as it relates to...

 2       MR. DELL'ANGELO:  I guess I just have a request for the

 3  Court's consideration regarding the briefing schedule, just that

 4  the Court consider maybe doing it on a relatively expedited

 5  basis because we'll need to be prepared by February 4th, so

 6  getting the proffer and having the shape of the defendants'

 7  perspective on this.  I mean, we did -- we did anticipate this

 8  issue based on your comments at the December 4th hearing and

 9  addressed some of this at Page 24 of our December 16th filing,

10  but, you know, we're happy to continue the briefing on that.

11       I mean, I think the general rule is that privilege

12  isn't really implicated in a spoliation once there's -- you

13  don't even need an actual finding of spoliation, just that there

14  is indicia of it.  So I think we've kind of got to that

15  threshold, but I understand that there are, you know -- the

16  Court's being very thoughtful about this, so there are -- we

17  need to be clear about the details of where we're going.

18       But just so we have, kind of, the shape of the table

19  for the February 4th and February 5th hearing, if we could set a

20  schedule that allows that to complete in advance.

21       THE COURT:  So check your calendars for January 6th.

22  Because part of what I want to do on January 6th is address the

23  issue of what's outstanding in discovery in Johnson.  That will

24  also impact the conversation about spoliation.

25       Mr. Chiu?

 1            MR. CHIU:  It's just availability on January 6th?

 2   Sorry.

 3            THE COURT:  What's that?

 4            MR. CHIU:  You're asking if --

 5            THE COURT:  Yes.

 6            MR. CHIU:  For a hearing?

 7            THE COURT:  I have very limited availability in

 8   January.  Otherwise, I'd give you all more dates.

 9            MR. DELL'ANGELO:  That date works for plaintiffs, Your

10   Honor.

11            MR. CHIU:  That works here, Your Honor.

12            THE COURT:  So what we will do on the 6th is by that

13   time I'm going to look at this issue about the jurisdiction as

14   it relates to Cirkunovs.  We have these issues as relates to

15   discovery responses in Johnson.

16            And I'm not sure, Mr. Dell'Angelo, if this chart is

17   about Johnson or if it's about Cirkunovs.

18            MR. DELL'ANGELO:  It's actually about Johnson,

19   Cirkunovs, and Davis.  So what this is, Your Honor, is this is

20   just Exhibit 2 to our December 15th filing.

21            THE COURT:  Right.

22            MR. DELL'ANGELO:  To the extent that we were going to

23   talk -- you --

24            THE COURT:  I can't even read that.  I mean, it looks

25   pretty, but I'm just telling you from --

```
 1              MR. DELL'ANGELO:  Thank you.  I actually think --

 2              THE COURT:  -- from this distance I can't read it at

 3    all.

 4              MR. DELL'ANGELO:  I do have -- we did make paper

 5    copies, but, you know, it is -- it is -- it is part of the

 6    December 16th filing.  We just thought if we were going to

 7    address the device disclosures.  The Court may recall, at the

 8    December 4th hearing you asked the parties to do a device -- an

 9    exchange about device disclosures, plaintiffs to go on

10    December 9th and defendants to respond by December 15th.  And

11    really what this reflects is just we -- we've taken all of the

12    device disclosures that we've received from defendants thus

13    far -- the voluntary one in April, the one that this Court

14    ordered in July, the one that the magistrate ordered in October,

15    as well as the December exchange -- and we've tried to condense

16    all of that information so you can kind of track when things

17    were disclosed, what it was disclosed, what we have, what's

18    missing.

19              THE COURT:  So you called this a condensed version?

20              MR. DELL'ANGELO:  Unfortunately, yes, this is as

21    condensed as it gets.

22              THE COURT:  Well, we're not going to get to that right

23    now --

24              MR. DELL'ANGELO:  Okay.

25              THE COURT:  -- because I have a couple basic
```

1   questions --

2           MR. DELL'ANGELO:  Okay.

3           THE COURT:  -- about Johnson.

4           And I'll start with you, Mr. Chiu.  In terms of what

5   has been produced, disclosed, and responded to, is there

6   anything that you believe is outstanding?

7           MR. CHIU:  Um --

8           THE COURT:  Is there anything that you're still, I

9   mean, producing or providing?  Because --

10          MR. CHIU:  Setting aside the search term, obviously,

11  dispute, yes.

12          THE COURT:  Setting aside the search term issue, right,

13  there are issues regarding the interrogatories and what has been

14  provided.  And some of your answers to some of these questions

15  seem to suggest that there may be still things that could be

16  produced, but it's helpful for me to know whether or not you're

17  simply saying that because you recognize your ongoing duty to

18  disclose something if you discover it versus we believe there's

19  things that exist that we have an obligation to produce that we

20  haven't produced yet but we're in the process of doing.

21          Do you have anything that falls into that latter

22  category?

23          MR. CHIU:  Yes, there's -- and we have been conferring

24  with plaintiffs on this.  The issue of, kind of, centralized

25  fighter files, things like that, we've been investigating.

1   We're in the progress of conferring with plaintiffs on that, but

2   that is forthcoming in terms of -- and this is kind of the --

3   some of the centralized files with respect to fighter

4   information and whatnot.  That is still in process.

5          And some other, kind of, centralized informational

6   files and data is, I would say, the kind of category of things

7   that we're still working through and that we anticipate to be --

8   you know, there to be some sort of additional production in

9   those categories of information.  But that is largely it,

10  notwithstanding obviously the outstanding disputes.

11         And then with respect to the device disclosure, you

12  know, our position is -- and we've provided this -- you know, we

13  haven't had a chance to respond to -- to, you know, the chart

14  and the suggestions, but from our perspective, we have provided

15  all of the additional information in terms of the disclosure,

16  carrier information for all of the remaining custodians for who

17  we have investigated and confirmed devices and numbers that they

18  used for work and any relevant information.  So from that

19  perspective, that is complete on our end.

20         THE COURT:  Okay.  Thank you, Mr. Chiu.

21         Mr. Dell'Angelo, do you agree with that in terms of

22  where we stand with the discovery?  I know that there are

23  disputes, right, and so I'm not talking about --

24         MR. DELL'ANGELO:  Right.

25         THE COURT:  -- the disputes.  What I'm trying to figure

PATRICIA L. GANCI, RMR, CRR

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

 1   out is there was a motion regarding interrogatory responses and

 2   related potential documents which --

 3          MR. DELL'ANGELO:  Yes.

 4          THE COURT:  -- I'm not going to resolve today, but I am

 5   going to resolve on the 6th.

 6          MR. DELL'ANGELO:  Okay.

 7          THE COURT:  But I want to know if there's other things

 8   out there.  Because for now at least, while we're doing

 9   spoliation, I'm going to handle the discovery.  It does not make

10   sense for me to have Judge Weksler do this because it's just too

11   much back and forth.  So I want to know what needs to be teed up

12   as it relates to discovery issues, and we'll handle those on the

13   6th of January.

14          And so besides the issues of the responses to the

15   interrogatories that are in your motion, is there anything else

16   that the Court would need to address?

17          MR. DELL'ANGELO:  Yes, there are a few, Your Honor.

18   And I think the -- resolving the texts, sort of, chat issue and

19   search terms are -- are -- you know, are going to drive a lot of

20   this.  But, you know, we do have competing proposals about which

21   custodians should be included in what search is ultimately done.

22          There is the outstanding question that the magistrate

23   had been considering, but understand that that's -- that's now

24   under your purview, Your Honor, about the second set of requests

25   for production of documents that the plaintiffs had served.  I

PATRICIA L. GANCI, RMR, CRR

1          MR. CHIU:  Thank you, Your Honor.

2          (Whereupon the proceedings concluded at 11:35 a.m.)

3                        --oOo--

4                COURT REPORTER'S CERTIFICATE

5

6      I, PATRICIA L. GANCI, Official Court Reporter, United

7   States District Court, District of Nevada, Las Vegas, Nevada,

8   certify that the foregoing is a correct transcript from the

9   record of proceedings in the above-entitled matter.

10

11  Date:  December 19, 2025.

12                              /s/ **Patricia L. Ganci**

13                              Patricia L. Ganci, RMR, CRR

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

1

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

|  |  |  |
|---|---|---|
| 1 | UNITED STATES DISTRICT COURT | |
| 2 | DISTRICT OF NEVADA | |
| 3 | | |
| 4 | KAJAN JOHNSON, et al., | ) Case No. 2:21-cv-01189-RFB-BNW |
| 5 | MIKHAIL CIRKUNOVS, et al., | ) Case No. 2:25-cv-00914-RFB-BNW |
| 6 | PHIL DAVIS, et al., | ) Case No. 2:25-cv-00946-RFB-BNW |

```
 1                  UNITED STATES DISTRICT COURT

 2                      DISTRICT OF NEVADA

 3

 4 KAJAN JOHNSON, et al.,        ) Case No. 2:21-cv-01189-RFB-BNW
                                 )
 5 MIKHAIL CIRKUNOVS, et al.,    ) Case No. 2:25-cv-00914-RFB-BNW
                                 )
 6 PHIL DAVIS, et al.,           ) Case No. 2:25-cv-00946-RFB-BNW
                                 )
 7                               )
                 Plaintiffs,     ) Las Vegas, Nevada
 8                               ) Thursday, December 4, 2025
          vs.                    ) 10:02 a.m.
 9
   ZUFFA, LLC; TKO OPERATING       STATUS CONFERENCE
10 COMPANY, LLC f/k/a Zuffa
   Parent, LLC (d/b/a Ultimate   C E R T I F I E D   C O P Y
11 Fighting Championship and
   UFC); and ENDEAVOR GROUP
12 HOLDINGS, INC.,

13               Defendants.
   _____

14

15

16           REPORTER'S TRANSCRIPT OF PROCEEDINGS

17         THE HONORABLE RICHARD F. BOULWARE, II,
                UNITED STATES DISTRICT JUDGE
18

19

20 APPEARANCES:        See next page

21

22 COURT REPORTER:     Patricia L. Ganci, RMR, CRR
                       United States District Court
23                     333 Las Vegas Boulevard South, Room 1334
                       Las Vegas, Nevada  89101
24
   Proceedings reported by machine shorthand, transcript produced
25 by computer-aided transcription.
```

```
 1  APPEARANCES:
    For the Plaintiffs:
 2
            MICHAEL GAYAN, ESQ.
 3      CLAGGETT & SYKES
        4101 Meadows Lane, Suite 100
 4      Las Vegas, Nevada 89107
        (702) 903-1353
 5
            MICHAEL C. DELL'ANGELO, ESQ.
 6          PATRICK F. MADDEN, ESQ.
            JEREMY GRADWOHL, ESQ.
 7      BERGER & MONTAGUE, P.C.
        1818 Market Street, Suite 3600
 8      Philadelphia, Pennsylvania 19103
        (215) 875-3000
 9
            DANIEL GIFFORD, ESQ.
10      COHEN MILSTEIN SELLERS & TOLL, PLLC
        88 Pine Street, 14th Floor
11      New York, New York 10005
        (617) 877-0508
12
            ITAK MORADI, ESQ.
13      THE JOSEPH SAVERI LAW FIRM, INC.
        601 California Street, Suite 1505
14      San Francisco, California 94108
        (415) 500-6800
15
    For the Defendants:
16
            J. COLBY WILLIAMS, ESQ.
17          SAMUEL MIRKOVICH, ESQ.
        CAMPBELL & WILLIAMS
18      700 South 7th Street
        Las Vegas, Nevada 89101
19      (702)382-5222
20          AARON T. CHIU, ESQ.
        LATHAM & WATKINS, LLP
21      505 Montgomery Street, Suite 2000
        San Francisco, California 94111
22      (415) 391-0600

23

24  ////

25
```

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1   APPEARANCES CONTINUED:

2         **JOSEPH AXELRAD, ESQ.**
          **ROBERT MEDINA, ESQ.**
3         **ADAM B. PETERSON, ESQ.**
          LATHAM & WATKINS, LLP
4         10250 Constellation Boulevard, Suite 1100
          Los Angeles, California 90067
5         (424) 653-5500

6

7       LAS VEGAS, NEVADA; THURSDAY, DECEMBER 4, 2025; 10:02 A.M.

8                          --oOo--

9                    P R O C E E D I N G S

10          THE COURT:  Please be seated.

11          COURTROOM ADMINISTRATOR:  This is the date and time set

12   for a status conference in cases 2:21-cr-1189-RFB-BNW, Johnson,

13   et al., versus Zuffa, LLC, et al.; Case Number

14   2:25-cv-914-RFB-BNW, Cirkunovs versus Zuffa, LLC, et al.; and

15   Case Number 2:25-cv-00946-RFB-BNW, Davis versus Zuffa, LLC, et

16   al.

17          Counsel, starting with the plaintiffs' side, please

18   make your appearances for the record.

19          MR. DELL'ANGELO:  Good morning, Your Honor.  Michael

20   Dell'Angelo from the law firm of Berger Montague.

21          MR. MADDEN:  Good morning, Your Honor.  Patrick Madden

22   for Berger Montague.

23          MR. GRADWOHL:  Good morning, Your Honor.  Jeremy

24   Gradwohl with Berger Montague for the plaintiffs.

25          MR. GIFFORD:  Good morning.  Daniel Gifford, Cohen

 1  Milstein, for plaintiffs.

 2        MR. GAYAN:  Good morning, Your Honor.  Michael Gayan

 3  from Claggett & Sykes for plaintiffs.

 4        MS. MORADI:  Good morning.  Itak Moradi for plaintiffs.

 5        MR. CHIU:  Good morning, Your Honor.  Aaron Chiu of

 6  Latham & Watkins for the defendants.

 7        MR. AXELRAD:  Good morning, Your Honor.  Joseph Axelrad

 8  from Latham & Watkins for defendants.

 9        MR. WILLIAMS:  And good morning, Your Honor.  Colby

10  Williams of Williams & Campbell for the defendants.

11        MR. MIRKOVICH:  Good morning, Your Honor.  Samuel

12  Mirkovich, Williams & Campbell, for the defendants.

13        MR. MEDINA:  Good morning, Your Honor.  Robert Medina

14  of Latham & Watkins for defendants.

15        MR. PETERSON:  Good morning.  Adam Peterson, Latham &

16  Watkins, for defendants.

17        THE COURT:  Good morning.  So we are here to do a

18  little bit of work today on some of these discovery issues.

19        And the first thing I wanted to check on on my list of

20  things to discuss is the update to the device disclosure list.

21  Mr. Dell'Angelo, can you talk to me about what information has

22  been provided beyond the carrier information thus far?

23        MR. DELL'ANGELO:  We received the carrier information

24  for Ms. Long and Mr. White on December 1st timely, I believe,

25  pursuant to the -- your order at the last hearing.  Otherwise,

1  we've not received any additional update since the last hearing,

2  Your Honor.

3          THE COURT:  Okay.

4          And, Mr. Chiu, I assume that the remaining carrier

5  information will be forthcoming for the other individuals who

6  are identified, correct?

7          MR. CHIU:  Your Honor, I think I did want to clarify

8  something with respect to the device disclosure.  Our

9  understanding is that, you know, with respect to Mr. White and

10 Tracy's phone, we've obviously provided the carrier information.

11 We're continuing to run down the gaps in the issues, so we're

12 continuing to investigate that.

13         With respect to the device disclosures, I think coming

14 out of the last hearing I just wanted to clarify because our

15 original disclosure did have and we have collected and imaged

16 apps, right.  And that was really the issue.

17         THE COURT:  I'm sorry.  Does that include the carrier

18 information?  Because apps can't -- for example, iCloud has its

19 own app, but it's also the carrier.

20         MR. CHIU:  Correct.

21         THE COURT:  So...

22         MR. CHIU:  So if we're talking about apps, I think our

23 under- -- I think there was a misunderstanding from the last

24 hearing because we did subsequently do a production of

25 information.  That was in response to a dispute we had before

 1   out today?

 2          MR. CHIU:  We can try, but it -- it involves, you know,

 3   analytics with our vendor.  So we can reach out right now and

 4   try to do that, but I -- I can't sit here and guarantee to the

 5   Court that we would --

 6          THE COURT:  No, I appreciate that, Mr. Chiu.  And I

 7   know that that's a lot of work and you all have a whole team

 8   here and it will get done tomorrow in terms of production.  And

 9   then after that you can have -- we can have a conversation.  But

10   I just think it would inform our conversation here.  But I

11   appreciate that update as it relates to that.

12          Anything else, Mr. Chiu, you wanted to update me about

13   as it relates to the production of material that we have

14   previously discussed?

15          MR. CHIU:  No, Your Honor.

16          THE COURT:  So one question I had related to that,

17   Mr. Chiu, is this issue of spoliation and what is and isn't

18   missing.  I take it from our prior conversation that as of now

19   the plaintiffs' representations about what may be missing for

20   Mr. Long -- excuse me -- for Ms. Long and Mr. White as of now

21   you have no reason to believe that that information is going to

22   be forthcoming or that you have it and are going to be producing

23   it.  Is that accurate?

24          MR. CHIU:  That's not accurate.  I think we're

25   continuing to run down these issues.  We're continuing to

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1  investigate.  It's taking some time.  So I don't want to sit

2  here and say it's a foregone conclusion that that information is

3  lost and missing.  We are -- we are continuing to look and

4  figure it out.

5       THE COURT:  Can you tell me more about that?  Because

6  obviously I'm going to set a spoliation hearing, and the last

7  thing I would want, Mr. Chiu, is like the day before the

8  hearing, right, all of a sudden data is discovered.

9       MR. CHIU:  Yep.

10      THE COURT:  And so it's helpful for me to have some

11 sense of the timing of that and, again, without disclosing, sort

12 of, attorney-client privileged conversations, right.  I just

13 don't want to say, like, two days before the hearing for

14 Mr. White and Ms. Long all of a sudden, right --

15      MR. CHIU:  Yeah.

16      THE COURT:  -- these texts and messages materialize.

17 That would be concerning to me.  So can you tell me when you say

18 that we're still searching, what that means?

19      MR. CHIU:  I want to be careful and just not disclose

20 privileged information, but we're undergoing the process of

21 going back and looking at, you know, why there is a gap and, you

22 know, is there -- are there devices or other places we can look

23 to see if information was not captured.  So that process is

24 ongoing.  I think it takes sometime.  We've been diligently,

25 kind of, working through that for -- and -- and as to --

 1          THE COURT:  Yes, but I'm sorry, Mr. Chiu.  Do you have

 2   an estimate for that?  And, look, I want to be honest.  As you

 3   know, Rule 37 has some fairly significant potential penalties

 4   for spoliation, and I don't want to start down that pathway

 5   until I've given you all enough time to be able to say, "We've

 6   tried and it's not here," right.  So I need a bit of an

 7   estimate, Mr. Chiu, about the timing of that because right now I

 8   intend to set the spoliation hearing late January/early

 9   February.  That seems to me to be more than enough time to be

10   able to clearly indicate whether this information exists or

11   doesn't.

12          MR. CHIU:  Yeah, I was going to propose, Your Honor,

13   that, you know, just being realistic as we kind of go through

14   that process, another month, month and a half as we kind of work

15   through that between vendors, you know, obviously talking with

16   individuals, and -- and undergoing that process, so...

17          THE COURT:  Okay.  Because one of the other things I

18   want to do today was to set a hearing date or a hearing range

19   for the spoliation hearing where at a minimum Ms. Long and

20   Mr. White would testify that's consistent with all of our

21   schedules, their schedule, because we're going to have to

22   obviously go back and forth and figure that out.  But I'm

23   looking at the first or second week of February to do that.  So

24   that's the other thing I was going to tell you all is you all

25   should look at your schedules and you should speak with at least

1   those two individuals, Mr. Chiu, to figure out what their

2   schedules are.

3          But I definitely want a date within that two weeks.  I

4   think that's a reasonable timeframe to offer to set the hearing,

5   and it's far enough out that I don't think there should be any

6   conflict issues.  And given what you've said, by that point in

7   time we should know one way or another if information's

8   forthcoming or if it's not likely to be produced.

9          Any reason why those dates wouldn't work, Mr. Chiu?

10         (Defense counsel conferring.)

11         MR. WILLIAMS:  Your Honor, Colby Williams.

12         Just we will need to run down the prospective

13  witnesses' schedules, as you just indicated, but subject to

14  that, I think that timeframe would work.

15         THE COURT:  Well, I don't want to go passed that.

16         MR. WILLIAMS:  No, I understand.

17         THE COURT:  So just when you're talking to the

18  witnesses, if those two weeks don't work, then we'll move it

19  into January, but I don't really, Mr. Williams, want to go

20  passed that.  And I do want to emphasize that this is obviously

21  an important matter and I appreciate people's schedules, but

22  absent something really extraordinary, someone having plans that

23  they've already made to be out of the country or a medical

24  procedure, I would expect that we would be able to find a day or

25  two within that range.

 1              MR. WILLIAMS:  Understood, Your Honor.

 2              THE COURT:  I appreciate you're hedging as lawyers do,

 3   but I do want to emphasize the significance of that hearing.

 4   And I think it will probably take -- I'm just going to block a

 5   whole day.  And we'll do Mr. White and Ms. Long preferably on

 6   the same day so that you all don't have to fly -- well, you're

 7   not flying -- but everyone doesn't have to fly back and forth.

 8   But I appreciate that.  Thank you, Mr. Williams.

 9              MR. WILLIAMS:  Right, we'll run it down, Your Honor.

10   And I understand the Court's directive.

11              THE COURT:  All right.

12              MR. DELL'ANGELO:  Your Honor, may I just request a

13   clarification on that?

14              THE COURT:  Yes.

15              MR. DELL'ANGELO:  Because I think at the last hearing

16   you had indicated that in advance of the anticipated spoliation

17   hearing that Mr. White and Ms. Long would sit for deposition on

18   these issues.  Is the plan to still do a deposition before that

19   hearing?

