UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| KAJAN JOHNSON, et al., | Case No. 2:21-cv-01189-RFB-BNW |
| PHIL DAVIS, et al., | Case No. 2:25-cv-00946-RFB-BNW |
| Plaintiffs, | Las Vegas, Nevada<br>Thursday, February 5, 2026<br>9:05 a.m. |
| vs. | |
| ZUFFA, LLC; TKO OPERATING COMPANY, LLC f/k/a Zuffa Parent, LLC (d/b/a Ultimate Fighting Championship and UFC); and ENDEAVOR GROUP HOLDINGS, INC., | EVIDENTIARY HEARING, DAY 2<br><br>***C E R T I F I E D C O P Y*** |
| Defendants. | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

THE HONORABLE RICHARD F. BOULWARE, II,
UNITED STATES DISTRICT JUDGE

APPEARANCES: See Pages 2 and 3

COURT REPORTER: Patricia L. Ganci, RMR, CRR
United States District Court
333 Las Vegas Boulevard South, Room 1334
Las Vegas, Nevada 89101

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

APPEARANCES:
For the Plaintiffs:

**MICHAEL GAYAN, ESQ.**
CLAGGETT & SYKES
4101 Meadows Lane, Suite 100
Las Vegas, Nevada 89107
(702) 903-1353

**MICHAEL C. DELL'ANGELO, ESQ.**
**PATRICK F. MADDEN, ESQ.**
**JEREMY GRADWOHL, ESQ.**
**JESSICA SEIGEL, ESQ.**
**JUSTIN COLE, ESQ.**
BERGER & MONTAGUE, P.C.
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3000

**DANIEL GIFFORD, ESQ.**
**EMILY B. MARCUS, ESQ.**
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(617) 877-0508

**JOSEPH SAVERI, ESQ.**
THE JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1505
San Francisco, California 94108
(415) 500-6800

**ROBERT CHARLES MAYSEY, ESQ.**
BERGER MONTAGUE, PC
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 906-0684

For the Defendants:

**J. COLBY WILLIAMS, ESQ.**
**SAMUEL MIRKOVICH, ESQ.**
CAMPBELL & WILLIAMS
700 South 7th Street
Las Vegas, Nevada 89101
(702)382-5222

////

APPEARANCES CONTINUED:

**CHRISTOPHER S. YATES, ESQ.**
**AARON T. CHIU, ESQ.**
LATHAM & WATKINS, LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111
(415) 395-8157

**WILLIAM A. ISAACSON, ESQ.**
DUNN ISAACSON RHEE, LLP
401 Ninth Street, NW
Washington, DC 20004
(202) 240-2900

**JOSEPH AXELRAD, ESQ.**
**ROBERT MEDINA, ESQ.**
**ADAM B. PETERSON, ESQ.**
LATHAM & WATKINS, LLP
10250 Constellation Boulevard, Suite 1100
Los Angeles, California 90067
(424) 653-5500

ALSO PRESENT:

Riche McKnight, Zuffa, LLC
Andrew Bendarick, Zuffa, LLC

## INDEX OF EXAMINATIONS

TESTIMONY OF ERIC YEE
Direct Examination by Mr. Madden........................8
Cross-Examination by Mr. Chiu..........................38
Examination by the Court...............................42
Redirect Examination by Mr. Madden.....................43

TESTIMONY OF ELLIOTT HOWARD
Direct Examination by Mr. Madden.......................45
Cross-Examination by Mr. Isaacson......................68
Examination by the Court...............................69
Redirect Examination by Mr. Madden.....................70

TESTIMONY OF HUNTER CAMPBELL
Direct Examination by Mr. Dell'Angelo.................102
Cross-Examination by Mr. Williams.....................239
Examination by the Court..............................249

## PLAINTIFFS' EXHIBIT INDEX

| Exhibit No. | Admitted |
|---|---|
| 22 | 204 |
| 23 | 224 |
| 24 | 229 |

LAS VEGAS, NEVADA; THURSDAY, FEBRUARY 5, 2026; 9:05 A.M.

--oOo--

P R O C E E D I N G S

THE COURT: Please be seated.

COURTROOM ADMINISTRATOR: Good morning. We have three matters now before the Court. The first being 21-cv-1189-RFB --

THE COURT: Darci.

(Court conferring with courtroom administrator.)

COURTROOM ADMINISTRATOR: -- Johnson, et al., v. Zuffa, and 2:25-cv-946-RFB, Davis v. Zuffa, et al. Counsel, please make your appearances beginning with the plaintiffs.

MR. DELL'ANGELO: Good morning, Your Honor. Michael Dell'Angelo for Berger Montague on behalf --

THE COURT: I was going to say, I will recognize that you all are all here and do not need to re-announce yourselves. We'll just note everyone's presence for the record because it takes us a little bit of time to go through everyone's names. So I've seen you all enough. So we'll be fine.

So, what I wanted to find out is a couple of things. Mr. Dell'Angelo, what's the order again of the witnesses going to be today?

MR. DELL'ANGELO: Good morning, Your Honor. The proposed order is Yee, Howard, and Campbell.

THE COURT: Okay. Any reason, Mr. Williams, why we can't proceed in that fashion?

MR. WILLIAMS: No, Your Honor. We have Mr. Yee and Mr. Elliott Howard, who probably has been removed from the courtroom. And Hunter Campbell is on his way. I told him 10 o'clock to be safe.

THE COURT: That's fine. Yeah.

MR. WILLIAMS: And we're ready to go.

THE COURT: Okay. Well, why don't we call the first witness then.

MR. WILLIAMS: Okay.

THE COURT: Well, I was going ask, though, Mr. Williams, I had asked for cloud account information. I'd also asked for the phones. Are they here?

MR. WILLIAMS: Your Honor, I looked at the phones last night. I did not bring them for the following reason. The drawer of phones --

(Court reporter clarification.)

MR. WILLIAMS: -- drawer of phones. What I learned last night is there are other phones in that drawer besides Mr. White's. And given that we were prepping witnesses, I didn't have the resources to identify whose phones are whose. So when we're done today, then I'm going to make that my next project. I -- I -- you heard my name come up several times from witnesses because I've been out at the UFC a lot. I will go back out there and deal with this next. And I didn't mean to be disrespectful to Your Honor, but I didn't want to bring you a

box of phones and say, "I don't know what this is."

THE COURT: No, I appreciate that. But since there's reference to the phones, right, and the phones are going to be, obviously, an issue, and we heard about the phones and the drawers -- so that's going to be a part of this process --

MR. WILLIAMS: Understood.

THE COURT: -- I wanted to be able to talk about the phones with the witnesses because, obviously, Mr. White had indicated that Mr. Howard and/or Mr. Yee, but I think it was Mr. Howard had set the phones up.

MR. WILLIAMS: That's right.

THE COURT: So I wanted to be able to look at the phone and say, "Is this is the phone that" -- if he recalls it, to set it up. So we may have to do that again once you come back, in part, because in this case, like, the models and the different operating systems may matter in the context of how things were preserved. I don't know. So we'll leave you to your phone sleuthing later, and we'll just start with the witnesses today.

MR. WILLIAMS: I appreciate it, Judge. Thank you.

THE COURT: Okay. Uh-huh.

Let's see. Who's going to do the questioning?

MR. MADDEN: I will, Your Honor.

THE COURT: All right.

COURTROOM ADMINISTRATOR: Good morning. Please watch your step.

Raise your right hand.

ERIC YEE, having duly been sworn, was examined and testified as follows:

COURTROOM ADMINISTRATOR: Thank you. Please be seated.

Please state and spell your name for the record.

THE WITNESS: Eric, E-R-I-C, last name is Y-E-E.

(Court conferring with courtroom administrator.)

THE COURT: Before we get started, I know we have people on the phone. Again, I wanted to let people know, as I said the other day, that you're not permitted to record these proceedings in any way. And if you do record them and distribute them in any way, you could be held in contempt of court and face criminal or civil sanctions. So I just want to repeat that for those who are listening on the phone or online.

All right, Mr. Madden. You may go ahead.

DIRECT EXAMINATION OF ERIC LEE

BY MR. MADDEN:

*Q.* Good morning, Mr. Yee. My name is Patrick Madden. I represent the plaintiffs in this action.

Who's your employer?

***A.*** UFC Zuffa.

*Q.* And for how long have you been employed by Zuffa?

***A.*** Since 20 -- summer of 2019.

*Q.* Okay. And what is your title?

***A.*** Current title is director of social media.

*Q.* And for how long has that been your title?

***A.*** For about three years.

*Q.* And what was your title prior?

***A.*** Manager of social media.

*Q.* And that goes all the way back to 2019 when you began?

***A.*** That's correct.

*Q.* What are your duties as the director of social media for UFC?

***A.*** There's a handful of duties that I -- that I do. Oversee and help manage digital and social media campaigns across UFC platforms is one of them. Communication between the social media department and the executive department, both directions, is another one, as well as help curate and manage and post on behalf of Dana White.

*Q.* And when you say "post on behalf of Dana White," do you mean his accounts on social media?

***A.*** That's correct.

*Q.* And how are those duties different, if at all, from when you were a manager of social media?

***A.*** Not terribly different. I continued to provide communication both from the social media department and the executive department, continued to post on behalf of Mr. White, and also helped with conceiving, managing, and executing social media -- social and digital media campaigns.

*Q.* Do you have to get approval prior to posting content on the

UFC social media accounts?
***A.*** Can you explain the approval process that you're asking about?
*Q.* So you testified that you post content to the UFC social media accounts. Is that right?
***A.*** I manage campaigns, correct. That part is correct. I don't on a regular basis post to UFC's accounts.
*Q.* Who posts to the UFC accounts?
***A.*** We have a team of -- of account managers that post to the UFC account.
THE COURT: And I'm sorry, Mr. Yee. You said that you had done some work directly for Mr. White as relates to social media. Is that correct?
THE WITNESS: That is correct. Yes.
THE COURT: And when you post on behalf of Mr. White, does he tell you what to post?
THE WITNESS: Yes, that's correct.
THE COURT: And do you send the post to him to confirm that that's what you're going to post?
THE WITNESS: For 100 percent of posts, yes, he sees both the media that would be attached to photo or video as well as the caption.
THE COURT: And how do you send him that information, is that by text?
THE WITNESS: Text. Correct.

THE COURT: By text?

THE WITNESS: Yes, sir.

THE COURT: All right. Thank you.

BY MR. MADDEN:

*Q.* And how do you post that information? Do you log into his account?

***A.*** Post for --

*Q.* For Dana White?

***A.*** -- for Dana White? There's two ways of posting to Dana White's account. The native platform on Meta, which is the owner -- is the group behind Threads, Facebook, and Twitter -- or, sorry -- Instagram, Threads, and Facebook. There is a web-based service called Meta Business Suite, which is about 50 percent of posts go through that platform. Similarly with Threads, that's almost entirely web based. And then the other 50 percent would be through my phone, correct, posting natively from my phone.

*Q.* Posting natively from your phone on his accounts?

***A.*** Correct.

*Q.* And when you said 50 percent of posts go through Meta Business, is that in general or is that 50 percent of the posts you do for Mr. White?

***A.*** That is for posts that I'm publishing on behalf of Dana White, correct.

*Q.* Okay. All right.

And so you mentioned Instagram, Threads, and Facebook. Do you also post on behalf of Mr. White's accounts on Twitter --
***A.*** I do.
*Q.* -- or X?
***A.*** I do. Yes.
*Q.* Okay. And how do you post on those accounts?
***A.*** Very similarly, split between Twitter natively on web and Twitter natively on -- on the phone.
*Q.* And so you have account access on your phone to Mr. White's Twitter and X accounts?
***A.*** That's correct.
*Q.* And to his Instagram accounts.
***A.*** That's correct.
*Q.* Do you post on Mr. White's behalf on Snapchat?
***A.*** Yes.
*Q.* On TikTok?
***A.*** Yes.
*Q.* On Telegram?
***A.*** To my knowledge, he does not have a Telegram.
*Q.* Any other social media or apps that you post on behalf of Mr. White that we haven't discussed here?
***A.*** Not to my knowledge.
*Q.* Does -- how many accounts does Dana White have on Instagram?
***A.*** To my knowledge, one.
*Q.* And has that been the case for the entire time you've been

at the UFC?
***A.*** That's correct.
*Q.* Are you familiar with the account @danawhiteufc?
***A.*** Not familiar with it.
*Q.* So at no point was your responsibility to post on that account.
***A.*** Correct.
*Q.* How many accounts does Mr. White have on Twitter/now known as X?
***A.*** One account.
*Q.* Are you familiar with an account @danawhiteufc on Twitter?
***A.*** I'm not familiar with the account.
*Q.* What is Dana White's Snapchat account?
***A.*** @danawhite.
*Q.* Are you familiar with the Dana White UFC account on Snapchat?
***A.*** I'm not familiar.
THE COURT: When you say you're not familiar, you're saying that you know it, but you don't use it, or you've never heard of it?
THE WITNESS: I've never followed or seen any content from the accounts that were listed.
THE COURT: What are the accounts that you know of for Mr. White on these different platforms? What are their names?
THE WITNESS: @danawhite across -- so Facebook would

be -- Facebook is the unique one because it's /Dana White. Threads, Instagram, TikTok, Snapchat, and Twitter/X are both @danawhite.

THE COURT: They're all @danawhite?

THE WITNESS: Yes, sir.

THE COURT: Okay. Thank you.

Go ahead, Mr. Madden.

BY MR. MADDEN:

*Q.* And I don't think I asked this. Do you have direct access on your phone via Snapchat?

***A.*** I do.

*Q.* To Dana White's account?

***A.*** Correct.

*Q.* Did you set up each of those apps on Dana White's phones during your time at the UFC?

***A.*** When you say "set up," can you -- are you -- do you mean download the apps?

*Q.* Well, let's start there. Did you download each of those apps?

***A.*** I downloaded Instagram. TikTok on -- at one point, I did download TikTok, yes. I did not download Facebook, Threads, Snapchat. And X, I don't recall downloading, although it may -- may have already been on his phone.

*Q.* When you downloaded Instagram or TikTok, did you observe that Snapchat was on his phone?

***A.*** I don't recall.

*Q.* Did you observe that Twitter or X was on his phone?

***A.*** I don't recall looking for it.

*Q.* Did you observe whether WhatsApp was on his phone?

***A.*** I don't recall looking for WhatsApp.

*Q.* Did you download WhatsApp on his phone?

***A.*** I believe so, yes.

THE COURT: Did you show him how to use those apps?

THE WITNESS: None of those -- none of those apps. I -- TikTok, I may have showed him a video, but not how to -- how a general user would use TikTok.

THE COURT: What about Instagram?

THE WITNESS: Similarly, I never explained how the app functions, other than downloading the app and showing him posts on TikTok.

THE COURT: Have you ever known --

THE WITNESS: I'm sorry, Instagram.

THE COURT: Have you ever known him to post anything on those platforms by himself without going through you?

THE WITNESS: Instagram, yes. And Twitter, yes.

THE COURT: So he knows how to do that?

THE WITNESS: To post -- to post to Twitter and Instagram, correct.

THE COURT: Yeah. Okay.

And how long has he had those accounts?

THE WITNESS: The X/Twitter, Facebook, and Instagram accounts, I couldn't say with definition. They were in existence before I was hired at UFC.

THE COURT: So as of 2019 when you were hired, they were -- those accounts were in existence for Mr. White.

THE WITNESS: Yes. Yes, Your Honor.

THE COURT: And he was posting on them.

THE WITNESS: Yes. He --

THE COURT: All right. Thank you.

THE WITNESS: -- he or somebody else was posting -- he or the person who was in the role that I was in was posting before, correct.

THE COURT: No. My question is, because I want to be clear about this --

THE WITNESS: Yes.

THE COURT: -- right, do you understand that he knows how to post on these accounts?

THE WITNESS: For?

THE COURT: Instagram.

THE WITNESS: Yes, yes. Yes, Your Honor.

THE COURT: All right. So whether someone else posted or he posted, you understand that he knows how to do it himself?

THE WITNESS: I agree, yes.

THE COURT: Okay.

THE WITNESS: That's right.

THE COURT: That's what I was trying to understand.

THE WITNESS: Yes, yes.

THE COURT: Thank you.

BY MR. MADDEN:

*Q.* Do you know who set up White's social media and communications apps before you started?

***A.*** Not with definitive confirmation.

*Q.* Okay. Did you download all of those apps that we just discussed in November of 2024 when he got a new iPhone 16 Pro?

THE COURT: He wasn't at the UFC then, right?

THE WITNESS: Sorry, can you repeat the year, please?

THE COURT: Oh, 2024. I thought you said 2014.

MR. MADDEN: 2024.

THE COURT: I'm sorry.

THE WITNESS: The exact year, I'm not sure if I can 100 percent recollect what was downloaded. In 2024, I think I may have downloaded -- it might have been 2025 -- early 2025, downloaded WhatsApp to his phone, but I just -- I don't recall the exact.

BY MR. MADDEN:

*Q.* When you downloaded WhatsApp to his phone in 2025, are you familiar with the App Store process of acquiring an app for an iPhone?

***A.*** Sorry, can you --

*Q.* Yeah.

***A.*** -- explain?
*Q.* So when you're downloading an app from the App Store, there's various things that can appear as a button for you to accomplish that download. It can say "get." It can have a cloud and then an arrow pointing down. Do you recall which you had?
***A.*** I don't recall the exact phrasing that the button would have said.
*Q.* So was it clear to you at that time whether he had had WhatsApp before you downloaded it?
***A.*** I can't say with definition one way or the other.
*Q.* Okay. Do you have Dana White's Apple ID credentials for the purposes of downloading these apps?
***A.*** I do not.
THE COURT: Mr. Yee, but Mr. White had an Apple ID, correct?
THE WITNESS: Correct.
THE COURT: Right. In order to set up these phones, right, it's your understanding, right, that he would have had to have an Apple ID, correct?
THE WITNESS: That's my understanding as to how iPhone -- the App Store on iPhone works, correct.
THE COURT: Right. Do you know whether or not Mr. White had an iCloud account associated with his Apple ID?
THE WITNESS: I can't say with definition. I don't

know.

THE COURT: How were any of these messages then saved as it relates to the things that were posted on his accounts?

THE WITNESS: The messages within -- within WhatsApp or the individual apps themselves?

THE COURT: Well, the different apps.

THE WITNESS: Yeah.

THE COURT: I would assume that you would want to keep a record of what was posted, right. And the question is, did you --

THE WITNESS: Yes.

THE COURT: -- was his phone set up also to save whatever was posted to his accounts?

THE WITNESS: If I'm -- to understand the questions of posts, the public-facing posts. So posts are not saved within the physical device itself.

THE COURT: But they can be, correct?

THE WITNESS: The -- not to my knowledge, for Instagram, Twitter, Facebook, Snapchat -- I guess -- no, Snapchat was still digital, WhatsApp, and Threads.

THE COURT: So -- and that's helpful. So in terms of an Instagram account, in terms of the posts, what would be your understanding of how that would be -- or how you all saved those for the future?

THE WITNESS: To my understanding, as far as the listed

apps --

THE COURT: Well, let's focus on Instagram for now.

THE WITNESS: Okay. So the posts are saved digitally and viewable on the Instagram app. So what -- what that would mean would be if an individual went from one phone to a new phone, the posts don't disappear or go away. There would have to be action taken in order for those posts to no longer appear.

THE COURT: Because it would be associated with the account.

THE WITNESS: Correct. The account -- the account and all of its posts would be saved digitally to the Instagram app, not to the physical device.

THE COURT: Right.

So if there were messages on there at one point in time and then later those messages didn't exist, that would require someone to actually physically delete them?

THE WITNESS: For clarification, messages would be more direct messages as opposed to --

THE COURT: Well, that's a good point.

THE WITNESS: -- public facing.

THE COURT: So what are the different types of messages or postings that carry over on the app?

THE WITNESS: And, again, Your Honor, just Instagram?

THE COURT: Instagram. We're focusing on Instagram for now.

THE WITNESS: Understood. There are three types of -- primarily three types of messaging. There are feed posts, which would occur in -- served to users who follow or do not follow that individual account.

THE COURT: Right.

THE WITNESS: Then there are story posts, which automatically expire by the functionality of Instagram. And those automatically expire for all users after 24 hours. And this is -- there's no exception, other than manual -- manual deletion. Again, similar for all users.

And then there's direct messages, which is a -- serves as a point-to-point communication between one or a group of people within the app itself.

THE COURT: And as it relates to direct messages, are those messages maintained within the app or do they also expire?

THE WITNESS: They are maintained within the app, correct.

THE COURT: So, in other words, any direct messages that would happen between Instagram users, those would be preserved in the app for the account?

THE WITNESS: It would be preserved digitally within the app, correct.

THE COURT: So if I say, "Mr. Yee sent you a direct message two years ago on Instagram," if I still have my account now, I could retrieve that direct message?

THE WITNESS: That's correct.

THE COURT: Right. Now, and if I wanted to, I could also delete that message.

THE WITNESS: That's correct.

THE COURT: But if I didn't actively seek to delete it, it would remain associated with my account and would be retrievable.

THE WITNESS: If you do not actively -- apologies. If you do not actively delete it, it would be retrievable, correct.

THE COURT: Thank you.

BY MR. MADDEN:

*Q.* Are there limited audience stories that you can post on Instagram?

***A.*** There is a functionality of -- of limited audience, correct. On stories only.

*Q.* Can you explain that functionality?

***A.*** Sure. The feature's called "close friends," and that would be a story post similarly that would expire in 24 hours that is distributed to a list of -- Instagram would call them close friends.

*Q.* Did you explain that functionality to Mr. White?

***A.*** I did not.

*Q.* Do you know whether he uses it?

***A.*** I'm unaware if he uses it.

*Q.* Okay. And just to follow-up on the Court's questions --

THE COURT: Excuse me, Mr. Madden.

Did you have access, Mr. Yee, to any direct messages that Mr. White would send to other individuals?

THE WITNESS: I have access to it. Haven't ever --

THE COURT: Looked at it.

THE WITNESS: Correct.

THE COURT: Do you have any information as to how many messages were in the direct messages, sort of, library, for lack of a better word? Do you know how many messages were in there?

THE WITNESS: Because I've never accessed it, I -- I don't have that -- I don't have that information.

THE COURT: Okay. Perfect. Thank you.

BY MR. MADDEN:

*Q.* Did you provide Mr. White's login credentials to counsel for collection in this case?

***A.*** I did not, no.

THE COURT: Were you ever asked to provide that information?

THE WITNESS: I did not, no.

THE COURT: So you were never asked for that?

THE WITNESS: The login credentials --

THE COURT: Yeah.

THE WITNESS: -- for his social media account, that's correct. I did not. I was not asked for it.

BY MR. MADDEN:

*Q.* So to the extent that defendants have not collected Instagram messages for any period of time -- direct messages for any period of time during which he had the account, it's your understanding that those messages would have had to have been deleted if they existed.

MR. CHIU: Objection. Objection, Your Honor. That misstates --

THE COURT: Overruled.

THE WITNESS: Sorry. Can you ask one more time, the question.

BY MR. MADDEN:

*Q.* Yeah. So to the extent the defendants have not collected Instagram messages for any period of time during which --

THE COURT: So let's not talk about what they did or didn't collect. Plus, Mr. Madden, he's already answered this question, right. He basically -- he did say, he said they'd have to be deleted, right. So I'm not sure --

MR. MADDEN: Okay.

THE COURT: -- if you're just asking him to reiterate that. But my understanding of his testimony was that if they were there, right, they would be associated with the account. And they would remain associated unless someone deleted them, which they could do manually. Is that correct?

THE WITNESS: That's correct.

THE COURT: Okay.

MR. MADDEN: Okay.

BY MR. MADDEN:

*Q.* Are you familiar with Zuffa's document retention policies?

***A.*** I'm not familiar.

*Q.* So you don't know whether they apply to social media accounts?

***A.*** I wouldn't know if they would apply because I'm not familiar with their retention policy.

THE COURT: So as far as you know, have you ever been told that there is a digital media retention policy?

THE WITNESS: I have not been instructed if there is or isn't, so -- sorry. Does that answer the question?

THE COURT: No, it does. So, in other words, as far as you know, you're not aware of an official UFC digital retention policy.

THE WITNESS: Correct.

THE COURT: Right. You've never been trained on that type of a policy.

THE WITNESS: Correct. For, like, employees, like, who are new -- new employees?

THE COURT: I mean forever. For example, you're responsible for social media, right?

THE WITNESS: Yes, sir.

THE COURT: Is there a retention policy that's an official policy of the UFC regarding social media?

THE WITNESS: Retention -- sorry, would you -- would we -- could we discuss retention of, like --

THE COURT: So, in other words, you have social media posts and other things that you present, right?

THE WITNESS: Correct.

THE COURT: Other than how they may be retained within the apps, does the UFC take any other steps to preserve those posts?

THE WITNESS: I understand. Steps were taken -- I can't provide the exact year. This was probably three or four years ago -- of Mr. Campbell telling me directly messages aren't to be deleted, but social posts are kept until -- with the exception of copyright music. So for a social media best practices, due to licensing of commercial assets, there is -- there are posts from the UFC account, for example, and from Dana White's account, which are publicly viewed and then required to be taken down. So from a retention standpoint, there are policies in place to remove some posts due to copyright or commercial music or likeness.

THE COURT: Have you ever seen a written retention policy for the UFC?

THE WITNESS: For social media content, I have not.

THE COURT: Right. For any digital content.

THE WITNESS: I don't recall.

THE COURT: And you indicated that Mr. Campbell at one

point came to you and asked you to preserve direct messages?

THE WITNESS: He said -- Mr. Campbell instructed to not delete messages in general.

THE COURT: I'm sorry, when was that conversation?

THE WITNESS: Oh, this was -- this must have been during COVID, so my best guess is '21 or '22.

THE COURT: Okay.

THE WITNESS: A few years after I had been employed at UFC. The discussion was that I was to not delete any messages. That's when I informed him -- this is why I also do not go into any of Dana's messages on any social media platform.

THE COURT: So you told him that you hadn't deleted messages anyway. Is that correct?

THE WITNESS: That's correct. So I followed -- correct.

THE COURT: Right. So as far as you knew, right, any direct messages on Instagram would not have been deleted by yourself.

THE WITNESS: Instagram or other platforms or anything that I manage, correct.

THE COURT: Okay. Perfect. Thank you.

Go ahead, Mr. Madden.

BY MR. MADDEN:

*Q.* Who else has direct access to Mr. White's Instagram account?

***A.*** To my knowledge, nobody.

*Q.* Do you know of anyone else who has direct access to his other personal social media accounts?

***A.*** To my knowledge, if we're talking about Instagram or the previously mentioned accounts, he has one account per platform. So one Instagram account, one WhatsApp account, one TikTok account.

*Q.* And does anyone other than you and Mr. White have direct access to those accounts?

***A.*** To my knowledge, no.

*Q.* Now, did you just download WhatsApp or did you set it up as well for him?

***A.*** I downloaded WhatsApp, and I confirmed that it was connected to the phone number that we downloaded it to.

*Q.* Do you know whether Zuffa has a policy concerning ephemeral messaging or disappearing messaging?

(Court reporter clarification.)

MR. MADDEN: Ephemeral messaging or disappearing messages.

THE WITNESS: If the question -- sorry. If -- the question is if they have a policy?

BY MR. MADDEN:

*Q.* Concerning the use of ephemeral or disappearing messages.

***A.*** I have not been instructed on any messaging.

*Q.* You mentioned that there are circumstances where you have been instructed to delete posts because of copyright issues, for

example. How does Zuffa ensure that you are complying with that policy?

***A.*** How does Zuffa ensure that I'm complying with that policy. It's direct instruction from who I report to, which would be Dana White and Hunter Campbell.

*Q.* When you were instructed on that policy, did you ask about their policy for deleting any other content on social media?

***A.*** I -- sorry, I don't follow you. I don't --

THE COURT: Mr. Madden, I think we've covered this. Let's move on, please.

BY MR. MADDEN:

*Q.* Do you know what a litigation hold is?

***A.*** Not -- I do not, no.

*Q.* You haven't received any training from Zuffa concerning compliance with litigation holds?

***A.*** Not to my knowledge.

THE COURT: Excuse me, Mr. Madden.

Have you ever heard the term "litigation hold"?

THE WITNESS: I've seen the term. I don't know what it means.

THE COURT: Okay. When you say you've seen it, where have you seen it?

THE WITNESS: Social media.

THE COURT: Social media that you received from UFC or just your general view?

THE WITNESS: General social media, correct.

THE COURT: So have you ever received any direct communication from UFC about a, quote/unquote, litigation hold in this case?

THE WITNESS: No, I have not received direct messaging with any term on litigation hold.

THE COURT: So you -- so you never received any direct instruction from Hunter Campbell or Dana White regarding a litigation hold for just UFC content.

THE WITNESS: That's correct. I have not received.

THE COURT: All right. Thank you.

BY MR. MADDEN:

*Q.* And you've never received any information concerning a litigation hold applicable to Dana White's social media accounts?

***A.*** As I mentioned, I haven't received any direct messaging on the phrasing of litigation hold.

THE COURT: Okay.

BY MR. MADDEN:

*Q.* Did you have an understanding of Mr. White's obligation to preserve and not allow deletion of his social media messages and content?

***A.*** Of -- I received messaging from Hunter Campbell. Again, this was -- this was during COVID, maybe 2022 or '21, to not delete messages.

*Q.* Okay. But I think my question was a little bit different. Did you have an understanding that Mr. White was subject to an obligation to ensure that his messages were not deleted?

***A.*** Correct. Yes. I do -- did.

THE COURT: So in that -- in that conversation, Mr. Campbell explained to you that Mr. White had an obligation to preserve messages.

THE WITNESS: Yes, Your Honor.

THE COURT: And that was the first time you had that conversation with him since you started working at the company.

THE WITNESS: That's correct, Your Honor.

THE COURT: Thank you.

BY MR. MADDEN:

*Q.* And then in 2024 or 2025 when you were setting up social media apps on his new phone, did you have a subsequent conversation about his obligation to preserve messages on his social media and communications apps?

***A.*** I don't recall.

*Q.* In response to the instruction in 2020 or 2021, did you make any changes to Mr. White's retention settings on his social media apps?

***A.*** I've never adjusted the base settings on -- on his social media apps.

*Q.* Does Zuffa offer any support for setting up social media and communications apps on cell phones?

***A.*** I'm unaware. I've never -- never explored it.

*Q.* What is your expertise on setting those up?

***A.*** Setting up social media apps?

*Q.* Yes.

***A.*** I would say highly proficient.

*Q.* Where do you derive that expertise?

***A.*** Professional experience within -- working in social media.

*Q.* And does that experience involve anything relating to the retention settings in social media and communications apps?

***A.*** Sorry, can you repeat the question -- repeat the question?

*Q.* Does your experience involve anything relating to the retention settings in social media and communications apps?

THE COURT: Excuse me, Mr. Madden.

(Court conferring with law clerk.)

THE COURT: I'm sorry, Mr. Madden. Could you repeat that question, please?

MR. MADDEN: Yeah.

BY MR. MADDEN:

*Q.* Does your experience involved anything relating to the retention settings in social media and communications apps?

***A.*** I have experience within social media apps, yes. Can you -- is there, like, an example that you can provide for retention?

*Q.* Sure. So do you understand that WhatsApp has a disappearing messages feature since at least May of 2022 called ephemeral enabled?

***A.*** I understand that WhatsApp and Instagram have disappearing messages. I'm aware of that, yes.

*Q.* Do you understand that WhatsApp has the ability for users to delete messages for everyone?

***A.*** I'm aware that they have the -- that ability, correct.

*Q.* Have you discussed that setting with Mr. White?

***A.*** I have not.

THE COURT: And as far as you know, in terms of Mr. White's Instagram account in particular, it was not set to automatically delete messages. Is that correct?

THE WITNESS: That would be correct. That -- based on when I set up his phone. When I didn't change any of the base settings on these apps, all of these base settings do not delete or remove any direct messages, any content not -- aside from dark messages.

THE COURT: Right.

THE WITNESS: Any content other than stories, which expire after 24 hours.

THE COURT: So as you understood it, the base settings for Mr. White's Instagram account were such that the direct messages would not be deleted. Is that correct?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay.

BY MR. MADDEN:

*Q.* When you were told not to delete any of Mr. White's messages

in 2020 or 2021, was there any indication that messages had been lost at that time?
***A.*** There was no indication to me.
*Q.* And you were talking about the base settings a few moments ago. Do you understand that individual threads or conversations can be set and turned on and off, the feature, to disappear?
***A.*** Yes. I understand that ability, yes.
*Q.* And have you discussed that with Mr. White?
***A.*** We have not discussed it.
*Q.* How does one turn that on or off for Instagram?
***A.*** I believe it is a swipe-up motion once you're inside the direct message with the individual or with the group, followed by a confirmation, yes.
*Q.* So it is easy to do.
***A.*** Correct.
*Q.* What about in WhatsApp?
***A.*** I'm not terribly familiar. I haven't actually physically done it. I'm aware that it exists.
*Q.* Okay.
Do you know what WhatsApp's default retention setting is?
***A.*** For -- for which -- which element of WhatsApp?
*Q.* For chats.
***A.*** For direct messages?
*Q.* In WhatsApp, yes.

***A.*** So the direct setting for direct messages is to keep messages.

*Q.* And that could be turned on and off on an individual message basis, right?

***A.*** I -- correct. I believe so.

*Q.* How easy is that to do?

***A.*** Like I said, I've never done it before.

*Q.* And it could be turned on by someone other than Mr. White, right?

***A.*** It would -- whoever has access to the direct chat itself. So whoever has access to the physical phone and within the chat itself, correct, has -- has access to remove -- or turn on these vanishing posts.

*Q.* So what I want to be clear on, because I'm -- I just want to clarify your -- your statement about access to the physical phone. So if Mr. White is having a WhatsApp chat with person X and person X enables the -- the disappearing message function in that chat, Mr. White gets a notice of that, right?

***A.*** Again, I've never used WhatsApp disappearing messages. I can't -- I can't confirm that. I don't know.

*Q.* Okay.

