# EXHIBIT 6
# PUBLIC/REDACTED VERSION

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| KAJAN JOHNSON, CLARENCE DOLLAWAY, and TRISTAN CONNELLY, on behalf of themselves and all others similarly situated,<br>Plaintiffs,<br>v.<br>ZUFFA, LLC, TKO OPERATING COMPANY, LLC f/k/a ZUFFA PARENT LLC (d/b/a ULTIMATE FIGHTING CHAMPIONSHIP and UFC), and ENDEAVOR GROUP HOLDINGS, INC.,<br>Defendants. | No.: 2:21-cv-01189-RFB<br><br><br>**EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS** |
| PHIL DAVIS, on behalf of himself and all others similarly situated,<br>Plaintiff,<br>v.<br>ZUFFA LLC, TKO GROUP HOLDINGS, INC. (d/b/a ULTIMATE FIGHTING CHAMPIONSHIP and UFC), and ENDEAVOR GROUP HOLDINGS, INC.,<br>Defendants. | No.: 2:25-cv-00946-RFB |

# TABLE OF CONTENTS

I.   CREDENTIALS ................................................................................................ 1

II.  PURPOSES AND SUMMARY OF DECLARATION TESTIMONY ................................ 4

III. RELEVANT BACKGROUND ............................................................................... 8

    A.  Zuffa's and Endeavor's Litigation Hold Notice in the Action and Zuffa's Litigation Hold Notices in the *Le* litigation .................................................. 8

    B.  The 7/2/2021 Hold Notice .................................................................... 9

    C.  The Hold Notices from the *Le* Litigation Provide Additional Instructions for Preserving Text and Instant Messages ................................................. 11

    D.  Defendants' Oral Hold Instructions to Custodians on Preservation Issues ......... 11

    E.  Defendants' Efforts to Preserve Relevant Text and Instant Messages ............... 13

    F.  Defendants' Charge to Mr. Howard and Mr. Yee to Effectuate Preservation of Mr. White's Text and Instant Messages .................................................. 15

IV. 2015 AMENDMENTS TO RULE 37(e) PROMULGATE A REASONABLENESS STANDARD IN CONNECTION WITH ESI PRESERVATION .............................................. 16

V.  REASONABLE STEPS TO PRESERVE RELEVANT TEXT AND INSTANT MESSAGES ......... 19

    A.  Pre-Litigation Information Governance ...................................................... 21

    B.  Educate Custodians on the Nature and Extent of Their Preservation Obligations ...... 23

    C.  General Follow-Up Steps After Issuance of a Litigation Hold Notice ............... 24

    D.  Specific Follow-Up Steps to Preserve Text and Instant Messages on Phones ...... 26

VI. DEFENDANTS' PRESERVATION EFFORTS FELL FAR SHORT OF "REASONABLE STEPS" TO PRESERVE RELEVANT ESI, EVINCE A WILLFUL DISREGARD FOR THEIR PRESERVATION DUTIES IN THE ACTION, AND APPEAR CALCULATED TO WITHHOLD RELEVANT TEXT AND INSTANT MESSAGES ................................................................................................ 29

    A.  Defendants Failed to Adopt Pre-Litigation Information Governance Measures to Facilitate Preservation of Relevant Text and Instant Messages ........................ 31

    B.  Defendants Failed to Educate Custodians regarding Their Preservation Duties ...... 33

    C.  Defendants Failed to Take Reasonable Follow Up Steps After Issuing a Litigation Hold Notice ...................................................................................... 34

VII. CONCLUSION ............................................................................................... 37

CASE NOS. 2:21-CV-1189; 2:25-CV-946

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

I, Philip Favro, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    I submit the instant declaration in support of the Motion for Sanctions that Plaintiffs Kajan Johnson, Clarence Dollaway, and Tristan Connelly ("Plaintiffs") have filed in the above-captioned litigation ("Action").

## I.    CREDENTIALS

2.    I am the Founder and President of Favro Law PLLC, a law firm based in Alpine, Utah. I am also an attorney licensed to practice law in the States of California (1999) and Utah (2011). If called to do so, I could and would competently testify to the statements and opinions in this Affidavit. My Curriculum Vitae is attached hereto as Exhibit "A".

3.    I am a nationally recognized expert and thought leader in the field of electronic discovery. In that capacity, I have been a prolific commentator on issues relating to electronically stored information ("ESI"), including as an author of numerous law review and other articles on Federal Rule of Civil Procedure 37(e) and its predecessors, for nearly 20 years. More generally, I am one of the field's leading scholars on issues relating to the discovery process and the confluence of litigation and technology. Multiple courts and academic journals have cited my articles on ESI and spoliation. *See*, *e.g.*, *Groves Inc. v. R.C. Bremer Mktg. Assocs.*, No. 22 CV 50154, 2024 WL 4871368 (N.D. Ill. Nov. 22, 2024); *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839 (N.D. Ill. 2021); *Winfield v. City of New York*, 2017 WL 5664852 (S.D.N.Y. Nov. 27, 2017); *Rio Tinto PLC v. Vale S.A.*, 306 F.R.D. 125 (S.D.N.Y. 2015).

4.    Over the past five years, I have delivered several trainings on ESI preservation and spoliation issues to the federal judiciary. In addition, I have lectured to the National Conference of Magistrate Judges on spoliation. Over the past 20 years, I have delivered dozens of continuing legal education programs and taught thousands of lawyers and legal professionals throughout the country regarding generally accepted ESI practices. This includes, but is not limited to, generally accepted ESI practices for preserving relevant phone data, such as text and instant messages. I am adjunct faculty at Gonzaga Law School where I teach an e-Discovery and e-Evidence course to second and

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

third year law students. Of the 12 weeks of classes that span the semester, I dedicate four classes to handling ESI preservation and spoliation issues given both the importance and the complexity of these issues.

5.      In addition, I am a leading expert on issues arising in civil litigation from parties' use of electronic communication applications, including automated deletion features and ephemeral messaging applications. I have delivered trainings to district judges and magistrate judges and also lectured to numerous audiences on this topic. In addition, I have written several articles addressing the impact of automated deletion and ephemeral messaging features on ESI preservation duties. My scholarship on this subject includes serving as the Editor-in-Chief for The Sedona Conference *Commentary on Ephemeral Messaging*, 22 SEDONA CONF. J. 435 (2021), an authoritative paper that promulgates guidance for courts, regulators, and counsel on corporate uses of ephemeral messaging. I have also counseled clients regarding these issues.

6.      My expertise has qualified me to serve in court-appointed neutral roles—including as a special master—on issues relating to electronic discovery and ESI. In my role as a court-appointed neutral, courts have frequently tasked me with (among other things) addressing issues arising from parties' failures to preserve relevant ESI. *See*, *e.g.*, *Pso-Rite.com LLC v. Thrival LLC*, 1:21-cv-00775-PAB-STV (D. Colo.); *Deal Genius, LLC v. O2COOL, LLC*, No. 21-cv-2046 (N.D. Ill.); and *Shumway v. Wright*, No. 4:19-cv-00058 (D. Utah).

7.      I regularly offer expert testimony on issues regarding ESI and electronic discovery, including but not limited to, issues relating to data preservation practices, litigation holds, data collection strategies, protocols regarding the preservation and collection of relevant ESI, and strategies and methods for mitigating the impact of spoliation.

8.      I have given oral and written expert testimony on spoliation-related topics. For example, I offered expert testimony as a rebuttal witness on behalf of Google at a trial that transpired in 2025. *See Reactx LLC v. Google LLC*, No. 18CV09674 (Cal. Super. Ct., Los Angeles Cty.). I have also offered written expert testimony on behalf of Madison Square Garden in 2025 (*Oakley v. MSG Networks, Inc.*, 792 F.Supp.3d 377 (S.D.N.Y. 2025)), Google in 2024 (*State of*

2

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

*Texas v. Google, LLC*, No. CV58999, Midland County District Court, TX 385th Judicial District (Mar. 10, 2025)), and Uber in 2023 (*In re Uber Techs., Inc. Passenger Sexual Assault Litig.*, 3:23-MD-3084-CRB-LJC (N.D. Cal.). I have given expert testimony on both the plaintiff and defendant sides in litigation.

9.     Courts have cited my expert testimony with approval. *See*, *e.g.*, *Oakley v. MSG Networks, Inc.*, 792 F.Supp.3d 377 (S.D.N.Y. 2025) ("the Court finds Mr. Favro's report and analysis to be more persuasive by a wide margin . . . Given Mr. Favro's extensive experience and rigorous analysis, the Court credits his conclusions in this case**.**"); *Lee v. Cnty. of Los Angeles*, No. 2:23-CV-06875-GW-MAA, 2025 WL 2505484, at *20 (C.D. Cal. Aug. 29, 2025), *reconsideration denied*, 2025 WL 3211209 (C.D. Cal. Oct. 14, 2025) ("crediting expert witness Phil Favro's extensive experience and rigorous analysis and adopting his conclusions").

10.     In addition to serving as a special master and expert witness, I regularly counsel clients on ESI and discovery matters in litigation. I also provide clients with pre-litigation information governance advice on (among other things) the development of information retention policies and practices and legal hold policies and practices.

11.     Prior to opening Favro Law PLLC, I served as an in-house expert at a global electronic discovery consultancy where I regularly consulted with enterprises and organizations across the spectrum of verticals for both plaintiffs and defendants on preservation, collection, and often, spoliation-related issues on a wide variety of sources of potential evidence, including but not limited to, text messages, instant messages, and other cell phone data. I consulted clients facing spoliation issues as well as clients asserting that their adversaries spoliated evidence. I also observed, from a practical standpoint, how preservation and collection are undertaken with respect to mobile devices.

12.     Before working as a consultant, I was in private practice for approximately 11 years. During that time, I represented enterprises in business litigation disputes and subsequently served as counsel for relators in False Claims Act litigation. Accordingly, I have observed and been

involved in litigation—and particularly, ESI preservation and spoliation issues—on both the plaintiff and defendant sides in litigation.

13.    I am being compensated at my standard hourly rate for time I spend in connection with this matter. My compensation is not contingent upon my opinions or the outcome of Plaintiffs' spoliation motion in any way.

## II.    PURPOSES AND SUMMARY OF DECLARATION TESTIMONY

14.    I have been engaged by Plaintiffs to offer this declaration in support of their motion for sanctions based on the spoliation of evidence. The purpose of my declaration is to provide the Court with contextual understanding regarding the process that clients and counsel should generally undertake to preserve relevant information for litigation and, in particular, to preserve relevant phone data, including text messages and instant messages from electronic communication applications. As part of my testimony, I offer opinions on the following items:

•    An overview of the 2015 amendments to Federal Rule of Civil Procedure 37(e) and the Advisory Committee's decision to implement a "reasonable steps" standard by which courts should measure a party's preservation conduct for ESI.

•    The nature and extent of the steps a corporate party should take to preserve relevant phone data, including text and instant messages from electronic communication applications, for litigation, including adopting upstream, pre-litigation information governance policies and practices that facilitate downstream preservation of relevant text and instant messages for litigation, together with implementing actionable steps to keep relevant messages once a common law duty to preserve attaches.

•    An analysis of the preservation efforts undertaken by defendants Zuffa, LLC ("Zuffa"), TKO Operating Company, LLC ("TKO"), and Endeavor Group Holdings, Inc. ("Endeavor") (collectively "Defendants") and their counsel to preserve relevant information from the phones of several of Defendants' executives and employees for the Action. In particular, this includes (at this time) Defendants' efforts to preserve relevant text and instant messages from the

4

phones of Dana White, Tracy Long, Hunter Campbell, Ari Emanuel, Mick Maynard, and Denitza Batchvarova.

15.     Based on my collective experience with ESI as a court-appointed special master, legal counsel to clients, adviser to the judiciary, expert witness, and consultant, it is my opinion that Defendants did not take appropriate reasonable steps to preserve relevant information—including, in particular, text and instant messages for Mr. White, Ms. Long, Mr. Campbell, Mr. Emanuel, Mr. Maynard, or Ms. Batchvarova—in the Action. In my experience, defendants did not have a defensible process to preserve relevant phone data, including text and instant messages. Nor did Defendants implement adequate practices or otherwise take sufficient steps to collect and preserve several years of text and instant messages from phone-based electronic communication applications for the Action. All of this has led to relevant phone data, including text and instant messages, not being collected, lost, or spoliated.

16.     As I discuss in greater detail throughout this Declaration, defensible preservation policies and practices for enterprises—particularly sophisticated companies such as Defendants that have had annual revenues in the hundreds of millions or billions of dollars during the relevant time period and that have been represented by respected legal counsel—would have included some combination of the following:

•     Adopting pre-litigation information governance policies and practices upstream that would facilitate preservation of downstream relevant phone data, including text and instant messages, once litigation was reasonably anticipated;

•     Educating and training executive and employee custodians of relevant information on the nature and extent of their obligations to comply with the preservation instructions memorialized in an issued litigation hold notice, and working with custodians of relevant data and non-custodial managers of relevant information to take actionable steps to preserve relevant data;

•     Conducting custodian interviews with executives and employees who possess relevant information, along with managers of non-custodial data sources, to better

understand the nature, extent, and location of relevant information within a party's possession, custody, or control;

• Taking measures to ensure that custodians of relevant information disable automated deletion features for text and instant messages to more readily ensure that relevant messages would be preserved;

• Taking action to ensure that custodians of relevant information enable cloud storage backup to better safeguard the preservation of relevant phone data including text and instant messages;

• Taking steps to collect relevant information from phones that custodians of relevant information used during the relevant time period, including imaging those phones, to preserve, among other things, relevant text and instant messages;

• Taking measures to safeguard relevant phone data, including text and instant messages, when phones used by custodians of relevant information are upgraded and replaced while a duty to preserve remains in force; and

• Taking action to periodically collect relevant text and instant messages from the phones used by custodians of relevant information while a duty to preserve remains active and otherwise ensuring custodian compliance with ongoing preservation obligations.

In all of these steps, a defensible preservation process would have included outside counsel. Outside counsel would be involved in overseeing and supervising the preservation and collection of relevant phone data, including text and instant messages, along with managing ongoing preservation duties relating to electronic communications.

17.    In my opinion, Defendants' preservation efforts fell far below what I would have expected and what courts generally expect of sophisticated corporate litigants like Defendants whose annual revenues are in the billions of dollars. Defendants' overall approach to preservation was disorganized and haphazard, at best. At worst, Defendants' preservation conduct appears purposely calculated to hide adverse evidence. For example:

CASE NOS. 2:21-CV-1189; 2:25-CV-946

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

1      • Defendants' preservation procedures are memorialized in document

2   retention policies that were implemented in ███████████. While those policies included

3   preservation directives in the event of litigation, it does not appear that Defendants trained their

4   employees on the nature or the extent of their preservation duties under those policies. Nor does it

5   appear that Defendants adopted other pre-litigation information governance policies or practices

6   that would help them keep relevant text and instant messages once litigation was reasonably

7   anticipated. That includes a "bring your own device" ("BYOD") policy, which could have

8   delineated Defendants' rights to obtain relevant messages on personal phones belonging to

9   executive and employee custodians, along with employees' corresponding duties to provide those

10  relevant messages to Defendants from their personal phones. It also includes a mobile device return

11  policy that would inventory custodian phones returned for phone upgrades from executives and

12  employees who are on legal hold.

13      • It does not appear that Defendants educated or otherwise trained executive

14  or employee custodians of relevant information on the nature and extent of their preservation duties

15  after issuing a litigation hold notice. Defendants apparently did not conduct effective custodian

16  interviews with executives or employees of relevant information, or managers of non-custodial data

17  sources. Nor does it appear that Defendants took measures to ensure that custodians of relevant

18  information did any of the following: disabled automated deletion features for text and instant

19  messages; enabled cloud storage backup for custodian phones; imaged or otherwise collected

20  relevant information from various phones that custodians of relevant information used during the

21  relevant time period; safeguarded relevant phone data, including text and instant messages, when

22  phones used by custodians of relevant information were upgraded and replaced; or periodically

23  collected relevant text and instant messages from the phones used by custodians of relevant

24  information. In addition, Defendants do not appear to have received support from their outside

25  counsel, which ostensibly could have enabled them to take actual, actionable steps to preserve

26  phone data including relevant text and instant messages.

27

28

CASE NOS. 2:21-CV-1189; 2:25-CV-946

- All of these acts and omissions have led to the spoliation of several years of relevant phone data, including relevant text and instant messages, from key custodians like Mr. White, Ms. Long, Mr. Emanuel, Mr. Campbell, Mr. Maynard, and Ms. Batchvarova after Defendants' duty to preserve triggered in this Action.

**III.    RELEVANT BACKGROUND**

18.    I was present in the courtroom for the Court's spoliation hearing that took place on February 4 and 5, 2026 and personally observed the testimony that witnesses offered during those proceedings. I have considered, reviewed, and relied on several materials in connection with preparing this Declaration. I have not included citations to the materials supporting each fact that I have identified or mentioned in this Section or elsewhere in this Declaration. Instead, I have generally listed those materials on Exhibit B to this Declaration.

**A. Zuffa's and Endeavor's Litigation Hold Notice in the Action and Zuffa's Litigation Hold Notices in the *Le* litigation.**

19.    I understand this Action was filed on June 23, 2021. I also understand that the Court determined that the duty to preserve in this Action triggered in or about December 2014 in connection with the filing of the complaint in the *Le v. Zuffa, LLC*, No. 15-cv-1045, (D. Nev.) litigation ("*Le* litigation"). I further understand that the Court established that the duty to preserve for the Action was continuous and uninterrupted beginning in or about December 2014 through the present. I understand that Zuffa and Endeavor issued an unsigned " ███████████ ███████████████████████████████████████ in connection with the Action. In addition, I understand that Zuffa issued in connection with the *Le* litigation:

- An unsigned ██████████████████████████████████ ████████████████████;
- An unsigned " ████████████████████████████████ ████████████████████;
- An unsigned ██████████████████████████████████ ██████████████████ and

8

1    • An unsigned ████████████████████████████████████

2    ████████████████████████████).

3    20.    I understand that the ██████████████ was issued before Zuffa engaged

4    outside counsel to represent the company in the *Le* litigation and reasonably conclude that Zuffa

5    prepared the ████████████. I also understand that ██████████████████████

6    ████████████████████████████████████ generally follow the same

7    format as the ████████████████. While I am aware that there are certain differences between

8    the above-referenced ████████, I reasonably conclude that the ████████—given their

9    similarities in format, style, and substance—were all prepared by Zuffa.

