**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| Kajan Johnson, Clarence Dollaway, and Tristan Connelly, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>Zuffa, LLC, TKO Operating Company, LLC f/k/a Zuffa Parent LLC (d/b/a Ultimate Fighting Championship and UFC), and Endeavor Group Holdings, Inc.,<br><br>Defendants. | No.: 2:21-cv-01189-RFB<br><br>**JOINT STATUS REPORT** |
| Phil Davis, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Zuffa LLC, TKO Group Holdings, Inc. (d/b/a Ultimate Fighting Championship and UFC), and Endeavor Group Holdings, Inc.,<br><br>Defendants. | No.: 2:25-cv-00946-RFB |

# I. Defendants' Position

## A. Progress Regarding The Experts' Collaborative Analysis of Zuffa and TKO's Custodians' Mobile Devices

### 1. Zuffa and TKO Have Implemented The Agreed-Upon Protocol Promptly, While Plaintiffs Have Sought To Expand It

Since the October 9 Hearing, at which the Court reviewed and confirmed the parties' agreement to proceed with the Joint Forensic Protocol (the "Protocol"), ECF 817 at 7–12, Zuffa and TKO and their experts ("CRA") have moved promptly to implement it. By October 11, CRA prepared dedicated systems and had requested Plaintiffs' expert's ("Maryman") processing profiles. By October 15, CRA had copied and hashed extractions onto a dedicated workstation running Axiom, iLEAPP, ArtEx, and Cellebrite, and had proposed standing expert meetings three times weekly. CRA then produced database schemas by October 21; iLEAPP missing-ROWID reports and Axiom reports by October 27; Axiom Case Information logs documenting each extraction's available artifacts; and, on November 4, hash values, Axiom processing logs, and logs from Maryman's SMS database script. CRA is now producing DB Browser exports and redacted Axiom reports for all extractions, on the rolling basis the Protocol contemplates. Protocol ¶¶ 4, 6. CRA has also done work beyond what the Protocol requires, including re-exporting the listed SMS database tables directly to CSV in their native column structure and providing processing logs.

Plaintiffs' experts, by contrast, have not moved as quickly. Plaintiffs' experts delayed providing critical information necessary to complete their Protocol. For example, Plaintiffs' experts did not supply its iLEAPP profile until October 26, its SMS database script until October 29, or ArtEx configuration instructions until November 3, and its initial script failed whenever the "WITH_WAL" folder was empty, a defect requiring revision. Meanwhile, Plaintiffs have layered on several *additional* requests the Protocol neither requires nor contemplates, asking CRA to: (1) export every SMS database table as a "native-column" CSV, although the Protocol calls for Axiom and DB Browser exports and permits multiple output formats, Protocol ¶¶ 4, 6(b)(i); (2) expand iLEAPP processing from the message database (sms.db), which Maryman itself specified on October 20, to *every* data category the tool parses, each requiring review and redaction; (3) run iLEAPP three times per iPhone image, although the Protocol requires analysis of only two database

states, before and after pending write-ahead log ("WAL") changes are merged, *id.* ¶ 6(a); and (4) generate new deliverables, such as a WAL inventory, hashes for every file and log, and schemas for every database rather than for the ROWID gap export the Protocol specifies, *id.* ¶ 6(b)(i). Plaintiffs' experts have not explained why these additional requests, and the additional time and resources necessary to accomplish them, are necessary. Nevertheless, CRA has accommodated many of these requests, but each adds time and work to a process that must be completed within 60 days. ECF 817 at 27–28.

Plaintiffs' counsel's latest demand follows the same pattern: that their experts watch, by live screen-share, as CRA runs Maryman's SMS database script on each evidence item. The Protocol does not provide for live observation of processing, and the Court already found "no reason between the two of you to in any way question your candor . . ." ECF 816, at 85:12-17. Plaintiffs proposed real-time monitoring of "[a]ll work" only as a "[c]ontested" security term, Protocol at 5–6, and at the October 9 Hearing the Court found CRA's existing safeguards, including isolated workstations, access controls, and pre- and post-processing hash verification, sufficient. ECF 817 at 14–22. Dr. Greenfield himself wrote on October 13, in setting out the processing steps, that Maryman did "not need to watch it process." CRA has already provided the script's logs and hash values, and will continue to collaborate on script parameters and to screen-share where the experts agree it aids a particular analysis, *see id.* at 14–15. Live broadcasting of a batch script whose integrity the hash record already confirms is not provided for in the Protocol, and serves no purpose.