20              THE COURT:  Well, part of that depends in part,

21   Mr. Dell'Angelo, on what I hear from Mr. Chiu as it relates to

22   the status of their search.

23              MR. DELL'ANGELO:  Understood.  Okay.  Thank you, Your

24   Honor.

25              THE COURT:  Because, I mean, I don't -- honestly, I

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1  don't know that we need a deposition necessarily.  I think you

2  all can prepare questions and I'll have questions, right.  And

3  we can just come in here and just have the hearing.  I think the

4  issue with the deposition is that just prolongs this process,

5  and if I feel like we need to come back, we can always have them

6  come back, I mean.

7          But given my experience in this case, I think a depo

8  schedule and you all agreeing to questions and how that --

9  that's a whole set of hearings that we'd have to have regarding

10 that.  Now, we'll certainly agree to what the questions will be,

11 but, look, as relates to spoliation, the questions are fairly

12 straightforward in terms of what was known and not known about

13 the duty to preserve this information, what steps were taken or

14 not taken, who was involved.

15         I mean, the only issue that, Mr. Chiu, you'll have to

16 think a little bit about are privilege issues because that's

17 certainly going to come up in the context of this.  But, as you

18 know, the rules are slightly different when it comes to

19 spoliation and privilege.  You know, lawyers can't be advising

20 their clients in ways that destroy evidence.  So it's going to

21 be a bit delicate, and so we'll probably have to have a hearing

22 about the scope of the spoliation hearing before anyway.

23         But I don't see a reason, Mr. Dell'Angelo, unless you

24 think otherwise, to have a deposition.  I thought about that and

25 I had indicated that, but I think that's just going to prolong

1   this process.

2          MR. DELL'ANGELO:  I appreciate that, Your Honor.  I

3   mean, I think it could be helpful in setting up the hearing and

4   framing the issues, but I of course defer to Your Honor.  I just

5   wanted to raise it because you had mentioned it last time, and

6   to the extent that we needed to factor that into the schedule, I

7   just wanted to make sure.

8          THE COURT:  No, but what we will have is we'll have a

9   conversation regarding what the scope will be.  Because what's

10  tricky about this is that the spoliation actually affects all

11  three cases, but I don't know that we need to go into all three

12  cases separately because I think the issue of spoliation affects

13  them all in the same way.

14         So to the extent that exhibits or information was or

15  was not preserved for Cirkunovs or as relates to Johnson, my

16  questions would be more or less the same because it's missing

17  information, at least as of this moment.

18         MR. DELL'ANGELO:  Right.

19         THE COURT:  So I don't -- the spoliation issue, just so

20  we're clear, will cover all three cases.  But I don't know that

21  it will involve, sort of, extensive questioning.  Now, what

22  again I've said is we will have a conversation about the scope

23  of that, but I don't think we need a deposition, unless you all

24  think we need one.  I just don't think we need one at this time.

25         Mr. Chiu, do you think that would be necessary?

1          MR. CHIU:  Not at all, Your Honor.

2          THE COURT:  All right.

3          So let's turn to the issue of the search terms.  So,

4    Mr. Dell'Angelo, I assume that you saw the defendants' status

5    report as relates to the number of documents.

6          MR. DELL'ANGELO:  I did.

7          THE COURT:  Now, I don't know and, Mr. Dell'Angelo and

8    Mr. Chiu, it would be helpful for me to know, sort of, further

9    metadata about documents.  Because, certainly, 5 million

10   documents is a fair number of documents, but the source of the

11   documents and other things matters and certainly analytics can

12   be used to narrow that further.  The question really is, sort

13   of, what metadata exists regarding all of those documents such

14   that they could be narrowed.

15         And so I don't know, Mr. Chiu, if you and

16   Mr. Dell'Angelo have had a conversation about these hits, but it

17   would be helpful for you all to have that conversation before I

18   made a decision.  And I think it would also be helpful,

19   honestly, for me to be able to hear from plaintiffs after they

20   get the Cirkunovs material tomorrow because I'm obviously not

21   going to order defendants to produce 5 million documents, and I

22   don't think the plaintiffs want that either.

23         So, Mr. Dell'Angelo, I'll start with you in terms of

24   suggestions about how do we approach that.

25         MR. DELL'ANGELO:  I very much appreciate that, Your

1       THE COURT:  Okay.  So I'll give you a week to do -- a

2  week from today to do your request as it relates to

3  Mr. Cirkunovs', right, information.

4       And tell me, Mr. Chiu, why Mr. Cirkunovs would be

5  relevant to the defendants' spoliation.  Because if it's about

6  what you think may be missing, right, I'm not sure that he's the

7  sole person related to that.  I mean, for his case, but the

8  spoliation issue is actually across all three cases.  So tell me

9  what you would expect that he would provide that would help the

10  Court make a decision about that.  Because right now, again, I'm

11  just focussed on the missing information from those two

12  individuals across the three cases.

13       MR. CHIU:  Yeah, I think with respect to the impact of

14  potential spoliation on the motion to compel arbitration of

15  Mr. Cirkunovs' claim, right, we are talking about two

16  custodians, Mr. White, Ms. Long.  You know, one thing that is at

17  issue is, well, you know, based on the gaps for right now, for

18  example, for Mr. White's device, you know, our understanding is

19  that, number one, he did not actually communicate or negotiate

20  with Mr. Cirkunovs with respect to Mr. Cirkunovs' contract, and

21  that's the arbitration clause at issue.  But that -- as it

22  relates to that issue, you know, to the extent there was any

23  spoliation or we need to figure that out or whether that

24  impacts, for example, the Court's determination of the

25  arbitration issue, well, if Mr. Cirkunovs did in fact

1   communicate with Mr. White, those communications would be in his

2   possession as well.

3           So, you know, from our perspective as it relates

4   specifically to the Cirkunovs case and the pending motion to

5   compel arbitration, that is relevant to understanding, right, if

6   there is in fact missing information while we're still running

7   that down whether that implicates the arbitration issue before

8   the Court.

9           THE COURT:  Mr. Dell'Angelo.

10          MR. DELL'ANGELO:  It sounds to me like a -- it's a

11  version of a good defense is a good offense, Your Honor.  So

12  Cirkunovs filed his case in mid-2025, right.  So his

13  preservation obligations are very, very different than those for

14  the defendants to go back to 2015.  I mean, we'll certainly

15  expect a document request as to Mr. Cirkunovs.  We'll get those.

16  We'll respond -- you know, collect and respond.  It may provide

17  some insight, but I don't think it answers the spoliation

18  questions in this case.

19          THE COURT:  Well, here's what I think we should do.  I

20  mean, they'd be entitled to a certain amount of discovery with

21  respect to Mr. Cirkunovs anyway.  You can make that request in a

22  week, Mr. Chiu.  I'll make a decision after I hear the two

23  custodians whether or not we need to hear from him.  I think he

24  should potentially be available.

25          But Mr. Dell'Angelo is right.  I mean, the spoliation

1   issue really is about, sort of, the preservation obligation, and

2   certainly Mr. Cirkunovs wouldn't have had that until the case

3   was filed or at least when he was contemplating the case at some

4   point, maybe a little bit before that.

5          But it may be relevant as you indicate, Mr. Chiu,

6   depending upon, sort of, what I hear from the other custodians

7   about who was involved, who was involved with him, who was

8   involved with the other fighters in terms of negotiating

9   contracts.

10         So I'm not going to, sort of, say categorically now

11  that Mr. Cirkunovs wouldn't have to testify, but I want to hear

12  from the two other individuals first and maybe more depending

13  upon what they say before we'd get to Mr. Cirkunovs.  But I'm

14  not going to rule out his testimony at this point.

15         Let's see.  Given the potential overlap of some of the

16  issues that Judge Weksler's going to be hearing today, I don't

17  know if you have any update as relates to the motion to compel

18  because there was a back-and-forth about this.  I'm going to

19  resolve those motions actually that she was going to handle when

20  we come back on the 18th because I want you all to be focussed

21  on this other material first.

22         But the motion to compel seemed like there was

23  information that was produced after that was there, then there's

24  the request for strike because of new arguments, and then more

25  information was provided.  So someone, perhaps, can give me an

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1  update about that.  Because I want to address that, but I just

2  want to hear the latest as it relates to what's been provided.

3          MR. MADDEN:  I don't know that we have an update, but I

4  think that where it came to rest -- and Mr. Chiu can correct me

5  if I'm wrong, but if all the briefs come in, the sur-reply and

6  the sur-sur-reply, I think that resolves the motion to strike

7  and the other motion.

8          THE COURT:  When you say "resolves," you mean that the

9  parties are in agreement as to what happens or it resolves it

10  from the standpoint of all the arguments are in and then it's

11  just up for me to decide?

12          MR. MADDEN:  The latter.

13          THE COURT:  Okay.  Because my concern is it looked as

14  if there was more information that was coming in after the

15  initial motion to compel was filed.  I was unclear about that.

16          MR. MADDEN:  It is correct that there was additional

17  information.  So defendants responded to the motion to compel

18  initially by getting an extension and then producing responses.

19  And then in our reply we addressed why those responses should

20  continue to be treated as a failure to --

21          THE COURT:  Right.

22          MR. MADDEN:  -- respond.

23          THE COURT:  Which they viewed as new argument.

24          MR. MADDEN:  Correct.

25          THE COURT:  Right.

1    MR. MADDEN:  So they wanted to strike the reply or in

2   the alternative allow a sur-reply.  And we said, "No, you don't

3   strike the reply, but if you -- if you do allow their sur-reply,

4   then we should get a sur-sur-reply."  And I think that where it

5   came to rest in terms of their opposition to our sur-sur-reply

6   is that if all four briefs come in, then I think everyone is set

7   with their positions.

8    THE COURT:  Well, they're already filed --

9    MR. MADDEN:  Yeah.

10    THE COURT:  -- right.  And typically, which is always

11   funny in these situations, where people say, "I would like a

12   sur-reply and here's what I will say," it's effectively the same

13   thing.  You all are smart lawyers.  You have done that.  I'm

14   just going to consider everything, and then we'll just move

15   forward.

16    I just wasn't sure if there was anything else that I

17   needed to consider as relates to what's been produced on that.

18   So I'll also rule on that, those motions, on the 18th since

19   we're coming back.  And I do think there could be some overlap

20   between what you all are searching and what may come up in the

21   context of at least some of those questions and those

22   interrogatories about who's responsible for negotiating fights

23   and the completeness of that.  So I might ask you questions

24   about how the information you've done searches on might inform

25   that those are, as I understand it, purely Johnson-related

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1   motions.  But there's some overlap, so we might as well address

2   that.

3           So you all should just be prepared to answer questions

4   regarding those motions when we come back on the 18th.  Let me

5   look at the time.  Let me give you the time.

6           Let's see.  We've got a sentencing.  1:30 on the 18th.

7   Well, you know what we're going to do, why don't we do this.

8   I'm going to bring you in actually -- what is the first one?

9   That's 10:45.

10          We're going to get started at 9:30 because what we

11  may -- but you should be prepared to be here the whole day.  So

12  don't book a flight at 2 o'clock, please, particularly because I

13  may ask you all to go back and forth on terms and things.  We

14  may spend sometime doing that after I look at your proposals.

15  So I expect that we'll start at 9:30.  I have some other

16  matters, but I'll give you some homework, we'll come back, and

17  then we'll make some rulings.

18          Here's the other thing that I want you to file by the

19  16th, which would be the scope of the questions of the two

20  witnesses for spoliation.  I want to be able to address that so

21  that you all can be prepared.  To the extent that there's going

22  to be questions about various matters, I want to be able to

23  address what's going to be the scope of the questions.  Okay?

24          MR. CHIU:  Sorry.  This is for the plaintiffs, Your

25  Honor?

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1          THE COURT:  Well, I assume you're going to be asking

2     questions of the witnesses, too.

3          MR. CHIU:  Oh, this is for the February...

4          THE COURT:  For the February hearing because I want

5     to -- right, to the extent we're going to have a back-and-forth

6     because I expect that we will, right, and to the extent there's

7     going to be some discussion, Mr. Chiu, about what's actually

8     still, sort of, outstanding, it would be helpful to not, again,

9     wait until later.  So I'm going to ask you all to give, again,

10    what you anticipate would be, sort of, the scope of the

11    questions and the topics, right.  I mean, you don't have to give

12    the exact questions, but just the scope.

13         And I just want to be clear, I'm not going to do

14    case-specific questions.  The spoliation issue covers all three

15    cases.  So I don't believe it's necessary to limit it to

16    arbitration because I don't think that it would be efficient to

17    do that in this case, which is why it may take a little bit

18    longer.  But I also think the questions about who negotiates

19    contracts and how Mr. White or Ms. Long retained that

20    information, that would apply across all three cases anyway so

21    it wouldn't really change.  So I don't anticipate that the

22    questions would be different across the cases, but I just want

23    to be clear that the spoliation hearing is for all three cases.

24    Okay?

25         And so to the extent you think there may be different

1  questions that need to be asked for the different cases, you

2  should bring that up with me on the 18th so we can hash that

3  out, right.

4          Any questions about that, Mr. Madden?

5          MR. MADDEN:  No, Your Honor.

6          THE COURT:  Mr. Chiu?

7          MR. CHIU:  Nope.

8          THE COURT:  But I'm not requiring you -- Mr. Chiu, you

9  all don't have to ask any questions, but I anticipate that.

10          The one issue, Mr. Chiu, that I also am going to want

11  to know and you all to think about is the assertion of

12  privilege.  In these types of spoliation hearings, as you know,

13  it can get a little tricky if a witness says, "I was advised,"

14  for example, "that I didn't have to keep this particular

15  information," right.

16          And so I want to hear from you about, sort of, how

17  we're going to manage the privilege because obviously, as you

18  know, I have to make a credibility determination about to what

19  extent things were done intentionally or inadvertently or in bad

20  faith, and that can turn on the information that a particular

21  witness received.  And that can implicate attorney-client

22  privilege issues which it often does in these hearings.

23          And so we don't have to decide that issue finally on

24  the 18th, but I do want to hear from you about what you

25  anticipate would be issues that I'd have to resolve and whether

1  or not you would anticipate, for example, there being some

2  either ex parte or some other form of a separate privilege, you

3  know, log or communication or something that would happen in

4  this case.  Because, again, it can be very tricky as it relates

5  to what the witnesses may have been informed or advised by

6  counsel, by, you know, internal counsel and then outside

7  counsel.  I don't know.  It may not be an issue.  But I don't

8  want us to encounter it the first time at the hearing.

9         MR. CHIU:  Yeah, so I guess hearing that, Your Honor, I

10 guess in light of the fact that we're still running these two

11 issues down, I know we had talked about the hearing, you wanted

12 to set it in February.  You know, I just wonder whether it makes

13 sense at this time, you know, by the 18th for us to have

14 submitted, kind of, a proposal for how that hearing will go as

15 opposed to -- you know, I expect, you know, over the next month

16 my hope is that we will have run down these issues.

17        So I just wonder if it's premature at this point,

18 understanding before you had said, you know, prior to the

19 February hearing there will of course be some briefing or teeing

20 up of issues to the extent it's still -- it's still a live

21 issue.

22        THE COURT:  I appreciate that, Mr. Chiu.  It's sort of

23 hard for me to know because I think it's hard for you to know

24 when information may potentially be produced or potentially be

25 available that it wasn't previously available.

1        So for now I think we can still have the scope of the

2   questions because I don't know the scope will change that much,

3   particularly from the plaintiffs' standpoint in terms of what

4   they're going to ask.  You can potentially hold off on the

5   privilege issues.  I wanted to tee that up and have you start

6   thinking about that, right, because I don't want to have the

7   hearing delayed because you all say, "Well, we have to go

8   through attorney-client communications because we need to make

9   sure that we are protecting privilege, but at the same point in

10  time providing information we think is relevant for the Court's

11  determination."

12       So you don't have to say that now, Mr. Chiu.  I'm just

13  trying to avoid a delay if we end up going forward with the

14  spoliation hearing based upon privilege.  Because that can

15  actually delay it quite a bit because then you all can come

16  forward and say -- you know, and it can be done sometimes on an

17  ex parte basis where you're saying --

18       MR. CHIU:  Yeah.

19       THE COURT:  -- "Here are the issues."  I just want to,

20  sort of, tee that up.  So what I'll do is I will hold off on you

21  teeing that up for the 18th, but I will set a timeframe by which

22  you'd have to confirm what does and doesn't exist probably some

23  time in mid-January after we come back on the 18th, so at least

24  we can be clear about the schedule then.  I know you all are

25  still trying to figure out, sort of, what still exists.

1          But I'll hold off on making any particular findings or

2    requiring any submissions regarding privilege at this point.

3    But we'll just add to our to-do list that on the 18th we will

4    discuss the issue of when we're going to set a deadline for,

5    sort of, a final determination of what does and doesn't actually

6    exist.

7          All right.  Anything else on that point, Mr. Chiu?

8          MR. CHIU:  Nothing further.  Thank you, Your Honor.

9          THE COURT:  All right.  Okay.

10         Anything else on the outstanding motions that were in

11   front of Judge Weksler?

12         MR. MADDEN:  No, Your Honor.

13         THE COURT:  Anyone else?

14         MR. CHIU:  No, Your Honor.

15         THE COURT:  Because for now I'm going to ask her just

16   to hold off on holding any further discovery matters until we

17   get these issues resolved and because there's overlap.  I don't

18   know if you all have anything outstanding that's due for her.

19   Do you all?

20         MR. DELL'ANGELO:  So Michael Dell'Angelo, Your Honor.

21         No, I guess the -- just the thing that we've been

22   thinking about and it sounds like Your Honor is as well that

23   we've just been trying -- the needle we've been trying to thread

24   is that, you know, Your Honor is obviously doing a lot on the

25   arbitration discovery and the search terms and custodians, et

1  cetera, to move that process along.  But, you know, there's

2  really a parallel process that relates to all three cases where

3  we still have these, sort of, same disputes.  And, I guess, I am

4  just wondering how we kind of -- since the magistrate had been

5  handling that, how we deal with those issues.

6          THE COURT:  So, Mr. Dell'Angelo --

7          MR. DELL'ANGELO:  Yeah.

8          THE COURT:  -- I assume the discovery's moving forward

9  in these other cases.  I'm not saying that you should stop,

10  either side, with your discovery obligations.

11          MR. DELL'ANGELO:  Yeah.

12          THE COURT:  All I'm saying is that there are certain

13  discovery motions in all three cases that overlap and I'm going

14  to handle those.

15          MR. DELL'ANGELO:  Right.

16          THE COURT:  So that's not in any way to suggest that

17  you all shouldn't continue to propound discovery, they shouldn't

18  continue to propound discovery, and there shouldn't be

19  responses.  I'm not --

20          MR. DELL'ANGELO:  Right.

21          THE COURT:  I'm not delaying anything.  I am not in any

22  way advancing anything.

23          MR. DELL'ANGELO:  Right.

24          THE COURT:  I'm simply saying those motions that she

25  was going to handle I think overlap with what I'm addressing in

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1  arbitration, so I'm going to handle them.  But if you have a

2  discovery issue, either side, go ahead and file your motion.

3  I'm not telling you to stop doing that.

4          MR. DELL'ANGELO:  Okay.  Thank you, Your Honor.

5          THE COURT:  Right.

6          MR. DELL'ANGELO:  Yeah, and I appreciate everything

7  that you're doing and I understand what you're saying.  I think

8  what -- and I think I now have it, you know.  The clarity I was

9  trying to get is, you know, at the last hearing you made some

10  findings about -- I think you said that they were disingenuous

11  search terms, right, that -- and we're running that process for

12  arbitration, but that same search term process, you know, it

13  affects all three cases and, you know, discovery in Davis and

14  Johnson.

15          THE COURT:  But I think, Mr. Dell'Angelo --

16          MR. DELL'ANGELO:  Yes.

17          THE COURT:  -- the process of the arbitration and

18  search is going to inform the other.  So it doesn't make sense

19  for you to be doing that in front of Judge Weksler --

20          MR. DELL'ANGELO:  Right.

21          THE COURT:  -- when we're going to spend a whole day

22  doing search terms, right, and I'm going to be talking with you

23  about it.  I will then turn to the other case, but the fact

24  is --

25          MR. DELL'ANGELO:  Okay.

1           THE COURT:  -- a lot of what you're asking for in the

2    arbitration for search terms is going to cover the discovery in

3    the other case.  If you look at the interrogatories and the

4    other things, there's overlapping.  You're going to want the

5    fighter contracts, the negotiations, and communications about

6    the contracts.  I mean, that's what you wanted previously in the

7    prior case.  That's what you're going to be seeking now.  The

8    FightMetric data, all -- basically a lot of what you're seeking

9    that we're going to be working on in the Cirkunovs case

10   regarding arbitration is going to overlap with that.

11          And so from my perspective it makes no sense from a

12   judicial economy standpoint to have Judge Weksler simultaneously

13   and on a parallel basis be talking with you all about search

14   terms.

15          MR. DELL'ANGELO:  Understood, Your Honor, and I

16   appreciate that.  And it sounds like maybe after December 18th

17   we'll, sort of, figure out the process about how to deal with

18   the larger discovery issues.

19          THE COURT:  Well, even across the three cases --

20          MR. DELL'ANGELO:  Yeah.

21          THE COURT:  -- the priority for me is to get the

22   arbitration issue resolved, right.

23          MR. DELL'ANGELO:  Understood.

24          THE COURT:  And to the extent I know you all have big

25   firms and a lot of lawyers involved, but I want you focussed on

1  dealing with this issue right now in the next few weeks and the

2  spoliation issue because that also addresses all three cases.

3          But the discovery will proceed in the normal course in

4  Johnson, right, and in Davis consistent with what's already been

5  set for the schedule.  To the extent that either side has any

6  issue that it wants to raise, discovery, you file it and Judge

7  Weksler and I will simply decide who's the appropriate judge to

8  handle it.