Have you raised with anyone at Zuffa the issue of how disappearing messages in WhatsApp or Instagram could be problematic for the --

THE COURT: Mr. Madden, we've gone through this area

enough. Let's move on, please.
BY MR. MADDEN:
*Q.* Do you have an understanding of the retention settings on an iPhone for audio messages?
***A.*** I'm familiar with -- transitioning to text messages, I'm aware -- I'm aware of the settings, yes.
*Q.* What is the default setting for audio messages sent via the iMessage app?
***A.*** To my best knowledge, it is -- it's -- you -- once you listen to an audio message, you have a minute or a few minutes to save it or it expires.
*Q.* Does Dana White send you audio messages?
***A.*** Yes.
THE COURT: Now, Mr. Yee, as far as you understand, the actual typed text messages, those are automatically retained in iMessage unless someone actively deletes them. Is that correct?
THE WITNESS: Yes, Your Honor.
THE COURT: Okay. And I think you had said you weren't the one to set up his phone. Is that correct?
THE WITNESS: That's correct.
THE COURT: But at times you had access to his phone.
THE WITNESS: From time to time, correct, yes.
THE COURT: Right.
And when you had access to his phone, again, I just wanted to clarify, was it your understanding that he had an

Apple ID?

THE WITNESS: To my understanding, yes, because you need to have an Apple ID for an -- for an iPhone so --

THE COURT: To work, right. And, I guess, what you said is you weren't sure if he had an iCloud account to back up his messages.

THE WITNESS: That, I'm unaware of.

THE COURT: Right. Were you ever asked to back up Mr. White's text messages?

THE WITNESS: That's not my purview, so I was never asked.

THE COURT: Okay. Would you know how to do that if you were asked to do that?

THE WITNESS: I could certainly figure it out, yes.

THE COURT: Right. Okay. But you've never had to do that in terms of your duties at UFC for anyone.

THE WITNESS: Correct.

THE COURT: Okay. All right. Thank you.

Go ahead, Mr. Madden.

BY MR. MADDEN:

*Q.* Does Mr. White frequently send you audio messages in lieu of a written text message?

***A.*** Can you describe, like, what frequency would mean -- or "frequently," sorry, would mean?

*Q.* How often does Mr. White send you audio messages in lieu of

a written text message?

THE COURT: So let's say -- excuse me, Mr. Madden -- out of 10 messages you receive from him, how many would be an audio message?

THE WITNESS: If we could expand it to maybe out of --

THE COURT: 100.

THE WITNESS: Yeah, maybe, like, two or three.

THE COURT: Okay.

THE WITNESS: Yeah.

THE COURT: Thank you.

MR. MADDEN: I don't have any further questions right now.

THE COURT: Thank you.

CROSS-EXAMINATION OF ERIC YEE

BY MR. CHIU:

*Q.* Good morning, Mr. Yee.

I just want to touch on a few things. Mr. Madden asked you about these other supposed social media accounts, @danawhiteufc. To your knowledge, how many social media accounts does Mr. White have?

***A.*** To my knowledge, he has one for each of the following platforms: Instagram, Facebook, Threads, Twitter, Snapchat, and TikTok. So six.

*Q.* And are you aware of this concept of kind of like fake Dana White or UFC social media accounts?

***A.*** Yes, I'm aware.
*Q.* Okay. And is it a possibility that, you know, some of these other accounts are fake ones or not ones that you, the company, or Mr. White actually has?
***A.*** That is a possibility, yes.
*Q.* Okay. Now, I just want to talk a bit about the various social media platforms that you manage for Mr. White. Beyond Instagram, and I know you mentioned X, on all those other social media platforms, does Mr. White personally post to those social media platforms?
***A.*** So --
THE COURT: I'm sorry. Excuse me, Mr. Yee.
Mr. Chiu, if you could specify, it would be helpful --
MR. CHIU: Sure.
THE COURT: -- because there's others, but we've had so many platforms mentioned --
MR. CHIU: Sure.
THE COURT: -- it would be helpful if you just went through which ones you were describing.
MR. CHIU: Sure.
BY MR. CHIU:
*Q.* Let's start with -- so with Instagram, you mentioned, you know -- you mentioned that Mr. White does post -- himself make posts on Instagram. Can you just tell us what percentage of the posts on Instagram are made by you versus, for example,

Mr. White?
***A.*** I would say, once approved, and approved would be Dana has -- Dana White has seen the message written out and the medium, which would be photo or video, I'll press send on about 75 percent of Instagram visible posts.
*Q.* Okay. And what about for Snapchat?
***A.*** Similarly, once the -- the approval process has been completed, I'll post 100 percent to Snapchat.
*Q.* So on Snapchat -- Snapchat, Mr. White is not individually posting and making any posts.
***A.*** To my knowledge, correct.
*Q.* Okay. And what about TikTok?
***A.*** Zero -- same as Snapchat. I would post 100 percent, to my knowledge.
*Q.* Okay. And you mentioned Twitter/X. What about that platform?
***A.*** I'll post -- once approved, I'll post about 95, 98 percent of the time.
*Q.* Okay.
***A.*** Where -- the -- five -- 2 to 5 percent wouldn't generally be posts, as opposed to replies, which are still publicly viewable. But he will often -- not often. That percentage that he's posting is, like, a reply instead of a post, so...
*Q.* Okay. And what about Facebook?
***A.*** I'll post 100 to --

*Q.* Okay. And what about Threads?
***A.*** I'll post 100 percent.
*Q.* Okay. And are there any other social media platforms that I missed?
***A.*** I don't believe there is.
*Q.* Okay.
***A.*** Not for Dana White.
*Q.* Okay. Now, I want to talk briefly about, you know, when you set up, for example, the Instagram account on Mr. White's phone. You mentioned the base setting for Instagram is to not delete anything. Have you ever been instructed to change that setting on Mr. White's phone?
***A.*** I have not.
*Q.* All right. And every time you set up the Instagram account on Mr. White's phone, you just set it up with the base setting?
***A.*** That's correct.
*Q.* Okay. And what about WhatsApp? When you set up WhatsApp on Mr. White's phone, did you leave it in the base setting?
***A.*** I did.
*Q.* And is your understanding of the base setting is that even ephemeral messages or auto-delete messages, that is suspended?
***A.*** To my knowledge, when you download the WhatsApp app, messages are -- the base setting is for them to not delete, correct.
*Q.* And have you ever been instructed to turn on the

disappearing messages function on Mr. White's Instagram account?
***A.*** I have not.
*Q.* And what about for his WhatsApp account, have you ever been instructed to turn on --
***A.*** I have not. Excuse me.
*Q.* Sorry -- turn on the disappearing messages function on that account?
***A.*** I have not been instructed.
*Q.* Okay.
MR. CHIU: Nothing further, Your Honor. Thank you.
THE COURT: Mr. Yee, just a couple of questions.

EXAMINATION BY THE COURT OF ERIC YEE

BY THE COURT:
*Q.* To your knowledge, does Mr. White have a personal phone and a -- and a work phone?
***A.*** Yes. That would be correct, to my knowledge.
*Q.* To your knowledge, he has at least two phones?
***A.*** To my knowledge, correct.
*Q.* And in the time that you've been here, has he ever had his phone upgraded to a new phone?
***A.*** Definitely to a different phone. My assumption would be a new phone.
*Q.* Right.
***A.*** I couldn't say.
*Q.* You wouldn't say. So since you've been working there, how

often, approximately, have you seen him transition to a new phone?
***A.*** It would be a guess. Certainly at least once I've -- I've seen and he's told me he's received a new phone --
*Q.* Okay.
***A.*** -- because I had to redownload Instagram.
*Q.* Right.
***A.*** I can't say with certainty how many -- how many times.
*Q.* And when you -- when you helped him transition to the new phone, did he ever say to you that he had lost messages or anything from any of the apps?
***A.*** I don't recall that being --
*Q.* So you don't recall him saying that to you?
***A.*** Correct.
*Q.* Okay. And in terms of the transitioning to the new phone, the one at least that you recall, did you have physical access to the old phone while you were helping him transition to the new phone?
***A.*** I don't recall asking for the old phone.
*Q.* Okay.
THE COURT: All right. That's all. Thank you.
MR. MADDEN: I have just, I think, four questions.

REDIRECT EXAMINATION BY MR. MADDEN

BY MR. MADDEN:
*Q.* Did you set up his personal phone with his social media

accounts?
***A.*** I was never instructed which phones are which, so I'm -- I can't say with certainty.
*Q.* Do you set up anyone else's social media and communications apps at the UFC?
***A.*** For staff members, I can't think of a circumstance where I may have.
*Q.* Any executives?
***A.*** I think I downloaded Instagram for Hunter Campbell one time.
*Q.* Okay. Did you ever observe, when you were in White's Twitter or X account, that there were -- there was an icon for unread direct messages?
***A.*** I don't look for it. I'm sure it's -- I'm sure -- I just -- I don't look for it.
*Q.* Okay. And so you don't know whether you've then observed that there were no unread direct messages on the icon?
***A.*** I -- I don't look for it.
*Q.* Okay.
***A.*** Sorry.
MR. MADDEN: No further questions.
THE COURT: Thank you.
Mr. Chiu.
MR. CHIU: Nothing further, Your Honor.
THE COURT: Mr. Yee, thank you for your time.
THE WITNESS: Thank you, Your Honor.

THE COURT: You're excused.

Why don't we take about a five, 10-minute recess and we'll come back and then have Mr. Howard. Thank you.

(Recess taken at 9:54 a.m.)

(Resumed at 10:04 a.m.)

THE COURT: Please be seated.

All right. Are we ready for Mr. Howard?

MR. MADDEN: Yes, Your Honor.

THE COURT: All right.

ELLIOTT HOWARD, having duly been sworn, was examined and testified as follows:

COURTROOM ADMINISTRATOR: Thank you. Please be seated.

Please state and spell your name for the record.

THE WITNESS: Elliott Howard, E-L-L-I-O-T-T, Howard, H-O-W-A-R-D.

DIRECT EXAMINATION OF ELLIOTT HOWARD

BY MR. MADDEN:

*Q.* Mr. Howard, my name is Patrick Madden. I represent the plaintiffs in this matter.

***A.*** Good morning, sir.

*Q.* What -- who is your employer?

***A.*** Dana White.

*Q.* In his personal capacity?

***A.*** I mean, UFC is where I get my paycheck from, yeah.

*Q.* Okay. So would you understand your employer to be the UFC?

***A.*** Yes.
*Q.* Okay. What is your title?
***A.*** VP of photography.
*Q.* And what are your roles in that title?
***A.*** Photo-wise, I, you know, take photos and distribute them to social media or wherever needs them. Help out with printing art, stuff like that. Help distribute some stuff for production, you know, I shoot some stuff for those guys as well.
*Q.* Do you work directly with Mr. White?
***A.*** Yes, sir.
*Q.* What do you do for Mr. White?
***A.*** Whatever needs to get done.

THE COURT: Sir, I'm sorry. You're going to have to -- I'm sorry. You're going to have to speak up just a little bit. I'm having some difficulty hearing you.

THE WITNESS: Yes, sir. I'm sorry.

THE COURT: No worries.

BY MR. MADDEN:
*Q.* And so you said, "Whatever needs to get done." And I'd like to understand, is that separate and apart from your role as a photographer?
***A.*** Yes.
*Q.* Do you get paid separately for that?
***A.*** No, but I'm -- I just -- whatever he asks, I, you know, help out with.

*Q.* Do you have an IT background?
***A.*** No, sir.
*Q.* Do you have a degree in engineering or a similar field?
***A.*** No, sir.
*Q.* Have you had a job with the -- a company, other than your role for Mr. White here, that involves setting up or configuring iPhones for use by consumers?
***A.*** No, sir.
*Q.* How did you learn to set up an iPhone?
***A.*** Trial and error.
*Q.* How many iPhones have you set up?
***A.*** I -- I couldn't tell you.

THE COURT: Approximately.

THE WITNESS: I mean, every iPhone I've ever owned, so at least two dozen.

BY MR. MADDEN:
*Q.* You've owned two dozen iPhones?
***A.*** Yeah, they break or you get a new one. It's approximate, obviously.
*Q.* Did you also set up all of Mr. White's iPhones?
***A.*** Yes.
*Q.* For how long have you been working with Mr. White?
***A.*** Going on 20 years.
*Q.* And so iPhones haven't existed for that long, but for the time period for which he had iPhones, did you set up every

single one?
***A.*** As far as I can remember, yes, sir.
*Q.* Do you obtain the iPhones for Mr. White?
***A.*** Yes.
*Q.* Where do you obtain them?
***A.*** Apple Store.
*Q.* Do you also set up Mr. White's personal cell phones?
***A.*** Yes.
*Q.* Do you set up iPhones or other cellular devices for any other UFC executive or employee?
***A.*** No, sir.
*Q.* You don't have a position in Zuffa's legal department, right?
***A.*** No, sir.
*Q.* And you're not in their IT department?
***A.*** No, sir.
*Q.* You're not in their H.R. department?
***A.*** No, sir.
*Q.* Are you familiar with Zuffa's document retention and destruction policies?
***A.*** Yes, sir.
*Q.* Have you had training on Zuffa's document retention policies?
***A.*** Yes, sir.
*Q.* When did you have that training?

***A.*** I couldn't tell off the top of my head. We -- we do H.R. training all the time, so...

THE COURT: Well, specifically, when were you trained on the retention policy regarding digital records?

THE WITNESS: I don't recall. It was, you know, one of the H.R. things that they sent us and we watch videos on, you know. It all kind of blends together. I couldn't tell you off the top of my head. But I do know that I definitely had done some.

THE COURT: Well, what was your understanding of the digital retention policy at UFC?

THE WITNESS: The bare bones is you don't get rid of anything. You don't destroy anything, don't delete anything, don't -- you know, that was my understanding. That's what I -- bare bones of what I got from it.

THE COURT: And how were you instructed to retain and store digital information?

THE WITNESS: Specifically the phone? Just be -- hang on to the phone and, you know, you never -- never get rid of that, never.

THE COURT: Were you ever instructed to download information --

THE WITNESS: No, sir.

THE COURT: Hold on. Let me finish the question.

THE WITNESS: I'm sorry.

THE COURT: That's all right -- download information from any phones in order to preserve it?

THE WITNESS: No, sir.

THE COURT: Did you ever give any of Mr. White's phones to anyone to download them to be preserved?

THE WITNESS: No, sir.

THE COURT: Were you ever asked to provide any of Mr. White's phones to anyone so that the phones could be downloaded and preserved?

THE WITNESS: No, no. No, sir.

THE COURT: All right. Thank you.

BY MR. MADDEN:

*Q.* So I -- I just want to ask a couple more questions about Zuffa's general retention policy because -- and I want to be clear, the questions that I'm asking are separate from any legal holds and obligation to preserve everything.

You said that your trainings came from the H.R. department on that?

***A.*** Yeah. Whatever H.R. -- you know, we have a bunch of things we got to do about certain people at -- you have to learn about certain things, you know, to protect the company, I guess, to, you know, make sure that you're doing everything above board.

*Q.* Are you aware that as of 2014, Zuffa's retention policy was to destroy documents, all documents other than a specific set, after 30 days unless they serve some specific business purpose?

***A.*** I was not.

*Q.* So you didn't receive training on that retention policy?

***A.*** If I did, I don't remember. But me, personally, I don't destroy anything that's not mine. Yeah, so...

*Q.* Do you know how Zuffa enforces its retention policies for text messages?

***A.*** I do not.

*Q.* How does Zuffa ensure that you are aware of the retention policies?

***A.*** I assume through H.R. training.

*Q.* Have you ever received any notice that you are not complying with Zuffa's retention policies?

***A.*** Not that I remember or recall.

*Q.* Does Zuffa's standard retention policies require that employees using iPhones for business use an iCloud account to back up their phones?

***A.*** I don't know.

*Q.* Are you aware of any other cloud backups that are in use at Zuffa?

***A.*** For me specifically, no.

*Q.* Does Zuffa's standard retention policy provide for the destruction of retired cellular devices?

***A.*** I don't know the answer to that.

*Q.* Have you provided to Zuffa any basis for it to understand that you complied with the retention policies for at least the

last 10 and a half years when configuring devices?

THE COURT: Mr. Madden, I don't even understand that question.

THE WITNESS: I was going to say --

THE COURT: Hold on.

THE WITNESS: Oh, I'm sorry.

THE COURT: Please rephrase that.

BY MR. MADDEN:

*Q.* Do you have to track when you set up a new device for Mr. White?

***A.*** Track?

*Q.* In any business record that is submitted within Zuffa.

***A.*** No, no -- no tracking.

*Q.* Do you have to track what happens to the device that gets retired?

***A.*** No, I mean, I -- you just put it in -- in same spot, safe place, where everything else kind of goes.

THE COURT: So, I'm sorry. So, Mr. Howard, you were told when you got him a new phone --

THE WITNESS: Yes, sir.

THE COURT: -- to keep the old phone.

THE WITNESS: Yes, sir.

THE COURT: Okay. And who told you to keep the old phone?

THE WITNESS: Legal. Hunter, yeah.

THE COURT: Right.

THE WITNESS: Yep.

THE COURT: And were you instructed to give the old phone to Mr. Campbell or just to leave it with Mr. White?

THE WITNESS: No, we -- it's in a specific area. It's usually, like, a -- you know, a -- a place where we keep all of Dana's, you know -- at one time it was all the phones and other items, you know, personal to him. There's a specific place that nobody touches and it all goes there in case, you know, somebody needs it. And Hunter knew where the -- everything was. And it's just kind of a specific, you know, place where we keep everything.

THE COURT: Right. So there was a specific place where you kept all of Mr. White's old devices.

THE WITNESS: Yes, sir.

THE COURT: Okay. All right. Thank you.

Go ahead, Mr. Madden.

BY MR. MADDEN:

*Q.* Do you have to affirm that you used any specific settings on an iPhone that you set up for Mr. White to Zuffa?

***A.*** No. I -- when I set something up, it's all whatever the default settings are.

*Q.* Did you alert anyone else -- strike that. I asked that question.

Do you know what a litigation hold is?

***A.*** Vaguely.
*Q.* What is it?
***A.*** I think it's where you have to keep documents for court? Guessing.
*Q.* Have you received any training from Zuffa concerning compliance with litigation holds?
***A.*** No.
*Q.* Has Zuffa, TKO --
(Court reporter clarification.)
BY MR. MADDEN:
*Q.* Did Zuffa, TKO, or Endeavor ever offer you any training related to litigation holds?
***A.*** I don't know the answer to that. I -- I don't believe so.
*Q.* Are you aware of any standard policy or practice for how litigation holds are implemented at Zuffa?
***A.*** I'm not.
*Q.* Does Zuffa have guidelines or instructions for how retention settings for iPhones subject to litigation holds must be calibrated?
***A.*** I'm sure they do.
*Q.* Are you aware of them?
***A.*** I don't know them, no.
*Q.* Did Mr. White ever ask you if you were aware of them?
***A.*** No.
*Q.* Did you ever tell him you weren't aware of them?

***A.*** No.
*Q.* Have you been supplied with the litigation holds that were applicable to Mr. White each time you set up a phone?
***A.*** I don't believe so.
THE COURT: I'm sorry, I couldn't hear you.
THE WITNESS: I'm sorry. No, sir. I don't believe so.
BY MR. MADDEN:
*Q.* Were you aware that Mr. White was subject to a litigation hold continuously for the last 10 and a half years?
***A.*** You know, I don't -- I -- I don't know when something's going on unless I hear it. And I'm not privy to all that information. If the lawyers say, "Hey, something's going on," then I know. But I don't know specific dates or what's going on.
*Q.* You said if the lawyers say that something's going on, you know, but you don't know specific dates.
Did you have conversations with Zuffa's lawyers concerning the litigation holds for Mr. White?
***A.*** No.
*Q.* So I just want to understand. You are not aware that Mr. White was subject to a litigation hold for the last 10 years?
***A.*** Again, I -- you're saying "litigation hold." I -- I know that we were in a lawsuit, yes. But I didn't know when it started, when it ended. I don't know any of that. So I

don't --
*Q.* Did you --
***A.*** -- know.
*Q.* Oh, I didn't mean to cut you off.
***A.*** I just don't know the timeframe, right. Like, it could be over at -- it's way above my pay grade. I don't know. I don't know those things.
*Q.* Did your knowledge that Zuffa was in a lawsuit affect, in any way, the settings you implemented on Mr. White's cell phones?
***A.*** No, sir.
*Q.* Did it affect, in any way, what you did with Mr. White's old device when it was retired?
***A.*** No, sir.
*Q.* Are you familiar with iCloud?
***A.*** Fairly. Yes, sir.
*Q.* Did you set up Mr. White's iPhones with an iCloud account?
***A.*** No, sir.
*Q.* Did he ask you to?
***A.*** No, sir.
*Q.* Did anyone ask you to?
***A.*** No, sir.
*Q.* Did he tell you not to?
***A.*** Yes.
*Q.* Did he explain why?

***A.*** Yes.
*Q.* Why?
***A.*** Terrified of digital, you know, corruption, getting hacked, things like that.
*Q.* Did he instruct you to use a different cloud-based backup?
***A.*** No, sir.
*Q.* Are you familiar with any alternative cloud-backup programs that could be used on an iPhone?
***A.*** No, sir.
*Q.* Are you familiar with the iMessage retention settings for text messages in an iPhone?
***A.*** Meaning how long it holds on to a message or --
*Q.* Correct.
***A.*** -- when it's deleted, or just in the message itself?
*Q.* So within the iMessages app, you can configure whether the messages are retained forever, for 30 days, and then it's either 90 days or six months. Are you familiar with those settings?
***A.*** Yes.
*Q.* Did you check those settings for each iPhone you set up for Mr. White?
***A.*** I didn't touch them. I did the default, which I believe is save forever on everything else.

THE COURT: Excuse me, Mr. Madden.

So, Mr. Howard, I just want to understand. You set up the phones with the default setting --

THE WITNESS: Yes, sir.

THE COURT: -- which, as you understood, was that the message would essentially be saved on the phone --

THE WITNESS: Yes, sir.

THE COURT: -- forever unless someone deleted them.

THE WITNESS: Yes, sir.

THE COURT: Okay. Thank you.

THE WITNESS: Yes, sir.

BY MR. MADDEN:

*Q.* Are you aware that White uses audio messages for some of his messaging?

***A.*** Yes.

*Q.* Are you familiar with the retention settings for audio messages in iPhones?

***A.*** I'm not.

*Q.* So when you configured White's iPhones, did you change the default retention setting for audio messages?

***A.*** No, sir.

*Q.* Did you ever discuss with Mr. White his understanding of the retention settings for audio messages?

***A.*** No, sir.

*Q.* Okay. I'd like to talk for a moment about your process for setting up his iPhones.

Let's start with his most recent iPhone 16 Pro for his phone number ending 0682 that was set up on or around November

14th, 2024. Where did you get that device?

***A.*** One of the Apple Stores. I don't remember which one it was, but...

*Q.* Did the Apple Store set it up or did you set it up?

***A.*** I set the phone up.

*Q.* So once you --

THE COURT: Excuse me, Mr. Madden.

Mr. Howard, approximately how many phones have you set up for Mr. White in the past 10 years?

THE WITNESS: I'd say around nine, maybe, I would say.

THE COURT: Nine, approximately.

THE WITNESS: I would say that's probably a safe guess.

THE COURT: Okay.

THE WITNESS: Because he --

THE COURT: And the process that you followed, was it the same for all the phones?

THE WITNESS: Yes, sir. Yep.

THE COURT: And so you would go to the Apple Store to get the phone.

THE WITNESS: Or a runner would grab it and bring it to us. Yes, sir.

THE COURT: And they'd bring it to you to set it up.

THE WITNESS: Yes, sir.

THE COURT: Go ahead. So, Mr. Madden, why don't we just go through the process. I don't want to go through a

separate process for six different phones.

MR. MADDEN: I appreciate it, Your Honor. I do think I need to do it for two.

THE COURT: I don't think you do need to do it for two. So let's go through the process first this way, and then you can try to convince me why you would need to do it for the additional ones. So let's go through the process generally.

MR. MADDEN: Okay.

BY MR. MADDEN:

*Q.* I do want to ask a preliminary question. Did your setup process change depending on whether the phone was a business or a personal device?

***A.*** No, sir.

*Q.* Okay.

So when you set up the device, did you set it up as a new phone or did you transfer the data from the old phone?

***A.*** As a new phone.

*Q.* Did you configure it to work with White's Outlook account for his UFC e-mail, calendar, and contacts?

***A.*** No.

*Q.* Did you have to download all the apps he uses anew?

***A.*** No, his social media guy did that.

*Q.* So the only apps that got downloaded were those by the social media guy?

***A.*** Yes. Before him I might have downloaded apps, you know,

when they first came out. But as soon as we had Eric, he kind of took that role over.

*Q.* Okay. So after you set it up as a new phone, at any time did you try to transfer the data from the old phone to the new phone?

***A.*** No, sir.

THE COURT: So let me ask this question, Mr. Howard, because I want to make sure I'm understanding.

There would have potentially been prior text messages on the old phone.

THE WITNESS: Yes, sir.

THE COURT: Did those text messages get transferred to the new phone?

THE WITNESS: No, sir. Not when you set up a new phone.

THE COURT: I'm sorry?

THE WITNESS: Not when you set up a new phone. I'm sorry. No, sir.

THE COURT: You're saying that you don't think it's possible or you didn't specifically do that?

THE WITNESS: I don't know if it's possible, but I -- I didn't personally do that. No, there was -- there was no transfer of...

THE COURT: But when you set up the new phone, you used his iCloud -- excuse me -- you used his Apple ID, correct?

THE WITNESS: There was an Apple ID, but it wasn't attached to a cloud. You needed it to downloaded apps, but it had -- there was no -- iCloud is always turned off. There was no backup in that sense. So, kind of, every time he started with a new phone, he started anew. And that was kind of the way we -- we started.

THE COURT: So you're saying that when he got a new phone --

THE WITNESS: Yes, sir.

THE COURT: -- and it was set up, it didn't have the text messages from the prior phone?

THE WITNESS: Not that I'm aware of. There's -- sometimes when setting up a phone, you would get the phone and, you know, if you had it for two hours, there would be a bunch of text messages, you know, coming through, obviously. A lot of people text him at one time, so it could -- it could fill up fairly quickly. But there wouldn't be anything prior to that phone being turned on.

THE COURT: Okay. Well, because you said you set up a few phones --

THE WITNESS: Yes, sir.

THE COURT: -- iPhones.

THE WITNESS: Yes, sir.

THE COURT: Right. And are you aware of whether or not when you set up an iPhone it asks you whether or not you want to

transfer, for example, photos or messages from the old phone?

THE WITNESS: Yes, sir.

THE COURT: Have you ever seen that when you've --

THE WITNESS: On the -- on the brand new phones, yes. Yep.

THE COURT: And whenever you had that option for any of Mr. White's phones --

THE WITNESS: Yes, sir.

THE COURT: -- did you transfer --

THE WITNESS: No, sir.

THE COURT: -- the photos or text messages?

THE WITNESS: No, sir.

THE COURT: And why didn't you do that?

THE WITNESS: It was my understanding that, you know, you kept the old phone because of, you know, that. And it was just afraid to move anything, to plug anything into the phone, because they were afraid of anything getting destroyed on a phone or -- or, you know, corrupted, I guess, is -- so never plugged it into anything. I personally never -- there was no cloud, there was no backup. I was under the impression that the phone itself was the -- the piece of gold.

THE COURT: So you were instructed not to transfer --

THE WITNESS: I was never instructed to do anything --

THE COURT: Okay.

THE WITNESS: -- except set the phone up.

THE COURT: Yeah. Well --

THE WITNESS: And -- and not get rid of the old phone, if that makes sense.

THE COURT: Right. But when you set up the new phone --

THE WITNESS: Yes, sir.

THE COURT: -- right, you would have been given the option whether or not to transfer the text messages from the old phone to the new phone, right?

THE WITNESS: From what I remember, maybe on the newest phone. But I don't even remember that setting. Again, it would -- there's a million things happening in a day. And he can only be without his phone for a finite amount of time --

THE COURT: I'm not talking about him. I'm talking about you. When you set up his phones, there's potentially an option, right, to transfer the old text messages from -- from the old phone to the new phone.

THE WITNESS: Yes, sir. The only way that I know is via the cloud, and I've never done any other way, so...

THE COURT: Okay.

THE WITNESS: Because you have to have -- it basically has to go to a cloud. So everything gets downloaded from the cloud, right, not device to device. So if there is a new one, I -- I'm not aware of it.

THE COURT: So if Mr. White had testified, which he did

previously, that when he had his new phone, he had his old text messages on it, do you understand how that would have happened?

THE WITNESS: Ah. I mean, it -- it -- I -- I don't. Yeah. I don't know how it -- there couldn't have been old -- you know, there might have been texts from, you know, say, his contacts. Like, I would manually put in contacts, right. That's kind of the way we did it. And then, you know, if his partner, Lorenzo, or something texted him, there could be texts from him, and maybe he just -- it looked like it wasn't blank, I guess. Maybe to him it just didn't look blank and that's what he -- what he thought. But for me personally, there's -- the only way I know to transfer the data is via the cloud.

THE COURT: Okay. And you were not asked ever to do that.

THE WITNESS: To do the cloud, no, sir.

THE COURT: Right.

THE WITNESS: No.

THE COURT: And you, yourself, didn't transfer the old text messages on the old phone to any of the new phones.

THE WITNESS: No, sir.

THE COURT: So whenever you set up a new phone, you did not transfer his text messages.

THE WITNESS: No, sir.

THE COURT: When you set up the new phone, would you put a new SIM card in the phone?

THE WITNESS: In the old phones, yes, sir. The new ones have I believe it's called eSIM or something along those lines where you don't have to do the SIM card, but -- or that was a long time ago when you had to switch SIM cards.

THE COURT: And as far as you knew, when you kept the old phones, you were supposed to also keep the SIM cards with those phones?

THE WITNESS: Well, the -- the -- yeah. So a new phone would come with a blank SIM card. And my understanding, very rudimentary, was that SIM card was just a direction of the phone number, right. The phone number goes from point A to point B, when you switch the SIM card. Now it goes -- it was nothing about data transfer. That was my understanding.

THE COURT: Okay.

THE WITNESS: So, yes, the -- if you had the new phone came with a new SIM card, that went into the old phone as a placeholder. The old SIM card would go into the new phone. But, yeah, you potentially keep them indefinitely because then the new phone would, you know, just kind of switch vice versa until the SIM card gave out or something like that.

THE COURT: Okay. Thank you.

THE WITNESS: I think the new phones are all eSIMs. I don't remember taking out a SIM card in a long time.

THE COURT: Yeah, that may be old school.

Thank you, Mr. Howard.

THE WITNESS: Yes, sir.

THE COURT: Go ahead, Mr. Madden.

BY MR. MADDEN:

*Q.* So I just want to make sure I understood what you just said. So you would manually transfer contacts from the one phone to another for him?

***A.*** Yes, sir.

*Q.* Okay. So you would sit there with, for example, the iPhone 11 and the iPhone 16 and punch in the contacts from one to the other?

***A.*** Yes, sir.

*Q.* And he didn't have access to his phone during that process.

***A.*** I mean, if the President called, I'd run him his phone, you know, obviously.

*Q.* Did he ever tell you to transfer the data from one phone to another?

***A.*** No, sir.

*Q.* Did he tell you not to?

***A.*** No, sir.

*Q.* Did he tell you to turn over his retired phone to counsel?

***A.*** Not to counsel, but, I mean, they were obviously -- like, Hunter was made aware, "Hey, we're getting a new phone. Here -- here's the spot."

*Q.* And did Hunter know that you were not transferring the data from one phone to another?

***A.*** I don't know if Hunter and I ever had that conversation.

MR. MADDEN: In light of that testimony, I don't need to ask about the other processes.

THE COURT: I didn't think that you would.

MR. MADDEN: I have no questions at this time.

THE COURT: Okay. Thank you, Mr. Madden.

Excuse me just a moment, Mr. Isaacson.

(Court conferring with law clerk.)

THE COURT: I'm sorry, Mr. Isaacson. Go ahead.

CROSS-EXAMINATION OF ELLIOTT HOWARD

BY MR. ISAACSON:

*Q.* Very briefly, Mr. Howard. And there is a microphone over there behind you, if you want to --

THE COURT: Well, that's actually -- no, it's better for him to use, I think, the bar that's in front of him.

BY MR. ISAACSON:

*Q.* There's a bar in front of you that's a microphone.

***A.*** Okay.

*Q.* You were asked about Mr. -- your understanding of why Mr. White didn't want to use the cloud, and you said a few things. You mentioned the word "hacking." Could you amplify about what your understanding was about why Mr. White did not want to use the cloud?

***A.*** You know, he -- he just deals with a lot of sensitive people, and he's very afraid of the -- getting hacked, somebody

getting his data, you know, getting personal information of, you know, presidents and world leaders and his own personal stuff. It's just -- you know, just seems easy nowadays to get into it. And he was hypervigilant about nothing cloud-based simply for that fact.

*Q.* All right. And what was Mr. White's general attitude about throwing things away when you were dealing with him?

***A.*** You don't, you know. That -- you don't throw anything of his away. I mean, he's -- to be candid, he's -- the same drawer where some of these phones were stored in the beginning, there's a drawer full of keys from cars he hasn't owned in 20 years. We don't throw anything away. His -- you know, first of all, it's not my place or anyone else's place, unless he specifically said, you know, "Let's get rid of this." I don't even assume that anything is trash or -- you know.

*Q.* All right.

MR. ISAACSON: I don't have any further questions.

THE COURT: Thank you, Mr. Isaacson.

Mr. Howard, I did have a few additional questions.

EXAMINATION BY THE COURT OF ELLIOTT HOWARD

BY THE COURT:

*Q.* Which is, were you ever asked to go back to an old phone to try to retrieve text messages by Mr. White or anyone else at UFC?

***A.*** No, sir.

*Q.* Were you ever informed by anyone that some of Mr. White's older text messages were missing?
***A.*** No, sir. I -- not until the past couple days.
*Q.* Okay. So prior to the past couple days, no one at UFC came to you to ask you to try to retrieve or access his old phones to look at old text messages?
***A.*** No, sir.
THE COURT: Thank you.
MR. MADDEN: I just have two more questions about the transfer and his not wanting to get hacked.

REDIRECT EXAMINATION OF ELLIOTT HOWARD

BY MR. MADDEN:
*Q.* Did you look into whether direct transfers between devices could be subject to hacking?
***A.*** I did not.
*Q.* Do you know whether they used the cloud?
***A.*** I don't know the answer to that question. No, sir.
*Q.* Did you ask anyone to look into that?
***A.*** I didn't.
MR. MADDEN: No further questions.
THE COURT: Thank you.
Mr. Isaacson, anything else?
MR. ISAACSON: No -- no, Your Honor.
THE COURT: All right.
All right, Mr. Howard. Thank you for your time. I

appreciate it.

THE WITNESS: Thank you, sir.

THE COURT: You're excused. Thank you.

All right. Are we ready for Mr. Campbell?

MR. WILLIAMS: He's outside, Judge.

COURTROOM ADMINISTRATOR: Watch your step.

THE COURT: So before we get to Mr. Campbell, Mr. Williams?