10    21.    I am not aware of whether Zuffa, TKO, or Endeavor issued ██████████

11    ████, either in connection with the *Le* litigation or the Action. I am not aware of Defendants'

12    counsel having issued ████████ in the Action.

13    22.    I am not aware of the precise recipients of the ████████.

14    23.    I am not aware of Defendants providing custodians of relevant information

15    education or training on the nature and extent of their obligations under the above-referenced ████

16    ████.

17    24.    I am aware that Defendants are large enterprises whose business dealings span the

18    globe, whose gross revenues are in the billions of dollars, and that collectively enjoy a market

19    capitalization in excess of $30 Billion. I am also aware that Defendants have acknowledged that

20    they have an active litigation profile. I further understand that Defendants believe they are

21    technologically savvy. Endeavor represented in its 2023 Annual Report (10-K) that it has "invested

22    and focused extensively on the training and development of [its] employees, from both a personnel

23    and technology perspective."

24    **B. The 7/2/2021 Hold Notice**

25    25.    I understand that the ████████████ generally required ████████████

26    ████████████████████████████████████████:

27

28    ████████████████████████████████████████

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

In addition, I understand █████████████████████████████

26.    I additionally understand that ███████████████████████

█████████████████████████████████:

For ██████████, I am also aware that the ███████████████████

I understand that the █████████.

27.    I additionally understand that ███████████████████████

28.    I am aware that the █████████████████████████████████.

10

29.    I understand that the ███████████████████
██████████████████████████████████████.

30.    I am not aware of Defendants issuing updates to the ███████████
███████████████████████.

**C. The ██████████ from the *Le* Litigation Provide ████████████
██████████████**

31.    While I understand that the ██████████ from the *Le* litigation follow the same
general format as █████████████████████████, I am aware that the *Le* litigation ███
██████████████████████████████████████████
████████████████████████████.

32.    For example, I understand that the █████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
█████████████ (emphasis added).

33.    I also understand that the ██████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████.

34.    I further understand that the ██████████████████████
██████████████████████████████████████████
████████████████.

**D. Defendants' Oral Hold Instructions to Custodians on Preservation Issues**

35.    I understand that Defendants generally maintain that they communicated hold
instructions orally to custodians with relevant information, including text and instant messages. For
example, I understand that Mr. Campbell contends that he orally notified custodians about their
preservation obligations for the Action, even though I am aware that Mr. Campbell testified that he

11

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

1  was not a recipient of a ████████. I also understand that Mr. White, Ms. Long, and Mr. Maynard,

2  as well as employees like Elliot Howard, Zuffa's Vice President of Photography, and Eric Yee,

3  Zuffa's Director of Social Media, who were allegedly tasked with facilitating document

4  preservation efforts for Mr. White, are among the custodians that Mr. Campbell notified regarding

5  the need to preserve relevant information. I am not aware of Defendants having promulgated a

6  written legal hold policy that would have provided Defendants' custodians with specific guidance

7  on the nature and extent of their legal hold obligations once a common law duty to preserve

8  triggered.

9      36.    I understand that Defendants have a ███████████████████

10  █████████████████████████████████████████████████████

11  ██████████████████████. I understand that ███████████████

12  █████████████████████████████████████████████████████

13  █████████████████████████████████████████████████████

14  ████████████████ I am aware that ██████████████████████

15  █████████████████████████████████████████████████████

16  █████████████████████████████████████████████████████

17  ███████████████████████████. I am not aware of Defendants having

18  provided training to their employees on the nature and extent of their ███████████████ under

19  those policies.

20      37.    I am not aware of Defendants having implemented other information governance

21  policies that could have facilitated downstream preservation of relevant data such as obtaining or

22  tracking relevant information from phones, including text and instant messages. Effective

23  information governance measures would have included a BYOD policy, which could have

24  delineated Defendants' rights to obtain relevant data, including text and instant messages, from

25  personal phones belonging to custodians. A BYOD policy could also have outlined custodians'

26  corresponding duties to provide relevant information to Defendants from their personal phones. A

27  BYOD policy could have helped Defendants and their custodians—including Mr. Campbell and

28

Mr. Maynard, both of whom, I am aware, believed that personal phones were outside the scope of discovery—understand that data from personal devices is subject to preservation, collection, and production where it includes relevant information. In addition, a mobile device return policy would have been an effective measure for inventorying returned phones for custodians who are on legal hold. An inventory would have allowed Defendants to track and monitor phones that custodians returned either for device upgrades or because they left Defendants' employ, along with the passcodes to access those devices.

### E. Defendants' Efforts to Preserve Relevant Text and Instant Messages

38.    I understand that Defendants have represented that they have taken actions to preserve certain ESI such as relevant text and instant messages from their employees including, but not limited to, Mr. White, Ms. Long, Mr. Campbell, Mr. Emanuel, Mr. Maynard, and Ms. Batchvarova. I also understand that Defendants maintain that their outside counsel arranged to have phones imaged that belonged to these or other custodians and which contained relevant text and instant messages. I additionally understand that Mr. White, Ms. Long, Mr. Campbell, Mr. Emanuel, Mr. Maynard, and Ms. Batchvarova did not take steps themselves to preserve phone data including text or instant messages and that they instead relied on other of Defendants' employees or their outside counsel to handle the preservation of such information.

39.    While Defendants have collected certain electronic communications from Mr. White, Ms. Long, Mr. Campbell, and Mr. Maynard, I am aware that Defendants have not collected or preserved phone data, including text or instant messages, for these same custodians over extensive periods that in some instances span several years. I also understand that Defendants have not taken steps to collect or preserve phone data, including text messages and instant messages from the Signal messaging application, for Mr. Emanuel. I further understand that Defendants have not taken steps to collect or preserve phone data, including text or instant messages, from Ms. Batchvarova before she moved overseas prior to the Court's spoliation hearing in February 2026.

40.    For some text message strings that Defendants have produced in this Action involving Mr. White, I understand that Mr. White's actions appear to contravene the ▮▮▮▮▮▮

13

1    █████  For example, I understand that there are indicia from produced messages confirming that

2    Mr. White sent audio messages to recipients that have since been deleted. In addition, I understand

3    that Mr. White's produced text message strings with Mr. Maynard memorialize instances where

4    Mr. Maynard ███████████████████████████████ since he appears to have

5    affirmatively and selectively deleted text messages from those text exchanges.

6         41.    Among the text and instant messages that Defendants did not collect, I understand

7    that Ms. Long's actions appear to contravene the ███████████. For example, I am aware

8    that Defendants collected text messages and other data from one of Ms. Long's phones for the

9    period of November 4, 2020 through May 18, 2022. From that 19-month collection of Ms. Long's

10    phone data, I understand that Defendants only produced text messages from the last 30 days, *i.e.*,

11    April 19, 2022 through May 18, 2022. I am aware that Defendants did not produce text messages

12    from Ms. Long from November 4, 2020 to April 18, 2022. Given my understanding of the iPhone

13    automated deletion and retention settings, I reasonably conclude that the approximate 18-month

14    text message production gap from November 4, 2020 to April 18, 2022 resulted from Ms. Long not

15    suspending the iMessage automated deletion feature on her phone that permanently deletes message

16    content beyond 30 days.

17         42.    For the instant messages from the Signal messaging application that Defendants did

18    not produce from Mr. Emanuel in this Action, I understand that Mr. Emanuel's actions contravene

19    ███████████████. At this time, my understanding is that Defendants have not produced

20    relevant instant messages from Mr. Emanuel that he sent or received over Signal. In addition, I am

21    aware that Mr. Emanuel corresponded with other executives from TKO over Signal during the

22    relevant time period. Those messages may have been lost and are no longer available as evidence.

23    I am also aware that Mr. Emanuel may have enabled Signal's "disappearing messages" feature in

24    his instant message exchanges with other TKO executives. I understand that when Signal's

25    "disappearing messages" feature is activated, Signal automates the deletion of instant messages

26    after a pre-set time period on both the sender and the recipient phones. *See* Philip Favro, *Ephemeral*

27

28

14

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

*Messaging: Understanding Key Preservation Issues in Civil Litigation*, THE CIRCUIT RIDER: THE JOURNAL OF THE SEVENTH CIRCUIT BAR ASSOCIATION (May 2023).

43.     I also understand that Mr. White, Ms. Long, and Mr. Campbell did not enable cloud backup for data on their iPhones.

### F. Defendants' Charge to Mr. Howard and Mr. Yee to Effectuate Preservation of Mr. White's Text and Instant Messages

44.     I understand that Defendants charged Mr. Howard with handling the preservation of Mr. White's phones, including his text messages. I am aware that Mr. Howard has indicated that he is not knowledgeable about litigation holds or preserving relevant information for this Action, nor has he received training regarding the preservation of relevant ESI such as text messages. I understand Mr. Howard believes he received some training from Defendants' human resources department on Defendants' information retention policy; while he did not recall the nature and extent of the training he received, his understanding of the policy was that he was not to delete any documents. I understand that Mr. Howard—even though he was tasked with handling both the preservation and the transfer of data including text messages from Mr. White's returned phones to new devices—did not have educational or vocational training, or related experience with a prior employer, to help him accomplish these assignments. I understand that Mr. Howard's qualifications for handling phone upgrades, data transfers, and preserving relevant phone data, including text messages, was limited to his experience working both with his phones, and Mr. White's phones while employed by Zuffa.

45.     I am aware that Mr. Howard did not transfer text messages to Mr. White's new upgraded devices. I further understand that Mr. Howard did not set up or otherwise use an iCloud account for Mr. White and that Mr. White refused to use an iCloud account. I additionally understand that neither Mr. Howard nor other of Defendants' employees maintained a written inventory of Mr. White's phones that would track and retain those devices, including the passcodes that Mr. White used to access those phones. I understand that Mr. Howard did not use a secure repository to maintain Mr. White's phones, that those phones were stored in a random drawer, and

15

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

that Defendants believe that it is possible that a former employee may have stolen one of Mr. White's phones from the unsecured drawer. I am not aware of Mr. Howard meeting with Defendants' outside counsel prior to February 2026 to address questions relating to the preservation of relevant ESI including text messages from Mr. White's phones.

46.    I understand that Defendants charged Mr. Yee with handling Mr. White's social media accounts, including the preservation of his instant (or direct) messages from accounts such as Instagram, WhatsApp, Facebook Messenger, and X (formerly known as Twitter). I am aware that Mr. Yee was informed several years ago not to delete Mr. White's instant messages. I am also aware that Mr. Yee understood that instant messages from Mr. White's Instagram account would be retained unless "actively deleted." I also understand that Mr. Yee was not aware of the nature of a litigation hold notice, nor was Mr. Yee aware of Defendants' document retention policies. I understand that Mr. Yee did not access Mr. White's instant messages, that Mr. Yee did not have Mr. White's login credentials to access Mr. White's Apple account, and Mr. Yee did not set up or otherwise use an iCloud account for Mr. White. I am not aware of Mr. Yee meeting with Defendants' outside counsel prior to the Court's spoliation hearing in February 2026 to address questions relating to the preservation of relevant ESI including instant messages from Mr. White's phones.

### IV.    2015 AMENDMENTS TO RULE 37(e) PROMULGATE A REASONABLENESS STANDARD IN CONNECTION WITH ESI PRESERVATION

47.    The principle that enterprises such as Defendants, along with their counsel, need to preserve relevant ESI, including text and instant messages on phones, is well established by common law and the Federal Rules of Civil Procedure. The duty to preserve evidence is triggered once a party knows or should know that the evidence is relevant to "pending or reasonably anticipated litigation." *See* FED. R. CIV. P. 37(e), 2015 advisory committee note. Once the duty is triggered, Rule 37(e) provides that a party may be sanctioned in certain circumstances for failing to take reasonable steps to preserve relevant ESI, particularly where the preserving "party acted

with the intent to deprive another party of the information's use in the litigation." FED. R. CIV. P. 37(e)(2).

48.     There are any number of issues that a court may consider when determining whether and what sanctions to impose on a party who failed to keep relevant ESI. Perhaps the most important consideration, however, is whether a preserving party took "reasonable steps" to preserve that information. When the Civil Rules Advisory Committee drafted the amendments to Rule 37(e) that were enacted on December 1, 2015, it opined that "reasonable steps" issue was the standard by which a court should measure a party's conduct: "This rule recognizes that 'reasonable steps' to preserve suffice; it does not call for perfection." *Id*.

49.     The Advisory Committee settled on "reasonable steps" as the appropriate benchmark to address shortcomings in the prior iteration of Rule 37(e). Previous to the 2015 Amendments, the focus of Rule 37(e) was too narrow and generally considered whether and when a party suspended particular aspects of its computer systems after a preservation duty attached. *See generally* Philip Favro, *The New ESI Sanctions Framework Under the Proposed Rule 37(e) Amendments*, 21 RICH. J. L. & TECH 8, ¶7 (2015). By shifting Rule 37(e)'s focus to reasonableness, the Advisory Committee expected that courts would be able "to examine preservation issues with a broader perspective" and address disputes through a "common sense determination of the issues based on a benchmark—reasonableness—with which courts and counsel are familiar." *Id*. at ¶13.

50.     In its 2015 committee note to the Rule 37(e) changes, the Advisory Committee did not precisely define the "reasonable steps" parties should take to preserve relevant ESI. Such a determination would be infeasible since, in my experience, what constitutes "reasonable steps" under Rule 37(e) should be considered in the context of specific litigation and dependent on the facts and circumstances of a particular matter. Nevertheless, the Advisory Committee offered some guidance to help courts evaluate the issue of reasonable steps. Among other things, the Advisory Committee identified certain considerations such as the sophistication of the preserving party, the application of proportionality standards, whether the loss of information was beyond the party's control, and whether the loss of information occurred because the party failed to disable aspects of

17

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

a computer program or policy that deleted that information. *See* FED. R. CIV. P. 37(e), 2015 advisory committee note. These considerations suggest that courts evaluate the actions of a preserving party against a similarly situated party in terms of its sophistication, knowledge, resources, and other related factors.

51.    Underlying this guidance is a key directive that lawyers should assist their clients with ESI preservation by (among other things) learning what types of electronic information systems their clients use so they can better counsel client representatives on the information that should be preserved: "**It is important that counsel become familiar with their clients' information systems and digital data — including social media — to address these issues**." *Id.* (emphasis added). Several courts have likewise highlighted this issue—the need for counsel to understand client information systems so they can properly advise the client on how to preserve relevant information—as the lynchpin for successfully preserving relevant information. That includes *this* Court, which sanctioned parties whose abject failures to preserve relevant text messages and other ESI led to the imposition of severe sanctions under Rule 37(e)(2). *See Small v. Univ. Med. Ctr.*, No. 2:13-CV-0298-APG-PAL, 2018 WL 3795238, at *60 (D. Nev. Aug. 9, 2018). In *Small*, this Court cited the above-referenced language from the 2015 committee note to Rule 37(e) and reasoned as follows:

> "**The lawyer has an obligation to educate himself or herself about what data the client has, who has it, how it is stored, what document retention and destruction policies the client has, who has access to the data, and how it is preserved, or how it may be modified or destroyed** . . . It is simply not an option to fail to learn how to address the technical issues related to preservation, collection, and production of ESI. Even the old dogs of the federal judiciary must learn new tricks. We no longer communicate with quill pens and paper. We no longer store most information on paper. We file lawsuits electronically. We do research electronically. We keep track of what is going on in the world electronically. **Parties to lawsuits and their lawyers may not avoid their legal duties to preserve and produce discoverable information because no one devotes sufficient time to find out what the party has, stores, and preserves.**" *Id.* (emphasis added).

52.    That both the Advisory Committee and this Court specifically identified counsel as being charged with helping the client meet its preservation duties is consistent with my understanding of a lawyer's legal and ethical duties regarding the preservation of evidence. For

18

while a party is ultimately responsible for preservation, courts in the Ninth Circuit have concluded that attorneys are duty-bound to supervise and help their clients take reasonable steps to preserve relevant information: "Attorneys have a duty to oversee their clients' collection of information and documents, especially when ESI is involved, during the discovery process." *Lee v. Cnty. of Los Angeles*, No. 2:23-CV-06875-GW-MAA, 2025 WL 2505484, at \*17 (C.D. Cal. Aug. 29, 2025). *Lee*'s rationale underlying this position is insightful, *i.e.*,

> **Parties and clients**, who are often lay persons, **do not normally have the knowledge and expertise to understand their discovery obligations**, to conduct appropriate searches, to collect responsive discovery, and then to fully produce it, **especially when dealing with ESI, without counsel's guiding hand**. *Id.* (emphasis added).

Given the essential role that lawyers play in assisting the client with preserving ESI, courts "have recognized that 'the obligation to preserve evidence runs first to counsel, who then has a duty to advise and explain to the client its obligations to retain pertinent documents that may be relevant to the litigation.'" *Schnatter v. 247 Grp., LLC*, 3:20-CV-00003-BJB-CHL, 2022 WL 2402658, at \*19 (W.D. Ky. Mar. 14, 2022).

53.     I understand that Defendants have been represented in the Action by various law firms that are reputable for their experience representing clients in complex litigation, including antitrust cases. I also understand that Defendants' counsel of record can be reasonably expected to possess the practical and technical knowledge required to facilitate Defendants' preservation duties regarding relevant ESI, including phone data such as text and instant messages.

**V.    REASONABLE STEPS TO PRESERVE RELEVANT TEXT AND INSTANT MESSAGES**

54.     To be certain, the concept of "reasonable steps" may vary from one case to the next. Nevertheless, my collective experience with litigation, discovery, and ESI—as a special master, as counsel, as a judicial adviser, as an expert, and as a consultant—has led me to conclude that there are several measures that corporate parties and their counsel can take to ensure that they have establish a reasonable process for preserving relevant phone data, including text and instant messages. A party that fails to adopt at least some combination of the measures identified below

could reasonably anticipate that it would lose relevant ESI and could incur discovery sanctions under Rule 37(e).