**2.** <u>Mr. Campbell's Former Law Firm Phone Requires Tailored Treatment</u>

Plaintiffs insist that a Samsung device (-7084) registered to the Campbell & Williams law firm which Mr. Campbell used while an attorney at the firm and briefly after joining the UFC—be processed identically to other devices. The record forecloses that demand. First, the device has already been imaged and reviewed, and Zuffa and TKO already produced all responsive, non-privileged messages. This issue is also not new. When Plaintiffs sought carrier records for this device at the March 3, 2026 status conference, Zuffa and TKO's counsel asked that it be treated "a little bit differently," "given that it was a law firm phone"; the Court responded that "makes

sense," and Plaintiffs agreed. ECF 466 at 31–32. Plaintiffs now reverse course, asserting that no privilege concern arises because they will not receive message content. But that misses the point. On a law firm phone, the metadata is itself sensitive and potentially implicates privileged information: telephone numbers, contact names, and timestamps can reveal who Campbell & Williams's clients are and when they sought counsel, among other things, which is precisely the confidential information a law firm is obligated to protect. Those privileges belong to Campbell & Williams's clients, not to TKO or Zuffa, so they are not TKO's or Zuffa's to waive.

**3.** <u>The Experts Should Also Analyze Plaintiffs' Own Extractions</u>

The Protocol should apply equally to Plaintiffs' devices in light of the widespread spoliation Plaintiffs have admitted. Mr. Johnson downloaded Signal on January 28, 2017, Mr. Dollaway on July 16, 2018, and Mr. Connelly in or around 2020; yet no Plaintiff was instructed to preserve Signal messages until June 19, 2026, and no Signal collection was attempted until August 2026. ECF 788 at 8–9, 13–14. Mr. Johnson reset his phone on April 12, 2026, losing all earlier Signal data; Mr. Dollaway has no Signal messages before December 22, 2023; and two full file system extractions of Mr. Connelly's devices have failed. *Id.* at 8–9, 18–19. Plaintiffs have also admitted to data loss from Telegram, WhatsApp, and Instagram.

While Defendants produced vendor collection reports for their custodians' devices at the Court's direction, Plaintiffs have not reciprocated. *Id.* at 6, 16–17. In addition, the Court stated that it would resolve any spoliation allegations against Plaintiffs before finalizing any remedy, and it invited Defendants to identify discovery motions warranting expedited resolution. ECF 817 at 55–56, 58–59. Defendants so identify ECF 709 and ECF 788 (both motions to compel, *inter alia*, vendor collection reports and full file system extractions for each of Plaintiffs' digital devices) and request their expedited resolution.

**B. The One-Way Intervention Rule Prevents Determination of Sanctions Prior to Class Certification**

Plaintiffs' sanctions motion should not be decided before a ruling on class certification and, if a class is certified, notice and an opportunity to opt-out. The one-way intervention rule protects defendants from a sequence in which "members of a class not yet certified can wait for the court's

ruling . . . and either opt in to a favorable ruling or avoid being bound by an unfavorable one." *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1095 (N.D. Cal. 2019) (citation omitted); *see also Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995). The rule prohibits a "heads I win, tails you lose" dynamic, whereby "[s]ideline plaintiffs can swoop in to benefit from a class representative's hard-won victory without having to share in that representative's possible defeat." *In re Parish*, 81 F.4th 403, 412 (5th Cir. 2023). The rule is not limited to final judgments; it "applies in the context of merits rulings," because such a ruling "can still affect putative class members' decisions whether or not to opt in." *Diva*, 392 F. Supp. 3d at 1095; *accord James v. Uber Techs. Inc.*, 338 F.R.D. 123, 145 (N.D. Cal. 2021); *see also Koehler v. USAA Cas. Ins. Co.*, 2019 WL 4447623, at *5 (E.D. Pa. Sept. 17, 2019) ("[t]he rule against one-way intervention is implicated whenever a plaintiff seeks a ruling on an issue relevant to the merits of the class claims."). And Rule 23's timing inquiry is not "mechanical," *Wright v. Schock*, 742 F.2d 541, 543 (9th Cir. 1984), thus a ruling's effect, not its label, controls.