9          MR. DELL'ANGELO:  That's very helpful.  Thank you, Your

10  Honor.

11          THE COURT:  Okay.  All right.

12          Mr. Chiu, any questions about that?

13          MR. CHIU:  No, I think from our perspective

14  everything's been teed up.  So it sounds like, you know, before

15  Judge Weksler and now the Court has taken it back.  So from our

16  perspective there are no other, kind of, live issues.

17          THE COURT:  Okay.

18          MR. CHIU:  The one -- the one clarification I had and

19  not that there are any live issues, but I know the Court had

20  previously, kind of, set a procedure where, you know,

21  plaintiffs -- there was a procedure in place for plaintiffs

22  raising discovery issues, kind of, like the one-letter-a-month,

23  if that's back in play or --

24          THE COURT:  No.  No.  I mean, I think because of the

25  need to prioritize the arbitration issue and because of the

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1          THE COURT:  9:30.  Okay.  All right.  Safe travels

2  everyone.  Take care.

3          MR. DELL'ANGELO:  Thank you, Your Honor.

4          MR. WILLIAMS:  Thank you, Your Honor.

5          (Whereupon the proceedings concluded at 12:13 p.m.)

6                          --oOo--

7                 COURT REPORTER'S CERTIFICATE

8

9      I, PATRICIA L. GANCI, Official Court Reporter, United

10  States District Court, District of Nevada, Las Vegas, Nevada,

11  certify that the foregoing is a correct transcript from the

12  record of proceedings in the above-entitled matter.

13

14  Date:  December 4, 2025.

15                              /s/ **Patricia L. Ganci**

16                              Patricia L. Ganci, RMR, CRR

17

18

19

20

21

22

23

24

25

# EXHIBIT D

1                  UNITED STATES DISTRICT COURT

2                    DISTRICT OF NEVADA

3

4  KAJAN JOHNSON, et al.,     ) Case No. 2:21-cv-01189-RFB-BNW
                          )

5  MIKHAIL CIRKUNOVS, et al.,   ) Case No. 2:25-cv-00914-RFB-BNW
                          )

6  PHIL DAVIS, et al.,       ) Case No. 2:25-cv-00946-RFB-BNW
                          )

7                         )
               Plaintiffs,  ) Las Vegas, Nevada

8                        ) Thursday, November 20, 2025
        vs.            ) 10:07 a.m.

9
  ZUFFA, LLC; TKO OPERATING     STATUS CONFERENCE

10  COMPANY, LLC f/k/a Zuffa
   Parent, LLC (d/b/a Ultimate      ***C E R T I F I E D  C O P Y***

11  Fighting Championship and
   UFC); and ENDEAVOR GROUP

12  HOLDINGS, INC.,

13              Defendants.

14  _____

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17        THE HONORABLE RICHARD F. BOULWARE, II,
           UNITED STATES DISTRICT JUDGE

18

19

20  APPEARANCES:     See next page

21

22  COURT REPORTER:    Patricia L. Ganci, RMR, CRR
                 United States District Court

23                333 Las Vegas Boulevard South, Room 1334
                 Las Vegas, Nevada  89101

24
  Proceedings reported by machine shorthand, transcript produced

25  by computer-aided transcription.

```
 1  APPEARANCES:
    For the Plaintiffs:
 2
            KATRINA STARK, ESQ.
 3      CLAGGETT & SYKES
        4101 Meadows Lane, Suite 100
 4      Las Vegas, Nevada 89107
        (702) 903-1353
 5
            MICHAEL C. DELL'ANGELO, ESQ.
 6          PATRICK F. MADDEN, ESQ.
        BERGER & MONTAGUE, P.C.
 7      1818 Market Street, Suite 3600
        Philadelphia, Pennsylvania 19103
 8      (215) 875-3000

 9          JOSEPH SAVERI, ESQ.
        THE JOSEPH SAVERI LAW FIRM, INC.
10      601 California Street, Suite 1505
        San Francisco, California 94108
11      (415) 500-6800

12  For the Defendants:

13          J. COLBY WILLIAMS, ESQ.
            SAMUEL MIRKOVICH, ESQ.
14      CAMPBELL & WILLIAMS
        700 South 7th Street
15      Las Vegas, Nevada 89101
        (702)382-5222
16
            AARON T. CHIU, ESQ.
17      LATHAM & WATKINS, LLP
        505 Montgomery Street, Suite 2000
18      San Francisco, California 94111
        (415) 391-0600
19
            AGBEKO C. PETTY, ESQ.
20      DUNN ISAACSON & RHEE, LLP
        401 Ninth Street NW
21      Washington DC 20004
        (202) 240-2900
22
            JOSEPH AXELRAD, ESQ.
23          ROBERT MEDINA, ESQ.
            ADAM B. PETERSON, ESQ.
24      LATHAM & WATKINS, LLP
        10250 Constellation Boulevard, Suite 1100
25      Los Angeles, California 90067
        (424) 653-5500
```

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

 1      LAS VEGAS, NEVADA; THURSDAY, NOVEMBER 20, 2025; 10:07 A.M.

 2                            --oOo--

 3                   P R O C E E D I N G S

 4           THE COURT:  Please be seated.

 5           COURTROOM ADMINISTRATOR:  Good morning.  We have three

 6   matters set for status conference, first being 21-cv-1189-RFB,

 7   *Johnson versus Zuffa, et al.*; Case Number 25-cv-914-RFB,

 8   *Cirkunovs v. Zuffa, et al.*; and 25-cv-946-RFB, *Davis v. Zuffa,*

 9   *et al.*

10           Counsel, please make your appearances, beginning with

11   the petitioners.

12           MR. DELL'ANGELO:  Good morning, Your Honor.  Michael

13   Dell'Angelo from the law firm of Berger Montague on behalf of

14   the plaintiffs.

15           MR. MADDEN:  Good morning, Your Honor.  Patrick Madden

16   from Berger Montague on behalf of the plaintiffs.

17           MR. SAVERI:  Good morning, Your Honor.  Joseph Saveri

18   on behalf of the plaintiffs.

19           THE COURT:  Good morning.

20           MR. CHIU:  Good morning, Your Honor.  Aaron Chiu of

21   Latham & Watkins on behalf of defendants.

22           MR. AXELRAD:  Good morning, Your Honor.  Joseph

23   Axelrad, Latham & Watkins, also on behalf of defendants.

24           MS. PETTY:  Good morning, Your Honor.  Agbeko Petty of

25   Dunn Isaacson Rhee on behalf of defendants.

1          MR. MEDINA:  Good morning, Your Honor.  Robert Medina

2  of Latham & Watkins on behalf of defendants.

3          MR. PETERSON:  Good morning, Your Honor.  Adam

4  Peterson, Latham and Watkins, also on behalf of defendants.

5          MR. WILLIAMS:  Good morning, Your Honor.  Colby

6  Williams, Campbell & Williams, on behalf of defendants.

7          MR. MIRKOVICH:  Good morning.  Samuel Mirkovich,

8  Campbell & Williams, on behalf of defendants.

9          THE COURT:  Good morning.  We have a few matters to go

10  through here.  Let me pull up my notes.

11          (Pause.)

12          THE COURT:  So I've reviewed the submissions of the

13  parties in this case.  I know that you all have presentations

14  that you'd like to make, although the presentations seem to me

15  to be duplicative of what's already been put into the

16  submissions.  So I'll give you an opportunity if you want to add

17  something that's not in a submission, if somehow there's an

18  update you'd like to give me, you can do that now.  But I don't

19  need to go through presentation of material that's already been

20  well-documented in your very extensive filings in this case.

21          Mr. Dell'Angelo, I'll start with you.

22          MR. DELL'ANGELO:  Thank you, Your Honor.  Good morning.

23          I guess the one thing I would note is we -- we tried to

24  just detail something that was in our November 7th statement,

25  and it's one of the two materials that we e-mailed to the

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1  spreadsheet -- excuse me -- that we e-mailed to the Court

2  yesterday.

3          THE COURT:  I'm sorry.  Say that again,

4  Mr. Dell'Angelo.

5          MR. DELL'ANGELO:  It was one of the two materials that

6  we e-mailed to the Court yesterday.  It was a spreadsheet in PDF

7  form entitled "Defendants' Produced PAR Agreements, July '15 to

8  the Present."  And I just note that, Your Honor, because what we

9  tried to do was just provide a very detailed analysis of a

10  matter that we discussed regarding the negotiation documents in

11  the statement.

12          And what this spreadsheet attempts to show, what we

13  did, Your Honor, was we attempted to identify every single PAR

14  agreement in the production thus far.  It's in that mass of

15  about 153,000 documents from -- produced from Ms. Long's files,

16  but we went through the entire production.  We detailed 2,813

17  PAR agreements that were -- that we identified from July 15th

18  [sic] to the present.

19          We added a demarcation line on Page 26 for October 7 --

20  beginning October 7, 2020, to the present.  We've indicated that

21  in orange.  And what that attempts to show is the period --

22  October 7, 2020, as best we can tell, is about the period when

23  Zuffa began implementing arbitration clauses.  And then what we

24  did in the far -- so we -- we indicated it by fighter and the

25  Bates number for the PAR agreement in the production, and then

1    the next column is the effective date.

2           And lastly and most importantly, why we did this, there

3    are about 1,400 agreements in that arbitration period.

4           THE COURT:  Right.  You want to draw my attention to

5    the blank column.  Is that what you're telling me?

6           MR. DELL'ANGELO:  Yes, that there are not

7    negotiations -- we could not identify anything that constitutes

8    a substantive negotiation regarding the PAR agreements listed.

9    So that -- that's, I think, the one big piece of additional

10   information that we'd like to address.

11          THE COURT:  Okay.  Thank you.

12          Mr. Chiu.

13          MR. CHIU:  Good morning, Your Honor.

14          You know, as the Court knows, I think our -- our

15   demonstratives, kind of, reflect what was in the submissions.  I

16   think there are, kind of, two points that I just want to draw to

17   the Court's attention that are additional.

18          Number one, in response to, you know, Mr. Dell'Angelo's

19   attempt to point to -- the Court to these thousands of PAR

20   agreements for which they claim that there are no negotiating

21   documents, first, that is incorrect.  We have searched for all

22   of that and produced what is -- what --

23          THE COURT:  So are you saying that there are actually

24   Bates numbers for these documents that they have that you

25   haven't provided?

1          MR. CHIU:  We have searched for and provided the

2    e-mails and everything that is related to the PAR agreements.

3          But, number two, I think --

4          THE COURT:  So hold on.  But I want to clarify this,

5    Mr. Chiu.  Because for Mr. Cirkunovs, there's Bates numbers, but

6    for other people, I don't -- and I haven't seen -- and I've gone

7    through all of your exhibits -- any negotiations, none, right?

8          MR. CHIU:  No, Your Honor.  What we've -- we have

9    searched for and collected, when the PAR agreements get

10   exchanged with e-mails, everything we have has been produced.

11         THE COURT:  No, I'm not talking about that.  I'm

12   talking about -- I'm not talking about just the transmittal of

13   the agreement.  The production regarding Cirkunovs is indicative

14   because it talks -- it shows what happens when there's a --

15         MR. CHIU:  Correct.

16         THE COURT:  -- a negotiation.  I don't -- I haven't

17   seen anything, at least from what I see in the record, for

18   anyone else besides him.

19         Is that correct?

20         MR. CHIU:  No, it has been produced, what we have.

21   And --

22         THE COURT:  Because I have -- well, I looked in your

23   filing.  I didn't see --

24         MR. CHIU:  Yeah, and --

25         THE COURT:  -- any other --

1          MR. CHIU:  And let me address that, Your Honor, because

2     as we said in our filing, the motion to compel arbitration that

3     is at issue before the Court is about Mr. Cirkunovs' claim.

4          THE COURT:  Okay.  So let me address that right now.

5     You're going to argue to me, right, and I find -- I've already

6     said it's relevant, is the issue of UFC's monopsony or not,

7     right.  I find that to be relevant.

8          So the issue of how they negotiated is relevant under

9     Nevada law.  The issue of the market position, I find, is

10    relevant under Nevada law, right.  The issue of the extent to

11    which, right, again, there was take-it-or-leave-it tactics that

12    were used, right, repeatedly with fighters is relevant.  So if

13    your position is that we have it and we're not providing it,

14    that's one thing.

15         MR. CHIU:  That's not our position.

16         THE COURT:  Okay.

17         MR. CHIU:  But I think --

18         THE COURT:  I'm just saying this because I want to make

19    clear about the fact that I read that in your -- in your

20    submission, right.  And I was puzzled by that because I've been

21    very clear, Mr. Chiu, that I find that the market position of

22    UFC, the issue of its monopsony power or not, the issue of its

23    monopoly power and the output market or not are all relevant to

24    a determination of whether or not the arbitration clause is

25    enforceable.

1            So I am confused by this argument that somehow only

2   Mr. Cirkunovs' negotiations are relevant when I've previously

3   said that that's not true.

4            MR. CHIU:  Your Honor, respectfully, we disagree.  We

5   think the law says otherwise.

6            THE COURT:  I appreciate that, but I've already -- I'm

7   ruling that way and I've ruled that way previously, right.  And

8   so -- because, Mr. Chiu, you all are certainly going to argue to

9   me that UFC doesn't have a monopsony, right?  I assume you're

10  going to argue that to me, correct?

11           MR. CHIU:  Correct.

12           THE COURT:  Right.  So then if you're going to argue

13  that, how is it you can argue that to me, but then not provide

14  any information about it?  Because it's absolutely relevant as

15  it relates to the arbitration clause.  Because if I were to

16  find, for example, that there was in fact competition, as you

17  all argue to me, that in fact there weren't barriers to entry

18  based upon current market conditions regardless what happened

19  previously, that would be an argument that would support me

20  finding that, in fact, this is an enforceable arbitration

21  clause, there wasn't unequal bargaining power as defined under

22  Nevada law.  And so to the extent that UFC had some level of

23  monopsony power, it wasn't sufficient such that the arbitration

24  clause wouldn't be enforceable.

25           So I'm not sure how it is that you're going to argue to

1  me that that's not relevant information when that's clearly

2  relevant and you're going to argue it to me, UFC's market

3  position.

4       MR. CHIU:  Your Honor, two -- two responses to that.

5  First is, again, the claim at issue here that we're seeking to

6  compel to arbitration is Mr. Cirkunovs' claim.  Even if Your

7  Honor believes that this issue of monopsony power is relevant to

8  the unconscionability determination -- which we respectfully

9  disagree.  We think, under the Supreme Court's precedent in

10 *Rent-A-Center* and other Ninth Circuit precedence, if that were

11 correct, an arb- -- an antitrust claim would never get sent to

12 arbitration because in every antitrust case where there's a

13 contract that's being challenged as unlawful or anticompetitive,

14 that's when this arbitration issue arises.

15      THE COURT:  So you mean to tell me that if there was a

16 100 percent monopsony, like a mining town, right, that that

17 wouldn't fall into an unconscionable contract?  Because I

18 don't --

19      MR. CHIU:  There is not one case that plaintiffs have

20 cited or we have found --

21      THE COURT:  No, no.  My question I'm asking you is, are

22 you telling me that if there literally was a 100 percent

23 monopsony in a labor market that that wouldn't matter and be

24 dispositive or potentially dispositive of the issue of the

25 enforceability of an arbitration clause?

1          MR. CHIU:  I think you would have to look at how it was

2  applied to the specific, let's say, employee at issue.  And I

3  think that's a key distinction.  Because with -- again,

4  Mr. Cirkunovs is the only plaintiff in his -- his claim is the

5  only claim that is subject to the motion to compel arbitration.

6  So this idea that you need evidence -- and, again, we'll get to

7  that because we have produced it, we have searched it, we have

8  committed to producing it -- but the idea that you need evidence

9  of thousands of other fighters and with respect to their

10  negotiations to determine whether with respect to Mr. Cirkunovs,

11  right, the negotiation over the promotional agreement faced --

12  he faced unconscionable circumstances, that doesn't bear on his

13  claim and the enforceability of the arbitration agreement that

14  he agreed to.  That is what is before the Court.

15          THE COURT:  So what would they have to show, Mr. Chiu,

16  in your view, to establish, right, an unconscionable arbitration

17  agreement?  Think of the circumstances --

18          MR. CHIU:  That law is very clear, Your Honor.  There

19  are two prongs.  There's procedural unconscionability --

20          THE COURT:  No, I know that.  I'm saying in this case

21  specifically, what facts do you think they have to show to

22  demonstrate that?

23          MR. CHIU:  Well, you've seen the evidence with

24  Mr. Cirkunovs' negotiation --

25          THE COURT:  No, no.  I'm asking you again.  What facts

PATRICIA L. GANCI, RMR, CRR

1   do you believe they have to show in this case, right -- and I'm

2   not saying that you think that they exist, but what would be the

3   facts, if they did exist, that would establish, right, an

4   unconscionable contract, procedurally and substantively?

5           (Court reporter interruption and admonition.)

6           THE COURT:  Go ahead, Mr. Chiu.

7           MR. CHIU:  For example, you know, under the Nevada law

8   that talks about what is procedurally and substantively

9   unconscionable, circumstances where there was no opportunity to

10  review the contract and the arbitration provision, that goes to

11  procedural unconscionability.  A situation, unlike

12  Mr. Cirkunovs' situation, where a contract is sent over and

13  under some circumstances of duress or whatever, it's asked to be

14  returned or there's no ability to go back and forth, which is

15  not the case with Mr. Cirkunovs, as you've seen in the evidence.

16          Situations where the law says, for example, you hide

17  the arbitration provision in an otherwise lengthy agreement and

18  it's not conspicuous, you can't see it, you can't review it.

19          In a case like this, a situation where there is no

20  movement between the fighters or there's no ability to negotiate

21  re-upping the contract.  That didn't happen here.  Those are the

22  sorts of situations where the law starts to say, you know, look,

23  there may be unconscionability issues here.

24          And on the substantive piece, right, which plaintiffs

25  don't even challenge, the substantive unconscionability

1   standards under Nevada law talk about things like forcing the

2   plaintiffs to bear the costs of arbitration, right, things like

3   that that are not present in the arbitration agreement here,

4   right.

5           And I think that the idea that if -- if a defendant had

6   a 100 percent monopsony share that that is de facto --

7           THE COURT:  I didn't say it's de facto.  I'm saying I

8   think that would be relevant, but the question is, do you think

9   that would be relevant to the Court's analysis as it relates to

10  the unconscionability of the arbitration clause?

11          MR. CHIU:  We disagree, Your Honor.  We think --

12          THE COURT:  You think that it's not -- it wouldn't be

13  relevant at all, you're saying.

14          MR. CHIU:  I think when you look at the

15  unconscionability test, the way it would come up in a

16  circumstance is actually in the negotiations.  Did -- did the

17  negotiating party have the ability to go sign somewhere else?

18  Did they have the ability to walk away from the contract --

19          THE COURT:  Yes, but if there's a 100 percent

20  monopsony, they wouldn't have that and they would know that,

21  right.  So --

22          MR. CHIU:  That's not the case here, though.

23          THE COURT:  I was talking about this, sort of, in terms

24  of the hypothetical, but also in terms of that being a relevant

25  factor.  So I take your point that you're saying, even if it's

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1  relevant, there are other factors and other facts that they

2  would --

3          MR. CHIU:  Absolutely.

4          THE COURT:  -- that they would have to establish and

5  you think are not present here, but you think that in the

6  context of the arbitration discovery, right, you think it

7  doesn't matter what happens with other fighters, it only matters

8  what happens with one fighter, even though this is a class

9  action.  I mean, there's also a class action waiver, so that's a

10  separate issue.  We're not really getting to that, but --

11          MR. CHIU:  Well, Your Honor, there's been no class

12  certified yet in either Johnson or in this case.

13          THE COURT:  Yes, but they're filed as a class action,

14  so I have to treat them that way.  I mean, I can't ignore the

15  fact that they're filed as a class action, right.  Class actions

16  have different approaches as it relates to discovery and other

17  matters.  So it's not simply the case that you have one person,

18  right, and we don't look at anything else as it relates to the

19  class.

20          Now, I know that the class, in terms of the discovery,

21  focuses certainly on class representatives and that's how these

22  cases proceed, but it sounds to me like you're saying that what

23  happened with any other fighter doesn't actually matter in terms

24  of the Court's determination about the enforceability of the

25  arbitration clause for the class.

1        MR. CHIU:  That's not what I'm saying, Your Honor.

2        THE COURT:  Okay.  Go ahead.

3        MR. CHIU:  What I'm saying is that in this posture,

4   currently the claim that we are seeking to move to compel the

5   arbitration is that of Mr. Cirkunovs.  Yes, he's a class

6   representative, brought a case on behalf of a putative class.

7   The class has not been certified yet.  All the Court needs to do

8   at this phase is to determine whether Mr. Cirkunovs' agreement

9   with Zuffa to arbitrate any and all claims arising out of his

10  promotional agreement should be compelled to arbitration.

11        And all the relevant precedence and the law state you

12  have to look at the circumstances of how he entered into his

13  promotional agreement because that is the only operative claim

14  that is before the Court in the Cirkunovs case.  And that is the

15  only claim that we are seeking to move to compel the

16  arbitration.

17        There is nothing in the law that would suggest you can

18  look at absent class members or -- before a class has been

19  certified that bears on the enforceability of Mr. Cirkunovs'

20  agreement with Zuffa.  That is the arbitration agreement that is

21  at issue and subject to the motion to compel arbitration.

22        THE COURT:  But, Mr. Chiu, if that were the case, then

23  what would happen in all of these class actions if there's an

24  arbitration agreement?  Potentially -- let's assume that it's

25  enforceable or not enforceable -- each named plaintiff would be

1  going through this, sort of, on a serial basis, right.  And

2  that, first of all, is not, how I see it, how the law works in

3  the context of class actions where there might be, right, an

4  arbitration clause.

5          Because if I were to find the arbitration clause to be

6  enforceable, it would apply to the class and you'd ask me to

7  apply it to the class, right.  You wouldn't say, "Okay.  Well,

8  it only applies to Mr. Cirkunovs.  They can bring in a new named

9  plaintiff, and we can do this each time."