MR. WILLIAMS: Yeah.

THE COURT: We'll let Mr. Howard step out.

Do you on the defense side have any information about any efforts to retrieve the messages from these phones? I'm hearing in the course of this litigation and this hearing that phones were made available. I have heard not anything yet that would indicate there was ever an effort made to retrieve messages from these phones. If there was ever an effort made, I'd like to hear about it. Because if there wasn't an effort made, that would be of deep concern to me, because Mr. Chiu was here multiple times telling me about efforts that were being made.

So I'm having some concerns about that, but I didn't, Mr. Williams or Mr. Chiu, want to make assumptions about that. But I certainly want to hear about that, because there is a recurring theme here about these phones existing and people having access to them, but it would seem that they have not been

accessed.

So, Mr. Williams, Mr. Chiu, perhaps you could enlighten me before we begin Mr. Campbell's testimony?

MR. WILLIAMS: Yes, Your Honor. I can tell you that efforts have been made -- well, with -- first, the efforts focused on the phone that couldn't be found, the most recent time period. That's -- and for context, Your Honor, that's May of '22 to November of '24. Okay. And so the efforts were spent looking for that phone. And you've heard about that, and I won't waste time with that.

With respect to earlier phones, I can tell you that there has been efforts to identify whether any of those phones would have been the ones Mr. White used during earlier time periods and whether messages could be get -- could be obtained from them. The issue, as I understand it, is that given the age of some of the phones, we're not sure what the passcodes are. And the --

THE COURT: So, Mr. Williams, let me ask a question.

MR. WILLIAMS: Yes.

THE COURT: Was there ever any attempt to have the phones forensically analyzed?

MR. WILLIAMS: Okay.

THE COURT: There are experts --

MR. CHIU: Yeah, absolutely.

MR. WILLIAMS: Yes, yes.

THE COURT: So, again, it's helpful --

MR. WILLIAMS: Yes.

THE COURT: -- for you all to communicate these things to me. I know, Mr. Chiu, you were saying there were efforts being made.

MR. CHIU: No.

THE COURT: But it's helpful for me to know, for example, on these 10 dates, this is --

MR. CHIU: Sure.

THE COURT: -- what was made. Because, obviously, one of the things I have to look at is what reasonable steps were taken. I'm not getting that from these witnesses.

MR. CHIU: Your Honor --

THE COURT: But I assume that there was something, Mr. Chiu, because of the statements.

MR. CHIU: Absolutely.

THE COURT: And before we got to Hunter Campbell, he might have been part of that. I want to hear a little bit about that so I have some context.

MR. CHIU: Yeah. Your Honor, I think some of these are getting confused.

MR. WILLIAMS: Right.

MR. CHIU: But first, stepping back, in terms of the -- Mr. White's phones and other custodians' phones, we have continually been engaged in a process where those phones are

imaged, right. That's what you've heard testimony about, right. Even from Mr. White, there are times where the lawyers came, Mr. Campbell came, and his phone was taken and forensically imaged.

So one thing we're -- we're pulling, and as you asked about yesterday, is kind of the log from our vendors of, you know, which devices were imaged when. So that process as part of discovery has been happening throughout.

THE COURT: Okay.

MR. CHIU: Right. And so -- and we can provide the Court with logs from the discovery vendors as to what devices, when those were imaged, right. The vendors go on-site. They take the phone for a couple hours, the -- the models and all that. So all of that's been happening.

I think what we have been talking about throughout the past has been what Mr. Campbell has been talking about, which is the effort to go find these missing devices. Because when we did the imaging, for example, of Mr. White's new phone, there was that gap, right. And so I think -- the Court I think is conflating those two issues. In terms of forensic collection of devices, we have a log of all of that. That has all been done. That's what's been produced.

THE COURT: But I guess what I don't understand, Mr. Chiu, is -- this is what I want to understand. If a phone was forensically imaged, right, and it looks like there were a

series of old phones that there were, it would be helpful to know whether or not for each phone, for example, it had some text messages or all the text messages were gone. I don't know, for example, how many phones have been imaged, whether or not there were text messages on any of them, right. I've heard conflicting testimony about whether or not the new phones had old messages on them. You heard Mr. White explicitly say he had access to the message, which would indicate that each phone had messages and the successive phone would have had the message from the old phone.

Now, of course, Mr. Howard said something different. But this could be resolved as it relates to what's actually on the phones, right. And so my question to you is, is it your understanding, as it relates to the images of Mr. White's old phones, that they are all missing text messages for the periods identified?

MR. CHIU: I -- standing here, I can't represent to the Court that, you know, we have -- in terms of the images what -- what the collection of Mr. White's phones on the forensic side has revealed was this gap, right.

THE COURT: No. But, Mr. Chiu, we're past that, right.

MR. CHIU: Yeah.

THE COURT: I need to know for each phone did it or did it not have prior text messages. That would be something that the vendor should be able to tell you from their imaging of the

phone.

MR. CHIU: We can get that information.

THE COURT: Right. I'd like that information this afternoon. Because, honestly, Mr. Chiu, I should have had that earlier, right. You were saying efforts, but the fact is it makes a big difference if the messages were on some phones, but not other phones. If they have been missing on each successive phone, right, that's a different situation than if they're on some phones and not other phones. It is hard for me to evaluate the testimony without knowing what the images are and what text messages exist.

So I would like this afternoon a report or some summary of each of Mr. White's phones and whether or not each of the phones are missing text messages, right. Because that's something, from my experience, the vendor would say. If there are no text messages, they'll tell you because it's a type of file that would exist, and it would say, "Here's a report of the image of the phone. It doesn't have it."

And then I can start to think about how to contextualize the testimony. But I don't want to wait anymore for this information. I feel like I've been very patient as it relates to this, but at this point I need this information and I need it today.

Now, the breakdown can be something different, but I assume that they received this, too. And that's how they

identified the gaps.

MR. CHIU: Right.

THE COURT: Is there any reason why the reports from the vendors, Mr. Chiu, wouldn't have that information?

MR. CHIU: I think the report from the vendors would reflect what was imaged from the phone and the volume of, for example, text messages or data that was pulled from the phone that was imaged. So that's -- those are the reports that we could get from the vendor and provide to the Court. The dates, the phones, that's what -- that's what we do when we were collecting as part of the process.

THE COURT: So let me ask you a question. How many phones, as far as you know, were imaged that belonged to Mr. White?

MR. CHIU: From the course of the litigation, I'd have to check. But there was the 11 and then the 16, in the last kind of two periods, which is what revealed the gap. And then prior to that, I believe, one or two more, in terms of when the collections were done.

MR. WILLIAMS: Your Honor, just -- I can provide a tad bit of specificity. The iPhone 11 I know was collected in May of '22. The iPhone 16 was collected -- it was obtained in -- in November of '24, as you've heard. It was collected first in August of '25.

THE COURT: So --

MR. WILLIAMS: And then we went and recollected it in January of '26.

THE COURT: So what's helpful for me to understand, Mr. Williams, is the iPhone 16 --

MR. WILLIAMS: Yes.

THE COURT: -- does it have messages going back to 2015?

MR. WILLIAMS: No. That -- and that's -- that's how the -- that's -- that's how everyone here knows what the gap is. So let me see if I can -- and I'm not a tech expert, but the phone -- the iPhone 11 is collected in May of '22.

THE COURT: Right.

MR. WILLIAMS: Okay. He gets the new phone in November of '24. There is a gap. One of the gaps we're talking about here is from May of '22, so the date or roughly around the same date as the prior collection of the 11. He gets the new phone in November of '24. There is a gap there. That's known because the imaging -- the collection and imaging has been done at those two different times of those two different phones. So the iPhone 16 --

THE COURT: So -- I'm sorry, Mr. Williams. I want to make sure I'm understanding.

MR. WILLIAMS: Sure.

THE COURT: Because there's a difference between, for example, there's a gap that exists on the phone itself and

there's a gap because of the messages start on a particular day. So, for example, Mr. Howard had indicated, "I didn't transfer new messages."

MR. WILLIAMS: Uh-huh.

THE COURT: Mr. White said actually the opposite, that he had access to all of his messages. So I'm trying to understand, for example, is it the case that there's a phone that has messages from 2019 and then no messages until 2022, or is it just the case that for certain phones there's no messages at all?

MR. WILLIAMS: Right. Your Honor, I -- I'll be honest, I would have to go back and look at the transcript about what Mr. White said. But I -- I don't think anyone is going to argue in here -- part of the reason we're here is that we have identified this missing period from May '22 to November 2024 because the current phone, the iPhone 16, doesn't have the messages from that period.

THE COURT: Right.

MR. WILLIAMS: So to say that the iPhone 16 has -- that -- that's why we know -- that's why we're talking about this gap.

THE COURT: But what about -- we have 2015 -- also, we have an earlier gap, too, right?

MR. WILLIAMS: Right. We have the earlier gap and that's when I think Mr. White was asked about having lost, you

know, a phone or being -- remembered he was being asked questions about the text messages reflecting, "Hey, I lost my contacts. Who is this that's calling me." Mr. Dell'Angelo took him through that. And he had testified about either losing a phone or losing data on a phone.

And so when you had asked me about going -- this drawer of phones, remember, that we've talked about first thing this morning and we talked about yesterday, that's what I have to go back and -- and work on for you. And that's why I think, to be candid, it would be impossible for me to tell you what is or isn't on those phones because --

THE COURT: Well --

MR. WILLIAMS: -- that's going to be --

THE COURT: But, Mr. Williams, here's the question I have.

MR. WILLIAMS: Yeah.

THE COURT: And you weren't here to answer this. Why wasn't this done two years ago? I have no idea -- honestly, I've been asking about these phones for months. And I'm a little concerned that here we are in a spoliation hearing where I've been asking where is this information, where is it, how is it that you all don't know now, months later, which of the phones are his? I mean, how --

MR. WILLIAMS: His --

THE COURT: -- how is it -- why didn't you -- why

didn't someone sit down with Mr. White or a forensic expert and go through the drawer of phones to figure out which of the phones were his? Because this has been an issue. The discovery deadline has passed last year, months ago. The disclosure deadline -- device disclosure deadline, months ago. And I'm just concerned, like, why is it only now when we have the spoliation hearing that there is an effort being made to identify the phones?

MR. CHIU: Your Honor, just to clarify, I think the effort has been ongoing to find this one missing phone. And the reason the gap appeared is because we reimaged in time, right, Mr. White's phones and others once the Cirkunovs and Davis cases were filed. We went back and that triggered a new obligation to go back and pull them. That's when the gap was revealed in the '22 to '24 time period.

The prior collection was when the Johnson case initiated that pull. That's what led to this gap, which wasn't discovered until the fall of last year, which is what set off this process. And as we've told the Court, we have been investigating that throughout.

So it's not the case that this could have been done previously, right. It's that the gap we're talking about that brings us here was not made apparent until we went and imaged Mr. White's iPhone 16, which is the current phone he was using, and this gap appeared. And that's just a function of the time

of when we went back and had to reimage and pull these devices in response to additional cases. And that's just kind of the course of how discovery worked.

THE COURT: Okay. So I guess what I don't understand is I thought there was an additional gap, earlier gap. Is that correct?

MR. CHIU: There is.

MR. WILLIAMS: There is.

THE COURT: From 2015, I think, to 2020. Is that correct? Approximately.

MR. DELL'ANGELO: May I give you the data on that, Your Honor?

THE COURT: Yes.

MR. DELL'ANGELO: Okay. My under- -- my understanding is based on the -- the December 15th, 2025, disclosure that the defendants provided is that the first chats that are available for Mr. White begin on July 3, 2020, so that there are no chats or texts before that. And I think we heard Mr. Colby talk about the 2021 gap that Mr. White testified about yesterday, but that -- that's obviously many months after that. So there's this -- from July 2, 2020, to before.

THE COURT: Because for Johnson the rel- -- 2015 to 2020 is a relevant time period. And that's why I'm understanding -- I'm trying to understand, Mr. Chiu, Mr. Williams, whether these other phones that are in the drawer

were checked for that gap, right. Because we have the later gap, but there is, I think, what, four or five years for the earlier gap for a relevant time period for the Johnson case. Have those phones been checked for that gap?

MR. CHIU: We've been looking, Your Honor. I think -- and just, again, to contextualize the time period when this issue arose, that gap was also not apparent until this -- the same issue arose in the fall of last year, right. And just to kind of contextualize things, right, while the collections have been done, right, discovery in Johnson really kicked off last year as we were kind of working through these things, right. So this issue didn't really come to a head until when we had the device disclosure, what we collected, and then plaintiffs raised that and the gap. In the course of discovery, yes, these things happen.

But just in terms of timing, Your Honor, I think in, kind of, suggesting that, oh, we've known about this gap for the last couple of years since Johnson was filed, that's just not what happened, right. Discovery picks up because the *Le* case and the Johnson case were in settlement. Things were stayed. Now we are picking back up in 2024 -- frankly '25 of last year, and this all kind of came to a head. And for the last couple months we have been investigating and trying to figure this out. And so that -- that's really the issue.

THE COURT: So, Mr. Chiu, Mr. Williams, the question

becomes, you have phones in a drawer that may have missing data. And how long will it take us to figure that out? I mean, I don't know how many phones are in this drawer, but -- and how many of them are Mr. White's or not. But it actually doesn't take that long to image -- excuse me -- a particular phone. I don't see how this should take more than 30 days to figure out at least which of the phones are his. I mean, in terms of imaging the phones, that's actually a pretty quick process. You still have to look what's on the phone to figure out who it belongs to. But I have no idea, for example, Mr. Williams, how many phones were in this drawer.

MR. WILLIAMS: Right.

THE COURT: Right. Do you know how many phones are in this drawer? Because it looks like, from the testimony, they're just Mr. White's devices. And I don't know how many there are. So can you give me some more information?

MR. WILLIAMS: I saw, Your Honor -- but I can't tell you how many are Mr. White's phones, but I saw multiple phones and I -- over five.

THE COURT: Okay.

MR. WILLIAMS: Okay. I -- I can't tell you at this point -- this is what I told you this morning I will go out and start -- and doing -- but whether they are Mr. White's phones for work or Mr. White's phones for personal use or whether they are another executive's former work phone or former personal.

I -- that's what I have to do.

I will represent to the Court that I'll go do it, Your Honor. But in terms of, you know, how long that will take, 30 days, is that -- you said that. I think 30 days can -- you know, we can get that done.

The imaging is not the issue. That takes hours.

THE COURT: Right.

MR. WILLIAMS: The identification of what phones are there, that -- that's what we'll go start.

THE COURT: Well, I'm just saying, Mr. Williams, the imaging, I think, could be done in a day. And I also think the identification can be done in a day, in part, because you don't need to look through all the messages. I mean, you can look at a few of them to know whose phone it is.

MR. WILLIAMS: Yes, but there's a predicate issue, and that's what I started to say. Your Honor, we need to be careful because to the extent that these phones require passwords to open them up, okay, which let's -- I'll be -- you know, you heard Mr. White doesn't even know his own phone number yesterday. Okay. You have to be careful because if you don't know the code and if you enter the wrong code more than three times, that phone will wipe itself clean. Okay. So this -- I can't rush into this and just, you know, start saying, "Hey, what do you think the code" -- like, we are going to have -- I want to be careful.

THE COURT: I appreciate that.

MR. WILLIAMS: Okay.

THE COURT: Mr. Williams, here's part of the issue, which is, I also have to evaluate the reasonable efforts that your client made to preserve the phones. Keeping phones without a password so they're inaccessible is not reasonable, right. You don't have to respond to that, but the fact of the matter is it doesn't matter if the phone is in the drawer if, when you try to access it, you can't get the data.

I'm only saying that because you should impress upon your client that if they can find these passwords, they should. Because I can tell you right now it is certainly not reasonable under 37, Rule 37, to keep a phone, allegedly for preservation, that no one can access, right. I mean, that is not preservation, honestly. And you all don't have to respond to that now, but I just want to impress upon you the significance of the accessibility of these phones.

And I suspect -- you don't have to comment on this -- some of this information you all are learning yourselves potentially for the first time. Again, you don't have to comment on that, but it does seem to me some of this may be new information. And, again, before I made assumptions, that's why we're having this conversation, I wanted to ask you and Mr. Chiu about it because Mr. Chiu has been telling me repeatedly there are efforts that have been made, which you can understand when I

hear this testimony, I'm wondering why haven't the phones been checked.

So I appreciate you all providing me with the context because, as I said, as I'm sitting up here, I'm like, the phones are there, they're in the drawer, what's the issue? Now, there's a separate issue about if the texts are missing or not. But it's hard for me to even get to that and whether or not the information can be replaced, all of that, without even knowing what is and isn't missing.

So we can talk after Mr. Campbell testifies, but I do want to make sure -- excuse me -- that we have a conversation about at least figuring out what we know and don't know and what we can access. And I certainly wouldn't want to issue an order, Mr. Williams or Mr. Chiu, that would lead you to rush and have information deleted. So I don't want to suggest that.

But you can understand my frustration as I'm hearing this about these phones, and we're having all this time spent on spoliation, when it's possible that some of this information are on the phones in that drawer. And so the sooner we get at that, the sooner I can address this issue.

So I don't know if you all have anything else you want to add, but I wanted to raise that issue, Mr. Williams and Mr. Chiu -- I mean, you all have been most actively involved with this -- because I really want to know a few things as soon as possible.

One is how many phones you actually have that are Mr. White's old phones, personal or otherwise. Okay. And two is the years that you understand that the phone was put into service, right, and the model. Because his account, if he's using the same account, which I think he was, would reflect, potentially, the models that he was using.

Because my other concern is, Mr. Williams, Mr. Chiu, is Mr. Howard said he set up eight to nine phones for Mr. White. Now, he wasn't sure about the exact number, but there is a difference between nine phones and two or three phones. And so he didn't know exactly, but before I made, again, any assumptions about that, I wanted you all to check to see how many of Mr. White's old phones that you have.

MR. WILLIAMS: Understood, Your Honor. And Mr. Howard had testified that he set up both personal and work phones.

THE COURT: Exactly.

MR. WILLIAMS: So to the extent that there were, you know, four of each, let's just say, if we are talking about the number eight, then I think that's more in line with what we understand to be the use. But I understand the Court's directive.

THE COURT: Well, here's the other issue, which is, it's not clear to me that Mr. White didn't also use his personal phone for some UFC business. So I would like to know, even if it's a personal phone, how many phones you have, right, to your

point, Mr. Williams, if you have four personal, four business, and how do you know that.

Because my other concern is -- and I want you to try to find this information -- is, was there any log or other record created as to the phone, its model, or anything like that. You know, some companies obviously keep better records than others, but they keep a record, particularly as relates to business phones, of what the phone is, when it was given to someone, and if it was lost or stolen and had to be replaced.

And so, to the extent that there's any type of record or log regarding when Mr. White obtained a new phone and how long he had it or what the model was for the device, it would be helpful to know.

But, again, the sooner we get access to this information, Mr. Williams, Mr. Chiu, the sooner I can resolve this issue. But I would expect within 30 days to have all of this information submitted to me and to plaintiffs' counsel.

Mr. Dell'Angelo.

MR. DELL'ANGELO: Yeah. Thank you, Your Honor. May I be heard on a couple of these issues?

THE COURT: Sure.

MR. DELL'ANGELO: First of all, with respect to the phones in the cabinet, I think, as we understood from your -- from the Court and heard this morning, there -- there was an order for those to be addressed and they weren't.

We are also now hearing for the first time that there's a risk of data loss. Substantial completion in this case was July 2025. We are so far past the point at which these phones should have been secured and inventoried. There is -- this is a very unusual proceeding. And I think it is an enormous waste of the parties' and the Court's time and resources to sort out some of this information that is so simple and it is highly prejudicial.

What I would ask, particularly in light of the representations that they don't even know how to access some of these phones, that they're mixed in with other phones, there's the risk of data loss, that instead of giving them a month to figure it out, those phones either -- they needed to be deposited in an independent secure location until they can even figure out, you know, what they have, how to get into them. And, you know, there are independent experts who do exactly this when you have this kind of situation.

I just think we're far past the point where we can be giving the defendants a month or more to even figure out what they have, right. I think it's not their job anymore. So respectfully ask that we consider a different process for how to lockdown those phones and get at the information, if it's even possible.

THE COURT: Well, I'll think about that. Here's what I will say, because we have a motion for sanctions already

pending. I certainly think that this is sanctionable conduct as it relates to the amount of time and effort that is spent regarding these phones. I hear what you said, Mr. Chiu and Mr. Williams, but, honestly, I am deeply concerned about this process given the deadlines that we had previously. But I'll wait to hear a response for the motion to sanctions as relates to this.

So, Mr. Dell'Angelo, there's a mechanism for that as relates to the amount of time and resources that are spent.

MR. DELL'ANGELO: I understand.

THE COURT: But my goal, Mr. Dell'Angelo, is to get the information potentially provided. Now, if you're saying that you think that this information should be deposited with an independent expert, that's something for the Court to consider and I'll think about that. But given that the potential for data loss and given the fact that it was ultimately the defendants' responsibility to preserve this in the first place, I'm going to give them one final opportunity to come up with this information.

Now, we can discuss possible sanction for why this wasn't actually done previously, because I'm still not convinced that it couldn't have been done previously. But, again, I'll reserve judgment on that until I hear more.

Mr. Williams and Mr. Chiu have indicated they've done other -- made other efforts. Before I make a final

determination, I want to give them a full opportunity to explain that. So I don't want to make a judgment or determination, Mr. Dell'Angelo, at this point. But I am obviously concerned and frustrated by the timing of this. And I think that we should have some resolution related to these phones sooner rather than later. So I will consider it -- your request as it relates to the timing.

At this point, I will also consider the possibility of an independent vendor being brought in that's agreed upon by both sides to assess the phones. But if there's a password issue, Mr. Dell'Angelo, it won't matter who the vendor is, right. And, honestly, in my experience, Mr. Dell'Angelo, the vendors aren't usually where any issue arises. The vendors do what they do. They have a process for imaging. In my years of practicing and on the bench, I don't know I've ever encountered a situation where a vendor engaged in a process that I thought was damaging to the data, intentionally or otherwise.

So, to me, they should have an opportunity to be able to access this, ultimately, because it's their obligation to have done it in the first place and, also, because the Court has to assess what reasonable steps they've taken or should have taken at that -- you know, at this point.

So, I'll consider the timing, because I do think maybe 30 days is too long. But I'll think about that after I hear Mr. Campbell's testimony.

MR. DELL'ANGELO: Thank you, Your Honor.

And just so -- so we're clear in what my thinking was about the risk of data loss, it's not so much that the vendor would -- may cause that, but, you know, we are now so far past when documents should have been obtained from these phones and actually produced that, you know, my concern is, or belief is that given the fact that we're in these Rule 37 proceedings, you know, there's some -- been findings about spoliation, that -- that this is a task that really shouldn't be the defendants' task anymore to figure out what happened.

So it -- I wasn't really expressing a concern about a vendor spoliating the data further somehow, but, rather, the ability of the defendants to actually carry out this task. And it is an extremely rare and unusual situation that we all find ourselves in, which is why the request to bring in a third party, you know, is somewhat unusual, but I think appropriate here.

So...

THE COURT: I appreciate that, Mr. Dell'Angelo. I'm going to give them one final opportunity to address this.

MR. DELL'ANGELO: All right.

THE COURT: And then we'll see how that works out.

MR. DELL'ANGELO: Okay. Then the -- the other issue I wanted to address, Your Honor, I think would be very efficient and help move this process along significantly if we could just

address -- just like to address a few things about this vendor disclosure.

First of all, it just wasn't clear to me, I'd like to clarify if that disclosure would also come to the plaintiffs. I know you had said you wanted it this afternoon.

THE COURT: Yes.

MR. DELL'ANGELO: Okay. Thank you.

The other thing is I understood your comments to be -- to limit that disclosure to Mr. White. There are other potential spoliated custodians, and I would ask that the Court have the defendants provide that disclosure for all of the phones that they've collected so that we're not doing this piecemeal and we can just kind of move this process along for all of the phones that the vendor has --

THE COURT: Well, I'm focused right now because these proceedings have been focused on Mr. White and Ms. Long. And I actually thought there might have been some issues with Mr. Campbell as well. I don't know if it was with a phone. Were there any issues with respect to his devices, Mr. Dell'Angelo?

MR. DELL'ANGELO: Well, I think that that's what we're going to try to sort out in his -- his testimony today, Your Honor, but --

THE COURT: Preliminarily, Mr. Dell'Angelo.

MR. DELL'ANGELO: Our understanding, Your Honor, is

that Mr. Campbell uses more than one device to conduct business on behalf of Zuffa. We understand his current primary business phone ends in the numbers 1109, but that he has also used a separate number, 7804, to conduct Zuffa for -- business for Zuffa. The 7804 number, to our knowledge, has not been collected, and there's nothing been produced from that. So -- I'm sorry, 7084. I misspoke.

And so part of what we're trying to figure out --

THE COURT: So, Mr. Dell'Angelo, my question is this.

MR. DELL'ANGELO: Yep.

THE COURT: I don't have the chart in front of me, but I believe that there was some indication that there might have been some missing information from Mr. Campbell as well. Is that correct?

MR. DELL'ANGELO: We believe so.

THE COURT: What is the timeframe for what's missing and what exactly is missing?

MR. DELL'ANGELO: So we believe that the time period runs through December 2023 for communications on Mr. Campbell's 7084 number.

THE COURT: I'm sorry, you said starts when?

MR. DELL'ANGELO: We don't know when he began using that phone. I know that it goes --

THE COURT: Okay. Mr. Dell'Angelo --

MR. DELL'ANGELO: Yeah.

THE COURT: -- I'm asking a very specific question.

MR. DELL'ANGELO: Yes.

THE COURT: For Mr. White, for example, we know there's a gap of information for certain periods of time.

MR. DELL'ANGELO: Yes.

THE COURT: Is there a gap of information for Mr. Campbell for certain periods of time?

MR. DELL'ANGELO: Yes. So there is --

THE COURT: From when to when?

MR. DELL'ANGELO: From the time that he began using the 7084 number to conduct business for Zuffa, which I know standing here is at least at early as 2019, and I can -- I can direct your attention. If Your Honor were to look at what we marked as Exhibit --

THE COURT: No, just give me the information.

MR. DELL'ANGELO: Okay. At least 2019, you'll see there's an e-mail from -- Exhibit 15 that was marked yesterday. Mr. Campbell's Zuffa e-mail signature includes a mobile number 7084. It says work/mobile number. We understand that he used that through at least December 2023, possibly later. That phone has not been disclosed or collected. We've written them and said, "Hey, look. It's actually on his e-mail signature as his Zuffa phone."

So I don't know when he began using it. I can give you some earliest dates. It appears to have been used at least

through 2023. There has been nothing produced from that phone. We're able to triangulate the fact that he was using it for business because we have some text messages from other people that communicate with that 7084.

THE COURT: So what about the other phone that he has? Has that phone been imaged and are there any gaps for that phone?

MR. DELL'ANGELO: I'm not aware of any gaps for that phone. So -- however, however, because the -- the documents -- there's a very large number of texts and chats that were disclosed that were imaged on that phone. The production to date that has been made from that phone, as we understand it, has been based on the defendants' run of search terms. Bless you.

As the Court may recall, it ordered a linear review of those texts and they're forthcoming, I believe, in March. So I think as we get additional data from that phone, we'll be able to, sort of, determine whether or not there are gaps or other missing communications, but I don't have sufficient information to fully answer that question, Your Honor.

THE COURT: Okay.

MR. DELL'ANGELO: And then one thing I think will help answer that question that we have asked the defendants for and that goes precisely to the disclosure that you have ordered to come from the defendants' vendor is this. All of the

disclosures that the defendants have made are chat communications, which conflate several things. They conflate at least two things, text messages and instant messages or chat communications on things like Instagram, WhatsApp, and other messaging platforms.

So the problem is, because those numbers are conflated, right -- so from period A to period B they're saying -- or just hypothetically, there's 1,000, quote, chats. I don't know if those are -- are text messages, WhatsApps, Instagrams, right. And so we have asked them, "Can you please break it down?" And here's why that's -- and the answer that we got back recently was, "We don't know if it's possible."

And, you know, our view is, if you're giving me a number, 1,000, that's compromised of three things, you must know the individual components that you used to sum the number, right.

And here's why it's important. If what comes back is, you know, of that five --

THE COURT: I understand, Mr. Dell'Angelo, why it would be important.

MR. DELL'ANGELO: Okay. So we would just like the breakdown from the vendor as well, because it will give us a lot of information about what -- where even within the -- the -- even where documents have been produced, where there may be additional gaps within them that you can't infer from the

conflated data.

THE COURT: Well, we're going to have a bit of a conversation after the testimony today about various discovery matters. That includes discussion about the fighter file, the digital file, and the hard file, and some other conversations. So we can circle back to that, Mr. Dell'Angelo. We'll do that at the end of the testimony.

MR. DELL'ANGELO: Okay.

THE COURT: But let's hear -- let's start Mr. Campbell's testimony, and we'll see how it goes as it relates to that.

MR. DELL'ANGELO: Okay. Yeah. I just wanted to raise that -- that breakdown now because I understand the defendants should already be working with the vendor to get the information to the Court for Mr. White this afternoon. But -- but I understand your direction, Your Honor.

THE COURT: Right.

Okay. Well, why don't we bring Mr. Campbell in. We'll start there.

Before we do that -- I'm sorry -- Mr. Williams, Mr. Chiu, any questions about the information that I want this afternoon?

MR. WILLIAMS: I don't think so, Your Honor.

THE COURT: I'm just checking.

MR. WILLIAMS: The -- this relates to the log of when

phones were collected on what dates?

THE COURT: Yes.

MR. WILLIAMS: And what phones.

THE COURT: And what phones, right.

MR. WILLIAMS: From the vendors.

THE COURT: Right. I wanted to get a sense as soon as possible of the -- sort of, the phones, when they were logged or imaged, how many there are, how many more there may be. And some of that you can't do, obviously, until you look at the phones. But some of it you already have, obviously, because some of the phones have been imaged.

But, again, I just want to be clear, in terms of the gap, the earlier gap, the 2015 to 2020 gap, what I hear from the defendants is that gap exists because, as far as you know, you have no phone that covers that period that has messages on it. Is that correct?

MR. WILLIAMS: I think that's accurate based on what we know right now, Your Honor.

THE COURT: Right. Not to say that it couldn't be on other phones that are in the drawer, but as of now that's the situation. What I was trying to figure out was whether or not, for example, there's a phone that covers 2013 to 2020, but on that phone you have messages up to 2015 and they stop and they start again at 2020. That's a different situation than not having a phone at all for a period, and that potentially

implicates different issues as it relates to the intentional loss or destruction.

So that's why it would be very helpful, Mr. Williams, Mr. Chiu, to know whether or not we just don't have the phone for that period of time, or we have a phone, but the messages are missing on that phone. That, to me, is a very important distinction, as I'm sure you can imagine.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: So as you look through this, I want you to be thinking about that because that will be important information for me to know.

With that, why don't we go ahead and bring Mr. Campbell in, please.

THE COURT REPORTER: Your Honor, can we take a quick break.

THE COURT: Yes. Why don't we take a five, 10-minute recess.

(Recess taken at 11:14 a.m.)

(Resumed at 11:27 a.m.)

COURTROOM ADMINISTRATOR: Please rise.

THE COURT: Please be seated.

(Court conferring with courtroom administrator.)

THE COURT: Okay. Are we ready for Mr. Campbell? Oh, there he is.

Mr. Campbell, can you take the stand.

HUNTER CAMPBELL, having duly been sworn, was examined and testified as follows:

COURTROOM ADMINISTRATOR: Thank you. Please be seated.

Please state and spell your name for the record.

THE WITNESS: Hunter Campbell, H-U-N-T-E-R, C-A-M-P-B-E-L-L.

THE COURT: Okay.

Mr. Dell'Angelo.

MR. DELL'ANGELO: Thank you, Your Honor.

DIRECT EXAMINATION OF HUNTER CAMPBELL

BY MR. DELL'ANGELO:

*Q.* Good morning, Mr. Campbell.

***A.*** Good morning, sir.

*Q.* Did you communicate with Mr. Dana White regarding the preservation notice applicable to this case?

***A.*** I'm sorry, I couldn't hear you.

*Q.* Did you communicate with Mr. Dana White regarding the litigation preservation notice applicable to this case?

***A.*** Concerning the litigation preservation notice, like an actual document or his -- the duty to essentially preserve all of our text messages, communications, et cetera? I just want to be clear on what you're asking me.

*Q.* Are you aware of the fact that there is a -- that Zuffa issued a preservation notice?

***A.*** I am personally, yes.

*Q.* Okay. And you are aware that the preservation notice was issued with respect to documents and electronically-stored information that may be relevant to this litigation?

***A.*** That is my understanding, yes, sir.

*Q.* Okay. Is there a different notice or litigation hold, as you've used that term, than the preservation notice that we were just talking about?

***A.*** To be honest with you, I don't recall. I think the first one may have actually been issued before I was with the company.

*Q.* Okay.

***A.*** So I'm -- I'm not trying to be difficult. I just don't know the specifics and I want to answer your question accurately. I I'm aware that there is a litigation hold. And I'm aware that at one point in time, I believe, we were issued preservation notices.

*Q.* We're used the terms "litigation hold" and "preservation notice." Are you using those interchangeably or are they distinct in your mind somehow?

***A.*** I'm not certain, to be honest with you, what the distinction is.

THE COURT: In your mind, he's asking.

THE WITNESS: They were the same thing to me. In my mind, I'll tell you what -- if you're asking me, what I understand it to be is. We were required, as the result of litigation, to preserve all digital communications, documents,

anything that was business related in any form or fashion.

BY MR. DELL'ANGELO:

*Q.* And how did you come to understand that?

***A.*** The first time I was aware of it actually was during the first litigation back in whatever year that started, so...

THE COURT: And I'm sorry, when did you start with the UFC?

THE WITNESS: So, Judge, I -- I started officially -- well, the short answer is I actually started in -- I was the first intern the UFC ever hired. And I want to say that was maybe around 2008. And I worked there while I was in law school. When I graduated, I left. I became outside counsel. I retained a working relationship with the organization. And then in early '16 I was aware that the UFC was going to be going through a sale process. And I started to have discussions with Dana White and Lorenza Fertitta about returning to the company in 2016 -- the end of 2016. And I formally started, I want to say, the end of January '17 or early February '17, I think, technically I moved onto the company's payroll.

THE COURT: Okay. And what position was that?

THE WITNESS: At the time it was, I want to say, chief legal officer and/or general counsel and executive vice president.

THE COURT: Okay. Thank you.

THE WITNESS: Yes, sir.