- Implement pre-litigation information governance policies and practices upstream to facilitate downstream preservation of relevant phone data, including text and instant messages, once litigation is reasonably anticipated. Those policies and practices include, among others, information retention, BYOD, mobile device return, and legal hold policies and related practices including educating employees regarding the nature and extent of those procedures;

- Educate and train custodians of relevant information on the nature and extent of their obligations to comply with the preservation instructions memorialized in an issued litigation hold notice, and working with custodians of relevant data and non-custodial managers of relevant information to take actionable steps to preserve relevant information;

- Conduct custodian interviews with custodians of relevant information, along with managers of non-custodial data sources, to better understand the nature, extent, and location of relevant information within a party's possession, custody, or control and to better ensure that relevant ESI maintained on client communication and information systems is actually collected and preserved; and

- Specifically for preserving relevant text and instant messages on phones, some combination of the following steps:

  o Ensure that custodians of relevant information disable automated deletion features for text and instant messages to more readily ensure that relevant text and instant messages are preserved;

  o Ensure that custodians of relevant information enable cloud storage backup to better safeguard the preservation of relevant phone data, including text and instant messages;

  o Collect relevant information from phones that custodians of relevant information used during the relevant time period, including imaging those phones, to preserve, among other things, relevant text and instant messages;

20

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

1    o    Take measures to safeguard relevant phone data, including text and

2    instant messages, when phones used by custodians of relevant information are upgraded and

3    replaced while a duty to preserve remains in force; and

4    o    Periodically collect relevant text and instant messages from the

5    phones used by custodians of relevant information while a duty to preserve remains active and

6    otherwise ensuring custodian compliance with ongoing preservation obligations.

7    55.    I have found the steps summarized in Paragraph 54 of my Declaration are generally

8    accepted ESI practices for preserving relevant phone data, such as text and instant messages. In my

9    opinion, adopting some combination of these steps would be reasonable for large and sophisticated

10    enterprises like Defendants to establish the defensibility of their ESI preservation process and to

11    comply with court-ordered preservation orders and obligations.

12    **A.  Pre-Litigation Information Governance**

13    56.    In my experience, it is reasonable for Defendants to implement information

14    governance procedures so they can effectively manage the flow of information they both generate

15    and receive in the ordinary course of business. I have generally observed that organizations that

16    proactively implement information governance procedures upstream, before litigation, are far

17    better prepared to preserve relevant information downstream, in the reactive environment of

18    litigation and discovery.

19    57.    <u>Information Retention Policies</u>. I have found that organizations typically implement

20    an information retention policy, with a corresponding records retention schedule, and regularly

21    update the policy and schedule to ensure directives remain current. Through an information

22    retention policy, an enterprise evaluates the nature and extent of its records and designates

23    appropriate retention periods corresponding to the legal and regulatory requirements and business

24    needs of the organization. In my experience, an organization that deletes records and other

25    documents—including text and instant messages—pursuant to a neutral retention policy and before

26    a common law duty to preserve triggers generally will not incur sanctions for having done so. *See*

27    *generally Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1322 (Fed. Cir. 2011) ("where a party

28

21

has a long-standing policy of destruction of documents on a regular schedule, with that policy motivated by general business needs, which may include a general concern for the possibility of litigation, destruction that occurs in line with the policy is relatively unlikely to be seen as spoliation."). Of course, once litigation is reasonably anticipated, an organization should take reasonable steps to disable or modify aspects of its information retention policy and records retention schedule to keep relevant information. In my experience advising clients regarding the preparation of document retention policies, I have found that an effective policy will consider the potential of litigation and provide appropriate directions for disabling or modifying aspects of the policy to ensure information relevant to a lawsuit is preserved.

58.    <u>BYOD Policies</u>. I have also observed that organizations also implement policies to manage employee use of phones for work purposes. For organizations that allow employees to use their personal phones for work, a BYOD policy is generally essential for delineating whether the enterprise has an ownership interest in the work information on employee phones, such as text and instant messages. If the enterprise asserts corporate ownership over work-related ESI including electronic communications, the BYOD policy will typically delineate the nature and extent of that ownership interest, the conditions under which the organization will obtain that information, and employee consent to those conditions. I have found that an effective BYOD policy typically includes a provision outlining the need to preserve relevant information on an employee personal phone for legal matters once a lawsuit is reasonably anticipated.

59.    <u>Mobile Device Return Policies</u>. In addition to BYOD policies, organizations that issue phones to certain employees will typically implement a mobile device return policy to detail how they will handle the exchange, return, disposal, and possible re-use of those devices. I have observed that effective mobile device return policies include provisions requiring a written inventory of phones corresponding to employees who are on legal hold. The inventory should include phone passcodes so returned devices can be accessed. In my opinion, a fulsome inventory with tracking and retention details, together with passcode information for returned phones, is

essential for ensuring the organization can actually preserve and access data on returned devices, including text and instant messages, after employees upgrade to a new device or leave the company.

60.    <u>Legal Hold Policies</u>. Underlying the other corporate information governance procedures will be a legal hold policy with a specific process for handling the preservation of relevant information such as text and instant messages on phones. In particular, I have found that effective legal hold policies are typically integrated with appropriate cross-references to the enterprise's other information governance procedures. In my experience advising clients on the development of legal hold policies, I have also found that effective policies generally include the following basic elements:

- Designate officials responsible for issuing a litigation hold notice;

- Identify key custodians and non-custodial data sources within the enterprise that have information relevant to anticipated or pending litigation;

- Prepare a hold notice that intelligibly communicates preservation instructions to a lay audience and which does not overuse legal jargon;

- Mandate that the hold notice be immediately distributed to key custodians and managers of non-custodial data sources to help prevent data loss;

- Require hold notice custodians to acknowledge receipt and compliance with the hold;

- Periodically renew the hold notice as necessary to remind existing custodians and apprise new custodians of their preservation obligations; and

- Take additional follow up measures to ensure relevant information is actually preserved and custodians continue complying with the hold.

**B. Educate Custodians on the Nature and Extent of Their Preservation Obligations**

61.    I have observed that organizations typically promulgate upstream practices to help effectuate employee compliance with information governance policies. In my experience, doing so is reasonable—particularly for issues affecting downstream preservation of ESI—since lay

23

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

employees "do not normally have the knowledge and expertise to understand their discovery obligations." *Lee v. Cnty. of Los Angeles*, No. 2:23-CV-06875-GW-MAA, 2025 WL 2505484, *17 (C.D. Cal. Aug. 29, 2025). One such practice is educating employees on the nature and extent of those policies. Education measures typically include onboarding training for new hires as well as periodic training—such as on an annual basis—for existing employees.

62.    For legal hold policies, it is customary for organizations provide additional training for executives and employees who are custodians of relevant information after issuing a litigation hold notice. Such training is designed to ensure compliance with the hold notice by educating custodians on the nature and extent of their obligations to comply with the notice's preservation instructions. I am also aware that companies may discipline personnel who fail to comply with hold notice requirements. *See*, *e.g.*, *GN Netcom, Inc. v. Plantronics, Inc.*, No. CV 12-1318-LPS, 2016 WL 3792833, at *3, n.3 (D. Del. July 12, 2016) (noting that defendant imposed a $1,000,000 "financial penalty" on a senior vice-president after he failed to obey a legal hold notice in an antitrust lawsuit).

### C.  General Follow-Up Steps After Issuance of a Litigation Hold Notice

63.    While important, the issuance of a litigation hold notice is just the beginning of the preservation process. To properly effectuate a reasonable preservation process, enterprises should take follow-up steps to ensure they can reasonably comply with the hold notice and their common law preservation obligations. Unless reasonable follow-up steps are taken, organizations that just issue a litigation hold notice leave themselves vulnerable to data loss and court sanctions. In my opinion, the ensuing measures characterize a defensible preservation process.

64.    <u>Custodian Interviews</u>. In my experience, an enterprise should interview custodians or managers of non-custodial data sources to better understand the nature, extent, and location of relevant information within its possession, custody, or control. Typically handled by outside counsel, custodian interviews often yield a wealth of detail including what information systems employees use to generate, store, and communicate relevant ESI. Questioning should not be confined to work devices and repositories; outside counsel should also inquire whether the

custodian keeps relevant data on personal phones, personal cloud applications, or other personal locations to more readily determine whether all sources of relevant information have been identified and can then be collected for preservation. Outside counsel can then triage those sources and make reasonable decisions on the responsive information that should be produced in discovery.

65.     Custodian interviews can also divulge the identities of additional witnesses or document custodians, which often leads to the issuance of an updated legal hold notice to other employees that includes newly identified data sources for preservation. Interviews with custodians and non-custodial data managers are one of the principal ways outside counsel can "become familiar with their clients' information systems and digital data." FED. R. CIV. P. 37(e), 2015 advisory committee note. Those interviews (particularly with managers of non-custodian data sources) should disclose whether client information systems are governed by retention periods and the nature of any automated deletion features. I have found that securing details about data retention and deletion settings is essential for ensuring that relevant information is actually preserved for litigation.

66.     When outside counsel do not conduct custodian interviews, I have observed that enterprises may be exposed to data loss from failing to take this reasonable preservation step, which can result in Rule 37(e) discovery sanctions. *See Small v. Univ. Med. Ctr.*, No. 2:13-CV-0298-APG-PAL, 2018 WL 3795238, at *18, *43, *45, *62 (D. Nev. Aug. 9, 2018); *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 926-28 (N.D. Ill. 2021) (describing the significance of custodian interviews and imposing sanctions on defendants pursuant to Rule 37(e) and their counsel under Rule 26(g)(3) for failing to preserve relevant information).

67.     Collect Data from Phones, Laptops, and Information Systems. After completing custodian interviews, identifying pertinent client communication and information systems, and determining the nature of applicable retention and deletion settings, enterprises should then take steps to safeguard relevant ESI for preservation purposes. In my experience, this should entail (among other things) collecting relevant data from custodian sources where applicable, such as phones, laptops, and information systems. For example, outside counsel will typically work with

25

eDiscovery vendors to image custodian phones so relevant text and instant messages can be collected and preserved.

68.    My experience with ESI and discovery is that organizations must collect relevant data from custodians and non-custodial data sources to ensure it is preserved. Relevant data that is not collected from devices or information systems is often lost by enterprises, either unwittingly through negligence or intentionally through misfeasance or malfeasance. *See Lee v. Cnty. of Los Angeles*, No. 2:23-CV-06875-GW-MAA, 2025 WL 2505484 (C.D. Cal. Aug. 29, 2025).

**D.  Specific Follow-Up Steps to Preserve Text and Instant Messages on Phones**

69.    Beyond the importance of general follow-up steps are specific measures that enterprises should take to preserve text and instant messages on phones. My experience with ESI leads me to conclude that text and instant messages are dynamic sources of ESI. This means messages can be easily and quickly modified or deleted, either by the sender or recipient of the messages, the electronic messaging application involved, or the phone itself. In my opinion, "reasonable steps" for preserving relevant text and instant messages—and a defensible preservation process—generally include adopting some or all of the following measures, depending on the circumstances of the case.

70.    <u>Disable Automated Deletion Features—iPhone</u>. A key follow-up step that enterprises should adopt is working with custodians to disable automated deletion features for text and instant messages. For custodians who use the native iMessage application on iPhones to send and receive text messages, they should confirm to outside counsel during the custodian interview that they have already disabled the automated deletion feature that allows users to eliminate messages that are older than 30 days or one year (depending on which setting was previously enabled). Custodians should also indicate to outside counsel that they will not enable the automated deletion feature—the factory default setting for which is "Keep Messages" "Forever"— while they are on legal hold. In my experience, a typical iPhone user must make six separate selections to reach and activate the automated deletion functionality and must read the following message before enabling the feature: "Messages older than 30 days [or 1 year] will be permanently deleted. You

can't undo this action. Delete." For this reason, I have observed that courts have generally find that activating or maintaining the automated deletion feature for text messages is evidence of an intent to deprive within the meaning of Rule 37(e)(2). *See, e.g.*, *Hunters Cap., LLC v. City of Seattle*, No. C20-0983 TSZ, 2023 WL 184208, at *3 (W.D. Wash. Jan. 13, 2023) (imposing Rule 37(e)(2) sanctions on defendants after concluding that "'someone' selected the '30-day delete' setting on Mayor Durkan's new iPhone 11 . . . Consequently, Mayor Durkan's iPhone 11 began deleting, on a rolling basis, all text messages older than 30 days.").

71.    If custodians use the native iMessage application to share audio messages, they should also confirm to outside counsel during the custodian interview that they disabled the automated deletion feature that by default eliminates those audio messages after two minutes. If that automated disposition functionality—which I have found can be easily deactivated within a few moments for all future messages—is not disabled, audio messages sent over iMessage will be permanently deleted two minutes after the recipient listens to them.

72.    <u>Disable Automated Deletion Features—Instant Messages</u>. Instant messaging applications have varying automated deletion features that enterprises and their counsel may need to learn and address if they are used by custodians of relevant information. For example, Instagram, WhatsApp, and Messenger—applications that each offer an instant (direct) messaging feature that I understand Mr. White used for business purposes during the relevant time period—have an ephemeral messaging feature that can eliminate sent or received messages on both the user *and* the recipient devices. Signal, which Mr. Emanuel used for business purposes during the relevant time period, likewise has ephemeral messaging functionality. Because custodians can enable the "disappearing messages" feature for these applications in multiple ways, outside counsel should confirm with custodians that they will not activate the automated deletion feature while they are on legal hold. In my experience, I have found that Instagram, WhatsApp, Messenger, and Signal place a written advisory to users in a chat string when "disappearing messages" is active. As a result, counsel could additionally consider admonishing custodians to be watchful for such a message, enabled inadvertently or otherwise, by the custodian or a correspondent with the custodian.

27

73.    <u>Enable Cloud Backup</u>. Enterprises should also determine whether custodians of phones with relevant information have enabled cloud backup for their text and instant messages. In my experience with ESI, I have found that it is reasonable to use cloud backup to prevent the loss of relevant text and instant messages and may also in certain circumstances facilitate the recovery of lost text messages. *See Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 233 (D. Minn. 2019) (imposing sanctions against defendants under Rule 37(e)(2) for their failure to preserve relevant text messages and reasoning that defendants "could have taken advantage of relatively simple options to ensure that their text messages were backed up to cloud storage.").

74.    <u>Collecting Messages | Imaging Phones</u>. After outside counsel conducts custodian interviews and identifies certain custodian phones for preservation, organizations should take steps to collect data from those phones. My understanding of ESI case law is that courts have not imposed a requirement that parties must always image custodian phones that have relevant data. Nevertheless, as a practical matter, I have observed that organizations and their counsel will often image the phones for key custodians to ameliorate concerns that relevant text and instant messages have not been collected or otherwise preserved. This includes phones that custodians are presently using and previously issued phones as well. While there are costs for imaging phones, doing so can reduce the potential for losing relevant text and instant messages. *See generally Oakley v. MSG Networks, Inc.*, 792 F. Supp. 3d 377 (S.D.N.Y. 2025) (imposing sanctions on plaintiff for failing to take reasonable steps to preserve relevant text messages and discussing the costs for imaging phones).

75.    <u>Phone Upgrades</u>. Another key step is to ensure that relevant text messages are retained when custodians replace old phones with upgrades to new devices. While this step should be handled in connection with an enterprise's mobile device return and litigation hold policies, manual follow-up may be required with custodians—either by outside counsel or in-house corporate representatives—to ensure that messages are either preserved on the old phone or transferred over to the new device. Courts have frequently imposed sanctions on parties who fail to take this step and allow relevant text messages to be lost when changing or upgrading to a new

28

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

phone. *See*, *e.g.*, *Lee v. Cnty. of Los Angeles*, No. 2:23-CV-06875-GW-MAA, 2025 WL 2505484 (C.D. Cal. Aug. 29, 2025).

76.     <u>Periodic Collections from Custodians</u>. Because the duty to preserve relevant ESI is prospective and continuing, enterprises must be certain that they periodically collect text and instant messages from custodians who are subject to ongoing preservation requirements to ensure relevant messages are both preserved and produced in discovery. While there is not a prescribed method of collection, my understanding is that imaging (where proportional to the needs of the case) is still the preferred method for ensuring that relevant text and instant messages are collected and preserved.

**VI.     DEFENDANTS' PRESERVATION EFFORTS FELL FAR SHORT OF "REASONABLE STEPS" TO PRESERVE RELEVANT ESI, EVINCE A WILLFUL DISREGARD FOR THEIR PRESERVATION DUTIES IN THE ACTION, AND APPEAR CALCULATED TO WITHHOLD RELEVANT TEXT AND INSTANT MESSAGES**

77.     Applying the standards I have delineated from Rule 37(e) and generally accepted ESI practices to the actions of Defendants and their custodians of relevant information, it is my opinion that Defendants have not met these standards, in particular Rule 37(e)'s "reasonable steps to preserve" standard. My opinion is that Defendants have not established a reasonable preservation process, which has led to widespread data loss, and Defendants' actions in preserving relevant information have fallen well short of what was required of them in the Action. Defendants failed to take follow up steps to keep or collect several years of relevant data, including text and instant messages, from various phones used by Mr. White, Ms. Long, Mr. Campbell, Mr. Emanuel, Mr. Maynard, and Ms. Batchvarova after the duty to preserve attached in this Action. Defendants should have reasonably anticipated that their failure to adopt at least some combination of these steps would cause relevant ESI to be lost and could result in discovery sanctions under Rule 37(e).

78.     That Defendants and their counsel had actual notice that phones may have included relevant information is confirmed by the ███████ that Defendants issued in the *Le* litigation and this Action. The ██████████████████████████████████ each confirmed that ██████████████████████████████████████████.

CASE NOS. 2:21-CV-1189; 2:25-CV-946

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

1    In addition, those █████████████████████████████████████████

2    ████████████████████████████████████████████████████████████

3    ██████████████████████████. In like manner, █████████████████

4    ████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████

7    ██████████. Mr. White and Mr. Campbell each conceded that they were individually and

8    collectively as an enterprise required to preserve relevant information for the Action. Under these

9    circumstances, my opinion is that Defendants' failures to take additional steps to preserve the

10   balance of their custodians' relevant phone data, including text and instant messages, do not appear

11   to be reasonable. Defendants and their counsel could have drawn upon even a few of the measures

12   I delineate in Paragraphs 54 through 76 of this Declaration to have better effectuated the

13   preservation of relevant data on their custodians' phones, thereby preventing the spoliation at issue.