If Plaintiffs seek sanctions in the form of merits rulings, including but not limited to terminating sanctions, that would create precisely the unfair "heads I win, tails you lose" dynamic foreclosed by the one-way intervention rule. *See Brown v. Hain Celestial Grp., Inc.*, 2014 WL 6483216, at *7 (N.D. Cal. Nov. 18, 2014) ("inefficient" for the Court and the parties to expend resources on adjudicating motion while absent class members "would remain free to re-litigate" the same issues in the future.)

The relief Plaintiffs previewed they will seek underscores the problem. Under Federal Rule of Civil Procedure 37(e)(2), the most severe spoliation remedies—an instruction that the jury may or must presume lost information was unfavorable, or dismissal or entry of default judgment—are by design merits-determinative. Even a sanction involving factual findings about the content or significance of allegedly lost evidence would tell absent class members how the merits are likely to come out. Such relief would be the kind of pre-certification merits ruling that the one-way intervention rule forbids. *See Wright*, 742 F.2d at 543; *Diva*, 392 F. Supp. 3d at 1095; *Koehler*, 2019 WL 4447623, at *5.

The Court should first resolve class certification so that absent class members must decide whether to be bound before learning the outcome of any merits-affecting sanctions ruling. Only then should the Court adjudicate any request for relief under Rule 37. Deferral imposes no prejudice on Plaintiffs: any remedy to which Plaintiffs may ultimately be entitled (Defendants believe the answer is none) will remain available after certification. By contrast, a premature ruling cannot be undone once absent class members have been able to watch and wait.[1]

**C. Motion for Order to Show Cause in *Davis***

On November 6, 2026, Zuffa and the TKO moved for an order requiring Plaintiff Davis to show cause why he has not complied with Rule 26(f), LR 26-1(a), Rule 26(a)(1), and the Court's September 30, 2026 substantial completion deadline. *Davis* Dkt. No. 384. Nearly a year and a half after filing suit, Plaintiff never initiated the Rule 26(f) conference, and he has not produced a single document. *Id.* at 1–2, 13. Only after receiving notice of the motion did Plaintiff serve, on November 5, initial disclosures that are a carbon copy of the *Johnson* plaintiffs' disclosures with the caption swapped. *Id.* at 1, 8–9, 15–17. And contrary to Plaintiff's repeated representations to this Court that he seeks only injunctive relief, he now apparently seeks to claim trebled damages. *Id.* But *Johnson* and *Davis* are not the same case and involve distinct classes and theories. Zuffa and TKO ask the Court to order Plaintiff to (1) show cause in writing within 14 days; (2) hold the Rule 26(f) conference within 14 days; (3) serve complete, amended disclosures within 14 days thereafter; (4) substantially complete his production within 30 days; and (5) proceed on a schedule that trails *Johnson*, running from his full compliance. *Id.* at 19.

**D. Interrogatory Limits**

At August 6, 2026 status conference, the Court directed the Parties to submit competing proposals regarding the number of, and how to count, interrogatories, and the Parties filed those proposals on August 13, 2026. ECF 724. Defendants respectfully submit that the Court should adopt Defendants' proposal and reject Plaintiffs' approach.

---

[1] Defendants raise this objection now, before Plaintiffs' spoliation motion has been filed, so that the Court can set an appropriate schedule, and Defendants expressly preserve the objection as to any merits-affecting relief Plaintiffs may seek.