10         Are you saying they could do that?

11         MR. CHIU:  They could, and they would try to seek to

12  certify a class.  Look, Your Honor, we're not talking about

13  contracts that are form contracts.  These are individually

14  negotiated with terms with individual fighters.  That brings in

15  another issue with this case, right.  That's why this is putting

16  the cart before the horse if you're saying, "Look, we have to

17  look at all the class members."  There's no class that's been

18  certified here.  The only claim and issue that's before the

19  Court is Mr. Cirkunovs' arbitration agreement.

20         THE COURT:  So your position is that what they need to

21  do is find a class member where the arbitration clause was

22  unenforceable and then they could proceed, but they have to

23  establish that for an individual class representative.

24         MR. CHIU:  Correct.  I mean, the -- look, Your Honor,

25  we would have -- we would argue, right, if they brought a

1  separate case and they found someone else who they think the

2  circumstances of the negotiation gave them a better shot at

3  arguing -- arguing unconscionability, right, and let's say

4  Mr. Cirkunovs' claim was compelled to arbitration, we would

5  argue, right, based on the circumstance, yeah, I mean, that

6  should inform the Court's analysis.

7         But it is an individualized analysis by claim, right.

8  We're -- there's no certified class yet.  This is not a

9  situation where, for example --

10         THE COURT:  But what you're proposing, the class could

11  never be certified, because what you would be asking me to do is

12  in each case decide that and then only limit my ruling to that

13  case, right.  That's what you're saying to me.  You'd say --

14  Okay.  If they were to find someone, who --

15         MR. CHIU:  That is --

16         THE COURT:  -- who actually satisfied the class, you

17  would still argue to me, "Well, that only applies to this

18  person.  And so, therefore, they can't certify a class because

19  they'd have to prove that for everyone else."

20         MR. CHIU:  And the law and the FAA recognize that.

21  That's the very point of entering into an arbitration

22  agreement --

23         THE COURT:  Yes, but if it's unenforceable, you can't

24  use it.  So I can't assume that it's enforceable because if it's

25  unenforceable, right, then there is a class, right.  And so the

1   question isn't whether or not it's solely just enforceable.  The

2   question is, if it's unenforceable, right, how would that work

3   in the context of the class action?  And I don't see how it

4   works in a class action where you're essentially saying to me

5   each class member would have to demonstrate this, and we could

6   go through this literally for years with each new named

7   plaintiff potentially being swapped out based upon my finding.

8   So --

9            MR. CHIU:  Your Honor --

10           THE COURT:  -- I don't agree with that.  I don't agree

11   that that's what the law requires.  I appreciate that.  So let's

12   move on from there because I don't want to go back --

13           MR. CHIU:  Just --

14           THE COURT:  -- Mr. Chiu, I don't want to go back and

15   forth on this issue, right.

16           MR. CHIU:  Just one more issue on this, Your Honor.

17           THE COURT:  No, Mr. Chiu, I don't want to go back and

18   forth on this issue.

19           So I want to go back to actually what started this

20   conversation was the issue of what else you want to point out as

21   it relates to discovery in this case.

22           MR. CHIU:  I think with all the -- the categories that

23   plaintiffs have raised, as indicated in our submissions, we've

24   submitted all -- you know, exemplars of evidence that speak to

25   every one.  You know, on the issue of Mr. Cirkunovs'

1    negotiations, you know, in our submissions, we've -- we've

2    provided the Court with the e-mail exchanges, his text messages

3    with the various individuals at Zuffa that negotiated his

4    contract.  That -- the compensation in his contract, the renewal

5    of his contract.  You know, in our view, you know, plaintiffs

6    have this evidence.  They have what they need to respond to the

7    motion to compel arbitration.

8         THE COURT:  So I want to address the issue of missing

9    years of text messages for Mr. White and Ms. Long.  Even if we

10   were talking about Cirkunovs, why are there missing years,

11   years, of texts where we know those individuals were involved,

12   and you admitted they were involved, in negotiations of

13   contracts?  I mean, we don't know if we have a complete record,

14   even for Mr. Cirkunovs, because we have missing time for

15   potentially relevant people.

16        And I'm looking at the device disclosure chart.  The

17   last one that was provided, I think, was -- updated was in

18   October.  I want you to address that because there's a

19   spoliation issue here which I also need to address which is

20   raised by the plaintiffs.

21        MR. CHIU:  Your Honor, we -- on the -- on the text

22   messages, two points on that.  First is, as plaintiffs' own

23   filings show, they have the other piece of the texts.  So as

24   we --

25        THE COURT:  That's not what I'm talking about.  I want

1   you to address the issue of missing years of texts for Mr. White

2   and Ms. Long, in particular, like, years of missing texts.  How

3   is that possible, Mr. Chiu?

4          MR. CHIU:  Your Honor, we are -- on the -- on the

5   Mr. White -- Mr. White's texts, we are continuing to look for

6   those.  We have indicated that to plaintiffs, and we're

7   continuing to search for it.  And that's -- that's what --

8   that's the answer there.

9          THE COURT:  How is that not spoliation?  Right.  He is

10  an individual who clearly is involved, as you've identified,

11  with negotiating contracts, as is Ms. Long, right.  And between

12  them, literally I have six, seven, eight years of missing texts,

13  like, no texts at all.

14         How is that not a spoliation issue when they were

15  clearly under a litigation hold?

16         MR. CHIU:  Your Honor, we disagree it's a spoliation

17  issue.  I don't think plaintiffs have shown it.  We are -- as

18  we've discussed before --

19         THE COURT:  Mr. Chiu, Mr. White is the head of the

20  organization.  Ms. Long is part of the negotiation.  How are

21  missing texts for individuals who are part of the negotiation

22  not relevant even if we're talking about Mr. Cirkunovs?  How

23  does that not raise a spoliation issue when since 2017 these

24  individuals, but particularly these individuals involved with

25  negotiations, would be on notice of preserving this information?

1          So are you saying that there wasn't a litigation hold

2  during the time period when these texts are missing?

3          MR. CHIU:  I'm not saying that, Your Honor.

4          THE COURT:  Okay.

5          MR. CHIU:  We've had a litigation hold in place.  We

6  are continuing to search for those texts, and it's an ongoing

7  process.

8          THE COURT:  Well, I appreciate that.  I mean, that's

9  the best that you can say.  I appreciate it, Mr. Chiu.  They're

10 not your phones, your text messages.  And so, again, I just have

11 to ask that because obviously they raised that.  That's a

12 significant issue in this case regarding the negotiations.

13         Hold on just a moment.  I have one other question for

14 you, Mr. Chiu.

15         (Pause.)

16         THE COURT:  So to that issue, Mr. Chiu, I want to ask

17 you this question.  How can I decide, right, this case when

18 there are clearly missing relevant texts for periods and you

19 have no idea where they are, when they will show up?  You're

20 arguing to me that we have a complete record of Mr. Cirkunovs,

21 but you actually can't say that because there's missing

22 information.  Individuals who are clearly involved with

23 negotiations have years of missing texts.

24         So how is it that the Court shouldn't consider that an

25 issue of spoliation and what should I do about that?

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1          MR. CHIU:  Your Honor, the permissible scope of

2    arbitration-related discovery is narrow.  Our position is that

3    based on what we have produced and we're continuing to look for,

4    plaintiffs have all they need to respond to the motion to compel

5    Mr. Cirkunovs' claim.

6          THE COURT:  But what I'm saying to you --

7          MR. CHIU:  With respect --

8          THE COURT:  But, Mr. Chiu, like, you don't know what

9    was in those texts.  You have no idea, as you stand here today,

10   whether or not the missing years of texts regarding Mr. White

11   and Ms. Long involve Mr. Cirkunovs.  You can't tell me that,

12   right?

13         MR. CHIU:  Your Honor, I can tell you that what we have

14   is and what we've produced are -- is the negotiations and the

15   e-mails around the time Mr. Cirkunovs negotiated and renewed his

16   contract.  That's what we've --

17         THE COURT:  But you have --

18         MR. CHIU:  -- produced before.

19         THE COURT:  But you have no idea if there are other

20   missing texts.  You don't know that.  You're right.  You have

21   information that you provided, right.  But as it relates to at

22   least those two individuals, and potentially there are other

23   issues regarding search terms that we don't need to talk about

24   now, you can't tell me that you've provided a complete record

25   for Mr. Cirkunovs because you have missing years of information.

1    Now, you can argue to me that based upon what you're

2    presented, it would appear that the negotiation is complete, and

3    I appreciate that's what you're saying to me that it doesn't

4    seem to be any indication that there is more.  But you can't

5    tell me, right, because you don't know because you haven't seen

6    them, whether or not those individuals who are clearly involved

7    with negotiations have relevant texts, right?

8    MR. CHIU:  Your Honor, our position is that based on

9    the record, based on what we've found, we believe that that

10   record with respect to Mr. Cirkunovs' negotiations is complete.

11   I will add a couple of more things.

12       The first is Mr. Cirkunovs himself, if -- to the extent

13   he negotiated, those would be in his possession as well.  And in

14   response to a motion to compel arbitration, plaintiffs always

15   and many times come forth with a declaration or exhibits, things

16   like that, saying, "In my negotiation, this is evidence that

17   supports an unconscionability argument."

18       So this idea that they're without and it's not complete

19   with respect to negotiations as to specific periods of time to

20   renew a contract -- it's not the entire class period, right.

21   It's not the entire length of the case.  These are distinct

22   periods of time where there's a negotiation that goes on and

23   then they execute the contract.

24       That's why it's limited.  That's why arbitration

25   discovery, Courts time and time and again recognize it's limited

1  because it is focussed on a discrete issue of the negotiations

2  and whether a valid agreement to arbitrate was entered into.

3           And so we would submit that based on we've produced,

4  what we've looked for, what the plaintiffs have with respect to

5  Mr. Cirkunovs' claim, there is a complete record.  There is more

6  than enough for plaintiffs to build an opposition and respond to

7  the motion to compel arbitration and for the Court to make the

8  determination as to whether, with respect to Mr. Cirkunovs'

9  claim, it should be compelled to arbitration.

10           THE COURT:  Okay.  All right.  Thank you, Mr. Chiu.

11           Mr. Dell'Angelo, I'll give you an opportunity to

12  respond to that.

13           MR. DELL'ANGELO:  Thank you, Your Honor.

14           First, let me just say that returning back to our

15  negotiation chart, and I do think it's -- it's an important

16  segue --

17           THE COURT:  Well, I want you to start with where

18  Mr. Chiu left off as it relates to Mr. Cirkunovs and

19  negotiations.

20           MR. DELL'ANGELO:  Sure.

21           THE COURT:  You obviously raised an issue about missing

22  years of texts for Mr. White and Ms. Long and also just about

23  how the search terms that were used themselves also didn't yield

24  information.

25           MR. DAVIS:  Right.

 1          THE COURT:  Right.  I want you to address that as it

 2   relates to Mr. Cirkunovs and also as it relates to other

 3   individuals and why you think it would be relevant for the

 4   Court's consideration regarding the arbitration clause.

 5          MR. DELL'ANGELO:  Happy to do that, Your Honor.  Thank

 6   you.

 7          So I'll start with the Ninth Circuit's decision in

 8   *Hansen*, and here's what it says and I'll quote at Page 670.

 9   It's 1 F.4th 667.  I'm sorry, at Page 672.  It says, quote, The

10   District Court must hold any motion to compel arbitration in

11   abeyance until the factual issues have been resolved, close

12   quote, and that a District Court, quote, is not authorized to

13   dispose of a motion to compel arbitration until after factual

14   disputes have been resolved, close quote.

15          Now, we obviously have some significant factual

16   disputes.  To answer your question directly, Your Honor, they

17   did finally on November 14th, right, for a motion to compel

18   arbitration that was filed on May 23rd and a substantial

19   completion deadline of July 17th produce a few text messages

20   among the defendant and Mr. Cirkunovs.  What is missing from

21   that production and from the entire production that we think is

22   directly relevant, and Your -- Your Honor got it exactly right,

23   are all of the internal discussions, right.

24          So as -- as the Court noted, for example, on Page 9 of

25   our -- of our statement of November 7th, there's this chart

1  showing these big gaps where Mr. White and Ms. Long's phones are

2  just missing communications.  Those fall right into these

3  arbitration periods.

4       So we may have communications that Mr. Cirkunovs

5  engaged in, but we do not have or we have no certainty --

6  because what we heard is that we have exemplars, there are

7  individual negotiations, they're continuing to search, right.

8  What we don't have is what they were saying among themselves,

9  right, whether it's about Mr. Cirkunovs or any other

10 plaintiff -- excuse me -- fighter or negotiation.

11      And that kind of gets to the -- the larger issue Your

12 Honor was asking about in terms of, like, what -- what do we

13 need to show.  Because part of what we are showing, yes, there's

14 a negotiation, and it's theoretical negotiation with

15 Mr. Cirkunovs, but part of what we are attempting to show is

16 that the market power that they have, the dominance that they

17 have, continued in the same way that this Court found that it

18 did in *Le* where there was a refusal to negotiate, that threats

19 were used, coercion was used, eliminating rivals, that some of

20 the threats were used in a way either you weren't going to fight

21 at all and, therefore, couldn't make a living or the way your

22 bout was structured, that it would result in physical harm.

23      And -- and if the Court remembers, I think one way to

24 think about this -- so what we're saying is those conditions in

25 their totality are exactly what could show procedural

1  unconscionability because, A, you know that you can't

2  negotiate --

3          THE COURT:  So, Mr. Dell'Angelo, let me ask you this

4  question.  So do you think the Court at this point has to find

5  that specifically Mr. Cirkunovs was subject to those same

6  conditions?

7          MR. DELL'ANGELO:  I'm sorry.  I...

8          THE COURT:  You're arguing to me, right, that the

9  factors which I have previously found for a different time

10  period --

11          MR. DELL'ANGELO:  Yeah.

12          THE COURT:  -- continued as it relates to

13  negotiating -- negotiation tactics, bout opponent choices, all

14  these other issues that I had previously found continued.  My

15  question to you is, do you think it's required at this stage for

16  essentially Mr. Cirkunovs to declare or to say in a deposition,

17  "That also applied to me in my negotiations," right, and that

18  would resolve this?  Do you think that's, one, necessary?  And,

19  two, is that something that would happen here?

20          MR. DELL'ANGELO:  So I -- I don't think that the

21  Court -- just to kind of break it down, I don't think that the

22  Court needs to find every one of those things, right, that it

23  found -- to still find that there was a sufficient environment

24  where someone like Mr. Cirkunovs or any other fighter after

25  October 7, 2020, would say, "I can't really negotiate this thing

1   successfully" or "I know better than to try."  It would

2   certainly aid our claim and I think it would aid the Court's

3   finding that the motion to compel should be denied and that

4   there's procedural unconscionability if Mr. Cirkunovs were to

5   declare or otherwise testify that it was his understanding that

6   those conditions existed and, you know, that dictated or drove

7   his decision with respect to the contract.

8          And I will tell you, you know, just to kind of zoom out

9   a little bit, if you think to a situation like we had in *Le*, if

10  you remember one of the named plaintiffs, Mr. Fitch, there was

11  this issue about the video games.  I think it's a really telling

12  story because it's -- it essentially drives what we're talking

13  about here.  Mr. Fitch was, you know, a very successful fighter

14  with the UFC.  He was under contract with them, and he fought at

15  the AKA gym in San Jose.

16         The UFC decided that it was going to launch a video

17  game, and what it determined was that the agreements that it had

18  with fighters at that time didn't include the video game rights.

19  So they went out to the fighters and said, "Sign this addendum

20  for no consideration and we get your right -- likeness rights

21  for the video game."  Mr. Fitch resisted.

22         And essentially what happened and what the evidence in

23  the *Le* case showed or would have shown is that the UFC

24  threatened Mr. Fitch's entire gym and said essentially, "If you

25  fight at that gym, you'll never fight for the UFC unless he" --

1  I'm paraphrasing -- "unless he sign" -- "Mr. Fitch signs the

2  agreement," right.  So that's sort of the same thing.

3          THE COURT:  Okay.  I'm not talking about the old case,

4  though --

5          MR. DELL'ANGELO:  Yes.

6          THE COURT:  -- Mr. Dell'Angelo.  I'm talking about the

7  current case, and the current issue before me is the issue of

8  the arbitration clause and what would have to be established,

9  right.  And I agree with the defendants that it's not full

10  merits discovery.  I disagree with them that the issue of the

11  UFC's market power on the input and output side is not relevant

12  as it relates to discovery, and I disagree that negotiation

13  tactics as relates to the fighters are not relevant.

14          The real focus I wanted you to have relates to this

15  argument about if it's -- if it didn't actually occur in all

16  respects regarding Mr. Cirkunovs, then the Court has to find the

17  arbitration clause enforceable as to him and you have to find a

18  new named plaintiff.

19          MR. DELL'ANGELO:  I don't -- I do not believe that you

20  need to find all of those things to make a determine- --

21  determination of procedural unconscionability.

22          THE COURT:  Well, what do you -- what do you believe

23  that the Court would need to find and what you think the

24  evidence and the record would demonstrate as it relates to

25  unconscionability, procedural and substantive?

1          MR. DELL'ANGELO:  Well, so -- so, first of all, we've

2    seen nothing that suggests that anything has changed since the

3    Court's finding in 2023.  But --

4          THE COURT:  Well, that's not really -- so I have to

5    say, I'm not persuaded by that.  You have to -- this is a new

6    case.

7          MR. DAVIS:  I understand.

8          THE COURT:  Right.  You can potentially use some of

9    that information as an example of history.  I'm not saying --

10   but, right, they could have completely changed how they

11   approached negotiations.  I can't assume that negotiation

12   tactics that I found previously continued --

13         MR. DELL'ANGELO:  Right.

14         THE COURT:  -- after the class period in those other

15   cases.

16         MR. DELL'ANGELO:  Yeah.  Understood, Your Honor.

17         So I think what you would have to find is that there is

18   sufficient indicia of market power, lack of -- lack of

19   alternatives for the fighters, a -- essentially a

20   take-it-or-leave-it environment with respect to these contracts,

21   and, you know, those sorts of things -- and I don't know that it

22   needs to be everything.  So, for example, if they have stopped

23   threatening fighters to give them fighters that would -- bouts

24   that would cause them physical harm as a way to coerce them,

25   I -- but you found all of the other things from -- you know,

1   that they continued to engage in the other tactics, I don't

2   think that that would be the fulcrum that would tip procedural

3   unconscionability in defendants' favor.

4        Right.  And I suppose at the end of the day, the way

5   you show those and -- and one of the key ways that you show

6   those things are through the negotiations.  I think that becomes

7   the touchstone, the negotiations with and the internal

8   discussions about.

9        THE COURT:  And I want you to address briefly the

10  spoliation issue as it relates to these text messages, but also,

11  I mean, there are other messages, direct messages, Instagram

12  messages that appear to be gone or missing.  I want you to

13  address that issue as well, Mr. Dell'Angelo, and how you think

14  the Court should address that.  I know you've identified a

15  three-step process, but --

16       MR. DELL'ANGELO:  Yep.

17       THE COURT:  -- that you think that the Court should

18  follow in this case.  And I want to understand what it is

19  exactly, as it relates to the arbitration clause issues, the

20  Court should do regarding that spoliation issue.

21       MR. DELL'ANGELO:  Sure.

22       So -- and I do appreciate Your Honor raising those.  We

23  have been asking the same types of questions that Your Honor

24  has, and I think what -- what that has resulted in, in part, you

25  know, we tried to reflect at Exhibits 2 and 3 to our statement

 1  as well as that chart -- sorry -- Exhibits 2 and 5 as well as

 2  the chart on Page 9 that shows the missing phones.  So --

 3          THE COURT:  And I'm sorry.  I just want to clarify one

 4  thing.

 5          MR. DELL'ANGELO:  Right.

 6          THE COURT:  I did see, again, the defendant, UFC, did

 7  provide text messages regarding Mr. Cirkunovs.  And I'm sorry.

 8  When did you say you received those?

 9          MR. DELL'ANGELO:  I believe it was November 14th, so it

10  was the day of the statement that defendants' filed their

11  response.

12          THE COURT:  So prior to them filing the response, had

13  you seen those?

14          MR. DELL'ANGELO:  No, Your Honor.  Now, I will say

15  there were some documents in the production that mention

16  Mr. Cirkunovs that had been produced earlier, but they weren't

17  the negotiate- -- the, quote, negotiation documents that you

18  were asking about.

19          THE COURT:  Okay.  All right.  You can go back to the

20  other issue you were --

21          MR. DELL'ANGELO:  Yes.

22          THE COURT:  -- discussing.

23          MR. DELL'ANGELO:  So -- so to address your question,

24  we -- so there's an April disclosure that was voluntary from the

25  defendants about mobile devices.  There was the court-ordered

1   July device disclosure.  And then -- that Your Honor ordered.

2   And then the magistrate ordered another disclosure that was in

3   October, I believe October 13th, that the defendants have

4   provided.

5          The issue that we have is that in many ways to the

6   extent that the defendants are saying what they -- what mobile

7   devices they have identified, what's on those devices, what

8   they've actually preserved, and what they have collected or

9   imaged from them, and what they have produced, it's -- it's like

10  a Swiss cheese.  We actually tried to make a chart, and it's

11  very difficult to even line up what's what.

12         So what I would recommend, to answer your question,

13  Your Honor, is let's set a short timeline, whatever you think is

14  reasonable, one week, two weeks.  Have the defendants take those

15  various disclosures.  We've also -- I think as we indicated in

16  the statement, we found several e-mails where there were cell

17  phones -- where in the e-mail signature of key -- key employees

18  there was a cell phone number that didn't appear in any of those

19  disclosures.  Have the defendants on some short timeline give

20  you a -- give plaintiffs and the -- and the Court a

21  comprehensive list of those devices and say definitively what

22  they've identified, what -- what has been preserved and when,

23  what they've collected, what the volume is, and what they've

24  actually produced and identify --

25         So, like, if you look at Exhibit 2 to our statement,

 1  we've got all of these communication platforms.  There's text

 2  chats.  There's WhatsApp.  There's Discord.  There's Twitter.