BY MR. DELL'ANGELO:

*Q.* Okay. Going back to our discussion regarding preservation notices and litigation holds. Let's focus on the preservation notice. You testified a little bit earlier about your understanding about the retention of -- or retaining documents. Was that with respect to what you understood to be a preservation notice?

***A.*** Can you repeat the question, sir?

*Q.* Yeah. I -- I just want to get our nomenclature clear, so we don't have a misunderstanding.

THE COURT: Yeah, but you're, yourself, Mr. Dell'Angelo conflating things. I don't know that it matters, honestly.

MR. DELL'ANGELO: Okay.

THE COURT: I think you can just ask him about particular documents, was a litigation hold issued, what he understood about that. I think you're probably making it more complicated than it needs to be. So let's try to rephrase.

MR. DELL'ANGELO: Okay.

BY MR. DELL'ANGELO:

*Q.* When did you first come to understand that there was a preservation notice issued by Zuffa in connection with this case?

***A.*** May I ask a clarifying question?

*Q.* Yes.

***A.*** When you say "a preservation notice," I'm telling you that

I'm not familiar or I've never seen an actual document that said a preservation notice. I want to make sure I'm answering it correctly to the extent that when you say a preservation notice, if you're asking when I became aware that there was a duty to preserve all communications, I became aware the first time during the first antitrust litigation case.

*Q.* Okay. And that's --

THE COURT: So hold on a second, Mr. Dell'Angelo.

So, Mr. Campbell, I just want to make sure I'm understanding. Whether it was entitled a "preservation notice" or "litigation hold," did you ever receive a written document that directed you to preserve records or assist with the preservation of records in connection with litigation?

THE WITNESS: And I would venture the answer is yes. I don't recall ever --

THE COURT: I don't want you to venture. If you recall it, then you should say. If you don't recall it, you can simply say I don't recall receiving that.

THE WITNESS: I don't recall ever seeing one.

THE COURT: Okay.

MR. DELL'ANGELO: Okay.

THE COURT: But you do recall having an understanding that the company was under a legal obligation, due to litigation, to preserve records.

THE WITNESS: Always and without question.

THE COURT: Yeah. So since you started in 2017 up to the present, right, has it been your understanding for that entire time that the company was under a legal obligation to preserve all records because of litigation?

THE WITNESS: I believe so, yes. I -- one caveat, I'm also -- I'm a little unclear once the *Le* case was settled what happened in between that time period and the time period that whatever litigation has followed has since been filed. I'm not certain at that point in time. And, frankly, I -- I'm not in -- working in that legal capacity at this stage.

THE COURT: Oh, certainly. I'm not asking you in your legal capacity. I'm -- you know, as an employee, obviously --

THE WITNESS: Yes.

THE COURT: -- at UFC, you potentially also could have received a written document or other communication about the requirement to keep documents preserved. And so what I understand you to be saying is that you recall that when you first started regarding the *Le* case. But then when it settled, you're unsure if there's some period of time where there wasn't a legal obligation to preserve. Is that correct?

THE WITNESS: That's correct with the caveat that I have always acted and told everybody else to act as if we were always under a preservation, litigation hold, preserve everything. That's always been my position from the day that I walked into the company.

THE COURT: Right. Okay.

So you never instructed anyone to not preserve records or that the litigation hold or obligation to preserve documents had ever been lifted.

THE WITNESS: Never. In fact, I was probably -- if you asked anybody, I was probably the one that was most vocal about the need to retain all documents, communications, et cetera.

THE COURT: Okay. Thank you, Mr. Campbell.

THE WITNESS: Yes, sir.

THE COURT: Go ahead, Mr. Dell'Angelo.

BY MR. DELL'ANGELO:

*Q.* Mr. Campbell, a moment ago you testified that you, quote, told everybody about or everyone about this obligation to preserve documents. Who are you referring to?

***A.*** Yeah. To clarify, everybody, sort of, in my world that I deal with every single day: Sean Shelby, Mick Maynard, Tracy Long, Dana White obviously, Elliott Howard, Eric Yee, Lenee Breckenridge. Off the top of my head, I'm not saying that's the complete list. I'm saying, as you're asking me in this moment right now, that's what I recall.

*Q.* So that's everyone you can recall right now?

***A.*** In this exact moment.

*Q.* Okay. So as I understand your testimony --

(Court reporter clarification.)

BY MR. DELL'ANGELO:

*Q.* Okay. So if I understand your testimony, you spoke to Mr. White about the -- his need and obligation to preserve documents. Is that correct?
***A.*** Constantly, yes.
*Q.* And when was that?
***A.*** Constantly. I mean, if you asked me for a specific instance, I couldn't tell you. It was constant. And it wasn't just with Mr. White, because Mr. White is very unsophisticated as it concerns any sort of technology. It was with some of the people surrounding him who I knew would be responsible for some of the technology components.
*Q.* And who are those people?
***A.*** Eric Yee would be one. Elliott Howard would be one. He has an assistant named Nichole. Nichole really wouldn't have much to do with anything, frankly, other than, you know, Elliott would give her a phone and she would put the phone away in a drawer cabinet. That -- that's the extent of it. But even her, I would say, "Do me a favor. Just make sure we're always saving everything."
*Q.* Anyone else you can think of that you spoke to?
***A.*** As it concerns Mr. White specifically?
*Q.* Yes.
***A.*** I mean, I recall we had -- there's a group text message thread that I call, sort of, our matchmaker thread. And it has Mick Maynard, Sean Shelby, Dana White, myself on it. You know,

matchmakers, sort of, by their nature are strange guys. It's a very -- this is a very, very difficult brutal profession. I'm sure it looks glamorous from the outside. And you have to be a little odd to do this job for as long as these guys have been doing it for.

There's this dose of skepticism sometimes and a little paranoia that exists just because of the world we live in. I remember being adamant on those threads, and Dana was on those threads, when one of my guys would be like, "I don't want to give up my phone," saying literally, "You don't have a choice. I've done it. You have to do this."

So, I mean, he was aware with -- not only did I tell him constantly, he was aware with it anecdotally through other interactions I had with other people related to our, sort of, core group.

*Q.* Okay. So you communicated with Mr. White about his preservation obligations on these matchmaker text threads. Did you communicate with Mr. White in writing outside of those text threads about his obligation to preserve documents in connection with the litigation?

***A.*** My answer to that is, it's possible. But I'll also -- if you -- if I can clarify?

Mr. White and I actually have a, sort of, unique setup where our offices are connected. And the door -- there's, like, a door between it. But basically, you know, it's open. We see

each other 50 times a day when I'm in town and he's in town.

So it's one of those things where I wouldn't say that it wasn't on there. I know certainly that there was a text message where I was upset with Mick Maynard, who was resistant to giving his phone to the collections. And I know Mr. White was on there. But I also know that I would tell him -- when things were going on, I would say, "I'm going to need your phone. So just so you know, this week I'm working with counsel. I'm going to need your phone. So I need to know your schedule. I need to know if you're traveling."

I travel between 250 and 300 days a year. So it was also, for me, trying to coordinate when I was in town to make sure -- it was important to me to be involved to make sure that it actually got done. Because counsel, frankly, relied on me to make sure that we were getting things done --

THE COURT: I'm sorry.

THE WITNESS: -- as it concerns him.

THE COURT: Which counsel?

THE WITNESS: So primarily I would deal with -- sorry, Judge.

THE COURT: That's all right.

THE WITNESS: Bless you. Primarily, I would deal with Colby Williams. Colby and I have a relationship that extends a number of years. And, you know, for context -- for context --

THE COURT: Here, let me ask you this question.

THE WITNESS: Yeah.

THE COURT: At some point you were chief legal officer. Could you go through your different positions at UFC for me, please.

THE WITNESS: Beginning with my --

THE COURT: When you started with the company in 2017.

THE WITNESS: Sure. To the best of my recollection, and I'm not certain on the title distinction, but some version of either general counsel and/or chief legal officer and executive vice president. To the best of my knowledge, I want to say that title existed or I served with that title, I want to say until late 2018, early 2019. At which point in time, I became the chief business officer of the organization.

THE COURT: At which point you became what?

THE WITNESS: The chief business officer of the organization.

THE COURT: Okay. Did that involve matchmaking?

THE WITNESS: And that would involve every single element of the fight side of the business.

THE COURT: Okay.

THE WITNESS: Would you like me to elaborate?

THE COURT: No, not necessarily.

THE WITNESS: Okay.

THE COURT: I guess my question is, you were chief legal officer for at least a year, correct?

THE WITNESS: Yes, sir.

THE COURT: And you never saw a written litigation hold for the company?

THE WITNESS: I didn't say I never saw one. I said I don't recall as I sit here today. But I've seen so many documents over the course of almost a ten-year period.

THE COURT: Mr. Campbell, I need some specifics. So if you don't recall it, you don't recall it.

THE WITNESS: Correct.

THE COURT: So as you sit here today, you don't recall seeing a written litigation hold.

THE WITNESS: I don't recall sit- -- if you're asking me today, in my memory when I sit down, can I specifically recall looking at and reading a specific notice, no.

THE COURT: Wouldn't a litigation hold have to go through you to be issued to the UFC as a company, if you're chief legal officer?

THE WITNESS: I don't believe so. And I'll -- if I can elaborate as well. And, again, I'm saying this to the best of my recollection. There was also a significant amount of outside counsel involved. And it was my understanding that outside counsel was taking the lead. In addition, there was a robust in-house counsel team that involved people like Riche McKnight and Seth Krause who were -- who were very sophisticated.

THE COURT: Right. But you're the chief legal officer.

And it sounds like what you're saying is, you didn't have any role in drafting or issuing the written litigation hold. Is that correct?

THE WITNESS: That is correct.

THE COURT: Okay. I'm not saying you never saw one.

THE WITNESS: Correct.

THE COURT: And I'm not saying that you didn't understand the obligations. I'm trying to understand the roles of the different individuals, as it relates to legal. And what you're saying is, as I understand it, that that wasn't part of your role as chief legal officer, that you had some outside counsel that helps you with the issuance of the written litigation hold. Is that accurate?

THE WITNESS: That is correct. And I'm also testifying that it may have occurred prior to me coming to the company in '17.

THE COURT: Yeah. I'm not worried about prior because you can't testify about things that you don't know --

THE WITNESS: Correct.

THE COURT: -- that happened before. I'm just trying to understand the different roles of the individuals within the company, because we have outside counsel, we have inside counsel. Obviously, in the context of a litigation hold or preservation of records, it's important for me to understand what the different roles for the different individuals are.

And so, as I understand it, what you're saying to me is that you were aware of the litigation hold. You directed individuals to preserve records. But as it relates to the specific -- excuse me -- promulgation of the written policy associated with litigation hold, that was not something that you directly participated in. Is that accurate?

THE WITNESS: To the best of my knowledge, yes.

THE COURT: Okay. Thank you.

Go ahead, Mr. Dell'Angelo.

MR. DELL'ANGELO: Thank you, Your Honor.

BY MR. DELL'ANGELO:

*Q.* As the general counsel or chief legal officer of Zuffa, did you -- were you responsible for overseeing compliance with the litigation hold?

***A.*** Can you repeat the question, sir?

*Q.* Yes. During the time that you were general counsel or chief legal officer of Zuffa, notwithstanding the fact that you didn't draft the litigation hold, were -- did you have any responsibilities for overseeing compliance by employees or executives with the litigation hold?

***A.*** Can you be more specific when you say "responsibilities"? I'm asking specifically what you mean.

THE COURT: What did you do, besides tell people about the litigation hold, to make sure that records were preserved?

THE WITNESS: I told everybody that was within my scope

of dealings every day in the business that that existed in any way I felt relevant when something was coming up and I felt the opportunity to remind people that that was going on.

THE COURT: Other than telling people that, what action did you take, if any, to ensure that the records were actually being preserved?

THE WITNESS: I don't recall sending a text message or an e-mail. And, again, that may have also been -- if you allow me to sort of elaborate, there was heavy and significant involvement with major litigation counsel that was, frankly, far better suited to, sort of, address these matters than what I was suited to deal with.

THE COURT: Well, here's what I mean by that. You earlier testified that you took Dana White's phone from him to go be imaged.

THE WITNESS: Correct.

THE COURT: Did you ever take any other actions, besides that, with any other employees to make sure that phones or other records were preserved?

THE WITNESS: I would -- for example, with Mick Maynard, I would tell him that he had to comply. With Sean Shelby, I would tell him that he had to comply.

THE COURT: I'm not talking about what you said orally.

THE WITNESS: Sure.

THE COURT: Other than, again, describing what you did

with Mr. White's phone, did you ever take anyone else's phone, for example, and give it to outside counsel to have it imaged?

THE WITNESS: I was in Tracy Long's office when we were collecting her data. I was there with her. And I want to say I may have been with Sean Shelby when, I think, we had turned over his phone one of the times. I also do have text messages, I believe, with some of these people concerning the need for data collection.

THE COURT: All right. But you, yourself, right, in terms of what you were directly involved with, was Mr. White's phone potentially once and then, perhaps, Ms. Long's phone and -- I'm sorry, the other individual's phone?

THE WITNESS: Mick Maynard.

THE COURT: Mick Maynard's phone.

THE WITNESS: And Sean Shelby, potentially.

THE COURT: And Sean Shelby. Okay.

Other than that, did you have any direct involvement with the preservation of records, digital or otherwise, at UFC?

THE WITNESS: May I ask what you mean by -- like, what else would I -- I'm not certain what you're asking me in terms of what else I would have had to do.

THE COURT: It sounds like you didn't do anything else besides tell people and collect the phones.

THE WITNESS: Or be present when it may have been collected, or go to Mr. White and say, "Mr. White, I need your

phone. We need to get this done today."

THE COURT: Right, besides that.

THE WITNESS: But taking physical action to make sure or ensure that it was completed.

THE COURT: For example, did you ever direct any employees to download, for example, any of the records from the phones?

THE WITNESS: It was my understanding --

THE COURT: Okay. Did you yourself do that?

THE WITNESS: Can you repeat the question, sir?

THE COURT: Did you ever direct any employees to download any of the electronic data on any of the employees' phones at Zuffa?

THE WITNESS: I believe they were all preserved and already downloaded through the preservation process.

THE COURT: Mr. Campbell, this is going to take a long time if you don't answer my direct questions. Did you specifically direct anyone to download data from any UFC employee's phone?

THE WITNESS: No, but I wouldn't even know the download process.

THE COURT: Okay. That's not -- again, it's important, again, just to focus on the question I'm asking you, right. So I'm trying to figure out what role you played as it relates to the preservation of the records. And it sounds to me like what

you're saying to me is that you didn't have a role in that, other than communicating to people the fact that they needed to preserve records, but you didn't do anything else beyond that in terms of actively downloading or directing people to download or preserve data, correct?

THE WITNESS: I believe what you're asking me is, yes, that's correct.

THE COURT: Okay. That's all I'm trying to get at.

THE WITNESS: Yeah.

THE COURT: I know that there other things that were happening, Mr. Campbell. And I know that you may have been aware of them, but I'm trying to sort out each person's role in that. So I just wanted you to focus on what you did --

THE WITNESS: Sure.

THE COURT: -- not what other people may have done because we'll get to that, too.

THE WITNESS: And out of respect, I just want to be super thorough. And I'm just trying to make sure that everything is covered.

THE COURT: Well, I understand that you also want to make sure that all the information that you're aware of is communicated --

THE WITNESS: That's correct, sir.

THE COURT: -- to me. And trust me, if I'm missing something, I have no doubt that Mr. Williams or Mr. Chiu or

Mr. Isaacson or Mr. Yates will make sure that you have an opportunity to communicate it to me. But there is some information that I need to sort out here, and that's why I'm trying to get you to focus on the very specific questions. But certainly if you have a question about the question, there's nothing wrong with that. But I want to just be very clear about the different things. Because it sounds to me, again, Mr. Campbell, that, again, you were chief legal officer for a short period of time and then you switched over to business operations.

And so, I guess, let me ask you this very specific question. In terms of the, sort of, preservation of records, and you said that counsel was involved, was the primary person that you dealt with as it relates to that Colby Williams?

THE WITNESS: Colby Williams and/or our outside counsel. I want to say it was with Bill Isaacson, sir, and there was a woman named Stacey at one point in time that was involved as well.

THE COURT: Yeah, I actually think I know who you're talking about.

MR. ISAACSON: Ms. Grigsby.

THE COURT: Yep. She's not with your new firm, though, Mr. Isaacson.

MR. ISAACSON: That's correct.

THE COURT: Okay. Okay. Yes. Perfect. Thank you.

Go ahead, Mr. Dell'Angelo.

MR. DELL'ANGELO: Thank you, Your Honor.

BY MR. DELL'ANGELO:

*Q.* And just so the record's clear, it was Stacey Grigsby? Is that...

***A.*** I don't recall her last name. She was -- she was very helpful and very intelligent.

*Q.* So -- but you were here yesterday when Mr. White was testifying. Is that right?

***A.*** I was, sir.

*Q.* Okay. And were you generally paying attention to his testimony?

***A.*** Sort of.

*Q.* Okay.

***A.*** To be honest with you, I had gotten off -- I had a 22-hour trip back from Australia. And I am terribly jet-lagged and I still am, so I wasn't in my best form yesterday.

*Q.* Okay. So you testified earlier that sometimes Mr. White would physically give you his phone for collection or imaging in this litigation. Is that right?

***A.*** To the best of my knowledge, whenever Mr. White's phone has been collected, I have taken possession of the phone to get it collected, yes.

*Q.* Okay. So you're not aware of any instance where Mr. White's phone was imaged where the phone was not given to you. Is that

right?
***A.*** Not to my knowledge, no.
*Q.* How many times did Mr. White give his phone to you for imaging in this litigation?
***A.*** I'm not certain, but I want to say at least two, maybe three.
*Q.* Okay. So it's two or three times. When was the first time?
***A.*** I'm not certain. I want to say maybe in '22. '21, '22, something like that. I'm speculating at best. I'm -- I'm not clear on the timeframe.
*Q.* So how would you figure it out if you needed to?
***A.*** I'm trying to go back in time and give you, based on what I think was occurring at the time, my best recollection of a time period that I think it could have occurred.
*Q.* Okay. Well, let -- let's talk about the process.
THE COURT: Hold on a second, Mr. Dell'Angelo. Perhaps, this may help.
When you gave the phone to an individual, it would be to outside counsel, correct?
THE WITNESS: Per -- yes. And there was generally, like, a -- I'll call them -- I'm not sophisticated with this process either. They're, like, the data person, someone that had a computer or whatever they were doing to capture the information off the device.
THE COURT: Okay. Did that sometimes then happen

actually at UFC?

THE WITNESS: I'm sorry, sir. One more time.

THE COURT: The data person you're describing, did they sometimes just look at the phone at UFC?

THE WITNESS: They took the phone. Like, they would be at my office. I would hand outside counsel the phone, who would then give it to the company, whatever the third-party company was that was doing the data collection, and they would take it.

THE COURT: And I guess what I'm saying is, were they doing the data collection on-site at UFC's offices or did they take the phone away?

THE WITNESS: I believe they have done it on-site.

THE COURT: Okay.

THE WITNESS: I don't know how many times and I don't know if that's consistent. I know that I have given the phone to outside counsel, and I believe that at least one occasion there was a data collection company that was set up in one of the spots at our office to ensure that it was done.

THE COURT: And when -- and when you gave the phone, Mr. White's phone, did you give them the password to open the phone?

THE WITNESS: I believe so, yes.

THE COURT: And how did you communicate that?

THE WITNESS: I went to Mr. White and I said, "I need to know your password so we can get into this phone."

THE COURT: And would you text him that information?

THE WITNESS: No, I would literally -- as I said, our offices connect. I would literally walk over and say, "I need to take your phone. What is your password?" I would go and say, "The password is XYZ."

And they would take the phone and do it.

THE COURT: So you would tell whoever you were handing the phone to the password so they could open it.

THE WITNESS: Correct. That's correct.

THE COURT: Okay. Thank you.

Go ahead, Mr. Dell'Angelo.

MR. DELL'ANGELO: Thank you, Your Honor.

BY MR. DELL'ANGELO:

*Q.* The vendor that was doing this collection that you were giving the phones to, was that Consilio?

***A.*** I have no idea, sir.

*Q.* Okay. So the first time that -- first time you got Mr. White's phone, you're arranging with the vendor for them to do whatever it is that they do with the phone, right, put it -- attaching it to their computer to collect the data?

***A.*** I wasn't arranging with anybody. I collected the phone from Mr. White and I --

*Q.* How did you know to go to Mr. White to even collect his phone?

***A.*** Outside counsel would tell me that it needed to get done.

*Q.* And -- and how would they tell you?

***A.*** Generally it was Colby Williams telling me it would need to get done and/or there was some in-house people, including Isabelle Mercier. I'm not specific on her title. She might have been head of litigation. I know she worked under Mr. McKnight. And Mr. McKnight, himself, at times, would remind me how important preservation was and say, "Hey, this thing's going. We need to make sure that this thing gets done."

*Q.* Would anybody communicate to you in writing, such as an e-mail or text message, that it was time to collect the phone and make the arrangements, such that if you were to go back and review your correspondence you could figure out when these collections took place?

***A.*** It's possible with Mr. Williams for sure and potentially Ms. Mercier.

*Q.* And -- and it -- would it be not possible with other people you may have communicated about for some reason?

***A.*** They would have been the two primary people I would have communicated with.

*Q.* Okay. Were there other people that you communicated about with it that were not primary?

***A.*** It's possible, but off -- as I sit here today, what I recall specifically is conversations with both Colby Williams and Isabelle Mercier.

*Q.* Okay.

And so when Mr. White would physically give you his phone for this process of the data collection to be happening, what would you then do?

***A.*** I'm sorry, repeat the question one more time.

*Q.* So -- so you -- so the first time that Mr. White gives you his phone, 2021 or 2022, he gives you his phone. What's the next thing that you do with that phone after you got the password?

***A.*** I -- I would ask him the password, and then I would tell the password to either Colby Williams or Isabelle or whoever -- whatever counsel was there that day to make sure that all this got handled. And I would turn the device over to them.

*Q.* And would you wait with the device while the process was happening?

***A.*** I'm sorry.

*Q.* Would you stay with the device while the process was happening?

***A.*** No, sir.

*Q.* Okay. And then so when the process was over, you'd return the phone to Mr. White, right?

***A.*** That's correct, sir.

*Q.* Okay.

Do you know if Mr. White would change his password after that process was completed?

***A.*** I -- I would have no idea.

*Q.* Okay.
So you said there may have been two or three collections. First one being in 20 -- 2021 or 2022. To the best of your recollection, when was the second collection?
***A.*** I want to say more recently than that.
*Q.* And --
***A.*** Maybe in the last three or four months, I think. Maybe six months.
*Q.* Okay. So mid to late 2025.
***A.*** I believe so.
*Q.* Okay. So -- and you said that there were two or three collections. We've -- you've given me approximate dates for two of them. As you sit here today, can you think of a date or time period when the third collection may have happened, if it did?
***A.*** I'm working off of -- I know this sounds strange. I'm trying to explain my thought process. I'm working off of COVID as, sort of, a timeline in my head for -- of how, sort of, things had played out. I want to say it may have happened prior. What I'm not clear on is how soon prior another collection had happened in terms of, you know, was it earlier even than -- than I was at the company in terms of the outside counsel doing it? Was it early when I had gotten there in '16/'17 through the transaction of the sale? Was it related to something else? I'm totally unclear at anything before, I'd say, COVID.

*Q.* So were there collections -- similar collections of Mr. White's phone that you're aware of that were performed for purposes other than this litigation?

***A.*** Not that I'm aware of.

*Q.* Okay. So when the collection was complete and you returned the phone to Mr. White, did you get any kind of inventory or report of the process that had been performed with respect to the collection of the phone?

***A.*** No, sir, other than asking, "Is everything" -- like, "Was -- was it good," "Did you get everything," or, you know, "Was it done." And they said, "Everything's done."

*Q.* Okay.

***A.*** What I didn't want to do -- to clarify -- is, again, because of my travel schedule and because of Mr. White's travel schedule, I wanted to make sure that while we were in town that this thing got done so we didn't have to play this, you know, "we'll see you in two weeks type of thing." Like, no, we're here. Let's get it done, and if there's a problem, I want to make sure we're here to make sure it gets done.

*Q.* But you didn't specifically keep a record or a log of -- of when the phones were collected and what was collected, right?

***A.*** I did not, sir.

*Q.* Okay. And you didn't get a report of that from the vendor or anybody else. Is that right?

***A.*** No, sir.

*Q.* Okay.

And I think you testified a moment ago that you wanted to find out if everything was, quote, good or worked out. What did you mean by that?

***A.*** I would say, "Everything good? Can I return the phone to him?" And they would tell me yes.

*Q.* Yeah. What I'm trying to understand is, when you would present the question of "everything good," what did you mean by that?

***A.*** Meaning, I just wanted to make sure that it was complete, that it wasn't, like, you got to come back tomorrow or -- again, for context, we -- we're a complicated business that involves people that generally are up very late at night. Most nights I work until probably about 4 or 5 in the morning. So with people who work on more normal business hours, if they were returning the phone to me at, say, 6 o'clock, I wanted to make sure they didn't need it the next day or something to that effect.

*Q.* Yeah. What I'm trying to understand is, when you were trying to assess whether or not everything was, quote, good with the process, is it correct that what you were trying to assess is whether or not the process was complete versus whether or not there was some problem with the data where data had been collected?

***A.*** Correct. I would say interchangeably I wanted to make sure it was okay for me to return the phone to Mr. White.

*Q.* Okay. And did you ever -- with respect to the two or three collections of Mr. White's phone that you participated in, did you ever inquire whether or not any data may have been missing that -- as determined during the course of the collection?

***A.*** Can you repeat the question one more time?

*Q.* Yeah. What I'm trying to understand is, with respect to the two or three collections of Mr. White's phone that you participated in, did you ever inquire as to whether or not any data was missing?

***A.*** No, sir.

*Q.* Okay. And did anybody ever tell you whether or not data may have been missing?

***A.*** No, sir. Never.

THE COURT: Did you ever become aware that at some point data was missing from Mr. White's phones?

THE WITNESS: Yes, sir.

THE COURT: When did you first become aware of that?

THE WITNESS: It would have been recent. Again, I'm not specific on the exact timeframe. I -- I --

THE COURT: When you say "recent," within the past 30 days?

THE WITNESS: I want -- maybe. Maybe -- eh, I'm going to speak in general, like, maybe the last three-month timeframe, something to that effect.

THE COURT: Okay.

THE WITNESS: Mr. Williams had called me after a hearing or after something had occurred and had said to me --

MR. WILLIAMS: Objection, Your Honor, I don't --

THE WITNESS: Yeah, yeah. Sorry.

THE COURT: You don't have to say what he said.

THE WITNESS: Yeah.

THE COURT: I am just trying to figure out approximately when you became aware. And it sounds like you think it's probably two to three months, approximately.

THE WITNESS: Within that timeframe, sir.

THE COURT: Yeah. Okay. That's fine.

BY MR. DELL'ANGELO:

*Q.* So two to three months ago is the first time that you learned data may have been missing from Mr. White's phones, correct?

***A.*** Yes, sir.

*Q.* Okay.

THE COURT: Excuse me, Mr. Dell'Angelo.

But as far as you know, Mr. White never told you that he thought there was any text messages missing from his phone.

THE WITNESS: No.

THE COURT: Right. He never said, "I can't retrieve some of my messages. They're missing from my phone."

He never said anything like that to you?

THE WITNESS: No, sir.

THE COURT: All right. Perfect. Thank you.

BY MR. DELL'ANGELO:

*Q.* Do you have an understanding, as you sit here today, of what periods of time, if any, data was missing from Mr. White's phones?

***A.*** I don't, sir.

*Q.* Okay. Did anybody ever communicate that to you?

***A.*** It's possible, but I'm -- I'm -- as I sit here today, I don't recall any specific date ranges, other than the general knowledge that there's something missing.

*Q.* Okay. So two or three months ago Mr. Williams contacts you and tells you that there may be --

MR. WILLIAMS: Objection, Your Honor, I mean, to the extent that he's trying to get into privileged communications.

THE COURT: Let's --

(Court reporter clarification.)

THE COURT: Mr. Dell'Angelo, let's move on.

BY MR. DELL'ANGELO:

*Q.* Once you learned that data may have been missing from Mr. White's phones, did you do anything to try to determine how, if at all, you could recover that data?

***A.*** I did.

*Q.* What did you do?

***A.*** I... I have a question, actually.

(Court reporter clarification.)

THE WITNESS: My question, Judge, is if it involves a direct communication I had with Mr. Williams, how would you like me to answer that question?

THE COURT: What I want you to do is just describe what you, yourself, did.

THE WITNESS: When I became aware that there was missing data, I got with Elliott Howard, primarily, and Mr. White, and I said, "It's my understanding there is data missing from a time period prior to you switching to your new phone post-election." And at that stage I said to them, "it's my understanding that this is serious and this isn't something that we can just sort of like, oh, it will be whatever. I need everyone to stop what they're doing, and we need to find the phone that would cover the period prior to him switching to the new device."

BY MR. DELL'ANGELO:

*Q.* And the device you're -- you're referring to was switched to in or around November 2024, correct?

***A.*** He switched -- let me -- again, I'm trying to be very specific from what I recall. He switched devices within a short time period around the election process. I remember he and I had a specific discussion to the extent where he was saying to me that he was getting, like, text messages from people he never knew asking him about political things. Dana White is actually not political, despite the way that it looks. And I was

petrified, having sort of seen things that have happened with other people, where I didn't want him trying to be a nice guy doing favors for people and end up back-ending himself into some like lobbyist claim or some crazy thing. And I said, "Get rid of all of these people. Do not respond."

And he said, "It's time for me to change my number."

And I said, "You should probably do that."

*Q.* Okay. So I'd like to be clear, the data loss that you were aware of at this time, two or three months ago, was -- was that -- was it your understanding that data was lost because a phone was lost?

***A.*** No. I had no idea how the data was lost at all.

*Q.* Okay. Did you ever seek to determine how the data was lost?

***A.*** I'm sorry.

*Q.* Did you ever --

***A.*** Clarify.

*Q.* Did you ever investigate how the data may have been lost?

***A.*** No. I mean, I -- it was my understanding when he switched phones there was -- I'm just telling you my understanding -- there was an issue with the time period prior to his phone switched to the new number and the new device.

*Q.* Okay. And so as -- as part of your process, so you meet with Mr. Howard and Mr. White to try to figure out what happened with respect to the data loss that resulted from the phone change, correct?

***A.*** That is correct.
*Q.* And when was that?
***A.*** It would be a time period after I spoke to my counsel --
*Q.* So --
***A.*** -- who informed me what was going on.
*Q.* So some time after that two or -- conversation two or three months ago with Mr. Williams?
***A.*** Yes, sir.

THE COURT: Okay. So let's stop referencing any conversation with Mr. Williams, Mr. Dell'Angelo. I told you this a couple times. I don't want to tell you again.

MR. DELL'ANGELO: Yeah.

THE COURT: You can talk about the date, two to three months, but let's not do that. Actually, that does raise an issue, which I want to talk with counsel at sidebar. So let's do this first.

(Whereupon, the following sidebar conference was held.)

THE COURT: So, Mr. White, I'm standing a little bit far back. As you all can tell, I'm sick.

MR. WILLIAMS: Oh, sorry.

THE COURT: I'm trying not to get you all sick.

I'll protect the privilege for now, but it's difficult for me to see at some point how you're not going to be a witness in this case and how some of your conversations, at least about the devices, are not going to be involved. I mean, you have

been pointed to now by almost every single witness as being involved in the chain of custody. It's hard for me to see how --

MR. YATES: Yeah.

THE COURT: -- you're not going to at least not need to talk about that. And I don't -- I want to protect the privilege, but, honestly, it's hard not to see the chain of custody without you at some point saying, "I got this phone from Mr. Campbell and then I took it here."

And that may be connected to these conversations. And so what I don't want to have happen is you all invoking the privilege, but then I can't get a full picture of how the process worked. And then it looks like you're not able to describe you completely discharging your duties because they're not talking about what you did, right. Because in that respect, it could make you look as if you're not doing things that you actually were doing because I'm protecting the privilege. And I wanted to be fair to you as it relates to that because we're in a little bit of a touchy area.

MR. YATES: Yeah. And just to be candid, Your Honor, Mr. Williams and I talked about this yesterday. And I've never been in this situation before, but our research suggests that, look, Mr. Williams obviously can talk about facts -- without waiving the privilege facts of what he did, what he did -- you know, facts about what did I do to facilitate the collection and

things like that. What I think is outside of the bounds is, you know, communications that relayed legal advice. But the facts of what Mr. Williams did, I think, are fair game, ultimately.

MR. DELL'ANGELO: Yeah.

THE COURT: Okay.

MR. DELL'ANGELO: What --

MR. YATES: Does that help?

THE COURT: Well, the problem is if he's -- if we're not going to get at least some timeframes on the conversations, it's hard to put what he did in context, right. So, in other words, it would be helpful to say, "I had a conversation with Mr. Williams on this date and then he came to the office without knowing what it is," right.

So I'm not saying that -- but, otherwise, then Mr. Williams is just popping up at the UFC office without me having context, without the witnesses being able to say, like, "I did this." Because, look --

MR. YATES: Right.

THE COURT: -- I want to be clear, because one of the issues is the witnesses' testimony suggests on some level that they were relying upon counsel to do things that were not happening, right. And here's what I mean by that. They're simply saying, "I handed stuff to Mr. Williams and I don't know why the data's missing," right. That's the part I want Mr. Williams to have a fair opportunity to be able to say --

MR. YATES: Sure.

THE COURT: -- "I did exactly what I was supposed to do. I took it to the vendor. I had no role in that." But right now, I'm trying to connect the dots between there was a phone that had messages on it, it gets handed to Mr. Williams, it gets handed to the vendor, and then somehow messages are not there or they're deleted. And I just think that from both a professional and ethical standpoint, I don't want Mr. Williams not to be able to describe --

MR. YATES: Right.

THE COURT: -- to be able to describe that. Because he's been thrust essentially into the forefront of this hearing, and I want to be fair to him. But it's hard for me to be completely understanding of everything that's happening if we don't get into some of these conversations where Mr. Williams may be saying, "Hey, you need to give me this device. This is important for the litigation hold. I've told you this five times. I don't want to tell you again."

I'm not saying that happened. But, you know, some of these witnesses are essentially saying, "I didn't have anything to do with this. Mr. Williams was supposed to do all this stuff."

I don't know if that's -- I don't think that's necessarily true, but I want him to be able to actually talk about that.

MR. YATES: Sure.