14          79.    Moreover, certain custodians appear to have disobeyed Defendants' preservation

15   instructions. This includes Mr. White, who did not disable the two-minute automated deletion

16   feature for audio messages on his phone; Ms. Long, who did not disable the 30-day automated

17   deletion feature on her phone; Mr. Emanuel, whose relevant instant messages appear to have been

18   deleted by Signal's ephemeral messaging feature, and Mr. Maynard, who appears to have

19   affirmatively and selectively deleted relevant text messages. These actions have caused relevant

20   phone data, including text and instant messages, to be permanently spoliated. Viewed both

21   individually and collectively, my opinion regarding such flagrant conduct—taken by custodians

22   whom I understand to be key executives for Defendants—is that it shows a willful disregard for

23   their preservation obligations and appears calculated to withhold or conceal relevant text and instant

24   messages and other phone data from discovery in the Action. My opinion is further supported by

25   Defendants' failure to inventory and secure safeguard custodian phones, particularly after a former

26   employee may have stolen one of Mr. White's phones from an unsecured shelf or drawer.

27

28

CASE NOS.  2:21-CV-1189; 2:25-CV-946

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

1

2

### A. Defendants Failed to Adopt Pre-Litigation Information Governance Measures to Facilitate Preservation of Relevant Text and Instant Messages

3    80.    As an initial matter, Defendants do not appear to have implemented the upstream,

4 pre-litigation information governance procedures that would have facilitated the downstream

5 preservation of relevant phone data, including text and instant messages, from phones used by Mr.

6 White, Ms. Long, Mr. Campbell, Mr. Emanuel, Mr. Maynard, or Ms. Batchvarova. Defendants

7 apparently do not have a BYOD policy, a mobile device return policy, or a litigation hold policy.

8 ███████████████████████████████████████████████████████████████, it

9 is unclear whether they provided education or training to their employees on how to preserve

10 relevant information such as text and instant messages. For example, Mr. Howard and Mr. Yee

11 were not provided with training on how to preserve relevant text and instant messages. Neither Mr.

12 Campbell nor Mr. Yee were aware of the information retention policy and Mr. Yee was not

13 knowledgeable about the nature of a litigation hold. Mr. Howard indicated he received training on

14 the information retention policy, but he did not recall the nature or extent of the training except that

15 he should not delete any documents.

16    81.    The lack of a BYOD policy may have contributed to Defendants not seeking to

17 preserve relevant text and instant messages from their custodians' personal phones. That there was

18 no such policy delineating both Defendants' rights to relevant messages on personal phones and

19 employees' corresponding obligation to provide those relevant messages to Defendants from their

20 personal phones likely contributed to Defendants not seeking to collect relevant text and instant

21 messages from Mr. White's, Ms. Long's, and Mr. Campbell's personal phones.

22    82.    The lack of a mobile device return policy and related practices impacted Defendants'

23 preservation of relevant phone data in the Action, including text and instant messages. Defendants

24 acknowledged that they did not create an inventory to manage tracking custodian phones after the

25 duty to preserve attached in the Action. Nor did Mr. Howard obtain or retain phone passcodes that

26 may have enabled Defendants to access relevant text and instant messages on returned phones

27 belonging to Mr. White and other custodians.

28

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

83.     The lack of a policy or practices relating to the return of phones left Defendants vulnerable to data loss, which is apparently what resulted. Data loss from custodian phones appears to have transpired when Mr. Howard did not transfer messages from Mr. White's returned phones to his new phones. Additional data loss occurred when Mr. Howard did not maintain passcodes to access Mr. White's returned phones, rendering the data permanently inaccessible. Further data loss transpired when Defendants lost one of Mr. White's phones. According to Defendants, it is possible the lost phone was stolen by an employee from the unsecured drawer where decommissioned phones were stored. Despite the loss of Mr. White's phone and the fact that many employees apparently had access to this unsecured phone repository, Defendants still did not have a secure storage location for Mr. White's (or apparently other custodians') returned phones at the time of the Court's spoliation hearing. Nor had Defendants apparently created a mobile device inventory to help manage their preservation efforts. In light of the collective data losses described in this Paragraph, my opinion is that Defendants' failure to subsequently inventory and more reasonably secure their custodian phones is clear evidence that Defendants failed to take reasonable steps to preserve relevant phone data, including text and instant messages. In my experience, these omissions far exceed simple or even gross negligence. From my perspective, the collective weight of these oversights tends to demonstrate willful indifference and disregard by Defendants for their preservation obligations.

84.     In summary, Defendants failed to provide Mr. Howard and Mr. Lee—the individuals tasked with preserving Mr. White's text and instant messages—with instructions, training, or tools they needed to effectuate preservation of relevant messages. Nor does it appear that other employees like Mr. White, Ms. Long, Mr. Campbell, Mr. Emanuel, Mr. Maynard, or Ms. Batchvarova were given training on how to handle preservation of their text and instant messages. Ultimately, the failure to implement proactive policies and practices upstream left Defendants with a disorganized and haphazard downstream preservation process for this Action, which eventually resulted in data loss and spoliation of relevant information.

**B. Defendants Failed to Educate Custodians regarding Their Preservation Duties**

85.    Another factor that tends to establish that Defendants failed to take reasonable steps to preserve relevant phone data, including text and instant messages, is the apparent lack of education and training they provided to custodians on carrying out the preservation instructions from ███████████████████. Mr. Campbell, formerly general counsel for Zuffa, did not recall even seeing a Hold Notice, though he indicated that he informed others about their preservation obligations for the Action. Nevertheless, neither Mr. Howard nor Mr. Yee were provided with training on how to preserve relevant text and instant messages, even though they were charged with handling the preservation of such information for Mr. White. Nor does it appear that Defendants otherwise provided formal training to help custodians comply with the ████████████████.

86.    In my view, Defendants should have offered their custodians and noncustodial data managers with training to better understand the nature and extent of ████████████████ ███████████████████. Having both prepared and evaluated many litigation hold notices, my opinion is that the ████████████████ poorly communicates to a lay audience the nature and extent of their ████████████, ██████████████████████████, its content is dense and is replete with legal jargon, and is nearly incomprehensible to lay employees unaccustomed to reading legal documents. It is my experience that lay employee custodians who receive ███████████████████████ generally do not read the entire document and—without training from the "guiding hand" of outside counsel—likely would have been unaware of their ████████████████████████ ███████████████████. *Lee v. Cnty. of Los Angeles*, No. 2:23-CV-06875-GW-MAA, 2025 WL 2505484, at *17 (C.D. Cal. Aug. 29, 2025); *see also Miramontes v. Peraton, Inc.*, No. 3:21-CV-3019-B, 2023 WL 3855603, at *2 (N.D. Tex. June 6, 2023) (imposing spoliation sanctions against defendant for failing to preserve relevant text messages and observing that plaintiff's former supervisor, who was responsible for the data loss, "read only the first paragraph of the hold letter and was unaware of any duty to preserve his text messages.").

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

87.    As Defendants' custodians may not have read the ███████████████ in its entirety and with Defendants not providing custodians with education or training on the nature or the extent of their ██████████, it does not surprise me that Defendants subsequently failed to collect or preserve relevant information, including text and instant messages from custodian phones. It is also my opinion that the lack of custodian education on preservation duties was exacerbated by the apparent failure of Defendants or their counsel to circulate updates to the ██████████████████. In my experience, ██████████████████████████ ████████████████████████████████████████████ such as Mr. White and Mr. Hunter, who are consumed with other job responsibilities. Defendants' conduct in this regard falls well short of their actions in the *Le* litigation, where they ██████████████ ████████████████████████████████████████████████ ██████████████.

### C. Defendants Failed to Take Reasonable Follow Up Steps After Issuing a Litigation Hold Notice

88.    ESI preservation is a process. A defensible ESI preservation process requires proactive follow up steps and is not limited to issuing a litigation hold. Nevertheless, in my opinion, Defendants do not appear to have taken the types of general and specific follow up steps necessary to preserve several years of relevant text messages from Mr. White, Ms. Long, Mr. Campbell, Mr. Emanuel, Mr. Maynard, or Ms. Batchvarova that now appear to be lost and unavailable as evidence.

89.    I am not aware of whether Defendants' counsel conducted custodian interviews in this Action for Mr. White, Ms. Long, Mr. Campbell, Mr. Emanuel, Mr. Maynard, Ms. Batchvarova, Mr. Howard, Mr. Yee, or other of Defendants' employee custodians. However, in my experience with ESI and discovery, that Defendants have apparently lost several years of relevant text and instant messages suggests that their counsel either neglected to conduct custodian interviews, conducted the interviews poorly, or did not follow up after the interviews to collect and preserve relevant text and instant messages. *See Small v. Univ. Med. Ctr.*, No. 2:13-CV-0298-APG-PAL, 2018 WL 3795238, at 18, 43, 45, 62 (D. Nev. Aug. 9, 2018) ("It is also undisputed that UMC's

34

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

prior and current counsel failed to conduct timely custodian interviews. Custodian interviews were not conducted until well into the special master proceedings when it became apparent they had not been done. The special master required the interviews to be conducted a second time because the initial custodian interviews conducted by counsel were inadequate.").

90.    For example, a properly conducted custodian interview of a key player like Mr. White should have revealed—at a minimum—the precise number of phones that he used during the Action, the location of those phones, and the passcodes for those phones. A properly conducted interview would have caused Mr. White to have disclosed the work and personal phones on which Mr. White had relevant text and instant messages. If Mr. White did not have all of that information at his disposal during the interview, then a properly conducted custodian interview of Mr. Howard should have divulged this information. Alternatively, Defendants could have obtained details regarding the phones that Mr. White used during the relevant time period from the cellular carrier associated with Mr. White's phones. I understand that Plaintiffs subpoenaed this information from AT&T and were able to determine that Mr. White used an iPhone 4, iPhone 6, iPhone 6S, iPhone 7, iPhone 11, and iPhone 16 during the relevant time period.

91.    Assuming a proper custodian interview, with details regarding Mr. White's phones in hand and authorization from Defendants, counsel could have taken steps to prevent data loss by directing its eDiscovery vendor to have collected data from Mr. White's phones by (among other things) imaging the devices. This would have allowed Defendants to have preserved and eventually produced relevant text and instant messages from Mr. White. Nevertheless, up through the February 2026 spoliation hearing, it appears that neither Defendants nor their counsel directed that certain of Mr. White's phones be imaged or relevant phone data (including text and instant messages) otherwise collected from those phones.

92.    It does not appear that Defendants or their counsel advised Mr. White, Ms. Long, or Mr. Campbell, or otherwise took action, to enable cloud backup on their phones to facilitate preservation of relevant text and instant messages. Mr. White, Ms. Long, and Mr. Campbell have acknowledged that they did not enable iCloud or other cloud backup for their iPhone data. I

35

1   understand that Mr. White apparently refused to use iCloud or other backup methods for phones

2   that he used to conduct business for Defendants.

3        93.    It does not appear that Defendants or their counsel advised Mr. White or Ms. Long,

4   or otherwise took action, consistent with their duties, to disable certain automated deletion features

5   that eliminated relevant text message content from their iPhones. For Mr. White, this is apparent

6   from produced text message strings that have indicia confirming that he texted audio messages and

7   those messages have now been deleted and are lost. For Ms. Long, this is apparent from Defendants'

8   failure to produce text messages for approximately 18 months, from November 4, 2020 to April

9   18, 2022. Given my understanding of and familiarity with the iPhone automated deletion and

10  retention settings, I reasonably conclude that these deletions occurred because Mr. White and Ms.

11  Long did not respectively modify the automated audio message deletion and the automated message

12  deletion features. Had Defendants or their counsel followed this standard procedure and advised

13  that those automated deletion features be disabled, Defendants could very well have produced

14  relevant audio text messages from Mr. White during the pendency of the Action, along with

15  relevant text message from Ms. Long between November 4, 2020 to April 18, 2022. An alternative

16  explanation for their conduct is that Mr. White and Ms. Long were advised to disable those settings

17  and they instead affirmatively disobeyed those instructions, either from the ████████████

18  ████ or from Defendants or their outside counsel.

19       94.    It does not appear that Defendants or their counsel advised Mr. Emanuel to keep

20  relevant instant messages since Defendants have not produced his relevant Signal messages.

21  Alternatively, Mr. Emanuel may have disobeyed preservation instructions, either ████████████

22  ████████████ or from Defendants or their outside counsel, by activating or not disabling the

23  application's "disappearing messages" feature and deleting relevant instant messages he exchanged

24  with other TKO executives (and perhaps others) over Signal.

25       95.    It does not appear that Defendants or their counsel advised Mr. Maynard to keep

26  relevant text messages as Mr. Maynard appears to have affirmatively and selectively deleted his

27  messages from produced text message exchanges with Mr. White. Alternatively, Mr. Maynard

28

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

1    disobeyed ████████████████████████████████████ or from Defendants

2    or their outside counsel, by selecting those messages for deletion.

3        96.    As detailed in Paragraphs 82 and 83 of this Declaration, it does not appear that

4    Defendants took steps to ensure that relevant phone data, including text and instant messages, were

5    preserved when Mr. White upgraded to new phones.

6        97.    It does not appear that Defendants or their counsel collected relevant phone data,

7    including text and instant messages, from Ms. Batchvarova before she departed the United States

8    prior to the Court's spoliation hearing. It does not appear that Defendants or their counsel undertook

9    periodic collections of text and instant messages from Mr. White, Ms. Long, Mr. Campbell, Mr.

10   Emanuel, or Mr. Maynard, despite these custodians being subject to ongoing preservation

11   obligations throughout the pendency of the Action. This is apparent from Defendants' failure to

12   produce relevant text and instant messages from these custodians over a period of several years.

13   Had Defendants or their counsel conducted periodic collections of text and instant messages

14   throughout the pendency of the Action, Defendants likely would have produced relevant

15   communications from these custodians.

16   **VII.    CONCLUSION**

17       98.    Defendants do not appear to have taken the general and specific measures needed to

18   retain several years of relevant text and instant messages from various custodians that now appear

19   to be lost and unavailable as evidence. Defendants' overall approach to preserving relevant text and

20   instant messages was not reasonable nor defensible. Their conduct was disorganized, haphazard,

21   and fell far short of what I would have expected from litigants in general and specifically for

22   enterprises such as Defendants that are sophisticated, repeat litigants with billions of dollars in

23   annual revenue. Worse, key executives for Defendants who are custodians in the Action appear to

24   have affirmatively deleted relevant text and instant messages. Moreover, even when Defendants

25   were confronted with evidence of data loss—such as Mr. White's apparently stolen phone—they

26   do not appear to have taken measures to ameliorate future preservation issues. Against this

27   backdrop of individual and collective preservation failures, my opinion is that Defendants' conduct

28

evinces a willful disregard of their common law preservation obligations and appears calculated to withhold or conceal relevant text and instant messages and other phone data from discovery in the Action.

Dated: February 25, 2026

_____

Philip Favro

EXPERT DECLARATION OF PHILIP FAVRO IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

# EXHIBIT A

# FAVRO LAW PLLC

# PHILIP J. FAVRO

https://favro-law.com | phil@favro-law.com
(650) 714-9134 | 650 E 100 N Alpine, UT 84004
linkedin.com/in/philip-favro-b1a27ba/ | @philipfavro

## PROFILE

Philip Favro is the Founder and President of Favro Law PLLC. Phil is a nationally recognized expert on issues relating to electronically stored information and electronic discovery. He advises clients on ESI and discovery matters in litigation and regularly serves as an expert witness on these issues, with courts acknowledging his credentials. *Oakley v. MSG Networks, Inc.*, 792 F.Supp.3d 377 (S.D.N.Y. 2025). Phil provides clients with pre-litigation information governance counseling on (among other things) the development of retention and acceptable uses policies regarding AI-generated content and technologies, along with other forms of ESI. In addition, he is a respected neutral who frequently serves as a court-appointed special master and expert advisor. A skilled mediator, Phil serves on federal court mediation panels, helping parties resolve complex disputes. He is a licensed attorney admitted to the Utah and California bars, with a background in business litigation at respected Silicon Valley law firms.

## PROFESSIONAL EXPERIENCE

**FAVRO LAW PLLC**                                                                                    06/25–Present
FOUNDER & PRESIDENT

**Special Master and ESI Neutral**. Serve as a court-appointed neutral including as a special master and expert advisor in civil lawsuits including IP, trade secret, employment, and other litigation. Address discovery disputes including ESI preservation, collection, search, review, production, and spoliation. Broker agreements with parties on disputed issues, hold hearings and conferences, examine and weigh evidence, assess witness credibility, and author orders, reports, and recommendations relating to the disposition of legal and factual issues.

**Counselor**. Counsel clients in litigation on complex business disputes, with a particular expertise on issues regarding discovery and electronically stored information. Advise clients regarding preservation, negotiations over ESI and ESI protocols, the role of AI in discovery, meet and confer discussions, discovery conferences, depositions, motion practice, and arguments in court. Guide clients on the legal, technical, and procedural aspects of discovery in various types of cases. Provide pre-litigation counseling and advice to clients on discovery process defensibility and information governance issues.

**Expert Witness and Rule 30(b)(6) Witness**. Offer expert testimony on issues relating to electronic discovery including appropriate steps and methods for handling the preservation of relevant information, the duty to conduct a reasonable inquiry, the proper use and development of search methodologies and analytics tools including technology-assisted review (TAR), the use of ESI protocols, the role of sampling to satisfy production obligations, the importance of and issues relating to metadata, family production formats, and safeguarding privileged information and work product. Also provide Rule 30(b)(6) testimony on behalf of organizations regarding discovery and information topics.

**Mediator**. Serve as mediator and use evaluative approach to facilitate resolutions to civil disputes. Handle a variety of different cases through federal court mediation panel service including for the U.S. District Court, Central District of California, and the U.S. District Court, Northern District of Illinois.

**PHILIP J. FAVRO**, CURRICULUM VITAE                    FAVRO LAW PLLC

---

### INNOVATIVE DRIVEN                                           12/15–06/25
PRINCIPAL CONSULTANT

**Special Master, Expert Witness, Consultant, Mediator**. Served as a court-appointed neutral in several cases dealing with ESI and discovery issues. Testified as an expert witness on behalf of and worked as a consultant with plaintiffs and defendants in various cases regarding ESI and discovery issues. Mediated civil disputes and served as mediator on federal court mediation panels.

### RECOMMIND, INC.                                              01/14 to 09/15
SENIOR DISCOVERY COUNSEL

**Consultant & Legal Scholar**. Served as consultant for lawyers, organizations, and judges regarding key developments, trends, and best practices in litigation, electronic discovery, information governance, and data protection. Authored scholarly articles and industry pieces relating to electronic discovery and information governance.