## II. Plaintiffs' Position

On October 9, the Court reviewed the forensic protocol that the parties submitted (the "Protocol") item by item with both experts and directed that the agreed analyses "will be done." ECF No. 817 ("Oct. 9 Tr.") at 7:2–13:7.[2] The Court instructed Defendants' examiners at "CRA" that "everything has to be run here, unless you hear from the plaintiff or plaintiffs' counsel that it doesn't need to be run," because "the plaintiffs doesn't have the information." *Id.* at 13:3–10. Under the Protocol, Plaintiffs' examiners at "Maryman" supply the instructions, CRA runs them against the extractions, and CRA produces the non-content outputs to Maryman. Protocol ¶¶ 1–4, 6. The Court ordered the experts' joint analysis completed within 45 days. ECF No. 833.

The examiners have met three times a week since mid-October, with several issues arising. The parties have been able to resolve some, but not all, and the delays have been mounting. For example, all of the SMS.db tables (without message content) are a required portion of this process. Yet, CRA withheld the required output until October 27, 2026, at which point Maryman realized the produced records were not what was required nor what was demonstrated as available by CRA on an October 19 call. When asked, CRA responded that it thought the outputs were sufficient and needed to confer with counsel before producing anything else. Defendants agreed to provide the output only after Plaintiffs' counsel intervened in writing on November 3, 2026. CRA also balked at the use of ArtEx, which was discussed on October 19, 2026 and written into the protocol. Only upon Plaintiffs' counsel's written intervention did Defendants agree to implement it.

Despite those efforts to resolve disputes (notwithstanding the associated delay), progress has been slower than anticipated,[3] and Defendants have refused to participate in required processes

---

[2] On November 8, 2026, Defendants notified Plaintiffs that they intended to address the one-way intervention rule, their Motion to Show Cause in *Davis,* and interrogatory limits in their section of the Joint Status Report. Plaintiffs believe these topics are outside the scope of the Court's direction to limit the report to a "joint presentation of disputed issues" regarding the implementation of the Protocol. *See* Oct. 9, 2026 Hr'g Tr. at 36:18-22; Minutes of Proceedings at 1, ECF No. 833 ("The Parties shall submit a Joint Status Report to the court by November 9, 2026, regarding disputed issues that need to be resolved.").

[3] Dr. Greenfield's work plan aimed to complete a set of processing steps for every evidence item by this mid-November status conference. That has not happened. Some of that delay is due to the structure of this process that deprives Maryman of the ability to have direct access to extractions for purposes of testing scripts and processes to ensure that they run properly; because only CRA

and to include a required device. Two disputes require the Court's resolution. Defendants have withheld one of Hunter Campbell's devices from the process entirely (Section I), and have also refused to let Plaintiffs' examiners observe CRA's runs of Maryman's scripts, which is the virtual verification process described at the October 9 hearing (Section II).[4]

**I. Defendants Must Process Hunter Campbell's Samsung Galaxy S20 (-7084)**

Plaintiffs' July 23, 2026 proposal identified Mr. Campbell's Samsung Galaxy S20 5G as one of the devices the forensic process would cover. ECF No. 712-4 at 2. Defendants have produced a Collection Report confirming that Holo performed a full file system extraction of this device on February 12, 2026. But Defendants refuse to include the device in this process and have not even given CRA access to it. Plaintiffs had asked Defendants to confirm in writing by November 2: (1) whether the extraction is in Defendants' possession, custody, or control, and where it is held; (2) if it cannot be located, how and when it was lost, and whether Defendants still have the device and are re-extracting it; and (3) the date by which it will be produced. Defendants answered none of these questions, and now say that "the issue is not one of logistics," despite the representations on multiple of the examiners' collaboration calls. Instead, Defendants now say the S20 "is a device registered to the Campbell & Williams law firm that Mr. Campbell used during and ***after*** his time at the firm," and that "disclosure of even metadata from the device implicates serious privilege and confidentiality concerns." (Emphasis added.) Defendants also confirm that "the device was imaged, Campbell & Williams reviewed it, and Zuffa/TKO produced responsive messages from it." They say they will raise the issue with the Court if Plaintiffs insist that the device be treated like every other device. *Id.* For the reasons below, further conferral would be futile, and the Court's intervention is required.

**First, the Court ordered that everything be run, and the S20 is within the agreed**

---

can access the extractions, every adjustment instead requires another round of correspondence and another CRA run.