 3  There's Instagram.  And I think we've shown in a bunch of our

 4  papers that we know that these communications are happening on

 5  some of these platforms.  I'll say as an aside, Your Honor, I

 6  think we're in the process of discovering yet another platform

 7  that one of the key defendant employees used to communicate has

 8  been -- at least there's been some measure of spoliation that

 9  will eventually get to the Court.

10          But with that kind of disclosure, I think if we have a

11  full, transparent, fulsome disclosure, we can then assess

12  essentially what may have been spoliated, and then the Court can

13  make a decision about how to proceed.  Because I think if you,

14  like, again look at that graphic on Page 9 of our statement, it

15  shows that a key person like Mr. White is missing -- appears to

16  be missing communications for a key arbitra- -- key time

17  relevant to the arbitration agreement.

18          THE COURT:  Well, let me focus on this issue.

19          MR. DELL'ANGELO:  Yeah.

20          THE COURT:  And is it your position that you believe

21  that particularly when it comes to Mr. White and Ms. Long that

22  those are key gaps as it relates to evidence because they were

23  involved with the negotiations for the bout agreements and PAR

24  agreements?  Not necessarily all of them --

25          MR. DELL'ANGELO:  Yep.

1        THE COURT:  -- but they were certainly involved.

2        MR. DELL'ANGELO:  We most certainly do, and for exactly

3   that reason.  And I think what you heard about the negotiation

4   chart, that demonstrative that we provided to the Court

5   yesterday, what -- what we understand the defendants to be

6   telling you is when they say, "If you look at that column that

7   says 'PAR Bates' with the Bates numbers, those are the

8   negotiations."  Because what they really are, almost

9   exclusively, are transmittal e-mails that come to or -- come

10  from or go to Ms. Long.

11       Okay.  Now, there is a document in the production that

12  I could point you to, Your Honor, that -- where Ms. Long

13  explicitly says, "I don't have authorization to make changes to

14  these contracts."  But be that as it may, it's their position

15  that those are negotiation documents and they're negotiations.

16  So if Ms. Long is, in fact, a negotiator and those are the

17  negotiations, the fact that her text message are missing, very

18  important.

19       And this is very important.  What you will see in a

20  handful of those documents in the "PAR Bates" column, they --

21  they include e-mails from time to time from an individual at

22  Zuffa who is actually doing the negotiation, then e-mailing

23  Ms. Long, saying essentially, "Here are the terms to put in the

24  contract," right, or forwarding an e-mail exchange that may

25  reflect the negotiation.

1     So how else might that information get to Ms. Long?  By
2  text message, right.  And if I don't have Mr. Campbell's or
3  Mr. White's or Mr. Maynard's or Mr. Shelby's for any number of
4  periods, as you can see in Exhibit 5 to our statement, then I
5  need Ms. Long.
6     THE COURT:  So, Mr. Dell'Angelo, the question becomes
7  in this case --
8     MR. DELL'ANGELO:  Yes.
9     THE COURT:  -- as opposed to the other cases, how is
10 that relevant with respect to the arbitration clause issue?
11     MR. DELL'ANGELO:  Two reasons.  One, as the Court
12 identified, the defendants cannot say definitively whether or
13 not the missing documentation or the potentially spoliated
14 documentation includes communications about Mr. Cirkunovs or the
15 negotiation with Mr. Cirkunovs or him just taking the contract
16 as it is.  But, secondly --
17     THE COURT:  So what would you then be asking me to do?
18 Let's assume for the moment I were to find that those texts and
19 messages are gone.  They should have been preserved and they
20 weren't, and they were deleted or allowed to be deleted.
21     What would you then argue to me as it relates to the
22 arbitration clause?
23     MR. DELL'ANGELO:  I would argue to you, Your Honor,
24 that you do not -- that there's not a sufficient record to make
25 the determination that goes in -- in defendants' favor that the

1  spoliation may be entirely ripe because what they're trying to

2  do is both hide the issue of arbitration, but essentially how

3  they negotiate generally --

4          THE COURT:  You would essentially say to me, "They

5  can't enforce the arbitration clause because they deleted

6  messages that they should have preserved and we know these

7  individuals were involved in the negotiations."  That's what

8  you'd ask me to do, right?

9          MR. DELL'ANGELO:  I would.  And I would add, Your

10  Honor -- and this is the second point I was going to raise

11  before, but it dovetails to exactly what you're asking about --

12  is, you know, some of the other discovery that we're asking for

13  here, right, are document requests -- I believe it's 8, 9, and

14  10 -- that we propounded long before this issue -- before the

15  Cirkunovs case was even filed -- that ask about the arbitration

16  clause, discussions about them, why you implemented them, et

17  cetera, right.

18          So that, too, is missing.

19          THE COURT:  Well, again, I had already previously found

20  that the fact that they decided to use arbitration clause, to me

21  that wouldn't be relevant to a determination of the

22  enforceability, right.  It's actually a reasonable business

23  decision that they might say, "Well, given what happened with

24  the class action, we would want to have arbitration clauses and

25  a class action waiver."  I don't know why that would be in any

 1   way supportive of an argument that the arbitration clause or the

 2   class action waiver's unconscionable.  I mean, that --

 3           MR. DELL'ANGELO:  Well --

 4           THE COURT:  -- that's a business decision that's not

 5   improper or unlawful.

 6           MR. DELL'ANGELO:  It -- that -- that's one possibility,

 7   but I would submit that there are other possibilities for why

 8   that arbitration clause may have been implemented and how they

 9   thought about it.  And so how they thought about it might be

10   one, like, this is one more thing, you know, that --

11           THE COURT:  But how would they -- okay.  Other than

12   saying, "We wanted to use it to limit our liability," right, and

13   "we think that the cost of litigation as it relates to going

14   into Federal Court, as we learned from that case, the *Le* case,

15   is not worth it.  And so we want to insert an arbitration clause

16   in our contracts."  I've seen no law that would indicate that

17   somehow the choice to insert an arbitration clause is at all

18   relevant to a determination of liability.  So you're saying that

19   somehow it -- it might relate to unconscionability, but I don't

20   see how.

21           MR. DELL'ANGELO:  Well --

22           THE COURT:  I mean, what would be an example of

23   something that they might say about it that you think would be

24   relevant for my consideration of the arbitration clause?

25           MR. DELL'ANGELO:  So -- so the following, right, the

 1  *D.R. Horton* case --

 2          (Court reporter interruption and clarification.)

 3          MR. DELL'ANGELO:  *D.R. Horton*, it's in -- cited in

 4  Footnote 1 of our statement, you know, it -- it talks about --

 5  explains procedural unconscionability, and one of the things

 6  it -- it talks about is unequal bargaining power, right.  So

 7  what -- what we're suggesting about the internal discussions

 8  about these arbitration clauses, generally, right, you could

 9  have the defendants saying, "Hey, there's this last bit of

10  daylight," right, "and we're going to take that away, too,"

11  right.  It's just -- it's sort of the last way -- it's the last

12  one-way ratchet of these, you know, otherwise exclusive

13  long-term contracts, you know.  It's things like that, right.

14          But the reality is we just don't know because I think

15  what's pretty clear is they're purporting to continue to search

16  for documentation that should have been preserved as far back as

17  2014 and we still don't have it.  And no matter how many times

18  we've asked and when the Court has demanded a disclosure and the

19  magistrate has demanded a disclosure, we're not getting, you

20  know, full --

21          THE COURT:  Well, look, they're admitting -- Mr. Chiu

22  said, "We've looked, we don't know where it is," right.  But the

23  issue for me, right, relates to what the impact of that is --

24          MR. DELL'ANGELO:  Right.

25          THE COURT:  -- right, you know, in terms of spoliation

1  and what I should do about it and what the impact is,

2  particularly here procedurally, regarding the arbitration

3  clause.

4          MR. DELL'ANGELO:  Right.

5          THE COURT:  So that's why I asked you that question

6  regarding the missing texts and other communications.

7          MR. DELL'ANGELO:  Yes.

8          THE COURT:  The other argument that you raise relates

9  to the use of search terms by the defendant regarding agreements

10 and negotiations such that their terms are yielding a fairly

11 small amount of relevant information, and you think that that's

12 improper here because you believe, based upon running your prior

13 search terms in the prior case against the same or similar data,

14 that there is more information out there.

15         MR. DELL'ANGELO:  Yes.

16         THE COURT:  So, again, how would that relate to the

17 arbitration clause analysis here?  So let's assume for the

18 moment I agree with that, right.  The question is its relevance

19 for my consideration regarding the motion to compel arbitration.

20         MR. DELL'ANGELO:  I'm sorry, Your Honor?

21         THE COURT:  So why does that matter for the motion to

22 compel arbitration?

23         MR. DELL'ANGELO:  Because --

24         THE COURT:  What specific information do you believe is

25 missing based upon them using search terms that have a low yield

 1   of relevant documents?

 2          MR. DELL'ANGELO:  Well, the -- the -- the document that

 3   we began our discussion with today, you know, the chart of

 4   negotiations, is a -- is a great starting point.  So their

 5   search terms don't include fighter names.  The whole case is

 6   about fighters.  Some of the most significant evidence in the

 7   case would be, was in the last case and you would expect it to

 8   be here, discussions about and with fighters using their names,

 9   their nicknames, et cetera.  Those are completely absent from

10   the search terms.  Cirkunovs in a way is proof of concept of

11   that, right.

12          So we didn't actually get the, quote, negotiation

13   documents that they produced on November 14th.  They got those,

14   right, because they did and they're doing -- what they're saying

15   they're doing is they actually finally searched for his name,

16   but they're not even searching for, like, every iteration of his

17   name.  And so you -- you kind of expand this problem out:  the

18   search terms don't have any fighter names, they don't have most

19   of the competitor names, and they're designed in such a way

20   where, you know, five terms are getting about 70 -- 68 or

21   70 percent of the documents, and most of those are coming from

22   Ms. Long's files.

23          And so what it's telling you is to the extent that

24   there are -- there are documents or information that are

25   necessary to decide this motion, the search terms are almost

1    intentionally designed -- I'm not going to describe intent, but

2    they are designed in such a way that they do not capture

3    relevant information.  And an easy way to see that, I mean, one

4    of the analyses that we provided Your Honor is we took some of

5    the most significant documents from the *Le* case, right, like

6    Mr. Shelby's, "I give him a" -- you know, "I lowball him the

7    first time," and Mr. Fertitta's, you know, "Take their oxygen,"

8    and so on and so on.  You know, these sort of really

9    substantively --

10           THE COURT:  Well, I --

11           MR. DELL'ANGELO:  -- they just don't get captured,

12   right.

13           THE COURT:  Well, okay.  I know what -- that's why I

14   asked you the question.

15           MR. DELL'ANGELO:  Yeah.

16           THE COURT:  I've reviewed what you said that you did.

17           MR. DELL'ANGELO:  Yeah.

18           THE COURT:  And I just wanted to figure out, again, why

19   it would be relevant here as it relates to the arbitration

20   clause determination.  Okay.

21           Let's see here.

22           Thank you, Mr. Dell'Angelo.  I don't have any more

23   questions for you.

24           MR. DELL'ANGELO:  Thank you, Your Honor.

25           THE COURT:  Mr. Chiu, again, I want to make sure I'm

1  understanding your argument regarding, sort of, the arbitration

2  clause and information.  Let's say, for example, Mr. Cirkunovs

3  were to say, "I didn't feel like they really negotiate.  Yeah, I

4  said this, but given what they had said, given what I knew,

5  given what -- the market, right, I felt it was a

6  take-it-or-leave-it, right.  And I felt that way, right."  I

7  assume you would argue to me, if you look at the communications,

8  he's actually negotiating, correct?

9           MR. CHIU:  Correct.

10           THE COURT:  Okay.  And so as it relates to the issue of

11  the enforceability of the arbitration clause, you're saying even

12  if individuals were aware of a completely dominant market

13  position, if they nonetheless sought to negotiate, that would be

14  indicative of that.  So I guess my question to you is, if you're

15  looking at their statements as being indicative of that, but

16  then they're also saying something separate, how would I resolve

17  that?

18           Let's just say for the moment, for example,

19  Mr. Cirkunovs were to be deposed and he said, "Look, I didn't

20  feel like I had any choice.  Yeah, I asked that just to see what

21  would happen," you would still argue to me that that -- I should

22  discard -- I should disregard that because he actually asked the

23  question.  And I'm saying that because it goes to a fundamental

24  problem as it relates to factual issues regarding the

25  enforceability or not of the arbitration clause in terms of what

 1   evidence the Court should consider, right.

 2        So let's assume that actually happens.  Mr. Cirkunovs

 3   gets deposed and says, "Look, they're the only game in town,

 4   right.  On multiple occasions I had heard Mr. Maynard or

 5   Mr. Campbell or Mr. White or whoever, sort of, basically go off

 6   on me and say, look, you want to go somewhere else, go somewhere

 7   else, right.  Take it or leave it."  Let's assume that he said

 8   that, right.  How would I in that context resolve that factual

 9   dispute as regarding the enforceability of the arbitration

10   clause?  Because part of what you're asking me to do is look at

11   these individual negotiations, but is that a credibility

12   determination or what would I look to to resolve that?

13        MR. CHIU:  I think it would be a mixed question of fact

14   and law.  Your Honor would look at the evidence before you.  We

15   would argue, nevertheless, under the applicable precedence under

16   the FAA and Nevada law, even if he'd felt a certain way, if you

17   look at his contemporaneous negotiations with Mr. Maynard, who

18   is the person negotiating and texting with him about renewing

19   his contract, that undermines his credibility now, you would

20   make that determination.  We would then argue even

21   notwithstanding that, as a matter of law, that doesn't establish

22   the procedural and substantive unconscionability under Nevada

23   law.  So it's a mixed question of fact and law.  But that's how

24   this gets teed up.

25        THE COURT:  Well, first of all, this -- again, I go to

1  the issue about, sort of, how this gets resolved because in

2  other cases, obviously, Mr. Chiu, that's what would actually

3  frequently happen if there wasn't a class action.  If there's an

4  individual, for example, plaintiff and an individual defendant,

5  the Court would look at the circumstances surrounding the

6  signing of the arbitration clause.

7        And so what I understand you to be arguing to me is

8  that if the Court were to make, let's say, a credibility

9  determination that in fact he felt that way, under the law,

10 that's not enough.  It's a sort of -- it's an objective

11 assessment of his subjective state of mind and the circumstances

12 surrounding his ability to negotiate.

13       MR. CHIU:  That would be our argument, yes.

14 Absolutely.  And I think the -- I guess I have two points in

15 addition to that, Your Honor.

16       If you look at the Supreme Court case law,

17 *Rent-A-Center* is a case that, you know, Your Honor cited and

18 numerous other cases, the Supreme Court has made very clear when

19 you're determining kind of whether a valid arbitration agreement

20 exists, you are looking -- under Section 2 of the FAA, you are

21 looking to the specific agreement to arbitrate even if there is

22 a challenge to the entire contract, right, and that's kind of

23 the situation here.

24       And I think that speaks to, kind of, your question of

25 that would -- we would argue that law kind of bears on this

1   question, right.  The Court's focus needs to be on whether --

2   yes, notwithstanding -- if we have a situation where

3   Mr. Cirkunovs, let's say, testifies or puts in a declaration and

4   says, "Look, I felt like UFC was the only game in town, but I

5   nevertheless agreed to it," and we say, "Look, there's evidence

6   that he didn't protest and he nevertheless re-upped his

7   promotional agreement," we would argue, "Look, under the

8   relevant binding precedence under the FAA, the Court has to

9   focus specifically, notwithstanding that, that he still

10  nevertheless willingly agreed to the arbitration provision."

11  And if the answer is "yes" based on the Court's determination

12  looking at the record, then it goes to arbitration.

13          THE COURT:  So then I go back to the question that I

14  had to you before which is, in the context of it being

15  unconscionable, are you saying that what they would have to show

16  is an explicit text or message that said, "Take it or leave it.

17  We're not entertaining any questions.  We're the dominant player

18  here, so you choose"?  Right.  You're saying if there was

19  something like that, that would be closer potentially to

20  unconscionability than asking questions back and forth.

21          MR. CHIU:  That would be one argument.  I think our --

22  our position would still be that is not -- under Nevada

23  precedence, there's --

24          THE COURT:  Because, Mr. Chiu, I'm trying to figure out

25  when you would say that there's, like, a contract adhesion

1  because it sounds to me like you're basically saying if I say

2  yes to the contract, that's all that matters.  And I don't think

3  that that's the law either, right.  You haven't really

4  identified a set of circumstances where you think it would be,

5  right, unconscionable, right.  You're saying to me, "Look, if a

6  person says 'I agree,' that's it.  The Court's analysis ends."

7       I don't agree with that.  Otherwise, right, you would

8  never find anything unconscionable.  Everything would be -- or

9  enforceable because someone signed the contract, right.  It

10  can't be that simply signing the contract or agreeing to it is

11  enough, right.  Otherwise, you wouldn't have a contract of

12  adhesion.  All contracts of adhesion are entered into, right.

13  So the question is, what would be the facts that would establish

14  that here?

15       MR. CHIU:  I think the --

16       (Defense counsel conferring.)

17       MR. CHIU:  I mean, if you had situations where, you

18  know, in the text messages or something where Mr. Cirkunovs is,

19  you know, under some sort of -- you know, Mr. Dell'Angelo tried

20  to refer -- refer to the *Le* case, an issue where there's an

21  actual threat or there's a -- you know, an exchange where it's

22  like, "Yeah, you have no other choice.  You have to take it or

23  leave it.  These are the terms."  That's not what happened here.

24  I think we would be closer, maybe.

25       THE COURT:  Okay.

1          MR. CHIU:  But to your point, Your Honor, again, under

2  Nevada law, contracts of adhesion have been enforced, right.

3  Contracts of adhesion with arbitration clauses have been

4  enforced.

5          THE COURT:  Right.  But in order for this standard to

6  actually have any meaning, Mr. Chiu, there has to be a case

7  where, in fact, it's un- -- right, it's unconscionable.

8  Otherwise, it's a nonexistent standard, right, which I don't

9  assume.

10         MR. CHIU:  No, I agree.

11         THE COURT:  So there has to be a scenario where that

12 happens.  I'm not saying this is the scenario.  I agree with you

13 Courts have enforced contracts where there is clear unequal

14 bargaining power.  That certainly is not -- I mean, it's a

15 factor, but that's not the touchstone of --

16         MR. CHIU:  Right.

17         THE COURT:  -- an unenforceable contract.  Otherwise,

18 you would have almost all of the arbitration clauses would be

19 found to be unconscionable.  But on the other side, there has to

20 be a situation where there are -- in fact, it is unconscionable.

21 And, again, I'm trying to figure out from you, although I know

22 you are not conceding in any way that that's here, what you

23 think that would look like here so that I can measure that

24 against the standard.

25         And it sounds to me like what you're saying is, there

1  would have to be some communications or other negotiations that

2  would establish it was a take-it-or-leave-it situation more

3  explicitly, one; two, there would have to be some way to

4  establish that he didn't have any choice.  So, in other words,

5  he couldn't go down the block and choose a different

6  organization.

7       Anything else that you think would have to be

8  demonstrated for there to be a finding of unconscionability?

9       MR. CHIU:  I mean, there's many -- there are other

10  factors to the unconscionability determination, right.  So if

11  you're just talking about this adhesion piece, I think that's

12  what we're talking about, but there are other things that they

13  would need to show.  There's procedural and substantive --

14       THE COURT:  Right.

15       MR. CHIU:  -- unconscionability, and so there would be

16  other factors that we would argue are not present here, right,

17  with respect to how the arbitration clause exists in the

18  agreement.  The terms of that, that goes to this whole

19  substantive unconscionability piece.

20       So the negotiations is one piece of it -- of a number

21  of factors that under Nevada law the Court would have to look

22  at, looking at the record, to make that determination.

23       THE COURT:  But --

24       MR. CHIU:  So I don't want to be -- you know, I

25  understand the Court is focussed on, like, the negotiation

1   piece, but --

2              THE COURT:  I'm not focussed on that.  What I'm trying

3   to -- what I'm trying to get at, Mr. Chiu, is figuring out what

4   would be, in your view, an unenforceable contract in terms of

5   the facts that it would present.  Because I agree with you the

6   reality of it is in most cases and, in fact, most of the cases

7   where I've had arbitration agreements, I've enforced them.  It's

8   unusual for them not to be enforced, right.  That is certainly

9   not the norm.

10             However, this case is definitely not the norm either,

11  and it brings up some unique economic circumstances, right.

12  I've not had -- well, I have one other cases involving a

13  monopsony, but that, I think, adds a unique wrinkle here.  But I

14  think I take your point that you think they'd have to have more

15  here.

16             I want to ask you another point, which is it does seem

17  to me that it's highly relevant what the market position is of

18  the UFC because, for example, if there was a report that

19  indicated there are five competitors who all had equal shares of

20  the market, it would seem to me that you would certainly argue

21  to me that it's not possible for this to be an unconscionable

22  contract where there are clear and known alternatives, right.

23             So my -- I go back to this question of why isn't market

24  position relevant.

25             MR. CHIU:  Because market position -- Your Honor, when

1  you look at the case law, there is no case -- we've looked --

2  there's no case that has found or made this determination on the

3  enforceability of an arbitration provision on this idea that the

4  defendant is alleged to have any sort of market power.  And I

5  get your point that --

6        THE COURT:  Mr. Chiu, here's the thing.  Mr. Chiu, this

7  case has always sorts of new aspects to it.  I appreciate that,

8  right.  But there had been no case where a monopsony class had

9  been certified.  And I understand that, but the fact of the

10 matter is I have to take the cases on their unique set of facts

11 because the law also says that to me, too, which is to say,

12 right, each case is unique as relates to the circumstances of

13 the arbitration clause.  The Court has to look at that, right.