THE COURT: And I want to talk with you all about how that happens in a way that lets him talk about him discharging his duties and obligations, but that would necessarily include him -- some conversation about when he talked to people.

MR. YATES: Yeah.

MR. DELL'ANGELO: Yeah.

THE COURT: And so that's why I want --

MR. YATES: And I would say, Your Honor, is I think that -- I mean, obviously, Mr. Williams and I have known each other for a while now on this case, and I have the utmost respect for him as a lawyer. And also as to --

THE COURT: As do I, Mr. Yates. He's appeared in front of me --

(Cross-talk.)

(Court reporter interruption and admonition.)

THE COURT: We're having this conversation because Mr. Williams, whenever he's appeared in front of me, right, has been wonderful. I have no reason to question anything about him professionally or ethically, right. But the witnesses are raising a gap about what happened to devices that I need to be able to fill in to understand this process. And the reason why we're having this sidebar is exactly because I don't want Mr. Williams to be implicated at all, in any way --

MR. YATES: Right.

THE COURT: -- as it relates to that process, but I can't ignore that, Mr. Yates and Mr. Williams, when I have four witnesses telling me that the devices with maybe missing evidence was handed to him. I want to be able to have the full story. So, again, I'm saying that because I'm not asking you to disclose it now, but if you want to have a conversation about what he has said or what he did, we then need to figure out what the contours of that are.

And, you know, because he may want to -- you all may want to have a conversation about what he said to these individuals about "this is what you need to be doing," right, not just Mr. Campbell, right. I don't know. I would suspect that Mr. Williams probably told them multiple times what they may need to be doing. But I don't have a record of that, right. But I want you all to think about that and discuss that.

MR. YATES: Okay.

THE COURT: But part of the issue is if I don't get some of that from Mr. Campbell, for example, it's hard for me to put it into context. Because Mr. Campbell sounds like he was the direct connect for the phones.

MR. YATES: So what I would say there, Your Honor, is let us think about that and probably do some more research on how to navigate that. Because, as I said, I've not been involved in one of these proceedings before and I want to make sure that we do it in a way that both gets Your Honor what you

need and also preserves the privilege, to the extent that we can.

The other thing I would say is what's become clear to me -- and I was off trying two other cases, which is why you didn't see me for a while, but what's become clear to me is there is a lot of confusion in terms of timelines. And I think we might need to provide Your Honor with a timeline or two that lays some of this out because I think, then, that would facilitate Your Honor's thinking about it and, ultimately, questions. And if people need to be recalled at some point, that's fine. But I think then Your Honor would see, okay, you know, the collection -- this collection took place, you know, shortly after the Johnson case was filed. There are litigation holds that were issued on these dates.

I think putting that together for Your Honor I think might be very helpful because I think we can see there's a lot of conflation of cases and times and confusion. And, frankly, when I got back into this, I was -- I got confused about the timelines myself.

THE COURT: Right. But, Mr. Yates, that's exactly why I wanted to have this conversation because Mr. Williams probably has notes about when he met with people, when he talked to people. All of that would be clear so he can describe what happened. But I don't want to, again, invade the privilege, but, again, I just want to reiterate that because I have this

record with people pointing to him as having this evidence. And, as I said, I want to be fair. I have the utmost respect for Mr. Williams. I want him to have a full opportunity, right, to be able to explain how he professionally discharged his duties, right.

MR. YATES: I appreciate that.

THE COURT: So that's, again, why we're having this conversation. Obviously, Mr. Yates, I want to make sure you understand that.

MR. DELL'ANGELO: May I be heard on this, Your Honor?

THE COURT: Yeah.

MR. DELL'ANGELO: So this -- Your Honor's concern is getting to exactly what was concerning me about this cabinet of phones. Because like Mr. Yates, we, too, have done the research. And at a minimum, the line is we -- I agree with you, at a minimum the line is witnesses and counsel can talk about the fact of what they did. There are instances where there are findings of spoliation, et cetera, where that privilege may be waived or there may be gradations where you move past that.

However, given the concern that Mr. Williams is now, you know, potentially a witness, by having counsel for Zuffa continue to participate in this process of the collection of the phones, about locking the phones and storing the phones, we're actually perpetuating, I think, the privilege concern here. Your Honor's --

THE COURT: How is that exactly? Because you're talking about a custodial issue. I have yet to see anything that would suggest, as of now, that there's been any sort of intentional mishandling of phones such that I would create an entirely new process for how the phones are handled, right. Now, I appreciate, Mr. Dell'Angelo, you saying that there might not have been efforts to preserve the phones in a way that they should have been preserved. I agree with that. But that's an entirely different matter than saying they should now not be allowed to have the phones because, essentially, at this point, you're not saying they can't be trusted, but it's implied.

MR. DELL'ANGELO: No.

THE COURT: Well, it sounds like that, Mr. Dell'Angelo. I just want to be clear, it sounds like that. And before I would make any decision based upon such an implication, I'd have to have a lot more than missing data on a phone to say that they can't be trusted to handle evidence.

MR. DELL'ANGELO: I understand that, but I really am thinking to a different issue, right.

THE COURT: Okay.

MR. DELL'ANGELO: Where if Mr. Colby [sic] does end up testifying, for example, to the extent that counsel continues to participate in the process and there is some privilege that attaches, there's just this continuation, right, where the Court and counsel for plaintiffs can't, sort of, know or understand

what is happening in the remediation phase, which explains what did happen.

THE COURT: So, Mr. Dell'Angelo, there is a mechanism if you think that a representative of a party should no longer represent them. There is a way to go about seeking --

MR. DELL'ANGELO: Okay.

THE COURT: -- their exclusion from the process if they became a witness. You're aware of that.

MR. DELL'ANGELO: Yes.

THE COURT: It sounds like that's what maybe you're asking. If you think that's appropriate, you can brief that to me. They can respond. But as of now, I haven't seen enough that would do that because it is not the case in every case involving a litigation hold that immediate counsel gets disqualified --

MR. DELL'ANGELO: Yeah.

THE COURT: -- simply because we're talking about a litigation hold because then that would be a big mess.

MR. DELL'ANGELO: Yeah. My --

THE COURT: So I've not seen that as a practice.

I just want -- and I'm trying to get to the bottom of what's happening here. And I'm just saying this at sidebar because Mr. Williams' name has come up almost in every witnesses' --

MR. DELL'ANGELO: Yeah.

THE COURT: Now, understandably, he was their outside counsel, but he's also come up as a witness as relates to the phone. So we'll get Mr. Campbell's testimony and you all can think about that. I'd agree that we can talk about what Mr. Williams did. "I got the phones on this day." But I think it may involve Mr. Williams going back and looking at his notes. He may have made a trip to UFC. It sounds like he's been there multiple times based upon what the witnesses have said. But it would be helpful -- Mr. Yates had talked about the timeline -- to do that.

Now, Mr. Williams, I've been talking about you, but I wanted to give you an opportunity to address these concerns. But, as I said, I wanted to have this sidebar because I wanted to make sure that you're clear about what you may have or may not have done in this case and because of the respect that I have for you as a lawyer here.

MR. WILLIAMS: I appreciate that, Judge. And, first, let me thank you for the opportunity. And I won't say everything here because I know that we have limited time. But what I would tell you is when I've invoked the privilege -- and, frankly, in fairness to Mr. Dell'Angelo, Mr. Campbell has been almost volunteering it. It's not that he was asking.

MR. DELL'ANGELO: I have been trying --

MR. WILLIAMS: That's why I jumped in. But right now I am simply trying to protect the privilege, and I don't want

there to be any arguments of waiver. I am not, however, trying to use the privilege as a sword and a shield. I don't want to deprive the Court of information that it is interested in and entitled to with respect to the actions that I have taken to discharge my ethical obligations. And as I told you yesterday, whether you want me in the witness chair or in a declaration or just to tell you, I will be prepared to do that. I may need to go back and look at time records to show what I did when, but I understand that the Court is interested in that and I'm prepared to do that, consistent with, you know, the research we do and make sure I don't do anything to harm our client or clients.

But I understand the Court's concern. I appreciate the opportunity to address it. And that's where I -- I'm coming from.

THE COURT: Right. And -- well, and I say that, Mr. Williams, because I reluctantly request this information because I wouldn't do it if I didn't think a gap needed to be filled just only because, as I've said, your name seems --

MR. WILLIAMS: It does.

THE COURT: -- seems to be coming out of every single witness's, sort of, mouth as to being involved and responsible. And since we're talking about missing evidence, I want to be clear, I'll be giving you as much opportunity as you want to be able to explain everything that you did and to think about how you do that without waiving the privilege.

And we don't have to belabor that, but that's the purpose of this -- of this sidebar in particular. Okay.

MR. WILLIAMS: It's --

MR. YATES: Thank you, Your Honor.

MR. WILLIAMS: -- it's fair and I appreciate it. And we will address it, Your Honor.

THE COURT: Okay. Perfect. So for now, what we're going to do is, absent him continuing to volunteer --

MR. WILLIAMS: Yeah.

THE COURT: -- to breach the privilege, which we'll try to rein in, we will just focus on timelines, Mr. Dell'Angelo. We won't have conversations about when he talked to Mr. Williams, except if you want to ask him when he might have -- if he recalls. I don't think he does -- might have handed a phone to Mr. Williams. You can ask him that.

MR. DELL'ANGELO: Sure.

THE COURT: But not about any conversations.

MR. DELL'ANGELO: Okay.

THE COURT: Okay. Any objection to that?

MR. YATES: Appreciate it, Your Honor.

MR. WILLIAMS: No problem, Your Honor.

THE COURT: Okay.

MR. YATES: And feel better.

MR. DELL'ANGELO: Thank you, Your Honor.

THE COURT: Thank you.

(Sidebar conference was concluded.)

THE COURT: Go ahead, Mr. Dell'Angelo.

MR. DELL'ANGELO: Thank you, Your Honor.

BY MR. DELL'ANGELO:

*Q.* Mr. Williams --

THE COURT: Mr. Campbell.

MR. DELL'ANGELO: Sorry. Mr. Campbell, I apologize.

BY MR. DELL'ANGELO:

*Q.* Mr. Campbell, before we broke, we were talking about some of the efforts that you were taking in connection with your -- the collection of Mr. White's phones. Do you recall you testified that you discovered several months ago that there may have been some data missing from Mr. White's phones?

***A.*** Correct.

*Q.* And you testified a little bit about the -- I asked you about the process of what you may have done in response to recovered data that you -- that was missing. Do you recall that?

***A.*** Right.

*Q.* Okay. Can you describe what steps, if any, you took to -- to try to recover data that was missing -- missing from Mr. White's phones after you met with Mr. Howard and Mr. White?

***A.*** When you say "recover data," what did I do to try to recover whatever I was told was missing?

*Q.* Yes.

***A.*** I got with Mr. Howard, I got with Mr. White in person, and I told them we needed to find the previous phone that he was on prior to his -- his switching to the phone post-election. And my assumption would be that everything that was missing, from what I understood, would have been contained on that device.

*Q.* And were there any other steps that you took as part of that process to try to recover the missing data or phone?

***A.*** Correct. So then what -- what we did at that stage was we went through and said, "Let's look at every place this phone could potentially be."

There is a -- there's an area -- so, again, to try and give you a better sense of layout, there's an area that exists where my office and his office connect. And there's actually, like, a lounge and a bar in between the two. In front of that, there's a storage area that's private that just contains our -- our, sort of, stuff that we have. So we have drinks back there that we stock for the fridge when people come to do meetings and, you know, office supplies and the stuff you would sort of imagine exists in a storage center. There -- there is an area back there where phones are kept.

So the first thing, obviously, we did is we went to that area. And in that -- in that space, I have phones I've -- to the best of my knowledge, I have every phone I've ever had retained back there. There's phones that look like they're 20 years old in there. I don't know every phone that exists in

there, but when we were looking for an updated phone, which was my understanding of what he had had prior to the switch, we could not find what seemed to be the phone that he would have been on prior.

Then we went into his office, searched every area we could possibly think in his office. Went into his closet, went into my closet at the office, went into my bathroom at the office, his bathroom, literally, my drawers, the legal file cabinet. I went into Tracy's office to say, "Hey, by chance, did I" -- I give Tracy things sometimes where I say, "Hey, print this document or do this" -- "did I give you a phone or did anything happen?"

And we could not find it anywhere.

*Q.* Okay. Are there any other steps that you took to try to locate that phone?

***A.*** I asked him to go and check at his home. I went to his home. And I said, "Hey, is it -- is it possible that it's downstairs in -- in your" -- you know, he hangs out in his movie room, like, where we talk -- "is it down there? Is it in your closet? Could you please double-check?"

I went to my house to double-check, and nothing.

*Q.* And the "him" you're referring to is Mr. White?

***A.*** Yes, sir.

*Q.* Okay. And as a result of that process, the phone was not found, correct?

***A.*** That is correct.

*Q.* Okay.

THE COURT: Excuse me, Mr. Dell'Angelo.

You're talking about one phone.

THE WITNESS: Yes, sir.

THE COURT: But in this case, there are several years of missing data, which would probably be on more than one phone. So were there other phones that you found that were for Mr. White in that cabinet?

THE WITNESS: It's possible. When I tell you that they appeared to me to be, like very, very old -- it's like, you know, when you see an old, like, an iPod and you're like, this is very outdated. I didn't see one that looked like it would be recent. And the reason why I'm not --

THE COURT: Wait, I'm sorry. So you're saying -- because, you know, some of the more recent -- even the iPhones don't look that different over time. So they may differ in size and shape, but, you know, they're not flip phones, for example.

THE WITNESS: Right.

THE COURT: I'm trying to understand. Mr. White and Mr. Howard had indicated that he had had several phones, right, that were stored in that cabinet.

THE WITNESS: Yes.

THE COURT: Besides the one phone, right, were there other iPhones for Mr. White in that cabinet?

THE WITNESS: I don't know whose phones they were. I believe that Mr. White had phones in there, but I'll -- I'll detail why I think they're much older. They all were smaller in scale and they had the button. So I didn't see -- I'm telling you my process to try to find the phone that I believed was missing.

THE COURT: But what about, then -- if I tell you that I believed there were other phones -- there's one phone here, but I don't think that's the only phone that would have had all the missing data. I think there are other phones. So are you telling me that you think there might be other missing phones? Because I don't think there was just one missing phone, as correlated with just this data. And if you're -- and I think there might have been another phone or two that might have had some of the data at least because you're talking about potentially five to seven years of missing text messages.

So other than the one phone, were there other iPhones in that cabinet belonging to Mr. White?

THE WITNESS: I don't know. The iPhones that I saw in there that looked more recent, appeared to be my old iPhones. The iPhones in there that looked to be very, very old, I believe could have been his, but I'm not certain because they're so old. I -- I didn't think that they were what we were looking for at all.

THE COURT: So let me ask you this other question. So

when the phones went into the drawer --

THE WITNESS: Yes, sir.

THE COURT: -- were they labeled?

THE WITNESS: You know what's interesting, I don't know if some of them are or not. Like, I want to say one of them might have had a Post-it on the back of it. I'm trying to recall off the top of my head in real time.

THE COURT: Have you looked at them recently?

THE WITNESS: Whenever we were doing the search, I don't know the exact date, is when we were going through it.

THE COURT: What I'm saying to you is, like, it sounds like they're all, sort of, in a drawer or cabinet, right?

THE WITNESS: That's correct.

THE COURT: But --

THE WITNESS: Well, they're in a specific area. Primarily in this specific area that has a cabinet and a drawer sort of across from each other.

THE COURT: So in other words, the phones, though, are not, for example, kept in that same cabinet, but on, for example, a piece of -- or connected with a piece of paper folder that says, "This is Dana White's phone from this period to this period and here is what the access number is," right? They're not organized that way. Is that correct?

THE WITNESS: No, sir. I didn't see anything like that.

THE COURT: Okay. So you're saying that you think they're older and they may be yours because, as far as you can tell when you look at them, you can't tell from looking at them whose phone it is.

THE WITNESS: That's correct. But I could tell based on the case that I had, that I don't recall him ever having, that I believed at least two of the newer models belonged to me.

THE COURT: Okay. So how many of his phones do you think are in that drawer?

THE WITNESS: I -- I don't -- I don't know. Not -- not more than two.

THE COURT: Okay. So for the other phones --

THE WITNESS: Yes, sir.

THE COURT: -- did you ever hand those other phones to anyone to have them searched?

THE WITNESS: Not that I'm aware of.

THE COURT: So the two phones that you think were his, did you ever give those phones to anyone to have them searched?

THE WITNESS: No, sir.

THE COURT: Okay. And, of course, you said you're not tech savvy, so you didn't do that yourself.

THE WITNESS: I'm literally about as bad as Mr. White is, to be frank with you.

THE COURT: Okay.

Okay. Thank you. And there's some water there.

THE WITNESS: Oh. Thank you, sir. I appreciate it.

THE COURT: Go ahead, Mr. Dell'Angelo.

MR. DELL'ANGELO: Thank you, Your Honor.

BY MR. DELL'ANGELO:

*Q.* Other than what you've already testified to, did you take any additional steps to try to locate the phone that you understood was missing?

***A.*** No, that was -- that was what we did.

*Q.* Okay. And is it correct that, to the best of your knowledge, that phone's never been found?

***A.*** That is correct.

*Q.* Okay.

Are you aware that Mr. White has produced no data prior to July 2, 2020, in this case?

***A.*** No, I'm not aware of the exact timeframes, sir.

*Q.* Okay. Do you have an understanding that -- so you -- you've testified a bit about a period of time for which Mr. White's data may be missing because of the missing phone. Are you aware of -- generally of any additional periods of time for which Mr. White's data may be missing as it relates to this case?

***A.*** No, sir.

*Q.* Okay.

Are you -- did you hear Mr. White's testimony yesterday that he lost certain of his phone contacts in 2021?

***A.*** Yes.

*Q.* And when did you first become aware of that?
***A.*** When he said it.
*Q.* Yesterday?
***A.*** Yes, sir.
*Q.* Okay. So prior to today, you didn't know that Mr. White lost any of his phone contacts in 2021?
***A.*** Not that I recall.
*Q.* Okay. In prior -- well, did you have any knowledge that Mr. White may have lost any other data associated with his phones in 2021?
***A.*** No, sir.
*Q.* Okay. You just don't know either way. Is that correct?
***A.*** I was never made aware of it. I -- I didn't know until yesterday that there was even an issue in 2021.
*Q.* Okay. And do you recall Mr. White's testimony yesterday when he indicated that he also lost contacts in 2024 after he changed phones?
***A.*** I remember him saying that, yes.
*Q.* And did Mr. White -- when did you first learn that?
***A.*** That he had lost contacts?
*Q.* In 2024, yes.
***A.*** First time I heard him say that was yesterday. But I was aware in 2024, post-election, that he did switch phones and get a new number.
*Q.* Okay. But in 2024, post-election, when Mr. White switched

phones, you weren't aware that he had lost contacts. Okay.

***A.*** No, sir.

*Q.* And -- and to be clear, in 2024 Mr. White didn't tell you that he lost any other data or information, correct?

***A.*** No, sir.

*Q.* Okay.

So, other than the process of -- that you've described of physically taking Mr. White's phone on these two or three occasions and delivering them to a vendor for their process, did you have any other role in ensuring that Mr. White's data was preserved?

***A.*** Can you repeat the question?

*Q.* Yeah. So let me -- let me put this together for you. You testified that you specifically told Mr. White several times in person and by text that he had to preserve his data. And you, on two or three occasions, actually took his phone and took it to a vendor for collection, correct?

***A.*** That's correct.

*Q.* Okay. Other than -- other than the communications and physically taking his phone, is there anything else that you did to help ensure that Mr. White preserved his data on his phones?

***A.*** Not that I'm aware of.

*Q.* Okay.

Do you know what steps, if any, Mr. White was taking to preserve the data on his phones, other than what you've already

testified about?

***A.*** Can you repeat the question? I'm sorry.

*Q.* Yeah. Other than physically taking Mr. White's phone --

***A.*** Yes.

*Q.* -- are you aware of anything else that he did to help ensure that the data on his phones were preserved?

***A.*** No. I -- I don't know what he did.

*Q.* Okay.

Other than you physically taking Mr. White's phone on those two or three occasions and having it collected, are you aware of anything else -- anything that anyone else did to ensure that the data on his phones was preserved?

***A.*** Can you repeat the second part of that?

*Q.* Yes. I'll withdraw and repeat -- restate the question.

Other than physically taking the phones on those two or three occasions that you testified about and giving them to the vendor, is there anything else that you're aware of that someone other than you did to help ensure the data on Mr. White's phones was preserved?

***A.*** I believe that both Elliott and Eric Yee, when setting up the devices, were -- were setting them up in a way so that the information would be preserved.

*Q.* Okay. And how did you come to that belief?

***A.*** I had told both of them over the years, "Please, whatever you do" -- again, I don't -- I don't even have my own Instagram,

right. I'm not -- I don't like that stuff. So I'm not sophisticated when it comes to that whole world.

It's lost to me. I understand how important it is, and I understand that he's active on it, but Eric Yee really is the person that manages all the technology side. So I was clear with him that he needed to make sure that these things were being set up in a way where we weren't losing any information or any data.

And I remember telling Elliott, "When you set up the phones, please make sure that everything is -- is maintained and when you change the phones, make sure we always keep the old phones."

*Q.* Okay. And so is that correct that you relied on Mr. Yee and Mr. Howard to ensure that Mr. White's data was preserved?

***A.*** It -- to that extent, yes, sir.

*Q.* And when you say "to that extent," do you mean with respect to when Mr. White's phones were upgraded?

***A.*** Upgraded, new apps downloaded, however the technology unfolded, they would be -- they would have had to have been the ones responsible.

*Q.* Okay.

***A.*** He certainly wouldn't have any information on it, and I certainly wouldn't. We were relying on those people to figure out how to make sure that this was done correctly.

*Q.* And by "he" you mean Mr. White?

***A.*** Mr. White, myself, making sure that Eric Yee on the app side and the social media side, and Elliott just in terms of actually turning the phone on, setting it up, and making sure that the other phone's retained.

*Q.* Okay.

And other than Mr. Yee and Mr. Howard, is there anyone else that you relied on to help ensure that the data on Mr. White's phones was preserved?

***A.*** Not specifically the data, but I would rely on Nichole Durand, who was essentially his assistant that sits in front of his desk, to make sure that that area -- that the phones were kept in the drawer. If something went missing, I would assume that she would tell me. I mean, that was sort of her -- her gig, right. But she didn't have any real involvement in terms of she's an assistant -- I'm not trying to downplay what she does. She's important. But she wasn't involved in the actual -- if I had a phone issue, I didn't say, "Hey, Nichole." I went to Elliott, unless I thought Nichole was in charge of or would know of where a phone would actually be.

*Q.* And was Ms. Durand responsible for putting the -- Mr. White's phones in this cabinet or drawer that you've testified about?

***A.*** So he's -- I'll caveat it. I don't know. And I'll tell you why because he had also had assistants prior to Ms. Durand, so I don't know. When we moved to the office -- we used to be at a

2960 address. When we moved to the new building, I don't know how that whole area got set up. He had a separate assistant at that time. So I'm not -- I don't want to speak to what she did or didn't do as it concerns how that all got set up in the first place.

*Q.* Okay.

***A.*** I'm not aware.

*Q.* During the period of -- that Ms. Durand was working for Mr. -- Mr. White, was she the person who was responsible for putting an old phone in his drawer or cabinet that you've testified about?

***A.*** It could have been or it was -- my assumption would have been it would have been Elliott giving it to her and then she have would have put it wherever it had gone in that area behind her desk, essentially.

*Q.* Okay. So you said it's your assumption. Is it -- do you not know as you sit here?

***A.*** I'm not certain.

*Q.* Okay.

***A.*** It -- I guess the best question is, it's my understanding -- I wasn't there for how this happened. It's my understanding Elliott would have given her the phone, and then she would have placed it in the cabinet or the drawer.

*Q.* Okay. And so Ms. Durand would have access to that cabinet?

***A.*** Yes, sir.

*Q.* Okay. And did you have access to that cabinet?
***A.*** Yes.
*Q.* And Mr. White had access to the cabinet?
***A.*** Yes.
*Q.* Who else, if anyone, had access to the cabinet?
***A.*** My assistant. Well, I have Assistant Candace Dochtermann. And I have --

(Court reporter clarification.)

THE WITNESS: Dochtermann, D-O-C-H-T-E-R-M-A-N-N. And I have another assistant named Luis Vallejo, and a woman named Kim Campbell, unrelated, but she's also an assistant. They would have been the only people, outside of the runners, who would have had access to that area.

BY MR. DELL'ANGELO:

*Q.* Okay. So your -- your three assistants, essentially, right --
***A.*** Correct.
*Q.* -- you've testified about, and then the runners. Who were the runners that you're referring to?
***A.*** We've had a few over the years and -- and forgive me, I don't know their full names. There's a gentleman named Saul, I think it's Saul Huedeen (phonetic), who's our current one. We had a gentleman named Tuva Emanuel (phonetic) who was there before that. We had a gentleman named Mike Young who was there, I want to say -- there was a gap between Mike Young and Tuva.

I'm not certain who the gentleman was that we had at that point in time, to be frank.
*Q.* Okay. And even if you can't recall their names as you sit here, are there any additional people that you can think of that may have -- may have had access to the cabinet where the phones were kept?
***A.*** No.
*Q.* Okay.
Does Zuffa have a document retention policy?
***A.*** I personally am not familiar with a document retention policy.
*Q.* Okay.
***A.*** And, again, I just want to be careful because I want to make sure -- and this is where I want to be careful earlier -- I want to make sure that when you say "a document retention policy," I actually understand what you mean by a document retention policy.
*Q.* Sure. Let me try to ask you a more specific question.
***A.*** I appreciate that.
*Q.* So we spent a bit of time this morning talking about preservation notices and litigation holds, right?
***A.*** Correct.
*Q.* Okay. With -- when I ask you about -- I would like to ask you now about retention policies. And so what I'm referring to is just a general policy that Zuffa would implement that governs

the retention and maintenance and destruction of its documents and information on a day-to-day basis, independent of litigation. Are you aware of whether or not Zuffa has such a policy?

***A.*** I'm not certain.

*Q.* Okay.

Do you know if Zuffa had a document retention policy at any time, even if you're not currently certain that one may be in place?

***A.*** I -- I have no information regarding a document retention policy outside of the duty to preserve communications as part of the litigation.

*Q.* Okay.

And so as general counsel or chief legal officer, you didn't participate in the drafting or -- sorry -- the oversight of any general policies regarding the retention of documents at Zuffa?

***A.*** No. No, sir.

*Q.* Okay.

And I -- I would just like to make sure we're clear about something. Earlier this morning you testified about -- or were testifying -- or you were testifying about litigation holds and preservation notices, and you'd referenced the *Le* case several times. Do you recall that?

***A.*** I do.

*Q.* Okay. I'd just like to be clear. Do you have an understanding of whether or not there was a preservation hold -- preservation notice or litigation hold that applies to the Johnson case independent of the *Le* case?
***A.*** I am.
*Q.* Okay. And what is your understanding?
***A.*** My understanding is is that we have a preservation obligation as part of all litigation.
*Q.* Okay.
***A.*** That's my understanding. If you're saying do I specifically know of a document that was sent, the answer is no. I was aware and made aware that new litigation was filed. And at the time I was made aware that new litigation was filed, it was my default understanding that any time litigation was filed, particularly key executives are under a duty to preserve.
*Q.* Okay.
***A.*** And, again, just speaking personally to give context, I have literally never deleted anything to my knowledge outside of something like where -- you know how if you send the text to the wrong person, you delete and send something new or something to that effect. But I never deleted anything of substance ever since I've been at this company.
THE COURT: And I'm sorry, Mr. Campbell, I just want to be clear. It sounds like since you started --
THE WITNESS: Yes, sir.

THE COURT: -- there has been litigation or anticipation of litigation for the entire period of time. Is that correct?

THE WITNESS: It's my understanding we have always been involved in some form or fashion with litigation.

THE COURT: Which is why you're saying that the entire time that you were there, you understood that you had an obligation to keep everything.

THE WITNESS: That's correct.

THE COURT: Okay. Thank you.

BY MR. DELL'ANGELO:

*Q.* All right. And with respect to your understanding that you needed to keep documents generally, did that include text messages?

***A.*** Yes, sir.

*Q.* Okay. And did that also include communications that you made on apps such as WhatsApp?

***A.*** Yes, sir.

*Q.* Okay.

THE COURT: E-mails?

THE WITNESS: Yes, sir.

THE COURT: And what was your primary mode of communicating, Mr. Campbell, with Mr. White?

THE WITNESS: Text messages, but primarily in person. I mean, we spend -- we spend a lot of time together.

And, to be frank, I do very little relative to somebody who's sort of -- I would say, would be in a comparable position. I don't do a ton of e-mail. I would say my e-mails are probably relatively light by comparison. Just because of the nature of what I do, it's primarily a combination of phone calls, in-person meetings, and text messages.

BY MR. DELL'ANGELO:

*Q.* Okay.

THE COURT: And well -- excuse me, Mr. Dell'Angelo.

So part of your role as matchmaker is to work out details of fights and contracts, fighters, right?

THE WITNESS: That's correct, sir.

THE COURT: So you do work on the fighters' contracts and the details related to them. Is that right?

THE WITNESS: That's correct, sir.

THE COURT: And so we had heard Ms. Long testify about there being certain templates for the contracts and agreements that are used by UFC, right. Those would be the -- and so you use -- excuse me -- you use contract templates as it relates to the agreements. Is that right?

THE WITNESS: We use -- I want to be careful with how -- how I say it to make sure that I'm being clear. There is a template in terms of set, sort of, conditions and -- and recitals and provisions that exist that we start from when we're building out a new agreement. But the individual terms of each

of those agreements could vary significantly depending on the fighter, the manager, the request, the country the fighter's from. All of those things are considerations that you sort of take into account when you're working through one of these deals.

THE COURT: So who creates the contract templates?

THE WITNESS: It's sort of been a living, breathing, evolving document process over the years. I don't know where the first template was created. I know that over the years we've continued to sort of evaluate and modify them at different periods of time.

THE COURT: So if a contract template is changed, whose responsibility is it to potentially change it?

THE WITNESS: Contract template is -- can you repeat the question, Your Honor? I'm sorry.

THE COURT: Yeah. You said that the contract templates evolved over time --

THE WITNESS: That's correct.

THE COURT: -- which means that the standard terms evolved over time, right?

THE WITNESS: Some of the terms have evolved over time, correct.

THE COURT: Who's responsible for making those changes?

THE WITNESS: It would be a combination of -- of people. Outside counsel, in-house counsel, and -- and myself.

THE COURT: Right. And who would have the ultimate authority to approve the final contract template?

THE WITNESS: While I've been there, me.

THE COURT: Right. And did Mr. White ever see any of the contract templates?

THE WITNESS: Never once. And he has never asked me about one ever once, nor do I think he would care.

THE COURT: Do you understand, Mr. Campbell, that's a little difficult for me to believe that the CEO and president of the company never saw the contracts.

THE WITNESS: Mr. White --

THE COURT: I mean, that -- right. This is a multimillion dollar company and you're saying to me that he never saw or looked at or approved any of the contracts?

THE WITNESS: Never once.

THE COURT: Okay.

THE WITNESS: If -- if you... can I elaborate?

THE COURT: You can. I'm just saying that --

THE WITNESS: I understand.

THE COURT: -- you can understand that that just --

THE WITNESS: I think context is important, though.

THE COURT: Okay.

THE WITNESS: So I've known him a very, very long time. Dana's a very unique individual, but where Dana excels -- if you're asking me to, sort of, give context to where his focus is

and why he doesn't care --

THE COURT: Well, I'm not asking that. It sounds to me like what you're saying is that he didn't approve the contracts and he didn't look at them.

THE WITNESS: Never.

THE COURT: Were any contract terms and how they operated ever discussed with him?

THE WITNESS: Never.

THE COURT: So you're saying he didn't understand how the contract terms worked in connection with whether or not fighters could be renewed or they could in any way be under contract with Zuffa?

THE WITNESS: I'm not saying he wouldn't understand conceptually. I'm saying he never cared nor did he ever have any discussions or interactions where it was of any concern to him. And his mentality was always I trust Lorenzo, lawyers, you, to figure out to make sure we're doing what we need to do.

THE COURT: So, for example, in this case there's been discussion about -- these cases -- a discussion about the addition of an arbitration clause and other clauses after litigation began. Were you involved in those contract changes?

THE WITNESS: Heavily.

THE COURT: Okay. And you're saying that you never discussed them with Mr. White in any way.

THE WITNESS: Not once ever.

That's not what he does.

THE COURT: Mr. Campbell, I appreciate that --

THE WITNESS: Yeah.

THE COURT: -- I just want to make sure that I'm understanding what you're saying, right.

And so in the context of the contracts, in terms of how they were developed and approved, you're saying he wasn't involved in that.

THE WITNESS: At all, zero.

THE COURT: Well, now, as it relates to the contract terms in terms of what fighters may or may not be paid, was he involved with that?

THE WITNESS: What timeframe? If you don't mind, to clarify.

THE COURT: Well, did it change over time?

THE WITNESS: It did, significantly.

THE COURT: Because it seems that he, himself, had indicated and the record had indicated previously, at least that we have, that he had been heavily involved in fighter negotiations and contracts. Is that your understanding as his role early on?

THE WITNESS: Early on, it's my understanding he was very heavily involved.

THE COURT: And you arrived at the company in around 2017 to start doing matchmaking around 2018. Is that fair?

THE WITNESS: Around that time -- yes, around that time period, generally.

THE COURT: And so during that timeframe, let's say starting in 2018, how actively involved was he as it relates to negotiating fighter contracts or terms or pay?

THE WITNESS: Two clarifications. My first week on the job, I was tasked with negotiating a new contract for our heavyweight champion, Stipe Miocic. So I would say that from the day that I actually walked into the building, he was at a point where he was prepared to transition almost completely out of that function.

As time went on, to clarify the question for what you were asking, I would say -- there was a transition period because I also didn't have certain relationships that had existed prior. I know for certain that he was heavily involved in the earlier days. I can't speak to the specific timeframe when I wasn't at the company and in the building. But I know that from the date I got there, the transition was immediate and within a short period of time he made it clear to me that he wanted zero involvement whatsoever with any of those processes.

THE COURT: When you say "any of those processes," what are you --

THE WITNESS: He doesn't want to negotiate contracts. He doesn't want to sit and discuss where to put a fight at the right venue on the right date, how many fights a fighter has

left, whether or not this is a process of we want this guy to fight this guy on an undercard, or move a fighter from here to here, or this guy wants to leave and do whatever. He basically said, "I want to focus on the growth and the creative and the production. And I want to run this company and I run to take it to another level."