### SYMANTEC CORPORATION                                         02/11 to 08/13
SENIOR DISCOVERY COUNSEL

**Consultant & Legal Scholar**. Provided guidance to organizations' in-house counsel regarding best practices for electronic discovery, data protection, and information governance. Shared strategies for reducing inefficiencies and costs, maximizing information, and satisfying legal strictures. Developed articles and analyses regarding int'l data protection laws. Authored scholarly articles and other writings on electronic discovery and information governance.

### SANTA CLARA COUNTY SUPERIOR COURT                            02/10 to 08/12
JUDGE PRO TEM, TRAFFIC DIVISION

**Arraignments**. Presided as pro tem judicial officer at arraignment proceedings for traffic-related infractions and misdemeanors. Entered pleas, set matters for trial, and assigned fines or other penalties.

**Trials**. Conducted trials as pro tem judicial officer for traffic-related infractions and misdemeanors. Received and weighed oral/written evidence from police officers and defendants, entered findings, imposed fines or other penalties, and/or dismissed matters.

**Appeals**. Prepared written record of proceedings of traffic trials subject to appeal.

### PACKARD, PACKARD & JOHNSON                                   02/06 to 08/10
SENIOR COUNSEL (LITIGATION)

**High Stakes Litigation**. False Claims Act litigation practice focused on pursuing high stakes procurement fraud cases with the U.S. Department of Justice. Represented clients in matters that culminated in settlements between the Department of Justice and various defendants in a total amount exceeding $300 million.

**Discovery Practice**. Successfully litigated discovery motions that enabled clients to obtain key documents supporting their claims and allegations of procurement fraud. Prepared initial disclosures, handled FRCP 26(f) obligations, reviewed ESI, conducted meet and confers, prepared discovery motions, and conducted follow-up consistent with discovery orders.

**Firm eDiscovery Practice Leader**. Directed the firm's electronic discovery practice. Trained government attorneys, federal investigators, firm lawyers, and document reviewers regarding the discovery of ESI. Supervised production, receipt, and analysis of millions of pages of ESI.

**PHILIP J. FAVRO**, CURRICULUM VITAE                    FAVRO LAW PLLC

---

**HOPKINS & CARLEY, A LAW CORPORATION**                    09/99 to 02/06
ASSOCIATE (LITIGATION)

**Business Litigation**. Business litigation practice concentrated on advising organizations regarding commercial contract, trademark, trade secret, partnership, and employment disputes. Obtained summary judgment and writs of attachment orders; handled pleadings, discovery, pre-trial motion practice, and expert discovery. Participated as counsel in trial regarding IP dispute in U.S. District Court, Northern District of California.

**Discovery Practice**. Managed discovery efforts as lead associate on a professional malpractice dispute involving $300 million in alleged damages against an international accounting firm. Engaged in motion practice, supervised production of millions of pages of electronic and paper records, and advised client regarding other complex discovery issues. Handled motion practice, depositions, written discovery, and related tasks in various other cases.

**HON. JEREMY FOGEL, U.S. DISTRICT JUDGE (N.D. CAL.)**                    08/98 to 01/99
JUDICIAL EXTERN

**Legal Research and Writing**. Performed legal research and analysis, prepared memoranda, and drafted proposed orders under the direction of the Judge Fogel and his law clerks.

# Education

**Santa Clara University School of Law**, Santa Clara, CA
DEGREE: Juris Doctor | 1999
- Emery Academic Merit Scholar | 1997-99
- Member, Honors Moot Court Board | 1998-99
- Dean's List | 1997

**Brigham Young University**, Provo, UT
DEGREE: Bachelor of Arts, Political Science | 1994
- Spanish Minor
- Dean's List

# Licenses

**Utah State Bar, Lawyer**
- 2011—Present

**California State Bar, Lawyer**
- 1999—Present

# Special Master & Other Neutral Appointments
*(Orders, Reports, and Recommendations available on Westlaw)*

1. **Pso-Rite.com LLC v. Thrival LLC**, 1:21-cv-00775-PAB-STV (D. Colo.); Chief Magistrate Judge Scott Varholak; Appointed Special Master on November 26, 2025. *See* ECF No. 182.

    **Omnibus Order Re Discovery Issues**, 1:21-cv-00775-PAB-STV, 2025 WL 3899841 (D. Colo. Dec. 23, 2025).

2. **Singh v. Singh**, Case Nos. 23CV025894, RG20078515 (Cal. Super. Ct., Alameda Cty.); Superior Court Judge Karin Schwartz; Appointed ESI Expert Advisor on November 6, 2024.

3. **Rayome v. ABT Electronics Inc.**, No. 1:21-cv-02639 (N.D. Ill.); Magistrate Judge Jeffrey Cole; Appointed Special Master on September 18, 2024. *See* ECF No. 142 and 2024 WL 4296755 (N.D. Ill. Sept. 24, 2024).

4. **Deal Genius, LLC v. O2COOL, LLC**, No. 21-cv-2046 (N.D. Ill.); Magistrate Judge Jeffrey Cole; Appointed Special Master on September 23, 2022. *See* 2022 WL 17418892 and 2022 WL 17419522.

   **Order Addressing the Parties' Dispute Re Elusion Testing and Additional Search Terms**, 682 F. Supp. 3d 727 (N.D. Ill. 2023).

   **Special Master Report No. 11**, *Report Re Status of Disputes Over the Production of Emails and the Failure to Preserve Emails*, 2023 WL 3445759 (N.D. Ill. May 8, 2023).

   **Special Master Report No. 9**, *Report Re Status of Disputes Over the Production of Emails and the Failure to Preserve Emails*, 2023 WL 3445758 (N.D. Ill. Apr. 28, 2023).

   **Special Master Report No. 6**, *Report Re Status of Disputes Over the Production of Emails and the Failure to Preserve Emails*, 2023 WL 2299977 (N.D. Ill. Feb. 17, 2023); *report and recommendations adopted*, 2023 WL 2299976 (N.D. Ill. Feb. 23, 2023).

   **Special Master Report No. 1**, *Report Re Status of Dispute Regarding Production Of Certain Emails*, 2022 WL 17418933 (N.D. Ill. Oct. 24, 2022).

5. **Porter v. Equinox Holdings, Inc.**, No. RG19009052 (Cal. Super. Ct., Alameda Cty.); Superior Court Judge Paul Herbert; Appointed Expert Advisor on December 16, 2021.

   **Order** *Re Production of Linked Documents in Family Relationships and Privacy Issues Re Production of Relevant Documents*, 2022 WL 887242 (Cal. Super. Mar. 17, 2022).

6. **Shumway v. Wright**, No. 4:19-cv-00058 (D. Utah); District Judge David Nuffer; Appointed Special Master on September 4, 2019. *See* 2019 WL 8135705.

   **Special Master Report No. 21**, *Report and Recommendation on Plaintiffs' Motion for Order of Contempt against Defendant Gary D. Slavens and Award of Attorney Fees and Costs*, 2020 WL 3038052 (D. Utah May 19, 2020); *report and recommendation adopted*, 2020 WL 3037207 (D. Utah June 5, 2020).

   **Special Master Report No. 17**, *Report and Recommendation re Erasure of Google Drive Documents Reflecting Trade Secrets Seized from Defendant Gary D. Slavens*, 2020 WL 1042168 (D. Utah Jan. 28, 2020); *report and recommendation adopted*, 2020 WL 1038014 (D. Utah Feb. 10, 2020).

   **Special Master Report No. 16**, *Report and Recommendation re Erasure of Additional Trade Secret Documents Seized from Defendant Gary D. Slavens*, 2020 WL 1037773 (D. Utah Jan. 13, 2020); *report and recommendation adopted*, 2020 WL 1038152 (D. Utah Jan. 29, 2020).

**PHILIP J. FAVRO**, CURRICULUM VITAE                                      **FAVRO LAW PLLC**

---

**Special Master Report No. 14**, *Report and Recommendation re Erasure of Trade Secret Documents Seized from Defendant Gary D. Slavens*, 2019 WL 8129801 (D. Utah Dec. 17, 2019); *report and recommendation adopted*, 2020 WL 1042036 (D. Utah Jan. 29, 2020).

**Special Master Report No. 12**, *Report and Recommendation on Additional Null Set Searches re Documents Seized from Defendant Gary D. Slavens*, 2019 WL 8137128 (D. Utah Nov. 25, 2019), *report and recommendation adopted*, 2020 WL 1042211 (D. Utah Jan. 8, 2020).

**Special Master Report No. 11**, *Report and Recommendation on the Review of Certain Null Set Documents Seized from Defendants James Linn Wright, Audra Wright, and Gary D. Slavens*, 2019 WL 8135308 (D. Utah Nov. 22, 2019), *report and recommendation adopted*, No. 4:19-CV-00058-DN-PK, 2019 WL 8137130 (D. Utah Dec. 16, 2019).

**Special Master Report No. 10**, *Report and Recommendation on the Disposition of Certain ESI Seized from Defendant Gary D. Slavens*, 2019 WL 8129803 (D. Utah Nov. 19, 2019), *report and recommendation adopted*, 2019 WL 8137130 (D. Utah Dec. 16, 2019).

**Special Master Report No. 8**, *Report and Recommendation on the Disposition of Information Seized from Defendant Gary D. Slavens*, 2019 WL 8129820 (D. Utah Nov. 4, 2019); *report and recommendation adopted*, 2019 WL 8137130 (Dec. 16, 2019).

**Special Master Report No. 7**, *Preliminary Conclusions regarding the Records Seized from Defendant Gary Slavens*, 2019 WL 8135701 (D. Utah Oct. 9, 2019).

**Special Master Report No. 5**, *Report on the Erasure of Information Seized from Defendant James Linn Wright and Defendant Audra Wright*, 2019 WL 8135310 (D. Utah Oct. 1, 2019).

**Special Master Report No. 3**, *Report and Recommendation on the Disposition of Information Seized from Defendant James Linn Wright and Defendant Audra Wright*, 2019 WL 8129822 (D. Utah Sept. 27, 2019). **Order**, *Granting in Part and Denying in Part the Wrights' Motion for Expedited Return of Seized Devices or, in the Alternative, Supervised Access to Macbook Pro*, 2019 WL 8129821 (D. Utah Sept. 18, 2019).

**Special Master Report No. 1**, *Status of Searches through Data from Defendants' Seized Computer Devices*, 2019 WL 8137124 (D. Utah Sept. 17, 2019).

# Expert Witness and Rule 30(b)(6) Testimony
### (2019—Present)

1. **Liess v. Walmart, Inc.**, No. 25BU-CC00288 (Buchanan County Circuit Court, Missouri). Written declaration in opposition to discovery motion regarding ESI search issues and ESI protocol.

2. **Reactx LLC v. Google LLC**, No. 18STCV09674 (Cal. Super. Ct., Los Angeles Cty.). Trial testimony in May 2025 as rebuttal expert witness on issues relating to productions of hyperlinked documents and preservation of relevant communications.

3. **State of Texas v. Google, LLC**, No. CV58999, Midland County District Court, TX 385th Judicial District (Mar. 10, 2025). Written expert report offered as rebuttal on issues relating to the preservation of relevant communications.

4. **Oakley v. MSG Networks, Inc.**, Case No. 17-cv-6903 (RJS) (S.D.N.Y. Dec. 27, 2024). Written declaration supporting motion for spoliation sanctions on issues regarding reasonable steps to preserve relevant ESI in the context of relevant text messages and mobile phone data. The court both adopted and

**PHILIP J. FAVRO**, CURRICULUM VITAE                              **FAVRO LAW PLLC**

relied upon this expert testimony in determining that plaintiff failed to take reasonable steps to preserve relevant text messages. *See Oakley v. MSG Networks, Inc.*, 792 F. Supp. 3d 377, 385-88 (S.D.N.Y. 2025) ("the Court finds Mr. Favro's report and analysis to be more persuasive by a wide margin . . . Given Mr. Favro's extensive experience and rigorous analysis, the Court credits his conclusions in this case.").

5. **Consumer Protection Division, Office of the Attorney General, v. DARCARS of Bowie, Inc. d/b/a DARCARS Honda**, CPD Case No. 24-017-372787, OAH Case No. OAG-CPD-04-24-21286 (Md Atty. Gen. Admin. Proc. Dec. 23, 2024). Written affidavit supporting opposition to motion for spoliation sanctions on issues relating to timeliness, the nature and extent of the duty to preserve relevant evidence, and the purposes of spoliation sanctions.

6. **Reactx LLC v. Google LLC**, No. 18STCV09674 (Cal. Super. Ct., Los Angeles Cty.). Oral deposition testimony as rebuttal expert witness on issues relating to family productions of hyperlinked documents and preservation of relevant communications.

7. **Pursuit Credit Special Opportunity Fund, L.P. v. Krunchcash, LLC**, Index No. 651070/2022 (New York Supreme Court, New York County, New York Apr. 15, 2024). Written declaration supporting motion to compel and discussing the role of metadata regarding a reasonably usable production of ESI.

8. **In re Uber Techs., Inc. Passenger Sexual Assault Litig.**, 3:23-MD-3084-CRB-LJC (N.D. Cal. Apr. 12, 2024). Supplemental written declaration supporting adoption of defendants' ESI protocol regarding their position on family productions of hyperlinked documents.

9. **In re Uber Techs., Inc. Passenger Sexual Assault Litig.**, 3:23-MD-3084-CRB-LJC (N.D. Cal. Feb. 12, 2024). Written declaration supporting adoption of defendants' ESI protocol regarding their position on family productions of hyperlinked documents.

10. **In re Uber Techs., Inc. Passenger Sexual Assault Litig.**, 3:23-MD-3084-CRB-LJC (N.D. Cal. Dec. 22, 2023). Written declaration supporting defendants' opposition to a motion to compel production of litigation hold and preservation information.

11. **Core Consultants, Inc. v. Ferran**, No. 2021CV31719 (Colo. District Court, Arapahoe Cty., Nov. 7, 2022). Oral testimony during hearing before court-appointed special master supporting plaintiff's request for inclusion of certain provisions in an ESI protocol regarding search terms and production format.

12. **Fernandez v. Walmart Inc.**, No. RIC1904598 (Cal. Super. Ct, Riverside Cty., Oct. 17, 2022). Written declaration in support of opposition to motion for terminating, issue, evidentiary, and monetary sanctions and/or to compel compliance with the court's prior discovery order.

13. **Schmidt v. Allstate Prop. and Cas. Ins. Co.**, No.: 41D03-1408-CT-00125 (Indiana, Johnson County Super. Ct., Aug. 12, 2022). Written affidavit in support of motion to modify an order compelling defendant to engage in a nationwide production of insurance claims files.

14. **Dominion Voting Systems, Inc. v. Fox News Network, LLC**, No. N21C-03-257 EMD (Delaware Super. Ct., Aug. 5, 2022). Oral testimony in the capacity of a Rule 30(b)(6) witness regarding the nature and extent of plaintiff's efforts to respond to defendant's written discovery requests.

15. **Hogan v. Wal-Mart Stores E., LP**, No. 4:21-cv-78 RLW (E.D. Mo. Mar. 11, 2022), ECF No. 48-2. Written declaration in support of motion for relief from discovery order compelling defendant to produce responsive communications to plaintiff's written discovery request.

16. **Hernandez v. Solorzano**, No. 21STFL06318 (Cal. Super. Ct., Los Angeles Cty., Aug. 17, 2021). Written declaration addressing standard employer practices regarding termination of access to corporate network and devices for departed employees.

17. **Moore v. Westgate Resorts, Ltd.**, No. 3:18-cv-00410 (M.D. Tenn. Nov. 1, 2019), ECF No. 78. Written declaration in support of motion for entry of an ESI protocol to govern discovery issues in the litigation.

18. **Southam & Associates, Inc. v. McClellan**, No. 1604011926 (Utah Fourth Dist. Ct., Mar. 8, 2019). Written declaration in support of motion for sanctions and other discovery relief regarding a litigant's apparent refusal to meet and confer regarding the development of search terms.

# ESI and eDiscovery Trainings for the Judiciary
*(2013—Present)*

1. **2026 National Workshop for Magistrate Judges II—7/13/2026 (Milwaukee, WI)**, *New ESI Sources and Their Impact on Civil Discovery*. Forthcoming training regarding the impact of newer ESI sources—particularly ESI from Artificial Intelligence applications—on civil discovery issues to a national audience of U.S. Magistrate Judges through the Federal Judicial Center.

2. **2026 National Workshop for Magistrate Judges I—4/13/2026 (San Antonio, TX)**, *New ESI Sources and Their Impact on Civil Discovery*. Forthcoming training regarding the impact of newer ESI sources—particularly ESI from Artificial Intelligence applications—on civil discovery issues to a national audience of U.S. Magistrate Judges through the Federal Judicial Center.

3. **U.S. District Court, Northern District of Illinois—10/8/2025 (Chicago, IL)**, *Five Methods to More Efficiently Address Discovery Issues*. Training for the district judges and magistrate judges regarding efficient and effective methods for addressing quarrelsome discovery issues.

4. **2023 National Workshop for Magistrate Judges II—7/11/2023 (Atlanta, GA)**, *"Delete" Uncertainty: Learn the Basics and Beyond on ESI Spoliation*. Training regarding ESI spoliation sanctions under Federal Rule of Civil Procedure 37(e) to a national audience of U.S. Magistrate Judges through the Federal Judicial Center.

5. **2023 National Workshop for Magistrate Judges II—7/10/2023 (Atlanta, GA)**, *A Discussion with Magistrate Judges about AI's Impact on Legal Issues They Manage*. Training regarding the potential impact of artificial intelligence on civil and criminal issues to a national audience of U.S. Magistrate Judges through the Federal Judicial Center.

6. **2023 National Workshop for Magistrate Judges I—4/18/2023 (San Diego, CA)**, *"Delete" Uncertainty: Learn the Basics and Beyond on ESI Spoliation*. Training regarding ESI spoliation sanctions under Federal Rule of Civil Procedure 37(e) to a national audience of U.S. Magistrate Judges through the Federal Judicial Center.

7. **2023 National Workshop for Magistrate Judges I—4/17/2023 (San Diego, CA)**, *AI is Coming to Your Courthouse: Are You Ready?* Training regarding the potential impact of artificial intelligence on civil and criminal issues to a national audience of U.S. Magistrate Judges through the Federal Judicial Center.

8. **U.S. District Court, Eastern District of Michigan—5/31/2022 (Virtual)**, *Ephemeral Messaging: Understanding the Benefits and Addressing the Risks*. Training regarding the nature of ephemeral messaging and the challenges that it presents for courts in civil litigation.