[4] To the extent Defendants try to shoehorn their misguided spoliation allegations against Plaintiffs into this process, the Court has already foreclosed this argument, noting that any allegations of spoliation against the named Plaintiffs are on a different track. Oct. 9, 2026 Hr'g Tr. at 55:8-25 ("Well, it's a separate request for sanctions, and I will certainly, obviously, consider that. The timing of that occurred separately. So the scheduling for that occurred much later, and it's brought to my attention much later than this initial spoliation. As far as I'm concerned, they're not related.")

**scope.** The S20 has been on Plaintiffs' device list since July 23. ECF No. 712-4 at 2. Defendants raised no objection to the device in response to that proposal, in the parties' September briefing, or in negotiating the Protocol, and they did not raise it at the October hearing. Defendants' brief described the process as covering "extractions of 23 of Defendants' custodians' mobile devices." ECF No. 801 at 13. The S20 is one of those 23 devices. The Protocol carves out no device and has a mechanism for raising disputes with the Court. Protocol ¶¶ 5, 6.m. Defendants did not use it. The Court directed that "everything has to be run" unless *Plaintiffs* say otherwise, because they lack access to the data. Oct. 9 Tr. 13:3–10. Defendants cannot invert that instruction by leaving a device off CRA's evidence list. Defendants' only basis for treating the S20 differently is a March 3 exchange that precedes the Court's Order and directions to the parties.

**Second, the March 3 hearing Defendants cite does not support withholding the device.** Defendants rely on remarks their counsel made at the March 3, 2026 status conference. That exchange was not about forensic analysis of the device. It was about whether Defendants would consent to the carrier releasing call and text records for the old "84" number. Mar. 3 Tr. 31:16–32:13. In the same hearing, discussing carrier records generally, the Court observed that "much of this is not content information," and that "I'm not sure that that's necessarily privileged because it doesn't sound like it's content." *Id.* at 28:17–20. Nothing at that hearing suggested the device would be excluded from forensic analysis, nor has anything at any hearing since suggested that this device would be excluded from a non-content analysis like the one at issue.

**Third, the Protocol already protects privilege.** At this stage Plaintiffs receive only non-content outputs. CRA screens every processing step for anything that "may possibly reveal any communications content" and hides that content before proceeding. Protocol ¶¶ 2–4. Plaintiffs get message content only through targeted requests. Defendants' counsel reviews that content for privilege and logs any withholding before production, and disputes come to the Court. *Id.* ¶ 5. That is how the Protocol treats every device, including those whose users exchanged privileged messages with counsel. Thus, Defendants' stated privilege concerns are moot.

Plaintiffs respectfully request that the Court order Defendants to immediately comply with the already ordered process and include the Galaxy S20 for Campbell's -84 number in the process.

**II. CRA Should Run Maryman's Scripts by Screenshare and Provide the Processing Logs**

Maryman wrote custom scripts to process each SMS database. Plaintiffs asked that Maryman's team observe each run over Teams so it can capture screen recordings of the processing log and hash of those logs. The logs record the hash values for every output file. Plaintiffs also asked that CRA send the complete log as soon as each evidence item finishes processing. CRA has stated that it is fine with doing so, but Defendants' counsel has expressly directed CRA both on the calls and in correspondence not to screenshare any of the processing. No party has stated concerns about such screensharing revealing any message content. Notwithstanding that, Defendants assert "CRA will not run the script by live screenshare." *Id.* They offer "hash values and documentation" of CRA's choosing in its place. *Id.* Defendants' counsel's obstruction is inappropriate and conflicts with the Court-Ordered process.

**First, the Court endorsed screensharing to verify CRA's work.** The Court asked how Plaintiffs could "ensure that they have reliability as relates to these procedures." Oct. 9 Tr. 13:14–17. Mr. Hart answered that "doing this over screen share remotely is . . . the most efficient manner," with tools such as DB Browser and ArtEx "queued up" for Maryman during scheduled sessions. *Id.* at 14:8–11, 15:5–12. The Court responded: "it'd be nice to be able to do a screen share for some of it, and it sounds like that's what you're going to do." *Id.* at 15:23–16:1. On that understanding, the Court found CRA's lab security sufficient without the room monitoring Plaintiffs had proposed. *Id.* at 20:18–22:16. The Court explained: "What I heard is that Mr. Hart's going to explain the steps and go over them with Dr. Greenfield, and that they can be verified, and that Dr. Greenfield can verify that when they're going through it virtually." *Id.* at 23:9–12.