14       And I don't understand how in this case it wouldn't

15 matter how dominant UFC's position is in the input and output

16 market.

17       MR. CHIU:  It wouldn't matter because the law's very

18 clear when you look at the elements of what amount to an

19 enforceable agreement to arbitrate, you're looking at the

20 circumstances of the individual and the parties and how they

21 came to that agreement.

22       THE COURT:  So you're saying that a lack of choice

23 doesn't matter?  Because I'm not sure I understand that, right.

24 Because you would certainly argue to me, as I said, if there are

25 five other competitors who had equal market share that there are

1  five other competitors that were known.  So I don't understand

2  how you're arguing to me that it's not relevant -- I'm not

3  saying dispositive, but it's not relevant to the Court's

4  consideration what the market position is of the UFC even in the

5  context of the particular arbitration clause.

6          MR. CHIU:  Yeah, Your Honor, I think, again, our

7  position, if that were the case, any time a plaintiff alleges

8  some sort of market power, that could be the issue that holds up

9  the determination of arbitrability.  That's not --

10         THE COURT:  Okay.  But, Mr. Chiu, you're

11  misunderstanding.  I am not saying that it would be dispositive,

12  but you seem to be arguing to me that it doesn't actually

13  matter, that it's not even relevant, right, for my

14  consideration.  Because that's what I'm focussed on.  I'm not

15  saying that it's a dispositive issue that if there were, as I

16  said earlier, a 100 percent monopsony, like a coal town, that

17  that would mean necessarily those are unconscionable arbitration

18  clauses.  I'm not saying that.

19         My question to you is about the relevance of this in

20  terms of the arbitration clause analysis.  Because you seem to

21  be suggesting to me that it's not even relevant.  And that's

22  important as I look at the discovery and what needs to be

23  provided or not for my determination.

24         So why is it not relevant to the analysis?

25         MR. CHIU:  It's not relevant because, again, when you

1  look at the case law as to what -- what courts look to when

2  making the determination as to whether an arbitration agreement

3  is enforceable, they look to things like substantive and

4  procedural unconscionability.  Okay.  And the idea that -- so

5  just simply because a defendant is alleged to have a certain

6  market share, if that doesn't translate into how the

7  negotiations went, whether the plaintiff willingly nevertheless

8  agreed to a -- to a contract, right, to an arbitration

9  provision, knew about it, had the chance to review it, and

10  signed it, it's not relevant.

11         THE COURT:  Yes, but you seem -- so then you seem to be

12  saying to me the touchstone is the fact that a person entered

13  into the contract and that they willingly did so, and that

14  unless you can really show that there was some sort of, like,

15  essentially done at gunpoint that the clause is unenforceable, I

16  don't think the law is that extreme.  I'm trying to figure out,

17  like, where the law is as it relates to a situation where

18  someone's signing literally a -- a contract literally at

19  gunpoint versus the level of coercion that is suggested in both

20  procedural and substantive unconscionability.

21         And so...

22         MR. CHIU:  I mean --

23         THE COURT:  Again, I'm not -- I'm not clear why you're

24  saying that this wouldn't be relevant.  I'm not saying, again,

25  it's dispositive, but you seem to be saying that it doesn't

1  matter.

2       MR. CHIU:  Because I think where -- Your Honor, I think

3  the issue is that plaintiffs keep asking for -- number one, we

4  have produced and I think -- as in our filings, we have

5  produced, at least within Zuffa's possession, documents that

6  speak about this idea of market share and competitors and

7  whatnot.  And, of course, we dispute that there was no

8  competition throughout this period.  Competition has only

9  increased.

10      But setting that aside, you know, again, it -- when you

11 look at the -- the precedence, they focus on the circumstances

12 of the negotiation and whether the parties willingly entered

13 into the agreement.  That is what is dispositive and that is

14 what matters for determining whether the agreement to arbitrate

15 is enforceable.

16      Now I, understand, you know, the plaintiffs are trying

17 to suggest, well, market power is relevant.  It's not unless it

18 actually impacts the negotiation.

19      THE COURT:  But Mr. Cirkunovs clearly would have known,

20 right -- I'm not saying -- I mean, it doesn't seem to me that

21 you can reasonably argue to me that he wouldn't know that UFC

22 was the dominant player in the market.  I mean, that's obviously

23 part of what they're going to say.  I don't hear you saying that

24 he wouldn't have known that.  So that goes into the specific,

25 right, negotiation.

1        MR. CHIU:  Right.  And -- and our position would be,

2   and under the law, if he nevertheless knew that and agreed to an

3   arbitration clause, it is enforceable.

4        And I just want -- I want to direct the Court to a

5   passage in the Supreme Court case that I mentioned,

6   *Rent-A-Center*, where the Court was very clear that -- and this

7   is at Page 70 of this opinion, and it's cited in our papers.

8   And the Court has relied on this case in other decisions

9   enforcing arbitration agreements.

10        But it says that because Section 2 of the FAA states

11   that a written provision to settle an arbitration -- "by

12   arbitration a controversy is valid, irrevocable, and enforceable

13   without mention of the validity of the contract in which it is

14   contained.  Thus, a party's challenge to another provision of

15   the contract or to the contract as a whole does not present a

16   Court from enforcing a specific agreement to arbitrate.  As a

17   matter of substantive federal arbitration law, an arbitration

18   provision is severable from the remainder of the contract."

19        And so in this case, the Supreme Court has made very

20   clear you are looking to the circumstances of the agreement to

21   arbitrate.  In every antitrust case --

22        THE COURT:  Yes, but hold on, Mr. Chiu.  You can't have

23   it both ways.  You can't say, "Look at the negotiations

24   regarding the contract in total," which is what you provided,

25   but then say, "We're only looking at the arbitration clause."

1  Because what you're going to argue and have argued to me is if

2  you look at the negotiation of the contract itself, which

3  included the arbitration clause, right, that that indicates an

4  ability to negotiate.  So, right, I mean, you're actually asking

5  me to consider the negotiations regarding the contract itself,

6  too, right?

7          MR. CHIU:  Yeah, but as it relates -- but this is the

8  point as to why this idea of alleging monopoly power in an

9  antitrust case or monopsony power is irrelevant.  Because in

10  every antitrust case where an arbitration provision comes up,

11  there is a contract and the contract is being challenged, right.

12  The contract is either alleged to be unlawfully exclusive or it

13  is being used to -- as part of a course of monopoly conduct.

14  Every case in which there's an antitrust claim that gets sent to

15  arbitration, there is a contract.

16          There is no Court that has ever held that you look at

17  the allegations with respect to the contract being unlawfully

18  exclusive or that it reflects that the defendant has monopoly

19  power and monopsony power to bear on the question of whether

20  there was a valid agreement to arbitrate.  In all those cases --

21          THE COURT:  But, Mr. Chiu, here's the issue, right, and

22  we don't need to go round and round about this.  If you look at

23  the standard, they use terms like "unequal bargaining power."

24  They use terms like "take it or leave it."  So it's -- right,

25  they talk about that, right.

1          And those are all cases where they found, right, a

2  contract or clause to be unenforceable where the person signed

3  it, right.  So it's not the case that simply signing it is

4  enough, right.  The Courts, including the Nevada Supreme Court,

5  have looked at issues of take-it-or-leave-it negotiations.  So

6  I'm not sure why you're saying that that isn't the case.  There

7  are more recent cases than the case you cited which I think talk

8  about, right, the fact that take-it-or-leave-it negotiates are

9  clearly relevant to the enforceability of an arbitration clause.

10  So why would you say that to me that they're not relevant?

11          MR. CHIU:  I didn't say that.

12          THE COURT:  Okay.

13          MR. CHIU:  I said the issue of power, right.  The

14  merits issue of power, does that translate into a true

15  take-it-or-leave-it.  That's a very different scenario, right.

16          THE COURT:  How else am I -- but, Mr. Chiu, how else am

17  I suppose to evaluate take it or leave it?  Because, again, I go

18  back to this question where you say if there are five different

19  grocery stores on the same street, right, one saying "take it or

20  leave it" is certainly different than if there's only one game

21  in town and you say, "You have to leave here, right, this

22  grocery store, and you can't buy food anywhere else."  Obviously

23  that matters.  So I'm not sure why you're arguing that to me.

24          MR. CHIU:  Why it matters is you still have to look at

25  does that actually translate.  This idea of, oh, there's one --

1  one game in town, does that actually translate into the

2  negotiation and whether the plaintiff nevertheless, knowing

3  that, agreed.

4         THE COURT:  Okay.  But, again, we don't have to go back

5  and forth.  Obviously, I appreciate your position.  I just

6  disagree.  It is not the touchstone of these cases in

7  determining the enforceability of the contract whether or not

8  the person actually entered into the contract.  Because

9  obviously there are clear case law where the clauses were

10 entered into and the Courts found them not to be enforceable.

11        So here's what we're going to do.  We're going to take

12 a break because I'm going to come back now, given what the

13 parties are arguing, I'm going to make a decision about what

14 we're going to do as it relates to the evidence in this case and

15 what's relevant and some of the discovery issues here.  So we'll

16 take about a five-, 10-minute recess and we'll come back.

17        COURTROOM ADMINISTRATOR:  Please rise.

18        (Recess taken at 11:24 a.m.)

19        (Resumed at 11:47 a.m.)

20        THE COURT:  Please be seated.

21        So I've considered the arguments and the submissions of

22 the parties.  And I'm just going to make a few findings here.

23 First, I do find that there is a factual dispute between the

24 parties with respect to the circumstances of the negotiation of

25 the arbitration clause itself, and I do find that the

1  negotiations themselves with respect to both the class members

2  and Mr. Cirkunovs is relevant to the Court's inquiry with

3  respect to the motion to compel arbitration.

4      I also find that the internal discussions between UFC

5  individuals involved with the negotiations, and that's

6  approximately the six people identified by the parties regarding

7  that issue, are also relevant to the Court's consideration with

8  respect to the arbitration clause.  Because the Court finds that

9  they would have to determine whether or not, in fact, there was

10  a pattern or policy as it relates to take-it-or-leave-it tactics

11  or other tactics that the Nevada Supreme Court has found to be

12  the basis for unconscionability.

13      I also find that the market position of the UFC as it

14  relates to its monopsony power and actually monopoly power in

15  the output market is relevant to the Court's inquiry as to the

16  enforceability of the arbitration clause.  This includes the

17  percentage of fighters that were controlled or under contract

18  from the UFC.

19      This also includes, for example, the promotional events

20  that were produced by the UFC in comparison to other alleged

21  competitors.

22      Now, I want to address the issue of discovery

23  violations, and I'm making some very specific findings here.

24  First, the Court finds that the defendant, UFC, has violated

25  this Court's orders regarding discovery and disclosure in this

1   case.  Specifically, the Court finds the defendant has and

2   continues to violate this Court's order as it relates to the

3   device disclosure regarding relevant custodians, particularly

4   those involved with the negotiations.  The Court had previously

5   ordered specific and detailed disclosure of device information

6   regarding relevant custodians, but in particular those

7   individuals who have been identified with negotiations, and the

8   Court finds that this is still not complete or done.

9           The Court finds that this is an ongoing pattern of

10  discovery violations dating back as far as July of this year

11  when defendant failed to meet the Court's deadline as to

12  disclosure.  In addition to this disclosure misconduct, which

13  includes the current issue of the disingenuous use of search

14  terms that have led to limited or minimal disclosure of relevant

15  material, even when it is clear that such material must exist,

16  for example, as documented by the plaintiffs in their briefing,

17  the failure to use appropriate search terms to capture relevant

18  documents related to the arbitration and the negotiation of the

19  arbitration clause in terms of the PAR agreements, the

20  negotiation of the arbitration clause or its part of the

21  negotiations for bout agreements, the use or lack of use of

22  compensation for bouts as a means of coercing the use of the

23  arbitration clause, and the fact that these sources of

24  information or these pieces of information simply have not been

25  identified.  The Court simply doesn't find it credible that

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1  there were literally thousands of contracts here and there has

2  been no production or meaningful production of negotiations

3  regarding these contracts.  There is no justification or

4  explanation for this defiance of the Court's orders.

5          The Court finds it necessary to take potential remedial

6  action under Rules 26 and 37 with respect to this ongoing

7  pattern of discovery violations.  The Court finds that this

8  ongoing pattern of discovery misconduct has led to continuous

9  delay of the production of relevant material for the purpose of

10 the resolution of the motion to compel arbitration.  For

11 example, even as indicated today, the production only on

12 November 14th of information regarding Mr. Cirkunovs'

13 negotiation of contracts in this case.

14         At the previous hearing, the Court identified

15 information relevant to the arbitration in order to process for

16 its expeditious production.  The Court set an expedited schedule

17 review based upon the defendants' representation that it could

18 and would provide relevant material identified by the Court.

19 However, while the defendant purports to seek an expeditious

20 resolution of the arbitration clause, the Court finds that the

21 record is clear that it has engaged for months in a pattern of

22 discovery disclosure failures that have and continue to

23 unnecessarily delay the Court's ability to resolve the

24 arbitration issue.

25         The Court also finds that the plaintiffs have presented

1   and that the Court has confirmed today significant indicia of

2   spoliation of relevant evidence with respect to the Court's

3   resolution of the arbitration clause.  For example, the fact

4   that there's been no production as relates to Mr. Cirkunovs or

5   other fighters of text messages, messages, or anything involving

6   Mr. White or Ms. Long for years, despite the fact that they were

7   under a litigation hold, is deeply troubling to the Court.  This

8   information should have been preserved, and there is clear

9   indication in the record that the defendant was aware of its

10  obligation and was aware that this evidence should have been

11  preserved and it was not.

12        The Court, therefore, finds it necessary to order a

13  spoliation hearing in this case to determine the extent and

14  level of the deletion or destruction of evidence in this case.

15        The Court will also order that the individuals who are

16  involved with the negotiations whose information is missing --

17  that would include at least Mr. White, Ms. Long, and

18  additionally Mr. Campbell and Mr. Maynard -- will be required to

19  testify at the spoliation hearing to explain what has happened

20  to these missing or lost or deleted messages, e-mails, or

21  correspondence.  The Court will consider a request by the

22  plaintiffs for these individuals to be first deposed prior to

23  the spoliation hearing specifically on the issue of missing

24  messages/texts that are relevant to the Court's determination of

25  the arbitration clause.

1          The Court is going to order the plaintiffs to provide a

2  proposed list of search terms that it believes will actually

3  capture this information, as indicated in its briefing, by

4  December 1st.  The Court will then set a hearing, and we'll

5  confirm the date of that, to discuss when and how the defendants

6  will be required to conduct a search of the relevant sources

7  pursuant to the proposed search terms by the plaintiffs.  And

8  the defendants will also have an opportunity to suggest edits or

9  modifications to the search requests.

10          Of course, the defendant will notify the Court if at

11  some point it discovers the missing text messages or direct

12  messages or messages on social media.  The Court finds from the

13  record that clearly such messages existed at some point as it

14  relates to negotiations regarding fighters' contracts and, to

15  date, those messages have not been produced or provided and the

16  defendant, UFC, has represented that it does not know where

17  these messages are and does not have them in its possession, and

18  that the individuals who were involved with the negotiation of

19  these contracts who may have missing messages, texts, or e-mails

20  at this point don't know where they are either.

21          The Court needs to ascertain what the consequence will

22  be for the potential finding of spoliation and for these

23  discovery violations.  So we're going to come back the week

24  of -- either the week of December 1st or the week of

25  December 8th to go through the schedule that we're going to set.

1           MR. DELL'ANGELO:  Excuse me, Your Honor.

2           THE COURT:  Yes.

3           MR. DELL'ANGELO:  The magistrate has scheduled a

4  hearing for December 4th.  So I think the parties will already

5  be here at that time, if it's helpful to the Court.

6           THE COURT:  Well, I'm going to communicate with Judge

7  Weksler about my findings today because obviously it will impact

8  what happens in front of her.  So that might be a date that we

9  could use.  I don't know.  I'll look at my calendar.

10          MR. DELL'ANGELO:  Okay.

11          THE COURT:  We could use that date.

12          Now, what we need to do in this case is, again, set

13 forth a list, Mr. Dell'Angelo, of what the plaintiffs are

14 requesting.  As indicated by my order, right, the Court finds

15 the defendants have not engaged in good faith production of

16 discovery in this case.  So what I'm going to need from the

17 plaintiffs is a clear list of the information that it will seek

18 be produced in this case as relates to, for example, search

19 terms and things like that.

20          Now, you've already identified certain issues in this

21 case.  Now, I will be clear -- let me be clear about this.  Not

22 all the issues in your submission I find necessarily to be

23 relevant.  But the market data, I find to be relevant.  That

24 includes the granular data with respect to compensation for

25 fighters for their relevant time period.

1        Now, Mr. Chiu, I don't know the extent to which and how

2   much that data is available.  I was a little confused because it

3   seemed like defendants were saying, "We don't have it," even

4   though, again, you objected to its production, but you're saying

5   you don't have some of it.  Can you tell me what it is that you

6   do and don't have?  Because I will consider potentially some

7   modification of my order based upon what defendant has or

8   doesn't have regarding data.

9        In the previous case, that information was provided,

10   right.  There were clear contracts that indicated amounts and

11   what was paid, right.  I don't know that that exists here, but I

12   thought that there were contracts that were produced here.

13        So when the defendants were saying, "We don't have some

14   of the granular compensation data," I wasn't sure what it is you

15   were referencing.

16        MR. CHIU:  Yeah, so, Your Honor, our understanding is

17   we have produced all of the contracts.  The contracts are what

18   contain the compensation data, right.  My only understanding of

19   what plaintiffs are complaining about with respect to

20   compensation data is with respect to the promotional agreements,

21   there's usually a show component and a win component, right.

22        (Court reporter interruption and clarification.)

23        MR. CHIU:  A show and a win.  So that the breakdown,

24   that's contained in the contracts.

25        Now, this idea that -- you know, in terms of

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1  granularity, what I understand is we have produced what we have

2  and keep.  So the -- they have the contracts.  The contracts

3  have the compensation data for all the fighters.

4          THE COURT:  Okay.  Well, let me ask -- thank you,

5  Mr. Chiu -- Mr. Dell'Angelo.  So explain to me what it is, then,

6  that you're missing.

7          MR. DELL'ANGELO:  With your indulgence, Your Honor, may

8  I have Mr. Madden address that?  He has intimate knowledge of

9  the data.

10         THE COURT:  Yes.  Mr. Madden, you need to get in front

11 of the microphone, please.

12         MR. MADDEN:  Yes.  So our understanding is that there's

13 several components of compensation that the UFC has paid

14 fighters over time and that this data is all housed in central

15 systems, not in the contracts themselves, and if you only have

16 the contracts, you don't actually have all the information that

17 you need.

18         THE COURT:  So what information, Mr. Madden, are you

19 saying...

20         MR. MADDEN:  Sure.  So in the *Le* case, we had a data

21 set that they produced at the beginning and at the end of the

22 discovery period in *Le*.  And that had the show payment, the win

23 payment, discretionary bonuses, Fight of the Night bonuses,

24 Performance of the Night bonus, KO of the night bonuses,

25 submission bonuses, an other column, letters of agreement, which

1  can be quite substantial.  They can be hundreds of thousands of

2  dollars in addition to what is on the contract.  And then

3  there's Pay-Per-View points.  There's also a column for signing

4  bonuses that I don't have in front of me as that actually being

5  populated anywhere, but they maintain --

6          THE COURT:  So, Mr. Madden, hold on a moment.  Was this

7  in a spreadsheet?

8          MR. MADDEN:  Yes.

9          THE COURT:  So they just produced the spreadsheet to

10  you.

11         MR. MADDEN:  In -- in the *Le* case, the output of their

12  system, we said, "This is what we need for these dates."  And so

13  what you have is you have a structured data system behind the

14  scenes.  Someone goes and they push a button and they say,

15  "These are the fields that you need."  And so they produce an

16  output in the form of a spreadsheet.

17         So it is a spreadsheet, but it's not like it's just

18  something that they had lying around that they're like, "Oh, we

19  have that from over there.  Let's go get it and produce it."

20  Instead, they went to someone who has access to the system that

21  contains the data and they obtained the data.

22         This is -- this is something that happens in every case

23  where there's structured data.  Someone has to go and get it.

24         THE COURT:  So, Mr. Chiu, does this data exist for this

25  relevant time period?

1    MR. CHIU:  So, Your Honor, we have produced what

2    exists, and we've responded to the plaintiffs' interrogatory --

3    THE COURT:  Okay.  Hold on.  What he described in the

4    previous case, this structured data, does that exist for this

5    current case?

6    MR. CHIU:  My understanding is that we have produced,

7    and I have examples here of what they have, of these sorts of

8    spreadsheet that provide compensation data and the -- the

9    additional level of granularity they've asked for, which is a

10   new request because previously they had said to us that they are

11   fine with what we produced to them, is -- what we've produced is

12   what we have.

13   THE COURT:  Do you have -- can you reference for me

14   where in the record I can look at that document?  Did anyone

15   attach it?  I don't know if I saw that to any of -- as an

16   attachment to any of the --

17   MR. CHIU:  I don't, but I have copies of it here with

18   me if the Court would like to take a look of an example.

19   THE COURT:  Yes, if you could show it to Mr. Madden --

20   MR. CHIU:  Sure.

21   THE COURT:  -- and then I'd be happy to look at it.

22   (Counsel conferring.)

23   THE COURT:  If you could --

24   MR. CHIU:  I provided a copy to them.

25   THE COURT:  You can approach, Mr. Chiu.

1          MR. CHIU:  Okay.

2          I can provide the Court with a Bates range.

3          THE COURT:  Mr. Chiu, do you have your own copy of

4    this?