THE COURT: How wouldn't that involve which fighters are involved in which fights and how they get compensated?

THE WITNESS: Can you be more specific, Your Honor?

THE COURT: Yeah, sure. If you want the company to grow and make money, you have to know how much the fighters are being paid and what the contracts involve. You have to have some idea, right, even as someone who's not directly involved as to, right, what the business model is as it relates to how you make the money, how you sign up fighters, how you keep fighters --

THE WITNESS: Right.

THE COURT: -- right. So it seems like he would have to know that, right?

THE WITNESS: He would know it because I would tell him that we were in a good place. And he would trust me, just as he would trust, I think, people like Lorenzo Fertitta earlier. And he trusts our matchmakers, too.

And we would convey to him, "Things are good. We think we're in a good place. This is where we were at." And we would

always -- listen, I would always do my best, particularly as an event was, sort of, getting finalized, to keep him updated with where I was at in terms of the fights that were being made and put together. And I would always say, "Hey, Dana. What do you think about this fight?"

And the reason being, if he is passionate about a fight, he's the greatest -- in my opinion, he's the greatest fight promoter ever. His ability to sell a fight is directly correlated to his interest level in it. And if he doesn't believe in something, the way that he is wired, he's not interested in selling a product that he doesn't believe in. That's not how he is. And he would tell me on occasion, "I don't like that. I hate that."

And I'd say, "All right. Well, let me look at it," or "I'll move it," or "Let me see if I can find something else and I'll talk to you about it."

But he never once cared with me of, like, "hey, what does the contract terms say" or, "hey, have we changed the deals to" -- it was never anything like that. He was only concerned that we were in a good place and he would ask me, "Is everything good?"

And I would say, "Yes, everything's good. We're in a good spot."

THE COURT: So who would decide what would be, sort of, the compensation levels for the various fighters?

THE WITNESS: It would be a combination of -- again, to clarify, what time period, sir?

THE COURT: So let's start -- let's look at the time period from 2000 -- well, you can only speak to, obviously, from the time you were there. From 2017 until 2021, who would be involved in deciding compensation levels and what fighters would be paid?

THE WITNESS: Ultimately, myself, along with Sean Shelby and Mick Maynard.

THE COURT: Okay. And who would be responsible for the -- deciding how the contract terms were ultimately finalized for each fighter?

THE WITNESS: It would depend on what fighter was involved, but it would be the three of us.

THE COURT: Okay.

THE WITNESS: And I would have ultimate approval authority over every agreement.

THE COURT: Okay.

So in the context of this case, right, it would be the three of you essentially talking amongst yourselves as it relates to the compensation levels for the different fighters.

THE WITNESS: Generally speaking, yes. And on occasion, specifically speaking.

THE COURT: Well, you'd want to make sure that you're on the same page, right. So I assume you guys are having

meetings about it.

THE WITNESS: You do, but I would also clarify -- I don't know how else to explain this other than to say if you think about -- I have six or seven or eight departments that I oversee. Matchmaking is one of them.

THE COURT: Okay.

THE WITNESS: As it concerns the matchmaking department as a whole, if you sort of think of me in that role as like the general manager of a sports organization. The difference being we have 650 or so fighters on the roster at any point in time. Sean and Mick are really focused on the development of the next generation of talent that's coming up. So a guy that's moving off of a regional promotion, a promotion in Russia, a promotion in Australia, et cetera, and how they work their way up into what we would say are, you know, the higher tier of, sort of, fighters.

By the time you get into the higher tier, I'm deeply, deeply involved, once you get into the top 15, top 10, and especially any title fight, the top five, anything that's sort of driving from the top down a card, and then where we go in terms of event placement, venues, locations, what the implications are to go to a place, the event planning itself, and then the actual structuring of a card from top to bottom.

So when it comes to the guys that are coming in, those guys are so sophisticated and so good at what they do, I,

frankly, have very little concern. I give them full autonomy to be able to do what they do because they're the best in the world at it. And when it concerns my own behavior, I sort of have to -- you know, I'm responsible to myself to make sure that it's being done in the right way.

And at the end of the year, I think if you look at, you know, where we were at 2017 versus where we're at today, to -- to answer your question about Mr. White's lack of concern, I think if you look at the evolution --

THE COURT: Well, I didn't say he -- I didn't stay anything about a lack of concern. I was just questioning, sort of, what he would and would not have seen and trying to make sure I understood what it is that you were saying that he did and didn't see.

THE WITNESS: Correct.

THE COURT: It sounds like you're saying that he's very concerned, obviously, about a company --

THE WITNESS: Very.

THE COURT: -- that he helped to develop. But your testimony is that he has certain areas he focuses on more than others.

THE WITNESS: That's absolutely true.

THE COURT: Right. And as it relates to these contract terms and this compensation, that's not an area of his focus.

THE WITNESS: At all.

THE COURT: Okay. All right. Thank you, Mr. Campbell.

THE WITNESS: Yes, sir.

THE COURT: Mr. Dell'Angelo.

BY MR. DELL'ANGELO:

*Q.* Thinking about the period from 2018 period forward, did Mr. White include you on all of his communications relating to Zuffa?

***A.*** Not that I'm aware of, no. And when you say "all," you -- legitimately you mean by definition all?

*Q.* Yes.

***A.*** No.

*Q.* Okay. And so from 2018 forward, if Mr. White were communicating with a fighter in writing through text or some other means, you wouldn't necessarily know that, correct?

***A.*** Can you repeat the question?

*Q.* Yeah. So from 2018 forward, if Mr. White were communicating with a fighter by text, you wouldn't necessarily know that, correct?

***A.*** When you say I wouldn't necessarily know it, I would know it if he conveyed it to me that he had.

*Q.* Otherwise, you would not, correct?

***A.*** That's correct.

*Q.* And is the same true with managers for fighters?

***A.*** Could you repeat the question in its entirety as it concerns managers?

*Q.* Yes. Is the same true with respect to managers for fighters?
***A.*** Is what -- I'm sorry. I'm trying to understand what the question is as it concerns managers.
*Q.* Yes, I understand. Let me try to clarify.
What I'm trying to understand is, if Mr. White's communicating with a manager for a fighter and you're not included on the writing, unless he tells you about, it is it fair to say that you might not know that that communication had happened?
***A.*** I would not know if a communication happened that he did not tell me about. That's correct.
*Q.* All right. And if Mr. White is communicating with an agent for a fighter and you're not included on the communication and he didn't tell you about it, is it fair to say that you wouldn't know that?
***A.*** Unless the manager or the agent told me separately.
*Q.* Okay. And does that --
***A.*** Which, by the way, has happened plenty.
*Q.* Okay.
THE COURT: Excuse me, Mr. Dell'Angelo.
And I think you said, in particular, it happened when you first started where Mr. White had these relationships that you didn't have and people were probably reaching out to him first and then he might have looped you back in.

THE WITNESS: That's absolutely correct, Your Honor. Or he would say just to a fighter, "Get with Hunter." Or a manager he would say, "Yeah, let me talk to the boys," or "I'll have one of the boys reach out to you," something to that effect.

An important distinction, I think, too, is I don't recall a time where any fighter has ever told me that Dana has ignored them. It's just been at a -- at a level of, like, if it involves anything business related, please talk to the people that are responsible for that area.

THE COURT: So just to be clear, you're not saying that he wasn't in contact with fighters.

THE WITNESS: That's correct.

THE COURT: You're saying that when it came down to the final details of the fight as it relates to a particular bout or a contract, that's something that other people would work out.

THE WITNESS: Anything that involved the business of, quote, fighting, from the matchmaking component to the contracts to the money to the term to the opponent, I would say almost exclusively from the time I got there, the transition was very quickly to now I would say zero.

THE COURT: Okay. Thank you.

Go ahead, Mr. Dell'Angelo.

BY MR. DELL'ANGELO:

*Q.* And when did it become zero?

***A.*** Quickly. I don't want -- I don't want to say a specific timeframe because I think to speak in definitives is tough because, to your point, I may not know of everything that's happened.

What I know is, from the day I got there he made it clear that he wanted to focus on growth, strategy, production, building the team, all of those things. That was really his focus. The Sphere, the White House shows, that's what he's doing.

The other thing that had happened -- and I'm just giving you the context of -- of why. The amount of media obligations that occur post-sale from him, particularly after the ESPN deal, became, like -- it became to a level I've never seen before in the sense that he was able to transition as a personality across not just sports, but sort of culture as a whole.

So when you see the 60 Minutes or the CBS Sunday Morning stuff, those were all massive time obligations. That if you just see a 30-minute clip, you assume that's what it is. It's not. It's weeks of filming and production and all those sort of things. So he really -- as he moved to that area, it became his focus to say anything that involves the actual fight side of the business, handle it.

*Q.* Has Mr. White had any role in fighter pay from 2018 forward?

***A.*** I don't want to speak definitively, but to the -- off the

top of my head recollection, almost zero with a few exceptions.
*Q.* So some?
***A.*** I'll -- and I can tell you off the top of my head if you want to know?
*Q.* I'm not asking you that. I'm just asking the answer is some at least, right?
***A.*** It would be almost zero.
*Q.* But some?
***A.*** Almost zero, with I would say two exceptions.
*Q.* Okay. And what are those two exceptions?
***A.*** On occasion, if a fighter had participated in a bout, he would say to me -- particularly if a fighter had lost, he would say to me, "Pay him his win money. That kid deserves every dollar of that win money."
He would also call me on occasion and he would say, "I love" -- I'll give you an example. There was a kid named, I think it was either Junior or Justin Tafa. He took off his hoodie on the way to a walkout, and he gave it to a kid and stopped literally to, like, take the time to talk to a kid. And he was like, "That was the most incredible thing I've ever seen. Please, let's make sure we take care of that guy. He's a good human being."
*Q.* Okay.
***A.*** Those would be the instances where he would intervene that involved a financial component.

*Q.* Okay. So those are not two individual instances, but two categories?
***A.*** Essentially.
*Q.* And so there may be multiple instances within each of those categories, correct?
***A.*** That's correct.
*Q.* Okay. And from 2018 forward --
***A.*** Not over specific dealings with the athletes themselves. It would be more directed at, "I saw this fighter do this. That was incredible. I want to take care of great people."
*Q.* From 2018 forward has Mr. White had any role in matchmaking?
***A.*** He's had a -- will you please clarify what you mean by "role"? I want to be specific with what you're trying to get to the core of.
*Q.* Has -- from 2018 forward, has Mr. White participated in any aspect of the UFC's matchmaking?
***A.*** He has participated in aspects of matchmaking.
*Q.* Okay. And from 2018 forward, has Mr. White participated in any aspect of developing a fight card for a particular event?
***A.*** Can you please be more specific what you mean by development of a fight card?
*Q.* Making -- providing input or making decisions about who goes on the card.
***A.*** Yes.
*Q.* Okay. And from 2018 forward, has Mr. White had any role in

the decision about whether or not to give a contract to a particular fighter?

***A.*** A fighter under roster or a fighter that hasn't previously been signed, I think, would be an important distinction.

*Q.* So let's first start with -- with a fighter who is not currently on the UFC's roster. From 2018 forward, has -- is it your -- has Mr. White had any role in making a decision about whether or not to give such a fighter a contract?

***A.*** Yes, sir. We actually have a full TV show called Dana White's Contender Series where after an event occurs he gives out contracts to specific fighters from that event.

*Q.* What about other than that?

***A.*** He does. We have a --

(Court reporter clarification.)

THE WITNESS: Oh, I'm so sorry, ma'am.

We have another show named Dana White's Looking For a Fight. And on that show he, along with two personalities and myself, sort of travel to these events. It's a similar version of the Contender Series. And generally after the show occurs, one or two fighters either get contracts to the Contender Series or to the UFC, and he participates in those personally, as well as The Ultimate Fighter reality show.

BY MR. DELL'ANGELO:

*Q.* And -- and other than these television shows that you've testified about, from 2018 forward, has Mr. White had any role

in the decision to give a contract to a fighter who is not yet on the UFC's roster?

***A.*** Possibly on a rare occasion through another fighter. So, like, if -- if, say, a fighter that he has admired and respected, a Georges St-Pierre, a Conor, or Khabib, would say, "Hey, I have a guy at my gym and he's incredible," Dana may reach out to Nick, Sean, or I and say, "Hey, try to get this kid a spot on the Contender Series," or "He's from, you know, the Middle East. Maybe look at an opportunity for him on a card or something like that."

But outside of just saying to us that, he would have no involvement outside of just informing us that someone reached out and, you know, take a look at the guy.

*Q.* And so in those instances it would be a fighter or a manager who would be reaching out to Mr. White and he would then be passing on the information to you?

***A.*** Pass it along, but I'll also say if we had objection to it, he would say, "Do whatever you want to do."

*Q.* Right.

***A.*** Like, if I went to him and said, "I'm not going to sign this guy. He actually is not a great person, and he got thrown out this organization for punching a referee," he'd say, "I didn't understand. No problem. Do whatever you want to do."

*Q.* And has Mr. White sometimes told you from 2018 -- from 2018 forward, are there instances where Mr. White has told you to

give a deal to a fighter who is not yet under contract with the UFC?

***A.*** Told me as said "I'm making you"? Or told me as saying exactly the context I described as, "Spoke to this guy. Please take a look at him" or, "Hey, figure something out with him." That would be more the context. I just want to be specific in the sense of -- of how that -- that's categorized.

*Q.* Yeah.

***A.*** And listen, if I felt it was important to him, that it was meaningful to him, I always went out of my way to try to make sure that we -- we figured it out.

THE COURT: So, Mr. Dell'Angelo, I think we've been going at it quite a while. It's 1 o'clock. Let's take a lunch break.

MR. DELL'ANGELO: Okay.

THE COURT: And we'll come back at 2 o'clock and keep going and finish up with Mr. Campbell, and then do whatever other business we have. Okay?

MR. DELL'ANGELO: Thank you, Your Honor.

THE COURT: Okay. We'll be adjourned. Thank you.

(Recess taken at 1:07 p.m.)

(Resumed at 2:06 p.m.)

THE COURT: Please be seated.

COURTROOM ADMINISTRATOR: Marshal, may I ask that you shut the outer doors for us, please. Thank you.

THE COURT: Thank you.

All right. Are we ready to resume with Mr. Campbell's testimony?

MR. DELL'ANGELO: Yes, Your Honor.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: All right. Mr. Campbell, if you wouldn't mind, please, retaking the stand.

You recognize that you're still under oath, right?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. Perfect. Go ahead, Mr. Dell'Angelo.

MR. DELL'ANGELO: Thank you, Your Honor.

BY MR. DELL'ANGELO:

*Q.* Mr. Campbell, does Dana White have the right to approve who's on a card for the UFC?

***A.*** Yes, he does.

*Q.* Okay. And does he sometimes approve who's on a card for the UFC?

***A.*** Does he sometimes approve -- yes. He will -- he will review a card when we present everything. And he'll say, "Looks right."

*Q.* Okay. And, in your mind, does that constitute approval?

***A.*** Yes.

*Q.* Okay. And does Mr. White have the right to -- at the UFC to decide who's on the main card versus a preliminary card?

***A.*** Does he have the right to decide. Sure.

*Q.* Okay. And does he sometimes do so?
***A.*** I want to clarify. Again, he would look at the card once it's already built. If he didn't like the card, he would say what he didn't like about it.
*Q.* And does Mr. -- so I want to make sure I understand what you're saying.
***A.*** Right.
*Q.* Does Mr. White -- so after 2018, say, does Mr. White ever look at a card and participate in how the card is structured before it's in what you believe to be final form?
***A.*** Yes.
*Q.* Okay.
And does Mr. White have the right to direct you or others at the UFC to give a fighter a contract who's not under a contract?
***A.*** Yes, he could.
*Q.* Okay. And does he sometimes do -- do so?
***A.*** Yes.
*Q.* Okay. And does Mr. White have the right to direct you or others at the UFC to give a fight to a fighter who's already under contract with the UFC?
***A.*** I want to clarify, when you say -- can you clarify what you mean by does he have the right? Like, I'm just -- if you're asking if he said, "Hey, I would love for Jeremy Stephens to be on a card" --

*Q.* Let's say, does he have decision-making ability?
***A.*** Sure, absolutely.
*Q.* Okay. And does he sometimes exercise that decision-making ability?
***A.*** Very rarely, but yes.
*Q.* Very rarely with respect to whether or not to give a fighter who's under contract a fight?
***A.*** That's correct.
*Q.* Okay. And does Mr. White have decision-making ability with respect to whether or not the UFC releases a fighter from its -- a contact with the UFC?
***A.*** Same answer. Very rarely, but yes.
THE COURT: Well, he has the authority to do that.
THE WITNESS: Well, he would have the authority to say, "Hey, guys, I" --
THE COURT: He has the authority to tell you basically at any point, "Put this fighter under contract" or "release this fighter," correct?
THE WITNESS: That's correct.
THE COURT: Okay. I'm not talking about how often he exercises that.
THE WITNESS: Right.
THE COURT: But you're not disputing the fact that --
THE WITNESS: No.
THE COURT: -- if he said to you, "Sign this fighter

up. I'm telling you to do that," then he has the authority to do that and you would do that?

THE WITNESS: Yes, Your Honor. If he --

THE COURT: Okay.

THE WITNESS: -- said, "I would like to release this fighter," I would do it.

THE COURT: Right. So, again, we're not talking about necessarily how often that happens --

THE WITNESS: Sure.

THE COURT: -- but I want to distinguish between --

THE WITNESS: Absolutely.

THE COURT: -- his authority and when he does that. So you're not, in your testimony, saying he doesn't have the authority to do that.

THE WITNESS: That's correct.

THE COURT: Okay.

BY MR. DELL'ANGELO:

*Q.* And from 2018 on, has Mr. Wright -- Mr. White had the authority over the decision of when to announce a fight?

***A.*** He does have the authority.

*Q.* Okay. And from 2018 forward, has he sometimes exercised his authority for when the UFC would announce a fight?

***A.*** Yes, he -- yes, he has.

*Q.* And does -- from 2018 forward, has Mr. White had the authority to decide the location at which a fight or event would

be held?
***A.*** He has the authority, yes.
*Q.* Okay. And from 2018 forward, has he sometimes exercised that authority?
***A.*** I'm trying to recall. He probably -- yes, I would say he probably has.
*Q.* Okay. Thank you.
Do you recall earlier in your testimony talked about the missing phone that you spent some time looking for that you thought may have been in the cabinet in the space that you share or that adjoins Mr. White's space? Do you recall that testimony?
***A.*** I do.
*Q.* Okay. And do you recall Mr. White's testimony yesterday that he formed a belief that it was possible that that phone had been stolen?
***A.*** I do.
*Q.* Okay.
Do you have an independent understanding that there's the possibility that that phone may have been stolen?
***A.*** I do.
*Q.* Okay. And when did you first learn that the phone may have been stolen?
***A.*** I don't know the specific dates, but it would have been whenever I was asked to really try to find the phone.

*Q.* Okay.
***A.*** It had been around that time period.
*Q.* And I believe your testimony earlier was that it was within the last two to three months. Is that correct?
***A.*** Yes, sir.
*Q.* Okay.
***A.*** That's correct.
*Q.* So just so we're clear, it was within the last two to three months that you first learned of the possibility that the missing phone may have been stolen?
***A.*** Yes. Can you do me a favor? I'm so sorry. There's like a weird echo. I don't hear you clearly. I don't -- if you could speak maybe a little closer. Thank you so much.
*Q.* Okay. I -- is this better?
***A.*** That's better actually, yes. Thank you so much.
*Q.* All right. Did -- did any -- to your knowledge, did anyone report to the police the possibility that the phone may have been stolen?
***A.*** I'm not aware of that.
*Q.* Okay. Who, if anyone, did you notify about the fact that the phone may have been stolen?
***A.*** Mr. White, Elliott, and I discussed it, and I discussed it with counsel.
*Q.* Okay. How many phone numbers -- during the course of your tenure at UFC --

THE COURT: Excuse me, Mr. Dell'Angelo.

MR. DELL'ANGELO: Yes.

THE COURT: In the cabinet where the phone was stolen, were there other phones?

THE WITNESS: In the area there were, yes.

THE COURT: But this was, you think, potentially the only phone that was stolen.

THE WITNESS: I do.

THE COURT: Okay. And as far as you know, was there any other phone stolen or taken?

THE WITNESS: I'm not aware.

THE COURT: Okay. Thank you.

THE WITNESS: Yes, sir.

THE COURT: Go ahead, Mr. Dell'Angelo.

MR. DELL'ANGELO: Thank you, Your Honor.

BY MR. DELL'ANGELO:

*Q.* During the course of your tenure at -- working for Zuffa, how many different mobile phone numbers have you used?

***A.*** Two.

*Q.* And what were those -- what are the -- I'm not asking for the full phone number. Can you give me the last four digits of the two phone numbers -- mobile phone numbers that you used while you worked at Zuffa?

***A.*** Yes, sir. To the best of my recollection, the last two digits of the one I've used, I want to say since maybe all but

the first year in, would have ended in 09.

*Q.* Okay. And what about the other phone?

***A.*** 84.

*Q.* And -- okay. And during what period of time did you use the 09 phone number?

***A.*** From whenever I secured the phone with the company until today.

*Q.* Okay. And was the 09 phone a business phone, a personal phone, or both?

***A.*** All business.

*Q.* Sorry?

***A.*** Business.

*Q.* Business. And it was business only?

***A.*** I mean, I'm sure there's communications with people where, you know, "Hey, how are you," or "I met you at a fight," or, you know, you know, celebrity stuff, you know what I mean, but it's all connected to -- it's not my aunt or something to that effect.

*Q.* And do you know when you first began to use the 09 phone?

***A.*** I want to say around a year in. So maybe '18.

*Q.* Okay.

And the 84 phone, when did you begin using that phone?

***A.*** Oh, I've had that number since I was 13 years old.

*Q.* Okay.

And have you ever used the 84 phone -- well, I'll

withdraw that for now.

Thinking about your 09 phone, does it have -- what type of phone is it?

***A.*** It's been an iPhone.

*Q.* Okay. And has it been an iPhone since at least you joined Zuffa?

***A.*** Yes, it has.

*Q.* Okay. And are you familiar with iCloud?

***A.*** Sort of.

*Q.* Okay.

***A.*** Conceptually, I think is the best answer.

*Q.* Is there an iCloud account associated with your 09 phone?

***A.*** I'm not certain, but I believe so.

*Q.* Do you know if you have more than one iCloud account?

***A.*** I'm not certain at all.

*Q.* All right.

THE COURT: Do you have the phone with you?

THE WITNESS: I do not. I was told not to bring it.

THE COURT: Oh, that's right. We had that order.

MR. WILLIAMS: Sorry, Judge. You issued an order.

THE COURT: But you all have your phones. I was just saying we could resolve the issue of the iCloud pretty quickly.

MR. DELL'ANGELO: Yeah.

THE COURT: Go ahead.

MR. DELL'ANGELO: Thank you, Your Honor.

BY MR. DELL'ANGELO:

*Q.* Let's see.

So do you know if -- I apologize. Do you know if there's an iCloud account associated with the phone that you currently use with your 09 number?

***A.*** I'm not certain, but I believe there is.

*Q.* Okay. And in connection with your obligation to preserve documents in this litigation, did you or anyone on your behalf examine or adjust any of the iCloud settings associated with the phones that you use for your -- with your 09 number?

***A.*** I did not and, to my knowledge, no one ever has.

*Q.* Okay.

Do you send or receive text messages using the -- the Apple text messaging service, iMessenger [sic], on your 09 iPhone?

***A.*** If that is the default messenger program, then, yes, I do.

*Q.* Okay. I will represent to you that it is, and that's what I was asking you about.

At any point since you joined Zuffa have you checked with your iCloud settings were able to retain messages in iCloud on your 09 phone?

***A.*** No, I wouldn't even know how to do that.

*Q.* Okay. So you're not aware of what your iPhone -- whether or not your iPhone has messaging preservation settings?

***A.*** Zero.

*Q.* Okay.
***A.*** I can tell you when I search my phone, I think it goes back a pretty long way. I -- I just assumed that everything was kept there.
*Q.* Okay. And do you use WhatsApp on your 09 phone?
***A.*** I do.
*Q.* How long have you used WhatsApp?
***A.*** I couldn't tell you, but as long as -- I mean, I believe from whatever point in time I was with the company I've been using it because I generally use it to communicate with international athletes.
*Q.* And do you use it -- do you use WhatsApp to communicate with other UFC executives?
***A.*** Probably.
*Q.* Okay. As you sit here today, can you identify any UFC executives with whom you communicate using WhatsApp?
***A.*** Not specifically, but I would assume it would be Mick Maynard, Sean Shelby, maybe some staff on my medical team. Where I would use it would be with respect to when we have particularly, international events, sometimes the domestic ones don't work well, but you can get through on WhatsApp.
*Q.* Okay. So among other things, when you're traveling internationally you might be more likely to use WhatsApp versus iMessenger?
***A.*** Yeah. But I -- I use it regularly. Like, I wouldn't say

that it's rare that I use it. I use it even when I'm here domestically.

*Q.* Okay. So you regularly use WhatsApp?

***A.*** I do.

*Q.* Okay. Have you looked at your WhatsApp account to determine whether or not you have any documents responsive to this litigation?

***A.*** I've never looked at my WhatsApp account for anything other than I know it exists and I know the texts are on there.

*Q.* Okay. To your knowledge, has anybody looked at your WhatsApp account to determine whether or not it contains relevant communications?

***A.*** I have no idea.

*Q.* Okay.

Did you know that WhatsApp had an option to delete messages in your WhatsApp account on your phone?

***A.*** I -- to be more specific, as a setting or can you actually manually delete one that you send?

*Q.* Well, I'll represent to you that you can do both. So let's start with the setting.

Were you aware that WhatsApp has a setting that allows for -- that regulates the automatic deletion of messages?

***A.*** I did not know that.

*Q.* Okay. Did you know that you have the ability to manually delete WhatsApp messages?

***A.*** I do.
*Q.* Okay. So if -- if you didn't know that WhatsApp has a setting that addresses the periodic deletion of messages, is it fair to say you don't know what setting your WhatsApp is set to with respect to the deletion of messages?
***A.*** That is correct.
*Q.* Okay. And did you know that WhatsApp has a disappearing messages feature sometimes called ephemeral messaging or ephemeral enabled?
***A.*** No, I don't even know what that means, though.
*Q.* Okay. So do you know what the default setting is for preserving WhatsApp messages?
***A.*** I do not.
*Q.* Okay.
Were you aware that other people on a chat thread with you on WhatsApp have the ability to enable message deletion?
***A.*** I'm aware that when people are on a text sometimes they can delete a message and on your screen it says message deleted.
*Q.* Okay.
***A.*** Yes, I've seen that.
*Q.* And has that happened in WhatsApp chat threads that you have participated in?
***A.*** Yes.
*Q.* And has that happened in chat threads on iMessenger that you've participated in?

***A.*** Yes.

*Q.* Okay. And sitting here, do you know if any of those messages related to UFC business?

***A.*** No. Sitting here, I don't know specifically. But I would assume that there are business threads where that has happened.

*Q.* And have you undertaken any steps to try to identify what those deleted messages are or how to recover them?

***A.*** No, sir.

*Q.* Okay.

The -- how many -- well, has there been more than one phone associated with your 09 number?

***A.*** Yes.

*Q.* And how many phones?

***A.*** I think I'm on my third.

*Q.* Third. And do you recall the models of those phones?

***A.*** I have no clue at all.

*Q.* Do you know what your current model is?

***A.*** Zero idea.

*Q.* Okay.

***A.*** I just know it's made by Apple, and the texts are blue on the work phone and on my other phone are green. That's when I know the difference.

*Q.* And have any of your -- and just so we're clear, are all of the phones that you've used with the 09 number been Apple iPhones?

***A.*** Yes.

*Q.* Okay. And have any of those Apple iPhones associated with your 09 number been imaged in connection with this litigation?

***A.*** I'm sorry. One more time, please.

*Q.* Yes. Have -- have any of the Apple iPhones associated with your 09 number been imaged in connection with this litigation?

***A.*** I believe so, yes.

*Q.* Okay. And when -- when was the first time that one of your Apple iPhones associated with the 09 number was imaged in connection with this litigation?

***A.*** I don't recall the first time.

*Q.* Okay. How many times have your Apple iPhones associated with the 09 number been imaged in connection with this litigation?

***A.*** I believe multiple times, but I'm not clear on, like, the specific numbers if it's two, three, whatever. I don't know.

*Q.* Okay. How would you determine that if you needed to?

***A.*** I would ask counsel.

*Q.* Okay. And do you know --

THE COURT: Excuse me, Mr. Dell'Angelo.

And who did you provide the phones to?

THE WITNESS: I believe counsel. I'm not specific at this stage, particularly earlier on, with what counsel would have collected them. But I believe it would have been in-house counsel at our parent company at one stage. It might have been

Stacey Grigsby. It might have been Isabelle Mercier. And it could have been Mr. Williams as well. I don't know. I mean, I've -- to be frank, it's never been an issue for me. So they've -- I've always been very -- that's not been a big process for me. I don't care.

THE COURT: So when the phone has been provided to counsel --

THE WITNESS: Yeah.

THE COURT: -- how long have they had it before they gave it back to you?

THE WITNESS: A long -- sometimes it's been a long time. I mean, I want to say, like, on occasions it might have been, like, an entire day.

THE COURT: Okay. But not usually longer than a day?

THE WITNESS: I don't know if one time they had to keep it overnight. Like, I left and they were still downloading because they were trying to get it. It may -- on one occasion, it may have been overnight and I picked it up the next morning. It's possible.

THE COURT: But no more than one day, from what you can recall.

THE WITNESS: Not that I ever recall, sir.

THE COURT: All right. Thank you.

BY MR. DELL'ANGELO:

*Q.* When was the last time your -- one of your iPhones

associated with your 09 account was imaged in connection with this litigation?

***A.*** I don't recall exactly, but I want to say within the last year or so, maybe sooner.

*Q.* And you testified that you may have had as many as three iPhones associated with your 09 account, correct?

***A.*** Yes.

*Q.* Okay. And were each of those iPhones -- each of those three iPhones imaged at least once?

***A.*** I can't be certain.

*Q.* Okay.

MR. DELL'ANGELO: Your Honor, I would like to mark as Exhibit 22 to the proceeding an e-mail chain with attachments from Adam Peterson of Latham & Watkins dated October 13, 2025. It was sent from counsel for defendants to counsel for plaintiffs in this litigation. The last page of which contains a chart of phones imaged as of -- or collected by counsel as of October 13th, 2025.

THE COURT: Any objection?

MR. WILLIAMS: Counsel, can we get the tab number?

MR. DELL'ANGELO: Pardon -- oh. It is Tab 24 in the binder of documents that we provided to counsel for defendants this morning, and it would be Exhibit 22 to the -- our hearing continuing from the exhibits yesterday, Your Honor.

MR. WILLIAMS: One second, Judge.

THE COURT: Sure.

MR. WILLIAMS: No objection.

All right. So Plaintiffs' Exhibit 22 will be admitted.

(Plaintiffs' Exhibit 22 is admitted.)

MR. DELL'ANGELO: Thank you, Your Honor.

BY MR. DELL'ANGELO:

*Q.* Mr. Campbell, I -- I put on the screen the last page of a series of attachments that were provided by your counsel to us in this litigation on October 13th, 2025. And the page that's on the screen now is a chart that shows certain phones that were collected by Zuffa's counsel in this litigation. If you look about halfway down, do you see your name there in two rows?

***A.*** I do, sir.

*Q.* Okay. And if you read across, do you see under the Device Make and Model column, that your 09 number, according to this, appears to be associated with an i 13 [sic] Pro and an iPhone 15 Pro?

***A.*** I see that's what it states, yes.

*Q.* Okay. Does that refresh your recollection as to at least two of the iPhones that you used associated with your 09 number?

***A.*** I know I've had multiple iPhones. I wouldn't know any distinction between a 13 or a 15 or -- I just know it's an Apple phone.

*Q.* Okay.

THE COURT: Excuse me, Mr. Dell'Angelo.

So you don't have any reason, though, to dispute that those are correct?

THE WITNESS: No. No reason at all, Your Honor.

THE COURT: All right. Thank you.

BY MR. DELL'ANGELO:

*Q.* But sitting here today, you believe that you may have had an additional iPhone associated with the 09 number, but is not listed here.

***A.*** It's possible. I'm not -- I'm not certain. I know for sure, too -- I do think there may have been another one early on, but I'm not positive.

*Q.* Okay.

And so it would appear from this that you transitioned at some point from an iPhone 13 Pro to an iPhone 15 Pro. Would you agree with that?

***A.*** I -- I know for certain I switched phones. Again, I'm not certain what the models are. I have no -- I have no ability to tell you the distinction --

*Q.* Okay.

***A.*** -- between the phones themselves, but I have switched phones.

*Q.* Okay. When is the last time you switched phones on your 09 number?

***A.*** I have no idea.

*Q.* Okay. When you switch phones on your 09 number, say, most

recently, to the best of your recollection, did somebody assist you with that process or did you do it by yourself?

***A.*** Yeah, what would happen -- the answer is, yes, I was assisted. I... I tell my assistant I'm having issues with my phone. And I think she contacts -- I don't know how it works, but she gets me a new phone.

*Q.* Okay. Did you get a new -- did you get a new phone because you were having issues with your phone?

***A.*** Yes.

*Q.* And what issues were you having?

***A.*** So sometimes when you travel internationally as much as, like I said, I travel 300 days a year --

(Court reporter clarification.)

THE WITNESS: Oh, I'm so sorry. If you travel between like 250, 300 days a year, when you log onto networks in some of these foreign countries, when you come back, you start having glitches in the phone. And whenever I would start to recognize glitches, or if I would leave and I would have a battery for a day, and I would come back and my battery would be dead in three hours, I knew there was a problem and I would request a new phone.

BY MR. DELL'ANGELO:

*Q.* And can you provide a little more detail on what you mean by "glitches"?

***A.*** Yeah. So I mean, on one phone I know for certain that I

would be texting on it and it would literally flash blank. And then it would turn basically black, turn itself back on, black, turn itself back on. And it would happen at random times. And then I had another phone that actually started making a buzzing noise randomly when I got back from the Middle East.

*Q.* Okay. And when the phone would turn black as you testified, did it result in data loss to the best of your knowledge?

***A.*** Not that I'm aware of.

*Q.* Okay. Did you do anything to determine whether or not you lost data as a result of the glitches that you described?

***A.*** No, because I wasn't ever aware that I thought I did lose data on those iPhones.

*Q.* Okay.

When you transitioned to your most recent iPhone, who assisted you with setting up your new phone?