9. **U.S. District Court, District of Utah—5/4/2022 (Salt Lake City, UT)**, *Ephemeral Messaging: Understanding the Benefits and Addressing the Risks*. Training regarding the nature of ephemeral messaging and the challenges that it presents for courts in civil litigation.

**PHILIP J. FAVRO**, CURRICULUM VITAE                                    FAVRO LAW PLLC

10. **U.S. District Court, Northern District of Illinois—2/9/2022 (Virtual)**, *Ephemeral Messaging: Understanding the Benefits and Addressing the Risks*. Training regarding the nature of ephemeral messaging and the challenges that it presents for courts in civil litigation.

11. **Ohio Courts of Appeals Judges Association Fall Conference—9/1/2021 (Virtual)**, *Discovery of Electronic Materials: New Ohio Civ. R.37(E): Failure to Preserve Electronic Stored Information (ESI)*. Delivered training to Ohio State Supreme Court Justices and Appellate Court Judges regarding key appellate issues relating to sanctions arising from the destruction of ESI under new Ohio Rule of Civil Procedure 37(e).

12. **Federal Judicial Center—5/3/2021 (Virtual)**, *Electronically Stored Information and Discovery Misconduct in an Electronic Age*. Provided training to national audience of U.S. District Judges and U.S. Magistrate Judges through the Federal Judicial Center regarding ESI preservation and production issues.

13. **U.S. District Court, District of Utah—10/20/2020 (Virtual)**, *Seizure Orders under the Defend Trade Secrets Act of 2016*. Training regarding key legal and technological considerations regarding the issuance of seizure orders under the Defend Trade Secrets Act of 2016.

14. **2018 Utah District Court Judges Conference—5/17/2018 (St. George, UT)**, *Dealing with Discovery: Technology and ESI Tips for the Digital Age Jurist*. Provided judicial training for Utah state court judges at their annual retreat regarding common ESI preservation and search challenges, together with various recommendations and best practices for addressing those challenges.

15. **U.S. District Court, District of Utah—10/1/2014 (Salt Lake City, UT)**, *Guidelines Regarding the Use of Technology-Assisted Review (TAR)*. Training regarding the basics of TAR, along with several strategic and tactical issues that courts and counsel should consider in connection with the use of TAR.

16. **U.S. District Court, District of Utah—9/12/2013 (Salt Lake City, UT)**, *Getting The Basics: Highlights of the Newly Proposed Amendments to the Federal Rules of Civil Procedure*. Training on the proposed amendments to the Federal Rules of Civil Procedure regarding proportionality and sanctions for failures to preserve relevant ESI.

# Professional Associations, Rankings, Training & Teaching

**Gonzaga Law** (2025—Present)
- Adjunct Professor
- E-Discovery & E-Evidence, Class No. 3760

**Dispute Resolution Training** (Oct. 2024)
- American Institute of Mediation
- Mediating Commercial & Litigated Cases (40 hours)

**Georgetown Law Advanced eDiscovery Institute** (2023–Present)
- Advisory Board Member

**Seventh Circuit Bar Association** (2023—Present)
- Senior Member
- Associate Editor, *The Circuit Rider*

**Chambers and Partners** (2019–Present)
- Chambers-Ranked Lawyer, Band 3 E-Discovery & Information Governance | USA (2025 – Present)

**PHILIP J. FAVRO**, CURRICULUM VITAE                    **FAVRO LAW PLLC**

- Chambers-Ranked Individual, Band 1 USA-Nationwide Litigation Support/eDiscovery (2023—2024)
- Chambers-Ranked Individual, Band 2 USA-Nationwide Litigation Support/eDiscovery (2019—2022)

**The Sedona Conference** (2011–Present)
- Member, WG1 Steering Committee (Electronic Document Retention & Production) (2019-2021)
- Project Manager, WG1 Steering Committee (2017-2019)
- Editor-in-Chief, *Commentary on Ephemeral Messaging* (2021)
- Editor-in-Chief, *Commentary on the Effective Use of Federal Rule of Evidence 502(d) Orders* (2021)
- Editor-in-Chief, *Commentary on ESI Evidence & Admissibility, Second Ed.* (2020)
- Editor-in-Chief, *Primer on Social Media, Second Ed.* (2019)
- Drafting Team Leader, *Commentary on Proportionality in Electronic Discovery, 3rd Ed.* (2017)

**Utah State Bar Litigation Section** (2018–2023)

**Central Utah Bar Association** (2014–2023)

**Coalition of Technology Resources for Lawyers** (2014–2019)
- Director of Legal Education and Resources
- Editor-in-chief, *Guidelines Regarding the Use of Technology-Assisted Review*
- Lead author, *The New Information Governance Playbook for Addressing Digital Age Threats*

**Santa Clara County Bar Association** (2000–2013)
- Member, Board of Trustees (2009–2010)
- Chair, Exec. Committee, High Technology Law Section (2007–2010)

**American Bar Association** (2009–2014)
- Science & Technology Section (2009–2014)
- Litigation Section (2013–2014)
- Judicial Division (Lawyers Conference) (2013–2014)

**California State Bar** (2008–2010)
- Exec. Committee, Law Practice Management & Technology Section

**Santa Clara Law** (2021)
- Advisor, Honors Moot Court Board

# Court Citations to Expert Opinions and Authored Articles

1. **Lee v. Cnty. of Los Angeles**, No. 2:23-CV-06875-GW-MAA, 2025 WL 2505484, at *20 (C.D. Cal. Aug. 29, 2025).

2. **Groves Inc. v. R.C. Bremer Mktg. Assocs.**, No. 22 CV 50154, 2024 WL 4871368, at *3 (N.D. Ill. Nov. 22, 2024).

3. **In re Uber Techs., Inc., Passenger Sexual Assault Litig.**, No. 23-MD-03084-CRB-LJC, 2024 WL 1772832, at *1-4 (N.D. Cal. Apr. 23, 2024).

4. **In re Uber Techs., Inc., Passenger Sexual Assault Litig.**, No. MDL 3084 CRB, 2024 WL 3491760, at *10 (N.D. Cal. Mar. 15, 2024).

5. **DR Distributors, LLC v. 21 Century Smoking, Inc.**, 616 F. Supp. 3d 769, 787 (N.D. Ill. 2022)

6. **DR Distributors, LLC v. 21 Century Smoking, Inc.**, 513 F. Supp. 3d 839, 948, n.49 (N.D. Ill. 2021).

7. **Moore v. Westgate Resorts**, No. 3:18-CV-410-DCLC-HBG, 2020 WL 113352, at *12 (E.D. Tenn. Jan. 9, 2020).

8. **Winfield v. City of New York**, No. 15-cv-05236, 2017 WL 5664852, at *10 (S.D.N.Y. Nov. 27, 2017).

9. **Rio Tinto PLC v. Vale S.A.**, 306 F.R.D. 125, 128 (S.D.N.Y. 2015).

10. **United States ex rel. Carter v. Bridgepoint Educ., Inc.**, 305 F.R.D. 225, 237, n.23 (S.D. Cal. 2015).

11. **Quintana v. Claire's Boutiques, Inc.**, No. 13-cv-0368, 2014 WL 234219, at *2, n.13 (N.D. Cal. Jan. 21, 2014).

12. **Lake v. City of Phoenix**, 220 Ariz. 472, 486 (Ct. App.) (Norris, J. *dissent*), *vacated in part*, 222 Ariz. 547 (2009).

# Scholarly Articles, Books, Commentaries, and Bar Journal Articles
### (2007—Present)

1. **Focus on Ethics and Civility: The Lawyer's Duty to Preserve AI**, 39 UTAH BAR J. 1, 44-45 (Jan/Feb 2026) | Co-Authored with Keith Call (Spencer Fane).

2. **A Tribute to Judge Cole**, THE CIRCUIT RIDER: THE JOURNAL OF THE SEVENTH CIRCUIT BAR ASSOCIATION (Oct. 2025) | Author.

3. **Five Methods to More Efficiently Address Discovery Issues**, FMJA BULLETIN (June 2025) | Author.

4. **Microsoft Purview eDiscovery Searches and the Rule 26(g) Reasonable Inquiry Standard**, THE CIRCUIT RIDER: THE JOURNAL OF THE SEVENTH CIRCUIT BAR ASSOCIATION (Oct. 2024) | Author.

5. **What Judges Need to Know about Microsoft Purview eDiscovery**, FMJA BULLETIN (Sept. 2024) | Author.

6. **Microsoft Purview eDiscovery: Key Features and Limitations**, PRACTICAL LAW (July 2024) | Author.

7. **Ephemeral Messaging: Understanding Key Preservation Issues in Civil Litigation**, THE CIRCUIT RIDER: THE JOURNAL OF THE SEVENTH CIRCUIT BAR ASSOCIATION (May 2023) | Author.

8. **The Outsized Impact of Text Messages on Litigation**, FMJA BULLETIN (March 2023) | Author.

9. **Ephemeral Messaging: Understanding Key Preservation Issues in Civil Litigation**, FMJA BULLETIN (Sep. 2022) | Author

10. **Selected eDiscovery and ESI Case Law from 2021-22**, THE CIRCUIT RIDER: THE JOURNAL OF THE SEVENTH CIRCUIT BAR ASSOCIATION (June 2022) | Author.

11. **Navigating Social Media Discovery: What Judges Need to Know About How Lawyers Should Deal with Mass Deletion of Social Media History**, FMJA BULLETIN (June 2022) | Co-Authored with the Hon. Helen Adams, U.S. Magistrate Judge (Southern District of Iowa) and Leslie Behaunek (Nyemaster Goode).

**PHILIP J. FAVRO**, CURRICULUM VITAE                    FAVRO LAW PLLC

12. **Navigating Social Media Discovery: Steps Counsel Can Take to Address Mass Deletion of Social Media History**, THE IOWA LAWYER (June 1, 2022) | Co-Authored with the Hon. Helen Adams, U.S. Magistrate Judge (Southern District of Iowa) and Leslie Behaunek (Nyemaster Goode).

13. **Solving the Privilege Conundrum in Discovery**, PRACTICAL LAW (Mar. 4, 2022) (with updates on legal and practical issues affecting privilege log practices since originally published in 2016) | Author.

14. **DTSA Seizure Orders**, PRACTICAL LAW THE JOURNAL (Winter 2022) | Author.

15. **Court Sanctions Defendants For Using Signal To Thwart FTC Investigation**, FMJA BULLETIN (Dec. 2021) | Author.

16. **Proportionality Weaponized: How It Happens And What Can Parties And Courts Do About It**, THE CIRCUIT RIDER: THE JOURNAL OF THE SEVENTH CIRCUIT BAR ASSOCIATION (Sept. 24, 2021) | Author.

17. **Commentary on the Effective Use of Federal Rule of Evidence 502(d) Orders**, 23 SEDONA CONF. J. 1 (forthcoming 2022) | Editor-in-Chief and Contributing Author (The Sedona Conference).

18. **Commentary on Ephemeral Messaging**, 22 SEDONA CONF. J. 435 (2021) | Editor-in-Chief and Contributing Author (The Sedona Conference).

19. **Slack Discovery: Key Issues and Challenges**, PRACTICAL LAW (Sep. 1, 2020) | Author.

20. **Seizure Orders Under the Defend Trade Secrets Act**, 33 UTAH BAR J. 32 (July/Aug 2020) | Co-Authored with the Hon. David Nuffer, U.S. District Judge (District of Utah).

21. **Commentary on ESI Evidence & Admissibility, Second Ed.**, 22 SEDONA CONF. J. 83 (2021) | Editor-in-Chief and Contributing Author (The Sedona Conference).

22. **Slack Discovery: Key Issues and Challenges**, PRACTICAL LAW (Apr. 1, 2020) | Author.

23. **Navigating the Discovery Chess Match through Effective Case Management**, 53 AKRON L. REV. 31 (2019) | Author.

24. **Ephemeral Messaging: Balancing the Benefits and Risks**, PRACTICAL LAW (June/July 2019) | Author.

25. **Primer on Social Media, Second Ed.**, 20 SEDONA CONF. 1 (2019) | Editor-in-Chief and Contributing Author (The Sedona Conference).

26. **A New Frontier in eDiscovery Ethics: Self-Destructing Messaging Applications**, 31 UTAH BAR J. 40 (Mar/Apr 2018) | Co-Authored with Keith Call (Snow Christensen & Martineau).

27. **Commentary on Proportionality in Electronic Discovery, Third Ed.,** 18 SEDONA CONF. J. 141 (2017) | Drafting Team Leader and Contributing Author (The Sedona Conference).

28. **The New Information Governance Playbook for Addressing Digital Age Threats**, 3 RICH. J.L. & TECH. ANN. SURVEY (2017) | Co-Author.

29. **Safeguarding The Seed Set: Why Seed Set Documents May Be Entitled To Work Product Protection**, Chapter 9 in Jason R. Baron, Ralph C. Losey & Michael D. Berman, *Perspectives on Predictive Coding* (American Bar Association 2016) | Co-Authored with the Hon. John M. Facciola (ret.), U.S. Magistrate Judge (D.D.C.) | Author.

PHILIP J. FAVRO, CURRICULUM VITAE                    FAVRO LAW PLLC

30. **Protecting Work Product in the Age of Electronic Discovery**, 33 MICH. DEF. QUAR. 6 (2016) | Author.

31. **Addressing Employee Use of Personal Clouds**, 22 RICH. J. L. & TECH 6 (2016) | Author.

32. **Getting the Big Picture on the New eDiscovery Amendments to the Federal Rules of Civil Procedure**, 29 UTAH BAR J. 30 (Jan/Feb 2016) | Author.

33. **Solving the Privilege Conundrum in Discovery**, PRACTICAL LAW (Feb/Mar 2016) | Author.

34. **Protecting Privilege Claims in Discovery**, 29 UTAH BAR J. 22 (Mar/Apr 2016) | Author.

35. **Addressing EU Data Protection Laws in Discovery**, PRACTICAL LAW (May 15, 2015) | Author.

36. **Safeguarding The Seed Set: Why Seed Set Documents May Be Entitled To Work Product Protection**, 8 FED. CTS. L. REV. 1 (2015) | Co-Authored with the Hon. John M. Facciola (ret.), U.S. Magistrate Judge (D.D.C.).

37. **The New ESI Sanctions Framework Under the Proposed Rule 37(e) Amendments**, 21 RICH. J. L. & TECH 8 (2015) | Author.

38. **Changing the Culture of Discovery**, 37 AMER. J. TR. ADV. 587 (2014) | Co-Authored with the Hon. Mitchell D. Dembin, Magistrate Judge (S.D. Cal.).

39. **Getting Serious: Why Companies Must Adopt Information Governance Measures to Prepare for the Upcoming Changes to the Federal Rules of Civil Procedure**, 20 RICH. J. L. & TECH 5 (2014) | Author.

40. **A Comprehensive Look at the Newly Proposed Amendments to the Federal Rules of Civil Procedure**, 26 UTAH BAR J. 38 (Sep/Oct 2013) | Author.

41. **Inviting Scrutiny: How Technologies are Eroding the Attorney-Client Privilege**, 20 RICH. J. L. & TECH 2 (2013) | Author.

42. **New Utah Rule 26: A Blueprint for Proportionality under the Federal Rules of Civil Procedure**, 2012 MICH. ST. L. REV. 933 (2012), Co-Authored with the Honorable Derek P. Pullan, District Judge (Utah Fourth District) | Author.

43. **Five Proportionality Principles that Can Reduce eDiscovery Costs and Burdens**, 25 UTAH BAR J. 26 (Sep/Oct 2012) | Author.

44. **Sea Change or Status Quo: Has the Rule 37(e) Safe Harbor Advanced Best Practices for Records Management?**, 11 MINN. J. L. SCI. & TECH. 317 (2010) | Author.

45. **A New Frontier in Electronic Discovery: Preserving and Obtaining Metadata**, 13 B. U. J. SCI. & TECH. L. 1 (2007) | Author.

# Industry Publications, Posts, and White Papers
*(2012—Present)*

1. **Information Governance Can Enhance the Legal Hold Process**, FAVRO LAW BLOG (Jan. 30, 2026) | Author.

2. **2026 eDiscovery Guidance from 2025 Cases**, FAVRO LAW BLOG (Jan. 8, 2026) | Author.

PHILIP J. FAVRO, CURRICULUM VITAE                    FAVRO LAW PLLC

3.   **Satisfying ESI Evidence Rules and Admissibility Standards**, FAVRO LAW BLOG (Dec. 17, 2025) | Author.

4.   **Keeping Current with eDiscovery Search Trends**, FAVRO LAW BLOG (Dec. 8, 2025) | Author.

5.   **The Growing Power of the California Consumer Privacy Act**, FAVRO LAW BLOG (Dec. 1, 2025) | Author.

6.   **Lessons from the OpenAI Litigation on Safeguarding Privileged Information**, FAVRO LAW BLOG (Nov. 10, 2025) | Author.

7.   **Avoiding Harsh Sanctions from Technology Failures**, FAVRO LAW BLOG (Nov. 3, 2025) | Author.

8.   **SDNY OpenAI Order Clarifies Preservation Standards For AI**, LAW360 EXPERT ANALYSIS (Oct. 22, 2025) | Author.

9.   **Recent Cases Spotlight Retention Lessons for AI-Generated Content**, FAVRO LAW BLOG (Oct. 17, 2025) | Author.

10.  **Improving Defensibility: Legal Hold Lessons from Recent Case Law**, FAVRO LAW BLOG (Sept. 30, 2025) | Author.

11.  **Safeguarding the Corporate Network with Information Governance**, FAVRO LAW BLOG (Sept. 8, 2025) | Author.

12.  **Seventh Circuit Affirms Dismissal Sanction Order, Spotlights Ephemeral Messaging Risks**, LAW360 EXPERT ANALYSIS (August 22, 2025) | Author.

13.  **Addressing Cross-Border Discovery: Lessons from DiDi Global Litigation**, FAVRO LAW BLOG (Aug. 26, 2025) | Author.

14.  **Will Courts "Search, Forward" with eDiscovery Case Law on AI?**, FAVRO LAW BLOG (Aug. 11, 2025) | Author.

15.  **How Courts Are Addressing the Use of AI in Discovery**, LAW360 EXPERT ANALYSIS (July 29, 2025) | Author.

16.  **Validation in eDiscovery: How Much Information Must Be Disclosed?**, FAVRO LAW BLOG (July 17, 2025) | Author.

17.  **Lessons on Safeguarding Privilege under Rule 502(d)**, FAVRO LAW BLOG (June 25, 2025) | Author.