Dr. Greenfield then asked the precise question now in dispute: whether Maryman would "still be able to do the live recorded screen session when the commands are being set up, when the processing is being set up and then the screen is disabled, and then it's back online when the review is done." *Id.* at 24:7–12. Mr. Hart answered, "I wouldn't see an issue with that," and said CRA would "make an exception to do those scheduled meetings and screen shares." *Id.* at 24:25–25:3. Dr. Greenfield confirmed that he wanted "to see the beginning, the middle, and the end for this process." The Court responded, "It sounds like you will be able to do that." *Id.* at 25:23–26:1.

**Second, the Protocol itself contemplates screensharing.** Defendants said in meet and confer correspondence that "[t]he Protocol does not provide for live observation." In fact, the Protocol's content-protection procedure expressly provides for the experts to "turn off the display or for CRA to discontinue their screen-share" while content is hidden, and then "proceed." Protocol ¶ 3.c. The Protocol also leaves processing methods to Maryman's instructions and lets the examiners adjust tools and processes as the project requires. *Id.* ¶¶ 1.c, 6. The Court likewise told the experts that the Protocol is "a guideline" and that they may "add" to it in collaboration. Oct. 9 Tr. 12:17–13:2.

**Third, Plaintiffs conditioned exclusive processing by Defendants on integrity protections.** Plaintiffs agreed to let Defendants "exclusively perform all the processes" only "in exchange for" integrity and security protections. Those protections included real-time monitoring of the work and delivery of results "as generated." Protocol at 5, ¶¶ b, i. Defendants objected that those measures would "elongate the process" and impose cost. *Id.* at 5. At the hearing, the Court resolved that dispute by relying on CRA's lab controls together with virtual verification of the work. Oct. 9 Tr. 20:18–26:1. Defendants cannot now take away the verification resolution.

**Fourth, observation is an efficient way to run scripts on data only CRA can access and reduces the likelihood of disputes or undetected errors.** Maryman's methodology requires that any script be validated against known results and that the validation be documented. Watching the runs would let Maryman diagnose and fix problems like this on the spot. Without it, each one takes another round of emails and another CRA run. Observation would also settle any later dispute over who caused a delay.

**Fifth, Defendants told the Court Plaintiffs would be able to verify the process.** In advocating their own approach, Defendants told the Court that Plaintiffs would receive "the information necessary to confirm what was searched, how it was searched, and what the search returned." ECF No. 801 at 18. Plaintiffs' request is the verification of what was searched, how it was searched, and what the search returned. Observation would not put privileged material at risk as no content is revealed in this process.

Respectfully Submitted,

Dated: November 9, 2026

By: _s/ Michael Dell'Angelo_

Eric L. Cramer (*Pro hac vice*)
Michael Dell'Angelo (*Pro hac vice*)
Patrick F. Madden (*Pro hac vice*)
Dennie Zastrow (*Pro hac vice*)
BERGER MONTAGUE PC
1818 Market St., Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Email: ecramer@bergermontague.com
Email: mdellangelo@bergermontague.com
Email: pmadden@bergermontague.com
Email: dzastrow@bergermontague.com

Joshua P. Davis (*Pro Hac Vice*)
Robert C. Maysey (*Pro Hac Vice*)
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Phone: (415) 215-0962
jdavis@bergermontague.com
rmaysey@bergermontague.com
*Counsel for Plaintiffs and the Proposed Classes*

Benjamin D. Brown (*Pro Hac Vice*)
Richard A. Koffman (*Pro Hac Vice*)
Daniel H. Silverman (*Pro Hac Vice*)
Daniel Gifford (*Pro Hac Vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave., N.W., Suite 500
Washington, DC 20005
Phone: (202) 408-4600/Fax: (202) 408 4699
Email: bbrown@cohenmilstein.com
Email: rkoffman@cohenmilstein.com
Email: dsilverman@cohenmilstein.com
Email: dgfford@cohenmilstein.com