5          MR. CHIU:  I do.

6          THE COURT:  So, Mr. Madden, do you have an example of

7    what was previously produced that I could look at, the

8    spreadsheet?

9          MR. DELL'ANGELO:  I do.  I have it -- it's just for --

10   I've narrowed it just for one fighter, and I've taken out some

11   of the columns that were duplicative.  But I can hand up what I

12   have.  I'm happy to give a copy to them.

13         COURTROOM ADMINISTRATOR:  Sorry.

14         MR. DELL'ANGELO:  And I would also note, Your Honor,

15   that Exhibit 26 to our filing is an output of a system that

16   contains some of this data.

17         THE COURT:  What I'm trying to ascertain, Mr. Madden,

18   is how readily accessible the data is.  Obviously I don't think

19   it would be appropriate to order the defendant to manually

20   recreate information that it doesn't already have in a

21   structured data set.

22         So, Mr. Chiu, you've seen the document that Mr. Madden

23   handed to me.  Are you saying that the UFC no longer keeps this

24   information?

25         MR. CHIU:  Sitting here, I -- I can't represent to the

1  Court, you know, what the process of this was, whether it was

2  something created.  My understanding is based on what I just

3  provided to the Court in terms of the compensation data that we

4  pulled and collected, that is what we have and have produced to

5  the plaintiffs.  This is in their possession.  So we can go back

6  and -- and check, but I think what we have done in this process

7  is collect and produce what we have.

8           THE COURT:  Well, and I know that some of this is more

9  than was requested by them.  So I'm not saying that I would

10 necessarily order you to provide all that, but obviously it

11 matters, Mr. Chiu, in terms of the burden on your client.  If

12 this is in a database, right, it may take someone time to issue

13 the reports, but that's different than having to manually create

14 it --

15          MR. CHIU:  Right.

16          THE COURT:  -- which I would not order your client to

17 do.  And I recall from the case previously, as in the example

18 the plaintiff is describing, there's going to be some missing

19 data as it relates to the system anyway.

20          But I want to know, Mr. Chiu, whether or not this

21 information still exists in terms of it being collected.  It's

22 hard for me to imagine that this isn't information that isn't

23 somehow collected and maintained by your client, but it just may

24 be in a different form at this point.

25          MR. CHIU:  Yes.  So what we understand, we've been

1  looking into this idea of the breakdown of the show and win.

2  Our understanding is that that was -- that would require, kind

3  of, a manual process to break it down.

4       THE COURT:  So you don't -- they don't keep it this way

5  anymore, because this is not manual.  This is basically -- looks

6  like a report from a spread- -- excuse me -- from a database.

7       MR. CHIU:  I can't -- I can't represent to the Court

8  whether this was manual or an export --

9       THE COURT:  Well, I appreciate that because, again,

10 this is somewhat new at this point because you all just showed

11 this to me today.

12      MR. MADDEN:  Your Honor, if I may.

13      Exhibit 26 to our filing, we provided an example of a

14 document we found in their production that is attached to an

15 e-mail from Ms. Deborah Cook to Denitza Batchvarova.  The Excel

16 spreadsheet is called "Fighter Payments Total by Fighter."  And

17 in this document -- so this was in 2020.  We don't have any

18 other version, but in this document, there are specific

19 breakdowns between the show and the win purse.

20      For example, for Mr. Donald Matthew Grice in -- in

21 Exhibit 26, there's a statement for FX3 show purse and FX3 win

22 purse at 6,000 and 6,000.  This is data that they had as of

23 2020.  So it is not like it cut off magic -- like, when the *Le*

24 discovery period ended.  They had it in a structured data

25 system.

1          So it's not clear to me -- and we identified this

2   document to them in letters, and we've identified their hub

3   system as a place where it's describing letters of agreement

4   needing to be accurate in that system.  We believe that this

5   data is still maintained.  We've been asking them for it.  We've

6   been pointing them to places to look.  And maybe the answer is

7   that in addition to the other witnesses Your Honor has ordered,

8   Ms. Cook appears to be their data person, perhaps we should be

9   able to ask questions of her.

10          THE COURT:  Well, let's separate spoliation out from

11   other information.

12          MR. MADDEN:  Okay.

13          THE COURT:  Right.  To me the spoliation issue is

14   significant because I find it directly relevant to the issue of

15   the arbitration clause.  There's missing data.  That has to get

16   resolved, right.  And that's -- the Court is going to prioritize

17   that because the Court finds that to be central to the issues

18   regarding the arbitration clause.

19          I was simply asking about this compensation data

20   because I do find the market position is relevant, but what I'm

21   going to ask the parties about is what would be your positions

22   regarding what information is relevant to the Court's

23   determination of the market power of the UFC in the context of

24   the negotiation of the arbitration clause.

25          Now, I know, Mr. Chiu, your position is it's not at all

1  relevant.  I know you've preserved that, but I disagree with

2  that.  So I'm going to ask plaintiffs to outline what they

3  think, and then I'll ask you to comment on that, Mr. Chiu.

4       Because, Mr. Madden, again, it seems to me what would

5  be potentially relevant would be the market position, obviously,

6  of the UFC as it relates to fighters, the types of fighters, for

7  example, that were under contract.  Now, some of that actually

8  is this FightMetric data which UFC has, but that's, right, a

9  public -- publicly accessible information.

10       MR. MADDEN:  Yes and no.  It is on a -- a website, but

11  there's built-in, you know, programming that makes it difficult

12  to scrape and it's not accurate.  They have it.  They

13  absolutely -- they're the ones who maintain FightMetric now.

14  They are the ones who have all of the data in a readymade data

15  set that, again, they can just push the button and give to us,

16  but they've been refusing to do it.  And now they're

17  investigating whether they can.

18       THE COURT:  Well, okay.  Let's back up.  As it relates

19  to the market position, to me what's relevant, which I'm going

20  to order be produced, are the number of fighters under contract

21  each year, what percentage of the market that represents,

22  against the FightMetric data.

23       Now, if the defendant has that data, they can simply --

24  I'm going to order them to provide it because they can provide

25  it as part of this production.

1          And I asked about the compensation data because I

2    wanted to understand how accessible it is because I think that

3    that's a less relevant factor, potentially relevant, but a less

4    relevant factor.  Now -- unless there's going to be an argument,

5    and I think there's been some discussion in these cases, about

6    the use of certain types of payments also in the context of

7    negotiation or coercion as it relates to resigning PAR agreement

8    or signing a bout agreement.

9          So for right now, I'm simply just going to order that

10    the defendants find out whether or not they have this data

11    without producing it yet.  But that's what I am going to order

12    as it relates to the market position, which I find is relevant

13    to the consideration here.

14          As it relates to the negotiations -- I don't have any

15    more questions about the data, Mr. Madden, so if you want to

16    switch.

17          MR. MADDEN:  Thank you, Your Honor.

18          THE COURT:  So, Mr. Chiu, I'm not going to order you to

19    at this point do anything other than please find out if you

20    still have this information.  And then we can have a

21    conversation about what is produced.  Again, I'm not sure that I

22    will ultimately order this be produced in this form at all, but

23    I might order something that's a little bit more than what you

24    all have provided but not as complete as this.  But please find

25    out before we next meet what that looks like.

 1            MR. CHIU:  We will do so.  My understanding, just -- I

 2    just want to be clear that the idea that there was a spreadsheet

 3    attached to an e-mail suggests it came from a central system,

 4    you know, that -- I don't want the Court to think that just

 5    because there's an Excel with -- that could have been manually

 6    put together.  So we will investigate.  But my understanding is

 7    that the additional granularity that they've asked for, we have

 8    looked into that.  It's currently not something we can just hit

 9    a button on a database and export.  It's something that would be

10    manually put together, but we will double-check and --

11            THE COURT:  But the question, then, is how -- it was

12    clearly kept previously.  And so -- in a database, and so --

13            MR. CHIU:  Yeah, I don't -- I can't represent that.  I

14    don't think the Court should just assume that based on an Excel

15    spreadsheet like this that someone didn't, you know, in the *Le*

16    case actually manually put it together.

17            THE COURT:  I'm pretty sure it wasn't done manually,

18    Mr. Chiu, because there was extensive back-and-forth in the

19    discovery there, and I think that was -- one of the issues was

20    about the burden of production.  And my understanding is this

21    was information that could be provided from a structured set.

22    It might have been the case, Mr. Chiu, that there were multiple

23    databases and this was then put into one.  So that might be why

24    there's missing data, for example.  So you might want to look at

25    whether or not it's an issue of it being in separate databases,

1  right, and how that would be exported.

2       Now, as it relates to the production regarding

3  negotiations and -- with the fighters and internally, again, I'm

4  going to ask the plaintiffs to provide me with a list of or

5  their proposal as relates to search terms.

6       Now, Mr. Dell'Angelo, I want to be clear that as it

7  relates to the arbitration clause-related discovery, this is

8  about the negotiations with the fighters.  This is about

9  internal conversations about negotiations and any policy related

10  to that.  And this also includes internal conversations or

11  documents related to the market position of the UFC.

12       MR. DELL'ANGELO:  Understood.

13       THE COURT:  You have other, I believe, related

14  categories, right.  You actually have these issues here that are

15  identified in your brief.  So let me go through -- if you all

16  want to pull this up, we can go through this right now in terms

17  of what I'm ordering to be further produced from the defendant.

18  It's the -- look at the plaintiffs' brief, it's the chart that's

19  in blue.  And we're just going to go through that right now.

20       Mr. Dell'Angelo, it's my understanding that you don't

21  have an explicit identification of who was negotiating contracts

22  during certain periods of time.  Is that correct?

23       MR. DELL'ANGELO:  That's correct.  It's the who and at

24  what time.

25       THE COURT:  But you have evidence of negotiations by

 1  these various individuals.  I think there's six individuals,

 2  correct?

 3          MR. DELL'ANGELO:  Yes, and I think -- and I think

 4  they're -- so, as I understand it, the answer that we have is

 5  Dana White, Tracy Long, Hunter Campbell, Mick Maynard, Sean

 6  Shelby, Ike Epstein.  So that's six.  But the defendants' answer

 7  and I think one of the reasons why we have some -- have had some

 8  dissonance on this also said, quote, among others and that it

 9  may not be a, quote, complete list.  So -- but those are the six

10  that we're aware of.

11          THE COURT:  Well, if we have more complete search

12  terms, then you would find that one way or the other, correct?

13          MR. DELL'ANGELO:  I think that's correct.  I think it's

14  a separate implication for devices potentially, but, yes, Your

15  Honor.

16          THE COURT:  Well, the other issue, Mr. Dell'Angelo,

17  what I want you to do when you present this proposal to me is I

18  want to know what sources that you're suggesting that they

19  search.

20          MR. DELL'ANGELO:  Okay.

21          THE COURT:  Right, because there's devices.  There may

22  be -- I don't know if there's an internal, sort of, document

23  retention system, internal e-mail system, right.  I need to know

24  what it is so that I can rule specifically.

25          MR. DELL'ANGELO:  We -- we -- with respect to sources

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1  beyond devices, we will be as specific as we can.  I will say

2  that there has -- we have very little insight into the sources,

3  but I understand -- we will be as specific as we can given

4  what -- with what we have.

5        THE COURT:  Well, look, there could only be a certain

6  type of source.

7        MR. DELL'ANGELO:  Sure.

8        THE COURT:  Like, there are e-mails, there are text

9  messages, there are other messages, right.  And so they have

10  systems that I assume that they represented to you as relates to

11  what e-mail or how they're maintained for UFC employees.

12        MR. DELL'ANGELO:  No, and I think that -- that's kind

13  of the rub, but we will -- we will do our best, right.  So we

14  can --

15        THE COURT:  Well, hold on.  I thought we had these

16  custodians or these super custodians and this master list that

17  identified this.

18        MR. DELL'ANGELO:  Well, we asked a lot of super

19  custodian questions on those types of topics, and we got zero

20  answers.  So what we know, right, are there are mobile devices.

21  We know that there are e-mail systems.  Are there -- are there

22  central systems?  We believe so, but I don't have any detail

23  that I can provide to you that has been provided to us about

24  what those systems are or how kind of departments work.

25        So as we would in the normal course of discovery, I

 1  mean, I can make that kind of proposal to you.  But if you

 2  believe or think that we know, for example, or have been told,

 3  you know, that, sort of like, "These are the departments and we

 4  have central files and we do this," we don't have that

 5  information.

 6          THE COURT:  Well, for example, most corporations have

 7  some sort of backup system for the e-mails of employees.

 8          MR. DELL'ANGELO:  Right.

 9          THE COURT:  Right.  Now, that may be separated out by a

10  particular office or whatever, but the e-mails are backed up

11  somewhere, right.

12          MR. DELL'ANGELO:  Yeah.

13          THE COURT:  And they may have a document retention

14  system.

15          MR. DELL'ANGELO:  Yes.

16          THE COURT:  You're saying they haven't even given you

17  any information about that?

18          MR. DELL'ANGELO:  No, Your Honor, or --

19          MR. CHIU:  Your Honor, that's just flat-out incorrect.

20  We've produced documents from 35 custodians.

21          THE COURT:  Okay.  Hold on.  Wait.  So let's back up

22  for a second, Mr. Chiu, because I know you've produced documents

23  from custodians.  Let me just ask you this question.  Is there a

24  central system as relates to e-mail storage?

25          MR. CHIU:  When we collect e-mails, we pull it using a

1  vendor.  We've done that in this case.

2          THE COURT:  I'm sorry.  You pull it using?  I couldn't

3  hear you.

4          MR. CHIU:  A document -- an e-discovery vendor, right,

5  so that's how all that gets preserved.  And as part of --

6          THE COURT:  I'm not understanding what that means,

7  Mr. Chiu.  So I guess as I was saying earlier, like, most

8  companies have like a --

9          MR. CHIU:  An e-mail system.

10         THE COURT:  -- they have a system that they back up

11  their e-mails in.

12         MR. CHIU:  Correct.

13         THE COURT:  And are you saying that you used a vendor

14  to search that system?

15         MR. CHIU:  Well, how e-discovery works in civil cases

16  is we use an e-discovery vendor to image all the e-mails, right,

17  like collect, and then run search terms and produce what's

18  relevant.  We've done that since the beginning of this case.  So

19  to suggest that they have no idea what e-mails we've searched or

20  collected --

21         THE COURT:  No.  No, no.  I think that the confusion

22  here, and I want to clarify this, is is there one central system

23  that your document vendor used to extract the e-mails.  So -- or

24  is it the case, right, that you have four or five different

25  systems or there were different systems used over different

1 periods of time.  So, again, some companies may use a particular

2 system for a certain number of years, and then they use a

3 different backup system for a different numbers of years.

4     MR. CHIU:  For the relevant period, what we have done

5 is over a course of time, as part of discovery, you do an

6 investigation as to what systems were used.  And if it's

7 relevant for the custodians over the time period, we have

8 collected it all with the vendor to image e-mails, documents,

9 sources of information.  We've been transparent with plaintiffs

10 what sources.  That's why there's fights about this.

11     But to suggest that they're in the dark as to what

12 custodial sources of e-mail and information or what sources

13 we've searched is just -- is plainly wrong.  They've been

14 getting documents.  We have 35 custodians' e-mails across

15 various defendants.  Those systems are all preserved.  That's

16 how this is done.

17     THE COURT:  Okay.

18     MR. DELL'ANGELO:  Wait.  Can I -- may I, just so we're

19 clear about something.

20     So if -- we've received some text messages from mobile

21 devices, we've received some e-mails, sure, we know those are

22 sources.  But what I think you're asking and what I can assure

23 you that we don't know is we've never been told, for example,

24 "We maintain our e-mail on an AWS system," right.  "We have this

25 document retention or document management software.  We use the

1  XYZ software.  We have 10 departments:  marketing, events,

2  accounting, et cetera.  Accounting has central files for one,

3  two, three," right.

4          So do I know that I got the broadest category e-mail?

5  Sure, that's a source.  But do I know anything beyond that?  No.

6          THE COURT:  Well, that would only matter,

7  Mr. Dell'Angelo, if somehow you suspected there were sources

8  that they weren't searching that existed, right.  But --

9          MR. DELL'ANGELO:  Well, that's precisely the issue,

10  though, with --

11          THE COURT:  Well --

12          MR. DELL'ANGELO:  -- with the compensation data, for

13  example.  Because we know from before it came from a central

14  system, and now we've been told for months that they're, quote,

15  investigating where it's coming from.

16          THE COURT:  So here's what we're going to do.  We'll

17  obviously -- I'm obviously going to allow you to search again

18  using your terms.

19          MR. DELL'ANGELO:  Yes.

20          THE COURT:  If by extent -- or, excuse me, by that

21  search you encounter other e-mails that you think suggest

22  there's more e-mails that exist that you can't find, then you

23  can let me know.

24          MR. DELL'ANGELO:  Okay.

25          THE COURT:  But, clearly, they're searching e-mails and

1  getting hits because they provided e-mails, right.  I mean,

2  there are -- there have been thousands of e-mails provided here.

3  Now, your argument's about the relevance of those.  But there

4  have been thousands of e-mails provided.

5       So as it relates to that, I don't know that it

6  necessarily matters that you know which system they use so long

7  as they're saying they're searching whatever they have.

8       MR. DELL'ANGELO:  Sure.  And separate and apart from

9  systems, within, for example, companies or departments, there

10  are sources, right.  And that's all I was really getting to,

11  right.

12       THE COURT:  Well, no, no.  That's different than, for

13  example, my concern which is, as I said, based on my finding

14  which is about the device disclosure -- that's different --

15  where they're basically missing devices.  We know they're

16  missing devices --

17       MR. DELL'ANGELO:  Yeah.

18       THE COURT:  -- stuff that should have been maintained.

19  What I hear from Mr. Chiu is that "We've searched what we have.

20  We're not saying that there's stuff we're not searching.  Here's

21  what the hits are."  Now you all dispute what is the proper

22  search terms, and I agree with the plaintiffs that they should

23  be broader.  And that's why I'm going to order that those terms

24  be broader.  But I don't find at this point that that's one of

25  the areas, at least as of now, the record indicates, that there

1   is any, sort of, missing server or storage that's not being

2   searched, unlike the devices.

3           MR. DELL'ANGELO:  Well, I think that there -- there may

4   be something just to be clear about on that, and the

5   contracts -- the contract or the PAR production is a helpful or

6   illustrative point here.

7           So we asked for PAR agreements, bout agreements.  We've

8   received many.  However, we have asked for a complete set from a

9   central file.  And what we have been told is, "We pulled them

10  from Tracy Long's e-mail.  Those are the contracts."  It's an

11  example of where what we have been asking for and would like

12  certainty about is, is there a central file where you keep all

13  of your contracts, which would be -- sort of in the normal

14  course of business for most large, sophisticated businesses,

15  would not use a single person's Outlook e-mail box as their

16  filing system for, you know, what are probably the most

17  important contracts in the business.

18          And those are the types -- that's where there's

19  dissonance on the sources, right, where they're saying, "We

20  searched for the contracts.  We went to the, quote, e-mail."

21  And we're saying, "Yes, but is there a separate source for

22  those -- for those contracts like central files?"  We've had a

23  lot of dialogue about that question, but it's illustrative of

24  the types of source issues that I was trying to highlight for

25  Your Honor.

1           MR. CHIU:  Your Honor, I just want to interrupt real

2    quick.  They have all of the contracts from Tracy Long.  She is

3    the keeper of the contracts.  We discussed this with Judge

4    Weksler.  On top of that, we have also separately agreed to go

5    find the central place for these contracts.  So, again --

6           THE COURT:  So hold on.  I'm sorry, Mr. Chiu.  I want

7    to make sure I'm understanding this.  You're saying that she is

8    the one who keeps the contracts.  And so the contracts are all

9    sent out --

10          MR. CHIU:  Correct.

11          THE COURT:  -- by her.  So to the extent a contract

12   went out, she is the person that --

13          MR. CHIU:  Correct.

14          THE COURT:  -- you would look through her files because

15   she would have the contract.

16          MR. CHIU:  When they go find a contract, we go to

17   Ms. Long.

18          THE COURT:  Right.

19          MR. CHIU:  Contract.

20          But in addition to that, what Mr. Dell'Angelo's trying

21   to complain about now, we have separately agreed to go look and

22   see if there's a central file for these contracts.

23          THE COURT:  Okay.

24          MR. CHIU:  But as to the contracts, they have all of

25   them.

1    MR. DELL'ANGELO:  And the point in -- my point in

2 raising that, Your Honor, was not to pick a fight about the

3 contracts, but simply to make the point that there are different

4 sources, like e-mail central files, for types of documents and

5 what we lack insight into.  So I was trying to answer your

6 question very directly when you first answer [sic] it, what do I

7 know about sources and how specific I can be?  I can't be

8 specific about central file --

9    THE COURT:  Well, first of all, you know that Tracy

10 Long, as a representative, is the one who sends the contracts

11 out.  So you know that you have probably good representation

12 there.  But you don't know whether or not there's some other

13 repository where all the contracts are kept, and they said

14 they're going to look for that.

15    MR. DELL'ANGELO:  Right.

16    THE COURT:  Right?

17    MR. DELL'ANGELO:  Right.  Yeah, and really, at least

18 with respect to the contract point, that was sort of the point

19 of departure, right, where we were saying, "If there's a central

20 file where these are maintained, please pull from there because

21 that is a more complete and reliable source than someone's

22 e-mail."

23    But then, you know, again, it just gets to the, sort

24 of, larger source question where, you know, we will be as

25 specific as we can, Your Honor, but there just -- there's a lot

1   that we don't know.

2          THE COURT:  So let me be clear, Mr. Dell'Angelo.  As I

3   said, I made findings about discovery violations.  Those relate

4   specifically to two or a few different areas.  One as relates to

5   this issue of the device disclosures, which I find clearly it

6   should have been updated and clearly there's an issue as it

7   relates to missing information.  Second, I think that the use of

8   the search terms by the defendant are wholly inadequate as a

9   result -- as relates to related materials, as evidenced by the

10  fact that we have no information about negotiations that have

11  been produced, right.