***A.*** My assistant and someone in IT.

*Q.* What -- I believe you testified you had multiple assistants. Which assistant?

***A.*** It would have been Candace, primarily.

*Q.* Okay. And you -- you referenced IT. Who in IT, if you know?

***A.*** I don't know who would have done it. We have like an IT -- we have an IT department, but I'm not -- I don't even know who would have handled that.

*Q.* Does the I -- in your experience does the IT department at

Zuffa generally assist with the process of setting up or transitioning phones?

***A.*** I'm not -- I can't speak for everybody. I have no idea, to be honest with you.

*Q.* Is -- is there somebody at Zuffa who's primarily responsible for overseeing the mobile devices that employees or executives use?

***A.*** I'm not certain. I know the department has access to it. We've had -- that I'm aware of, we've had two people. I cannot remember the gentleman's name. I think the guy's name was Mr. Quinn. I forget his first name. He was the guy that I had remembered going back historically. And we had a gentleman named Davy and another gentleman named Ryan. But I have no clue the internal structure of how that whole operates with that department.

*Q.* Is that John Quinn?

***A.*** I have no idea, sir.

*Q.* Okay.

THE COURT: Do you oversee that department?

THE WITNESS: I do not, sir.

THE COURT: Who oversees that department?

THE WITNESS: That's a great question. It would -- my best guess would be Mr. Lawrence Epstein.

THE COURT: And, I'm sorry, what's his title?

THE WITNESS: He's the chief operating officer.

THE COURT: Okay. Thank you.

BY MR. DELL'ANGELO:

*Q.* And tell me about what, if any, instructions you gave to your assistant or IT when they were setting up your new phone, your most recent new iPhone on the 09 number?

***A.*** The only thing I can ever recall saying is, "Please, just make sure everything is there."

*Q.* Okay. And what do you mean by that?

***A.*** Meaning when I get my phone, I would prefer if when I get it I don't even know I'm on a new phone.

*Q.* Okay. And when -- when you did the transition of your last phone to your current iPhone, what happened to your old phone?

***A.*** I retained it.

*Q.* And so would you take it or you did, in fact, take it?

***A.*** I did take it.

*Q.* And what did you do with it?

***A.*** I stored it.

*Q.* Where did you store it?

***A.*** In a drawer with other phones.

*Q.* And where is that drawer?

***A.*** In the area behind the -- my office and Dana's office in that corridor.

*Q.* Is that the same drawer from which you think Mr. White's phone may possibly have been stolen that you testified about a little bit earlier?

***A.*** They're in a separate drawer.
*Q.* Okay.
***A.*** And there's a reason for that, but yeah.
*Q.* And is your -- is your old iPhone still in that drawer that you referenced?
***A.*** Yes.
*Q.* Okay. When's the last time that you saw it in there?
***A.*** I -- I can't recall exactly.
*Q.* Okay. Has anybody -- have you recently provided your old phone for imaging in this case?
***A.*** Actually, let me be correct. I remember I did see, for sure, one of the phones when I was looking for Mr. White's phone.
*Q.* Okay. And you say "one of the phones" --
***A.*** At least one, probably two. But, again, I'm careful because I'm not certain it's mine. It looks like my mine, and the cases that I have generally are different than everybody else's. So I -- I -- I tend to think I saw two phones.
*Q.* Can you describe those cases?
***A.*** Yeah. They're clear and they have, like, the corners on them. And my phones -- Dana's phones historically would have this, like, rubberized black case on the back of them. And mine don't have that case. Mine has a clear case. So that's how I would distinguish the difference between my phones and his, which was important because, again, we'd often be in the exact

same place at dinners or whatever, and it -- it was easier for me to separate what -- what was my device.

*Q.* Okay. And so when you say you recently saw that -- the phone in that drawer, how many phones were in the drawer?

***A.*** Again, I don't recall exactly. I want to say at least two that I thought were mine. And I don't know when it concerns some of these older iPhones. I just remember seeing some older iPhones in there.

*Q.* And are they still there today, to the best of knowledge?

***A.*** Absolutely, yes.

*Q.* And, I'm sorry, what's the last time you believe you saw them?

***A.*** Whenever we were asked to look for all the stuff.

*Q.* So within the last two or three months?

***A.*** Yes, sir.

*Q.* Okay. And did you then provide those phones to your counsel in connection with this litigation or they --

***A.*** No, they're just still there.

*Q.* They're just still there. Okay. And --

THE COURT: Excuse me, Mr. Dell'Angelo.

MR. DELL'ANGELO: Yeah.

THE COURT: So has it basically been the same cabinet that they've been in for the past seven or eight years?

THE WITNESS: I believe so. Again, I'm careful with it because I don't know if they've moved, you know, that area

around or they've changed drawers, or when we added storage we moved from one to another. I just know that when I had to go look for the phones, that's where I went. And I saw them in a drawer. And I believe that they were in the same drawer that I remember them being in for as long back as I can, sort of, remember. I do -- that's the answer to that question.

THE COURT: So as far as you know, there's no other place where the old phones are kept?

THE WITNESS: Again, there are two -- it's -- there are two -- the way it works is there's a hallway and there's cabinets on one side and cabinets on another. There are phones that are kept in another area, if they're in a box, because the box doesn't fit inside the drawer that you pull out.

THE COURT: Whose phones?

THE WITNESS: Some new phones that -- what we -- what we would do sometimes is buy phones in case we needed them. So we would have extras that were brand new. So if there was a brand new phone in a box, that would be in the cabinet to the right. If it was if an old phone that didn't have a box connected to it, it generally would go in the drawer on the left-hand side.

THE COURT: Okay. But there is this drawer that has your old phones and Mr. White's old phones? Or are they separate drawers?

THE WITNESS: Or some combination and I don't know what

other phones are in there. I don't want to be specific that it's just us because I -- I'm not certain.

THE COURT: Well, other people have access to the drawer.

THE WITNESS: There are a few other people that have access to the drawer. But, again, I know when we migrated office buildings, I don't know if other phones from our previous office and whoever had that stuff if anything would have ended up in there. I'm just not certain.

THE COURT: I'm sorry, when did you migrate?

THE WITNESS: 2000 -- I want to say 2017, 2018.

THE COURT: So within about a year or so after you joined the UFC.

THE WITNESS: Yes, sir.

THE COURT: And so, for example, if you were to go back to your office right now, there would be a drawer with your old phones in it.

THE WITNESS: With my two phones, yeah. At least two I think, yes.

THE COURT: And is that the same drawer that Mr. White's phone are in?

THE WITNESS: I don't know if they're Mr. White's or not. I would assume that some of those probably were Mr. White's at one point in time.

THE COURT: Well, you had asked him to keep his phones,

correct?

THE WITNESS: I did, yes.

THE COURT: So where do you understand that he kept them?

THE WITNESS: I understand that is where we think that they would be. But, again, not any that looked like from any modern era that I saw.

THE COURT: So you don't know where the modern phones are.

THE WITNESS: I do not.

THE COURT: So the phones that you see in the drawer, are they flip phones?

THE WITNESS: I can't recall, as I sit here today. It's possible that one could be in there.

THE COURT: So here's the other thing I want you to do. And, counsel, I want you to be involved with this. When you leave here today --

THE WITNESS: Yes, sir.

THE COURT: -- you're going to go with your counsel and you're going to take a picture of all the phones in these drawers. Mr. Williams, Mr. Chiu, you all want to coordinate that. I just want to figure out what this cabinet looks like, how many phones there are, where the phones are, right.

And, Mr. Campbell, if you could direct them to that, because I've heard -- excuse me -- I'm hearing about the drawers

and the phones. I want to get some sense of what that looks like, right. And then you all take pictures of that. Mr. Campbell, I want you to take pictures of that. Then I want you to sign an affidavit your lawyers will draft that says, "Here are the phones that are in the drawer" so that I have some sense of that.

And again, counsel, I'm assuming that there's no identifying information on there so there shouldn't really be an issue about confidentiality. Because I'm not asking him to identify which is his personal phone or not. But I'm trying to get a sense of this universe of phones. And while we're talking about it, I'd like to make sure that that's arranged.

So any reason why, Mr. Williams, Mr. Chiu, we can't do that?

MR. WILLIAMS: No, Your Honor.

THE COURT: Well, I know, Mr. Williams, you're going to be going to do that anyway. And that's what you had indicated.

MR. WILLIAMS: Right.

THE COURT: But that way so that I can, again, get a sense of when you're describing it, Mr. Williams, of what this is.

The other thing that I'm going to -- to ask you to do is work with Mr. Campbell. I want the phones secured, right. I want them -- and you can work with Mr. Campbell, and I want you to work with your counsel. I do not want them in a place where

anyone can access them except for Mr. Campbell, right -- again, Mr. Campbell or Mr. White, right.

And, Mr. Campbell, I'm going to ask you to arrange that because I don't want there to be any issues moving forward about a concern about a phone being stolen or moved now that we have this issue.

So, Mr. Williams, if you could arrange that with Mr. Campbell just to make sure that whatever's in the drawer is secured and then you can go through that process. And, again, I'm not particular about how that's secured. It can be in a lockbox or a safe. I don't know if you have that in the office. But it has to be something where only Mr. Campbell or Mr. White have access to that so we don't have any issues moving forward potentially of someone accessing it or stealing it for that matter so we can resolve that.

Any reason, again, Mr. Williams, why we can't do that?

MR. WILLIAMS: No reason that I'm aware of, Your Honor.

THE COURT: Okay. Mr. Campbell, any reason why we can't do that?

THE WITNESS: Not that I'm aware of.

THE COURT: Okay. All right. Thank you all. I appreciate your assistance.

MR. WILLIAMS: Your Honor, while I'm standing and there's a break in the action, I was just going to either ask a question or interpose an objection. We're spending a ton of

time talking about what Mr. Campbell has done with his 1109 number. And I'm not aware -- and the phones that were attached to that number. And I'm not aware of there being a gap related to that phone. So I'm not sure -- we're spending a ton of time on it, which, okay, but I'm not sure what -- what we're trying to get to here if there's no gaps with the 1109 phone.

THE COURT: I appreciate that. I actually think it may be, to a certain extent, helpful for me to understand the extent to which there are any gaps. But also to the extent, Mr. Campbell -- excuse me -- Mr. Williams, that you or Mr. Chiu or Mr. Yates or Mr. Isaacson are going to argue to me that if there's an issue about communication with Mr. White, there was a phone for Mr. Campbell that may have the communications. So I think it's worthwhile to make sure there are no issues to ensure that if there's an argument about there's another place to find these messages, we have no issue in the record regarding that.

And so that's why I'm allowing this testimony to go as long as it is because I'm anticipating that one of the arguments you're going to make, as it relates to communication between Mr. White and Mr. Campbell or other people at UFC, is it's not just Mr. White's phone that would have the messages.

MR. WILLIAMS: Very good, Your Honor. Understood.

THE COURT: Okay.

Mr. Dell'Angelo.

MR. DELL'ANGELO: Thank you, Your Honor.

THE COURT: But with that being said, Mr. Dell'Angelo, I think you spent a long time on this particular phone and so I think it may be time to move on.

MR. DELL'ANGELO: Thank you, Your Honor. And the good news is I only have a couple additional questions about the 09 phone, and I will wrap it up and move on.

THE COURT: Well, I really meant for us not to have any more questions about it, Mr. Dell'Angelo.

MR. DELL'ANGELO: Okay.

THE COURT: So let's move on.

MR. DELL'ANGELO: May I just ask, Your Honor, if there are any additional chat -- chat platforms or apps that Mr. Campbell uses on the 09 phone?

THE COURT: Sure.

MR. DELL'ANGELO: Okay. Thank you.

BY MR. DELL'ANGELO:

*Q.* Mr. Campbell, other than iMessenger and WhatsApp, are there any other apps with messaging or direct messaging capabilities such as Signal, Telegram, Instagram, et cetera, that you use on your 09 phone?

***A.*** Yeah, I have -- I do have a Signal on my phone. I think the only two people I've ever talked to on that phone are two people in the military. My brother's being one of them. He's been a Marine for 21 years, and that's how he chooses to communicate with me sometimes. And I do have an Instagram that Mr. Yee set

up for me so that when people send me a reel, I can click it and view it.

*Q.* Okay. And do you -- do you use Instagram to send messages or receive messages?

***A.*** I usually, like, if I'm looking at something to send, I copy and paste it and I generally send it in a text message.

*Q.* Okay.

***A.*** To the best of my knowledge. I think if you go in there, there's probably something that someone's, like, sent me or whatever, but I don't -- I can't recall if it's ever been work-related, put it that way.

*Q.* Okay.

***A.*** But if it's there, it's there. I've never touched it or done anything to it.

*Q.* Okay. Thank you. And --

***A.*** And I've never communicated with a fighter on Instagram ever because the one I have isn't even in my name. It's literally just so I can view content people send me.

*Q.* Do you have a -- you testified before that you have a personal cell phone, the 84 number, correct? Oh, sorry, it ends in 04, correct?

***A.*** I -- I do have a number that ends in 04, correct.

*Q.* Okay.

And is it your understanding that you have an obligation to preserve the data associated with your personal

phone that uses the 04 number in connection with this litigation?
***A.*** I'm not certain, but I have anyway.
*Q.* Okay. And what steps have you taken to preserve that data?
***A.*** I've always kept the devices.
*Q.* Okay.
***A.*** And I -- I still have the phone to this day.
*Q.* And does the -- the 04 number, is that associated with -- that's an iPhone as well?
***A.*** No, sir.
*Q.* What type of phone is it?
***A.*** I don't know. It's an Android phone of some kind. I think it's a Samsung, but I'm not sure. You know, I don't know any of the models or anything like that.
*Q.* Do you know if it's -- has any kind of cloud backup?
***A.*** I wouldn't have any idea whatsoever.
*Q.* Are you familiar with any of the device preservation settings for your 04 phone?
***A.*** Absolutely not.
*Q.* Okay.
And since you joined Zuffa, how many different phones have you had associated with your 04 phone?
***A.*** I think two.
*Q.* Okay. And what's the prior phone that you had?
***A.*** You mean what -- what type?

*Q.* Yes.
***A.*** It would have been a Samsung, but, again, I'm not sure.
*Q.* And do you have that phone?
***A.*** I do have that phone.
*Q.* Okay. And when did you transition between the two phones?
***A.*** I'm not certain.
*Q.* Okay. Is there some way that you could determine that?
***A.*** I -- I -- I assume I could try to figure out when the new phone was activated or whatever, but I'm not certain when exactly that date or timeframe was for that device.
*Q.* And what carrier do you use?
***A.*** Verizon.
*Q.* Have you always used --
***A.*** Actually, I'm not -- let me be careful. I'm not sure actually what carrier that's on.
*Q.* Okay.
***A.*** Because that phone number, to the best of my recollection, is actually still registered to my law firm -- my old law firm. And that's why I have that phone is because that was the phone I had used before I had come to the UFC.
*Q.* And did you use your 04 number during your work at the UFC -- I'm sorry. I -- yeah. I apologize. I think I've been saying 04, but it's 84, correct?
***A.*** Yes, sir.
*Q.* Okay. And can we --

(Court reporter clarification.)

BY MR. DELL'ANGELO:

*Q.* Can we agree for the purposes of your testimony today when I may have -- one of us may have say 04, we meant your 84 number?

***A.*** Absolutely.

*Q.* Thank you.

So going back to my question about the prior phone that you used on the 84 number, did you ever use that 84 number to conduct business on behalf of the UFC?

***A.*** I want to say for the first year or so I think I used that phone while I was transitioning from the law firm to the UFC.

*Q.* Okay.

***A.*** And, again, I'm not certain on the timeframe of transition, but I don't think it was very long.

*Q.* Let me show you what was introduced and entered as Exhibit 15 yesterday to these proceedings. This is a two-page e-mail from you, Hunter Campbell, to Audie Attar, copied to Tracy Long, dated February 22, 2019. Do you recognize this as a kind of e-mail header of the type that you'd sent at Zuffa?

***A.*** Yes.

*Q.* Okay.

MR. DELL'ANGELO: Could we -- could we go to the end of the -- this is the second page of the e-mail that shows your e-mail signature on this February 22, 2019, e-mail.

BY MR. DELL'ANGELO:

*Q.* And is that correct that it lists there as your mobile number the 84 number that we've been discussing?

***A.*** Yes, sir. That's correct.

*Q.* Okay. And so at least as of 2019 you were using your 84 number to conduct business on behalf of Zuffa?

***A.*** I don't believe that timeframe is accurate. That might have been an old -- frankly, an older signature block that had existed. I want to say by '19 I had actually transitioned to the new iPhone number.

THE COURT: But you don't have any reason to dispute that this is an accurate e-mail from that timeframe?

THE WITNESS: Zero. I'm sure it was accurate.

THE COURT: Okay. You're just saying you think around this time you might have started transitioning.

THE WITNESS: To be very honest, Judge, I want to say it was before 2019. But, again, I can't be certain.

THE COURT: Okay. That's fine. What's the date of this e-mail?

MR. DELL'ANGELO: February 2019, Your Honor.

THE COURT: Okay. Thank you.

THE WITNESS: And for context, I'm also not certain, but I think that IT or someone controlled these signature blocks. Like, they had to do it or Outlook or however that had happened. I probably, to be frank, just didn't even notice.

BY MR. DELL'ANGELO:

*Q.* Right.
***A.*** You know.
*Q.* Now, would you agree that given the fact that this 84 number was on your Zuffa e-mail signature, that if somebody received an e-mail from you and saw that on there, be reasonable for them to call or text you at that number?
***A.*** Yeah, that would be reasonable.
*Q.* And that would be about potentially UFC or Zuffa business?
***A.*** Yeah. Absolutely, it could be.
*Q.* All right.

MR. DELL'ANGELO: Your Honor, I'd like to mark as Exhibit 23 a document produced by the defendants in this case in discovery, Bates-stamped UFC 04746639. This is a text message between Mr. Campbell and Nate Diaz dated April 28, 2022.

MR. WILLIAMS: Can we get the tab number?

MR. DELL'ANGELO: Yes, it is Tab 27 in the binder of documents provided to you this morning.

MR. WILLIAMS: Thank you.

No objection.

THE COURT: Okay. This exhibit will be admitted.

(Plaintiffs' Exhibit 23 is admitted.)

MR. DELL'ANGELO: Thank you, Your Honor.

BY MR. DELL'ANGELO:
*Q.* Mr. Campbell, do you recognize this text message?
***A.*** I don't recall it, but it looks totally accurate and makes

total sense.

*Q.* Okay. And if you look at the date at the top, it says April 28, 2022?

***A.*** Yeah.

*Q.* Okay. And who's Nate Diaz?

***A.*** Nate Diaz was a fighter that fought for the UFC, former fighter.

*Q.* Okay. And if you look down to the first message in the thread there, do you see your name, Hunter Campbell?

***A.*** I do.

*Q.* Okay. And do you see your 84 number?

***A.*** I do.

*Q.* Okay. And so would you agree that at least as of April 28, 2022, you were conducting some UFC -- UFC business on your 84 number?

***A.*** Yes.

*Q.* Okay. Thank you.

As you sit here today, do you know -- well, let me withdraw that.

Do you -- you text with Mr. White. Is that correct?

***A.*** Yes, sir.

*Q.* And you do so on your 09 number?

***A.*** I do.

*Q.* How frequently do you text with Mr. White on your 09 number?

***A.*** I mean, multiple times -- if you ask me to average it,

multiple times a day.

*Q.* Okay. And so, say from 2018 to the present, how many times do you think you've texted with Mr. White?

***A.*** I have no idea. It would be considerable.

*Q.* Thousands?

***A.*** I -- I -- I couldn't even venture an estimation.

*Q.* Okay. And would you be able to determine that if you looked at -- you requested your communication logs from your cellular telephone carrier and counted them up?

***A.*** I'm sure if they could provide that information, then I'm sure that would be accurate, yeah.

*Q.* And do you text with Mr. White on your 84 number?

***A.*** Probably have, but I don't know when the last time I have is.

*Q.* Okay.

I'll represent to you that we obtained carrier data from AT&T, and they were able to provide it from the period October 1, 2017, through December 1, 2025. And it shows that --

THE COURT: For whom?

MR. DELL'ANGELO: Pardon? For Mr. White.

THE COURT: Okay.

BY MR. DELL'ANGELO:

*Q.* And what it shows is that between Mr. White's various numbers and your 09 number there were 1,077 text messages during that period. Does that sound right to you?

***A.*** Can you say the time period again?
*Q.* Yes, from October 1, 2017, to December 1, 2025.
***A.*** Yeah, sure. That sounds right.
*Q.* And I'll represent to you that your call logs for the 84 number were produced in this case, and it appears that there were 3,081 text messages between Mr. White's various numbers and your 84 number. Does that sound right to you?
***A.*** Over the same time period?
*Q.* Yes.
***A.*** Yeah, possible.
*Q.* And so it -- based on that, it would appear that you have three times as many text messages on your 84 number with Mr. White than you did on your 09 number, correct?
***A.*** Does that include group text messages?
*Q.* Yes.
***A.*** I don't know. It's possible.
*Q.* Okay.
And to be clear, your text messages on your 84 number haven't been collected in connection with this litigation, right?
***A.*** I wouldn't know. Actually, I don't know.
THE COURT: Did you ever turn over that phone to anyone within UFC or outside counsel to be imaged?
THE WITNESS: I don't know, Judge, to be honest with you. If they had asked me to, I would have. I don't know.

THE COURT: Okay.

THE WITNESS: And if they asked me today, I would do it as well. I have no -- there's no objection and I have the phone.

BY MR. DELL'ANGELO:

*Q.* Have you been asked?

***A.*** I don't -- I'm not aware. And, again, I'm just telling you I'm not aware because I don't know what happened in that earlier time period.

*Q.* You testified earlier that Mr. Maynard had some reservations about turning over his phone?

***A.*** Yes. Mr. Maynard has consistent reservations about turning over his phone.

*Q.* And what are those reservations?

***A.*** Mick Maynard is a gentleman who lives in Houston, Texas, and thinks everything is a violation of his First Amendment freedoms and privacy.

*Q.* Right. Can you tell us what his reservations were with respect to turning over his personal phone in connection with this litigation?

***A.*** Sorry, sir. I'm sorry, ma'am.

He just doesn't -- he believes that it's an invasion of his privacy.

*Q.* And did you express to him whether or not he was required to turn over his personal phone in connection with this litigation?

***A.*** I'm not certain, but I believe I was probably very expressive to him that he needed to do so.

*Q.* Okay.

MR. DELL'ANGELO: Your Honor, I would move to admit as Exhibit 24 a text chain produced by the defendants in this litigation, stamped UFC 04754866 dated June 12th, 2025.

MR. WILLIAMS: Tab number, please.

MR. DELL'ANGELO: 29.

MR. WILLIAMS: Thank you.

THE COURT: And it's from whom to whom?

MR. DELL'ANGELO: It appears to be a text conversation between Mr. Campbell, Mr. Dana White, Mr. Sean Shelby, and Mick Maynard.

THE COURT: Okay.

MR. WILLIAMS: No objection, Your Honor.

THE COURT: Okay. Exhibit 24 will be admitted.

(Plaintiffs' Exhibit 24 is admitted.)

MR. DELL'ANGELO: Thank you, Your Honor.

BY MR. DELL'ANGELO:

*Q.* Mr. Campbell, would you take a moment to just look at the header of that text message that has been admitted as Exhibit 24. And let me know when you're done.

***A.*** Yep.

*Q.* Okay. And based on this, would you agree that it's a text message chain that includes you, Mr. White, Mr. Maynard, and

Mr. Shelby?

***A.*** Yes, sir.

*Q.* Is this an example of the matchmaker text thread that you testified about earlier today?

***A.*** It could be. The only thing I'm uncertain of is the -- the Gmail thing. I don't even know what the hell that is.

*Q.* The danfrewhi@gmail.com?

***A.*** I have never seen that ever in my life.

(Court reporter clarification.)

BY MR. DELL'ANGELO:

*Q.* The -- the Gmail that you said you were uncertain about, I just want to be clear, is that the danfrewhi@gmail.com?

***A.*** I literally just -- I just have no idea what that is.

*Q.* Okay. I -- I'd like to direct your attention to the page Bates-stamped UFC 04754876. And let's see.

***A.*** Can you go back a little bit for context?

*Q.* Yes.

***A.*** Thank you.

*Q.* Would you like to -- to move through page by page?

***A.*** I'm just trying to understand the context of it.

*Q.* Sure.

THE COURT: How many pages is this exhibit?

MR. DELL'ANGELO: It's quite a few, Your Honor.

2, 4, 6, 8, 10, 12, 14, 16, it's about 18 pages, Your Honor.

THE WITNESS: Why don't we do this, just walk me through it, and if I need more context when you get to your question, I'll let you know.

BY MR. DELL'ANGELO:

*Q.* Sure. Thank you.

There's a text message on the top half of the page stamped 4876. The second one down there, do you see that -- your name with your 09 number?

***A.*** I do.

*Q.* Okay. And, again, on this June 12, 2025, e-mail or text message chain you say, "They're coming to do mine and Dana's the week after Azerbaijan."

Do you know what that refers to?

***A.*** I can assume what it refers to, but I'm not certain.

THE COURT: We don't want you to assume. If you don't know --

THE WITNESS: I don't know as I sit here what it refers to definitively.

BY MR. DELL'ANGELO:

*Q.* Okay. I'll represent to you, and I can have you read through this chain --

THE COURT: Well, why don't -- let's not represent its relation to the chain. If you want to point to him --

MR. DELL'ANGELO: Sure.

THE COURT: -- certain aspects, let him take a look at

it. And then I can also take a look at it so I also understand.

THE WITNESS: I'm just being careful where it says, "Tell him to call me."

I don't know who I would say "tell him to call me" to.

BY MR. DELL'ANGELO:

*Q.* Yeah. Let's get you to the right spot, Mr. Campbell.

THE COURT: Take your time.

BY MR. DELL'ANGELO:

*Q.* So let's -- let me show you the page that ends at 868.

MR. DELL'ANGELO: If we can make that a little larger.

THE WITNESS: I can see it.

BY MR. DELL'ANGELO:

*Q.* Okay. And you see at the bottom there there's the word "Consilio"?

***A.*** I do.

*Q.* Do you see that?

Okay. And take -- take a look at this and see if it helps orient you to the subject matter of this exhibit.

***A.*** It appears they're trying to collect Mr. Maynard's phone.

*Q.* Right. And did you have a discussion by text with Mr. Maynard about the collection of his personal phone?

***A.*** I'm going to review it. I don't recall it in detail, as I sit here with you today.

*Q.* Okay. All right.

Let's go to the next page, the top. Do you recall

Mr. Maynard asking you if he needed to turn over his personal phone?
***A.*** Where I say, "Yes. You need to do it" --
*Q.* Yes.
***A.*** -- "we all do"?
*Q.* And was that you indicating to Mr. Maynard that he needed to turn over his personal phone for collection?
***A.*** Again, I don't recall this, but, yes, this sounds very consistent with what I would have said to him.
*Q.* Okay.
***A.*** And then he says, "Commies." That's -- this is -- this seems very accurate to me.
*Q.* Okay. And it's kind of consistent with your recollection of your discussions with Mr. Maynard about turning over his personal phone for collection?
***A.*** Yes, sir, it is.
*Q.* Okay.
***A.*** Again, the fight business is a little bit different than everything else.
*Q.* Understood.
And do you recall if after June 12, 2025, anybody collected your phone and Mr. White's phone?
***A.*** I believe there was a text that said they were going to and I assume -- again, when I mentioned earlier in that timeframe, I believe, in the last year for sure they've collected the phones.

*Q.* Okay.

THE COURT: Excuse me, Mr. Dell'Angelo.

THE WITNESS: Yes, sir.

THE COURT: So it looks like, Mr. Campbell, in this text chain that you might have had, as you indicated previously, direct contact with the vendor in terms of collecting the phones. And I haven't read through all of this, but it looks as if Consilio either came to your office or you delivered phones directly to them.

Is that accurate that at times you would directly give the phone to Consilio or they would come to the office and do the -- the imaging of the phone?

THE WITNESS: So two parts. To the first part, I don't recall ever having a conversation or meeting with Consilio and I don't believe the Consilio e-mail was directed at me. I think that was directed at Mr. Maynard. But I absolutely would have told him if he said that they were trying to collect his devices that he needed to comply.

THE COURT: And the second part of that, do you recall Consilio or any other vendor coming to UFC office to image the phones at the office?

THE WITNESS: I do recall that there was a company. Again, I'm not sure if it was Consilio, or I -- I don't even know what Consilio is, to be honest with you, sir. But I do believe there was a collection company that came to get all the

data.

THE COURT: All right. Perfect. Thank you.

COURTROOM ADMINISTRATOR: Counsel, was that exchange within 24 or did you move on?

MR. DELL'ANGELO: No, it's all within.

COURTROOM ADMINISTRATOR: Thank you.

MR. DELL'ANGELO: Yeah, it's a very long text chain.

BY MR. DELL'ANGELO:

*Q.* Mr. Campbell, I'd like to direct your attention to the portion of the text exchange in Exhibit 24 at Page 877.

***A.*** Okay.

*Q.* Okay.

You'll see at the bottom there there's a text from Mr. Maynard that says: "Are you saying that if I had a company phone this whole time then my personal phone is off limits?"

Do you see that?

***A.*** Yes.

*Q.* And then what do you respond?

***A.*** "Yes."

*Q.* Okay. And is it your belief that if Mr. Maynard had a personal phone separate and apart from his business phone, he would not be required to provide his personal phone for collection in connection with this litigation?

***A.*** Yes, provided that it was used solely for personal purposes.

*Q.* Okay. And so let's -- let's go back to your phone, the ones

that end in 84.

***A.*** Sure.

*Q.* Is that used solely for personal? Business?

***A.*** No, sir. It was not used solely for -- it was not used solely for business or solely for personal. It was a phone that I had when I was with my law firm that I believe the number I had had since I was a teenager.

*Q.* Okay.

***A.*** And while I was acting as an attorney, it was the phone that I had conversations with clients on. And when I transitioned, obviously, I had clients that I still had and cases that were still ongoing at the time. That was the method that they needed to contact me.

*Q.* Okay.

***A.*** I didn't have an intention when I came over -- I didn't really know what I was getting fully into when I came over, to be frank. And now that -- you know, once in transition I realized what it was and I realized I was probably going to stay. I didn't know how long I was going to come over for initially, to be honest again.

*Q.* Okay. So -- so you'd agree then, because you've now seen that even into 2022 your 84 number has some Zuffa-related communications like your text message with Nate Diaz, that that phone was subject to preservation and collection in this case, right?

***A.*** Yeah. I -- well, I believe that there was business texts communicated on there, likely that were -- like with Nate Diaz, I probably used that phone initially to talk to him when I came to the company.

*Q.* Right.

***A.*** So the number that he had in his phone was probably the earlier phone.

*Q.* Right. So -- so you're saying then that you may have texts with Mr. Diaz on your 84 phone that span from as early as 2017 when you started with the UFC all the way to at least 2022 in the exhibit that we showed you a bit earlier, 23. Is that right?

***A.*** Yeah, it's absolutely possible.

*Q.* And it's possible that they continue after 2022, correct?

***A.*** It's possible.

*Q.* Okay.

And UFC held an event in Azerbaijan in 2025, right?

***A.*** That's correct.

*Q.* And that was in -- that was on June 25th, 2025, correct?

***A.*** I'm not certain of the date, but it sounds accurate.

*Q.* Okay. And your own iPhone was collected after the Azerbaijan event?

***A.*** It seems to indicate that's when it was supposed to be. I'm not certain on the timeframes.

*Q.* Okay. And I'd like -- we'll wrap this up in a moment. I'd

like to just go to the last page of this text -- or I'm sorry -- 878.

MR. DELL'ANGELO: 878.

BY MR. DELL'ANGELO:

*Q.* This continues on the chain that we saw a bit earlier when you had indicated that they were coming to get your phone. And after Azerbaijan -- and I'm sorry -- that said, "They're coming to do mine and Dana's the week after Azerbaijan."

And you see here the text at 22:29:01. That's from Mr. White from his 0682 number, correct?

***A.*** Yes.

*Q.* And that says: "They're taking my phone too and they can suck a big fat" expletive.

Do you see that?

***A.*** Very consistent, yes.

*Q.* Does that indicate to you that Mr. White understood that some time after June 12th, 2025, one of his phones was also being collected?

***A.*** It indicates to me that he was getting his phone collected and he was going to comply as well.

*Q.* Okay. And do you know if he did?

***A.*** I believe he did.

*Q.* Okay. And what's your belief based on?

***A.*** I assume that when they were collecting my phone and they were going to collect his, they would have, because he has never

ever said to me no when I told him I need his phone.

*Q.* And you said you assume. I just want to be clear, do you know?

***A.*** Because you're asking me specific dates and, again, as I've stated, I'm not certain on the dates.

*Q.* Okay. So it's just -- that is, you don't know, but it's possible?

***A.*** Correct.

*Q.* Okay.

MR. DELL'ANGELO: I have no further questions at this time, Your Honor.

THE COURT: Thank you, Mr. Dell'Angelo.

Mr. Williams.

CROSS-EXAMINATION OF HUNTER CAMPBELL

BY MR. WILLIAMS:

*Q.* Good afternoon, Mr. Campbell.

***A.*** Hello, sir.

*Q.* We've heard you testify and others testify that you joined the UFC in early 2018, correct?

***A.*** I believe it was early '17, late '16, but yes.

*Q.* Oh, excuse me. You're right. Early 2017.

Do you know when the Cung Le litigation was filed?

***A.*** I don't, sir.

*Q.* Do you have any reason to dispute that it was filed in December of 2014?

***A.*** No, I have no reason to dispute it.
*Q.* You testified earlier pursuant to the judge's questioning that you didn't recall receiving or being involved in the drafting of any litigation holds or preservation notices regarding the Cung Le lawsuit, right?
***A.*** I believe that's -- that's correct.
*Q.* Is one possible explanation that you did not -- for that is that you did not join the company until after the *Le* litigation had been pending for three years?
***A.*** That is absolutely possible.
*Q.* At the time you joined the company in 2017, did Zuffa have a parent company?
***A.*** Yes, they did.
*Q.* Who was that parent company?
***A.*** Don't know the technical entity, if it was WME-IMG and/or Endeavor Group, but it was a parent company. And I believe Silver Lake Partners was also involved.
*Q.* Did that parent company have a legal department?
***A.*** Yes, they both did.
*Q.* And did that legal department handle matters for the UFC?
***A.*** Yes, they did.
THE COURT: Excuse me, Mr. Williams.
Were the legal departments for those entities involved in the collection of phone data, as far as you know?
THE WITNESS: I'm going to -- I don't know

definitively.