18.  **Lessons Learned for 2025: Spotlighting Five Key eDiscovery Trends from 2024**, INNOVATIVE DRIVEN BLOG (Jan. 23, 2025) | Author.

19.  **Selected eDiscovery and ESI Case Law from 2024**, THE SEDONA CONFERENCE (Oct. 2024) | Author.

20.  **Selected eDiscovery and ESI Case Law from 2023-24**, THE SEDONA CONFERENCE (April 2024) | Author.

21.  **Selected Information Governance Case Law from 2023-24**, THE SEDONA CONFERENCE (March 2024) | Author.

PHILIP J. FAVRO, CURRICULUM VITAE                                          FAVRO LAW PLLC

22. **Prepare to Ride the Next Discovery Wave: New Initial Disclosures**, THE RECORDER (Jan. 26, 2024) | Co-Authored with Ron Best (Munger Tolles & Olsen).

23. **Lessons Learned for 2024: Spotlighting Five Key eDiscovery Trends from 2023**, INNOVATIVE DRIVEN BLOG (Jan. 18, 2024) | Author.

24. **New Circuit Court Opinion Highlights the Need for Enhanced Cyber and Privacy Safeguards**, INNOVATIVE DRIVEN BLOG (Sept. 8, 2023) | Co-Authored with Naheed Bleecker (Innovative Driven).

25. **New Case Law Spotlights the Need for Effective ESI Protocol Practices**, INNOVATIVE DRIVEN BLOG (Aug. 3, 2023) | Author.

26. **Selected Information Governance Case Law from 2022-23**, THE SEDONA CONFERENCE (May 2023) | Author.

27. **Selected eDiscovery and ESI Case Law from 2022-23**, THE SEDONA CONFERENCE (Apr. 2023) | Author.

28. **2023 Tech Glossary**, INNOVATIVE DRIVEN BLOG (April 11, 2023) | Author.

29. **New Cases Spotlight Best Practices for Handling Ephemeral Messages in Litigation**, LEGALTECH NEWS (March 20, 2023) | Author.

30. **Handling Structured Data in Discovery**, LEGAL PRACTICE INTELLIGENCE (Mar. 1, 2023) | Co-Authored with Gregg Parker (Innovative Driven).

31. **Lessons Learned for 2023: Spotlighting Five Key eDiscovery Trends from 2022**, INNOVATIVE DRIVEN BLOG (Jan. 4, 2023) | Author.

32. **The Impact that the Changing Nature of Documents is Having on eDiscovery**, INNOVATIVE DRIVEN BLOG (Dec. 7, 2022) | Author.

33. **Selected eDiscovery and ESI Case Law from 2022**, THE SEDONA CONFERENCE (Oct. 2022) | Author.

34. **New Sanctions Case Offers Lessons on ESI Protocols and Information Governance Policies**, LEGALTECH NEWS (July 25, 2022) | Author.

35. **New Cases Spotlight eDiscovery Trends on Possession, Custody or Control and Jury Instructions re ESI Spoliation**, LEGALTECH NEWS (May 18, 2022) | Author.

36. **Messaging Apps Raise Tricky E-Discovery Issues**, TECHNOLOGY & MARKETING LAW BLOG (May 16, 2022) | Author.

37. **Selected eDiscovery and ESI Case Law from 2021-22**, THE SEDONA CONFERENCE (Apr. 2022) | Author.

38. **Court Sanctions Plaintiff for Destroying Relevant Facebook Messenger and Telegram Messages**, LEGALTECH NEWS (Feb. 17, 2022) | Author.

39. **Court Rejects Sanctions Based on Party's Efforts to Remediate Data Loss**, LEGALTECH NEWS (Jan. 27, 2022) | Author.

40. **Lessons Learned for 2022: Spotlighting Five eDiscovery Trends from 2021**, INNOVATIVE DRIVEN BLOG (Jan. 3, 2022) | Author.

PHILIP J. FAVRO, CURRICULUM VITAE                         FAVRO LAW PLLC

41. **What Litigants Should Know About New Court Decisions on Categorical Privilege Logs**, LEGALTECH NEWS (Dec. 2, 2021) | Author.

42. **Fitbits, Teams and Privilege: New Cases Highlight Hot Discovery Trends**, LEGALTECH NEWS (Oct. 27, 2021) | Author.

43. **Selected eDiscovery and ESI Case Law from 2021**, THE SEDONA CONFERENCE (Oct. 2021) | Author.

44. **Court Sanctions Defendants For Using Signal To Thwart FTC Investigation**, LEGALTECH NEWS (Sept. 16, 2021) | Author.

45. **Fabricated Text Message Case Highlights the Importance of Emojis in E-Discovery**, LEGALTECH NEWS (Aug. 16, 2021) | Author.

46. **Snapchat Spoliation Case Highlights the Importance of E-Discovery Competence**, LEGALTECH NEWS (July 13, 2021) | Author.

47. **New ACC Report Spotlights Correlation between IG Maturity and Discovery Responsiveness**, DRIVEN BLOG (June 30, 2021) | Author.

48. **Court Rejects In Camera Review, Signals Need for Privilege Log Alternatives**, DRIVEN BLOG (May 27, 2021) | Author.

49. **New Federal Cases Spotlight 2021's Key Trends in E-discovery**, LEGALTECH NEWS (May 13, 2021) | Author.

50. **Dispute Over Linked Google Drive Documents Highlights Discovery Challenges with Information Systems**, DRIVEN BLOG (Apr. 27, 2021) | Author.

51. **Dispute Over Linked Google Drive Documents Highlights Discovery Challenges with Information Systems**, THE SEDONA CONFERENCE (Apr. 2021) | Author.

52. **Special Masters: A Cost-Effective Method for Handling eDiscovery**, DRIVEN BLOG (Mar. 29, 2021).

53. **New ESI Sanctions Order Offers E-Discovery 101 Course for Lawyers**, ACEDS DETROIT CHAPTER NEWSLETTER (Mar. 2021) | Author.

54. **Court Rejects Slack Production, Spotlights Discovery Pitfalls for Requesting Parties**, DRIVEN BLOG (Feb. 8, 2021) | Author.

55. **New ESI Sanctions Order Offers E-Discovery 101 Course for Lawyers**, LEGALTECH NEWS (Jan. 28, 2021) | Author.

56. **Lessons Learned for 2021: Spotlighting the Top eDiscovery Cases from 2020**, DRIVEN BLOG (Jan. 5, 2021) | Author.

57. **New TAR Case Spotlights Perils with Broad ESI Protocols**, LEGALTECH NEWS (Dec. 14, 2020) | Author.

58. **Proportionality: Cost Remains The Bottom Line in eDiscovery**, DRIVEN BLOG (Nov. 23, 2020) | Author.

PHILIP J. FAVRO, CURRICULUM VITAE                                    FAVRO LAW PLLC

59. **Terminating Sanctions Order Emphasizes the Need for Safeguards in Disposition Programs**, LEGALTECH NEWS (Oct. 27, 2020) | Author.

60. **Terminating Sanctions Order Emphasizes the Need for Safeguards to Ensure Disposition Programs are Defensible**, DRIVEN BLOG (Oct. 28, 2020) | Author.

61. **New TAR Case Affirms Sedona Principle Six, Approves Search Term Pre-Culling**, LEGALTECH NEWS (Sep. 15, 2020) | Author.

62. **New eDiscovery Case Law Developments in 2020: Native Excel Production without Relevance Redactions, FRCP 37(e) Order Rejecting Inherent Authority, and Denial of Proposed Blanket Production 502(d) Order**, DRIVEN BLOG (Aug. 20, 2020) | Author.

63. **Three New E-discovery Case Law Developments So Far in 2020**, LEGALTECH NEWS (Aug. 14, 2020) | Author.

64. **Top European Court Invalidates Privacy Shield, Unsettles Personal Data Transfer Practices under the Standard Contractual Clauses**, DRIVEN BLOG (Aug. 4, 2020) | Co-Author.

65. **Court Requires Production of Filepath Metadata, Spotlights Importance of eDiscovery Experts**, DRIVEN BLOG (June 23, 2020) | Author.

66. **California Case Offers Warnings on Ephemeral Messaging**, BLOOMBERG LAW (June 1, 2020) | Author.

67. **eDiscovery Cases Spotlight IG Best Practices for Workplace Collaboration Tools**, DRIVEN BLOG (May 4, 2020) | Author.

68. **Recent E-Discovery Cases Spotlight IG Best Practices for Workplace Collaboration Tools**, LEGALTECH NEWS (Apr. 29, 2020) | Author.

69. **Understanding and Addressing Discovery Challenges with Slack**, DRIVEN BLOG (Apr. 3, 2020) | Author.

70. **Slack: Understanding and Addressing Discovery Challenges**, DRIVEN BLOG (Apr. 2, 2020) | Author.

71. **Three New Changes to the Revised CCPA Regulations and New CCPA Lawsuits**, LEGALTECH NEWS (Mar. 24, 2020) | Author.

72. **eDiscovery and Seizure Orders under the Defend Trade Secrets Act**, DRIVEN BLOG (Mar. 16, 2020) | Author.

73. **Electronic Discovery and Seizure Orders Under the Defend Trade Secrets Act**, LEGALTECH NEWS (Feb. 27, 2020) | Author.

74. **Key Changes from the Newly Revised CCPA Regulations**, DRIVEN BLOG (Feb. 13, 2020) | Author.

75. **The Need for Continuing Federal Judiciary Education Regarding the 2015 FRCP Amendments**, LEGALTECH NEWS (Jan. 8, 2020) | Author.

76. **Lessons Learned for 2020: Spotlighting the Top eDiscovery Cases from 2019**, DRIVEN BLOG (Jan. 7, 2020) | Author.

77. **Court Criticizes Model eDiscovery Order, Spotlights Advanced Search Methodologies**, DRIVEN BLOG (Jan. 3, 2020) | Author.

PHILIP J. FAVRO, CURRICULUM VITAE    FAVRO LAW PLLC

78. **Information Governance is Key in New DOJ Antitrust Guidance on Corporate Compliance Programs**, DRIVEN BLOG (Nov. 18, 2019) | Author.

79. **Sedona Working Group 1 Meeting Spotlights Key E-Discovery Cases from 2019**, LEGALTECH NEWS (Nov. 12, 2019) | Author.

80. **Select Recent Decisions Regarding Federal Rule of Civil Procedure 37(e)**, THE SEDONA CONFERENCE (Oct. 2019) | Author.

81. **New Cases Provide Insights on the FRCP 37(e) "Reasonable Steps to Preserve" Requirement**, LEGALTECH NEWS (Sept. 5, 2019) | Author.

82. **New Cases Spotlight Production Pitfalls in eDiscovery with Slack**, DRIVEN BLOG (July 19, 2019) | Author.

83. **Recent Cases Spotlight the Challenges of Cross-Border Data Protection Laws in eDiscovery**, LEGALTECH NEWS (June 17, 2019) | Author.

84. **WeChat: A New Frontier in ESI Preservation and Production**, DRIVEN BLOG (May 21, 2019) | Author.

85. **Fatal Attraction? Examining the Merits of Ephemeral Messaging**, DRIVEN BLOG (May 1, 2019) | Author.

86. **Practical Tips for Lawyers on How to Preserve Relevant Text Messages**, DRIVEN BLOG (Apr. 29, 2019) | Author.

87. **Reducing ESI Preservation Obligations with Proportionality and Metrics**, DRIVEN BLOG (Apr. 22, 2019) | Author.

88. **Addressing Possible Pitfalls from Rule 502(d) Orders**, DRIVEN BLOG (Mar. 19, 2019) | Author.

89. **Lessons Learned for 2019: Spotlighting the Top eDiscovery Cases from 2018**, DRIVEN BLOG (Jan. 31, 2019) | Author.

90. **"Zombie Cookies" and eDiscovery: Baking Privacy into the Proportionality Analysis**, DRIVEN BLOG (Dec. 17, 2018) | Author.

91. **Utah Court Rejects Disclosure of TAR Process, Offers Insights on Transparency and Cooperation**, DRIVEN BLOG (Nov. 19, 2018) | Author.

92. **Judge Parker Reaffirms Rule 502(d) Protections, Rejects 'Quick Peek' Procedure**, LEGALTECH NEWS (Oct. 24, 2018) | Author.

93. **Using the FRCP 26(f) Conference to Effectively Address ESI Preservation Issues**, DRIVEN BLOG (Oct. 18, 2018) | Author.

94. **SF Court Rejects eDiscovery Sanctions, Provides Guidance on Defensible Preservation**, DRIVEN BLOG (Aug. 30, 2018) | Author.

95. **Vegas Court Spotlights the Importance of Custodian Interviews with New ESI Sources**, LEGALTECH NEWS (Aug. 30, 2018) | Author.

PHILIP J. FAVRO, CURRICULUM VITAE                                FAVRO LAW PLLC

96. **Safely Navigating Social Media Discovery with The Sedona Conference Primer on Social Media**, BLOOMBERG BNA and BIG LAW BUSINESS (Aug. 2018) | Co-Authored with Lauren Schwartzreich (Littler, LLP).

97. **New Case Highlights the Importance of an Effective Information Retention Program**, DRIVEN BLOG (June 7, 2018) | Author.

98. **"Follow the Money" and Metrics: A User's Guide to Proportionality in the Age of e-Discovery**, THE E-DISCOVERY TEAM (Apr. 8, 2018) | Author.

99. **Surfing for Sanctions under Federal Rule of Civil Procedure 37(e)**, DRIVEN BLOG (Mar. 28, 2018) | Author.

100. **The eDiscovery Legacy of Judge Andrew Peck: Cooperative Advocacy and Technology**, DRIVEN BLOG (Mar. 23, 2018) | Author.

101. **Analytics, Metrics, and Sampling: Tools Needed for Litigating in the Age of eDiscovery**, Bloomberg Law, DIGITAL DISC. & E-EVID., 18 DDEE 170 (Mar. 15, 2018) | Author.

102. **Recent Cases Offer Lessons on the Limitations of Discovery Sanctions**, LEGALTECH NEWS (Feb. 20, 2018) | Author.

103. **Waymo v. Uber Trade Secret Lawsuit Settles, Provides Guidance on Discovery Strategy**, DRIVEN BLOG (Feb. 9, 2018) | Author.

104. **The Challenges of Handling eDiscovery in an Increasingly Mobile World**, DRIVEN BLOG (Feb. 7, 2018) | Author.

105. **Lessons Learned for 2018: Spotlighting the Top eDiscovery Cases from 2017**, DRIVEN BLOG (Jan. 4, 2018) | Author.

106. **Three Key eDiscovery Lessons from New TAR Case Winfield v. City of New York**, LEGALTECH NEWS (Dec. 12, 2017) | Author.

107. **Unfinished Business: A Wish List for New FRCP Amendments**, AMERICAN LAWYER and LEGALTECH NEWS (Dec. 1, 2017) | Co-Authored with Gareth Evans (Gibson Dunn & Crutcher, LLP).

108. **The "Uber" Problem with Self-Destructing Messaging Apps**, DRIVEN BLOG (Nov. 30, 2017) | Author.

109. **The GDPR: Five Changes to EU Data Protection Law You Need to Know**, DRIVEN BLOG (Nov. 28, 2017) | Author.

110. **Key eDiscovery Insights for the Courts and Counsel from the Federal Judicial Center**, DRIVEN BLOG (Nov. 14, 2017) | Author.

111. **Smart Discovery Practices Required for Addressing Smartphone Discovery**, DRIVEN BLOG (Oct. 3, 2017) | Author.

112. **New Mandatory Initial Disclosures Could Radically Change Discovery**, DRIVEN BLOG (July 25, 2017) | Author.

113. **Social Media e-Discovery: What You Need to Know before You Preserve**, THE RELATIVITY BLOG (Aug. 15, 2017) | Author.

PHILIP J. FAVRO, CURRICULUM VITAE                    FAVRO LAW PLLC

114. **Wells Fargo Breach Spotlights the Need for Discovery Competence**, LEGALTECH NEWS (Aug. 8, 2017) | Author.

115. **eDiscovery and Ethical Considerations for Social Media**, DRIVEN BLOG (Aug. 29, 2017) | Author.

116. **The Critical Role of Sampling in Discovery**, LEGALTECH NEWS (July 18, 2017) | Author.

117. **The "Business Judgment" Discovery Rule and its Impact on Information Governance**, LEGALTECH NEWS (May 11, 2017) | Author.

118. **Social Messaging Applications Herald a New Era of Discovery Challenges**, DRIVEN BLOG (Mar. 22, 2017) | Author.

119. **The Art of the Litigation Hold: Preserving Electronic Data**, DRIVEN BLOG (Feb. 17, 2017) | Author.

120. **Three Expert Lessons about Digital Threats**, TODAY'S GENERAL COUNSEL (Feb/Mar 2017) | Author.

121. **Personal Cloud Applications Continue to Imperil Company Trade Secrets**, LEGALTECH NEWS (Jan. 25, 2017) | Author.

122. **Breakdowns and Tune-Ups: Getting the Litigation Hold Process Right**, DRIVEN BLOG (Jan. 24, 2017) | Author.

123. **Lessons Learned for 2017: Spotlighting the Top eDiscovery Cases from 2016**, DRIVEN BLOG (Jan. 11, 2017) | Author.

124. **Lessons from the Experts on Addressing Digital Age Threats**, DRIVEN BLOG (Dec. 13, 2016) | Author.

125. **Leading the Culture Change on Discovery Practice**, BLOOMBERG LAW (Dec. 1, 2016) | Co-Authored with Kevin F. Brady (Redgrave, LLP).

126. **Three Lessons on Digital Threats (and 4 Bonus Tips from a New IG Playbook)**, THE RELATIVITY BLOG (Nov. 29, 2016) | Author.

127. **New Court Decision Refuses to Require the Use of Technology-Assisted Review**, DRIVEN BLOG (Oct. 26, 2016) | Author.

128. **Court Sanctions Safeway, Spotlights the Importance of Conducting a Reasonable Search**, DRIVEN BLOG (Oct. 19, 2016) | Author.

129. **Old Habits Die Hard: The Difficulty in Getting Courts to Follow Rules Changes**, BIG LAW BUSINESS and BLOOMBERG LAW (Oct. 3, 2016) | Author.

130. **The New Information Governance Playbook for Addressing Digital Age Threats**, COALITION OF TECHNOLOGY RESOURCES FOR LAWYERS (Oct. 2016) | Co-Author.