Joseph R. Saveri (*Pro hac vice*)
Christopher Young (*Pro hac vice*)
Kevin E. Rayhill (*Pro hac vice*)
Itak Moradi (*Pro hac vice*)
SAVERI LAW FIRM, LLP
550 California St., Suite 910
San Francisco, CA 94104
Telephone: +1 (415) 500-6800
Facsimile: +1 (415) 395-9940
Email: jsaveri@saverilawfirm.com

By: _s/ Christopher S. Yates_

CHRISTOPHER S. YATES (*Pro hac vice*)
chris.yates@lw.com
AARON T. CHIU (*Pro hac vice*)
aaron.chiu@lw.com
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Tel: (415) 391-0600

SEAN M. BERKOWITZ *(Pro hac vice)*
sean.berkowitz@lw.com
LATHAM & WATKINS LLP
330 North Wabash Ave, Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700

LAURA WASHINGTON (*Pro hac vice*)
laura.washington@lw.com
JOSEPH AXELRAD (*Pro hac vice*)
joseph.axelrad@lw.com
DANIELLE LENECK (*Pro hac vice*)
danielle.leneck@lw.com
LATHAM & WATKINS LLP
10250 Constellation Blvd, Suite 1100
Los Angeles, CA 90067
Tel: (424) 653-5500

DAVID L. JOHNSON (*Pro hac vice*)
david.johnson@lw.com
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-1061

WILLIAM A. ISAACSON (*Pro hac vice*)
wisaacson@dirllp.com
JESSICA PHILLIPS (*Pro hac vice*)
jphillips@dirllp.com
AGBEKO PETTY (*Pro hac vice*)
apetty@dirllp.com
BENJAMIN J. CABRANES (*Pro hac vice*)
bcabranes@dirllp.com
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
Tel: (202) 240-2900

YOTAM BARKAI (*Pro hac vice*)
ybarkai@dirllp.com
MATTHEW D. KAMINER (*Pro hac vice*)
mkaminer@dirllp.com

Email: krayhill@saverilawfirm.com
Email: cyoung@saverilawfirm.com
Email: imoradi@saverilawfirm.com

W. Joseph Bruckner (*Pro hac vice*)
Brian D. Clark (*Pro hac vice*)
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave S, Suite 2200
Minneapolis, MN 55401
Phone: (612) 596-4001
Email: wjbruckner@locklaw.com
Email: bdclark@locklaw.com

Kyle J. Pozan (*Pro hac vice*)
LOCKRIDGE GRINDAL NAUEN PLLP
1165 N. Clark Street, Ste. 700
Chicago, IL 60610
Phone: (612) 339-6900
Email: kjpozan@locklaw.com
*Additional Counsel for Plaintiffs and the Proposed Classes*

Michael J. Gayan
CLAGGETT & SYKES
4101 Meadows Lane, Suite 100
Las Vegas, NV 89107
Tel: (702) 333-7777
Email: mike@claggettlaw.com

*Liaison Counsel for Plaintiffs and the Proposed Classes*

DUNN ISAACSON RHEE LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 389-9704

SAMUEL R. MIRKOVICH (No. 11662)
srm@cwlawlv.com
PHILIP R. ERWIN (No. 11563)
pre@cwlawlv.com
CAMPBELL & WILLIAMS
710 South 7th Street, Ste. A
Las Vegas, NV 89101
Tel: (702) 382-5222

*Attorneys for Defendants Zuffa, LLC and TKO Operating Company, LLC*

MAAREN A. SHAH *(Pro hac vice)*
maarenshah@quinnemanuel.com
ELLISON W. MERKEL*(Pro hac vice)*
ellisonmerkel@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
295 Fifth Avenue, 9th Floor
New York, New York 10016
Tel: (212) 849-7000

KRISTIN N. TAHLER *(Pro hac vice)*
kristintahler@quinnemanuel.com
WILLIAM R. SEARS *(Pro hac vice)*
will.sears@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Tel: (213) 443-3000

*Attorneys for Defendant Endeavor Group Holdings, Inc.*