12         And those are the areas I'm focussed on.  So on your

13  chart, that would be 6 -- 6, 7, 9, 10.  Those are the areas that

14  I'm focussed on.  Those are the areas where I think that, again,

15  there are negotiations.

16         And, Mr. Chiu, that's what I'm saying to you, look, I

17  just don't find it credible that those things don't exist with

18  the search terms.  I know this is not something you specifically

19  are in charge of, but I will tell you right now I'm very

20  disappointed, which is why I ruled the way I did, with the

21  defendants' production.  And I would expect in the future that

22  it will not involve this type of discovery violation.

23         Now, I know you disagree with that.  I appreciate that.

24  And you're not personally responsible for this.  But I am deeply

25  concerned about the nature of this production, specifically in

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1  that area where I believe very strongly that information exists

2  based upon what's already been produced and was late produced on

3  November 14th.  I think the defendants have an obligation to

4  find that and produce that, right.  And the extent of the remedy

5  that the Court may order is going to be directly related to how

6  quickly that happens.  But I want to be very clear about my

7  findings that I made about discovery violations because this is

8  not the first time I've had these issues.

9       And, again, you've not been involved in this case for

10  all these years, Mr. Chiu, and I appreciate that.  But even in

11  this -- and I'm not talking about, sort of, violations from the

12  *Le* case.  But even in this case going back, there have been

13  issues, and I'm saying that because I want these issues

14  resolved.  And that involves the other issue which I'm going to

15  order, is that I want the devices disclosure chart updated,

16  right, by the defendants by December 1st.  That means a complete

17  list.  Because that list doesn't look complete to me, and maybe

18  I'm missing something compared to what I saw earlier as it

19  relates to -- hold on.  Where's my...

20       -- all of the platforms and accounts, social media and

21  otherwise, being used by these individuals as it relates to

22  devices.  So I will give you all until December 1st to update

23  that.

24       MR. DELL'ANGELO:  Excuse me, Your Honor.  Just, I

25  guess, for clarity, I think -- with the disclosure, would your

1    expectation be that the disclosure would indicate the dates when

2    those various communication platforms --

3              THE COURT:  Yes.

4              MR. DELL'ANGELO:  -- were in use?

5              THE COURT:  Right.  When -- what I had ordered

6    previously --

7              MR. DELL'ANGELO:  Right.

8              THE COURT:  -- which was, right, which devices are

9    being used, which types of accounts were being used, if there's

10   a Gmail account or some other account, if there's Instagram

11   being used, if there was Twitter or X being used -- all of that

12   should be listed and should have been listed in that chart.  And

13   it's not, right, and it needs to be updated to include that.

14             And, defendants, you need to go back to the individuals

15   there and get the information.  Because that's not a complete

16   list and that's not a complete list of what I ordered, Mr. Chiu.

17             Do you have any questions about that?

18             MR. CHIU:  I -- I have two comments on that, Your

19   Honor, and really it's just our understanding and -- our

20   understanding was coming out of the last conference, we had

21   complied with that disclosure order.  What we had done in the

22   process is we did talk to the individuals as to whether they

23   used these apps for work, right.  And so -- and then on top of

24   that, the information that we disclosed in the disclosure order

25   and then -- we've been through this before with -- before Judge

 1  Weksler is what we're able to pull from those devices.  So this

 2  idea that there's, like, additional information that we're

 3  unable to --

 4          THE COURT:  It's not that, Mr. Chiu.  It's that knowing

 5  what was used at the time, even if it turns out that a

 6  particular platform doesn't retain messages, right.  I didn't

 7  say that you had to produce everything on those devices.  I just

 8  simply said, right, you had to identify that, right.  And I --

 9  right, and I had ordered this information previously.  I had

10  never said that there was full compliance with that discovery

11  disclosure order.

12          And so I -- again, I'm a little confused about you

13  saying that because that's not what I found.  And that's not --

14  that chart is not what I ordered.  I actually ordered -- I

15  ordered all that information that I'm actually talking about

16  now.  I ordered that previously, and I'm not saying that the

17  defendant has to provide that.  If it's, again, Instagram or

18  some other account that might have been used, but there's no

19  information available, you still have to identify that so that

20  the plaintiffs are aware of that, right.

21          And so there was -- and I'll go back and look at the

22  multiple conversations that we've had, but I was clear about the

23  need to provide more detailed information and that chart is not

24  in compliance with my order.  So, for the future, I want all of

25  the information about the accounts, the devices, everything,

1  right, that these individuals have updated.

2          Any questions about that, Mr. Chiu?

3          MR. CHIU:  I just want to be clear that we endeavored

4  to comply with the Court's order.  My understanding is that we

5  are only able to pull the data that is available on those

6  devices, right.  And so --

7          THE COURT:  But you can -- these individuals are --

8  you're in control.  You can go and ask Ms. Long.

9          MR. CHIU:  I think the disclosure order, what we put in

10 there, is the product of those conversations.  Did you use this

11 app for -- for UFC-related work?  You know, and that was -- you

12 know, that was the attempt there to kind of provide what we were

13 able to find out.

14         THE COURT:  So you're saying when you investigated,

15 this is all the information that you retrieved?  Because I --

16 the plaintiffs have provided information about various accounts.

17 There's the one example, for example, the Instagram message or

18 the direct -- the DM involving one of the fighters that was,

19 quote/unquote, leaked.  I don't know if there's a reference to

20 that account or how that works.

21         And I'm concerned, Mr. Chiu, because if what you're

22 saying to me is "We investigated, this is the information we got

23 back," that leads to an even greater concern about spoliation of

24 this information because it appears to me from the record that

25 there are a lot more accounts and potential devices that are on

1  that sheet that are simply not being disclosed and I don't know

2  why, right, which is why we're going to have the spoliation

3  hearing.

4         But I'm going to ask you to go back and update it, and

5  if you come back -- and you can tell me, "Based upon our

6  investigation, this is all we have."  I'm just saying to you

7  based upon what I see in the record, that doesn't appear to be a

8  credible representation.  And, again, this is not a reflection

9  on the fact of whether or not you're asking that question.  But

10  what I'm saying, from your client, that does not seem to be

11  complete or accurate or detailed based upon the record that I

12  have in front of me, which is why I think there's been a

13  violation of my order.  Because I think there was more

14  information and devices that are simply not being listed.  But I

15  will hear from you again when we come back on the 4th, but I

16  would like to have that filed under seal on the 1st.

17         Mr. Dell'Angelo.

18         MR. DELL'ANGELO:  Yes, Your Honor.

19         THE COURT:  Is there something else you wanted to add?

20         MR. DELL'ANGELO:  No, Your Honor.

21         THE COURT:  So the other issue, Mr. Dell'Angelo, I want

22  to talk about is the issue of the spoliation of evidence.  I'm

23  going to set a hearing in this case on that, and it appears to

24  me, at least as it relates to the spoliation, there are two

25  clear individuals where there are huge gaps, years of

1  information missing, who will be required to provide

2  information.

3          Besides those two individuals, Mr. White and Ms. Long,

4  there appear to have been some production for some of these

5  other individuals, but I don't know that I saw the same gaps as

6  it relates to messages for these other individuals.  So I want

7  you to identify for me who you think would be the other

8  individuals who would have to provide testimony.

9          (Plaintiffs' counsel conferring.)

10          MR. DELL'ANGELO:  Well, I guess it depends on what the

11  objective of the spoliation.  So the thing is with -- with

12  respect to White and Long, they appear to be very

13  arbitration-specific because of the time period.  There are --

14  but the problem, I believe, is much larger.

15          THE COURT:  But, yes, right now I'm focussed on

16  arbitration-specific.

17          MR. DELL'ANGELO:  Okay.

18          THE COURT:  This is --

19          MR. DELL'ANGELO:  Yes.

20          THE COURT:  If you want to raise it in a separate

21  issue --

22          MR. DELL'ANGELO:  Understood.

23          THE COURT:  -- right, the spoliation, we can do that in

24  the other case, but right now I'm focussed on arbitration,

25  right, because the timing of the gaps for them in particular

1  relates to when the arbitration clauses were starting to be

2  enforced, which is of concern to the Court.

3       MR. DELL'ANGELO:  Yes, and I appreciate that

4  clarification, and it's why I asked.  And I think given that, I

5  think Tracy Long and Dana White are the two key people for that

6  period.  The -- the only other possibility, and I'm looking at

7  this, our Exhibit 5, the second page of Exhibit 5 to our

8  submission, there's a gap for Mr. Shelby on at least one device

9  that begins around mid-2022.  So Long -- Long, White, and to

10 some extent Mr. Shelby.

11      THE COURT:  And what's the range for that gap?

12      MR. DELL'ANGELO:  Oh, you know what.  I misspoke, Your

13 Honor.  There's actually two different -- I don't think that

14 that's -- yeah, it's not.  It's Long and White.  So there's two

15 different rows for Mr. Shelby, but it's the same number.

16      (Plaintiffs' counsel conferring.)

17      MR. DELL'ANGELO:  Right.  And I guess -- I don't know

18 that this is a spoliation issue, but one thing I would identify

19 is one of the interrogatory answers we got, there was a

20 reference...

21      (Plaintiffs' counsel conferring.)

22      MR. DELL'ANGELO:  Excuse me, Your Honor.  I just want

23 to...

24      (Plaintiffs' counsel conferring.)

25      MR. DELL'ANGELO:  Yeah.  I think there's one other

1  individual for whom -- whose name appeared where there's not --

2  there was a device that was never identified.  I can't standing

3  here say that that individual -- that individual's involved in

4  talent relations -- that that ties to arbitration.  So...

5          THE COURT:  Okay.

6          MR. DELL'ANGELO:  So I think Long and White are the --

7  are the two primary ones for the arbitration-specific issues,

8  Your Honor.

9          THE COURT:  Hold on.  Let me just look at my notes here

10  for a second.

11          (Pause.)

12          MR. DELL'ANGELO:  So if I may, Your Honor, just so I'm

13  clear about what I was saying before about that other

14  individual.

15          So in response to Interrogatory Number 6, an individual

16  who is identified by the defendants as participating in the

17  matchmaking function that would include, as we understand it,

18  the arbitration period is a Christoph Goessing.  And then the

19  disclosures that we have --

20          THE COURT:  Okay.

21          MR. DELL'ANGELO:  Yeah.

22          THE COURT:  And what are the issues as relates to --

23          MR. DELL'ANGELO:  Well, so he's identified in the

24  Interrogatory Response Number 6 as somebody who's involved in

25  the matchmaking function with Mr. Shelby, Mr. Maynard, and

1  Mr. Campbell, who would all be operative during the arbitration

2  period.

3          THE COURT:  Right.

4          MR. DELL'ANGELO:  But from the -- what we don't have is

5  a disclosure that that device had been identi- -- his device had

6  been identified or collected.  So I cannot say standing here

7  that there's a spoliation issue, but what I would say is to the

8  extent -- one way that you could triangulate that is figuring

9  out, you know, does that device exist.  Because to the extent

10 he's communicating with Long or White about arbitration

11 issues --

12         THE COURT:  Well, that -- okay.  I'm focussed, again,

13 on just what's in this chart.

14         MR. DELL'ANGELO:  Okay.

15         THE COURT:  There are two individuals where there's

16 missing information that have been identified as part of

17 negotiations and would be relevant to a decision as relates to

18 the arbitration clause.  And so that's who the spoliation issue

19 will focus on.

20         MR. DELL'ANGELO:  That's fair, Your Honor.

21         THE COURT:  Those two individuals.

22         MR. DELL'ANGELO:  Yep.

23         THE COURT:  So here's what I'm going to order.  I'm

24 going to order that they will be deposed prior to the Court's

25 hearing related to this issue.  The depositions will be related

1   to the specific issue of spoliation.

2        Now, I know that you all are probably not going to

3   agree as to the scope of the questions.  So before the

4   deposition is taken, we can talk about what that will be on

5   December 4th.

6        MR. DELL'ANGELO:  Okay.

7        THE COURT:  Because I'm going to order the depositions

8   take place in January and then we'll have a spoliation hearing

9   either in January or in February, early February.

10       MR. DELL'ANGELO:  Your Honor, one thing that I think

11  would aid this process that we've asked the defendants for, both

12  in the requests informally and in those individual subpoenas

13  that we sent out when we were, sort of, told that, you know, we

14  weren't going to get devices through the defendant discovery,

15  was the identification of the carriers that -- so like Verizon,

16  T-Mobile, whatever it may be -- that these individuals used.  So

17  it would be helpful if the disclosure that the defendants are

18  going to provide on December 1 would provide carrier

19  information.  Because --

20       THE COURT:  It should.

21       MR. DELL'ANGELO:  Okay.  Thank you, Your Honor.

22       THE COURT:  All right.

23       Anything else, Mr. Dell'Angelo?

24       MR. DELL'ANGELO:  No, Your Honor.  Thank you.

25       THE COURT:  Mr. Chiu, anything else from the defendants

1   at this time?

2          MR. CHIU:  Your Honor, I would just raise one issue on

3   the disclosure device.  December 1, just with the Thanksgiving

4   holiday next week in terms of just --

5          THE COURT:  Well, because you have to go back and talk

6   to people.

7          MR. CHIU:  Correct.

8          THE COURT:  Oh, okay.  So here's what I will say.  I

9   want it to be complete, obviously, for the next time.  So what

10  we'll do is -- what I want you to do, Mr. Chiu, is at least be

11  able to tell me by the 4th how much longer it will take, right.

12  Because on the 4th, what we will do is we will go through the

13  search terms and the searches, and we'll -- and I will approve,

14  modify, reject, whatever is before me.  But we'll focus on that

15  for the December 4th hearing.

16         MR. DELL'ANGELO:  Excuse me, Your Honor.  Michael

17  Dell'Angelo.

18         May we at least in the meantime get the carrier

19  information?  Because one thing that we can do is issue a

20  subpoena to the carriers, and I think that that -- that

21  information would be very helpful.  I don't think that that

22  needs to wait until December 4th.

23         THE COURT:  I think that's a reasonable request,

24  Mr. Chiu, particularly as it relates to Mr. Long -- excuse me --

25  Ms. Long and Mr. White, right.  Those are obviously the focus of

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

1  the Court as relates to spoliation in particular.  So let's

2  start, Mr. Chiu, with those because I think it is reasonable to

3  expect that the carrier information can, in fact, be provided

4  for the four devices that are identified for those individuals

5  here.  That should not be difficult at all to provide by

6  December 1st.  Actually, I'm not sure it would be difficult to

7  provide for any of these individuals, but those are the

8  individuals that I'm focussed on as it relates to the spoliation

9  issue.  But we still need to have the disclosure be complete.

10 But let's focus on those first.

11        All right.  Any other questions about what I've ordered

12 today?  Mr. Dell'Angelo?

13        MR. DELL'ANGELO:  No, Your Honor.  Thank you.

14        THE COURT:  Mr. Chiu?

15        MR. CHIU:  No, Your Honor.

16        THE COURT:  Hold on just a moment.  You all can take

17 your seats for a moment.

18        (Court conferring with law clerk.)

19        THE COURT:  We have to set the time for December 4th

20 hearing.

21        (Court conferring with courtroom administrator.)

22        THE COURT:  So I'm going to set you all to come back on

23 12 o'clock on the 4th and I think -- well, why don't we say

24 1 o'clock.  You guys are with Judge Weksler in the morning, and

25 then you'll be with me in the afternoon.  And I'll coordinate

 1  with Judge Weksler and make sure we're not working at

 2  cross-purposes.

 3          Is there anything else that we need to do today, then?

 4  Mr. Dell'Angelo?

 5          MR. DELL'ANGELO:  Yeah, I just have a question, Your

 6  Honor.

 7          I'm just wondering if we could revisit at least having

 8  a tentative deadline for the disclosure.  I know you said that

 9  you would ask for an update of when it could be done on

10  December 4th.  My concern is that -- and I completely respect

11  the need for additional time around the holidays, but we only

12  have two custodians.  And then, you know, we come back on

13  December 4th, we're getting into Christmas and we're going to

14  be, sort of, back in the same loop.  So if we're going to be

15  before you in January at a hearing, there's a lot -- a lot that

16  we may need to do to get prepared for that.  So if we could even

17  just set a tentative of December 11th or something like that, it

18  would be helpful.

19          THE COURT:  Well, so here's what I will tell you,

20  Mr. Dell'Angelo.  I'm focussed on two individuals because that's

21  the issue in terms of the information.

22          MR. DELL'ANGELO:  Okay.

23          THE COURT:  The Device Disclosure Order needs to be

24  updated probably for everyone, but I'm focussed on those two

25  individuals because that's where there's missing information.

1           MR. DELL'ANGELO:  Right.

2           THE COURT:  You haven't highlighted yet for me whether

3    or not there's information missing from other individuals or

4    sources that would have information that's not been produced.

5    So from my perspective, I would expect that in December the

6    information would be fully disclosed for Mr. White and Ms. Long,

7    but I would give the defendant a little more time for the other

8    individuals because the focus for me is going to be on those

9    individuals in particular and then also the searches that need

10   to be run regarding the issue of arbitration.

11          So I'll hear from the defendant -- from Mr. Chiu on

12   December 4th about that, but it is my expectation that as

13   relates at least to Mr. White and Ms. Long, that information

14   would be completed, Mr. Chiu, in December at a minimum.  And

15   then for the other individuals, I would allow for a little more

16   time into the following year, but I want to deal with the

17   spoliation issue as quickly as possible.  And so that should be

18   the priority of the defendant.

19          MR. CHIU:  Understood, Your Honor.

20          THE COURT:  Okay.

21          MR. DELL'ANGELO:  Thank you, Your Honor.

22          THE COURT:  All right.  I hesitate to ask if there's

23   anything else, Mr. Dell'Angelo.

24          MR. DELL'ANGELO:  There is not, Your Honor.  I

25   appreciate it, though.

1          THE COURT:  Mr. Chiu, anything else?

2          MR. CHIU:  Nothing further, Your Honor.

3          THE COURT:  All right.  We will be adjourned on this

4  case.  Thank you.

5          MR. DELL'ANGELO:  Thank you, Your Honor.

6          (Whereupon proceedings concluded at 12:59 p.m.)

7                         --oOo--

8              COURT REPORTER'S CERTIFICATE

9

10         I, PATRICIA L. GANCI, Official Court Reporter, United

11  States District Court, District of Nevada, Las Vegas, Nevada,

12  certify that the foregoing is a correct transcript from the

13  record of proceedings in the above-entitled matter.

14

15  Date:  November 20, 2025.

16                              /s/ **Patricia L. Ganci**

17                              Patricia L. Ganci, RMR, CRR

18

19

20

21

22

23

24

25

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)**

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

See Certificate of Service Attachment.

**Description of Document(s)** *(required for all documents)*:

Petition for a Writ of Mandamus to the United States District Court for the District of Nevada

**Signature** | s/ Samir Deger-Sen | **Date** | January 20, 2026

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                                              *Rev. 12/01/2018*

## CERTIFICATE OF SERVICE ATTACHMENT

The foregoing was served on counsel for the following parties by electronic

mail.

Benjamin D. Brown
Daniel H. Silverman
Richard A Koffman
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, NW
West Tower, Suite 500
Washington, DC 20005
bbrown@cohenmilstein.com
dsilverman@cohenmilstein.com
rkoffman@cohenmilstein.com

Brian D. Clark
Consuela Abotsi-Kowu
William Joseph Bruckner
Lockridge Grindal Nauen PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
bdclark@locklaw.com
cmabotsi-kowu@locklaw.com
wjbruckner@locklaw.com

Emily B. Marcus
Danield Gifford
Cohen Milstein Sellers & Toll PLLC
88 Pine Street, 14th Floor
New York, NY 10005
emarcus@cohenmilstein.com
dgifford@cohenmilstein.com

Kyle J. Pozan
Lockridge Grindal Nauen, PLLP
1165 N. Clark Street, Suite 700
Chicago, IL 60610
kjpozan@locklaw.com

Joseph R. Saveri
Christopher K.L. Young
Itak Moradi
Joshua P. Davis
Kevin Rayhill
T. Brent Jordan
Joseph Saveri Law Firm, LLP
601 California Street, Suite 1505
San Francisco, CA 94108
jsaveri@saverilawfirm.com
cyoung@saverilawfirm.com
imoradi@saverilawfirm.com
jdavis@bergermontague.com
krayhill@saverilawfirm.com
tbjordan@saverilawfirm.com

Eric L. Cramer
Jeremy Gradwohl
Joshua P. Davis
Michael C. Dell'Angelo
Patrick F. Madden
Berger Montague PC
1818 Market Street, Suite 3600
Philadelphia, PA 19403
ecramer@bergermontague.com
jgradwohl@bergermontague.com
jdavis@bergermontague.com
mdellangelo@bergermontague.com
pmadden@bergermontague.com

Jerome Elwell
Warner Angle Hallam Jackson
   Formanek PLC
2555 East Camelback Road,
Suite 800
Phoenix, AZ 85016
jelwell@warnerangle.com

Robert C. Maysey
Kyla J. Gibboney
Berger Montague PC
505 Montgomery Street,
Suite 625
San Francisco, CA 94111
rmaysey@bm.net
kgibboney@bergermontague.com

Michael J. Gayan
Claggett & Skyles Law Firm
4101 Meadows Lane, Suite 100
Las Vegas, NV 89107
mike@claggettlaw.com

*Counsel for Real-Parties-in-Interest-Plaintiffs Kajan Johnson, Clarence Dollaway, Tristan Connelly, and on behalf all others similarly situated*

The foregoing will also be provided to the following:

The Honorable Richard F. Boulware, II
United States District Court
District of Nevada
333 Las Vegas Blvd. South
Las Vegas, NV 89101

2