THE COURT: Do you recall having a specific interaction with the parent companies in which you provided them phones?

THE WITNESS: What I recall, Judge, is that when I had come over, the transition and sale had already occurred. And there was a legal department that existed primarily within the WME-IMG Endeavor Group.

THE COURT: Right, but you've talked in your testimony about providing phones to counsel.

THE WITNESS: Right.

THE COURT: And when you're referencing that, are you saying that you also provided phones to counsel for these parent companies for the UFC?

THE WITNESS: I don't want to be specific because, as I sit here, I don't recall. But they were actively involved before I came over to the company.

THE COURT: That's not what I'm asking you. Did you, yourself, personally, ever give a phone for yourself or Mr. White to legal counsel for any of the parent companies?

THE WITNESS: I don't recall, sir.

THE COURT: You don't recall doing that?

THE WITNESS: I don't recall if I gave a phone to someone that was connected to the parent companies because I think at one collection Isabelle Mercier may have been involved and she would have been an attorney with the parent company.

THE COURT: Okay.

THE WITNESS: Right. I'm just being very careful because I don't want to misstate anything. But, again, I'm also trying to navigate specific timeframes that Mr. Williams's talking to me about, and I feel like our conversations were general.

THE COURT: Well, I just -- I'm trying to understand because Mr. Williams is referencing now a counsel for this parent company.

THE WITNESS: That's correct.

THE COURT: And earlier you had talked about "counsel" when discussing turning the phones over. And I'm trying to understand whether that's counsel for the UFC that has in-house lawyers, whether that's outside counsel -- you've referenced, for example, Mr. Williams -- or whether or not that was a whole other set of counsel connected with the parent entities.

THE WITNESS: There were so many lawyers involved, Judge, I believe it was a combination of all of them: outside counsel, in-house counsel, parent company, et cetera.

THE COURT: So you're saying you can't be certain, as you sit here today, which lawyer you dealt with at which time with which phone.

THE WITNESS: That's correct.

THE COURT: All right. Okay.

BY MR. WILLIAMS:

*Q.* And let me pick up on the Judge's questioning. Mr. Campbell, in your private practice were you a litigator?

***A.*** No.

*Q.* Okay. When you went to the UFC, did -- were you responsible for litigation matters?

***A.*** No.

*Q.* Did you rely on WME-IMG's legal department to help you with litigation matters?

***A.*** Yes, I did.

*Q.* Can you tell the Judge some of the individuals that were a part of that legal department who you interacted with?

***A.*** I believe the head of legal was a gentlemen named Seth Krause. I don't know his current title, but he was the head of legal, as far as I was concerned, within the WME-IMG group. Riche McKnight was, I believe, responsible in the litigation side working directly with Mr. Krause. And at some point in time there was a woman named Isabelle Mercier who got involved. I confuse, frankly, the dates of her involvement and the dates of Ms. Grigsby and how that whole interplay happened, but I was not involved at all with the litigation when I came over to the company.

*Q.* Thank you.

Let's fast-forward to the Johnson litigation. When did you become chief business officer at the UFC?

***A.*** I'm not certain, but I believe sometime '18, '19.

*Q.* Do you know when the Johnson litigation was filed?
***A.*** I have no idea.
*Q.* Do you have any reason to dispute that it was filed in June of 2021?
***A.*** I don't.
*Q.* Would you have been responsible for sending litigation holds or preservation notices in your capacity as chief business officer?
***A.*** No.
*Q.* Who would have had that responsibility?
***A.*** Someone in legal, outside counsel, or the parent company. Riche -- Riche's team or Seth's team or whoever they have hired. There's so many law firms, Mr. Williams, I literally couldn't even tell you how many law firms have been involved since I've been at that company.
*Q.* Well, I think there's a few in the courtroom here today, Mr. Campbell, so I understand.
***A.*** Absolutely.
*Q.* You were asked a couple of questions with respect to the runner that may have taken Mr. White's cell phone. Do you recall that questioning?
***A.*** I do.
*Q.* And I believe you testified -- I wanted to clarify something. I believe the Judge asked you the question whether you were aware of whether the runner had taken any other phones

from that secured floor or the area where the cabinets were. Do you recall that questioning?

***A.*** Yeah, I recall the context of it.

*Q.* Okay. And do you recall you answered the Judge's question, you said, no, you weren't aware that the runner had taken any other phones from that area?

***A.*** From that area, correct.

*Q.* That's what I wanted to get at. Did you come to learn as part of this investigation that the runner had taken phones from others at the UFC?

***A.*** I did.

*Q.* Please tell the Judge what you know about that.

***A.*** When we started trying to figure out where the phone -- the missing Dana White phone had been and we started trying to figure out what was possible, I had discussed this issue with a gentleman named Ron Williams who, I believe, was head of our facilities, as well as a gentleman named Ryan Palmer who, from what I understand, had ordered phones in the past.

And I had two stories. One was when they went -- after he was essentially, from what I understand, terminated or in the process of termination, when they went to his area they found an unopened cell phone that wasn't his. And then they also had asked him to return his cell phone before he was formally terminated. And when he returned the phone, they realized the phone he returned had been reported stolen because it was

actually intended for a sponsorship executive. And he claimed that it was undelivered. And he returned, essentially, the wrong cell phone which we believe had been stolen, except it turned out he stole it and then didn't return the phone that was actually assigned to him. So at least with the phones, those two instances.

*Q.* Thank you.

Let's talk a little bit about WhatsApp. I believe you testified that you are unfamiliar with the WhatsApp settings that allowed someone to have messages disappear. Do you recall that testimony?

***A.*** I have no clue about any WhatsApp settings, Mr. Williams.

*Q.* Fair enough. But do you have any reason to believe that your WhatsApp settings were set to anything other than the default settings?

***A.*** No.

*Q.* Okay. If Mr. Yee -- do you know who Eric Yee is?

***A.*** I do know who Eric Yee is.

*Q.* If Mr. Yee was here this morning and had testified that the default settings for WhatsApp are set to preserve messages, do you have any reason to dispute that?

***A.*** No.

*Q.* Okay.

Got one more question for you, Mr. Campbell. We've heard a lot today about what Mr. White doesn't do at the UFC.

Can you tell the Court the types of things that Mr. White does do today at the UFC?
***A.*** Yeah. The UFC is a global business. And what Mr. White is really focused on and has been focused on since I have been there has been what I would say are growth and strategy. And when I say things like "growth," I mean things like the Noche event that we did at the Sphere, the White House event that's coming up, the expansion and the relationships that we formed with countries around the world like Azerbaijan, parts of China, to grow the sport. I mean, his whole focus is, before he's dead our -- his goal to me has always been, I want this to be the biggest sport in the world. And that is primarily his focus on that end.
He is also completely and totally obsessed with production and how the product looks and feels from a television perspective and the amount of hours he spends with the production team and the lighting grids and trailers and cameras. It's the part that I -- I think the public doesn't see and no one talks about, but those are really his obsessions today far more than the actual -- you know, I think his words were running the fight business.
I run the fight business and he runs the entire company.
*Q.* Understood.
Now, Mr. Dell'Angelo had asked you a few questions,

excuse me, about Mr. White's ability to sign fighters that did not have a UFC contract. And I believe your testimony was that he did that primarily through three reality television programs. Is that right?

***A.*** Yeah, I would say 90 percent plus.

*Q.* Do those television programs have anything to do with talent identification and talent development?

***A.*** Yes.

*Q.* Is that something that Mr. White is focused on?

***A.*** Obsessively.

*Q.* Please tell the Court a little bit about that.

***A.*** Dana's mentality as it concerns that element has always been if we can identify the -- at the stage when these guys come through these platforms, the next generation of talent, it's how you sustain and grow the company moving forward. So when you think about something like the Contender Series program, I'm -- I'm going to average, you know, I'll guesstimate the number, but maybe 40 percent now of the roster has maybe come off of the Dana White's Contender Series program.

So his focus is, speaking frankly, I trust Hunter and the guys to run this thing, but I want to be a part of the early identification of people that I think that are going to represent the sport as athletes in the future. And he cares very, very deeply about that.

MR. WILLIAMS: I don't have any questions, Your Honor.

THE COURT: Thank you. I did have a few follow-up questions to that --

THE WITNESS: Yes, sir.

THE COURT: -- as relates to talent.

EXAMINATION BY THE COURT OF HUNTER CAMPBELL

BY THE COURT:

*Q.* Have you had conversations with Mr. White about competition for signing new fighters?

***A.*** About competition for signing new fighters?

*Q.* Right. There are other promoters who can sign fighters, correct?

***A.*** Yeah, there were many other promoters. And, frankly, Judge, it's not just MMA promoters. What I deal with today are boxing events on Netflix, the gimmick fights with, like, the Paul brothers, there's now freestyle wrestling programs that exist.

*Q.* Right. But my question for you is, in terms of your conversation with Mr. White about growth and strategy, have you had conversations about competitors for the same talent that the UFC is trying to sign?

***A.*** I'm sure I have in specific contextual scenarios that I felt it was relevant.

*Q.* I meant specific competitors. Obviously, there are other competitors --

***A.*** Yeah.

*Q.* -- for signing fighters in the MMA market.

***A.*** Sure.

*Q.* Have you had conversations with Mr. White in person or over texts regarding specific other competitors as it relates to signing fighters?

***A.*** Yes.

*Q.* Okay. And it sounds like what you're saying is that that may occur at a higher level, right, in terms of strategy, but not necessarily regarding a specific fighter.

***A.*** No, I actually think it would have been in the context of an actual specific fighter. Like, as you're asking me the question, the one that jumps to mind is there was a Polish fighter that I believe was coming out of an organization named KSW in Poland, which is very successful in that region. And I had met with him twice to try to get him to come to the UFC. And I had found out via the internet that he ultimately had decided not to sign with us. And -- and the efforts, and there were multiple on my part, to try to get him to come to us. He decided not to do so.

And I remember I had said to Mr. White, "I have to change a main card," because I had every belief that he was going to actually end up with us and he chose not to come here.

*Q.* Okay. So in the course of your conversations with him about overall strategy, you do have some conversations about signing talent and sometimes talent signing with competitors to the UFC?

***A.*** Yes, that would be a specific example of how that would

occur, though.

*Q.* Okay.

Because I'm trying to get a sense of when you talked about growth and overall strategy --

***A.*** Yes.

*Q.* -- that would certainly involve also moving into new international markets. Is that -- is that correct?

***A.*** Absolutely.

*Q.* So you've had conversations with Mr. White about moving into international markets.

***A.*** Yeah, we would have conversations about markets that we believe have incredible growth potential for talent in the future.

*Q.* Right. And as part of those conversations, it would also be important to make sure that your home market, in terms of your growth and profitability here, was strong as well, right?

***A.*** Everywhere, but I don't -- I don't draw any distinction between I think that the global market is different than the U.S. market. I -- I think that the reason the UFC is in the position it is today is because we've actually never focused just entirely on one market. We viewed this as a global -- a global marketplace where martial arts exists in every country in the world, and if we do this the right way and we do it successfully, we might actually be able to become one of the biggest sports in the world or the biggest one.

*Q.* Well, but also the UFC itself would become a major player in the market because in your view of -- well, let me -- let me rephrase that.

Obviously, one of the goals is also for the UFC to be a major player in this market, too, right, overall market?

***A.*** When you say "market," I just want to understand what you mean by market.

*Q.* There is a market for MMA fighting. And then there's also boxing and other sports. And I'm trying to get a sense of the types of strategy or conversations you have about strategy as relates to growth in the MMA market here and abroad that you've had with Mr. White.

***A.*** Extensive, because it's what we do. But I would also say, a perfect example, there's a fighter named Rico Verhoeven who might be the greatest kickboxer alive today. I tried to sign him to compete on our event in January. He has chosen not to sign and go box. So I would say that when you talk about -- and I'm just telling you, this is what I deal with and experience every single day.

*Q.* Sure.

***A.*** He -- this is a guy that's probably going to seek to make excess of a million dollars. And he is a guy who has said, "I want maybe explore the UFC, but I actually view there being better options for me to go potentially box on Netflix or box in Saudi Arabia or do other things."

And I've had similar situations where I've had fighters on my roster actually come to me and say, "You know what, Hunter, I know I just fought for a world title, but I actually maybe want to go do a boxing event in something called Misfits Boxing," which is sort of a hybrid, gimmick, social media-type event. In today's world, you can't really distinguish between the two in the way that I -- I think -- and I'm not saying how you view anything or how you -- how you see it. I'm telling you that what I deal with every day are -- is all of that coming together in a really significant and impactful way.

*Q.* Okay. That's helpful.

The other question I had related to Ms. Long. And I'm not sure if you were here for Ms. Long's --

***A.*** I wasn't, sir.

*Q.* Oh. She talked about fighter contracts and, sort of, hard copies and digital copies of the contracts. And we've had some conversations in this case about that. Since you're involved with the contracts, I want to make sure I'm understanding, from your perspective, where the copies of those contracts are saved.

Now, is there at the UFC digitally a fighter file for each fighter which would contain all of the fight contracts that they have signed?

***A.*** I have never personally seen what the digital storage files for that look like. It would be my understanding that when a fighter executes a promotional agreement or a bout agreement

through us that she would, I assume, save a copy of it in some version of a fighter file.

When it concerns hard copies, I know that I execute -- so if you go on my desk every day, there might be 10, 15, 20 documents that exist there with fighters that we're either -- you know, they're asking me to take a look at for release or signing onto The Ultimate Fighter or whatever it may be.

I don't know if hard copies of all of those exist once I sign them or they get scanned digitally and put in the file. But I do know on occasion I will tell Ms. Long -- say there is a text message or some exchange that has happened or, you know, I saw -- or I viewed that Tony Ferguson e-mail earlier. Sometimes there's situations where I think it's worth documenting and noting and detailing circumstances surrounding an individual fighter or an individual bout that provides context as to how you may end up in an interesting position with certain people.

*Q.* So in the context, for example, of fighter negotiations --

***A.*** Yes, sir.

*Q.* -- and say there's a draft of a contract that you would send out --

***A.*** Yes.

*Q.* -- and the fighter and their manager send it back with markings and say, "I don't like this" or "I don't like that" --

***A.*** Yeah.

*Q.* -- what happens to the draft? Is that saved in the

fighter's file or is it kept somewhere?

***A.*** I wouldn't know. That actually happened this week for my Australia event. I had done a new promotional agreement with our champion, Alexander Volkanovski. And his representatives and attorneys in Australia actually made red-line changes to the draft that I think were country-specific, for example. And I had reviewed them while, I think, I was traveling. And I don't know if they're technically printed or saved in a file, or if the executed copy just gets saved in the fighter file. But, I mean, literally just this week that's a perfect example of how that happens.

*Q.* And, typically, if you were to receive a marked-up --

***A.*** Yeah.

*Q.* -- draft of a contract --

***A.*** Yes.

*Q.* -- would you receive that by e-mail or by text or by WhatsApp?

***A.*** It could be by -- it would generally probably be sent in via e-mail or it would be sent in via text to me.

*Q.* As an attachment?

***A.*** An attachment or specific, "Hunter, with respect to provision whatever" --

*Q.* Right.

***A.*** -- "this is what we want to look at." I have a lot of issues -- and I would say this happens multiple times a month.

I have so many issues every month with what they call the LOAs. And, largely, it's because you have a lot of fighters today, particularly Diego Lopez is a fighter who just fought again in Australia for the world title. He lives in a part of Mexico a majority of the time -- he's from a part of Brazil where violence is a very real and serious concern for these guys. And when people in their neighborhood and their family members and their communities are like, "He just made X number of seven figures," everybody who all of a sudden is your new best friend stops [sic] popping out of the woodwork, and Mom has a new friend over at the house that wants to talk to you about a business deal. And there's all these implications that go into that. So I'm constantly in the process of working through LOA agreements with most of the higher -- I would say higher-tiered athletes.

*Q.* When you say "LOA," what does LOA stand for, just so we're clear?

***A.*** I want to say it stands for letter of agreement.

*Q.* Okay. And what is it, in essence?

***A.*** It's a version of the -- it's -- I don't want to speak in a legal sense where I'm being held accountable. I'll tell you my perception of what an LOA is.

*Q.* That's all I'm asking for.

***A.*** An LOA is a document that exists along with the bout agreement and the promotional agreement that, particularly for

fighters at an elevated tier, outline sort of responsibilities, obligations, et cetera, et cetera, where their compensation is broken down in a different format.

*Q.* So as far as you understand, as it relates to all of these agreements, who is responsible for keeping the digital or hard copy for the finalized agreements?

***A.*** Everything runs through Mrs. Long's department. And then within that department -- and Mrs. Long falls under -- she's on my team. And then within her department, the people that report directly for her are a handful of people that I think help coordinate and organize, sort of, the paperwork process, however it may be. But I couldn't definitively tell you in detail how any of it's actually stored or done.

*Q.* Okay.

Another question that relates to the same issue in terms of records is related to fighter compensation data by bout. My understanding is that the UFC keeps track of certain data regarding bouts in terms of how much each fighter might be paid and what might be the overall, sort of, gate or term you would use for that. Who is in charge of keeping and maintaining that data?

***A.*** So there were -- there were a couple things you had mentioned in there.

*Q.* Uh-huh.

***A.*** For fighter contractual data, in terms of if you're asking

me compensation --

*Q.* Yeah.

***A.*** -- that would be a combination. I work with -- I'm going to speak generally -- our finance team, and there's some individuals on the finance team that I work with directly. On a level that's material, I --

*Q.* I'm saying who would know, for example, for this fight this fighter X has made this amount of money across these different bouts in their career and work with the UFC?

***A.*** I would know what they were making for their individual contracts and for the upcoming bouts. If you ask me for a career total compensation amount, I wouldn't know that generally off the top of my head. I would call a gentleman named Mark Cowan, and I believe he would work with our -- I'm going to combine them because I'm not certain how this is categorized in terms of an organizational chart -- with someone in our financial department who would likely be able to pull that compensation data.

*Q.* So they'd be able -- they'd pull the specific data that would be kept?

***A.*** Yeah. And it would be -- for example, it would likely be with respect to an individual, I would say, "Can you let me know where this person is at in their career?"

*Q.* Okay. All right. That's helpful.

***A.*** Yes, sir.

THE COURT: Thank you, Mr. Campbell.

THE WITNESS: Yes, sir.

THE COURT: Anything else?

MR. WILLIAMS: Nothing from me, Judge.

THE COURT: Mr. Dell'Angelo?

MR. DELL'ANGELO: No further questions, Your Honor.

THE COURT: So, Mr. Campbell, thank you for your time. I did give you some homework.

THE WITNESS: Yes, sir.

THE COURT: So you and Mr. Williams aren't quite done, obviously. And I don't know, Mr. Williams, if your out-of-state colleagues are going to be assisting you with that, but they can. But just so we're clear, Mr. Campbell and Mr. Williams, right, what I would like is for Mr. Campbell to direct you all to where that drawer is for pictures to be taken of that. They don't have to be taken by Mr. Campbell. I'm not sure how technically savvy they are.

THE WITNESS: I am not technologically savvy --

MR. WILLIAMS: Maybe we can get Mr. Elliott to take the photos.

THE COURT: Right.

THE WITNESS: Mr. Elliott is the perfect gentleman to take a picture.

THE COURT: Mr. Elliott or Mr. Yee, right. But what I do want you to do, Mr. Campbell, in conjunction with your

lawyers is to sign an affidavit that says, "This is actually the cabinet."

THE WITNESS: Yep.

THE COURT: "These photos are an accurate representation of the cabinet, and the phones that are in there are the phones that I was describing in my testimony." That way, I can match up the phones with what you've described today.

THE WITNESS: Absolutely.

THE COURT: If for some reason there's some other information that you find out about in the course of this, you can speak with Mr. Williams, or Mr. Chiu if he's going to be involved with that. And, Mr. Williams, Mr. Chiu, you can then help me understand what's different. But, again, I'm trying to get a handle on the phones, Mr. Williams, that you, and perhaps Mr. Chiu, are going to be looking at to go back and extract. Because as you know, I'm going to want the information about which phone is which.

And to the extent, Mr. Campbell, you can assist them in identifying, for example, which phones are yours versus other people's phones, that would be helpful.

THE WITNESS: Absolutely.

THE COURT: The other thing, Mr. Campbell, I'm going to ask you to do in conjunction with your counsel is to figure out if there's any record anywhere of the passwords or passcodes to open the particular phones.

THE WITNESS: Okay.

THE COURT: Right. I know, as you sit here today, you may not know them. I'm not asking you to do that, and I wouldn't ask you to give it in public anyway. But, for example, you may have written it down someplace or you may have had conversations with individuals.

THE WITNESS: Yeah.

THE COURT: I'm going to ask you to look for that information in conjunction with your lawyers so that, Mr. Williams, that also can be provided. Now, that does not need to be provided --

MR. WILLIAMS: Publicly.

THE COURT: -- publicly or even in the affidavit other than to confirm whether or not Mr. Campbell's been able to find the passwords. That can be -- the communication of the passwords themselves can be done separately, and we can talk about the process for that, but obviously I'm concerned about the phones being able to be accessed. All right?

Mr. Campbell, any questions about that -- that bit of homework that I'm asking to you do?

THE WITNESS: No, sir.

THE COURT: I'm sorry, Mr. Campbell. You can step down.

THE WITNESS: Thank you so much. I appreciate it.

THE COURT: All right.

COURTROOM ADMINISTRATOR: And watch your step on that.

THE WITNESS: Thank you so much.

THE COURT: So what I'd like to do now is take a break, and I'm going to go through my notes to figure out what else we may need to discuss before we end for the day. And in particular, what I want you all to think about is we have some ongoing discovery disputes that I think may now take on a slightly different context given what we've heard thus far.

And so I think some of these things can be resolved today and some may require some additional time. And so I want you to think about that because, again, we have this issue, for example, of the subpoenas and what information is going to be provided. So, for example, it's hard for me to imagine that there wouldn't be an order from this Court requiring Mr. Campbell's 84 number to be imaged immediately with, Mr. Campbell, since you're here, the protections for it being only provided as relevant. But I know that there have been these conversations about resistance that weren't yours, Mr. Campbell, but from other individuals.

MR. CAMPBELL: I have the phone. I'll produce it. I have no issues.

THE COURT: That's fine. But I think, for example, things like that are things that we can deal with today which might address some of these outstanding issues --

MR. WILLIAMS: And, Your Honor --

THE COURT: -- while we're here.

MR. WILLIAMS: -- can I give you another one to take off the table because you were just asking about it?

THE COURT: Yeah.

MR. WILLIAMS: Let -- let's talk about hard copy fighter files. I can imagine that we're going to be getting an order telling us to do it, but the reality is we've already started copying every one of those hard copy files to produce to the plaintiffs. And so that -- that's already in process, Your Honor.

THE COURT: Because what has been helpful for some of this, Mr. Williams and Mr. Chiu, is that up to now Mr. Chiu has essentially been a go-between shuttling back and forth without always having personal knowledge of the information. So I think we've learned quite a bit in the process, and you all have probably learned quite a bit in this process. And so I want to take advantage of that so we can resolve some of these discovery disputes.

The same for the plaintiff. You all have obviously learned some information. And that's why I had asked, for example, the questions about the granular fighting data. We've been going back and forth about that. I think Mr. Campbell can help with that.

But, right, we had had some conversation -- I don't think Mr. Dell'Angelo -- Mr. Madden, I believe was the one who

had raised the issues about the chart with the granular data. Is that right?

MR. DELL'ANGELO: That's correct, Your Honor.

THE COURT: So I'd like to try to handle as much family business as we can today as relates to that. So I want you to think about that on the break so when we come back, if there's something we can resolve, we can resolve it.

Now, some of this you all are already in the process of doing. I know the linear review and other things, some of that's already happening. We don't need the revisit that. But, for example, things like Mr. Campbell's phone that's come up, or other issues, right -- because the discovery and the Rule 37 issues are going to be intertwined slightly because of the Court's need to evaluate what information actually exists to the extent that this missing information is never discovered.

And so for me, it's hard for me to evaluate the potential prejudice, if there's any, for the missing data without knowing what the universe of information is. And up until now we've had a little bit of back-and-forth about that. But the one thing I think the witnesses have done is provide some clarity for some of this information.

So we'll take about a 10-minute recess, and then we'll come back and talk a little bit more. Okay?

MR. WILLIAMS: Thank you, Judge.

MR. DELL'ANGELO: Thank you.

THE COURT: All right.

(Recess taken at 3:38 p.m.)

(Resumed at 4:12 p.m.)

THE COURT: Please be seated.

Okay. I don't suppose you all have worked anything out yet?

MR. WILLIAMS: Case is settled, Your Honor.

THE COURT: So just a moment.

(Court conferring with court staff.)

THE COURT: We have good news and bad news. The good news is you guys are going to finish early today. The bad new is you need to come back next week. I can't resolve all of this stuff without the time. And I'm going to set the hearing next week for Wednesday. Now, I don't need the whole team of everybody here. Probably, I will tell you will honestly, Mr. Dell'Angelo, Mr. Madden, Mr. Williams, Mr. Chiu, I mean, you all have been involved. Mr. Yates, if you're free. I know you have a busy trial calendar. But we need to clean up some of this work. And I know you have some disputes about the timing of when to produce things for my January 6th order, and then we have the appeal and some stuff is stalled. There's not enough time to handle all of that today, but it's pressing. It needs to be resolved.

Just so you all understand, my goal is to get all of this resolved regarding discovery and spoliation, everything,

done by no later than the end of April. That means everything will have to be done and produced and everything. So you -- I'm saying that to you all now because I'm going to be setting some pretty strict, potentially challenging deadlines. This is probably more for the defendants than for the plaintiffs, but also for the plaintiffs to do work. Because we've had these disputes about the returns on the searches, which we just have to resolve. I need to get a sense of what's available as it relates to the searches of other individuals' materials and Zuffa's files to resolve the discovery disputes and to resolve the Rule 37 issue. And I -- and I need time to do that.

And so right now, if you can take out your calendars, we're looking at next Wednesday.

Mr. Dell'Angelo or Mr. Madden?

MR. MADDEN: Your Honor, I can be here on Wednesday, the 11th. I know Mr. Dell'Angelo cannot.

MR. DELL'ANGELO: I -- I have a deposition in Philadelphia, Your Honor. But Mr. Madden can attend, so we're fine.

MR. MADDEN: I'm happy to handle it.

THE COURT: Okay. That's fine. We don't need -- as I said, we don't need the whole team. I mean, this is really about cleaning up some of what's already been disputed. So whoever is designated, that's fine.

MR. DELL'ANGELO: We're clear to attend.

THE COURT: Okay.

Mr. Chiu and Mr. Williams? Mr. Williams, I know you're here, but you may have other stuff.

MR. WILLIAMS: I'm here, Judge. I see one thing on my calendar at 3 o'clock, actually, with Mr. Guy, but I could probably have someone cover that. Or if it's in the morning, no problem.

THE COURT: All right. Mr. Chiu?

MR. CHIU: I can be here, Your Honor.

THE COURT: Okay. So let's set it...

(Court conferring with courtroom administrator.)

THE COURT: So 9 o'clock Wednesday of next week. So what I would like to discuss, and I want you all to come prepare to discuss, Mr. Chiu and Mr. Williams, the individual subpoenas, right, to the extent you're representing individuals on them, what we need to address as relates to that, one.

As it relates to the need, Mr. Madden and Mr. Dell'Angelo, for orders from the Court to providers or to carriers, I want to get that handled. If they're saying they need a Court order from any of these individuals, I have no difficulty based upon the record ordering the carriers to provide information. I don't want us to spend 45 months, right, because we're having a back-and-forth with the legal team for Verizon or T-Mobile, whomever, right. I want to resolve that and issue orders accordingly, right, as it relates to that. So

that's something that you all should come prepared to discuss.

There is some discussion both the linear review, what needs to be reviewed, the adequacy of some of the results. So all of the outstanding discovery issues I want to be able to resolve to move forward with the case. Okay?

The other thing I want you to come prepared to do is to discuss who else would need to be a witness for the spoliation proceedings. Now, we focused on Mr. White and Ms. Long only because they were the most prominent ones, but they are not the only ones who are missing information, one.

Two, to the extent there's going to be a discussion one way -- from both sides about what's available or not available regarding the missing data, we need to figure out who else would be available and who could talk about that. And so next week, I would expect, as this is the plaintiffs' request regarding spoliation, you all to come to me with a list saying, "We think these individuals should also be required to testify," right, "as it relates to this issue."

I also want, Mr. Dell'Angelo and Mr. Madden and Mr. Williams and Mr. Chiu, I want this granular fighter data issue resolved. I do not want to come back and have you all saying, "They have this, but they don't have that." I mean, we've had enough back-and-forth to resolve that.

MR. MADDEN: Your Honor, if I -- if I may. We've had meet and confers since we were last here. I believe we are --

I -- I haven't seen the data that we're going to get, but I believe there is not a pending dispute for Your Honor to deal with.

THE COURT: Okay. I'm glad to see we're moving forward.

Is that correct, Mr. Chiu?

MR. CHIU: Yes, Your Honor.

THE COURT: Okay. So I want to have that resolved.

Mr. Williams, I'd really like to have resolved issues regarding some of these phones: How many phones there are for Mr. White that are still there? Do you have the passwords for them or not? And what is the plan to access the data if you don't, right? But it seems to me that you all should at least be able to determine how many phones there are for Mr. White and Mr. Campbell in this cabinet. So I would like to be able to have an answer to that and the ability to access them. If you don't have the passwords, I understand. That's not necessarily something you control, but I want to know that. And I'd like to know, Mr. Williams, what the plan is.

MR. WILLIAMS: Understood, Judge.

THE COURT: The other issue, Mr. Williams, we have to discuss is the issue we discussed at sidebar.

MR. WILLIAMS: Right.

THE COURT: I'm not going to go into that publicly, but I want to have some approach to that particular issue that you

discussed. And while, Mr. Yates, you don't need to be here, I know you had some input on that as well. It's an important issue for the reasons that I stated at the sidebar. And I'm not going to emphasize why I think it's important, Mr. Williams, but you understand that in terms of giving all parties a fair opportunity to be able to discuss everything. And I won't say more than that, but I really want to figure out how we address that issue as soon as possible.

MR. WILLIAMS: Understood.

MR. YATES: And, Your Honor, unfortunately, I can't be here on Wednesday. My daughter's having surgery, but I'll consult with Mr. Williams in advance.

THE COURT: I'm sorry for that. Good luck with that.

MR. YATES: Thank you.

THE COURT: But I know you had been involved with that, Mr. Yates, so you can talk about that and you can talk about it with Mr. Chiu, but I really want to get that resolved sooner rather than later, not leave this hanging out there. That would involve potentially the things we talked about was if we have logs regarding when phones were provided, by whomever, to the vendor from UFC. Now, you may need to look at, for example, billing dates or other things or communications.

I'm not going to require you to provide that data, but I am going to ask you, Mr. Williams, Mr. Chiu, about -- on that date next week to say, "We've been able to confirm that these

phones were provided on these days," right. We can talk about the context of who may or may not have provided them as it relates to the privilege or not. I'm fine with that. I just want to know about the chain of the process of the phones being provided so I can understand that.

And to the extent, Mr. Chiu, Mr. Williams, Mr. Yates, there's information about a report after that phone was provided. So, for example, if a phone was provided on Monday, on Wednesday there was a report. This is what the report indicated as relates to the data that may or may not be missing. That way I can put it together.

Mr. Yates, you mentioned it would really be helpful to start at least on that timeline. That's -- I agree with that. That's a real issue in this case because I'm getting pieces of information about what happened when. And that makes it difficult for me to put together what actually happened over the course of this litigation as it relates to information. So I want to give you an opportunity to do that.

MR. YATES: And, Your Honor, I think Your Honor had directed a filing this afternoon, which I think will begin to help illuminate that, but, obviously, we'll continue to look at the issue. And I think one of the vendors has not given us all the information back yet. But we'll make that filing this afternoon as directed and then supplement it as necessary.

THE COURT: Well, if you need more time, because you've

all been here, we can do that. I actually anticipated Mr. Campbell would be a little quicker than he was. And so if you need to do the filing tomorrow so that it's more complete, by -- by close of business, I would prefer it to be complete than to get three supplements.

MR. YATES: Well, then why don't we take the time and we'll file it tomorrow. And hopefully the vendor will be able to supplement by that point in time.

THE COURT: Okay. All right.

So any questions about our moving forward now and what we're doing next week? Mr. Dell'Angelo?

MR. DELL'ANGELO: No, Your Honor.

THE COURT: Mr. Williams? Mr. Chiu?

MR. CHIU: Yeah. Nothing further, Your Honor.

(Court reporter clarification.)

MR. CHIU: We do have one issue, which is there's the outstanding amended interrogatory responses. They were bifurcated in terms of a response date. And we would just request some additional time to provide the amended answers to a number of those. We've asked plaintiffs --

THE COURT: How much additional time are you requesting?

MR. CHIU: So the secondary part of these broad responses, one of them we've agreed to March 9th. And so we would just ask that the remainder of those be, kind of, pushed

to that date. And that is just, you know, based on a lot of the information we've been learning over the last couple of days, we could use that time to provide those amended responses.

THE COURT: Mr. Dell'Angelo?

MR. DELL'ANGELO: I think we're fine, Your Honor, with a two-week extension. I think something that we were just trying to understand was the reason, and I think we now have a better understanding that, I guess, whatever investigation went into -- to preparing the responses up to this point is now implicated by information that we've all learned today. So, I mean, while we're sort of frustrated with the additional delay, we would rather have more complete and correct answers. So that's fine.

THE COURT: So I'll approve that extension with the understanding, I just want it to be complete. I really don't want to have additional supplements. I'd like for it to be complete on that date. Okay?

MR. CHIU: Thank you, Your Honor.

THE COURT: And so we'll come back, was it Wednesday, the 11th?

COURTROOM ADMINISTRATOR: Yes.

THE COURT: At 9 a.m. Okay?

(Court conferring with courtroom administrator .)

THE COURT: All right. Anything else we need to address today? Mr. Dell'Angelo?

MR. DELL'ANGELO: No, Your Honor. Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Chiu? Mr. Yates?

MR. YATES: No, Your Honor.

THE COURT: All right. Thank you all for your time. Save travels back wherever you traveled from. We'll be adjourned. Thank you.

MR. DELL'ANGELO: Thank you, Your Honor.

MR. WILLIAMS: Thank you, Your Honor.

(Whereupon the proceedings concluded at 4:27 p.m.)

--oOo--

COURT REPORTER'S CERTIFICATE

I, PATRICIA L. GANCI, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date: February 6, 2026.

/s/ **Patricia L. Ganci**

Patricia L. Ganci, RMR, CRR