131. **Insights on eDiscovery from the 2016 Norton Rose Fulbright Litigation Trends Survey**, DRIVEN BLOG (Sep. 22, 2016) | Author.

132. **Three Tips to Negotiating TAR Protocols in e-Discovery**, THE RELATIVITY BLOG (Sept. 20, 2016) | Author.

PHILIP J. FAVRO, CURRICULUM VITAE                              FAVRO LAW PLLC

133. **Tips for a Cost-Effective eDiscovery Process**, DRIVEN BLOG (Sep. 16, 2016) | Author.

134. **Mobile Devices Continue to Roil Information Governance Measures**, DRIVEN BLOG (Sep. 1, 2016) | Author.

135. **Confirming the Growing Use of Analytics Tools in Corporate Legal**, THE RELATIVITY BLOG (Aug. 26, 2016) | Author.

136. **Lessons Learned from New Technology-Assisted Review Case Law**, DRIVEN BLOG (Aug. 17, 2016) | Author.

137. **What Must Happen Before Technology is Widely Used in e-Discovery?**, BIG LAW BUSINESS and BLOOMBERG BNA (Aug. 2, 2016) | Author.

138. **2016 Guidelines Regarding the Use of Technology-Assisted Review**, COALITION OF TECHNOLOGY RESOURCES FOR LAWYERS (Aug. 2016) | Editor-in-Chief and Lead Author.

139. **Protecting Corporate Trade Secrets in the Age of Personal Clouds**, THE RECORDER (July 21, 2016) | Author.

140. **Courts Make the Case for Information Governance**, LEGALTECH NEWS (June 21, 2016) | Author.

141. **Court Issues Doomsday Sanctions, Finds Counsel Lacking eDiscovery Competence**, DRIVEN BLOG (June 17, 2016) | Author.

142. **Oracle v. Google Trial Highlights Importance of Privilege Reviews**, BIG LAW BUSINESS and BLOOMBERG LAW (May 11, 2016) | Author.

143. **The Art of the Litigation Hold: Lessons Learned for eDiscovery**, DRIVEN BLOG (Apr. 27, 2016) | Author.

144. **Tracking Newer Data Sources for eDiscovery: GPS, Toll Transponders, and Beyond**, DRIVEN BLOG (Apr. 6, 2016) | Author.

145. **Closing the Loop on Unreasonable eDiscovery Requests**, DRIVEN BLOG (Mar. 23, 2016) | Author.

146. **Catching the Information Governance Wave**, DRIVEN BLOG (Feb. 22, 2016) | Author.

147. **Lessons Learned From a UK Predictive Coding Order**, BIG LAW BUSINESS and BLOOMBERG BNA (Feb. 19, 2016) | Author.

148. **Proportionality Standards: The New Touchstone for Discovery?**, BIG LAW BUSINESS and BLOOMBERG LAW (Jan. 25, 2016) | Author.

149. **The Interplay between Proportionality and Information Governance**, DRIVEN BLOG (Jan. 25, 2016) | Author.

150. **Polluting the Corporate Environment with Employee Use of Personal Clouds**, DRIVEN BLOG (Jan. 7, 2016) | Author.

151. **The 2016 Horoscope: 10 Predictions for the Year in E-Discovery**, LEGALTECH NEWS (Dec. 29, 2015) | Author.

PHILIP J. FAVRO, CURRICULUM VITAE                          FAVRO LAW PLLC

152. **Navigating the choppy legal waves of connectivity**, ITPROPORTAL.COM (Sep. 4, 2015) | Author.

153. **New Regulatory Climate Requires Enhanced Compliance Processes**, BIG LAW BUSINESS and BLOOMBERG LAW (Sep. 1, 2015) | Author.

154. **Navigating the choppy legal waters of the Internet of Things**, LEGAL TECHNOLOGY INSIDER (Aug. 26, 2015) | Author.

155. **Information Governance: Busting Three Big Myths**, INFORMATION GOVERNANCE INITIATIVE (Aug. 18, 2015) | Author.

156. **'Rio Tinto' and Using Keywords in Predictive Coding**, CORPORATE COUNSEL (Aug. 13, 2015) | Author.

157. **Addressing the Continuing Challenges of Mobile Devices**, LEGAL TECHNOLOGY NEWS (Aug. 3, 2015) | Author.

158. **Surfing the choppy legal waves of Internet of Things: What Your Business Needs to Know**, INFORMATION AGE (July 17, 2015) | Author.

159. **Do You Know Your BYOCs?**, LEGAL TECHNOLOGY NEWS (July 13, 2015) | Author.

160. **IoT Data Collection Raises Legal, eDiscovery Questions**, DATA INFORMED (May 21, 2015) | Author.

161. **Is the Debate on Predictive Coding Ending?**, CORPORATE COUNSEL (May 17, 2015) | Author.

162. **The Missing Link: Law Firm Data Security**, BIG LAW BUSINESS and BLOOMBERG LAW (Apr. 6, 2015) | Author.

163. **The Question of Disclosure in Predictive Coding**, BIG LAW BUSINESS and BLOOMBERG BNA (Mar. 19, 2015) | Author.

164. **Why Hillary Clinton's Email Troubles Matter for In-House Counsel**, INSIDE COUNSEL (Mar. 17, 2015) | Author.

165. **The Sony Hack Signals the Need for Information Governance**, INSIDE COUNSEL (Jan. 22, 2015) | Author.

166. **How Analytics Tools Can Help Agencies Sharpen eDiscovery**, GCN (Jan. 15, 2015) | Author.

167. **The Impact of Cloud Computing and Mobile Devices on Litigation Holds**, LAW JOURNAL NEWSLETTERS (Jan. 2015—Vol. 31, No. 9) | Author.

168. **10 Predictions for 2015 E-Discovery**, LAW TECHNOLOGY NEWS (Dec. 12, 2014) | Author.

169. **Mobile Device Preservation Failures Lead to Doomsday eDiscovery Sanctions**, DRUVA BLOG: DATA PROTECTION AND BEYOND (Sep. 17, 2014) | Author.

170. **The Critical Role CIOs Play in e-Discovery**, FEDERAL COMPUTER WEEK (Sep. 8, 2014) | Author.

171. **Guidelines Regarding the Use of Technology-Assisted Review**, COALITION OF TECHNOLOGY RESOURCES FOR LAWYERS (CTRL) (Aug. 2014) | Editor-in-Chief and Contributing Author.

172. **Understanding the litigation hold landscape in 2014**, INSIDE COUNSEL (Sep. 5, 2014) | Author.

PHILIP J. FAVRO, CURRICULUM VITAE                    FAVRO LAW PLLC

173. **The eDiscovery Complexities of Mobile Devices**, DRUVA BLOG: DATA PROTECTION AND BEYOND (July 16, 2014) | Author.

174. **Information Governance**, THE CORPORATE COUNSELOR (July 2014— Vol. 29, No. 4) | Author.

175. **The New ESI Sanctions Framework under the Proposed Rule 37(e) Amendments**, THE AMERICAN LAW INSTITUTE (Summer 2014) | Author.

176. **The Challenge of Safeguarding Today's Attorney-Client Privilege**, INSIDE COUNSEL (June 5, 2014) | Author.

177. **The New ESI Sanctions Framework under the Proposed Rule 37(e) Amendments**, EDDE JOURNAL (ABA) (Summer 2014) | Author.

178. **What California's e-discovery Ethics Opinion means for In-house Counsel**, INSIDE COUNSEL (May 9, 2014) | Author.

179. **Addressing The Impact of Mobile Devices on In-house Counsel**, INSIDE COUNSEL (Apr. 9, 2014) | Author.

180. **Changing Discovery Culture One Step at a Time**, LAW TECHNOLOGY NEWS (Feb. 2014—print edition) | Co-Authored with the Hon. Mitchell D. Dembin, Magistrate Judge (S.D. Cal.) | Author.

181. **Just Three Simple Steps: The Key to a Better E-Discovery Culture Lies with In-House Counsel**, CORPORATE COUNSEL (Feb. 1, 2014) | Co-Authored with the Hon. Mitchell D. Dembin, Magistrate Judge (S.D. Cal.).

182. **The Impact of Oracle America v. Google: Are You Certain Your Emails Are Privileged?**, ACC DOCKET (Jan./Feb. 2014) | Co-Authored with Shawn Cheadle, General Counsel, Lockheed Space Systems | Author.

183. **Promiscuous Email**, LAW TECHNOLOGY NEWS (Dec. 2013) | Author.

184. **Changing Discovery Culture One Step at a Time**, LAW TECHNOLOGY NEWS (Dec. 5, 2013) | Co-Authored with the Hon. Mitchell D. Dembin, Magistrate Judge (S.D. Cal.).

185. **BYOD and Beyond: ACC Addresses Security Risks in the Digital Age**, LAW TECHNOLOGY NEWS (Nov. 1, 2013) | Author.

186. **ACC Explores Cross-Border Discovery Dilemmas**, LAW TECHNOLOGY NEWS (Nov. 1, 2013) | Author.

187. **Key Discovery Changes Proposed to the Federal Rules of Civil Procedure**, LITIGATION SUPPORT TODAY (Aug/Oct 2013) | Author.

188. **Technology: The Impact of Digital Age Innovations on the Attorney-Client Privilege**, INSIDE COUNSEL (Oct. 25, 2013) | Author.

189. **Trial: The Forgotten Phase of Litigation after Discovery**, LAW TECHNOLOGY NEWS (Oct. 18, 2013) | Author.

190. **The Promiscuous Use of Email Creates Cross-Border Nightmares**, LAW TECHNOLOGY NEWS (Oct. 17, 2013) | Author.

PHILIP J. FAVRO, CURRICULUM VITAE                                    FAVRO LAW PLLC

191. **Addressing Cross-Border Data Protection Traps**, LAW TECHNOLOGY NEWS (Oct. 17, 2013) | Author.

192. **Assessing the Impact of the Newly Proposed Amendments to the Federal Rules of Civil Procedure on the Discovery Process**, EDDE JOURNAL (ABBA Autumn 2013) | Author.

193. **ESI Sampling: The New Trend**, THE RECORDER (Sep. 9, 2013) | Co-Authored with the Hon. Paul S. Grewal, U.S. Magistrate Judge (N.D. Cal.).

194. **The "Other" Proposed Amendments to the Federal Rules of Civil Procedure**, INSIDE COUNSEL, July 31, 2013 | Author.

195. **Defensible Deletion: The Touchstone of Effective E-Discovery**, TECHNOLOGY FOR THE LITIGATOR (ABA) (July 24, 2013) | Author.

196. **Push vs. Pull: How Much Oversight is Required of In-house Counsel in e-Discovery?**, ACC DOCKET (May 2013) | Co-Authored with Shawn Cheadle, General Counsel, Lockheed Space Systems | Author.

197. **E-Disclosure: Disclosure Trends**, THE LAWYER (May 7, 2013) | Author.

198. **Will Changes to the Federal Rules Reduce e-Discovery Burdens?**, INSIDE COUNSEL (May 3, 2013) | Author.

199. **The Challenges of eDiscovery and Cloud Computing**, NYSBA SENIOR LAWYERS SECTION (Spring 2013—Vol. 5, No.1) | Co-Author.

200. **Cross-Border Data Privacy Laws**, THE RECORDER (Feb. 12, 2013) | Author.

201. **Proportionality: The Key to Reducing Corporate e-Discovery Costs**, INSIDE COUNSEL (Jan. 22, 2013) | Author.

202. **The Challenges of eDiscovery and Cloud Computing**, NYSBA CORPORATE COUNSEL SECTION (Winter 2013—Vol. 30, No.3) | Co-Author.

203. **Defensible Deletion**, THE RECORDER (Dec. 24, 2012) | Author.

204. **Peer Panel: eDisclosure**, THE LAWYER (Nov. 26, 2012) | Author.

205. **Refuge from the Storm: Defensible Deletion and the Federal Rule 37(e) Safe Harbor**, THOMSON REUTERS (Nov. 2012) | Author.

206. **Finding a Safe Harbor: Defensible Deletion and Federal Rule 37(e)**, INSIDE COUNSEL (Nov. 14, 2012) | Author.

207. **Keeping Pace with Disclosure Needs in a 'More for Less' but Increasingly Litigious World**, EUROPEANGC (Oct. 2012) | Author.

208. **UK eDiscovery News: How to Prepare for Civil Procedure Rule 31.5**, LEGAL TECHNOLOGY INSIDER (Oct. 15, 2012) | Author.

209. **The eDiscovery "Passport": The First Step to Succeeding in International Legal Disputes**, LEGAL WEEK (Oct. 3, 2012) | Author.

PHILIP J. FAVRO, CURRICULUM VITAE                    FAVRO LAW PLLC

210. **Following the Golden Rules of eDiscovery: What Litsupport Professionals Need to Know**, LITIGATION SUPPORT TODAY (Aug/Oct 2012) | Author.

211. **The Challenges of eDiscovery and Cloud Computing**, NYSBA INTERNATIONAL LAW PRACTICUM (Autumn 2012—Vol. 25, No.2) | Co-Author.

212. **Conducting eDiscovery in Glass Houses: Are You Prepared for the Next Stone?**, LEGAL WEEK (Oct. 3, 2012) | Author.

213. **Kleen Products Ruling Confirms Significance of Cooperation and Proportionality in eDiscovery**, LEGAL WEEK (Oct. 3, 2012) | Author.

214. **Decrease Your Litigation Costs and Risks by Following the Golden Rules of eDiscovery**, RECAP CALIFORNIA ALLIANCE OF PARALEGAL ASSOCIATIONS (Fall/Sep. 2012) | Author.

215. **International Mystery: How Information Governance Can Help Solve Cross-Border Data Protection Laws**, INSIDE COUNSEL (Sep. 6, 2012) | Author.

216. **Five Proportionality Principles That Can Reduce eDiscovery Costs and Burdens**, EDDE JOURNAL (ABA), Summer 2012 | Author.

217. **How Organizations Should Address Cross-Border Data Protection Laws**, PRACTICAL LAW (June 29, 2012) | Author.

218. **Drowning in International Waters? How to Stay Abreast of Treacherous Cross-Border eDiscovery Issues**, INSIDE COUNSEL (Apr. 11, 2012) | Author.

219. **Greater Global Integration and More International Litigation: A Planet-Sized Headache for European Legal Departments?**, EUROPEANGC (April 2012) | Author.

220. **The eDiscovery Passport**, LEGAL TECHNOLOGY INSIDER (Apr. 11, 2012) | Author.

221. **Look Before You Leap! Avoiding Pitfalls When Moving eDiscovery to the Cloud**, LAW JOURNAL NEWSLETTERS (Apr. 2012) | Author.

222. **The Golden Rules of eDiscovery: Gaining the Advantage in Litigation**, KM WORLD (Feb. 2012) | Author.

223. **Rule 37(e): The Touchstone for Effective Information Management**, METROPOLITAN CORPORATE COUNSEL (Jan. 17, 2012) | Author.

EXHIBIT B

- Hearing transcript from proceedings before the Honorable Richard F. Boulware II, dated November 20, 2026, *Johnson v. Zuffa, LLC*, No. 2:21-cv-01189-RFB-BNW (D. Nev.); *Cirkunovs v. Zuffa, LLC*, No. 2:25-cv-00914-RFB-BNW (D. Nev.); *Davis v. Zuffa, LLC*, No. 2:25-cv-00946-RFB-BNW (D. Nev.).

- Hearing transcript from proceedings before the Honorable Richard F. Boulware II, dated January 6, 2026, *Johnson v. Zuffa, LLC*, No. 2:21-cv-01189-RFB-BNW (D. Nev.); *Cirkunovs v. Zuffa, LLC*, No. 2:25-cv-00914-RFB-BNW (D. Nev.); *Davis v. Zuffa, LLC*, No. 2:25-cv-00946-RFB-BNW (D. Nev.).

- Hearing transcripts from proceedings before the Honorable Richard F. Boulware II, dated February 4-5, 2026, in *Johnson v. Zuffa, LLC*, No. 2:21-cv-01189-RFB-BNW (D. Nev.); *Davis v. Zuffa, LLC*, No. 2:25-cv-00946-RFB-BNW (D. Nev.).

- Plaintiffs' Statement of Missing Information and Document Discovery Relevant to Defendants' Motion to Compel Arbitration, filed with the Court on or about November 8, 2025.

- Plaintiffs' December 9, 2025 Statement regarding Defendants' Missing Device Disclosure Data and Information Pursuant to the Court's Order of December 4, 2025, filed with the Court on or about December 9, 2025.

- Plaintiffs' Statement concerning (1) Plaintiffs' Arbitration Document Search Term Proposal, and (2) The Scope of Questioning of Dana White and Tracy Long Regarding Spoliation, filed with the Court on or about December 16, 2025.

- Declaration of Michael Dell'Angelo in Support of Plaintiffs' Statement of Missing Information and Document Discovery Relevant to Defendants' Motion to Compel Arbitration, along with accompanying exhibits, filed with the Court on or about November 8, 2025.

- Declaration of Michael Dell'Angelo in Support of Plaintiffs' December 9, 2025 Statement, along with accompanying exhibits, filed with the Court on or about December 9, 2025.

- Declaration of Michael Dell'Angelo in Support of Plaintiffs' December 16, 2025 Statement, along with accompanying exhibits, filed with the Court on or about December 16, 2025.

- Plaintiffs' Subpoena to AT&T Inc., dated December 17, 2025, and AT&T's production of responsive records.

- Defendants' Petition for a Writ of Mandamus to the United States District Court for the District of Nevada, dated January 20, 2026.

- Defendants' First Supplemental Submission in connection with February 4 and 5, 2026 Hearing, along with accompanying exhibits, dated February 6, 2026.

- Defendants' Second Supplemental Submission in connection with February 4 and 5, 2026 Hearing, along with accompanying exhibits, dated February 10, 2026.

- Documents produced by Defendants in the Action including UFC-04744747-749, UFC-04745778-788, UFC-04746305-321, UFC-04754866-878, UFC-04755284-315.
- Exhibit 10 to the Plaintiffs' Motion to Modify Scheduling Order, *In re World Wrestling Entertainment, Inc. Merger Litig.*, C.A. No. 2023-1166-JTL, filed with the Delaware Chancery Court on or about November 14, 2025.
- Correspondence dated January 30, 2026 from David Axelrad, counsel for Defendants, to Plaintiffs' counsel.
- Endeavor 2023 Annual Report (10-K)